**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

_____
                                                    :
**iGAMES ENTERTAINMENT, INC.,**                     :
                                                    :
            Plaintiff,                              :
                                                    :
            v.                                      :        C.A. No. 04-180-KAJ
                                                    :
**CHEX SERVICES, INC.** and                         :        JURY TRIAL DEMANDED
**EQUITEX, INC.,**                                  :
                                                    :
            Defendants.                             :
_____:

**OPENING BRIEF IN SUPPORT OF MOTION BY
IGAMES ENTERTAINMENT, INC. FOR SUMMARY JUDGMENT
AGAINST CHEX SERVICES, INC. AND EQUITEX, INC.**

DATED:        March 15, 2005              **DUANE MORRIS LLP**
                                          Thomas P. McGonigle (Del. I.D. No. 3162)
                                          Matt Neiderman (Del. I.D. No. 4018)
                                          1100 North Market Street, 12th Floor
**OF COUNSEL:**                           Wilmington, Delaware  19801
**DUANE MORRIS LLP**                      302.657.4900
Matthew A. Taylor, Esquire
James L. Beausoleil, Jr., Esquire
One Liberty Place
Philadelphia, Pennsylvania 19103-7396     Attorneys for Plaintiff
215.979.1000                              iGames Entertainment, Inc.

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ...................................................................................... iii

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................1

NATURE AND STAGE OF PROCEEDING ..............................................................2

FACTUAL BACKGROUND ......................................................................................3

I.    The Stock Purchase Agreement And Prior Joint Ventures Of The Parties.........................3

II.   Chex And Equitex Depart From The Ordinary Course Of Business By Accepting A Note In Return For The Largest Sum Of Returned Checks Ever Incurred In Chex's History Of Operations And Then Booking That Note, As A Collectible In Violation Of Its Own Operating Procedures........................................6

III.  Chex Lost 25% Of Its Revenues In An Embarrassing Forced Eviction From Five Seminole Casinos That Nearly Destroyed Its Reputation And Ability To Conduct Business In Native American Casinos ..............................................7

IV.   Chex And Equitex Agree To Assist iGames With Financing For Its Acquisition Of Available Money In Exchange For A 50% Share Of Available Money's Operating Income But Then Chex And Equitex Breached The Financing Agreement...............................................9

V.    Chex Secretly Solicits A Joint Venture With A Venture Capitalist Known As Maroon Bells Capital Which Entices Chex And Equitex Away From The Planned Merger With iGames, Provides Them With A Shell Company, And Then Oversees A Reverse Merger Of Chex Into That Shell Company ......................................11

VI.   Equitex And Chex Secretly Close On A $5,000,000 Loan Which Requires Them To Pledge All Of The Common Stock, Of Chex, Grant Warrants, Take On Significant Liability And Indemnification Obligations, And Prohibits Them From Closing On The SPA.............................................14

LEGAL ARGUMENT..............................................................................................18

I.    The Standards Governing This Motion For Summary Judgment......................................18

II.   Defendants Breached The SPA By Converting The Howards' Debt To A Note And Misrepresenting That Bad Debt As A Valid Account Receivable.............................19

      A.    The Defendants Breached The SPA Because Chex's Transactions With The Howards Were Not In The Ordinary Course Of Business .............................20

i

B.    The Defendants Breached The SPA Because Chex's Transactions With The Howards Could Reasonably Have Been Expected To Have A Material Adverse Effect On Chex .........................................................................24

III.    Defendants Breached The SPA By Losing Nearly A Quarter Of Chex's Business ..........25

IV.    Defendants Breached The SPA By Entering The Whitebox Purchase Agreement Which Made It Impossible For Defendants To Close On The SPA .................................29

V.    Defendants Breached The SPA By Soliciting Other Investors In Search Of A Better Deal And By Agreeing To The Seven Ventures Transaction .................................33

VI.    Chex's Purported Termination Of The SPA Was Ineffective As A Matter Of Law .........37

VII.    The Defendants Are Liable For The Termination Amount Not Only Because They Breached The SPA On Several Grounds But Also Because They Failed To Close On The SPA And Instead Chose To Close On The Seven Ventures Transaction.............38

CONCLUSION.................................................................................................................40

## TABLE OF AUTHORITIES

**FEDERAL CASES**                                                                       **PAGE**

*Allegheny Energy Inc. v. DQE, Inc.*,
    74 F. Supp. 2d 482 (W.D. Pa. 1999)...............................................................................25

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)...............................................................................19

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)...............................................................................18

*Chemipal Ltd. v. Slim-Fast Nutritional Foods Int'l*,
    350 F. Supp. 2d 582 (D. Del. 2004)...............................................................................18

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)...............................................................................18, 19

*Pan Am Corp. v. Delta Air Lines, Inc.*,
    175 B.R. 438 (S.D.N.Y. 1994)...............................................................................29

**STATE CASES**

*H-M Wexford LLC v. Ballentine*,
    832 A.2d 129, 143 (Del. Ch. 2003)...............................................................................28

*Hudson v. D&V Mason Contractors, Inc.*,
    252 A.2d 166 (Del. Ch. 1969)...............................................................................37

*Kysor Indus. Corp. v. Margaux, Inc.*,
    674 A.2d 889 (Del. Super. 1996)...............................................................................39

## INTRODUCTION AND SUMMARY OF ARGUMENT

This case arises from a failed business merger involving Equitex, Inc. ("Equitex"), its wholly-owned subsidiary Chex Services, Inc. d/b/a Fastfunds ("Chex"), and iGames Entertainment, Inc. ("iGames").

Chex, Equitex, and iGames were parties to a Stock Purchase Agreement, entered into on November 3, 2003 (the "SPA") whereby iGames sought to acquire Chex. Discovery has revealed that while iGames was spending valuable time and money attempting in good faith to acquire Chex, Chex and Equitex secretly negotiated to sell Chex's stock to a third party, in violation of the SPA, and then to complete a reverse merger with a NASDAQ shell company, also in violation of the SPA. In fact, Chex and Equitex secretly closed on a financing agreement that was a prerequisite to the reverse merger on March 8, 2004 -- just four days before Chex and Equitex purported to terminate the SPA.

However, as detailed below, the defendants breached the SPA long before they purported to terminate it by: (1) advancing the extraordinary sum of over $606,000 in cash to a single customer in exchange for dozens of checks that were immediately returned "NSF" (*i.e.*, insufficient funds) and then doctoring their books in an effort to enhance their balance sheet by accepting a note from that customer in violation of their own operating procedures; (2) being thrown out of five casinos which together accounted for 25% of Chex's overall revenue; (3) entering into an unauthorized $5,000,000 loan transaction which created irreconcilable and fundamental breaches of the SPA; and (4) soliciting, negotiating and ultimately entering into an alternative deal to the SPA.

1

## NATURE AND STAGE OF THE PROCEEDING

On March 15, 2004, Chex filed a Complaint in Minnesota state court (the "Minnesota Action"). That action was removed and transferred to this District.

On March 24, 2004, iGames filed a Complaint in this Court against Equitex and its wholly-owned subsidiary Chex. iGames subsequently filed a First Amended Complaint (the "Delaware Federal Complaint").

On March 23, 2004, Equitex filed an action in Delaware state court concerning the same SPA at issue in the Delaware Federal Complaint (the "Delaware State Complaint"). iGames removed that action to the United States District Court for the District of Delaware. This Court issued an Order on September 13, 2004 consolidating the three separate actions after all parties agreed that they have the same operative facts and involve essentially the same parties.

All fact and expert discovery closed on March 1, 2005. Contemporaneously herewith, iGames filed a Motion for Summary Judgment, seeking judgment in its favor and against the Defendants on all claims. This is iGames' Opening Brief in support of its Motion for Summary Judgment.

## FACTUAL BACKGROUND

### I.     The Stock Purchase Agreement And Prior Joint Ventures Of The Parties

This case arises from a failed business merger involving Equitex, its wholly-owned subsidiary Chex, and iGames.[1]  At the time of filing, iGames was in the business of providing cash access and financial management systems for the gaming industry and focused on specialty transactions in the cash access segment of the funds transfer industry through its subsidiaries, Money Centers of America, Inc. and Available Money, Inc.  Defendant Chex provides the similar services for the gaming industry.

Chex, Equitex, and iGames entered into the SPA on November 3, 2003, whereby iGames agreed to acquire Chex through a purchase of its capital stock.[2]  Long before the parties entered into the SPA, Chex and iGames were involved in various joint ventures whereby they shared office space, employees, information and financial resources.[3]  (*See*, *e.g.*, Deposition of Ijaz Anwar ("Anwar Tr.") Vol. I, at 73:3-76:12).  In fact, the November 3, 2003 SPA represented the second attempt by iGames to acquire Chex.

In executing the SPA, Equitex represented that it owned all shares of Chex "free and clear of any restrictions on transfer (other than any restrictions under the Securities Act or applicable state securities laws), Taxes, Encumbrances, Security Interests, options, warrants,

---

[1]     Subsequent to the filing of the Complaint, iGames was merged into Money Centers of America, Inc., which continues in the same business.  The corporate structure now is Money Centers of America, Inc. ("MCA"), a Delaware corporation, that owns 100% of Available Money, Inc. ("Available Money").  iGames, the Nevada corporation, no longer exists.  For the sake of simplicity, we continue to refer to iGames as the plaintiff in these consolidated actions.

