# Exhibit A

FROM KLEHR HARRISON                    (WED) 1. 21' 04 16:16/ST. 16:15/NO. 4862034594 P  2

<u>**Term Loan Note**</u>

$4,000,000                                                                                          Philadelphia, PA

     FOR VALUE RECEIVED, the undersigned, iGAMES ENTERTAINMENT, INC., a Nevada corporation with its chief executive office and principal place of business at 700 S. Henderson Road, Suite 210, King of Prussia, PA 19406 (the "Borrower"), promises to pay to the order of CHEX SERVICES, INC., with offices located at 11100 Wayzata Blvd., Suite 111, Minnetonka, Minnesota 55305 (the "Lender") the principal sum of Four Million Dollars ($4,000,000) or, if less, the aggregate outstanding principal balance of all advances made by the Lender to the Borrower, as provided for herein (the "Term Loans") together with interest, from the date of this note ("Note"), in like money, at said office of the Lender, at the time and at rates per annum as provided herein..

     The Borrower and the Lender agree that the Lender shall advance $2,000,000 to the Borrower on the date hereof and shall advance an additional $2,000,000 to the Borrower on that day that is 60 days following the date hereof, provided that at such time the Borrower is in material compliance with the terms of this Note, the Stock Pledge Agreement (as defined below) and the Stock Purchase Agreement (as defined below). The aggregate amount so advanced shall constitute the "Term Loans" hereunder. The Lender agrees to deliver to the Borrower, within 21 days of the date hereof, a binding commitment for financing sufficient to fund the second advance hereunder either (i) from Mercantile Capital, L.P. on terms satisfactory to the Borrower; or (ii) from another institutional lender satisfactory to the Borrower, which financing shall be either (A) funded prior to the end of such 21 day period and placed in escrow subject to release to the Borrower in accordance with the first sentence of this paragraph, or (B) irrevocably committed to be advanced directly by the financing source to the Borrower in accordance with the first sentence of this paragraph without any further action by the Lender. For avoidance of doubt, any financing that could be diverted to other uses by the Lender, or under which the financing source could decline to advance, shall not satisfy the foregoing conditions. In the event that the Lender fails to comply with the foregoing within such 21 day period, then the Borrower shall have the right at any time thereafter to prepay the principal balance of this Note in full, in which case all further payment obligations of the Borrower, other than with respect to amounts accrued through the date of prepayment, shall terminate.

     <u>Interest</u>.  For the period ending February 1, 2004, the Borrower shall pay to the Lender interest on the outstanding Term Loans at the rate of fifteen percent (15%) per annum, calculated on the basis of a 360-day year and counting the actual number of days elapsed. In addition, in lieu of interest, the Borrower shall, on a monthly basis, pay to the Lender an amount equal to 50% of the Operating Income of the Borrower's Available Money, Inc. subsidiary ("Available Money") (which for the period ending February 1, 2004 shall be reduced by the amount of interest paid under the previous sentence), provided that, in the event that Lender completes a business combination with any party other than Borrower, or completes a direct or indirect acquisition or purchase or sale of assets or securities with any party other than Borrower, or agrees to complete such a transaction pursuant to a letter of intent or otherwise, then, from the date of such agreement, Borrower shall not be obligated to pay Lender 50% of the Operating Income of Available Money but shall be obligated to pay Lender interest on the outstanding Term Loans at the rate of ten percent (10%) per annum, calculated on the basis of a 360-day year and counting the actual number of days elapsed. "Operating Income" shall mean cash receipts of Available Money generated by normal operations, less all operating expenses, capital expenditures, reserves for taxes and reasonable operating reserves. Each payment shall be accompanied by a report of an officer of the Borrower in reasonable detail setting forth the calculation of Operating Income of Available Money for the applicable period.

     <u>Treatment of Revenues and Expenses</u>.  The Borrower hereby agrees that, notwithstanding its ownership of 100% of the capital stock of Available Money, for a period of 90 days following the date hereof (or such longer period as the Borrower may consent to in its reasonable discretion) the Borrower shall consent to the inclusion by the Lender in its financial statements of 50% of the revenues and expenses of Available Money; provided that the Borrower's and the Lender's independent auditors deliver their respective opinions that such

PHIL1 552321-5





treatment is in accordance with generally accepted accounting principles.

Stock Purchase Agreement Termination. In the event that the Stock Purchase Agreement is terminated by the Lender and Equitex, Inc. under Section 11(b)(v) thereof, then in addition to any Termination Fee due and payable by the Borrower under the Stock Purchase Agreement, the Borrower shall pay to the Lender as additional interest hereunder the amount of $1,000,000, which shall be due and payable immediately upon demand following termination of the Stock Purchase Agreement.

Repayment; Lender's Option.

(a) No repayment of the principal balance of this Note shall be due and payable until 120 days following the earlier to occur of (i) termination without closing under the Stock Purchase Agreement dated November 3, 2003 between the Lender, the Borrower and Equitex, Inc. and other parties (or any successor agreement for the acquisition of the Lender by the Borrower) (the "Stock Purchase Agreement"), or (ii) 100 days from the date hereof (in either case, the "Initial Maturity Date").

(b) On the Initial Maturity Date, if the Borrower does not pay the outstanding principal balance of the Term Loans, and all accrued but unpaid interest due hereunder in full, the Lender shall have the option to purchase 100% of the capital stock of Available Money from the Borrower for a purchase price of $6,000,000 (the "Option"), exercisable by delivery to the Borrower on the Initial Maturity Date of a written notice of exercise, this Note for cancellation and immediately available funds in an amount equal to $6,000,000 less the then-outstanding principal balance of, and all accrued but unpaid interest on, the Term Loans.

(c) If the Lender does not exercise the Option on the Initial Maturity Date, then the maturity date of this Note shall be extended for one or more additional periods of 30 days (the end of each of which shall be a "Subsequent Maturity Date"). On each Subsequent Maturity Date, if the Borrower does not pay the outstanding principal balance of the Term Loans, and all accrued but unpaid interest due hereunder, in full, the Lender shall have the right to exercise the Option on that Subsequent Maturity Date. If the Lender does not exercise the Option, the maturity date of this Note shall continue to be extended pursuant to this Section until the outstanding principal balance of, and all accrued but unpaid interest on, the Term Loans is paid or the Option is exercised.

(d) Notwithstanding any provision hereof to the contrary, the outstanding principal balance of this Note, and all accrued but unpaid interest hereon, shall be due and payable 180 days following the Initial Maturity Date.

Late Payment Penalty. In the event that Maker fails to pay any amount when due, Maker agrees to pay a late charge equal to ten percent (10%) of the overdue amount. Such late charge shall be due and payable upon demand. Maker acknowledges that it would be extremely difficult or impracticable to determine Holders actual damages resulting from any late payment, and this late charge is a reasonable estimate of those damages. Acceptance of any late-charge shall not limit any of Holders other rights or remedies under this Note or the Stock Purchase Agreement.

Payments. All payments required or permitted herein (principal and interest) shall be made to the address from time to time designated by the Holder and shall be paid not later than 5 p.m. (Minnesota time) on the day when due. All payments shall first be applied to interest accrued to the date of payment and the balance of such payment, if any, shall be applied to the unpaid principal remaining due hereon; provided, however, that upon the occurrence of an Event of Default (as defined herein) payment may first be applied to any late charges or sums advanced (if any) by the Lender for the payment of collection costs or other charges or fees (including reasonable attorneys fees). For all purposes herein, the date of payment shall be the date such payment is actually received by the Holder. Payment received by check or draft shall be credited as of the date delivered.

Security. The Borrower's obligations hereunder shall be secured by (i) a pledge of the capital

stock of Available Money pursuant to a Stock Pledge Agreement of even date herewith (the "Stock Pledge Agreement"), (ii) the guaranty and suretyship of Money Centers of America, Inc. pursuant to a Corporate Guaranty of even date herewith, and (iii) the guaranty and suretyship of Available Money pursuant to a Corporate Guaranty of even date herewith.

Events of Default. The occurrence of any one or more of the following events shall constitute an "Event of Default" hereunder:

(a)  the Borrower shall fail to pay when due, any installment of principal or interest or fee payable hereunder or any Obligation within 10 days following the date when due;

(b)  the Borrower shall fail to observe or perform any other material obligation or covenant required to be observed or performed by it hereunder or under the Stock Pledge Agreement;

(c)  the Borrower shall admit its inability to pay its debts as they mature, or shall make an assignment for the benefit of its creditors;

(d)  any event of default under the Borrower's primary borrowing facility as a result of which the lender thereunder has declared the principal balance thereof to be due and payable;

(e)  proceedings in bankruptcy, or for reorganization of the Borrower, or for the readjustment of any of its debts under Bankruptcy Code, as amended, or any part thereof, or under any other laws, whether state or federal, for the relief of debtors, now or hereafter existing, shall be commenced by or against the Borrower and, if commenced against the Borrower, shall not be discharged within ninety (90) days of their commencement; or

(f)  a receiver or trustee shall be appointed for the Borrower or for any substantial part of its assets, or any proceedings shall be instituted for the dissolution or the full or partial liquidation of the Borrower, and such receiver or trustee shall not be discharged within ninety (90) days of its appointment.

Acceleration.  Immediately upon the occurrence and during the continuation of any Event of Default, the Lender hereof, at its sole option, and without further notice may declare in writing the entire unpaid principal of this Note together with all interest accrued thereon, to forthwith become due and payable.

Notices.  All notices or demands required or permitted to be given pursuant to the terms hereof shall be effective on the date of deposit in the U.S. mails if addressed to the the Lender or the Borrower at its last known address as appropriate, postage prepaid, registered or certified mail, return receipt requested.

Time is of the essence hereof.

Costs.  Maker agrees to pay all costs of collection, including reasonable attorneys fees, in case payment of this Note is not made in accordance with its terms.

Governing Law; Jurisdiction.  This Note is delivered and made in and shall in all respects shall be construed pursuant to the laws of Minnesota and any and every legal proceeding arising out of or in connection with this Note shall be brought in the appropriate courts of the State of Minnesota, each of the parties hereby consenting to the exclusive jurisdiction of said courts for this purpose.

Remedies.  The remedies of the Lender as provided herein, or in the Stock Purchase Agreement, shall be cumulative and concurrent, and may be pursued singularly, successively or together, in the sole discretion of the Lender, and may be exercised as often as occasion therefore shall arise.  No act of omission or commission of the Lender, including specifically any failure to exercise any right, remedy or recourse, shall be deemed to be a waiver or release of the same; such waiver or release to be effected only through a written document executed by the Lender and then only to the extent specifically recited therein.  Without limiting the generality of the preceding

sentence, acceptance by the Lender of any payment with or without knowledge of the occurrence of Event of Default by Maker shall not be deemed a waiver of an Event of Default, and acceptance by the Lender of any payment in an amount less than the amount then due hereunder shall be an acceptance on account only and shall not in any way affect the existence of an Event of Default hereunder or under the Stock Purchase Agreement. A waiver or release with reference to any one event shall not be construed as continuing, as a bar to, or as a waiver or release of, any subsequent right, remedy, or recourse as to a subsequent event.

