## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| iGames Entertainment, Inc., ) | |
| ) | |
| Plaintiff, ) | |
| ) | C.A. No. 04-180-KAJ |
| vs. ) | |
| ) | |
| Chex Services, Inc. and Equitex, Inc. ) | |
| ) | |
| Defendants. ) | |

## BRIEF IN SUPPORT OF CHEX SERVICES, INC.'S AND EQUITEX, INC.'S
## MOTION TO EXCLUDE EXPERT TESTIMONY

MORRIS, JAMES, HITCHENS & WILLIAMS, LLP

James W. Semple (#396)
James E. Drnec (#3789)
222 Delaware Avenue
P.O. Box 2306
Wilmington, DE 19899
jdrnec@morrisjames.com
(302) 888-6800

Attorneys for Chex Services, Inc. and Equitex, Inc.

OF COUNSEL:
RIDER BENNETT, LLP
Daniel Q. Poretti (MN #185152)
Patrick D. Robben (MN#284166)
Douglas J. Frederick (MN #320699)
33 South Sixth Street, Suite 4900
Minneapolis, MN 55402
(612) 340-8900
DQPoretti@riderlaw.com

DATED: MARCH 15, 2005

# I.   TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................... ii

NATURE AND STAGE OF PROCEEDING ................................................. 1

SUMMARY OF ARGUMENT ......................................................................... 3

STATEMENT OF THE FACTS ....................................................................... 4

ARGUMENT ..................................................................................................... 5

    I.       STANDARD OF REVIEW. ................................................................ 5

    II.     THE ROTH REPORT AND ROTH'S TESTIMONY RELATED
           THERETO SHOULD BE EXCLUDED AS EVIDENCE. ...................... 7

           A.    Roth's Analysis Related to the "Termination Fee." ....................... 7

           B.    Roth's Analysis Related to the "Costs and Expenses." ................. 9

           C.    Roth's Analysis of the "Costs of Funds to Purchase
                Available Money." ....................................................................... 12

           D.    Roth's Analysis of the "Additional Costs to Convert
                Available Money ATM Machines." ............................................. 15

           E.    Roth's Analysis of the "Credit Facility Loan." ........................... 17

           F.    Roth's Analysis of the "Projected Loss of Income." ................... 18

    III.   THE "NOTE RECEIVABLE – HOWARDS" PORTION OF
           ROTH'S "RESPONSE TO EXPERT REPORT OF THOMAS
           JOHN SHOPA" AND ROTH'S TESTIMONY RELATED
           THERETO SHOULD BE EXCLUDED AS EVIDENCE. ...................... 19

    IV.   THE REBUTTAL REPORT OF R. ALAN MILLER AND HIS
           TESTIMONY RELATED THERETO SHOULD BE EXCLUDED
           AS EVIDENCE. ............................................................................... 21

           A.    Miller's Rebuttal Opinion Regarding iGames' Inability to
                Close on the SPA Should be Excluded ......................................... 21

           B.    Miller's Response to the Opinion that the Decline in
                iGames' Stock Price Constituted a Material Adverse Event. ....... 22

    CONCLUSION ................................................................................................ 25

# TABLE OF AUTHORITIES

## CASES

Chemipal, Ltd. v. Slim-Fast Nutritional Foods Int'l, Inc.,
350 F. Supp. 2d 582 (D. Del. 2004)........................................................ passim

Crowell Corp. v. Himont USA, Inc.,
1994 WL 762663 (Del. Super. Dec. 8, 1994) ............................................. 18

Daubert v. Merrell Dow Pharmaceuticals, Inc.,
509 U.S. 579 (1993).................................................................... 3, 5, 6, 23

F.E. Myers Co. v. Pipe Maint. Servs., Inc.,
599 F. Supp. 697 (D. Del. 1984)............................................................... 8

Gen. Elec. Co. v. Joiner,
522 U.S. 136 (1997).............................................................................. 6

Heller v. Shaw Indus., Inc.,
167 F.3d 146 (3d Cir. 1999)...................................................................... 7

Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.,
347 F. Supp. 2d 114 (D. Del. 2004)................................................. 6, 11, 23

Indep. Consol. Sch. Dist. No. 24, Blue Earth County v. Carlstrom,
151 N.W.2d 784 (Minn. 1967).......................................................... 13, 14, 16

Kumho Tire Co., Ltd. v. Carmichael,
526 U.S. 137 (1999).......................................................................... 3, 5

Liveware Publ'g, Inc. v. Best Software, Inc.,
252 F. Supp. 2d 74 (D. Del. 2003) ........................................................... 16

Nix v. Sawyer,
466 A.2d 407 (Del. Super. Ct. 1983) ........................................................ 15

Oxford Gene Tech. Ltd. v. Mergen Ltd.,
345 F. Supp. 2d 431 (D. Del. 2004)................................................... 6, 7, 21

## STATUTES

6 Del. C. § 2301(a)............................................................................... 8

## RULES

Fed. R. Civ. P. 26(a)(2)(B) ................................................................ 6, 21

Fed. R. Evid. 702 ......................................................................... passim

## NATURE AND STAGE OF PROCEEDING

iGames Entertainment, Inc. ("iGames") initiated this action in this Court[1] on March 24, 2004. iGames' Complaint alleges, among other things, that Chex Services, Inc. ("Chex") and Equitex, Inc. ("Equitex") (collectively "Defendants") breached a Stock Purchase Agreement ("SPA") between the parties, and that Chex breached a Term Loan Note[2] (the "Note") that iGames executed in favor Chex. (See C.A. No. 04-CV-180 D.I. 33 (First Am. Compl.).)