[2]     A true and correct copy of the November 3, 2003 SPA is attached to the accompanying Appendix as Exhibit "A."

[3]     Copies of relevant portions of the deposition transcripts of Ijaz Anwar and Christopher Wolfington are attached as Exhibits "B" and "C" to the accompanying Appendix, respectively.

purchase rights, contracts, commitments, equities, claims and demands." (SPA, § 4(d)). Equitex further represented that it had "full power and authority to execute and deliver" the SPA, subject only to the final approval of its shareholders. Final approval would have required Equitex's shareholders to vote on the acquisition, but only after closing:

> On the Closing Date, this Agreement shall be duly and validly authorized by all necessary action on the part of Parent and its stockholders in accordance with Applicable Laws and Parent's Governing Documents. *This Agreement constitutes the valid and legally binding obligation of Parent, enforceable in accordance with its terms and conditions.* . . . The affirmative approval of the Board of Directors of Parent (the "**Parent Board**") and of the holders of shares of Parent's issued and outstanding capital stock entitled to vote thereon representing a majority of the votes that may be cast by the holders of such securities as of the record date for the Company (the "**Parent Requisite Vote**") is the only vote of the holders of any class or series of capital stock of the Company necessary to approve the Contemplated Transactions.

(SPA, § 4(b) (italics added, bold in the original)).

There can be no doubt that the SPA was and is binding on Equitex and Chex. Indeed, the enforceability of the SPA was asserted by Equitex in the Delaware State Complaint and was also conceded by Ijaz Anwar (the Chief Financial Officer of Chex) and Henry Fong (the CEO of Equitex) during their depositions. (*See* Anwar Tr., Vol. II, at 238:21 - 239:4 (Q: Do you believe that the stock purchase agreement, November 3, 2003 agreement was still binding, was still the binding document between iGames, Chex and Equitex when you terminated it? A: Yes. It was the only binding agreement.); *see also* the Delaware State Complaint (Appendix Exhibit "E") (alleging breach of SPA and claiming damages thereunder)). This binding agreement included a number of important representations and warranties by Equitex and Chex that are particularly important in this litigation.

In Section 6(n) of the SPA, Equitex and Chex represented and warranted, among other things, that Chex fully complied with all material terms of its contracts (including service

4

contracts with casinos) and that no other party to a contract was terminating, intended to terminate or was considering terminating any contract. Chex and Equitex further represented and warranted that they had received no notice (oral or written) of any such termination or plans to terminate.

The SPA was structured so that on closing, iGames would "pay to [Equitex] consideration of that amount of shares of Buyer Common Stock which equals 62.5% of the issued and outstanding shares of Buyer following such issuance on the Closing Date after giving effect to the Stock Split and closing of the MCA Acquisition (the "Common Stock Consideration")."[4]  After closing, Equitex intended to retain ownership of 10% of the Common Stock it received from iGames and to distribute the balance of the Common Stock to its stockholders on a pro rata basis as a dividend.  (SPA, § 2(b)).  The contemplated distribution qualified as a public offering and therefore was "conditioned on the effectiveness of a Registration Statement under the Securities Act registering the issuance of the distributed shares of Buyer Common Stock."  (SPA, § 2(b)).  The SPA also contemplated fluctuations in iGames' stock price and provided for an adjustment in the amount of iGames' stock.  (SPA, § 2(b)).

iGames had the right to terminate the SPA and to collect a Termination Fee for various identified acts or omissions which could either be the result of purposeful conduct or of the mere occurrence of an event.  For example, iGames could terminate the SPA if any representation or warranty of Equitex or Chex was or became materially inaccurate or if Equitex or Chex failed to comply with their material obligations under the SPA.  (SPA, §§11(b)(ii), 11(b)(v)).  iGames could also terminate the SPA upon the occurrence of any event that was likely to have a Material

---

[4]    iGames was required to, and did, effect a stock split, such that its outstanding shares at the time of closing would total 40,000,000.  (SPA, § 1(pppp)).

Adverse Effect on Chex. (SPA, §11(b)(viii)). Upon any such termination, Section 11(e)(ii) of the SPA obligated Equitex and Chex to pay all of iGames' expenses incurred in connection with the proposed transaction, together with a termination fee of $1,000,000 (the "Termination Amount").

II.    **Chex And Equitex Depart From The Ordinary Course Of Business By Accepting A Note In Return For The Largest Sum Of Returned Checks Ever Incurred In Chex's History Of Operations And Then Booking That Note As A Collectible In Violation Of Its Own Operating Procedures**

In January 2004, while performing its due diligence review of Equitex's Quarterly Report on SEC Form 10-Q for the quarter ending September 30, 2003 (the "10-Q"), iGames discovered that in September 2003, Chex cashed $606,316 worth of bad checks for a single customer. This sum far surpassed the amount of checks ever written by one customer to Chex. In fact, the loss Chex suffered as a result of this one customer, over one holiday weekend, was greater than the losses Chex suffered for the entire preceding year, for all of the bad checks written by all of Chex's customers. (Anwar Deposition Exhibit ("Anwar Ex.") 11 (Appendix Exhibit "F")). Importantly, the normal course of business for Chex would have been to immediately write off each of these numerous bad checks. (*See* Anwar Tr., Vol. I, at 117:12-121:13; 149:22-150:10; SEC Form 10-Q, for the quarter ended September 30, 2004 (Appendix Exhibit "G") at page 34, "Returned Checks"). However, in an apparent effort to improve its financial statements, the dishonored checks remained on Chex's books as a valid accounts receivable until after the SPA was executed. Not surprisingly, the debt remains outstanding today.

These actions violated the SPA. First, in Section 6(o) of the SPA, Equitex and Chex represented and warranted, among other things, that all Accounts Receivable (defined as "trade accounts receivable, notes receivable and other rights to the payment of money, including any claim, remedy or other right related to any returned and unpaid checks") were current and

collectible net of the reserves set forth on the applicable balance sheets (which reserves were to be adequate and calculated in accordance with past practice and would not represent a Material Adverse Effect in terms of aging), and each Account Receivable would be collected in full, without any setoff, within 90 days of the day on which it first became due and payable. Importantly, Chex did not reserve for the likelihood of nonpayment on its September 30, 2003 balance sheet in accordance with normal procedures (which would have materially adversely affected its earnings for the quarter then ended), but rather had the customer execute a note for the amount due (the "Howard Note"). Thus, iGames learned through discovery that the Howard Note was in default as of October 14, 2003, and yet it remained on Chex's balance sheet and in its SEC filings as a note receivable in the full amount, without any reserve. As a result of these maneuvers, Chex's financial statements for the quarter ending September 30, 2003, were materially false.

Second, in Section 6(f) of the SPA, Equitex and Chex represented and warranted that, after June 30, 2003, there was not with respect to Chex, among other things, any action, transaction or agreement outside the Ordinary Course of Business, any loan to any person in excess of $10,000.00 and outside the Ordinary Course of Business, any compromise of any claims or, any other event or circumstance that could reasonably be expected to have a Material Adverse Effect on Chex. In short, Equitex and Chex violated each of these provisions by taking the Howard Note.

III.    **Chex Lost 25% Of Its Revenues In An Embarrassing Forced Eviction From Five Seminole Casinos That Nearly Destroyed Its Reputation And Ability To Conduct Business In Native American Casinos**

Under Section 9(a) of the SPA, iGames was not obligated to close on the acquisition of Chex unless, among other things, (i) all representations and warranties of Chex and Equitex, including those in Section 6, were true and correct as of the Closing Date, and (ii) there had been

no "Material Adverse Effect" on the business of Chex.  Section 1(iii) of the SPA defines "Material Adverse Effect" as "any event, change or effect that is materially adverse, individually or in the aggregate, to the condition (financial or otherwise), properties, assets, liabilities, revenues, income, business, operations, results of operations or prospects of such Person, taken as a whole."  Obviously, this section expressly contemplates the potential loss of significant revenue and its impact on the desirability of closing on the merger.

By way of background, on December 4, 2001, Native American Cash Systems Florida, Inc. ("NACSF") and Chex entered into agreements under which Chex agreed to perform financial services for five Seminole Tribe casinos.  (Plaintiff Chex Services, Inc.'s Second Amended Complaint, State of Minnesota, County of Hennepin, District Court, Fourth Judicial District (CX/EX 00594) ("NACSF Compl.") (Appendix Exhibit "H"), at ¶ 22.  At the time the SPA was executed, these five contracts were responsible for approximately 25% of Chex's revenue.  (Deposition of James Welbourn "Welbourn Tr."), at 165:2-7 (Appendix Exhibit "I")).  However, unbeknownst to iGames, Chex was experiencing significant problems in its relationship with NACSF, both prior to and after Chex executed the SPA.  (NACSF Compl. at ¶33).

As a result of certain breaches alleged by NACSF, at midnight on January 4, 2004, with only two days notice, NACSF "removed" Chex from the cash services booth and replaced it with a competitor (*i.e.*, Cash Systems, Inc.).  (NACSF Complaint, at ¶¶ 34-35).  The termination of the Seminole contracts affected, among other things, Chex's revenues, income, results of operations and prospects.  (Anwar Tr., Vol. I, at 104:14-20).  Indeed, the termination caused an instantaneous loss of 25% of Chex's revenue (Welbourn Tr., at 165:2-7) and significantly harmed its reputation.  In their own words, the "Seminole casinos constitute [sic] a significant

portion of Chex's revenue and provided Chex with unique relationships for establishing connections and business relationships with other Native American owned casinos. . . .  The actions of NACSF also will undoubtedly damage Chex's reputation within the Native American gaming community."  (NACSF Compl., at ¶¶37-38).