Maximum Interest Rate. All agreements between Maker and the Lender are expressly limited so that in no contingency or event whatsoever, whether by reason of: error of fact or law; payment, prepayment or advancement of the proceeds hereof; acceleration of maturity of the outstanding principal balance, or otherwise, shall the amount paid or agreed to be paid to the Lender hereof for the use, forbearance or retention of money to be advanced hereunder, including any charges collected or made in connection with the indebtedness evidenced by this Note which may be treated as interest under applicable law, if any, exceed the maximum legal limit (if any such limit is applicable) under United States federal law or state law (to the extent not preempted by federal law, if any), now or hereafter governing the interest payable in connection with such agreements. If, from any circumstances whatsoever, fulfillment of any provision hereof at the time performance of such provision shall be due shall involve transcending the limit of validity (if any) prescribed by law which a court of competent jurisdiction may deem applicable hereto, then, ipso facto, the obligation to be fulfilled shall be reduced to the limit of such validity, and if from any circumstances, the Lender shall ever receive as interest an amount which would exceed the maximum legal limit (if any such limit is applicable), such amount which would be excessive interest shall be applied to the reduction of the outstanding principal balance due hereunder and not to the payment of interest or, if necessary, rebated to the Borrower. This provision shall control every other provision of all agreements between Maker and the Lender.

Survival of Obligations. In the event that at any time any payment received by the Lender hereunder shall be deemed by final order of a court of competent jurisdiction to have been a voidable preference or fraudulent conveyance under the bankruptcy or insolvency laws of the United States, or shall otherwise be deemed to be due to any party other than the Lender, then, in any such event, the obligation to make such payment shall survive any cancellation of this Note and/or return thereof to Maker and shall not be discharged or satisfied by any prior payment thereof and/or cancellation of this Note, but shall remain a valid and binding obligation enforceable in accordance with the terms and provisions hereof, and the amount of such payment shall bare interest at the Default Rate from the date of such final order until repaid hereunder.

Waivers. The Maker hereby expressly waives presentment, demand, notice of dishonor, notice of nonpayment and all other notices and demands in connection therewith or in the nature thereof.

Note this **6th**    IN WITNESS WHEREOF, the undersigned, intending to be legally bound, has duly executed this
day of January, 2004

iGAMES ENTERTAINMENT, INC.

By: _____ (SEAL)
Name:   Christopher M. Wolfington
Title:   CEO

CHEX SERVICES, INC.

By: _____ (SEAL)
Name:      IJAZ ANWAR
Title:     C.F.O.

# Exhibit B

# KLEHR, HARRISON, HARVEY, BRANZBURG & ELLERS LLP
### ATTORNEYS AT LAW

LAWRENCE D. ROVIN

Direct Dial: (215) 569 2899
LROVIN@klehr.com

260 S. BROAD STREET
PHILADELPHIA, PA 19102

(215) 568-6060
FAX: (215) 568-6603

www.klehr.com

March 12, 2004

New Jersey Office
457 Haddonfield Road
Suite 510
Cherry Hill, New Jersey 08002-2220
(856) 486-7900

Delaware Office
919 Market Street
Suite 1000
Wilmington, Delaware 19801-3062
(302) 426-1189

Henry Fong, President
Equitex, Inc.
2401 PGA Boulevard, Suite 190
Palm Beach Gardens, FL 33410

James P. Welbourn, President and CEO
Chex Services, Inc.
11100 Wayzata Boulevard, Suite 111
Minnetonka, MN 55305

RE:   **Termination of Stock Purchase Agreement dated November 3, 2003**

Dear Messrs. Fong and Welbourn:

By my letter to you dated January 7, 2004 (the "January 7 Letter"), iGames Entertainment, Inc. ("iGames") notified you of its concerns related to the termination by NCASF, Inc. of its contracts with Chex Services, Inc. ("Chex"), including the impact of such termination on the relative rights of the parties under the November 3, 2003 Stock Purchase Agreement (the "Agreement") among Equitex, Inc. ("Equitex"), Chex and iGames. In particular, the January 7 Letter indicated that the termination of the NCASF, Inc. contracts, and related adverse publicity, would have a Material Adverse Effect on Chex, represented a breach by Equitex and Chex of representations and warranties in the Agreement and a failure to satisfy conditions precedent to iGames' obligations under the Agreement. As a result, iGames is entitled to terminate the Agreement and receive the Termination Amount called for therein.

In addition, by my letter to you dated January 27, 2004 (the "January 27 Letter"), iGames further notified you that the failure to disclose to iGames the existence of a $606,316 note receivable, the circumstances surrounding its execution and the current status of the note receivable constituted multiple breaches by Equitex and Chex of their representations and warranties in the Agreement, breaches of Equitex's and Chex's pre-Closing covenants and failure to satisfy conditions precedent to iGames' obligations under the Agreement. As a result, iGames is entitled to terminate the Agreement and receive the Termination Amount called for therein.

PHIL1 562784-1

KLEHR, HARRISON, HARVEY, BRANZBURG & ELLERS LLP

Henry Fong, President
James P. Welbourn, President and CEO
March 12, 2004
Page 2

Finally, in January 2004 you informed iGames that Equitex could not consummate the transaction as contemplated under the Agreement due to federal income tax consequences to Equitex associated with the structure of the transaction.

Notwithstanding these developments, iGames remained willing to explore terms and conditions upon which a combination of iGames and Chex could be achieved, while reserving its right to exercise its termination rights under the Agreement.

Unfortunately, iGames has concluded that these efforts have been fruitless. Accordingly, this letter shall serve as notice under Section 11(b) of the Agreement that iGames hereby terminates the Agreement pursuant to Sections 11(b)(ii), (iv) and (viii) as a result of the facts and occurrences described in the January 7 Letter and the January 27 Letter. Under Section 11(c) of the Agreement, Equitex and Chex are required to pay to iGames the Termination Amount of $1,000,000 immediately upon receipt of this notice of termination. iGames shall in a timely manner prepare documentation regarding its costs and expenses incurred in connection with the transactions contemplated by the Agreement, which amount shall be due and payable no later than five business days following your receipt of such documentation.

The Termination Amount and cost reimbursement shall be paid by wire transfer to the following account:

        Bank:           PNC Bank # 002998
        Account:        Money Centers of America
        Account No.:    8612826694

                                Very truly yours,

                                Lawrence D. Rovin

                                Lawrence D. Rovin

cc:     Christopher M. Wolfington

PHIL1 562784-1

CX/EX02029

# Exhibit C

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

iGAMES ENTERTAINMENT, INC.,          )
                                     )
                        Plaintiff,  )       C.A. No. 04-180-KAJ
                                     )
            vs.                      )       JURY TRIAL DEMANDED
                                     )
CHEX SERVICES, INC. and EQUITEX, INC., )
                                     )
                        Defendant.  )
                                     )
EQUITEX, INC. and CHEX SERVICES, INC. )
                                     )
                        Plaintiffs, )       C.A. No. 04-256-KAJ
                                     )
            vs.                      )
                                     )
iGAMES ENTERTAINMENT, INC.           )
                                     )
                        Defendant.  )
                                     )
CHEX SERVICES, INC., d/b/a FAST FUNDS, )
                                     )
                        Plaintiff,  )       C.A. No. 04-0885-KAJ
                                     )
            vs.                      )
                                     )
iGAMES ENTERTAINMENT, INC.           )
                                     )
                        Defendant.  )
                                     )

EXPERT REPORT OF
THOMAS JOHN SHOPA, CPA, CFP
JANUARY 26, 2005

# TABLE OF CONTENTS

**PURPOSE** ........................................................................................................................1

**BACKGROUND** ............................................................................................................2

**AGREEMENTS BETWEEN THE PARTIES**

    Stock Purchase Agreement .............................................................................4
    Term Loan Note ..............................................................................................4
    Termination of Stock Purchase Agreement by Equitex and Chex Services.................4
    Termination of Stock Purchase Agreement by iGames ...........................................4

**OBLIGATIONS OF iGAMES SPECIFIED IN THE TERM LOAN NOTE**

    Interest Payment Obligation .............................................................................5
    Profit Sharing Obligation ...................................................................................5
    Security Obligation ...........................................................................................5
    Maturity of the Term Loan Note..........................................................................6
    Initial Maturity Date .........................................................................................6
    Final Maturity Date...........................................................................................6
    Late Payment Penalty ("Late Fees").....................................................................6
    Alternative Payment Obligation (SPA Termination)...............................................7
    Calculation of Amounts Due by iGames under the Term Loan Note...........................7
    Accounting Materiality .....................................................................................7
    Summary of Amount Due from iGames.................................................................8
    Profit Sharing of Available Money Operating Income.............................................8
    IGames Assertion of Offsetting Expenses to Term Loan Note Obligations.................8

**FINANCIAL REPORTING OVERVIEW**

    Securities and Exchange (SEC) Filing Requirements of Equitex and iGames............10
    Assurance Provided by Independent Accounting Firm on Equitex............................10
    Basis of Presentation (Consolidated Financial Reporting) .........................................11
    Basis of Presentation (Interim Financial Statements)................................................11

**iGAMES ASSERTION OF IMPROPER FINANCIAL REPORTING BY EQUITEX:**
**- NOTES RECEIVABLE FROM THE HOWARDS**

    Checks Returned (NSF Check) - Howards ...........................................................12
    NSF Checks – Standard Policies and Procedures of Chex Services...........................12
    Initial Investigation of the Howards by Deanna Moose .............................................13
    Follow Up Investigation of the Mortgage Banker by Deanna Moose .........................13
    Conversion of Howards Receivable to a Financial Instrument ...................................14
    Status of Howards Receivable as of November 19, 2003............................................14

## FINANCIAL REPORTING ANALYSIS

Fair Value of Financial Instruments (SEC / Financial Statement Disclosure) ............15
Notes Receivable (SEC / Financial Statement Disclosure) .........................................16
Estimates (SEC / Financial Statement Disclosure).....................................................16
Accrual of Loss Contingencies ..................................................................................16
Recognition of Impairment ........................................................................................17
Summary Analysis .....................................................................................................17

## FINANCIAL REPORTING OF IGAMES AND MONEY CENTERS .....................17

TB Tribe Agreement ..................................................................................................18
Accounting Standards ................................................................................................20
Accounting Treatment of MCA's $3 Million Obligation to the TB Tribe .................20
Erroneous Accounting Treatment of MCA's $3 Million Obligation to the TB Tribe.21
Material Error.............................................................................................................22

## CONCLUSIONS ...............................................................................................23

## SOURCE OF INFORMATION RELIED UPON IN THIS REPORT .......................24

## CURRICULA VITAE
Thomas J. Shopa ........................................................................................................26
Clyde G. Hartman ......................................................................................................31

## EXHIBITS
Analysis of Term Loan Note (Varying Assumptions).............................................Exhibit 1
Shared Expenses for Conferences.........................................................................Exhibit 2

**PURPOSE**

This report has been prepared pursuant to the request of counsel to Equitex, Inc. ("Equitex" or "the Company") and Chex Services, Inc. ("Chex Services") in litigation between Equitex and Chex Services and iGames Entertainment, Inc. ("iGames"), which is currently pending in the United States District Court for the District of Delaware. McBride Shopa & Company, P.A., has been retained by counsel to serve as an expert consultant in this litigation. I understand that I may be called to present expert testimony at trial, and this report summarizes my possible testimony.

The purpose of this report is to evaluate and comment on certain financial issues of this case. Specifically, I have been asked to consider whether generally accepted accounting principles (GAAP") were consistently applied by Equitex, Inc. in their public filings with the Securities and Exchange Commission ("SEC") with respect to a note receivable owed by two individuals to Chex Services (Equitex subsidiary). Our analysis in this area was focused on the period of November 3, 2003 when the parties to this litigation entered into Stock Purchase Agreement until March 12, 2004 when the Agreement was terminated. Equitex filed Form 10-Q with the SEC during this period.

I have also been asked to consider the financial and other obligations of iGames in conjunction with a Term Loan Note resulting from a $2 million loan from Chex Services to iGames in January 2004.

I have also been asked to consider the appropriate financial reporting for a contractual obligation of iGames (through its subsidiary Money Centers of America, Inc.) to the Tunica-Biloxi Tribe of Louisiana for $3 million.