On January 26, 2005, the parties exchanged initial expert reports. In support of its claim of damages, iGames submitted an initial "Report on Damages" by Elliot A. Roth dated January 25, 2005. Mr. Roth is an accountant who purportedly computed alleged damages which iGames contends it sustained by the termination of the SPA, and by Chex's alleged non-compliance with the Note. iGames also submitted a report by Lawrence D. Rovin, Esq., however, iGames has subsequently withdrawn Mr. Rovin as an expert witness. Chex and Equitex timely submitted expert reports by Thomas John Shopa and Gregg A. Jarrell.

On February 11, 2005 the parties exchanged expert rebuttal reports. iGames submitted another report prepared by Mr. Roth in response to Mr. Shopa's report, and submitted a report by R. Alan Miller in response to Mr. Jarrell's report. Likewise,

---

[1]     iGames also removed an action filed in Delaware state court related to the claims made in this particular action, which was assigned C.A. No. 04-CV-256 and has now been consolidated with this action. (See C.A. No. 04-CV-256 D.I. 1 (Notice of Removal).)

[2]     The Note is the subject of litigation that was initiated by Chex in Minnesota because the Note contained a forum-selection clause dictating that all disputes arising out of the Note would be brought in the appropriate courts of the State of Minnesota. The Minnesota proceeding on the Note was transferred to this Court and assigned C.A. No. 04-CV-0885, which has now also been consolidated with this action.

Defendants submitted expert rebuttal reports prepared by Mr. Shopa and Mr. Jarrell in response to the initial reports submitted by Mr. Roth and Mr. Rovin.

Pursuant to Federal Rule of Evidence 702, Defendants now move this Court to exclude (1) Mr. Roth's initial "Report on Damages" in its entirety and his testimony related thereto, (2) certain portions of Mr. Roth's rebuttal report and his testimony related thereto, and (3) Mr. Miller's rebuttal report in its entirety and his testimony related thereto.

## SUMMARY OF ARGUMENT

First, in his "Report on Damages," Mr. Roth makes several unsupported conclusory statements, places blind reliance on financial projections supplied by iGames, intrudes into the province of the Court by opining on several items that are matters of law to be determined by the Court, and improperly speculates as to damages. Thus, this Court should exclude Mr. Roth's "Report on Damages" and his related testimony, pursuant to Rule 702 of the Federal Rules of Evidence and the Supreme Court cases of Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999) and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).

Second, in Mr. Roth's rebuttal report, responding to Mr. Shopa's initial report, Mr. Roth improperly offers opinions that are beyond the scope of "rebuttal" testimony and improperly attempts to introduce new, additional opinions of Mr. Roth that were not disclosed in accordance with the Rules of Civil Procedures and Court-imposed deadlines for "initial" expert reports. Mr. Roth's "new" opinions are simply belated attempts to fill in the gaps of his initial expert report and his testimony related thereto should be excluded.

Third, in Mr. Miller's rebuttal report, responding to Mr. Jarrell's initial report, Mr. Miller makes several unsupported, conclusory statements, intrudes into the province of the fact-finder by opining on items that are matters to be left to the jury, and reiterates statements without offering any "expert" analysis. As such, the entire rebuttal report and his testimony related thereto should be excluded as well.

## STATEMENT OF THE FACTS[3]

On January 26, 2005, the parties exchanged initial expert reports.  In support of its claim for damages, iGames submitted an initial "Report on Damages" by Elliot A. Roth dated January 25, 2005.  (See Drnec Aff. Ex. A ("Report on Damages") (hereinafter the "Roth Report").)[4]  Roth is an accountant.  (Id. Ex. A. at attached Ex. 18.)  His stated purpose for preparing the report was "to determine the amount of damages incurred by iGames Entertainment, Inc. as a result of Chex Services, Inc. and Equitex, Inc.'s alleged breach of the Stock Purchase Agreement dated November 3, 2003 and of the Term Loan Note."  (Id. Ex. A at 1.)  iGames also submitted a report by Lawrence D. Rovin, Esq., however, iGames has subsequently withdrawn Mr. Rovin as an expert witness.  Chex and Equitex submitted expert reports by Thomas John Shopa and Gregg A. Jarrell.

On February 11, 2005 the parties exchanged expert rebuttal reports.  iGames submitted another report prepared by Roth in response to Mr. Shopa's report.  (Drnec Aff. Ex. B ("Response to Expert Report of Thomas John Shopa").)   iGames also submitted a report by R. Alan Miller in response to Mr. Jarrell's report.  (Drnec Aff. Ex. C ("Rebuttal Report of R. Alan Miller").)   Likewise, Defendants submitted expert rebuttal reports.

The pertinent aspects of these expert reports will be addressed throughout the following Argument.

---

[3] The facts of this case have been presented to this Court in previously filed motions.  Only those facts relevant to the Motion at issue will be addressed herein.

[4] See Affidavit of James E. Drnec, Esquire in Support of Chex Services, Inc.'s and Equitex, Inc.s' Motion to Exclude the Expert Testimony (herein referred to as the "Drnec Aff.").

**ARGUMENT**

I.   **STANDARD OF REVIEW**

"Motions to exclude evidence are committed to the court's discretion."

Chemipal, Ltd. v. Slim-Fast Nutritional Foods Int'l, Inc., 350 F. Supp. 2d 582, 587 (D.

Del. 2004). Federal Rule of Evidence 702 provides as follows:

> If scientific, technical, or other specialized knowledge will
> assist the trier of fact to understand the evidence or to
> determine a fact in issue, a witness qualified as an expert by
> knowledge, skill, experience, training, or education, may
> testify thereto in the form of an opinion or otherwise, if (1)
> the testimony is based upon sufficient facts or data, (2) the
> testimony is the product of reliable principles and methods,
> and (3) the witness has applied the principles and methods
> reliably to the facts of the case.

Fed. R. Evid. 702. This Rule "obligates judges to ensure that any scientific testimony or

evidence admitted is relevant and reliable." Chemipal, 350 F. Supp. 2d at 587 (citing

Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589 (1993)).[5]  As the Court in

Kumho Tire made clear, this gate-keeping function is employed for all expert testimony.