Chex immediately recognized the seriousness of this loss and the impact it would have on its relationship with iGames.  (Supplemental Affidavit of James P. Welbourn in Support of Plaintiff's Application for a Temporary Restraining Order and for Expedited Discovery ("Welbourn Aff."), Exhibit 19 to Deposition of James Welbourn, ¶¶12-14, (Appendix Exhibit "J")).  As Mr. Welbourn, the President and founder of Chex stated under oath during the related injunction proceeding, "As the January 7, 2004 letter (Welbourn Aff., Ex. N) from iGames' attorneys suggests, the termination of the NACSF Contract may give iGames cause to terminate the acquisition agreement and negotiations.  Thus, the threat of iGames pulling out of the acquisition remains and immeasurably affects the bargaining position of Chex."  (*Id.* ¶14).

For its part, iGames publicly attempted to support Chex after its high profile loss of the Seminole contracts by issuing a joint press release with Equitex.  However, while iGames proceeded with the SPA, it reserved its rights under the SPA, in writing, because of this Material Adverse Effect on Chex's business.

## IV.    Chex And Equitex Agree To Assist iGames With Financing For Its Acquisition Of Available Money In Exchange For A 50% Share Of Available Money's Operating Income But Then Chex And Equitex Breached The Financing Agreement

After the parties executed the SPA, iGames learned of an opportunity to acquire Available Money, Inc. ("Available Money").  Available Money is in the same business as iGames, and all parties to the SPA believed that acquiring Available Money would strengthen the entity that would result from the SPA, thereby benefiting all parties to the SPA.  Chex and Equitex agreed that Chex would provide iGames $4,000,000 of the purchase price to facilitate

the acquisition.  At the time, Chex had $2,000,000 available to it and represented that it would borrow, on terms approved by iGames, the second payment of $2,000,000.  On January 6, 2004, Chex advanced $2,000,000 to iGames, the amount needed to make the initial closing date payment for the acquisition of Available Money.  iGames thereafter executed a Term Loan Note in favor of Chex dated January 6, 2004.[5]

The Term Loan Note provided for, and was conditioned on, a second advance by Chex to iGames in the amount of $2,000,000 which was to be made sixty days after the first payment (*i.e.*, on or about March 6, 2004).  According to the Term Loan Note, Chex had twenty-one days to obtain a binding commitment for financing sufficient to fund the second $2,000,000 installment.  This binding commitment was to contain terms satisfactory to iGames and was to come from either Mercantile or from another institutional lender satisfactory to iGames.  (*See* Term Loan Note, at ¶ 2).  The second payment was to be made to iGames on or before March 6, 2004.  (*Id.*).

Unfortunately, shortly after Chex advanced the first payment, and before it could obtain a loan from Mercantile for the second payment, Chex began discussions with a venture capital firm that convinced Chex and/or Equitex that Chex would be more valuable to Equitex if it entered into a reverse merger with a NASDAQ shell company than it would be if it closed on the SPA with iGames.  As such, no second payment was ever made.

---

[5]     A true and correct copy of the Term Loan Note is attached to the Appendix as Exhibit "K."

**V.**   **Chex Secretly Solicits A Joint Venture With A Venture Capitalist Who Entices Chex And Equitex Away From The Planned Merger With iGames, Provides Them With A Shell Company, And Then Oversees A Reverse Merger Of Chex Into That Shell Company**

In light of the prior failed attempts by iGames to acquire or merge with Chex and related reasons, iGames negotiated a non-solicitation provision as part of the SPA. This was a critical provision, as it strictly prohibited Chex and Equitex from looking for other competing business arrangements and thus provided some assurances to iGames that the SPA would, in fact, close:

> Chex and Parent shall, and shall direct and use Best Efforts to cause their respective Representatives to, immediately cease any discussions or negotiations with any parties that may be ongoing with respect to a Chex Proposed Transaction (as defined below). Neither Chex nor Parent shall, nor shall either permit any of their respective subsidiaries to, nor shall either authorize or permit any of their respective Representatives, directly or indirectly, to knowingly (i) solicit, initiate or encourage (including by way of furnishing information), or take any other action designed or reasonably likely to facilitate, any inquiries or the making of any proposal which constitutes, or may reasonably be expected to lead to, any Chex Proposed Transaction or (ii) participate in any discussion or negotiations regarding any Chex Proposed Transaction. The term "**Chex Proposed Transaction**" means any inquiry, proposal or offer from any person relating to any form of business combination involving Chex, or any direct or indirect acquisition or purchase of all or substantially all of the assets of Chex or any equity securities of Chex, any tender offer or exchange offer that if consummated would result in any person beneficially owning 10 percent or more of any class of equity securities of Chex, any merger, consolidation, share exchange, business combination, recapitalization, liquidation, dissolution or similar transaction involving Chex, other than the Contemplated Transactions.

(SPA, §7(g)(i) (emphasis in original)).

Notwithstanding this provision, Ijaz Anwar testified that in late December or early January, Chex was approached by a "dealmaker" named Mark Savage who introduced Chex to Maroon Bells Capital and the shell company "Seven Ventures" which Chex would later merge into following termination of the SPA. (Anwar Tr., Vol. II, at 139:10-140:10). Ignoring the

11

above contractual obligations under the SPA, on January 15, 2004, Mr. Anwar sent an email to

Maroon Bells (with copies to Mark Savage, Henry Fong and James Welbourn) stating the

following:

> It was a pleasure speaking with you over the phone yesterday.
> Please find enclosed some information of interest related to Chex
> Services, Inc.  I have also included a mutual confidentiality and
> non-disclosure agreement.  Please kindly execute the agreement
> and fax it to my attention as soon as possible at 952-417-1996.
>
> If you have any questions or concerns, please do not hesitate to
> contact me.  I look forward to working with Maroon Bells Capital,
> LLC as well as Corporate Capital Management, LLC.  Thanks.

(Exhibit 122, (Appendix Exhibit "L")).

Attached to the email was "an introductory letter from Chex Services to Maroon Bells

Capital" touting Chex's financial stability and superior business ethics.  (Anwar Tr., Vol. II,

258:11-12).  A few days later, on January 20, 2004, Mark Savage sent an email to Henry Fong

and Ijaz Anwar, regarding a proposed reverse merger.  (Anwar Ex. 123, (Appendix Exhibit

"M")).  In his email, Mr. Savage stated that:

> [a]fter talking to Ijaz last week our approach is different than what
> you are currently working with.  We feel that Chex Services has a
> good stand alone business that can be built upon by itself and then
> go and acquire the other candidates with alot [sic] less shares
> outstanding at the end of the day.
>
> Please let me know if you would like to continue these discussions
> if not I wish you well with your current project.

(*Id*.).  Importantly, Mr. Savage's email was clearly comparing and contrasting the proposed

reverse merger with the iGames' SPA and thus reveals that he had discussions with Mr. Anwar

regarding the structure of the iGames deal.  Again, all of these communications regarding an

alternative deal occurred after the parties entered the SPA, which prohibited this very activity,

and while iGames was investing time and effort to close on the SPA.

In fact, attached to Savage's email is a draft proposal to reverse merge Chex into a shell company. (*Id.*)  The proposed reverse merger is remarkably similar to the reverse merger that Chex ultimately completed with Seven Ventures.  In the proposal to reverse merge Chex into a shell, Mr. Savage reveals that following a successful merger, "the idea then would be to go and acquire IGME [*i.e.*, iGames].  This makes it more interesting. . . .  [Capital Corporate Management]/Maroon Bells will provide the shell and all of the costs for the shell. . . . "  (*Id.*)  Mr. Savage also predicts that Chex's stock, following a reverse merger into a shell would be a "$5.00+ stock right from the start."  Indeed, when Chex did complete its reverse merger with Seven Ventures on April 15, 2005, its stock traded at $5.25 the first day and steadily climbed to $7.00 within seven trading days.  (*See* Yahoo Finance Historical Prices for Fastfunds Financial Corp.  (Seven Ventures' new name) (Appendix Exhibit "N")).

Thus, unbeknownst to iGames, the discussions between Maroon Bells and Chex concerning a reverse merger continued while iGames diligently attempted to close on the SPA.  (*See, e.g.*, Anwar Ex. 124 (Appendix Exhibit "O") (March 5, 2005 email from Mark Savage with attached letter that begins "Pursuant to our discussions in connection with the potential reverse merger of Chex . . . into a public shell. . . ." and outlines various potential business arrangements); (Anwar Ex. 125, (Appendix Exhibit "P") (March 9, 2004 email from Maroon Bells to Chex regarding list of financial and business information needed as part of due diligence); (Anwar Tr., Vol. II, at 275:11-277:17 (explaining purpose of request in Exhibit 125)); (Anwar Ex. 126 (Appendix Exhibit "Q") (March 12, 2004 email from Maroon Bells to Chex requesting explanations from Mr. Anwar for certain casino contracts that were terminated)).