I have also been asked to consider documents produced by the parties in this litigation, including financial reports, accounting records, deposition transcripts, contracts, documents filed in this case and other relevant documents listed at the end of this report.

My qualifications for this engagement are outlined in the Curriculum Vitae section of this report, as are those of my colleague, Clyde G. Hartman, who assisted in the preparation of this report.

Fees for services performed for this study and any related testimony have been or will be charged at our standard billing rates ranging from $75 to $295 per hour. Out-of-pocket expenses are billed as incurred. My work on this case is expected to be ongoing.

At trial, I may employ schedules or other summaries of my opinions or demonstrative exhibits that are not in this report. I reserve the right to supplement this report up to the time of trial. All opinions stated in this report are expressed with a reasonable degree of professional certainty with regard to accounting and related fields.

This report is submitted solely in connection with the case referenced above and should not be used for any other purpose without my prior permission for each occasion.

1

**BACKGROUND**

**Equitex and Subsidiaries**

Equitex, Inc. is a public holding company and during the relevant time frame was the Parent Corporation of Chex Services, Inc. and the companies listed below.

Chex Services, Inc. provides comprehensive cash access services to casinos and gaming establishments.

Key Financial Systems, Inc. ("KFSI") ceased operations during the 4th quarter of 2003. Consequently, KFSI's financial information was presented as a "discontinued operation" in Equitex' financial statements for the year-ended December 31, 2003.

Nova Financial Systems, Inc. ("NFSI")

Chex Services, KFSI and NFSI were wholly owned subsidiaries of Equitex during the relevant time frame.

Denaris Corporation ("Denaris") was formed by Equitex in August 2002 to "pursue opportunities in stored value card operations." Equitex owned approximately 77% of Denaris' outstanding common stock as of December 31, 2003.[1]

**iGames Entertainment**

During the relevant time frame, iGames Entertainment ("iGames") was described as a public holding company that provides "cash access and financial management systems for the gaming industry and focuses on specialty transactions in the cash access segment of the funds transfer industry through its subsidiaries, Money Centers of America ("MCA") and Available Money, Inc. ("Available Money")."[2]

---

[1] SEC Filing of Equitex, Form 10-K 12-31-2003, Item 1. Description of Business
[2] First Amended Complaint of iGames, Background Information

**Check Cashing Services provided by Chex Services, Inc.**

Management described the services and business operations of Chex Services as follows.

"Chex's check cashing services allow location patrons to access cash by writing a check to Chex Services at its teller facility staffed by employees of the company. Chex's employees conduct the authorization and verification process for check cashing transactions in accordance with detailed procedures developed by Chex to help minimize bad debt from returned checks.

Chex's customers are granted check-cashing limits based upon their check cashing history, which is captured and maintained by Chex. The customer's ability to pay is critical in establishing their check cashing limits.

Chex charges the customer a fee for cashing checks. The fee for personal checks ranges from 3% to 10% of the amount of the cashed check. At the locations where they provide check-cashing services, Chex pays the location operator a commission based upon the monthly amount of checks cashed. Chex also cashes other financial instruments at varying customer fees, such as, money orders, government checks, payroll checks, insurance checks, etc.

Chex's check cashing services benefit location operators by providing demographic information on the location's patrons, relieving the location of any risk and collection costs associated with returned checks and by allowing the location to focus on the aspects of the business that they do best.

Chex mitigates its potential for returned items by establishing check-cashing limits based on the customer's history at Chex locations. In addition, Chex utilizes national negative databases to determine if a customer has written non-negotiable checks in the past. Chex also contacts the customer's bank to verify funds availability in the customer's checking account and take the fingerprints and photo of customers to both deter potential bad checks and to assist their efforts in collections when necessary.

In the past, Chex has used its own in-house collections department to pursue collection of returned checks. In September 2002, Chex incorporated this department as Collection Solutions, Inc. creating a separate wholly-owned stand-alone collections subsidiary licensed as a collection agency in seven states."[3]

---

[3] SEC Filing Form 10-K December 31, 2002, Pages 4-5

3

**AGREEMENTS BETWEEN THE PARTIES**

**Stock Purchase Agreement ("SPA")**

On November 3, 2003 the parties to this case entered into a "Stock Purchase Agreement for the Acquisition of Chex Services, Inc. by iGames Entertainment from Equitex, Inc." (the "Stock Purchase Agreement").[4] Under the SPA, iGames agreed to purchase "all of the issued and outstanding capital stock of Chex."

**Term Loan Note**

Chex Services (the "Lender") and iGames (the "Borrower") entered into a Term Loan Note dated January 6, 2004 (and signed on or about January 21, 2004) in which Chex Services agreed to lend $2 million to iGames and an additional $2 million 60 days thereafter, "provided that at such time the Borrower is in material compliance with the terms of the Note, the Stock Pledge Agreement and the Stock Purchase Agreement."

Pursuant to the provisions of the Term Loan Note, Chex Services advanced $2 million to iGames on or about January 6, 2004 and the funds were used by iGames to acquire 100% of the capital stock of Available Money, Inc. ("Available Money").

**Termination of Stock Purchase Agreement by Equitex and Chex Services**

On March 12, 2004 Equitex and Chex Services terminated the SPA with iGames "under Sections 11(b)(v) and 11(b)(ix) of the Stock Purchase Agreement for reasons including, but not limited to, the following:

1. "the continuing decline in iGames stock price constitutes an event having a "Material Adverse Effect" on iGames;

2. iGames made an unapproved offer to buy Game Cash in violation of Section 7(b)(ii) of the Stock Purchase Agreement;

3. iGames failure to attain financial targets stated in financial projections previously provided to Equitex constitutes an event having a "Material Adverse Effect" on iGames; and

4. the default under the Term Loan Note constitutes an event having a "Material Adverse Effect" on iGames."[5]

**Termination of Stock Purchase Agreement by iGames**

iGames sent a letter to Equitex and Chex Services on March 12, 2004 terminating the SPA.

---

[4] iGames Exhibit 16
[5] Exhibit D to the Brief in Support of Chex Services, Inc.'s Motion for Summary Judgment, filed by Rider Bennett on August 26, 2004

**OBLIGATIONS OF IGAMES UNDER THE TERM LOAN NOTE**

I have been asked by counsel to consider the financial and other obligations of iGames to Equitex and Chex Services ("the Lenders") under the Term Loan Note. Equitex and Chex Services have declared a breach of the notes provisions by iGames and the breach is relevant to the termination of the SPA by Equitex and Chex Services.

**Interest Payment Obligation**

IGames' obligations to pay interest to Chex Services on the Term Loan Note were clearly outlined in the agreement as follows.

> "For the period ending February 1, 2004, the Borrower shall pay to the Lender interest on the outstanding Term Loans at the rate of fifteen percent (15%) per annum, calculated on the basis of a 360-day year and counting the actual number of days elapsed.

**Profit Sharing Obligation**

The Term Loan Note also required a monthly "profit sharing payment", based upon the operating income of Available Money, Inc. The profit sharing payment was to be reduced by any interest payment already made during the month.

> "In addition, in lieu of interest, the Borrower shall, on a monthly basis, pay to the Lender an amount equal to 50% of the Operating Income of the Borrower's Available Money, Inc. subsidiary (which for the period ending February 1, 2004 shall be reduced by the amount of interest paid under the previous sentence."

This arrangement is similar in nature to a lease, which calls for a fixed monthly rent payment and the payment of additional "percentage rent" typically based upon sales revenue. In such instances, the monthly rent is payable on the first day of the month with payment of the additional "percentage rent" due as soon as the information to calculate the percentage rent becomes available.

**Security Obligation**

An important provision of the Term Loan Note was the agreement that the loan was to be secured by the following.

- A pledge of the capital stock of Available Money pursuant to a Stock Pledge Agreement
- The guaranty and suretyship of Money Centers of America, Inc.
- The guaranty and suretyship of Available Money

iGames was in control of Available Money and Money Centers of America, Inc., but did not deliver the security listed above to Chex Services as specified in the Term Loan Note. From an accounting perspective, it would be reasonable to assume that these "Events of Default" by iGames, would result in the Lenders activating the Acceleration clause in the Term Loan Note.

5

**Maturity of the Term Loan Note**

Under the most conservative reading of the Term Loan Note, the maturity date of the debt can be calculated as follows under the provisions of the "Repayment; Lender's Option".

**Initial Maturity Date**

The provisions listed in Section (a) state that the Initial Maturity Date of Term Loan Note would be 120 days following the earlier of:

(i)     Termination without closing on the Stock Purchase Agreement (March 12, 2004)
(ii)    100 days from the date hereof (April 15, 2004)

The date indicated by provision "i" is earlier than "ii". Thus, the Initial Maturity Date can be calculated by adding 120 days to March 12, 2004, which converts to July 10, 2004.

**Final Maturity Date**

Provision "d" of the Repayment section of the Term Loan Note states that "notwithstanding any provision to the contrary, the outstanding principal balance of his Note, and all accrued but unpaid interest hereon, shall be due and payable 180 days following the Initial Maturity Date."

Thus, the latest possible Maturity Date of the Term Loan Note would have been January 6, 2005, which is 180 days after the Initial Maturity Date of July 10, 2004 discussed above.

**Late Payment Penalty ("Late Fees")**

The Term Loan Note provides that in the event that iGames "fails to pay any amount when due" that iGames would be obligated to pay late fees equal to 10% of the overdue amount.

On March 12, 2004 Equitex and Chex Services declared a default of the Term Loan Note for reasons outlined in this report and declared that the "entire unpaid principal of the Term Loan Note together with all interest accrued thereon to be due and immediately payable."[6] If the court concludes that a default existed as of March 12, 2004, then late fees would be due accordingly.

As discussed above, the Final Maturity Date under a conservative reading of the Term Loan Note would be January 6, 2005. Accordingly, on January 18, 2005 Equitex and Chex Services demanded repayment of the total amount due on the Term Loan Note including late fees totaling $222,944.

It is our understanding that iGames has not made any payments to Equitex or Chex Services and have include late fees in our calculation of the amount due under the Term Loan Note.

---

[6] Exhibit D to the Brief in Support of Chex Services, Inc. Motion for Summary Judgment, Dated August 26, 2004

**Alternative Payment Obligation (SPA Termination)**

The Term Loan Note also provides that in the event Chex Services completes a business combination with any party other than iGames, the interest rate payable by iGames would be reduced from 15% to 10% per annum and iGames requirement to pay 50% of the Operating Income from Available Money would be waived thereafter.

**Calculation of Amounts Due by iGames under the Term Loan Note**

Pursuant to counsel's request, I prepared an analysis of iGames interest and profit sharing obligations on a monthly basis under the Term Loan Note and as of March 12, 2004 and the date of this report (Exhibit 1).

The Term Loan Note indicates that the failure of iGames to "pay any installment of principal or interest or fee payable hereunder or any obligation within 10 days following the date when due" constitutes an "Event of Default".

We have been informed by counsel that iGames did not make any payments on the Term Loan Note since inception. This is clearly an "Event of Default" as defined by the agreement.

Our analysis indicates that iGames was obligated to pay $20,833 and $24,167 of accrued interest to Chex Services as of February 1 and March 1, 2004. The 10-day grace period for these payments would be February 11 and March 11, 2004, but no payments were received. Consequently, overdue accrued interest totaled $45,000 as of March 11, 2004.

As reflected on Exhibit 1, additional interest of $9,167 was due for the period March 1 through March 12, 2004, resulting in accrued interest of $54,167 due from iGames to Chex Services on March 12, 2004, the termination date of the SPA.