See Kumho Tire, 526 U.S. at 147-49.

"The party offering the expert testimony has the burden of proving admissibility."

Chemipal, 350 F. Supp. 2d at 588.  An expert's testimony must be more than subjective

belief or speculation, must have a valid "connection to the pertinent inquiry" and must

---

[5]  In Daubert, the United States Supreme Court set forth the following non-
exclusive factors to guide trial courts in making this preliminary reliability assessment:
(1) whether the expert's methodology has been tested; (2) whether the expert's theory or
technique has been subjected to peer review and publication; (3) whether the technique
has a known or potential rate of error; and (4) whether the technique has been generally
accepted in the proper scientific community. See Daubert v. Merrell Dow Pharms., Inc.,
509 U.S. 579, 593-94 (1993).

not invade the province of the fact-finder. Id. In respect to an issue that is a matter of law, expert testimony is inappropriate and must be excluded. Id. at 595.

Additionally, an expert's opinion should not be based on blind reliance and uncritical acceptance of documents provided to the expert, and should not use untested and unverified "projections" as a foundation for a damages calculation. Chemipal, 350 F. Supp. 2d at 589-92. In the words of the Supreme Court:

> Trained experts commonly extrapolate from existing data. But nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997). Thus, unsupported conclusory statements fail to meet the requirements of Rule 702 and the Daubert standard. See Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp., 347 F. Supp. 2d 114, 119 (D. Del. 2004).

Further, "Federal Rule of Civil Procedure 26(a)(2)(B) requires that an expert report 'shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor.'" Oxford Gene Tech. Ltd. v. Mergen Ltd., 345 F. Supp. 2d 431, 434 (D. Del. 2004) (quoting Fed. R. Civ. P. 26(a)(2)(B)). A party is not required to depose an expert witness in order to extrapolate the reasons for an expert's opinion or the analytical steps that the expert took to reach a conclusion because the report is required to provide such information. Id. at 437. Belated attempts to "patch the holes" in an expert's report does not satisfy Rule 26(a)(2)(B). Id. When an expert report does not meet the 26(a)(2)(B) requirements in respect to any particular issue, that portion of the expert

report is excluded from evidence and the expert is precluded from offering any testimony regarding that issue. Id. at 437-41.

## II.     THE ROTH REPORT AND ROTH'S TESTIMONY RELATED THERETO SHOULD BE EXCLUDED AS EVIDENCE.

The Roth Report purports to provide an "analysis" of six separate areas under the following headings: (1) Termination Fee; (2) Costs and Expenses; (3) Cost of Funds to Purchase Available Money; (4) Additional Costs to Convert Available Money ATM Machines; (5) Credit Facility Loan; and (6) Projected Loss of Income. (See Drnec Aff. Ex. A at 3-11.)   As explained below, each area of Roth's purported "analysis" is substantially deficient and fails to meet the requirements of admissibility.

### A.     Roth's Analysis Related to the "Termination Fee."

It is axiomatic that an expert's conclusions must "reliably follow from the facts known to the expert and the methodology used." Chemipal, 350 F. Supp. 2d at 588 (citing Heller v. Shaw Indus., Inc., 167 F.3d 146, 153 (3d Cir. 1999)).   Here, Roth indicated the facts as known to him in relation to the "Termination Fee."  He stated that "[o]n March 12, [2004] attorneys for Equitex and Chex delivered a termination letter to iGames . . . .   Concurrently, attorneys for iGames sent a letter to Equitex and Chex asserting its rights to terminate the SPA." (See Drnec Aff. Ex. A at 3.)   Roth never established which party was the first to terminate the SPA, and he avoided stating anything in that respect.   Roth noted that iGames' purported termination letter cited SPA §§ 11(b)(ii), (iv), and (viii) as the basis of iGames' alleged termination. (Id.)   A simple review of the SPA reveals that those particular provisions require iGames (i.e., "Buyer") to be *the party* to terminate the SPA in order to claim the $1 million Termination Fee. (See Drnec Aff. Ex. B (SPA §§ 11(e)(ii); 11(b)(ii), (iv) and (viii)).)

An expert's opinion must be confined to the witness's area of expertise. Chemipal, 350 F.Supp.2d at 588. Roth's opinion that "iGames was entitled to receive the termination amount of $1 million" is an opinion beyond Roth's limited area of accounting expertise.[6] Therefore, the portion of the Roth Report and his testimony regarding iGames' alleged entitlement to the Termination Fee is inadmissible on that basis and should be excluded.

The next aspect of Roth's analysis of the "Termination Fee" purports to calculate interest on the Termination Fee, from the date of the termination of the SPA to the close of trial. (See Drnec Aff. Ex. A at 4.) Essentially, Roth attempted to calculate "prejudgment interest" on the Termination Fee. (See id.) In respect to such interest, this Court has held that in a "diversity suit on a contract, the law of the forum state, Delaware, relating to prejudgment interest applies in the absence of a rate set by the agreement between the parties." F.E. Myers Co. v. Pipe Maint. Servs., Inc., 599 F. Supp. 697, 704 (D. Del. 1984). In this case, Roth did not identify any provision of the SPA that set the interest rate applicable to the "Termination Fee." Thus, as a matter of law, federal courts would determine the rate in accordance with 6 Del. C. § 2301(a). See 6 Del. C. § 2301(a) ("Where there is no expressed contract rate, the legal rate of interest shall be 5% over the Federal Reserve discount rate . . . "); F.E. Myers, 599 F. Supp. at 704.

The Roth Report set forth a rate of 6% without any explanation of how Roth arrived at that number. (See Drnec Aff. Ex. A at 4.) Roth's "opinion" regarding the interest rate on the Termination Fee is contrary to the applicable law and would not assist

---

[6] It was Chex and Equitex, in fact, that terminated the SPA on March 12, 2004. iGames later sent in a letter in response to Chex and Equitex's termination letter purporting to terminate the agreement.

the trier of fact in any manner. Therefore, Roth's Report and his testimony in respect to the interest accrued on the "Termination Fee" is inadmissible and should be excluded. See Chemipal, 350 F. Supp. 2d 595 (excluding expert testimony regarding an issue that is determined as a matter of law).