Believing they cut a better deal, defendants purported to terminate the SPA and completed the reverse merger. [6]

Indeed, as a result of Chex's initial solicitation of Maroon Bells and the negotiations that followed, Seven Ventures announced on April 15, 2004 that it had entered into a definitive agreement with Chex to merge Chex into a wholly-owned subsidiary of Seven Ventures.  In fact, its SEC Form 8-K provides: "[U]nder the terms of the merger agreement, Equitex, Inc., will exchange 100% of its equity ownership in Chex Services for 7,700,000 shares representing 93% of Seven Ventures outstanding common stock following the transaction, along with warrants to purchase 800,000 shares of Seven Ventures common stock.  As a result, Chex Services will become a wholly-owned subsidiary of Seven Ventures, a publicly traded company. . . .  At closing, a bridge loan will be consummated with MBC Global [a.k.a. Maroon Bells Capital]or its affiliates whereby Seven Ventures will receive $400,000 through the issuance of a convertible promissory note. . . ."  (SEC Form 8-K, April 15, 2004 (Appendix Exhibit "R").

**VI.    Equitex And Chex Secretly Close On A $5,000,000 Loan Which Requires Them To Pledge All Of The Common Stock Of Chex, Grant Warrants, Take On Significant Liability And Indemnification Obligations, And Prohibits Them From Closing On The SPA**

In Section 6(f) of the SPA, Equitex and Chex represented and warranted that, after June 30, 2003, there was not with respect to Chex, among other things:  (1) any loss, transfer, assignment or encumbrance of assets; (2) any issuance, sale or other disposition of any capital stock or any grant of any options, warrants, or other rights to purchase or obtain any capital stock; (3) any action, transaction or agreement outside the Ordinary Course of Business; (4) any loan to any other person in excess of $10,000 and outside the Ordinary Course of Business; (5)

---

[6] Equitex and Chex purported to terminate the SPA on March 12, 2004.  iGames also tendered written notice of its termination of the SPA on March 12, 2004.

any compromise of any claims; or (6) any other event or circumstance that could reasonably be expected to have a Material Adverse Effect on Chex. In this case, Chex and Equitex entered into negotiations for a $5,000,000 loan transaction. While Equitex eventually presented the potential loan to iGames as a means to finance the Available Money purchase, but iGames objected to it because the proposed financing had "death spiral" components, which iGames did not want to inherit as part of its acquisition of Chex. Nevertheless, despite iGames' express rejection of the loan and the SPA's prohibitions against such a deal, Chex and Equitex secretly continued their negotiations and then closed on the financing, without notice to iGames.

Indeed, iGames learned after litigation was initiated, based on Equitex's SEC Form 10-K, that Equitex entered into a Purchase Agreement with Pandora Select Partners, L.P. ("Pandora") and Whitebox Hedged High Yield Partners, L.P. ("Whitebox") on March 8, 2004. (*See* Purchase Agreement, dated March 8, 2004, by and among Equitex, Inc., Pandora Select Partners, L.P. and Whitebox Hedged High Yield Partners, L.P. (the "Whitebox Purchase Agreement") (Appendix Exhibit "S")). Thus, while the SPA was still in effect, the defendants negotiated and entered a $5,000,000 transaction that iGames expressly rejected.

Pursuant to the Whitebox Purchase Agreement, Equitex issued an aggregate of $5,000,000 in convertible notes (the "Equitex Notes"), plus warrants to purchase 800,000 shares of Equitex common stock. The proceeds were then advanced to Chex pursuant to a $5,000,000 note (the "Chex Note"). (*See* Whitebox Purchase Agreement, Recitals and §3.27). The Equitex Notes were secured by a pledge of Chex's common stock and an assignment of the Chex Note. *Id.* Incredibly, this was the very same stock iGames had already contracted to purchase and the Defendants' agreed to sell "free and clear" of any encumbrances or security interests.

15

As part of the Whitebox transaction, Equitex also entered into a Security Agreement with Whitebox and Pandora.  (*See* Equitex Security Agreement, dated March 8, 2004, by and between Equitex, Inc., Pandora Select Partners, L.P., and Whitebox Hedged High Yield Partners, L.P. (Tab 8) (the "Security Agreement") (Appendix Exhibit "T").   The Security Agreement essentially required Equitex to pledge all of Chex's assets and for Chex to guarantee the obligations of Equitex under the notes.   Again, these were the very same assets that iGames agreed to purchase and Defendants agreed to sell, "free and clear" of any encumbrances or security interests.   The Whitebox agreements also provided the lenders with complete control over Chex under certain circumstances.

In particular, the Security Agreement provided in relevant part as follows:

> As a condition of making the [$5,000,000] Loan, the Secured Parties [i.e., Whitebox and Pandora] have required Equitex to (i) issue each of the Secured Parties a warrant of this date to purchase additional shares of Equitex Common Stock (the "**Warrants**"), (ii) agree to register the shares of Common Stock issuable upon exercise of the Warrants and upon conversion of the Notes or in payment thereof pursuant to a Registration Rights Agreement of this date (the "**Registration Rights Agreement**"), (iii) pledge certain of Equitex's assets, as more fully described in <u>Exhibit A</u> hereto (together with the rights described herein, (the "**Collateral**")[)], which Collateral consists of all of the outstanding capital stock of Chex, the Chex Loan and Equitex's interest in the Chex Note Security Agreement dated as of this date, as security for the due and prompt payment of all amounts under the Notes and the due and prompt performance of all obligations under the Warrants; and (iv) cause Chex to guarantee the obligations of Equitex under the Notes (the "**Guarantee**"), and to grant to Secured Parties a security interest in all of Chex's assets to secure the performance of Chex's obligations under the Guarantee.

(Security Agreement, Recital C.  *See also* Security Agreement, at § 2.1 (wherein Equitex assigns, grants and pledges all of its estate, right, title and interest in and to the collateral)).

Although it was kept secret from iGames, discovery revealed that the Whitebox Purchase Agreement was the result of extensive negotiations between Equitex, Chex, Pandora and

Whitebox which began in late November or early December 2003. (*See*, *e.g.*, Anwar Ex. 20 (Appendix Exhibit "U")) (January 2, 2004 email regarding drafting the Whitebox Purchase Agreement which states, "This is another very unique transaction that we have worked on over the last 45 days."); (Anwar Ex. 41 (Appendix Exhibit "V")) (containing January 9, 2004 email regarding Whitebox Purchase Agreement drafting meetings stating that "We have refined the terms over the last 30 days to everyones [sic] satisfaction. . . . ); (Anwar Ex. 38 (Appendix Exhibit "W") (December 19, 2003 email regarding negotiations on Whitebox Purchase Agreement). It is clear that as early as January 9, 2004, Chex and Equitex intended to complete a transaction with Whitebox and Pandora. On that date, Whitebox executed a Term Sheet and faxed it to Henry Fong. (Anwar Ex. 129 (Appendix Exhibit "X")). At his deposition, Mr. Anwar was specifically asked: "Do you know when it was finally decided that Equitex would close on the White Box financing?" In response, Mr. Anwar stated: "When Equitex decided they would close on the White Box financing? I think after speaking to Chris in January Equitex had the intent to move forward with White Box financing. I don't - -  can't pin down the exact date of their intent." (Anwar Tr., Vol. II, 297:12-19). Mr. Fong also testified that they were committed to the Whitebox financing as early as late January 2004 and that they had a signed term sheet from Whitebox. (Deposition of Henry Fong ("Fong Tr.") (Appendix Exhibit "Y"), at 123)).

The reason for all the secrecy is clear -- the Whitebox transaction expressly prohibited Chex and Equitex from closing on the SPA as agreed upon. Tellingly, the Whitebox transaction also specifically allowed for the type of shell company reverse merger first presented by Mark Savage and Maroon Bells in January 2004. In particular, the Security Agreement provided as follows:

**MERGER OR COMBINATION**.  Equitex will promptly notify (the "**Reorganization Notice**") Secured Parties of the material terms and conditions of any proposed transaction which, if consummated, would result in the merger or consolidation of Chex with, or the acquisition of the business of Chex by, another entity (which transaction is referred to hereunder as a "Reorganization"). Notwithstanding anything to the contrary contained herein, Equitex, with the consent of Secured Parties, which consent will not be unreasonably withheld, may cause or allow Chex to engage in a Reorganization, where Equitex retains ("**Retained Interest**") at least 87.5% of the outstanding capital stock and voting power of the entity surviving such Reorganization.

(Security Agreement, § 2.6 (emphasis added).  Thus, Equitex could not close on the SPA, which would have resulted in Equitex holding less than 87.5% of the outstanding capital stock of iGames, but could close on the Seven Ventures reverse merger which resulted in Equitex retaining 93% of the outstanding common stock of Seven Ventures.  (SEC Form 8-K, April 15, 2004, Item 5).

Although the Whitebox Purchase Agreement clearly involved over $10,000, and represented numerous breaches of the SPA, the defendants entered into it anyway.  The reason is clear.  The defendants were interested in completing the Seven Ventures deal, not the SPA.  To that end, late in the day on Friday, March 12, 2004, Chex and Equitex faxed a letter purporting to terminate the SPA and the related Term Loan Note for various unfounded breaches and immediately filed lawsuits in a hardball tactic designed to increase their bargaining power in the anticipated post-termination settlement negotiations.

## LEGAL ARGUMENT

### I.    The Standards Governing This Motion For Summary Judgment

Pursuant to Fed. R. Civ. P. 56(c),  "summary judgment  is proper if 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to

judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)).