Furthermore, the "Acceleration" clause in the Term Loan Note stated that "immediately upon the occurrence and during the continuation of any Event of Default," (Chex Services) "may declare in writing the entire unpaid principal of this note together with all accrued interest thereon, to forthwith become due and payable." The Event of Default discussed above gave Chex Services the right to activate the Acceleration clause, which would cause the entire principal and interest of $2,054,167 to be due immediately from iGames as of March 12, 2004.

**Accounting Materiality**

Our analysis indicates that iGames had incurred accrued interest ($54,167) and late fees ($205,416) totaling $25,583 of expenses as of March 12, 2004. iGames was required to record these expenses and disclose their default on the Term Loan Note in footnotes to their financial statements. The additional expenses and disclosure of loan default would clearly be material items for iGames, based upon our analysis of their total assets, liabilities, net worth, volume of business and operating results.

**Summary of Amount Due from iGames as of January 26, 2005 (Exhibits 1 and 1A)**

I calculated the amount due under the Term Loan Note under 2 different scenarios, based upon different effective dates for the accelerated payment provision.

| Description: | Demand Date of March 12, 2004 | Demand Date of January 18, 2005 |
|---|---|---|
| Principal | $  2,000,000 | $  2,000,000 |
| Interest | 240,556 | 240,556 |
| Late Fees | 205,416 | 222,944 |
| **Total Amount Due** | **$  2,445,972** | **$  2,463,500** |

**Profit Sharing of Available Money Operating Income**

The financial statements of Available Money during January through March 2004 indicate Operating Losses during this period. As a result, we have not included any amounts due from iGames to Chex Services for splitting the Operating Income of Available Money.

The Operating Losses reflected on the financial statements of Available Money during the period when iGames and Chex Services were to share profits (January through March 2004), are inconsistent with the operating results (profits) in the periods before and after this time frame. Consequently, I reserve the right to update my analysis, if additional financial data becomes available for Available Money during the relevant time frame.

We have assumed that the provision of the Term Loan Note for the parties in this case to share profits was no longer applicable after the business combination of Chex Services with another entity in April 2004.

**iGames Assertion of Offsetting Expenses to Term Loan Note Obligations**

iGames has asserted that unpaid shared expenses were due from Chex Services during the January through March 2004 time frame and iGames expected these shared expenses to be offset against their interest obligations under the Term Loan Note. Chex Services denies that such an agreement ever existed.

The shared expenses were attributable to joint participation by Chex Services and Money Centers of America (iGames subsidiary) at a marketing conference (CNIGA) in January 2004. iGames has presented a schedule listing expenses of $26,669 advanced by Money Centers for the CNIGA conference, as compared to $11,925 of expenses advanced by Chex Services (d/b/a Fast Funds) for the same conference. The schedule was attached to an email sent to Ijaz Anwar on March 19, 2004 and it contains a reference to a $13,960 payment made by Chex Services for a booth at another conference (NIGA "booth payment") occurring in approximately April 2004.[7]

---

[7] Exhibit iGames 2 / CX/EX2075-2077

The assertion by iGames that their nonpayment of the interest on the Term Loan Note is justified by these shared expenses is not reasonable for the following reasons.

1. The Term Loan Note is a written document whose obligations include very specific terms of repayment that must be complied with. When parties undertake a significant transaction and reduce their understanding to writing, it signifies the importance of the provisions outlined in the document, particularly the requirements for repayment of the obligation. In fact the express language contained in the "Remedies" paragraph of the Term Loan Note requires any "right, remedy or waiver" to be "a written document executed by the Lender" (Chex Services).

2. iGames owed Chex Services $2 million in principal, which was used by iGames to fund the acquisition of Available Money. At no time since this loan, has Chex Services ever been indebted to iGames.

3. If the shared expenses indicated on the schedule for the CNIGA conference were split evenly, then each party would be responsible for $19,297 (50/50 split of total expenses $38,594 ($26,669 + $11,925)). The expenses to be reimbursed by Chex Services to iGames would total $7,372 as of March 11, 2004 under this scenario.

   If the $13,960 booth payment for the NIGA conference was disbursed by Chex Services on or before March 11, 2004 then Chex Services would have owed a $392 reimbursement to iGames for shared expenses as of March 11, 2004 (Exhibit 2).

   Our analysis indicates that the amount owed by iGames to Chex Services for accrued interest ($45,000) even without regard to late fees, was in excess of the portion of shared expenses advanced by Money Centers of America and attributable to Chex Services ($7,372) as of March 11, 2004. In addition, iGames owed late fees totaling $4,582 to Chex Services as of the same date.

4. It is not practical from an accounting perspective to expect a debtor to regularly extend payment terms on a substantial term note of $2 million, while waiting for ever-changing reconciliations of shared expenses.

5. Finally, it is a very poor accounting practice to offset the payment of expenses particularly when they are of such different nature (financing v operating). Payments on a financial instrument requiring monthly interest payments should not be offset by shared fluctuating marketing expenses.

**FINANCIAL REPORTING**

**Securities and Exchange ("SEC") Filing Requirements of Equitex and iGames**

Equitex and iGames are both public companies registered with the Securities and Exchange Commission. As such, they are required to comply with the SEC's financial reporting regulations including annual filings of Form 10-K and quarterly interim filings of Form10-Q.

The filing included the financial statements of Chex Services and other subsidiaries of Equitex.

**Assurance Provided by Independent Accounting Firm on Equitex Financial Reporting**

The financial statements included in the SEC filings of Equitex were subjected to assurance procedures by an independent accounting firm, Gelfond, Hochstadt, Pangburn, P.C. ("GHP"), a CPA firm from Denver, Colorado.

The September 30, 2003 condensed consolidating financial statements of Equitex, Inc. and subsidiaries were reviewed by GHP in accordance with standards established by the American Institute of Certified Public Accountants. These quarterly interim financial statements were included in Form10-Q filed on November 19, 2003 for the quarter ended September 30, 2003. The "Independent Accountants' Report" issued by GHP and included in Form 10-Q for that period stated the following.

> "Based on our reviews, we are not aware of any material modifications that should be made to the accompanying condensed consolidated financial statements (of Equitex, Inc. and subsidiaries) for them to be in conformity with accounting principles generally accepted in the United States of America."[8]

The annual financial statements included in Form10-K filed for December 31, 2002 and 2003 were audited by GHP and filed in April of the following years.

The "Independent Accountants Report" issued by GHP and included in the Form 10-K of Equitex for December 31, 2002 stated the following.

> "In our opinion, the consolidated/combined financial statements (of Equitex, Inc. and subsidiaries) present fairly, in all material respects, the financial position of Equitex, Inc. and subsidiaries as of December 31, 2002 and 2001, and the results of their operations and their cash flows for each of the years in the two-year period ended December 31, 2002, in conformity with accounting principles generally accepted in the United States of America."[9]

The financial statements included in the Form 10-K filing of Equitex for December 31, 2003 included identical assurances regarding the compliance of Equitex' compliance with GAAP.[10]

---

[8] SEC Filing Form 10-Q September 30, 2003, Page 2
[9] SEC Filing Form 10-K, December 31, 2002 (Page 43)
[10] SEC Filing Form 10-K, December 31, 2003 (Page 40)

**Basis Of Presentation (Consolidated Financial Reporting):**

The consolidated financial reporting of Equitex, Inc. and subsidiaries was discussed in the Company's Form 10-Q as follows. As noted, the financial statements were fully included in the consolidated financial reporting of Equitex and subsidiaries.

"The accompanying financial statements present the consolidated financial position of Equitex, Inc. and its wholly-owned subsidiaries, Key Financial Systems, Inc. ("Key"), Nova Financial Systems, Inc. ("Nova"), Chex Services, Inc. ("Chex"), and its wholly-owned subsidiary Collection Solutions, Inc. ("Collection") and Equitex's majority-owned subsidiary, Denaris Corporation ("Denaris") as of September 30, 2003 and December 31, 2002. The results of operations and cash flows of the Company for the three and nine months ended September 30, 2003 present the consolidated results of Equitex, Key, Nova, Chex, Collection, and Denaris. (Comments regarding September 30, 2002 deleted)

During the three and nine months ended September 30, 2003, the net loss incurred by the Company's majority-owned subsidiary Denaris, exceeded the minority interest in the common equity (deficiency) of the subsidiary. The excess of 2003 losses applicable to the minority interest have been charged to the Company, and no minority interest is reflected in the Company's September 30, 2003 consolidated financial statements. All significant intercompany accounts and transactions have been eliminated in consolidation."

**Basis Of Presentation (Interim Financial Statements):**

The basis of presentation for interim financial reporting is less comprehensive than the annual filing. Management's assertions in Form 10-Q contained the following comments, which notified the reader that the 10-Q filing is condensed and that Form 10-K filed for the previous year should be read in conjunction with the current interim filing.

"all adjustments necessary to present fairly the financial position, results of operations, and cash flows of the Company as of September 30, 2003, and for the periods ended September 30, 2003 and 2002, have been made. Except as described below, those adjustments consist only of normal and recurring adjustments.

Certain information and note disclosures normally included in the Company's annual financial statements prepared in accordance with accounting principles generally accepted in the United States of America have been condensed or omitted. These condensed consolidated financial statements should be read in conjunction with a reading of the consolidated financial statements and notes thereto included in the Company's Form 10-K annual report filed with the Securities and Exchange Commission ("SEC") on April 15, 2003. The results of operations for the three months and nine months ended September 30, 2003, are not necessarily indicative of the results to be expected for the full year.

**IGAMES ASSERTION OF IMPROPER FINANCIAL REPORTING BY EQUITEX**

**NOTE RECEIVABLE - HOWARDS**

**Checks Returned (NSF Checks) - Howards**

During the first week of September 2003 (primarily the Labor Day Weekend and thereafter), LeRoy Howard and Pauline Mason-Howard ("Pauline Howard", collectively "the Howards"), cashed approximately $606 thousand of checks with Chex Services, Inc. at the Seminole Casino in Florida. The checks were presented for payment by Chex Services, but were returned due to insufficient funds in the Howards' personal checking account ("NSF Checks").

**NSF Checks – Standard Policies and Procedures of Chex Services**

The standard policies and procedures of Chex Services for handling checks returned for insufficient funds were outlined in the testimony of Deanna Moose.

"If a check was returned from a customer, the process was to set up a file within the location. The location would work the check, making -- sending out demand for payment letters, making phone calls to the person who bounced the check. I think they kept the files for 60 days to try to make it a collection from the location. If they couldn't collect the check within 60 days, it was sent to corporate and it was handed off to Bob Bloomberg, who was the in-house collection person."[11]

The large balance due from the Howards from the NSF checks, required more intensive collection procedures than the standard policies outlined above and management acted quickly to protect their interest.

---

[11] Deposition Transcript: Deanna Moose on December 27, 2004, Pages 10-11

**Initial Investigation of the Howards by Deanna Moose**

Deanna Moose, former director of customer service and current vice president of operations for Chex Services[12], was assigned to investigate the circumstances surrounding the Howards cashing $606 thousand in checks that were ultimately returned to Chex Services due to insufficient funds.

Deanna Moose knew the Howards from her previous employment with Game Cash, a company that provided check-cashing services similar to Chex Services at the Seminole casinos in Florida. Deanna Moose testified that the Howards were regarded as "established customers" and "preferred high rollers" when she worked at the Seminole casinos for Game Cash during the period June 1997 through February 2001. The Howards cashed large volumes of checks with Game Cash on a regular basis in pursuit of large jackpots on progressive jackpot slot machines. However, there was never a problem with the checks clearing during this time frame even when the Howards did not win a jackpot. Game Cash established a check-cashing limit of approximately $200 thousand for the Howards.[13]

Deanna Moose's procedures and findings were as follows[14].