### B. Roth's Analysis Related to the "Costs and Expenses."

As stated previously, an expert's conclusions must "reliably follow from the facts known to the expert and the methodology used." Chemipal, 350 F. Supp. 2d at 588. The second portion of Roth's Report addresses the "Costs and Expenses" to which iGames is allegedly entitled under the termination provisions of the SPA. (See Drnec Aff. Ex. A at 4.) Here again, the facts known to Roth included iGames' purported termination letter citing SPA §§ 11(b)(ii), (iv), and (viii) as the basis of iGames' alleged termination. (Id. at 3.) Once again, a simple review of the SPA reveals that those particular provisions require iGames (i.e., "Buyer") to be *the party* to terminate the SPA in order to claim the "costs and expenses" under 11(e)(ii). (See Drnec Aff. Ex. D §§ 11(e)(ii); 11(b)(ii), (iv) and (viii).) As before, in this portion of his Report, Roth is not qualified to offer the legal opinion that iGames was the party that properly terminated the SPA. Accordingly, that portion of his report should be stricken as lacking expert foundation.

Additionally, iGames is attempting to make its "cost and expenses" claim pursuant to section 11(e)(ii) of the SPA. (See Drnec Aff. Ex. A at 4 (stating "[a]s noted in the previous section" which quoted from § 11(e)(ii)).) Section 11(e)(ii) provides that if the SPA is terminated under certain circumstances, then "upon any such termination [Equitex] and/or Chex shall pay to [iGames], within five (5) Business Days of *receipt* by [Equitex] of a *written notice* from [iGames] *evidencing* [iGames'] *documented costs and expenses* otherwise payable by [iGames] under Subsection 12(n), an amount equal to

such costs and expenses." (Drnec Aff. Ex. D § 11(e)(ii) (emphasis added).)   Nowhere in the Roth Report did Roth ever identify if or when Equitex received a "written notice" from iGames evidencing iGames' documented costs and expenses.   The Roth Report failed to bridge that analytical gap and his conclusion does not "reliably follow" from the facts known to him.   Thus, his testimony regarding the "Costs and Expenses" is inadmissible.

An expert's opinion must be confined to the witness's area of expertise. Chemipal, 350 F. Supp. 2d at 588.   Roth's opinion that "iGames is entitled to receive costs and expenses as described in . . . the [SPA]" is an opinion beyond Roth's limited area of accounting expertise.   Therefore, the portion of the Roth Report and his testimony regarding iGames' alleged entitlement to the "Costs and Expenses" is inadmissible on that basis as well and should be excluded.

Even considering that Roth may simply be attempting to provide an opinion limited to the accounting of "costs and expenses" to which iGames may allegedly be entitled under the SPA, Roth's testimony falls far short of the requirements of Rule 702. For example, the "costs and expenses" mentioned in Subsection 12(n) of the SPA are defined as follows: "costs and expenses (including legal fees and expenses) incurred in connection with the preparation, negotiation, execution and performance of this Agreement and the Contemplated Transactions." (Drnec Aff. Ex. D § 12(n).)

As stated above, an expert's testimony must demonstrate a valid "connection to the pertinent inquiry." Chemipal, 350 F. Supp. 2d at 588.   Thus, the Roth Report is required to demonstrate a valid connection between Roth's conclusion that $312,386 is the amount of "costs and expenses" to which iGames is entitled, (see Drnec Aff. Ex. A at

4), and the "pertinent inquiry," which is that those specific "costs and expenses" were "incurred in connection with the preparation, negotiation, execution and performance of [the SPA] and the Contemplated Transactions." In this respect, the Report states that the "costs" are "detailed in Exhibit 3." (Id.) However, Exhibit 3 to the Roth Report does not even contain the words "Stock Purchase Agreement" or "SPA." (Drnec Aff. Ex. A at attached Ex. 3.) Instead, it simply states that "Legal fees and expenses" for the time period from "October 2003 to December 2004" were $264,209, that "Accounting fees and expenses" for the time period from "October 2003 to March 2004" were $15,992, and includes $32,185 for "Chris Wolfington expenses" for travel, meals and entertainment and delivery without indicating any time frame or purpose for those expenses. (Id.)

Roth never demonstrated how the items on his Exhibit 3 have any connection to the preparation, negotiation, execution or performance of the SPA or the Contemplated Transactions. In fact, Roth included items that could not possibly have been incurred in connection with those things. For example, even though Roth acknowledges that the SPA was terminated on March 12, 2004, he included "Legal fees and expenses" from "October 2003 *to December 2004*" as part of his damage calculation. (Id. (emphasis added).) There is no possible way that expenses occurring after March 12, 2004 can be connected to the preparation, negotiation, execution or performance of the SPA or the Contemplated Transactions. Thus, the Roth Report lacks the linking analysis required by Rule 26(a)(2)(B). See Honeywell, 347 F. Supp. 2d at 120. Therefore, Roth's testimony in respect to the "Costs and Expenses" should be excluded.

The unreliability of Roth's conclusions regarding the "costs and expenses" is further demonstrated by Thomas Shopa's Rebuttal Report, wherein he attempts to reconstruct Roth's analysis, and points out that Roth included items such as legal and accounting fees incurred by Money Centers of America, not iGames,[7] and other fees incurred after the termination of the SPA. (See Drnec Aff. Ex. E at 8-12 ("Expert Report of Thomas John Shopa, CPA, CFP in Rebuttal of the January 25, 2005 Report Submitted by Elliot A. Roth, CPA and Lawrence D. Rovin, Esquire February 10, 2005").) As discussed above, the "Costs and Expenses" portion of the Roth Report fails to provide *any* "connection" to the pertinent inquiry, and also fails the basic test of reliability required for expert testimony. See Chemipal, 350 F. Supp. 2d 589-90. Thus, not only does the Roth Report lack the required linking analysis, it is wildly misleading and will not assist the trier of fact. As such, Roth's testimony regarding the "Costs and Expenses" is inadmissible and should be excluded.