In order "[t]o defeat a motion for summary judgment, the non-moving party must 'do more than simply show that there is some metaphysical doubt as to the material facts.'" *Chemipal Ltd. v. Slim-Fast Nutritional Foods Int'l*, 350 F. Supp. 2d 582, 587 (D. Del. 2004) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). "'Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial.'" *Id.* (quoting *Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 587). "Accordingly, a mere scintilla of evidence in support of the non-moving party is insufficient for a court to deny summary judgment." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

## II. Defendants Breached The SPA By Converting The Howards' Debt To A Note And Misrepresenting That Bad Debt As A Valid Account Receivable

In September 2003, Chex provided LeRoy and Pauline Howard (collectively the "Howards"), with roughly $600,000 in cash to gamble at casinos serviced by Chex. In return for this extraordinary unsecured cash advance, Chex received over 60 "bad checks." Chex compounded this serious lapse in judgment by treating the Howards' bad debt as an account receivable, in direct violation of their own operating procedures.

By the admissions of the Defendants' own witnesses, the bad checks issued by the Howards far surpassed those issued by any previous customers. Further, the Defendants' witnesses admitted that this was the first time they ever converted bad debt to an account receivable for their financial statements. Based on admissions and the undisputed facts, Chex's transactions with the Howards, and subsequent accounting thereof, clearly breached Defendants' representations in the SPA because, by Defendants' own admissions, those transactions were not

in "the ordinary course of business" and could have reasonably been expected to have a "material adverse effect" on Chex.

### A.    The Defendants Breached The SPA Because Chex's Transactions With The Howards Were Not In The Ordinary Course Of Business

On November 3, 2003, iGames and the Defendants executed the SPA.  Importantly, in Section 6(f) of the SPA, the Defendants made certain representations regarding events after Chex's June 30, 2003 Interim Balance Sheet.  More specifically, the Defendants represented:

> 6.(f)  <u>Events Subsequent to Chex Interim Balance Sheet</u>.  Since the date of the Chex Interim Balance Sheet, and except as disclosed on <u>Schedule 6(f)</u>, there has not been, occurred or arisen, with respect to Chex:
>
> *        *        *
>
> (ix)  the execution of, or any other commitment to any agreement, contract, lease, or license (or series of related agreements, contracts, leases, and licenses) outside the Ordinary Course of Business, except for the CSI Agreement.
>
> *        *        *
>
> (xxiv) any taking of other action or entrance into any other transaction other than in the Ordinary Course of Business, or entrance into any transaction with any insider of Chex, except as disclosed in this Agreement and the Disclosure Schedules;

(SPA, §§ 6(f)(ix) & (xxiv)).    Thus, the Defendants represented that there had been no transactions or agreements other than in the "Ordinary Course of Business" between June 30, 2003, and November 3, 2003.  Chex's transactions with the Howards unquestionably rendered this representation false.

The SPA defines "Ordinary Course of Business" as follows:

> "**Ordinary Course of Business**" means an action taken by a Person will be deemed to have been taken in the Ordinary Course of Business <u>only</u> if that action: (i) <u>is consistent in nature, scope and magnitude with the past practices</u> of such Person and is taken in the ordinary course of the <u>normal, day-to-day operations</u> of such

> Person; (ii) does not require authorization by the board of directors
> or shareholders of such Person (or by any Person or group of
> Persons exercising similar authority) and does not require any
> other separate or special authorization of any nature; <u>and</u> (iii) is
> similar in <u>nature, scope and magnitude to actions customarily
> taken</u>, without any separate or special authorization, in the ordinary
> course of the <u>normal, day-to-day operations</u> of other Persons that
> are in the same line of business as such Person.

(SPA, § 1(ooo) (emphasis added)).    The testimony of Chex's own witnesses undeniably establishes that Chex's transactions with the Howards were not "consistent in nature, scope and magnitude with past practices" of Chex.  For example, Ijaz Anwar, the Chief Financial Officer of Chex, testified that other than the Howards, Chex never had a customer write hundreds of thousands of dollars of "bad checks" in one month.  (Anwar Tr., Vol. I, at 125).  In fact, other than the Howards, the most significant bad checks Mr. Anwar could recall amounted to between $10,000 and $15,000, far less than the $606,000 in bad checks written by the Howards.  (Anwar Tr., Vol. I, at 126).  In other words, in the past, Chex had taken losses in the range of $10,000 - $15,000 for its cash advances to specific customers.  In stark contrast here, Chex lost $606,000 to one couple.

The Howards' bad debt not only far surpassed the debt owed to Chex by any one individual, it even surpassed the bad debt expensed by Chex, from <u>all of its customers, for the entire year preceding the Howards' transactions</u>.  (Equitex SEC Form 10-Q).  Given these undisputed facts, and the testimony of Defendants' own witnesses, no trier of fact could conclude and Defendants cannot reasonably contend that the Howards transactions were of a scope and magnitude consistent with Chex's past practices.[7]

---

[7]    As further evidence that these transactions deviated from Chex's ordinary course of business, Chex disciplined several of its employees for their handling of the transactions with the Howards.  (Anwar Tr., Vol. I, at 131).

Chex also drastically deviated from its own procedures and practices in its accounting of the transactions with the Howards. By necessity, Chex has practices and procedures it follows when a casino customer provides Chex with a "bad check." (*See* Anwar Tr., Vol. I, at 119). Under such circumstances, as one might expect, Chex "writes off" bad checks as expenses or bad debt. (*See* Anwar Tr., Vol. I, at 117-119).[8] However, during the fall of 2003, as iGames and the Defendants were negotiating the SPA, Chex acted in direct contravention of its own procedures and the industry practice by treating the Howards' bad debt as an account receivable.

Specifically, instead of writing off the Howards' bad debt, Chex accepted a note from the Howards. (*See* Anwar Tr., Vol. I, at T124). Chex then claimed that note as a valid and collectible account receivable on its balance sheet. During his deposition, Mr. Anwar, Chex's CFO admitted that Chex accounted for the Howards' bad debt differently than it ordinarily treats such bad debt. Specifically, testifying about the Howards' transactions, Mr. Anwar testified:

> Q:    And typically you would write [bad check debt] off?
>
> A:    That is correct.
>
> Q:    And here you said instead of doing that, you put the Note, a receivable in your books?
>
> A:    That is correct.

(Anwar Tr., Vol. I, at 140-41). Mr. Anwar further testified:

---

[8]    The Howards' default on the note illustrates why Chex and similar businesses treat such bad checks as an expense and not as an account receivable. The Howards never made a single payment under the note, until paying $9,000 (on the $600,000 note) nearly a year later in August 2004. The Howards then apparently accused Anwar of "tricking and cheating" them. (Anwar Ex. 9 (Appendix Exhibit "Z")). Thus, calling this note a valid account receivable is beyond cavil. Indeed, even Chex ultimately conceded the note was not fully collectible when it wrote off roughly $250,000 of the note for its December 2003 year end financial statement. (*See* Equitex SEC Form 10-Q, at 34).

> Q:      How many times in your career have you accepted a Note
> from a customer who wrote a bad check?
>
> A:      From a customer, I don't recall.  The Howard, Leroy and
> Pauline Howard would be in my memory the first customer.
>
> Q:      Where Chex ever took a Note and exchanged it for bad
> checks?
>
> A:      That is correct.

(Anwar Tr., Vol. I, at 124).

Henry Fong, the CEO of Equitex, also confirmed Mr. Anwar's testimony.  Specifically, Mr. Fong testified that Chex had never accepted a note of over $600,000 for bad checks prior to the Howards' Note.  (Fong Tr., at 113).  Indeed, Mr. Fong was not aware of "anything even remotely close" to the Howards' note.  (Fong Tr., at 113).

At his deposition, Mr. Anwar conceded the reason Chex deviated from its general practices was to improve its financial statements.  Specifically, Mr. Anwar testified "if we have the option to classify that as a receivable, it would obviously reflect less expenses on the financial statements."  (Anwar Tr., Vol. I, at 141).  Of course, this conversion of what would typically be considered $606,000 of bad debt from an expense to an account receivable, made Chex appear to be significantly more profitable.  These clever accounting maneuvers occurred after the June 30, 2003 Interim Balance Sheet provided to iGames and while the parties were negotiating the SPA.

As detailed above, the Defendants represented that Chex had not entered into any agreements outside of the Ordinary Course of Business (SPA, § 6(f)(ix)), and that Chex had not taken any other action or entered any other transaction other than in the Ordinary Course of Business (SPA, § 6(f)(xxiv)).  By the admissions of Chex's own witnesses, however, Chex had never received even close to the $606,000 of bad checks they received from the Howards in one

month or from one customer.   Further, Chex had never accounted for such bad debt as a "receivable" instead of as an "expense."   Given these admissions, there can be no factual dispute that Chex's transactions with the Howards were <u>not</u> "consistent in nature, scope and magnitude with the past practices of Chex" and were not "similar in nature, scope and magnitude to actions customarily taken" by Chex.   Therefore, according to the express language of the SPA and Defendants' own admissions, the Defendants breached their representations in the SPA.