- A trend analysis of the Howards' check cashing during the 3 to 4 months prior to September 2003, revealed similar volumes of check cashing ($400 thousand to $800 thousand per month) with no problems clearing the checks.

- There appeared to be no fraud, kickbacks or collusion with the Howards on the part of Chex Services employees. The investigation in this area included counting cash, conducting interviews of cashiers, analyzing other aspects of the transaction and viewing the events as captured on surveillance cameras in the casino.

- The Howards won a progressive jackpot during August 2003 between $800 thousand to $1 million.

- Deanna Moose visited the nursing home owned by the Howards and she also met with the Howards, whereupon they assured her that they would pay the amount they owed in 30 to 45 days.

**Follow Up Investigation of the Mortgage Banker by Deanna Moose**

Deanna Moose also visited the office of the mortgage banker who was working on refinancing the Howards' properties to ensure the legitimacy of the mortgage company. This visit occurred in early October 2003. The mortgage banker assured Ms. Moose that he expected the refinancing to close within two weeks. The banker also indicated that the property appraisals and loan to value ratios had already been reviewed.[15]

---

[12] Deposition Transcript of Deanna Moose, Page 8
[13] Deposition Transcript of Deanna Moose, Pages 12-15
[14] Deposition Transcript of Deanna Moose, Pages 21-24
[15] Deposition Transcript of Deanna Moose, Page 23-24

**Conversion of Howards Receivable to Financial Instrument**

When Chex Services contacted the Howards regarding the NSF checks, the Howards affirmed their indebtedness in the full amount. On or about September 15, 2003, Deanna Moose and George Conners of Chex Services visited the Howards in Florida and obtained a promissory note signed by the Howards in the amount of $600 thousand payable to Chex Services, Inc. Terms of the note required payment of principal and accrued interest (12% per annum) on October 14, 2003, as the Howards had indicated that they would repay their debt within 30 to 45 days[16].

The note also contained provisions that allowed Chex Services to extend the time for payment of sums due under the note, accept a renewal of the note, change the interest rate, or modify other terms of the note without affecting the obligations of the Howards.

The note also stipulated that "any funds relating to a loan, credit line or similar advance made by Atlantic Coast Mortgage Group or any other banking of lending institution to (the Howards), from the time hereof, shall be paid directly to (Chex Services) by said Atlantic Coast Mortgage Group or said banking or lending institution."

**Status of Howard Receivable on the SEC Filing date of Form 10-Q by Equitex and Subsidiaries (November 19, 2003)**

The note receivable was not paid by the October 14, 2003 due date and no payments had been received from the Howards as of November 19, 2003. However, the following factors suggested that the Howards would pay their debt within 3 months.

- The Howards admitted their debt in writing, as evidenced by their signing a promissory note on September 15, 2003.

- A mortgage refinancing on a nursing home owned by the Howards was in process, as evidenced by a "Funding Commitment" letter from Guaranteed Principle SPC, Ltd. in the amount of $750 thousand. The letter is dated November 14, 2003 and appears to have been faxed to the accounting firm on November 18, 2003.[17]

- A mortgage refinancing on an auto repair facility owned by the Howards was in process, as evidenced by a "Conditional Loan Pre-Approval" from InterBay Funding, LLC in the amount of $375 thousand. The document is dated November 3, 2003 with an expiration date of December 18, 2003 and appears to have been faxed to the accounting firm on November 18, 2003.[18]

- The actions of the Howards (cashing $600 thousand of NSF checks) exposed them to criminal charges. From an accounting perspective, it is reasonable to assume that the Howards were motivated to pay their debt to avoid any possibility of prosecution.

---

[16] Deposition Transcript of Deanna Moose, Page 24-26
[17] Accountants' Workpapers
[18] Accountants' Workpapers

- The primary assets of the Howards appeared to be in commercial and residential real estate and commercial enterprises, which greatly reduced the risk that the Howards would simply disappear and abandon their assets.

## FINANCIAL REPORTING ANALYSIS

### Fair Value Of Financial Instruments (SEC / Financial Statement Disclosure):

The following footnote disclosure was applicable to the Howard note receivable after its conversion to a financial instrument on September 15, 2003.

"The estimated fair values of financial instruments has been determined by the Company using available market information and appropriate methodologies; however, considerable judgment is required in interpreting information necessary to develop these estimates. Accordingly, the Company's estimates of fair values are not necessarily indicative of the amounts that the Company could realize in a current market exchange.

The fair values of cash and cash equivalents, current non-related party receivables, accounts payable and accrued expenses approximate their carrying amounts because of the short maturities of these instruments.

The fair values of notes and advances receivable from non-related parties approximates their carrying values because of the short maturities of these instruments. The fair values of notes and advances receivable from related parties are not practicable to estimate, based upon the related party nature of the underlying transactions.

The fair values of notes and loans payable to non-related parties approximates their carrying values because of the short maturities of these instruments. The fair value of long-term debt payable to banks approximate fair value based on market rates currently available to the Company. The fair values of notes payable to related parties are not practicable to estimate, based upon the related party nature of the underlying transactions."[19]

---

[19] SEC Filing Form 10-K December 31, 2002 , Page F-18

**Notes Receivable (SEC / Financial Statement Disclosure):**

The note receivable from the Howards was disclosed as follows in the Form 10-Q filed by Equitex with the SEC for the quarter ended September 30, 2003.

> "Also included in notes receivable at September 30, 2003, is a note due from a customer of $606,316, representing the repayment of checks that were originally cashed at two casino locations and subsequently were returned for insufficient funds. The note provides for direct payment to the Company from funds anticipated to be available to the makers of the note during the fourth quarter of 2003."

**Estimates (SEC / Financial Statement Disclosure):**

The following footnote discusses the use of estimates in the preparation of financial statements and was disclosed in the Form 10-K filed by Equitex in December 31, 2002. The footnote is included by reference in the "Interim financial statements" paragraph (condensed and omitted information and note disclosures) of Form 10-Q for the quarter ended September 30, 2003.

> "Preparation of the consolidated/combined financial statements in accordance with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the balance sheets and the reported amounts of revenues and expenses during the reporting periods. Actual results could differ from those estimates."[20]

**Accrual of Loss Contingencies**

Accounting literature for Loss Contingencies states the following.

> "An estimated loss from a loss contingency shall be accrued by a charge to income if both of the following conditions are met;

> a.  Information available prior to issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements. It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss.

> b.  The amount of the loss can be reasonably estimated"[21]

The term probable is defined as "the future event or events are likely to occur."

---

[20] SEC Filing Form 10-K December 31, 2002, Page F-20
[21] FASB Current Text: C59 - Contingencies

**Recognition of Impairment**

Accounting literature for Loss Contingencies states the following.

> "A loan is impaired when, based on current information and events, it is probable that a creditor will be unable to collect all amounts due according to the contractual terms of the loan agreement."[22]

> "Measuring impairment of a loan requires judgment and estimates, and the eventual outcomes may differ from those estimates. Creditors should have latitude to develop measurement methods that are practical in their circumstances."[23]

**Summary Analysis**

The financial statement disclosures informs the reader that management uses estimates in the preparation of the financial statements and those estimates may differ from actual results. Management's estimates of future collections on the Howard note receivable were based upon the best information available to them at the time of filing and included many variables such as the market values and equity value of the Howards in 2 commercial properties and 1 residential properties. The accounting treatment of the notes receivable from the Howards is consistent with generally accepted accounting principles as discussed in the previous sections.

---

[22] FASB Current Text: I08 – Impairments (Paragraph 106)
[23] FASB Current Text: I08 – Impairments (Paragraph 109)

**FINANCIAL REPORTING OF iGAMES AND MONEY CENTERS OF AMERICA**

**TB TRIBE AGREEMENT**

I was also asked to consider the financial reporting of iGames and Money Centers; specifically with regard to an obligation of Money Centers to pay $3 million to the Tunica-Biloxi Tribe of Louisiana ("TB Tribe") pursuant to an agreement dated July 29, 2003 (the "TB Tribe Agreement").

The obligation at issue is described as "Equity Payments" in the TB Tribe Agreement and compensates the TB Tribe for their prior efforts in a joint venture with MCA. As such, the obligation should have been reflected as a liability on the balance sheet of MCA. iGames asserts that this is only a contingent liability and reported the obligation in a footnote disclosure only.

**SECTION 1**
**PROMISSORY NOTE**

Section 1 of the agreement is entitled "Promissory Note" and includes the following provisions.

TB Tribe Agreement has advanced approximately $1.3 million in advances from the TB Tribe to MCA in the form of vault cash ($1.1 million) and accrued interest at 9% ($196 thousand) as of February 1, 2003.

Included in the repayment terms for the Promissory Note is the stipulation that 50% of the interest accruing after February 1, 2003 was to be paid 180 days after the Agreement and the other 50% was to be added to the "Equity Payback" described in Section 4 and "shall continue accruing interest until paid". This language supports the assertion that the "Equity Payments" are a firm obligation.  Why else would a business continue accruing interest, if there was no expectation of eventually being paid?

**SECTION 2**
**CASH ADVANCE MANAGEMENT SYSTEM SOFTWARE**

Section 2 of the agreement transfers all rights to a Cash Advance Management System Software owned by TB Tribe, to Money Centers upon the repayment of the Vault Cash obligation. No other payments for the software were cited in this section. From an accounting perspective, it is reasonable to assume that payments (or the selling price) for this software is included in another section of the TB Tribe Agreement, such as Section 4.

18

# SECTION 4
## "EQUITY PAYMENTS"

Section 4 of the TB Tribe Agreement is entitled "Equity Payments" and includes the following provisions. This section is the focus of our analysis, as it describes a $3 million obligation that Money Centers did not reflect on its balance sheet during the relevant time frame.

a)   "The parties agree that in addition to the sums outlined above ("Use of Vault Cash") MCA will pay to TB Tribe an additional $3 million and the accrued interest payment referenced in paragraph 1(c)(ii) above as follows.

  i)   TB Tribe shall be paid 10% of the Operating Profit on all new financial services contracts secured by the MCA.

  ii)   TB Tribe will be paid 30% of the Operating Profit on all new financial service contracts secured in coordination with the efforts of the TB Tribe or any company owned or controlled by the TB Tribe;

  iii)   TB Tribe will be paid 35% of the Operating Profit on all new financial services contracts secured substantially by the sole efforts of the TB Tribe or any company owned or controlled by the TB Tribe.

  iv)   In the event that TB Tribe contracts with MCA to provide credit card services at Paragon Casino Resort, TB Tribe shall receive 100% of the Net Revenues from the credit card transactions. Of that sum, 30% of the Net Revenues collected by TB Tribe shall be applied to the $3,000,000 principal sum and accrued interest as described in Paragraph 4(a) above. All transaction commissions generated by the credit card services provided pursuant to this paragraph shall be settled directly into an account designated by TB Tribe.

b)   All sums paid pursuant to Paragraph 4(a)(i-iv) shall be applied first to accrued interest described in Paragraph 1(c)(ii) above and then to the principal sum of $3,000,000."

**Accelerated Payment Provision in the Event of MCA's Loss of License**

Of particular relevance to deciding the disputed issue, is provision "f" of Section 4.

f)   <u>In the event that MCA's license or certification to conduct business in Indian or State regulated casinos is revoked in a final adjudication, so as to prohibit MCA from conducting its business, then the balance of all outstanding equity payments shall be accelerated.</u>"

I believe that provision "f" clearly identifies the nature of MCA's obligation as a firm, unequivocal liability, that cannot be set aside and is not contingent on future performance.