**C.      Roth's Analysis of the "Costs of Funds to Purchase Available Money."**

The third area that Roth addressed is the purported "damage" that iGames has allegedly suffered as a result of Chex's failure to provide the second advance of $2 million in respect to the Note. (Drnec Aff. Ex. A at 4-8.) Initially, as more fully explained in Chex's recently filed motion for summary judgment on the Note, because iGames was not in compliance with the terms of the Note or the Stock Pledge Agreement, Chex was not required to make the second advance. (See id. Ex. A at attached Ex. 12 at 1 (requiring iGames to be in material compliance with the terms of the Note and Stock Pledge Agreement).) Thus, any alleged "damage" suffered by iGames in having to

---

[7] Money Centers of America was not a party to the SPA. Of course, the basis for recovery of these costs and expenses is the SPA.

obtain replacement financing for the second $2 million is not attributable to Chex which acted within its explicit rights provided under the Note.

Additionally, although attaching a copy of the Note as Exhibit 12 to his Report, Roth failed to acknowledge that the Note expressly states that if Chex fails to comply with the financing obligations for the second advance, then iGames "shall have the right at any time thereafter to prepay the principal balance of this Note in full, in which case all further payment obligations of the Borrower, other than with respect to amounts accrued through the date of prepayment, shall terminate." (Id.)

Under Minnesota law, which applies to the Note, when parties to a contract foresee a condition that may develop and provide for a remedy in the event of that condition, then the remedy is the exclusive remedy available in such an event. See Indep. Consol. Sch. Dist. No. 24, Blue Earth County v. Carlstrom, 151 N.W.2d 784, 786 (Minn. 1967) (indicating that remedy provided is exclusive). Thus, even if Chex failed to comply with the financing provisions of the Note, then as a matter of law, the sole remedy for iGames would be that it would have the right to "prepay the principal balance of this Note in full," and any "amounts accrued through the date of repayment." Therefore, as a matter of law, iGames is not entitled to any alleged "damages" suffered in having to obtain replacement financing for the second $2 million used to complete the Available Money transaction. As such, expert testimony on the issue is inappropriate and must be excluded. See Chemipal, 350 F. Supp. 2d at 595.

In the same manner, the Note specifically contemplated termination of the SPA (see Drnec Aff. Ex. A at attached Ex. 12 at 2 ("Stock Purchase Agreement Termination" provision)), and even contemplated that if Chex agreed to combine with another entity,

iGames' interest obligations under the Note would thereafter drop to a 10% interest rate. (See id. Ex. A at attached Ex. 12 at 1 ("Interest" provision).)  Further, the Roth Report alleges that Chex completed a merger with Seven Ventures, triggering this reduction in the interest rate. (See id. Ex. A at 6.)  Thus, even if one considers the non-completion of the SPA or the Seven Ventures transaction to be in any way relevant to the inquiry regarding iGames' alleged "damages" under the Note, iGames sole recourse, as a matter of law, is to reduce the interest rate accordingly.  See Carlstrom, 151 N.W.2d at 786 (exclusive remedy).  Therefore, expert testimony regarding the issue is inappropriate and must be excluded. See Chemipal, 350 F. Supp. 2d at 595.

Further, in respect to the initial $2 million advance which is undisputed, Roth seemed to acknowledge that iGames has not made any payment on the Note (principal or interest).   However, without any explanation, Roth turned iGames' failure to mitigate the accrual of interest due under the Note into alleged "costs of funds" incurred by iGames by including the entire interest accrued from January 6, 2004 through August 31, 2005 as part of iGames' damages calculation. (See Drnec Aff. Ex. A at attached Ex. 5.)  Initially, iGames has not paid any of the required interest on the Note and can therefore not legally be "damaged" by interest that it has not paid.  Second, the Roth Report never suggests anything other than the simple fact that the interest due under the Note was the result of iGames borrowing $2 million from Chex and executing the Note, which required iGames to pay interest. (See Drnec Aff. Ex. A at 4-5.)  Thus, the accrual of interest on the Note was not *caused* by Chex's alleged breach of the Note, and iGames inclusion of the interest in its "damages" calculation fails as a matter of law.

Third, any interest accrued cannot be attributed to the actions of Chex or Equitex because iGames could have repaid the entire amount due under the Note at any time and thus not incurred any additional interest. (See Drnec Aff. Ex. A at attached Ex. 12 at 1-2).) Such alleged accrued interest "costs of funds" are only attributable to iGames' failure to do so. Roth's conclusions in this respect are erroneous, illogical, unsupportable and misleading. Thus, Roth's Report does not assist the trier of fact as required by Rule 702, and his testimony regarding the "Costs of Funds to Purchase Available Money" should be excluded.

### D. Roth's Analysis of the "Additional Costs to Convert Available Money ATM Machines."

The fourth area in which Roth offers an opinion is iGames' alleged additional costs to convert Available Money ATM machines. (See Drnec Aff. Ex. A at 8-9.) Roth's analysis suggests iGames suffered this alleged damage "[b]ecause of the litigation with Chex and Equitex," as a result of which "the conversion process was unable to commence." (Id. Ex. A at 8.) Roth offers no explanation as to how these purported "damages" are in any way contemplated by or connected to the SPA or the Note. Indeed, Roth appears to simply conclude that because iGames initiated this lawsuit and had to spend money on this litigation, iGames did not have enough money to follow through with its ATM conversion plans. (Id. Ex. A at 8-9.) This is not a legally cognizable harm that can be attributed to Chex and/or Equitex.[8] Cf. Nix v. Sawyer, 466 A.2d 407 (Del. Super. Ct. 1983) (discussing limited availability of causes of action flowing from litigation itself to claims such as "malicious prosecution").