> **B.** **The Defendants Breached The SPA Because Chex's Transactions With The Howards Could Reasonably Have Been Expected To Have A Material Adverse Effect On Chex**

In signing the SPA, the Defendants represented that, between June 30, 2003 (the date of the Interim Balance Sheet Defendants provided to iGames) and November 3, 2003 (the closing date on the SPA), "there had not been, occurred or arisen, with respect to Chex" the following:

> (xxv) any other event or occurrence that may have or could reasonably be expected to have a Material Adverse Effect on Chex (whether or not similar to any of the foregoing)

(SPA, § 6(f)(xxv)).   The SPA defines "Material Adverse Effect" as follows:

> "**Material Adverse Effect**" or "**Material Adverse Change**" means, in connection with any Person, any event, change or effect that is materially adverse, individually or in the aggregate, to the condition (financial or otherwise), properties, assets, Liabilities, revenues, income, business, operations, results of operations or prospects of such Person, taken as a whole.

(SPA, § 1(iii)).

Chex's transactions with the Howards clearly "may have or could reasonably [have been] expected to have a Material Adverse Effect on Chex."   It is undisputed Chex provided the Howards with nearly $600,000 in cash, receiving bad checks in return.   Even Mr. Anwar, in attempting to justify the "special" accounting treatment for the Howards transactions,

characterized the Howards' bad debt as "<u>materially high</u>."  (Anwar Tr., Vol. I, at 134 (emphasis added)).

Regardless of how Chex accounted for this "bad debt," it may have or could have had a "Material Adverse Effect" on Chex.  Indeed, after the SPA closed, Chex "wrote off" roughly $250,000 of the Howards' bad debt.  One year after accepting the note, Chex had only collected roughly $9,000 from the Howards for this "receivable" of $606,000.

The impact of this $606,000 debt on Chex's balance sheet is material.  For example, between June 30, 2003 and September 30, 2003, Chex's claimed loss from operations was $436,927, and for the nine months ending September 30, 2003, Chex's loss from operations was $508,490.  Accounting for the Howards' bad debt as an expense, as Chex ordinarily would do, <u>would result in a 138.7% change to the losses</u> from operations for Chex's three month financial statement and a 119.2% change to Chex's nine month financial statement for the period ending September 30, 2003.  Simply put, no trier of fact could conclude that such losses were not "material."  Indeed, Chex's "creative" accounting efforts themselves reveal that Chex knew the losses were material and thus tried to pass them off as "accounts receivable."

In sum, Chex suffered a material loss of $606,000 after issuing its June 2003 Interim Balance Sheet and before closing on the SPA.  Despite Chex's characterizations of this loss as an "account receivable," <u>in contrast to Chex's own practices and procedures</u>, this loss was clearly an event that did, or at least could, materially effect Chex's financial condition.  In fact, the Howards' transaction resulted in a change between 138% for Chex's losses from operations for the quarter in question.  The Defendants, therefore, breached Section 6(f)(xxiv) of the SPA because Chex's transactions with the Howards were, or could have been, materially adverse events. *See Allegheny Energy Inc. v. DQE, Inc.*, 74 F. Supp. 2d 482, 518-19 (W.D. Pa. 1999)

(write-off amounting to 105% of net income was material adverse change), *aff'd without opinion*, 216 F.3d 1075 (3d Cir. 2000).

**III.     <u>Defendants Breached The SPA By Losing Nearly A Quarter Of Chex's Business</u>**

As one might expect, Chex's revenues and customer relationships were critical components of the Chex/iGames deal.  The SPA properly reflects the parties' intent on this fundamental point.  To that end, the Defendants were required to list all of Chex's contracts "involving more than $10,000."  (SPA, § 6(n)(i)).  Moreover, Chex represented in the SPA:

> there are no disputes or complaints with respect to nor has Parent or Chex received any notices (whether oral or in writing) that any other party to the Chex Contracts is terminating, intends to terminate or is considering terminating, any of the Chex Contracts listed or required to be listed in Schedule 6(n).

(SPA, § 6(n)).  Significantly, this representation was not limited to the date the parties entered the SPA.  Chex's representation, in addition to being true upon execution of the SPA, was required to remain true "as of the Closing Date (as though made then and as though the Closing Date were substituted for the date of [the SPA] . . ."  (SPA, § 6).

The SPA further provided iGames with the right to terminate the SPA, if Chex lost customer contracts that would result in a "Material Adverse Effect" on Chex's business.  Specifically, Section 11(b) of the SPA provides:

> (b)  <u>Termination of Agreement</u>.  In addition to termination during the Review Period, certain parties may terminate this Agreement prior to Closing as follows:
>
> *          *          *
>
> (viii)  Buyer, after the occurrence of any event having, or which would reasonably be likely to have, a Material Adverse Effect on Chex;

The parties expressly included within the definition of "Material Adverse Effect" "any event, change or effect that is materially adverse, individually or in the aggregate, to the to the

condition (financial or otherwise), properties, assets, Liabilities, <u>revenues</u>, <u>income</u>, business, operations, <u>results of operations</u> or <u>prospects</u> of [Chex], taken as a whole." (*See* SPA, § 1(iii) (emphasis added)).

Chex's most significant client was NACSF. Chex had five contracts with NACSF to provide cash management services at five Seminole Tribe casinos, which accounted for roughly 25% of Chex's revenues. (Welbourn Tr., at 165:2-7). During 2003, however, Chex had serious problems with its NACSF contracts. In May 2003, NACSF sent Chex a letter stating that Chex had breached its agreements with NACSF. (NACSF Compl., at ¶ 27). Chex settled this May 2003 dispute with NACSF, but problems with the contracts remained. (Deposition of Deanna Moose ("Moose Tr.") (Appendix Exhibit "AA"), at 32-34). Indeed, there were rumors throughout the fall about difficulties with the NACSF relationship. (Moose Tr., at 34).

On or about January 4, 2004, NACSF alleged that Chex had breached its agreements with NACSF. NACSF then terminated the agreements and awarded replacement contracts to one of Chex's competitors. These lost contracts not only cost Chex 25% of its revenues, (Welbourn Tr., at 165:2-7) they also caused significant marketing problems for Chex. In its litigation against NACSF, Chex asserted:

> Seminole casinos constitute [sic] a significant portion of Chex's revenue and provided Chex with unique relationships for establishing connections and business relationships with other Native American owned casinos. . . . The actions of NACSF also will undoubtedly damage Chex's reputation within the Native American gaming community.

(NACSF Compl., at ¶¶ 36-38). Chex's Vice President of Operations, Deanna Moose, confirmed this adverse effect on Chex's marketing efforts for prospective customers. During her deposition, Ms. Moose admitted:

> Q:    Do you know if the news that you had lost the [NACSF contract] had caused Chex problems in the marketplace?

27

        A:      Yes.

(Moose Tr., at 35).  Ms. Moose further testified that the loss of the NACSF contracts "was used

against [Chex]" and "caused some disruption to [Chex's] business."  (Moose Tr., at 35).

        The results of the NACSF termination were immediate and apparent to both iGames and

Chex.  Although Mr. Wolfington remained interested in the Chex transaction and did what he

could publicly to support Chex (Anwar Ex. 36 (Appendix Exhibit "BB")), iGames understood

the significance of the NACSF termination and reserved its rights with respect to this material

adverse effect on Chex's business.  (Anwar Ex. 37 (Appendix Exhibit "CC")).  Even Chex's

President and founder had to admit under oath in litigation against NACSF that "the termination

of the NACSF Contract may give iGames cause to terminate the acquisition agreement and

negotiations." (Welbourn Supp. Aff., at ¶ 14).

        Significant losses like the termination of the NACSF contracts are the very reason for

clauses regarding "Material Adverse Effects."  *See* Kari K. Hall, *How Big Is the MAC?: Material

Adverse Change Clauses in Today's Acquisition Environment*, 71 U. Cin. L. Rev. 1061, 1062

(2003) ("The purpose of a material adverse change clause, also called material adverse effect

clause, in a merger agreement is to allocate risk between the buyer and the seller during the time

between the signing of the acquisition agreement and the closing of the deal").  In this case, the

parties recognized the importance of Chex's customer contracts and revenues by incorporating

specific representations and covenants regarding those contracts.  The parties to the SPA then

placed the risk of such loss on the Defendants, who were in control of the customer relationships,

until closing on the SPA.

        Chex's loss of the NACSF contracts clearly constituted a "Material Adverse Effect" on

Chex's business.  First, Chex lost a quarter of its business and revenues.  Importantly, this was

no "temporary" or "cyclical" loss -- it was a permanent loss of Chex's biggest customer.  *See*,

*e.g.*, *H-M Wexford LLC v. Ballentine*, 832 A.2d 129, 143-44 (Del. Ch. 2003) (holding purchaser stated a claim for breach of representation that no material adverse change occurred where seller had lost one of its major customers and rejecting argument that purchaser should have discovered loss during due diligence). Second, as Chex's own witnesses admitted, the termination of the NACSF contracts harmed Chex's reputation and its ability to market to prospects. Clearly, under any reasonable interpretation of the SPA, the termination of the NACSF contracts was an "event, change or effect that [was] materially adverse, individually or in the aggregate, to the condition (financial or otherwise), properties, assets, Liabilities, revenues, income, business, operations, results of operations or prospects of [Chex], taken as a whole." (*See* SPA, § 1(iii) (emphasis added)). Accordingly, the Defendants breached the SPA and iGames' properly terminated the SPA as a matter of law. (*See* SPA, § 11(b)(viii)). *See Pan Am Corp. v. Delta Air Lines, Inc.*, 175 B.R. 438 (S.D.N.Y. 1994) (finding a material adverse change to airline's business and to its prospects where advanced bookings declined between 19%-25% on Latin American flights, 39% to 43% on Domestic North-South flights, and 21%-22% on Domestic Southern flights for January and February of 1992).