**Accounting Standards**

The following definition and characteristics of liabilities is excerpted from Statement of Accounting Concepts #6.

"Liabilities are probable future sacrifices of economic benefits arising from present obligations of a particular entity to transfer assets or provide services to other entities in the future as a result of past transactions or events."

Characteristics of a Liability

"A liability has three essential characteristics:

a) it embodies a present duty or responsibility to one or other entities that entails settlement by probable future transfer or use of assets at a specified or determinable date, on occurrence of a specified event, or on demand,

b) the duty or responsibility obligates a particular entity, leaving it little or no discretion to avoid the future sacrifice and

c) the transaction or other event obligating the entity has already happened."

MCA and the TB Tribe had previously undertaken a joint venture. The payments in the TB Tribe Agreement were to repay TB Tribe for cash advances, certain assets and to compensate the TB Tribe for past activities.

**Accounting Treatment of MCA's $3 million obligation to the TB Tribe**

MCA was a privately held corporation whose financial statements were presented on a stand-alone basis for the fiscal year-ended September 30, 2003. On January 2, 2004 MCA was acquired by iGames and their December 31, 2003 quarterly data was disclosed by iGames in an SEC filing.

MCA's financial statements for September 30, 2003 reflected their obligation for cash advances from the TB Tribe (as discussed in the "Promissory Note" section of the TB Tribe Agreement), as a liability on the balance sheet for $1.32 million.[24]

---

[24] Financial Statements of MCA for September 30, 2003 (CX/EX 14997 and 15004)

20

However, the same financial statements for MCA did not reflect a liability on the balance sheet for the $3 million obligation described in the "Equity Payments" section of the TB Tribe Agreement. The only reference in MCA's financial statements was the following footnote disclosure in the "Subsequent Events" section of the report. The date referenced in the footnote is not consistent with the July 2003 date that appears on the document.

> "In October 2003 the Company consolidated all of its notes payable into one note totaling $1,296,176. In December 2003 the Company paid back the note in full. The parties to the note, MCA and Tunica Biloxi Tribe of Louisiana (the Tribe), have also agreed to a possible additional $3,000,000 to be paid to the Tribe as royalties based on a percentage of future financial service contracts introduced to the Company by the Tribe and a percentage of any new financial service contracts secured by MCA."[25]

**Erroneous Accounting Treatment of MCA's $3 Million Obligation to the TB Tribe**

The provisions in Section 4 (Equity Payments) of the TB Tribe Agreement outline terms that impact the timing of the $3 million in equity payments, but the total obligation is fixed and certain. This fixed and certain nature of the obligation is evidenced by the statements in the TB Tribe Agreement that "MCA will pay TB Tribe an additional $3 million"[26] and the payment acceleration clause that states that in the event MCA loses it license and is prohibited from "conducting its business, then the balance of all outstanding equity payments shall be accelerated."[27]

As discussed above, MCA's $3 million obligation to the TB Tribe should have been reflected as a liability on MCA's financial statements from the date of the TB Tribe Agreement.

---

[25] Financial Statements of MCA for September 30, 2003 (CX/EX 15007)

[26] Exhibit 62 and iGames 006657 (Page 3 of 8)
[27] Exhibit 62 and iGames 006658 (Page 4 of 8)

**Material Error**

This $3 million understatement of MCA's liabilities is clearly material, when considered with MCA's balance sheet as of September 30, 2003 and the statement of operations data for the fiscal year then ended.

- Total assets of $3.2 million
- Total liabilities of $3.3 million
- Stockholder's deficit of $74 thousand
- Revenues of 4.4 million

Similarly the $3 million understatement of MCA's liabilities is material, when considered with the consolidated balance sheet of iGames as of December 31, 2003 and the statement of operations data for the 9 months then ended.

- Total assets of $2.8 million
- Total liabilities of $2.7 million
- Stockholder's equity of $103 thousand
- Revenues of $4.9 million for 9 months

"Financial statements would be considered materially misstated if they contain misstatements whose effect, individually or in the aggregate, is important enough to cause them to be presented fairly, in all material respects, in conformity with generally accepted accounting principles."[28]

---

[28] AU Section 9312 – Audit Risk and Materiality in Conducting an Audit

**CONCLUSION**

Based upon my analysis of the documents indicated in this report, I conclude that the financial reporting of the Howards note receivable was in accordance with generally accepted accounting principles as of the Equitex' filing of Form 10-Q with the Securities and Exchange Commission on November 19, 2004.

I also conclude that iGames was not in compliance with the provisions of the Term Loan Note, which constituted an Event of Default as of March 12, 2004 when the Stock Purchase Agreement was terminated by Equitex and Chex Services. iGames owed Chex Services $45,000 of interest payments per the Term Loan Note as of March 11, 2004 (including a 10 day grace period).

My analysis indicates that the total due from iGames under the Term Loan Note has grown to $2,445,972 including principal, interest and late fees as of January 26, 2005, based upon a loan acceleration date of March 12, 2004. Alternatively, ascribing a later loan acceleration date of January 6, 2005 results in an indebtedness of $2,463,500 as of January 26, 2005.

Based upon my analysis of the agreement between MCA and the TB Tribe and financial records, the $3 million obligation should have been recorded as a liability on the balance sheet of MCA, but was only reflected as a footnote disclosure.


Dated: Wilmington, Delaware
             January 26, 2005



_____                    _____
Thomas John Shopa, CPA, CFP                    Clyde G. Hartman, CPA/ABV, CFE, CVA

23

**SOURCE OF INFORMATION RELIED UPON IN THIS REPORT**

1) Court Filings

    a) Equitex, Inc. and Chex Services, Inc. D/B/A Fastfunds Complaint against iGames Entertainment, Inc. for Breach of Contract, Dated March 24, 2004

    b) iGames First Amended Complaint dated July 9, 2004

    c) Answers and Objections to Chex Services, Inc's and Equitex, Inc.'s First Set of Interrogatories Directed to iGames Entertainment, Inc.

    d) Brief in Support of Chex Services, Inc.'s Motion for Summary Judgment, or, in the Alternative, for Default Judgment, as well as the accompanying "Exhibits A" through "F"

    e) Answering Brief in Opposition to Motion for Summary Judgment, Dated October 1, 2004

2) Stock Purchase Agreement for the Acquisition of Chex Services, Inc. by iGames Entertainment, Inc. from Equitex, Inc. dated November 3, 2003

3) Deposition Transcripts and accompanying exhibits of Ijaz Anwar,

    a) September 17, 2004

    b) December 15, 2004 (Pages 7-9, 59-62, 155-165, 208-210)

4) Deposition Transcript and accompanying exhibits of James Welbourn, September 21, 2004

5) Deposition Transcripts and accompanying exhibits of Christopher Wolfington,

    a) September 22, 2004 (Pages 19-53, 135-36, 280-293)

    b) December 3, 2004 (Page337-339, 482-484)

6) Deposition Transcript of Deanna Moose, December 27, 2004

7) Filings of Equitex and iGames with the Securities and Exchange Commission (SEC) including the following:

    a) Equitex, Inc. Form 10-K for December 31, 2002

    b) Equitex, Inc. Form 10-Q for September 30, 2003 (CX/EX15975-16005)

    c) Equitex, Inc. Form 10-K for December 31, 2003

    d) IGames Entertainment, Inc., Form 10KSB for March 31, 2004

    e) IGames Entertainment, Inc., Form 10KSB for June 30, 2004

8) Workpapers produced by Auditing Firm

9) Financial Statements of Money Centers of America

    a) September 30, 2003 (Annual / Audited) (CX/EX 14993-15007)

    b) December 31, 2003 (Quarterly / Included in Form 10-K of iGames)

10) Financial Statements of Available Money, October 31, 2003

11) Statement of Accounting Concepts #6

12) FASB Current Text: including Sections I08 (Impairment) and C59 (Contingencies)

13) AU Section 337B and Excerpts from Statement of Financial Accounting Standards #5: Accounting for Contingencies

14) Correspondence regarding "Mega" Asset Search of the Howards (CX/EX02899-02927)

15) Warranty Deeds on Howard's Real Estate (CX/EX 2901-2906)

16) Handwritten letter the Pauline Howard to Mr. Ijaz on August 18,2004 and copy of check payment of $9,000 (CX/EX 2907-2908)

17) Correspondence from Ijaz Anwar to the Howards on January 27, 2004 (CX/EX 2909-2910)

18) Correspondence dated January 18, 2005 from counsel to Equitex and Chex Services (Rider Bennett), to opposing counsel for iGames (Duane Morris) demanding the immediate payment of the Term Loan Note obligation.

19) Mortgage filing of Chex Services, Inc. on Howard Real Estate, dated April 1, 2004 (CX/EX 2911-2915)

20) Amended and Restated Consolidated Promissory Note from the Howards payable to Chex Services, Inc. in the amount of $637,686.21, dated March 25, 2004 (CX/EX 2916-2918)

21) Filing of Mortgage and Amended and Restated Consolidated Promissory Note with Broward County on May 14, 2004 (CX/EX 2919-2927)

22) File Documents on Leroy Howard and Pauline Howard (CX/EX14816-14992)

23) Draft Closing List and Draft Supporting Documents for a $5 million Loan Facility from Mercantile Capital, L.P. to Chex Services (CX/EX17923-17995)

24) $5,000,000 Purchase of Promissory Notes and Warrants of Equitex, Inc. by Pandora Select Partners, L.P. and Whitebox Hedged High Yield Partners, L.P. (CX/EX01374-01562)

25) Guide to Litigation Support Services, Volumes 1-3, Practioners Publishing Company

26) Litigation Services Handbook, Peter Frank, Michael Wagner, Roman Weil, Published by John Wiley & Sons, 1990

27) Other materials discussed in this report

## CURRICULUM VITAE
## THOMAS JOHN SHOPA, CPA, CFP
## 2005

**EMPLOYMENT**

Managing Director
McBride Shopa & Company, P.A., CPAs
270 Presidential Drive
Wilmington, DE 19807

Director of Management, Advisory and
    Litigation Support Services

**CERTIFICATIONS**

Certified Public Accountant in Delaware
Certified Financial Planner

**EDUCATION**

Long Island University
B.S.- Accounting

**OTHER**

Specialized Training in Business Valuations
Specialized Training in Litigation Support Services

**LITIGATION SUPPORT
AND EXPERT TESTIMONY**

Penn Mart Supermarkets, Inc. v New Castle Shopping, LLC and
    National Wholesale Liquidators – Delaware Chancery Court

Associates in Obstetrics & Gynecology v Upper Merion Township
    – U.S. District Court – Eastern District of Pennsylvania

Rottlund Homes of New Jersey, et al v. Saul Ewing Remick &
    Saul, LLP – Delaware Superior Court

Christiana Marine Service v. Texaco, Inc. – Delaware Superior
    Court

Mrs. Nancy Aronoff v. Aronoff – Family Court of Delaware

Lickle v. Mrs. Sydney Lindley – Family Court of Delaware

Custom Decorative Moldings, Inc. – Mediation and Arbitration

26

**CURRICULUM VITAE (Cont'd.)**
**THOMAS JOHN SHOPA, CPA, CFP**
**2005**

Richard Wade v. Santora – Delaware Superior Court, Judge
Bifferato

Mr. Robert Siegfried – Arbitration

Dr. Grafton Reeves – Delaware Chancery Court, Chancellor Allan

**BUSINESS VALUATIONS**

Christiana Marine Service Corp. – Delaware Superior Court

Old Line Plastics, Inc. – Corporate Reorganization

Jazz and Java, Inc. – Family Court of Delaware

Delaware Digestive Disease Associates, P.A. – Family Court of
Delaware

Middletown Veterinary Hospital – Family Court of Delaware

Dr. Thomases, DDS, PA – Family Court of Delaware

Be Back Auto Parts, Inc. – Family Court of Delaware

Chambers Motors, Inc. – Bankruptcy Court, Judge Ballick

**CURRICULUM VITAE (Cont'd.)**
**THOMAS JOHN SHOPA, CPA, CFP**
**2005**

Managing director and co-founder of the certified public accounting firm of McBride Shopa & Company, P.A. Professional concentration in the areas of Federal Income Taxation since 1975, and Management Advisory Services, Business Valuations and Litigation Support Services since 1982.