---

[8] Moreover, given that iGames sued Chex and Equitex in this forum, it cannot logically follow that iGames has been harmed, and would be entitled to damages, from the lawsuit itself.

Additionally, section 11(d)(i) of the SPA specifically provides that if any party terminates the SPA under section 11, the provisions of section 11(e) regarding the Termination Fee and the costs and expenses recoverable therein is the exclusive remedy available. (See Drnec Aff. Ex. D § 11(d)(i).) It is well settled that if parties agree to exclusive remedies the contract should be enforced accordingly. See Liveware Publ'g, Inc. v. Best Software, Inc., 252 F. Supp. 2d 74 (D. Del. 2003) (enforcing an arbitration provision as an exclusive remedy provided under the contract); Carlstrom, 151 N.W.2d at 786 (exclusive remedy). In this case, the Roth Report does not provide any factual basis for ignoring the limited remedy of SPA § 11(d)(i). Thus, as a matter of law, iGames is not entitled to any damages related to its failure to timely convert ATM machines. Therefore, expert testimony on the topic should be excluded. See Chemipal, 350 F. Supp. 2d at 595.

Further, Roth states that "[i]t was estimated by Christopher Wolfington that the stabilized monthly interest expense for Genpass would be $60,000." (See Drnec Aff. Ex. A at 8.) Roth, with no indication that he independently verified this number, accepts this estimate and bases his entire analysis regarding the "Costs to Convert Available Money ATM Machines" on Wolfington's unverified "estimate." (See id. Ex. A at 8-9.) Such blind reliance is inappropriate in the expert witness context. See Chemipal, 350 F. Supp. 2d at 589-92. In Chemipal, the court found that an expert's uncritical acceptance of projections set forth in a marketing plan, which the expert then used as a foundation for calculating damages, precluded the expert's testimony. Id. Likewise, Roth's blind reliance on Wolfington's estimate, without independently verifying the accuracy of the estimate taints Roth's entire analysis. Therefore, Roth's testimony

regarding the "Additional Costs to Convert Available Money ATM Machines" is inadmissible and should be excluded.

**E.     Roth's Analysis of the "Credit Facility Loan."**

Under Delaware law, "it is axiomatic that a plaintiff, in order to recover damages from a defendant for breach of contract, must demonstrate with *reasonable certainty* that [the] defendant's breach caused the loss." See Chemipal, 350 F. Supp. 2d at 596-97 (citation omitted). The fifth area where Roth provides an opinion relates to the interest paid by iGames on a $250,000 credit facility loan. (See Drnec Aff. Ex. A at 9-10.) Here again, Roth provides no factual bases that any such interest expense was in any way caused by Chex or Equitex's alleged breach of the SPA or the Note. Indeed, the loan agreement was executed by iGames on November 26, 2003, long before iGames had ever alleged that Chex or Equitex breached any agreement. Neither Chex or Equitex caused iGames to execute that loan. The Loan itself suggests that iGames borrowed the money as "working capital." (See id. at attached Ex. 16 at 1.) Roth, without any supporting documentation, states the "proceeds of the loan were used to pay expenses related to the Stock Purchase Agreement." (Id. at 9.) Even if the proceeds were used to pay such expenses, the fact that iGames did not have sufficient capital in November 2003 to pay its expenses without borrowing "working capital" from Mercantile is in no way attributable to the actions of Chex and/or Equitex. Moreover, iGames could have avoided those alleged damages by simply paying back the Mercantile loan and not extending it. iGames' failure to mitigate such alleged "damages" was not caused by Chex and/or Equitex. Roth's Report and testimony on this topic is inappropriate and cannot assist the trier of fact in any meaningful way. Thus, iGames purported "damages" claim in regard to the "Credit Facility Loan" fails as a matter of law. See Chemipal, 350 F. Supp. 2d at

596-97 (indicating that Delaware law requires a plaintiff to prove with *reasonable certainty* that defendant's breach caused the loss). As such, Roth's testimony regarding the Credit Facility Loan should be excluded. See Chemipal, 350 F. Supp. 2d at 595.

Additionally, as explained above, section 11(d)(i) of the SPA provides an exclusive remedy, which should be enforced accordingly. Thus, here also, as a matter of law, iGames is not entitled to any alleged damages related to the Credit Facility Loan. Therefore, expert testimony on the topic is inappropriate and should be excluded. See Chemipal, 350 F. Supp. 2d at 595.

### F.      Roth's Analysis of the "Projected Loss of Income."

The sixth area that Roth discusses is iGames' alleged "Projected Loss of Income." (Drnec Aff. Ex. A at 10-11.) Roth's analysis purports to "estimate the amounts of profits lost by iGames" that would have been "obtained for three, five and ten years after the consummation of the [SPA]." (Id. Ex. A at 10.) Essentially, Roth is purporting to calculate iGames' lost future profits. (See id.)

Under Delaware law, damages that are speculative in nature are not recoverable. See Chemipal, 350 F. Supp. 2d at 595-97. For this reason, "consequential damages in the form of good will, *lost future profits*, and lost customers are not awarded in breach of contract actions." Id. at 595 (quoting Crowell Corp. v. Himont USA, Inc., 1994 WL 762663 (Del. Super. Dec. 8, 1994) (emphasis added). Thus, as a matter of law, iGames cannot be awarded lost future profits even if it establishes a breach of the SPA. Therefore, Roth's Report and testimony related to iGames' "Projected Loss of Income" is inappropriate and should be excluded. See Chemipal, 350 F. Supp. 2d at 595.