## IV.  Defendants Breached The SPA By Entering The Whitebox Purchase Agreement Which Made It Impossible For Defendants To Close On The SPA

Pursuant to the SPA, Chex was to purchase all shares of Chex from Equitex. Accordingly, Equitex made the following representation, a representation that was fundamental to the transaction:

> Parent [Equitex] is the lawful owner of the Chex Shares to be sold, transferred and delivered by it to iGames hereunder, free and clear of any restrictions on transfer (other than any restrictions under the Securities Act or applicable state securities laws), Taxes, Encumbrances, Security Interests, options, warrants, purchase rights, contracts, commitments, equities, claims and demands.

29

(SPA, § 4(d)).  Significantly, Equitex represented that this statement regarding its ownership of the Chex stock was correct and complete "as of the date of [the SPA]" and further represented it "will be correct and complete as of the Closing Date (as though made then and as though the Closing Date was substituted for the date of the [SPA]."  (SPA, § 4).

        In addition to Equitex's representation that it owned all of Chex's stock free and clear of any encumbrances or other restrictions, "Chex represent[ed] and warrant[ed] to [iGames] that the statements contained in this Section 6 [of the SPA] from (a) through (z) are correct and complete as of the date of this Agreement <u>and will be correct and complete as of the Closing Date</u> (as though made then and as though the Closing Date were substituted for the date of this Agreement throughout this Section 6), except as set forth in the schedules to be provided."  (SPA, § 6 (emphasis added)).  Thus, Chex represented that the following statements would be correct after the execution of the SPA and as of the Closing Date for the SPA:

> (f)    <u>Events Subsequent to Chex Interim Balance Sheet</u>.  Since the date of the Chex Interim Balance Sheet, and except as disclosed on Schedule 6(f), there has not been, occurred or arisen, with respect to Chex:
>
> *        *        *
>
> (iii)    any direct or indirect redemption, purchase or acquisition by any Person of any of its capital stock or of any interest in or right to acquire any such stock;
>
> *        *        *
>
> (ix)  the execution of, or any other commitment to any agreement, contract, lease, or license (or series of related agreements, contracts, leases, and licenses) outside the Ordinary Course of Business, except for the CSI Agreement.
>
> *        *        *
>
> (xi)  any Security Interest or Encumbrance imposed upon any of its assets, tangible or intangible;

*     *     *

(xvi) any issuance of any note, bond, or other debt security or created, incurred, assumed, or guaranteed any indebtedness for borrowed money or capitalized lease obligation involving more than $10,000; . . .

(SPA, Ex. A, § 6(f)).

Despite the Defendants' very clear an unambiguous representations to the contrary, the Defendants executed the Whitebox Purchase Agreement and accompanying transaction agreements on March 8, 2004. As part of this transaction, Chex issued a $5 million secured promissory note to Equitex. Equitex, in turn, issued two promissory notes to Whitebox and Pandora respectively. Significantly, in the Equitex Security Agreement, Equitex pledged as collateral the following assets:

A.     2,170,000 shares of the common stock of [Chex], being all of the outstanding capital stock of [Chex] represented by Certificate number ___, and any distributions made with respect to said shares.

B.     Promissory note the ("Chex Note") executed by [Chex] in favor of Equitex, Inc., dated March 8, 2004, in the principal amount of $5,000,000.

C.     Equitex's rights, title and interest in the Security Agreement, providing collateral security for payment of the Chex Note, dated March 8, 2004, which collateral consists of substantially all of the assets of [Chex].

(*See* Equitex Security Agreement, at Recitals C, § 2.1, & Ex. A). Thus, Equitex pledged as collateral the very same stock and assets that iGames was to acquire pursuant to the SPA.

Moreover, Equitex entered these agreements without iGames' knowledge or approval. Indeed, in January 2004, the Defendants discussed the potential Whitebox transaction with iGames, and iGames rejected it. iGames did not learn that the Defendants actually completed the transaction until after this litigation began.

31

By pledging all of the stock of Chex and all of Chex's assets, the Defendants breached the express terms of Section 6(f) of the SPA. Because of the Whitebox transaction, the Defendants could <u>not</u>, as they were obligated to do, represent at closing on the SPA that: (1) Equitex owned the stock of Chex free and clear of any encumbrances or security interests (SPA, § 4(d)); (2) that there had been no security interests or encumbrances imposed upon Chex's assets (SPA, § 6(f)(xi)); (3) that there had been no agreements outside of the ordinary course of business (SPA, § 6(f)(ix)); (4) that there had been no issuance of any note, bond, or other debt security for Chex involving more than $10,000 (SPA, § 6(f)(xvi)); or (5) that there had been no direct or indirect redemption, purchase or acquisition of Chex's stock or any interest in such stock (SPA, § (f)(iii)).

The Whitebox transaction not only breached the many representations made by Defendants as set forth above, it also required Defendants to obtain the consent of Whitebox and Pandora to consummate a merger or combination, such as the SPA, which had already been entered by the Defendants and iGames. (*See* Equitex Security Agreement, §§ 2.6, 4.4). Worse yet, pursuant to the Equitex Security Agreement executed as part of the Whitebox Transaction, in order for Equitex to consummate any merger or combination, such as the SPA, Equitex was to retain at least 87.5% of the stock of any entity surviving such a transaction. (*See* Equitex Security Agreement, § 2.6). Pursuant to the SPA with iGames which had already been executed, however, Equitex would have retained significantly less than 87.5% of the "surviving entity." Thus, on March 8, 2004, the Defendants actually executed agreements that prohibited them from completing the SPA.

As set forth below, the reason for the Defendants' execution of the Whitebox agreements in violation of their obligations under the SPA was revealed during discovery. The Defendants

sought, negotiated, and agreed to an alternative transaction with another investor.  This alternative transaction, unlike the SPA, fit within the parameters of the Whitebox agreements and provided that Chex would own 93% of the surviving entity.  Thus, it was clear that the Defendants had no intention of closing on the SPA when the Defendants had negotiated and entered the Whitebox agreements which: (1) breached the SPA; (2) made it impossible to close on the SPA; and (3) contemplated a merger under different terms which was closed shortly after the Defendants purported to terminate the SPA.

**V.    Defendants Breached The SPA By Soliciting Other Investors In Search Of A Better Deal And By Agreeing To The Seven Ventures Transaction**

Stock purchase agreements often have "no-shop" or "window shop" clauses and termination or cancellation fees to protect prospective buyers while they invest the extraordinary time and resources necessary to complete such a complex corporate transaction.  The SPA is no exception.  Generally, the SPA prohibited the Defendants from actively seeking alternative deals while they attempted to close on the SPA.  (*See* SPA, § 7(g), pp. 41-43).  In the event that the Defendants received and accepted a better offer, the SPA required the Defendants to pay a "Termination Amount."  (*Id.* § 11, pp. 54-56).  In this case, it is undisputed that the Defendants discussed an alternative deal while at the same time leading iGames to continue its significant investment in the SPA.  The Defendants then entered that alternative deal but failed to pay iGames the mandatory Termination Amount.

The SPA had very detailed provisions prohibiting any solicitations by Chex for alternative transactions after the parties entered the SPA.  (*See* SPA, § 7(g)).  Generally speaking, these non-solicitation provisions provided:  (1) Chex would not solicit, initiate or encourage any offers that would compete with the iGames transaction nor would Chex participate in any negotiations of such a competitive transaction; (2) if Chex received an

unsolicited offer better than the iGames transaction (defined in the SPA as a "Superior Proposal"), Chex would notify iGames at least three days prior to accepting such Superior Proposal; and (3) if Chex decided to accept a Superior Proposal it would terminate the SPA and pay to iGames the specified "Termination Amount."

These standard "non-solicitation" provisions were particularly important to iGames. Chex had discussed, and withdrawn from, several similar transactions (including potential deals with iGames) in the past. Thus, before investing the significant time and effort necessary to proceed with the SPA, iGames needed the protection afforded by the non-solicitation provisions of the SPA.

Section 7(g)(i) of the SPA specifically restricted Chex from soliciting, initiating, encouraging or discussing alternative transactions after the parties executed the SPA and required Chex to immediately cease any such discussions that may have been ongoing. That provision provides:

> (i) Chex and Parent shall, and shall direct and use Best Efforts to cause their respective Representatives to, immediately cease any discussions or negotiations with any parties that may be ongoing with respect to a Chex Proposed Transaction (as defined below). Neither Chex nor Parent shall, nor shall either permit any of their respective subsidiaries to, nor shall either authorize or permit any of their respective Representatives, directly or indirectly, to knowingly (i) solicit, initiate or encourage (including by way of furnishing information), or take any other action designed or reasonably likely to facilitate, any inquiries or the making of any proposal which constitutes, or may reasonably be expected to lead to, any Chex Proposed Transaction or (ii) participate in any discussion or negotiations regarding any Chex Proposed Transaction. The term "**Chex Proposed Transaction**" means any inquiry, proposal or offer from any person relating to any form of business combination involving Chex, or any direct or indirect acquisition or purchase of all or substantially all of the assets of Chex or any equity securities of Chex, any tender offer or exchange offer that if consummated would result in any person beneficially owning 10 percent or more of any class of equity

securities of Chex, any merger, consolidation, share exchange, business combination, recapitalization, liquidation, dissolution or similar transaction involving Chex, other than the Contemplated Transactions.