## ACTIVITIES

### Current Positions

Board of Directors – Delaware Economic and Financial Advisory Council - 2002

Board of Directors – Delaware Community Foundation, 2001

Board of Trustees and Officer - New Castle County Chamber of Commerce, 2001

Board of Commissioners and Treasurer – Wilmington Housing Authority, 1999

Board of Directors – KINfolk – 1999

Board of Directors and Officer – William P. Frank Scholarship Fund, 1995

### Former Positions

Board of Directors - Wilmington Economic and Financial Advisory Council, 2000-2004

Board of Members – Governor's Task Force on Financial Options for the
    City of Wilmington – 2003

Board of Directors – Independent Accountants International, 1996-1999

Delaware Delegate to the White House Conference on Small Business, Washington, D.C.,
    1986 and 1995

Board of Trustees, Treasurer - Ursuline Academy, 1988-1994

**CURRICULUM VITAE (Cont'd.)**
**THOMAS JOHN SHOPA, CPA, CFP**
**2005**

### Former Positions (Cont'd.)

IRS Commissioner's Advisory Group, 1991-1994

Advisory Board - Blue Rock Capital, L.P., 1993-1994

Board of Directors - Delaware Entrepreneurs Forum, 1994

Board of Governing Council - American Institute of Certified Public Accountants, 1990

President - Delaware Society of Certified Public Accountants, 1989-1990

Chairman, Advisory Council - Delaware Small Business Development Center, 1988-1990

### Speaking Engagements

Television appearances –
    "Political Perspective"
    "Speaking of Your Money"

Delaware Estate Planning Council - "Valuation of Closely-Held Enterprises in
    Marital Dissolutions"

Delaware Society of Certified Public Accountants -
    various topics on Taxation and Management Advisory Services

Various Presentations on Real Estate Taxation

Various Presentations on Financial Planning

### Membership in Professional Associations

American Institute of Certified Public Accountants:
    Member of Governing Council – 1990

    Institute of Certified Financial Planners

**CURRICULUM VITAE (Cont'd.)**
**THOMAS JOHN SHOPA, CPA, CFP**
**2005**

**Membership in Professional Associations** (Cont'd.)

Delaware Society of Certified Public Accountants:
    Member of Council 1983-1990

National Association of Certified Valuation Analysts

Institute of Business Appraisers

National Association of Accountants

National Society of Public Accountants

Construction Financial Management Association

Institute for Certified Divorce Planners

**Awards**

2001 Delaware State Chamber of Commerce Marvin S. Gilman Superstars in Business Award

1997 AICPA Public Service Award

1996 SBA Advocate of the Year – Region III

**Articles**

Income Tax Guide for Delaware Legislators, sponsored by the Delaware Society of Certified
    Public Accountants, co-authored.  Printed in 1984, reprinted in 1985 and 1986.

## CURRICULUM VITAE
## CLYDE G. HARTMAN, CPA/ABV, CVA, CFE
## 2005

## EMPLOYMENT

Current:

December 2002 - Current
McBride Shopa & Company, P.A., CPAs
Wilmington, DE  19809
Manager, Litigation Support and Consulting

History:

January 1994 - August 2002
BDO Seidman, LLP
Philadelphia, PA
Manager

March 1992 - December 1993
Blueprinting Network, Inc.
Washington, DC
Controller

June 1988 - February 1992
Pulsar Data Systems, Inc.
Newark, DE and Lanham, MD
Manager, Finance and Accounting

November 1985 - May 1988
CoreStates Financial (Now Wachovia)
Philadelphia, PA
Secured Lending Auditor

## CERTIFICATIONS

Certified Public Accountant in Delaware & Pennsylvania
Accredited in Business Valuation
Certified Valuation Analyst
Certified Fraud Examiner

## EDUCATION
Undergraduate:

University of Delaware ("UD"), Newark, DE
Bachelor or Science in Accounting, June 1981
Certificate of Computer Applications, June 1999

Other:

Specialized Training in Litigation Support & ADR
Specialized Training in Business Valuations
Specialized Training in Fraud Investigations
Specialized Training in Asset Based Lending

## CURRICULUM VITAE (Cont'd.)
## CLYDE G. HARTMAN, CPA/ABV, CFE, CVA
## 2005

**SPEAKING ENGAGEMENTS**

Institute of Management Accountants: "Internal Controls and Fraud Prevention"
UD Small Business Development Center: "Growing Your Business & Building Value"

**PROFESSIONAL**
**ORGANIZATIONS**

American Institute of CPA's
Delaware Society of CPA's
National Association of Certified Valuation Analysts
Association of Certified Fraud Examiners
American Arbitration Association

**EXPERIENCE HIGHLIGHTS**

**Litigation Support**

- Investigate and provide documentation to dispute the amount due by an international company to the former owners of a subsidiary, based upon criteria set forth in the acquisition contract.

- Investigate and obtain documentation to resolve a contract dispute between a multi-million hotel to the prime contractor, based upon a visit to the contractor's office and analysis of the original contract and addendums.

- Expert report for defense in disputing alleged damages for a potential "age qualified" real estate development. An alternative calculation of damages was necessary postulating a sale of the undeveloped property.

- Consulting to creditor of a Delaware hotel developer involved in dispute with New Castle County over building size and rooms authorized.

- Consulting on the level of compliance/variance with professional accounting and auditing standards by a CPA firm in performance of 3 annual audits.

- Determine and document issues in other dispute resolution cases involving financial reporting, conflicts of interest, breach of contract, loss of earnings, and various deceptive business practices.

- Assist the City of Philadelphia in their FOP Act 111 Interest Arbitration hearings in July 2002 involving the health care plans of the Police and Firefighters.

CURRICULUM VITAE (Cont'd.)
CLYDE G. HARTMAN, CPA/ABV, CFE, CVA
2005

**Business Valuation**

- Real estate management companies - property settlement in divorce matter.

- Real estate properties – property settlement in divorce matter.

- Music education service company – potential sale of business

- Veterinary service companies – sale of business

- Real estate holding companies - gift tax returns

- Distributors, professional & other service companies, etc. – various use

**Fraud and Forensic Accounting**

- Investigate the fraudulent reporting, conversion of funds and other transactional analysis of a securities broker on behalf of a major international brokerage firm. This case gained substantial media attention including articles in the Wall Street Journal and New York Times.

- Investigate the fraudulent conversion of funds by a company's president and assist in the documentation of the loss for the company's insurance claim.

- Investigate and provide documentation to dispute directory assistance billings to a national collection agency. Use of audit sampling methodologies to provide a basis for conclusions was a key component in the case.

- Investigate the fraudulent reporting and other transactional analysis of a regional computer reseller on behalf of a major international bank.

- Investigate the conversion of funds in contravention of the applicable agreement on behalf of a medium-sized commercial bank in the Midwest.

- Investigate the improper use of trust funds by a law firm and report the findings to the appropriate state agency. Calculate the principal and interest amounts due to the trust by the firm.

- On behalf of numerous commercial banks, perform agreed-upon-procedure audits of manufacturers, wholesalers, healthcare, retailers and service companies. Performed similar function as an employee of CoreStates Bank.

33

**EXHIBITS**

Ex 1- Term Loan_Accel_March 04

Chex Services, Inc.
Analysis of Term Loan Note
Due from iGames Entertainment, Inc.
Including Principal, Interest and Late Fees
Assuming a Loan Acceleration Date of March 12, 2004

| Date | Ref | Number of days Elapsed | Daily Interest | Annual Interest Rate | Accrued Interest Monthly | Accrued Interest Cumulative | Late Payments at 10% | Principal Amount Due | Current Balance Due |
|---|---|---|---|---|---|---|---|---|---|
| 1/6/2004 | (A) | | | | | | | $ 2,000,000.00 | $ - |
| 2/1/2004 | (B) | 25 | $ 833.33 | 15% | $ 20,833.33 | $ 20,833.33 | | | $ 20,833.33 |
| 3/1/2004 | | 29 | $ 833.33 | 15% | $ 24,166.67 | $ 45,000.00 | | | 45,000.00 |
| 3/12/2004 | (C) | 11 | $ 833.33 | 15% | $ 9,166.67 | $ 54,166.67 | | | 2,054,166.67 |
| 3/12/2004 | (D) | | | | | $ 54,166.67 | 205,416.67 | 2,000,000.00 | 2,259,583.33 |
| 4/1/2004 | | 20 | $ 833.33 | 15% | $ 16,666.67 | $ 70,833.33 | 205,416.67 | 2,000,000.00 | 2,276,250.00 |
| 4/12/2004 | (E) | 11 | $ 833.33 | 15% | $ 9,166.67 | $ 80,000.00 | 205,416.67 | 2,000,000.00 | 2,285,416.67 |
| 5/1/2004 | | 19 | $ 555.56 | 10% | $ 10,555.56 | $ 90,555.56 | 205,416.67 | 2,000,000.00 | 2,295,972.22 |
| 6/1/2004 | | 31 | $ 555.56 | 10% | $ 17,222.22 | $ 107,777.78 | 205,416.67 | 2,000,000.00 | 2,313,194.44 |
| 7/1/2004 | | 30 | $ 555.56 | 10% | $ 16,666.67 | $ 124,444.44 | 205,416.67 | 2,000,000.00 | 2,329,861.11 |
| 8/1/2004 | | 31 | $ 555.56 | 10% | $ 17,222.22 | $ 141,666.67 | 205,416.67 | 2,000,000.00 | 2,347,083.33 |
| 8/24/2004 | | 23 | $ 555.56 | 10% | $ 12,777.78 | $ 154,444.44 | 205,416.67 | 2,000,000.00 | 2,359,861.11 |
| 9/1/2004 | | 8 | $ 555.56 | 10% | $ 4,444.44 | $ 158,888.89 | 205,416.67 | 2,000,000.00 | 2,364,305.56 |
| 10/1/2004 | | 30 | $ 555.56 | 10% | $ 16,666.67 | $ 175,555.56 | 205,416.67 | 2,000,000.00 | 2,380,972.22 |
| 11/1/2004 | | 31 | $ 555.56 | 10% | $ 17,222.22 | $ 192,777.78 | 205,416.67 | 2,000,000.00 | 2,398,194.44 |
| 12/1/2004 | | 30 | $ 555.56 | 10% | $ 16,666.67 | $ 209,444.44 | 205,416.67 | 2,000,000.00 | 2,414,861.11 |
| 1/1/2005 | | 31 | $ 555.56 | 10% | $ 17,222.22 | $ 226,666.67 | 205,416.67 | 2,000,000.00 | 2,432,083.33 |
| 1/26/2005 | (F) | 25 | $ 555.56 | 10% | $ 13,888.89 | $ 240,555.56 | 205,416.67 | 2,000,000.00 | 2,445,972.22 |
| | | | | | $ 240,555.56 | $ 240,555.56 | $ 205,416.67 | $ 2,000,000.00 | $ 2,445,972.22 |

| Daily Interest Calculation: | Principal | Days in Year | Interest Rate | Daily Interest |
|---|---|---|---|---|
| 01/06 - 04/12/04 | $ 2,000,000 | 360 | 15% | $ 833.33 |
| Thereafter | $ 2,000,000 | 360 | 10% | $ 555.56 |