Additionally, Roth's entire analysis in this portion of his report is based upon a document prepared by Christopher Wolfington in March of 2004, entitled

"iGames/Equitex Transaction Analysis." (Drnec Aff. Ex. A at 10-11.) The document attempted to project the "combined results of operations after the completion of the SPA." (Id. Ex. A at 10.) Roth, with no indication that he independently verified the projections therein, stated "we accepted the conservative projections contained in this document and assumed that these results would be obtained for three, five and ten years . . . ." (Id.) Here again, such blind reliance is inappropriate. See Chemipal, 350 F. Supp. 2d at 589-92. In Chemipal, the court found that an expert's uncritical acceptance of projections set forth in a marketing plan, which the expert then used as a foundation for calculating damages, precluded the expert's testimony. Id. Likewise, Roth's blind reliance on Wolfington's projections, without independently verifying the accuracy of the projections taints Roth's entire analysis. Therefore, Roth's testimony regarding the "Projected Loss of Income" is inadmissible and should be excluded.

Additionally, as explained above, section 11(d)(i) of the SPA provides an exclusive remedy, which should be enforced accordingly. Here also, as a matter of law, iGames is not entitled to any alleged damages related to its "Projected Loss of Income." Thus, expert testimony on the topic is inappropriate and should be excluded. See Chemipal, 350 F. Supp. 2d at 595.

III.   **THE "NOTE RECEIVABLE – HOWARDS" PORTION OF ROTH'S "RESPONSE TO EXPERT REPORT OF THOMAS JOHN SHOPA" AND ROTH'S TESTIMONY RELATED THERETO SHOULD BE EXCLUDED AS EVIDENCE.**

Defendants submitted an initial report prepared by Thomas John Shopa. (Drnec Aff. Ex. F ("Expert Report of Thomas John Shopa, CPA, CFP, January 26, 2005").) Therein, Mr. Shopa considers "whether generally accepted accounting principles (GAAP) were consistently applied by Equitex, Inc. in their public filings with the Securities and

Exchange Commission ('SEC') with respect to a note receivable owed by two individuals to Chex Services (Equitex subsidiary)." (Id. Ex. F at 1.)   Mr. Shopa analyzes the accounting practices regarding the "Note Receivable – Howards" on pages 12 through 17 of his report. (Id. Ex. F at 12-17.) Mr. Shopa concludes that "The accounting treatment of the notes receivable from the Howards is consistent with generally accepted accounting principles." (Id. Ex. F. at 17.)

iGames submitted a rebuttal report prepared by Mr. Roth purporting to rebut Mr. Shopa's report. (Id. Ex. B.) However, Mr. Roth's rebuttal report when addressing the "Note Receivable – Howards" does not even discuss generally accepted accounting principles. (Id. Ex. B at 4-6.) Instead, Roth set forth a new opinion regarding the "materiality" of the note receivable and his opinion that it "represents a 'material adverse effect on Chex' as defined in the [SPA]." (Id. Ex. F at 6.)

The inherent nature of rebuttal evidence is that it is limited to the scope of the evidence to which it purports to rebut.   As explained above, Mr. Roth's "rebuttal" report goes beyond analyzing the note receivable in relation to generally accepted accounting principles, which was the scope of Mr. Shopa's initial report.   Instead, Roth's "rebuttal" report delves into a different issue (i.e., whether the note receivable had a "material adverse effect on Chex"). (Id.)   This is simply a belated attempt to submit additional expert testimony on behalf of iGames.   Thus, the "Note Receivable – Howards" portion of Roth's "rebuttal" report and his testimony related thereto should be excluded. Cf. Oxford Gene Tech., 345 F. Supp. 2d at 437 (indicating that belated attempts to submit additional expert testimony does not satisfy Rule 26(a)(2)(B)).

## IV.   THE REBUTTAL REPORT OF R. ALAN MILLER AND HIS TESTIMONY RELATED THERETO SHOULD BE EXCLUDED.

Defendants timely submitted an expert report from Dr. Gregg A. Jarrell.  (Drnec Aff. Ex G ("Expert Report of Gregg A. Jarrell, January 26, 2005").)  Dr. Jarrell's report considered, *inter alia*, whether 1) the 70% decline in the stock value of iGames meant that iGames could not have feasibly completed the acquisition of Chex; and 2) whether this significant decline in the stock value of iGames constituted a material adverse event under the terms of the SPA.  In response, iGames submitted a rebuttal report from R. Alan Miller, President of Philadelphia Investment Banking Company.  (Id. at Ex. C ("Rebuttal Report of R. Alan Miller").)   After summarizing his background and qualifications, Mr. Miller's report includes approximately three (3) pages devoted to responding to Mr. Jarrell's report.  Mr. Miller's report includes summary statements opposing Mr. Jarrell's opinions without meaningful substance or inclusion of any purported basis for the rebuttal opinions offered.  It is therefore inadmissible and should be excluded.

### A.   Miller's Rebuttal Opinion Regarding iGames' Inability to Close on the SPA Should be Excluded.

Mr. Miller first responds to Dr. Jarrell's opinion that, due to the decline in the market price of iGames' stock, it was infeasible for iGames to complete its acquisition of Chex.  (Id. Ex. C at 4-5.)  Section 2(b) of the SPA provided that Equitex would receive, at the time of the closing of the SPA, 62.5% of iGames' stock.  (Id. Ex. D at 9.)  Section 2(b) of the SPA also provided that if the average closing bid price for iGames' stock in the last five-day trading period before closing on the acquisition was less than $2.52, iGames would issue additional shares to Equitex to ensure that the value of the final consideration was worth at least $63 million.  (Id.)  Dr. Jarrell's report analyzed the

iGames stock price over the entire period from November 12, 2003, when the execution of the SPA was publicly announced, until the agreement was terminated on March 12, 2004, and also analyzed the five-day closing price per share of iGames stock during the period from March 1 to March 12, 2004. (Id. Ex. G at 10-13.) Dr. Jarrell's report also notes that even if Chex' and iGames' market capitalizations were combined, iGames still could not have reached the $63 million in consideration needed to close under the terms of the SPA. (Id. Ex. G at 12-13.)