While Section 7(g)(i) prohibited Chex from soliciting, encouraging, or discussing proposals, Section 7(g)(iii) of the SPA regulated the manner in which the Defendants could react to <u>unsolicited</u> written proposals. However, before the Defendants accepted any such unsolicited written proposals they were required to (1) provide iGames with written notice at least three business days before approving or recommending such an unsolicited written proposal to their shareholders; and (2) terminate the SPA and pay iGames the applicable "Termination Amount". (*See* SPA, § 7(g)(iii)). In other words, if Chex received an <u>unsolicited</u> "better deal," could enter it, only after paying the Termination Amount to iGames.

Chex unquestionably breached its non-solicitation obligations. During December 2003 or January 2004, Chex discussed alternatives to the SPA with a venture capital firm called Maroon Bells Capital and an investment banking firm known as Corporate Capital Management LLC. In fact, on January 20, 2004, Mark Savage of Corporate Capital sent an email to the Defendants which attached an outline for the structure of a reverse merger of Chex into a shell corporation. (*See* Anwar Ex. 123). Savage's email even compared his proposed structure with the SPA, thus revealing his knowledge of the iGames deal. Specifically, Savage wrote "after talking with Ijaz last week our approach is different than what you are currently working with." (*See* Anwar Ex. 123). In light of Savage's email to the Defendants and their prior discussions with Savage, there can be no dispute that the Defendants breached Section 7(g)(i) of the SPA

which prohibits them from participating "in any discussion or negotiations regarding any Chex Proposed Transaction."[9]

       Savage explained his proposal as follows:

> We feel that Chex Services has a good stand alone business that can be built upon by itself and then go and acquire the other candidates with alot [sic] less shares outstanding at the end of the day.

(Anwar Ex. 123).  Thus, rather than merging Chex's business into another business, Savage proposed merging Chex into a shell, developing the business, and then acquiring other businesses.  Savage requested the Defendants contact him if they wished to further discuss his proposal.

       The Defendants continued their discussions with Savage, Corporate Capital, and Maroon Bells, while at the same time leading iGames to continue to invest in its transaction with the Defendants.  (*See*, *e.g.*, Anwar Ex. 124) (March 5, 2005 email from Mark Savage with attached letter that begins "Pursuant to our discussions in connection with the potential reverse merger of Chex . . . into a public shell. . . ." and outlines various potential business arrangements). Ultimately, Defendants entered the Seven Ventures Transaction on terms unmistakably similar to those outlined by Savage in his January 20, 2004 email.  More specifically, Chex merged into a shell corporation, Seven Ventures, and Chex's shareholders received 93% of the outstanding common stock in Seven Ventures.

       The Defendants' conduct during their negotiations with iGames reinforces the necessity of non-solicitation clauses such as those in the SPA, as iGames invested significant time, money,

---

[9]    The Defendants have not taken the position that Savage's email constituted an "unsolicited written proposal" pursuant to Section 7(g)(iii) of the SPA and, even if they did, the Defendants never provided notice to iGames as they would have been required to had Savage's email constituted an "unsolicited written proposal."

and other resources into pursuing its transaction with the Defendants.  At the same time that iGames was attempting to close on the SPA, the Defendants were searching for "a better deal." The SPA specifically contemplated this very scenario.  First, the SPA provided that Defendants solicitations of "a better deal" would constitute a breach of the SPA.  (SPA, § 7(g)(i)).  Second, the SPA provided that if the Defendants did consummate such a "better deal," then the Defendants would be required to pay the $1 million Termination Amount.  (SPA, § 7(g)(iii)).

Based on the undisputed evidence and the straightforward language of the SPA, summary judgment should be granted in favor of iGames and against the Defendants because of their violations of the non-solicitation obligations under the SPA.

## VI.    Chex's Purported Termination Of The SPA Was Ineffective As A Matter Of Law

On March 12, 2004, only after receiving a letter from iGames that threatened to terminate the SPA, the Defendants purported to terminate the SPA.  However, by that time, the Defendants had been in material breach of the SPA for months.  As further detailed above, long before March 12, 2004, the Defendants had: (1) provided roughly $606,000 to the Howards and converted the Howards' bad debt to an "account receivable" (September-November 2003); (2) lost the NACSF contracts constituting 25% of Chex's business (January 4, 2004); (3) encouraged and engaged in discussions for a proposed alternative transaction (January 14 - 20, 2004); and (4) negotiated and consummated the Whitebox agreements which were fundamentally inconsistent with closing on the SPA (March 8, 2004).

According to both the express language of the SPA and the well-established common law, the Defendants had no right to terminate the SPA or to claim a right to the Termination Amount, and any purported termination of the SPA by the Defendants was ineffective. Specifically, Section 11(b) of the SPA provides "the right to terminate this Agreement pursuant to Section 11(b) shall not be available to any Party that has breached in any material respect its

37

obligations under this Agreement in any manner that proximately contributed to the failure of the transactions contemplated hereby to be consummated." (SPA, § 11(b)). Moreover, as the Defendants themselves argue in their motion for summary judgment, "[a]s a general rule the party first guilty of a material breach of contract cannot complain if the other party subsequently refuses to perform." (*See* Opening Br. in Support of Chex and Equitex's Motion for Summary Judgment at 22 (quoting *Hudson v. D&V Mason Contractors, Inc.*, 252 A.2d 166, 170 (Del. Ch. 1969)). Based on these undisputed principles, the Defendants' purported termination of the SPA was ineffective as a matter of law.

VII.  **The Defendants Are Liable For The Termination Amount Not Only Because They Breached The SPA On Several Grounds But Also Because They Failed To Close On The SPA And Instead Chose To Close On The Seven Ventures Transaction**

In Section 11(e)(ii) of the SPA, Equitex and Chex agreed that a $1 million "Termination Amount" would be paid to iGames if the SPA was terminated for any one of several specified reasons. Section 11(e)(ii) requires:

> (ii)  Parent and Chex agree that if this Agreement is terminated pursuant to Sections 11(b)(ii), (iv)(only if such failure is not due to receipt of Parent Board approval pursuant to Section 7(f)), (vi)(only if within twelve months of such Parent stockholder vote, Parent, Chex or any of their Subsidiaries enters into a Chex Proposed Transaction, an agreement with CSI for a Chex Proposed Transaction or the CSI Transaction), (vii)(only if the failure to effect the Closing is not due to any action or failure to act by Buyer), (viii) or (x), then Parent shall pay to Buyer a termination fee in an amount equal to $1,000,000 (the "**Termination Amount**"). The Termination Amount shall be paid immediately upon termination. In addition, upon any such termination Parent and/or Chex shall pay to Buyer, within five (5) Business Days of receipt by Parent of a written notice from Buyer evidencing Buyer's documented costs and expenses otherwise payable by Buyer under Subsection 12(n), an amount equal to such costs and expenses. Any payment required to be made pursuant to this Subsection shall be made on the requisite payment date by wire transfer of immediately available funds to an account designated by Buyer.

38

Because the Defendants breached their representations that there would be no material adverse effect on Chex and that there would be no transactions outside of the Ordinary Course of Business, iGames' termination of the SPA was appropriate pursuant to Section 11(b)(ii) and (b)(viii).  In addition, iGames' termination was also appropriate pursuant to Section 11(b)(iv) because the Defendants failed to abide by their non-solicitation covenants as well as their covenants not to engage in any transactions outside of the Ordinary Course of Business. Accordingly, Defendants are liable to iGames for the Termination Amount pursuant to Section 11(e)(ii).

Entirely irrespective of their prior breaches, the Defendants are also liable for the Termination Amount because they failed to close on the SPA and instead closed on the Seven Ventures Transaction.  Pursuant to Section 11(b)(vi) and (b)(x), the Defendants could terminate the SPA if the Defendants, and their shareholders, decided not to close on the SPA and to instead accept an alternative proposal.  However, the SPA required the Defendants to pay iGames the Termination Amount under such circumstances.  (SPA, § 11(e)(ii)).  Accordingly, summary judgment in favor of iGames for the Termination Amount is appropriate as a matter of law.  *See*, *e.g. Kysor Indus. Corp. v. Margaux, Inc.*, 674 A.2d 889, 897 (Del. Super. 1996) (granting summary judgment for prospective purchaser for termination fee pursuant to letter of intent agreement where selling company instead accepted offer from another purchaser).

## CONCLUSION

WHEREFORE, for the foregoing reasons, iGames respectfully requests that the Court enter judgment in its favor finding Chex and Equitex jointly and severally liable for the Termination Amount, including all associated costs and fees, or, in the alternative, finding that Chex and Equitex were not entitled to terminate the November 3, 2003 Stock Purchase Agreement or to claim any damages at trial resulting from the termination of the SPA.


DATED:     March 15, 2005                    **DUANE MORRIS LLP**


                                             /s/ Thomas P. McGonigle
                                             Thomas P. McGonigle (Del. I.D. No. 3162)
                                             Matt Neiderman (Del. I.D. No. 4018)
                                             1100 North Market Street, 12th Floor
                                             Wilmington, Delaware  19801
**OF COUNSEL:**                              302.657.4900
**DUANE MORRIS LLP**
Matthew A. Taylor, Esquire
James L. Beausoleil, Jr., Esquire            Attorneys for Plaintiff
One Liberty Place                            iGames Entertainment, Inc.
Philadelphia, Pennsylvania 19103-7396
215.979.1000

40