Comments Referenced Above:
(A) Loan Advance to iGames Entertainment, Inc.
(B) Initial interest payment due on February 1 and delinquent on February 11 (assuming a 10 day grace period).
(C) 2nd interest payment due on March 1 and delinquent on March 11 (assuming a 10 day grace period).
(D) Equitex declares a default on the term loan note and the entire principal debt becomes due immediately.
Late fee of 10% is calculated on the note's principal amount ($2,000,000 x 10% = $200,000).
(E) Equitex enters into an acquisition agreement, which reduces the interest rate to 10%.
(F) Date of Report: Last day of our analysis of amounts due from iGames to Equitex/Chex Services

Chex Services, Inc.
Analysis of Term Loan Note
Due from iGames Entertainment, Inc.
Including Principal, Interest and Late Fees
Assuming a Loan Acceleration Date of January 6, 2005

| Date | Ref | Number of days Elapsed | Daily Interest | Annual Interest Rate | Accrued Interest Monthly | Accrued Interest Cumulative | Principal Amount Due | Balance Due Before Late Fees | Cumulative Late Fees at 10% | Total Balance Due |
|---|---|---|---|---|---|---|---|---|---|---|
| 1/6/2004 | (A) | | | | | | $ 2,000,000 | | | |
| 2/1/2004 | (B) | 25 | $ 833.33 | 15% | $ 20,833.33 | $ 20,833.33 | | $ 20,833.33 | | $ 20,833.33 |
| 3/1/2004 | | 29 | $ 833.33 | 15% | $ 24,166.67 | $ 45,000.00 | | $ 45,000.00 | | $ 45,000.00 |
| 3/12/2004 | (C) | 11 | $ 833.33 | 15% | $ 9,166.67 | $ 54,166.67 | 2,000,000.00 | $ 2,054,166.67 | | $ 2,054,166.67 |
| 3/12/2004 | (D) | | | | | $ 54,166.67 | 2,000,000.00 | $ 2,054,166.67 | | $ 2,054,166.67 |
| 4/1/2004 | | 20 | $ 833.33 | 15% | $ 16,666.67 | $ 70,833.33 | 2,000,000.00 | $ 2,070,833.33 | | $ 2,070,833.33 |
| 4/12/2004 | (E) | 11 | $ 833.33 | 15% | $ 9,166.67 | $ 80,000.00 | 2,000,000.00 | $ 2,080,000.00 | | $ 2,080,000.00 |
| 5/1/2004 | | 19 | $ 555.56 | 10% | $ 10,555.56 | $ 90,555.56 | 2,000,000.00 | $ 2,090,555.56 | | $ 2,090,555.56 |
| 6/1/2004 | | 31 | $ 555.56 | 10% | $ 17,222.22 | $ 107,777.78 | 2,000,000.00 | $ 2,107,777.78 | | $ 2,107,777.78 |
| 7/1/2004 | | 30 | $ 555.56 | 10% | $ 16,666.67 | $ 124,444.44 | 2,000,000.00 | $ 2,124,444.44 | | $ 2,124,444.44 |
| 8/1/2004 | | 31 | $ 555.56 | 10% | $ 17,222.22 | $ 141,666.67 | 2,000,000.00 | $ 2,141,666.67 | | $ 2,141,666.67 |
| 8/24/2004 | | 23 | $ 555.56 | 10% | $ 12,777.78 | $ 154,444.44 | 2,000,000.00 | $ 2,154,444.44 | | $ 2,154,444.44 |
| 9/1/2004 | | 8 | $ 555.56 | 10% | $ 4,444.44 | $ 158,888.89 | 2,000,000.00 | $ 2,158,888.89 | | $ 2,158,888.89 |
| 10/1/2004 | | 30 | $ 555.56 | 10% | $ 16,666.67 | $ 175,555.56 | 2,000,000.00 | $ 2,175,555.56 | | $ 2,175,555.56 |
| 11/1/2004 | | 31 | $ 555.56 | 10% | $ 17,222.22 | $ 192,777.78 | 2,000,000.00 | $ 2,192,777.78 | | $ 2,192,777.78 |
| 12/1/2004 | | 30 | $ 555.56 | 10% | $ 16,666.67 | $ 209,444.44 | 2,000,000.00 | $ 2,209,444.44 | | $ 2,209,444.44 |
| 1/1/2005 | | 31 | $ 555.56 | 10% | $ 17,222.22 | $ 226,666.67 | 2,000,000.00 | $ 2,226,666.67 | | $ 2,226,666.67 |
| 1/6/2005 | | 5 | $ 555.56 | 10% | $ 2,777.78 | $ 229,444.44 | 2,000,000.00 | $ 2,229,444.44 | $ 222,944.44 | $ 2,452,388.89 |
| 1/26/2005 | (F) | 20 | $ 555.56 | 10% | $ 11,111.11 | $ 240,555.56 | 2,000,000.00 | $ 2,240,555.56 | $ 222,944.44 | $ 2,463,500.00 |
| | | | | | | $ 240,555.56 | $ 2,000,000.00 | $ 2,240,555.56 | $ 222,944.44 | $ 2,463,500.00 |

| Daily Interest Calculation: | Principal | Days In Year | Interest Rate | Daily Interest |
|---|---|---|---|---|
| 01/06 - 04/12/04 | $ 2,000,000 | 360 | 15% | $ 833.33 |
| Thereafter | $ 2,000,000 | 360 | 10% | $ 555.56 |

Comments Referenced Above:
(A) Loan Advance to iGames Entertainment, Inc.
(B) Initial interest payment due on February 1 and delinquent on February 11 (assuming a 10 day grace period).
(C) 2nd Interest payment due on March 1 and delinquent on March 11 (assuming a 10 day grace period).
(D) Equitex declares a default on the term loan note and the entire principal debt becomes due immediately.
Late fee of 10% is calculated on the note's principal when it is not paid by iGames ($2,000,000 x 10% = $200,000).
(E) Equitex enters into an acquisition agreement, which reduces the interest rate to 10%.
(F) Date of Report: Last day of our analysis of amounts due from iGames to Equitex/Chex Services

Ex 2 - Shared Expenses

Chex Services, Inc.
and IGames Entertainment, Inc.
Shared Expenses for Conferences
January 6 to March 19, 2004

| Description | Money Centers | (Chex) Fast Funds | 50% / 50% Expense Allocation |
|---|---|---|---|
| CNIGA Conference | 26,669.30 | 11,924.79 | 19,297.05 |
| NIGA Conference | - | 13,960.00 | 6,980.00 |
| Total | 26,669.30 | 25,884.79 | 26,277.05 |
| Expense Allocation | (26,277.05) | (26,277.05) | |
| Due (Payable) Reimbursement | 392.26 | (392.25) | |

**CONCLUSION**

Based upon my analysis of the documents indicated in this report, I conclude that the financial reporting of the Howards note receivable was in accordance with generally accepted accounting principles as of the Equitex' filing of Form 10-Q with the Securities and Exchange Commission on November 19, 2004.

I also conclude that iGames was not in compliance with the provisions of the Term Loan Note, which constituted an Event of Default as of March 12, 2004 when the Stock Purchase Agreement was terminated by Equitex and Chex Services. iGames owed Chex Services $45,000 of interest payments per the Term Loan Note as of March 11, 2004 (including a 10 day grace period).

My analysis indicates that the total due from iGames under the Term Loan Note has grown to $2,445,972 including principal, interest and late fees as of January 26, 2005, based upon a loan acceleration date of March 12, 2004. Alternatively, ascribing a later loan acceleration date of January 6, 2005 results in an indebtedness of $2,463,500 as of January 26, 2005.

Based upon my analysis of the agreement between MCA and the TB Tribe and financial records, the $3 million obligation should have been recorded as a liability on the balance sheet of MCA, but was only reflected as a footnote disclosure.


Dated: Wilmington, Delaware
        January 26, 2005


Thomas John Shopa, CPA, CFP        Clyde G. Hartman, CPA/ABV, CFE, CVA

# Exhibit D

Ijaz Anwar

34

1 a fact, I don't know.
2      Q.    You'd agree it was on or about
3 January 6th?
4      A.    I believe so, yes.
5      Q.    All right.  So then you said they
6 would have to wait for Available Money -- in
7 order to calculate what was due, you'd have to
8 wait for Available Money's profits and loss
9 statement?
10      A.    I believe the Note says that
11 fifty percent -- I would have to read the Note.
12      Q.    Go ahead.
13      A.    Just give me a second.
14      Q.    You know the paragraph?
15      A.    Yes, the interest section.
16      Q.    You're referring to iGames-1,
17 correct?
18      A.    That is correct.  Yes, the note
19 asks or requires them to pay fifty percent of the
20 operating income of the borrower's Available
21 Money subsidiary for the period ending February
22 1st, 2004.
23           Just to clarify my position, I
24 believe one of the reasons we did not ask for the

35

1 payment during the month of February was the
2 financial statements from Available Money, the
3 calculations from Fifth Third Bank come for the
4 month of February sometime during March.  So if
5 they did not have the basis to make a payment, it
6 would be irrelevant to ask for the payment.
7      Q.    So basically from your own
8 practices Available Money or iGames wouldn't know
9 or be able to calculate that payment without
10 having the financials, and in your organization
11 that's not done until March 25th or approximately
12 that time period?
13      A.    I believe so.  So January's
14 financial statements would have or should have, I
15 don't know exactly when they did at iGames,
16 arrived sometime in February, in February and
17 March, I would assume.  I don't know exact dates,
18 how Fifth Third and Available Money provided the
19 financial statements.
20      Q.    Doesn't that Note provide for one
21 payment for the time period before February 1st
22 and not a separate payment for January?
23      MR. PORETTI:  Objection.  Vague.
24      A.    At least I don't read in the Note

36

1 that they can substitute the February payment or
2 the January payment.  Maybe I'm reading it
3 incorrectly.
4      Q.    Could you tell me where in that
5 Note it says there is a January payment or when
6 it's due or how to calculate it?
7      MR. PORETTI:  Objection.
8      Compound.
9 BY MR. BEAUSOLEIL:
10      Q.    Explain to me the basis for
11 saying there's a January payment due.
12      A.    Funds were given on January 6th,
13 somewhere around January 6th.
14      Q.    And the Note then was negotiated
15 and signed somewhere around January 21st,
16 correct?
17      A.    That would be correct.  I believe
18 so.  I know it's dated January 6th and it was
19 subsequently negotiated or signed and then dated
20 for January 6th.
21      Q.    In fact, this is sent, the fax
22 says January 21, '04.  We could later maybe
23 establish that a little better.  Okay?
24      A.    Yes.

37

1      Q.    All right.  So the January 21st
2 Note is signed in terms of settled?
3      A.    I don't know the exact date, but
4 it was signed after January 6th.  Yes, sometime
5 after January 6th.  It was not signed on January
6 6th.
7      Q.    All right.  Then I was asking if
8 you would read that Note and give me the basis
9 for your statement that there was some type of
10 payment due for January.
11      MR. PORETTI:  I object in that the
12      document speaks for itself, but go ahead
13      and answer.
14      A.    It does not refer to a
15 calculation of interest for the month of January.
16      Q.    It combines January and -- tell
17 me, Mr. Anwar, when the first --
18      A.    For the period ending February
19 1st, when it says the period ending February 1st,
20 it's really referring to January, because the
21 period ending February 1st entails the month of
22 January.
23      Q.    Tell me when that payment was due
24 and how you would calculate it.  You don't have

10  (Pages 34 to 37)