Mr. Miller responds to this analysis with a one-paragraph statement that this plain requirement that iGames provide consideration of $63 million is "irrelevant" and "not an impediment to concluding the deal from iGames' perspective." (Id. Ex. C at 4-5.) Mr. Miller's response does not really dispute the calculations provided by Dr. Jarrell showing iGames could not feasibly meet this requirement of the SPA, but instead simply states that "this fact was irrelevant" and "not a deal breaker", based on Mr. Miller's opinion as to the parties' intent in including the language in Section 2(b) of the SPA. Mr. Miller's conclusory rebuttal, rather than addressing the substance of Dr. Jarrell's opinion and calculations, provides nothing more than an unsupported statement as to Mr. Miller's belief as to the parties' intentions when they signed the SPA. Of course, Mr. Miller cannot be an "expert" on the issue of the intent of the parties to the contract. This conclusory opinion fails to meet the requirements of Rule 702 and Daubert. See Honeywell Int'l, 347 F. Supp. 2d at 119.

### B.   Miller's Response to the Opinion that the Decline in iGames' Stock Price Constituted a Material Adverse Event.

Next, Mr. Miller responds to Dr. Jarrell's expert opinion that the 70% decline in iGames' stock price during the merger period constituted a material adverse event under

the SPA. Dr. Jarrell reached this conclusion after comparing the precipitous decline in iGames' stock price to the 48% increase in the value of an index of public-traded gaming stocks. Dr. Jarrell also analyzed iGames' cash flow and loss from operations during the merger period to confirm that its reported financials were consistent with this decline in the stock price. (Id. Ex. G at 13-15.) Dr. Jarrell also analyzed iGames' stock price before and after the announcement that Chex had lost the Seminole casino contract, in order to confirm this announcement did not explain the decline in stock price. (Id. at 15-16.)

In response, Mr. Miller first states that the decline in iGames' stock price "appears" to have been caused by the loss of the Seminole contract, as well as news of another lawsuit between Defendants and a company called Cash Systems. (Id. Ex. C at 5-6.) However, Mr. Miller's bald assertion appears to be based on his own guesswork, rather than expert analysis, as Mr. Miller cites no data or analysis undertaken to establish this statement. He does not address the data pointed to by Dr. Jarrell showing the apparent lack of correlation between the decline in iGames' stock price and the announcement of the loss of the Seminole contract. (Id. Ex. C at 15-16.)

Second, Mr. Miller states that iGames' stock price might have gone up had other events attributable to Defendants not occurred. Mr. Miller states that iGames' merger with Money Centers of America ("MCA") would have led to an increase in iGames' stock prices, as "[p]ublic disclosure of MCA's business, operations and results, which had not occurred during the period in question, reasonably could have been expected at the time to produce a rising stock price into the future, including the anticipated time frame of the Chex acquisition." (Id. at 6.) Mr. Miller provides no basis or data to support this statement. He also provides no explanation other than his "understanding" that

iGames could have raised its stock price by touting MCA but for Defendants actions. Again, this type of conclusory statement is not reasonably reliable testimony in an area of technical expertise and so is not the proper subject of expert opinion testimony.

## CONCLUSION

It is iGames' burden to prove that its experts' testimony is admissible. iGames cannot meet this burden. Mr. Roth's "Report on Damages" and the "Note Receivable – Howards" portion of Mr. Roth's "Response to Expert Report of Thomas John Shopa" fails to meet the relevant and reliability threshold of Rule 702. Likewise, the "Rebuttal Report of R. Alan Miller" also fails to meet the standards of Rule 702. Accordingly, Chex and Equitex respectfully request that this Court exercise its duty as a gatekeeper and rule that (1) Mr. Roth's entire "Report on Damages" and his testimony related thereto is inadmissible; that (2) the "Note Receivable – Howards" portion of Mr. Roth's "Response to Expert Report of Thomas John Shopa" and Roth's testimony related thereto is inadmissible; and that (3) Mr. Miller's entire "Rebuttal Report of R. Alan Miller" along with his testimony related thereto is inadmissible.

MORRIS, JAMES, HITCHENS & WILLIAMS, LLP

James W. Semple (#396)
James E. Drnec (#3789)
222 Delaware Avenue
P.O. Box 2306
Wilmington, DE 19899
jdrnec@morrisjames.com
(302) 888-6800

Attorneys for Chex Services, Inc. and Equitex, Inc.

OF COUNSEL:
RIDER BENNETT, LLP
Daniel Q. Poretti (MN #185152)
Patrick D. Robben (MN#284166)
Douglas J. Frederick (MN #320699)
33 South Sixth Street, Suite 4900
Minneapolis, MN 55402
(612) 340-8900
DQPoretti@riderlaw.com

DATED: MARCH 15, 2005

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 15, 2005 I electronically filed BRIEF IN SUPPORT OF

CHEX SERVICES, INC.'S AND EQUITEX, INC.'S  MOTION TO EXCLUDE EXPERT

TESTIMONY with the Clerk using CM/ECF which will send notification of such filing(s) to the

following:

Thomas P. McGonigle, Esquire
Matt Neiderman, Esquire
Duane Morris, LLP
1100 North Market Street
12th Floor
Wilmington, Delaware 19801

Matthew A. Taylor, Esquire
James L. Beausoleil, Jr., Esquire
Shannon H. Sutherland, Esquire
Duane Morris, LLP
One Liberty Place
Philadelphia, PA  19103-7396


James E. Drnec (#3789)
Morris, James, Hitchens & Williams, LLP
222 Delaware Avenue
P.O. Box 2306
Wilmington, DE  19899
(302) 888-6950
jdrnec@morrisjames.com