**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| iGAMES ENTERTAINMENT, INC., | : |
| | : |
| Plaintiff, | :    C.A. No. 04-180 (KAJ) |
| | : |
| v. | : |
| | : |
| CHEX SERVICES, INC. and | : |
| EQUITEX, INC., | : |
| | :    JURY TRIAL DEMANDED |
| | : |
| Defendants. | : |

# Appendix of Exhibits To iGames Entertainment, Inc's Motion For Summary Judgement

# Exhibit A
# (Part I)

STOCK PURCHASE AGREEMENT

FOR THE ACQUISITION OF

CHEX SERVICES, INC.

BY

iGAMES ENTERTAINMENT, INC.

FROM

EQUITEX, INC.

NOVEMBER 3, 2003



EXHIBIT

iGames 16

# STOCK PURCHASE AGREEMENT

THIS AGREEMENT is made and entered into as of the 3rd day of November, 2003, by and among iGAMES ENTERTAINMENT, INC., a Nevada corporation ("**Buyer**"), CHEX SERVICES, INC., a Minnesota corporation ("**Chex**"), and EQUITEX, INC., a Delaware corporation ("**Parent**").

## RECITALS:

WHEREAS, Parent owns all of the issued and outstanding shares of capital stock of Chex;

WHEREAS, Buyer has agreed to purchase from Parent, and Parent has agreed to sell to Buyer, all of the issued and outstanding capital stock of Chex upon the terms and subject to the conditions hereof; and

WHEREAS, Chex has a vested interest in the Contemplated Transactions and is a Party to this Agreement in order to make certain representations and warranties to Buyer; and

WHEREAS, concurrently with the execution and delivery of this Agreement, certain stockholders of Buyer and Parent are executing and delivering one or more voting agreements, dated as of the date hereof, in a form attached hereto as **Exhibit C** (the "Voting Agreements") pursuant to which such stockholders are, among other things, covenanting to vote in favor of the adoption of and otherwise to support this Agreement.

NOW, THEREFORE, for and in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, the Parties agree as follows:

1.      **Definitions.**  As used herein, the following terms will have the meanings ascribed thereto in this Section 1:

(a)     "**Accounts Receivable**" means trade accounts receivable, notes receivable and other rights to the payment of money, including any claim, remedy or other right related to any returned and unpaid checks.

(b)     "**Adverse Items**" has the meaning set forth in Section 11(a).

(c)     "**Applicable Law**" or "**Applicable Laws**" means any and all laws, ordinances, constitutions, regulations, statutes, treaties, rules, codes, licenses, certificates, franchises, permits, requirements and Orders adopted, enacted, implemented, promulgated, issued, entered or deemed applicable by or under the authority of any Governmental Body having jurisdiction over a specified Person or any of such Person's properties or assets.

(d)     "**Best Efforts**" means the efforts that a prudent Person desirous of achieving a result would use in similar circumstances to achieve that result as expeditiously as possible, provided, however, that a Person required to use Best Efforts under this Agreement will not be thereby required to take actions that would result in a Material Adverse Effect in the benefits to such Person of this Agreement and the Contemplated Transactions.

(e)    **"Breach"** means any breach of, or any inaccuracy in, any representation or warranty or any breach of, or failure to perform or comply with, any covenant or obligation, in or of this Agreement or any other Contract.

(f)    **"Business"** means Chex's business of providing cash access services to gaming and other facilities.

(g)    **"Business Day"** means any day other than (a) Saturday or Sunday or (b) any other day on which banks in Minnesota are permitted or required to be closed.

(h)    **"Buyer"** has the meaning given in the preamble above.

(i)    **"Buyer Common Stock"** means the common stock, par value $.001 per share, of Buyer.

(j)    **"Buyer Contracts"** has the meaning set forth in Section 5(o).

(k)    **"Buyer's Counsel"** means Klehr, Harrison, Harvey, Branzburg & Ellers, LLP, Philadelphia, Pennsylvania.

(l)    **"Buyer Employee Plans"** has the meaning set forth in Section 5(s)(i).

(m)    **"Buyer Financial Information"** has the meaning set forth in Section 5(f).

(n)    **"Buyer Intellectual Property"** has the meaning set forth in Section 5(m)(i).

(o)    **"Buyer Interim Balance Sheet"** has the meaning set forth in Section 5(f)(ii).

(p)    **"Buyer Offer Period"** has the meaning set forth in Section 2(f).

(q)    **"Buyer Proposed Transaction"** has the meaning set forth in Section 7(g)(vii).

(r)    **"Buyer Right of First Refusal"** has the meaning set forth in Section 2(f).

(s)    **"Buyer SEC Reports"** has the meaning set forth in Section 5(n).

(t)    **"Buyer Tax Affiliate"** has the meaning set forth in Section 5(h).

(u)    **"Chex"** has the meaning set forth in the recitals set forth above and includes any Subsidiary corporation or entities of Chex.

(v)    **"Chex Contracts"** has the meaning set forth in Section 6(n)(ii).

(w)    **"Chex Employee Plans"** has the meaning set forth in Section 6(r)(i).

(x)    **"Chex Financial Information"** has the meaning set forth in Section 6(e) below.

(y)    **"Chex Intellectual Property"** has the meaning set forth in Section 6(l)(i).

(z)    **"Chex Interim Balance Sheet"** has the meaning set forth in Section 6(e)(ii).

(aa)    **"Chex Proposed Transaction"** has the meaning set forth in Section 7(f)(i).

(bb)    **"Chex Share"** means any share of the capital stock of Chex.

(cc)    **"Closing"** has the meaning set forth in Section 2(c) below.

(dd)    **"Closing Balance Sheet"** means the balance sheet for the most recent quarter ended provided at or just prior to the Closing.

(ee)    **"Closing Date"** means the date on which the Closing actually takes place.

(ff)    **"Code"** means the Internal Revenue Code of 1986, as amended, and the rules and regulations issued by the IRS pursuant to the Internal Revenue Code or any successor law.

(gg)    **"Common Stock Consideration"** has the meaning set forth in Section 2(b) below.

(hh)    **"Competing Buyer Proposed Transaction"** has the meaning set forth in Section 7(g)(vii).

(ii)    **"Confidential Information"** means any information pertaining to the business, operations, marketing, customers, financing, forecasts and plans of any Party provided to or learned by any other Party during the course of negotiation of the Contemplated Transactions. Information shall be treated as Confidential Information whether such information has been marked "confidential" or in a similar manner.

(jj)    **"Consent"** means any approval, consent, ratification, waiver or other authorization.

(kk)    **"Contemplated Transactions"** means all of the transactions contemplated by the Transaction Documents.

(ll)    **"Contract"** means any agreement, contract, lease, license, consensual obligation, promise, undertaking, understanding, commitment, arrangement, instrument or document (whether written or oral and whether express or implied), whether or not legally binding.

(mm)    **"Covenant Not to Compete"** means the Covenant Not to Compete attached hereto as **Exhibit B**.

(nn)    **"CSI"** means Cash Systems, Inc.

(oo)    **"CSI Agreement"** has the meaning set forth in Section 7(f)(ii).

(pp)    **"CSI Transaction"** has the meaning set forth in Section 7(f)(ii).

(qq)    **" "Denaris"** means the Denaris Corporation.

(rr)    **"Disclosure Schedules"** means the disclosure schedules delivered by each Party to the other Parties as required by this Agreement on the date hereof and initialed by the Parties, as subsequently updated or supplemented by the Parties prior to the Closing. The Disclosure Schedules will be arranged in paragraphs corresponding to the lettered and numbered paragraphs contained in this Agreement. The Disclosure Schedules shall be attached hereto as **Exhibit A** and by reference made a part hereof.

(ss)    **"Employee Benefit Plan"** has the meaning set forth in ERISA Section 3(3).

(tt)    **"Encumbrance"** means and includes:

(i)    with respect to any personal property, any security or other property interest or right, claim, lien, pledge, option, charge, security interest, contingent or conditional sale, or other title claim or retention agreement or lease or use agreement in the nature thereof, interest or other right or claim of third parties, whether voluntarily incurred or arising by operation of law, and including any agreement to grant or submit to any of the foregoing in the future; and

(ii)    with respect to any real property (whether and including owned real estate or Leased Real Estate), any mortgage, lien, easement, interest, right-of-way, condemnation or eminent domain proceeding, encroachment, any building, use or other form of restriction, encumbrance or other claim (including adverse or prescriptive) or right of third parties (including Governmental Bodies), any lease or sublease, boundary dispute, and agreements with respect to any real property including: purchase, sale, right of first refusal, option, construction, building or property service, maintenance, property management, conditional or contingent sale, use or occupancy, franchise or concession, whether voluntarily incurred or arising by operation of law, and including any agreement to grant or submit to any of the foregoing in the future.

(uu)    **"ERISA"** means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations issued by the Department of Labor pursuant to ERISA or any successor law.

(vv)    **"Escrow Agreement"** has the meaning set forth in Section 8(f).

(ww)    **"Escrow Amount"** has the meaning set forth in Section 8(f).

(xx)    **"Exchange Act"** means the Securities Exchange Act of 1934, as amended.

(yy)    **"Final Returns"** has the meaning set forth in Section 3(b).

(zz)    **"GAAP"** means at any particular time generally accepted accounting principles in the United States, consistently applied on a going concern basis, using consistent audit scope and materiality standards.

(aaa)    **"Governing Documents"** means with respect to any particular entity, the articles or certificate of incorporation and the bylaws; all equityholders' agreements, voting agreements, voting trust agreements, joint venture agreements, registration rights agreements or other agreements or documents relating to the organization, management or operation of any Person or relating to the

rights, duties and obligations of the equityholders of any Person; and any amendment or supplement to any of the foregoing.

(bbb)    "**Governmental Authorization**" means any Consent, license, registration or permit issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any Legal Requirement.

(ccc)    "**Governmental Body**" means: (i) nation, state, county, city, town, borough, village, district, tribe or other jurisdiction; (ii) federal, state, local, municipal, foreign, tribal or other government; (iii) governmental or quasi-governmental authority of any nature (including any agency, branch, department, board, commission, court, tribunal or other entity exercising governmental or quasi-governmental powers); (iv) multinational organization or body; (v) body exercising, or entitled or purporting to exercise, any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power; or (vi) official of any of the foregoing.

(ddd)    "**Improvements**" means all buildings, structures, fixtures and improvements located on Land, including those under construction.

(eee)    "**IRS**" means the United States Internal Revenue Service and, the extent relevant, the United States Department of the Treasury.

(fff)    "**Knowledge**" means actual knowledge without independent investigation.

(ggg)    "**Land**" means all parcels and tracts of land in which any Person has an ownership or leasehold interest.

(hhh)    "**Legal Requirement**" means any federal, state, local, municipal, foreign, international, multinational or other constitution, law, ordinance, principle of common law, code, regulation, statute or treaty, including the Foreign Corrupt Practices Act, the violation of which would have a Material Adverse Effect.

(iii)    "**Material Adverse Effect**" or "**Material Adverse Change**" means, in connection with any Person, any event, change or effect that is materially adverse, individually or in the aggregate, to the condition (financial or otherwise), properties, assets, Liabilities, revenues, income, business, operations, results of operations or prospects of such Person, taken as a whole.

(jjj)    "**MCA Acquisition**" means the acquisition by Buyer of all of the issued and outstanding capital stock of Money Centers of America, Inc.

(kkk)    "**Merviss Estate Shares**" has the meaning set forth in Section 9(a)(iv).

(lll)    "**Note Receivables**" has the meaning set forth in Section 9(a)(viii).

(mmm)    "**Offered Buyer Common Stock**" has the meaning set forth in Section 2(f).

(nnn)    "**Order**" means any writ, directive, order, injunction, judgment, decree, ruling, assessment or arbitration award of any Governmental Body or arbitrator.

(ooo)   **"Ordinary Course of Business"** means an action taken by a Person will be deemed to have been taken in the Ordinary Course of Business only if that action: (i) is consistent in nature, scope and magnitude with the past practices of such Person and is taken in the ordinary course of the normal, day-to-day operations of such Person; (ii) does not require authorization by the board of directors or shareholders of such Person (or by any Person or group of Persons exercising similar authority) and does not require any other separate or special authorization of any nature; and (iii) is similar in nature, scope and magnitude to actions customarily taken, without any separate or special authorization, in the ordinary course of the normal, day-to-day operations of other Persons that are in the same line of business as such Person.

(ppp)   **"Parent"** has the meaning set forth in the preamble above.

(qqq)   **"Parent Board"** has the meaning set forth in Section 4(b).

(rrr)   **"Parent's Counsel"** means the law firm of Friedlob Sanderson Paulson & Tourtillott, LLC.

(sss)   **"Parent Proposals"** has the meaning set forth in Section 7(g).

(ttt)   **"Parent Requisite Vote"** has the meaning set forth in Section 4(b).

(uuu)   **"Parent SEC Reports"** has the meaning set forth in Section 4(f).

(vvv)   **"Party"** or **"Parties"** means Buyer, Chex and/or Parent.

(www)   **"Person"** means any individual, corporation, partnership, business trust, limited liability company, limited liability partnership, joint stock company, joint venture, trust, associated, unincorporated organization, other entity or Governmental Body.

(xxx)   **"Pledged Shares"** has the meaning set forth in Section 9(a)(vi).

(yyy)   **"Private Placement"** has the meaning set forth in Section 9(a)(vi).

(zzz)   **"Proceeding"** means any action, arbitration, audit, hearing, investigation, litigation or suit (whether civil, criminal, administrative, judicial or investigative, whether formal or informal, whether public or private) commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Body or arbitrator.

(aaaa)   **"Prospectus/Proxy Statement"** has the meaning set forth in Section 7(g).

(bbbb)   **"Real Property"** means any Land and Improvements and all privileges, rights, easements, hereditaments and appurtenances belonging to or for the benefit of any Land, including all easements appurtenant to and for the benefit of any Land (a **"Dominant Parcel"**) for, and as the primary means of access between, the Dominant Parcel and a public way, or for any other use upon which lawful use of the Dominant Parcel for the purposes for which it is presently being used is dependent, and all rights existing in and to any streets, alleys, passages and other rights-of-way included thereon or adjacent thereto (before or after vacation thereof) and vaults beneath any such streets.

(cccc)    **"Real Property Lease"** means any lease or rental agreement pertaining to the occupancy of any improved space on any Land.

(dddd)    **"Registration Statement"** has the meaning set forth in Section 7(g).

(eeee)    **"Regulatory Approval"** means all necessary licenses and approvals from Regulatory Authorities to conduct an activity.

(ffff)    **"Regulatory Authority"** means any federal, state, local, tribal and/or other regulatory agencies, bodies and authorities that from time to time have control or jurisdiction over or determine the licensability or suitability of Buyer or its Affiliates and/or any other Person in which Buyer has any interest (whether as an equity holder, a lender or otherwise).

(gggg)    **"Regulatory Problem"** has the meaning set forth in Section 2(g).

(hhhh)    **"Related Person"** means with respect to any Person: (i) any Person that directly or indirectly controls, is directly or indirectly controlled by or is directly or indirectly under common control with such specified Person; (ii) any Person that holds a Material Interest in such specified Person; (iii) each Person that serves as a director, officer, partner, executor or trustee of such specified Person (or in a similar capacity); (iv) any Person in which such specified Person holds a Material Interest; and (v) any Person with respect to which such specified Person serves as a general partner or a trustee (or in a similar capacity).

For purposes of this definition, (a) **"Control"** (including "controlling," "controlled by," and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise, and shall be construed as such term is used in the rules promulgated under the Securities Act; (b) the **"Family"** of an individual includes (i) the individual, (ii) the individual's spouse, (iii) any other natural person who is related to the individual or the individual's spouse within the second degree and (iv) any other natural person who resides with such individual; and (c) **"Material Interest"** means direct or indirect beneficial ownership (as defined in Rule 13d-3 under the Exchange Act) of voting securities or other voting interests representing at least ten percent (10%) of the outstanding voting power of a Person or equity securities or other equity interests representing at least ten percent (10%) of the outstanding equity securities or equity interests in a Person.

(iiii)    **"Representative"** means with respect to a particular Person, any director, officer, manager, employee, agent, consultant, advisor, accountant, financial advisor, legal counsel or other representative of that Person.

(jjjj)    **"Retained Common Stock Consideration"** has the meaning set forth in Section 2(b).

(kkkk)    **"Review Period"** has the meaning set forth in Section 11(a).

(llll)    **"Sale Notice"** has the meaning set forth in Section 2(f).

(mmmm)    **"SEC"** means the United States Securities and Exchange Commission.

(nnnn)    "**Securities Act**" means the Securities Act of 1933, as amended.

(oooo)    "**Security Interest**" means any mortgage, pledge, security interest, Encumbrance, charge, claim, or other lien, other than: (a) mechanic's, materialmen's and similar liens; (b) liens for Taxes not yet due and payable or for Taxes that the taxpayer is contesting in good faith through appropriate Proceedings; (c) liens arising under worker's compensation, unemployment insurance, social security, retirement and similar legislation; (d) liens arising in connection with sales of foreign receivables; (e) liens on goods in transit incurred pursuant to documentary letters of credit; (f) purchase money liens and liens securing rental payments under capital lease arrangements; and (g) other liens arising in the Ordinary Course of Business and not incurred in connection with the borrowing of money.

(pppp)    "**Stock Split**" means a reverse stock split of the issued and outstanding shares of Buyer Common Stock calculated to result in 40,000,000 issued and outstanding shares of Buyer Common Stock following the MCA Acquisition and the Contemplated Transactions.

(qqqq)    "**Subsidiary**" means with respect to any Person (the "**Owner**"), any corporation or other Person of which securities or other interests having the power to elect a majority of that corporation's or other Person's board of directors or similar governing body, or otherwise having the power to direct the business and policies of that corporation or other Person (other than securities or other interests having such power only upon the happening of a contingency that has not occurred), are held by the Owner or one or more of its Subsidiaries.

(rrrr)    "**Tangible Personal Property**" means all machinery, equipment, tools, furniture, office equipment, computer hardware, supplies, materials, vehicles and other items of tangible personal property of every kind owned or leased by a Party (wherever located and whether or not carried on a Party's books), together with any express or implied warranty by the manufacturers or sellers or lessors of any item or component part thereof and all maintenance records and other documents relating thereto.

(ssss)    "**Tax**" or "**Taxes**" "**Taxes**" means, with respect to any person, (i) all income taxes (including any tax on or based upon net income, gross income, income as specially defined, earnings, profits or selected items of income, earnings or profits) and all gross receipts, sales, use, ad valorem, transfer, franchise, license, withholding, payroll, employment, excise, severance, stamp, occupation, commercial rent, premium, property or windfall profit taxes, alternative or add-on minimum taxes, customs duties and other taxes, fees, assessments or charges of any kind whatsoever, together with all interest and penalties, additions to tax and other additional amounts imposed by any taxing authority (domestic or foreign) on such person (if any) and (ii) any liability for the payment of any amount of the type described in clause (i) above as a result of (A) being a "transferee" (within the meaning of Section 6901 of the Code or any Applicable Law) of another person, (B) being a member of an affiliated, combined or consolidated group or (C) a contractual arrangement or otherwise.

(tttt)    "**Tax Return**" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

(uuuu)    **"Termination Amount"** has the meaning set forth in Section 11(e)(ii).

(vvvv)    **"Third Party"** means a Person that is not a Party to this Agreement.

(wwww)    **"Transaction Documents"** means this Agreement and all other agreements, documents or instruments to be delivered pursuant to the provisions hereof.

(xxxx)    **"Voting Agreement"** has the meaning set forth in the recitals.

2.    **Purchase and Sale of the Chex Shares.**

(a)    Basic Transaction.  On and subject to the terms and conditions of this Agreement, Buyer agrees to purchase from Parent, and Parent agrees to sell to Buyer, all of the issued and outstanding Chex Shares for total aggregate consideration specified below.

(b)    Form and Distribution of Payment.  At the Closing, Buyer shall pay to Parent consideration of that amount of shares of Buyer Common Stock which equals 62.5% of the issued and outstanding shares of Buyer following such issuance on the Closing Date after giving effect to the Stock Split and closing of the MCA Acquisition (the **"Common Stock Consideration"**). It is contemplated that subsequent to Closing, Parent shall: (i) retain ownership of that amount of shares of Buyer Common Stock which equals 10% of the Common Stock Consideration (the **"Retained Common Stock Consideration"**); and (ii) distribute the balance of the Common Stock Consideration to Parent's stockholders on a pro rata basis as a dividend (net of any shares distributed by Parent in connection with the with the Contemplated Transaction as consideration for the retention of advisers, attorneys or other agents as listed on Schedule 2(b) hereof, and of any such shares contributed to Parent Employee Benefit Plan). Completion of the distribution will be conditioned on the effectiveness of a Registration Statement under the Securities Act registering the issuance of the distributed shares of Buyer Common Stock. In the event that the average closing bid price of the Buyer Common Stock for the five (5) trading days preceding the date of distribution is less than $2.52 (assuming a 1 – for 3.6 Stock Split; this amount will be adjusted proportionately for the actual Stock Split ratio)(the "Target Price"), the Buyer will issue sufficient additional shares of its Buyer Common Stock to Parent to cause the aggregate value of the Common Stock Consideration to equal that amount determined by multiplying the number of shares of Buyer Common Stock initially issued to Parent by the Target Price, which amount shall have an aggregate value of $63,000,000, which shares of Buyer Common Stock shall be considered part of the Common Stock Consideration and either retained by Parent or distributed to Parent's shareholders (proportionately to the amounts otherwise retained or distributed in accordance with this section) in accordance with this Agreement.

(c)    The Closing.  The closing of the Contemplated Transactions (the **"Closing"**) shall take place at such location, and at such time as the parties hereto shall mutually agree at the earliest practicable time after the satisfaction or waiver of the conditions set forth in Sections 7 and 9, but in no event later than five Business Days after the date that all of the conditions of Sections 7 and 9 are satisfied or waived.

(d)    Deliveries at Closing.  At the Closing:

(i)    Chex and Parent, as the case may be, will deliver to Buyer:

(A)    the stock certificates representing all of the Chex Shares, duly endorsed for transfer or accompanied by duly executed stock powers endorsed in blank;

(B)    the Covenants Not to Compete attached hereto as **Exhibit B**, executed by each Person identified on Schedule 2(d)(i);.

(C)    the Escrow Agreement in the form attached here to as **Exhibit D**.

(D)    a certificate of the Secretary of Chex certifying, as complete and accurate as of the Closing, attached copies of the Governing Documents of Chex and Parent, certifying and attaching all requisite resolutions or actions of Chex's and Parent's board of directors approving the execution and delivery of this Agreement and the other Transaction Documents and the consummation of the Contemplated Transactions and certifying to the incumbency and signatures of the officers of Chex and Parent executing this Agreement and each of the other Transaction Documents;

(E)    a certificate signed by the president or chief financial officer of each of Chex and Parent, dated the Closing Date, stating that the conditions specified in Section 9(a)(i), (ii) and (iii) have been fully satisfied;

(F)    an opinion of Parent's Counsel, dated the Closing Date, in a form reasonably satisfactory to Buyer and Buyer's Counsel;

(G)    certificates dated as of a date not earlier than thirty (30) days immediately preceding the Closing Date as to the good standing of Chex, executed by the appropriate officials of the State of Minnesota and each jurisdiction in which Chex is licensed or qualified to do business as a foreign corporation as specified in Schedule 2(d)(i); and

(H)    such other documents relating to the Contemplated Transactions as Buyer may reasonably request that are customary for similar transactions.

(ii)    Buyer will deliver to Parent:

(A)    the Escrow Agreement in the form attached hereto as **Exhibit D**.

(B)    certificates representing the Common Stock Consideration;

(C)    a certificate of the Secretary of Buyer certifying, as complete and accurate as of the Closing, attached copies of the Governing Documents of Buyer, certifying and attaching all requisite resolutions or actions of Buyer's board of directors approving the execution and delivery of this Agreement and the other Transaction Documents and the consummation of the Contemplated Transactions and certifying to the incumbency and signatures of the officers of Buyer executing this Agreement and each of the other Transaction Documents;

(D)    a certificate signed by the president or chief financial officer of Buyer, dated the Closing Date, stating that the conditions specified in Section 9(b)(i), (ii) and (iii) have been fully satisfied;

(E)    an opinion of Buyer's Counsel, dated the Closing Date, in form reasonably satisfactory to Parent and Parent Counsel;

(F)    certificates dated as of a date not earlier than thirty (30) days immediately preceding the Closing Date as to the good standing of Buyer, executed by the appropriate officials of the its incorporating state and each jurisdiction in which Buyer is licensed or qualified to do business as a foreign corporation as specified in Schedule 5(a)(i); and

(G)    such other documents relating to the Contemplated Transactions as Parent may reasonably request that are customary for similar transactions.

(e)    <u>Restriction on Parent's Sale or Transfer of Retained Common Stock Consideration</u>. Parent acknowledges and agrees that it may not, without the prior written consent of Buyer, sell or transfer any shares of the Retained Common Stock Consideration or complete any transactions involving Buyer Common Stock until the date on which shares of the Retained Common Stock Consideration other than the Pledged Shares are released from escrow pursuant to Section 8(f). Subsequent to such date, in any three month period, Parent may sell or transfer that number of shares of the Retained Common Stock Consideration, exclusive of the Pledged Shares held in escrow pursuant to Section 9(a)(vi)(A), equal to the greater of (i) one percent (1%) of the issued and outstanding Buyer Common Stock as reported in the most recent report or statement of Buyer filed with the SEC or (ii) the average weekly reported volume of trading in Buyer Common Stock on all national securities exchanges and/or reported through the automated quotation system of a registered securities association during the four calendar weeks preceding such sales or transfers. Prior to any sale or transfer pursuant to this Section, Parent shall provide Buyer with a schedule for the sale or transfer of any shares of Retained Common Stock Consideration, which schedule shall receive prior approval by Buyer, whose approval shall not be unreasonably withheld.

(f)    <u>Buyer Right of First Refusal</u>. If Parent wishes to dispose of all or any portion of the Retained Common Stock Consideration (the "**Offered Buyer Common Stock**") through a voluntary sale or other disposition to any Person other than Buyer or to a wholly owned Subsidiary of Parent provided that such Subsidiary is subject to this Buyer Right of First Refusal, Parent must provide written notice to Buyer of the amount of the Offered Buyer Common Stock for which it has received an offer to purchase from a Third Party including the price, payment terms and purchase date (the "**Sale Notice**"). For a period of five (5) Business Days after the receipt by Buyer of the Sale Notice (the "**Buyer Offer Period**"), Buyer shall have the right to submit a written offer to purchase the Offered Buyer Common Stock. Provided Parent has not received a higher offer from a Third Party during Buyer Offer Period, Buyer shall have the right, exercisable within five (5) Business Days of the receipt of the Sale Notice, to purchase all, but not less than all (unless the Third Party agrees to purchase the remainder on the same terms and conditions set forth in the Sale Notice), of the Offered Buyer Common Stock on the terms specified in the Sale Notice, which must include full payment for the Offered Buyer Common Stock (the "**Buyer Right of First Refusal**"). If Parent has received a higher offer from a Third Party during Buyer Offer Period for the Offered

Buyer Common Stock, Parent shall provide Buyer with a Sale Notice of the higher offer and Buyer Offer Period shall begin again. If Buyer does not exercise its Buyer Rights of First Refusal, Parent shall be permitted to sell the Offered Buyer Common Stock pursuant to and in accordance with the Sale Notice. Buyer Right of First Refusal shall expire when the aggregate of Parent's ownership of the Common Stock Consideration and that of any wholly owned Subsidiary of Parent to which Parent has transferred such Common Stock Consideration is one percent (1%) or lower of the total outstanding common stock of Buyer.

(g)     Regulatory Call Right.   In the event that Buyer reasonably determines that Parent's continued ownership of shares of Buyer Common Stock will materially adversely impact the ability of the Company, any of its Related Persons, and/or any other Person in which the Company or any of its subsidiaries has any interest (whether as an equity holder, a lender or otherwise), to receive or to retain any required Regulatory Approval for the Business (a "**Regulatory Problem**"), Buyer shall have the option, exercisable by written notice given to Parent within sixty (60) days after Buyer receives notice of such Regulatory Problem, to purchase that amount of Buyer Common Stock held by Parent required to be purchased by Buyer in order to eliminate the Regulatory Problem, for an amount per share equal to the average closing bid price of the Buyer Common Stock for the five (5) trading days preceding the date of Buyer's written notice.  Parent shall deliver certificates evidencing the Buyer Common Stock to Buyer within five (5) days of receipt of Buyer's written notice, and the purchase price therefore shall be due and payable upon delivery of such certificates.

(h)     Covenant Not to Compete.   The Parties acknowledge that it is in the best interest of the stockholders of Buyer and Parent to protect the anticipated benefits of Buyer resulting from its acquisition of Chex under the Agreement, and that obtaining a Covenant Not to Compete from Parent, Denaris Corporation ("**Denaris**"), certain principal stockholders and/or members of management of Parent, Chex and certain representatives of Parent will further these ends.  The Parties further understand and agree that the execution and delivery of the Covenant Not to Compete that is attached hereto as **Exhibit B** by the Persons outlined in Schedule 9(a)(iv) is a primary condition to the Closing of this Agreement on behalf of Buyer.  The Parties have agreed that the Covenant Not to Compete from Denaris will allow Denaris to conduct business activities in the cash access and gaming industry so long as such activities are conducted through the Buyer and/or its Related Persons after the Closing Date.

3.     **Tax Matters.**

(a)     General.   As set forth in Section 3(d), the Parties have agreed to have the Contemplated Transactions treated for tax purposes as a tax-free type B reorganization under Section 368 of the Code.

(b)     Final Tax Returns.   Prior to the date which is 45 days prior to the due date of any of the following returns, including any extensions of time, Parent and Chex shall, consistent with the terms of Section 3(d) and Parent's past practice, prepare and submit to Buyer each Tax Return of Parent and Chex for any taxable periods ending upon the close of business on the Closing Date, for which returns have not been filed prior to the Closing Date (the "**Final Returns**").  Buyer shall review such returns, and within 10 Business Days of Buyer's receipt of any such return, notify Parent and Chex of any changes thereto desired by Buyer.  Chex and Parent shall make such changes as Buyer shall propose which are necessary to make the Final Returns consistent with the agreements of

the Parties as set forth in this Section 3 and cause the Final Returns to be timely filed (which timely filing may include all extensions to file as may be legally obtained by Chex and Parent), and a copy thereof to be delivered to Buyer. Buyer and Chex shall cooperate with and assist tax advisors of Parent, as may be reasonably requested by Parent in the preparation of data necessary for filing any Tax Return of Chex for any period including the Closing Date and ending upon the close of business on the Closing Date to the extent that such data is based on the operations of Chex.

(c)     Allocation of Income and Initial Chex Consolidated Tax Returns. Buyer shall be responsible for all Taxes of Chex for the activities and operations of Chex occurring after the close of business on the Closing Date and shall also be responsible for and pay taxes, to the extent that such Taxes are reflected as a liability on the Closing Balance Sheet. Buyer acknowledges and agrees that the first income Tax Return of Chex for any tax period beginning after the close of business on the Closing Date shall be filed on a consolidated basis with Buyer. The taxable income or loss of Chex to be allocated to the periods or portions thereof including the Closing Date and ending upon the close of business on the Closing Date shall be determined by an actual closing of Chex's books and records and not on a pro-rata basis, except that real estate taxes and other taxes customarily pro rated shall be pro rated.

(d)     Consistent Reporting. Each of Chex, Buyer and Parent agrees for all federal, state and local income and franchise tax reporting purposes to report the consequences of the Contemplated Transactions in a manner consistent with a reorganization within the meaning of Section 368(a) of the Code (and consistent with any election or action, if necessary, under any applicable state law), unless advised by tax counsel that such reporting is more likely than not to result in the accrual of penalties or interest as a result of not being correct.

(e)     Tax Audits.

(i)     In the event that any taxing authority shall notify any Party of any investigation, inquiry or audit involving the federal or state income Tax Returns of Chex for a period including the Closing Date and ending upon the close of business on the Closing Date, the notified Party shall notify all other Parties. Parent shall be responsible for and assume the defense and control all aspects of any such inquiry, investigation or audit involving the Tax Returns of Chex and Parent for any period including the Closing Date and ending upon the close of business on the Closing Date, including all costs and expenses incurred by Parent in connection therewith; provided, that Parent shall consult with Buyer with respect to any such inquiry, investigation or audit that might affect Buyer for the taxable periods ending after the Closing Date; and provided further that Parent shall not file any claims or amended returns, or enter into any final settlement or closing agreement that may increase Taxes of Buyer or Chex without the consent of Buyer, which consent shall not be unreasonably withheld. Chex and Buyer shall make available such records and documents in their possession as may be reasonably requested by Parent or legally requested by such taxing authority. Buyer and Chex shall reasonably cooperate with and assist Parent and such taxing authority in the completion of such inquiry, investigation or audit and shall advise Parent of the commencement and progress of any such audit following receipt of notice thereof by Chex.

(ii)     In the event that any taxing authority shall notify any Party of any investigation, inquiry or audit involving the Tax Returns of Chex for a period commencing after the close of business on the Closing Date, the notified Party shall immediately notify all other Parties.

Buyer shall be responsible for and assume the defense and control all aspects of any such inquiry, investigation or audit, including all costs and expenses incurred by Buyer in connection therewith. To the extent necessary, Buyer shall engage legal counsel with respect to state tax matters that is reasonably acceptable to Parent. Parent shall make available to Buyer such records and documents in its possession as may be reasonably requested by any Buyer or legally requested by such taxing authority. Parent shall reasonably cooperate with and assist Buyer and Chex and such taxing authority in the completion of such inquiry, investigation or audit. Buyer, Parent and Chex shall be responsible for all costs and expenses incurred by them in connection with any inquiry, investigation or audit involving the Tax Returns of Chex for any period commencing after the close of business on the Closing Date. Buyer shall keep Parent reasonably informed of the status of any such investigation, inquiry or audit, including any settlement, appeal, payment of sums due or other agreement arising out of such investigation, inquiry or audit that could have a Material Adverse Effect on Parent. Parent shall have the right to amend any Final Tax Returns to reflect the final outcome of any such inquiry, investigation or audit.

      (f)    <u>Income Tax Indemnification</u>.

      (i)    Parent shall indemnify and hold harmless, on an after tax basis, Buyer from and against any liability for Taxes of Chex (other than to the extent such taxes are reflected as a liability on the Closing Balance Sheet), including any taxes imposed under Code Section 1374, resulting from the operations or activities of Chex, or the manner in which Chex or Parent treated certain items (including the making of any elections under the Code or applicable state income tax provisions) for income tax purposes, prior to the close of business on the Closing Date.

      (ii)    Buyer shall indemnify and hold harmless, on an after tax basis, Parent from and against any liability for Taxes of Chex, including any taxes imposed under Code Section 1374, resulting from the operations or activities of Chex, or the manner in which Chex or Buyer treated certain items (including the making of any elections under the Code or applicable state income tax provisions) for income tax purposes, after the Closing Date.

      (iii)    Tax liabilities, other than income taxes, subject to indemnification under Section 10, below, shall be governed by the procedures set forth therein.

    4.    **Representations of Parent Concerning the Transaction.** Parent represents to Buyer that the statements contained in this Section 4 are correct and complete as of the date of this Agreement and will be correct and complete as of the Closing Date (as though made then and as though the Closing Date was substituted for the date of this Agreement throughout this Section 4).

      (a)    <u>Organization and Good Standing</u>. Parent is a corporation duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation. Parent is duly qualified to do business as a foreign corporation and is in good standing under the laws of each state or other jurisdiction in which either the ownership or use of the properties owned or used by it, or the nature of the activities conducted by it, requires such qualification and the failure to be so qualified would have a Material Adverse Effect on Parent. <u>Schedule 4(a)</u> contains a complete and accurate list of every jurisdiction in which Parent is qualified to do business.

(b)     <u>Authorization of Transaction</u>.  Subject to the approval of its shareholders, Parent has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder.   On the Closing Date, this Agreement shall be duly and validly authorized by all necessary action on the part of Parent and its stockholders in accordance with Applicable Laws and Parent's Governing Documents. This Agreement constitutes the valid and legally binding obligation of Parent, enforceable in accordance with its terms and conditions.  Except in connection with Parent Shareholder Meeting, Parent does not need to give any notice to, make any filing with, or obtain any authorization, Consent or approval of any government or governmental agency in order to consummate the Contemplated Transactions.  The affirmative approval of the Board of Directors of Parent (the "**Parent Board**)" and of the holders of shares of Parent's issued and outstanding capital stock entitled to vote thereon representing a majority of the votes that may be cast by the holders of such securities as of the record date for the Company (the "**Parent Requisite Vote**") is the only vote of the holders of any class or series of capital stock of the Company necessary to approve the Contemplated Transactions.

(c)     <u>Noncontravention</u>.  Neither the execution and delivery of this Agreement, nor consummation of the Contemplated Transactions, will:

(i)     violate any Applicable Law, Order, stipulation, charge or other restriction of any government, governmental agency or court to which Parent is subject;

(ii)     conflict with, result in a Breach of, constitute a default under, result in the acceleration of, create in any Person the right to accelerate, terminate, modify or cancel, or require any notice under any contract, lease, sublease, license, sublicense, franchise, permit, indenture, agreement or mortgage for borrowed money, instrument of indebtedness, Security Interest or other arrangement to which Parent is a party or by which it is bound or to which any of its assets is subject, except for the CSI Agreement;

(iii)     violate or conflict with any provision of Parent's Governing Documents; or

(iv)     result in the creation or imposition of any Encumbrance on any of the properties or assets of Chex.

(d)     <u>Transfer of Chex Shares</u>.  Parent is the lawful owner of the Chex Shares to be sold, transferred and delivered by it to Buyer hereunder, free and clear of any restrictions on transfer (other than any restrictions under the Securities Act or applicable state securities laws), Taxes, Encumbrances, Security Interests, options, warrants, purchase rights, contracts, commitments, equities, claims and demands. Other than this Agreement and the CSI Agreement, there are no outstanding or authorized options, warrants, rights, contracts, calls, puts, rights to subscribe, conversion rights or other agreements or commitments providing for the disposition or acquisition of any Chex Shares or other equity interest in Chex. The Chex Shares to be sold, transferred and delivered to Buyer hereunder represent all of the issued and outstanding capital stock of Chex.

(e)     <u>Brokers' Fees</u>.  Parent does not have any liability or obligation to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement for which Chex, Buyer or Parent could become liable or obligated. This section excludes

any fees that may have been or be incurred for financial advisement services which shall be the sole obligation of Parent.

(f)    SEC Reports and Financial Statements. Since January 1, 2000, Parent has filed with the SEC all reports and other filings required to be filed by Parent in accordance with the Securities Act and the Exchange Act and the rules and regulations promulgated thereunder (the "**Parent SEC Reports**"). As of their respective dates, Parent SEC Reports complied with the applicable requirements of the Securities Act, the Exchange Act and the respective rules and regulations promulgated thereunder applicable to such Parent SEC Reports and, except to the extent that information contained in any Parent SEC Report has been revised or superseded by a later Parent SEC Report filed and publicly available prior to the date of this Agreement, none of the Parent SEC Reports contained any untrue statement of a material fact or omitted to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading. The financial statements of Parent included in Parent SEC Reports were prepared from and are in accordance with the accounting books and other financial records of Parent, were prepared in accordance with GAAP (except, in the case of unaudited statements, as permitted by the SEC) and presented fairly the consolidated financial position of Parent and its consolidated subsidiaries as of the dates thereof and the consolidated results of their operations and cash flows for the periods then ended (subject, in the case of unaudited statements, to normal year-end audit adjustments). Except as set forth in Parent SEC Reports, Parent has no liabilities or obligations of any nature (whether accrued, absolute, contingent or otherwise) other than liabilities or obligations incurred in the Ordinary Course of Business. Parent SEC Reports completely and accurately disclose (i) the terms and provisions of all stock option plans, (ii) transactions with affiliates, and (iii) all material contracts required to be disclosed pursuant to Item 601(b)(10) of Regulation S-B promulgated by the SEC.

5.    **Representations of Buyer Concerning the Transaction.** Buyer represents to Parent and Chex that the statements contained in this Section 5 are correct and complete as of the date of this Agreement and will be correct and complete as of the Closing Date (as though made then and as though the Closing Date was substituted for the date of this Agreement throughout this Section 5).

(a)    Organization and Good Standing.

(i)    Buyer is a corporation duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation. Buyer is duly qualified to do business as a foreign corporation and is in good standing under the laws of each state or other jurisdiction in which either the ownership or use of the properties owned or used by it, or the nature of the activities conducted by it, requires such qualification and the failure to be so qualified would have a Material Adverse Effect on Buyer. Schedule 5(a)(i) contains a complete and accurate list of every jurisdiction in which Buyer is qualified to do business.

(ii)    Buyer has no Subsidiary and does not own any shares of capital stock or other securities of any other Person, other than as set forth on Schedule 5(a)(ii).

(b)    Authorization of Transaction. Subject to the approval of its shareholders of the Stock Split, Buyer has full power and authority (including full corporate power and authority) to execute and deliver this Agreement and to perform its obligations hereunder. This Agreement

constitutes the valid and legally binding obligation of Buyer, enforceable in accordance with its terms and conditions. Buyer is not required to give any notice to, make any filing with or obtain any authorization, Consent or approval of any Governmental Body in order to consummate the Contemplated Transactions except for (i) the filing and mailing of an information statement to Buyer's stockholders under the Exchange Act, (ii) the Registration Statement, (iii) such notice filings as may be required under federal or applicable state securities laws and (iv) except for any filings pursuant to the Securities Act, which may be required in connection with Buyer's financing of the Contemplated Transactions.

(c)     Capitalization of Buyer. Subject to amendment of the appropriate Governing Documents of Buyer upon approval by majority written consent of Buyer's stockholders and delivery of an information statement to Buyer's stockholders who do not consent to such amendment, the entire authorized capital stock of Buyer consists of 50,000,000 shares of common stock having a par value of $0.001 per share, of which _____ shares are issued and outstanding, and no shares of preferred stock. All of Buyer's issued and outstanding shares of common stock have been duly authorized, are validly issued, fully paid and nonassessable. Other than this Agreement and as disclosed on Schedule 5(c), there are no outstanding or authorized options, warrants, rights, contracts, calls, puts, rights to subscribe, conversion rights or other agreements or commitments to which Buyer is a party or which are binding upon Buyer providing for the issuance, disposition or acquisition of any of its capital stock, nor any outstanding or authorized stock appreciation, phantom stock or similar rights with respect to Buyer.

(d)     Noncontravention. Neither the execution and delivery of this Agreement, nor consummation of the Contemplated Transactions, will:

(i)     violate any Applicable Law, Legal Requirement, Order, stipulation, charge or other restriction of any Governmental Body or court to which Buyer is subject or any provision of its Governing Documents; or

(ii)     conflict with, result in a Breach of, constitute a default under, result in the acceleration of, create in any Person the right to accelerate, terminate, modify or cancel, or require any notice under any contract, lease, sublease, license, sublicense, franchise, permit, indenture, agreement or mortgage for borrowed money, instrument of indebtedness, Security Interest, or other arrangement to which Buyer is a party or by which it is bound or to which any of its assets is subject.

(e)     Affiliate Transactions. No officer, director, or employee of Buyer or any member of the immediate family of any such officer, director or employee, or any entity in which any of such persons owns any beneficial interest (other than any publicly-held corporation whose stock is traded on a national securities exchange or in the over-the-counter market and less than one percent of the stock of which is beneficially owned by any of such persons), has any agreement with Buyer or any interest in any of their property of any nature, used in or pertaining to the business of Buyer, except as disclosed in Schedule 5(e). None of the foregoing Persons has any direct or indirect interest in any competitor, supplier or customer of Buyer or in any Person from whom or to whom Buyer leases any property or transacts business of any nature.

(f)     Buyer Financial Information. Schedule 5(e) shall include the following financial information (collectively, the "**Buyer Financial Information**"):

(i)     audited consolidated and consolidating balance sheets and statements of income, changes in stockholders' equity and cash flow as of and for each of the years ended December 31, 2002, for Buyer; and

(ii)     unaudited consolidated and consolidating balance sheets and statements of income, changes in stockholders' equity and cash flow as of and for the quarter ended June 30, 2003 (the "**Buyer Interim Balance Sheet**") for Buyer.  Buyer Financial Information present fairly the financial condition of Buyer as of such dates and the results of operations of Buyer for such periods, in accordance with GAAP and are consistent with the books and records of Buyer (which books and records are correct and complete).

(g)     <u>Events Subsequent to Buyer Interim Balance Sheet</u>.  Since the date of Buyer Interim Balance Sheet, and except as disclosed on <u>Schedule 5(g)</u>, there has not been, occurred or arisen, with respect to Buyer:

(i)     any change or amendment in its Governing Documents;

(ii)     any reclassification, split up or other change in, or amendment of or modification to, the rights of the holders of any of its capital stock;

(iii)     any direct or indirect redemption, purchase or acquisition by any Person of any of its capital stock or of any interest in or right to acquire any such stock;

(iv)     other than in connection with the MCA Acquisition, any issuance, sale, or other disposition of any capital stock, or any grant of any options, warrants, or other rights to purchase or obtain (including upon conversion, exchange, or exercise) any capital stock;

(v)     any declaration, set aside, or payment of any dividend or any distribution with respect to its capital stock (whether in cash or in kind) or any redemption, purchase, or other acquisition of any of its capital stock;

(vi)     the organization of any Subsidiary or the acquisition of any shares of capital stock by any Person or any equity or ownership interest in any business;

(vii)     any damage, destruction or loss of any of the its properties or assets whether or not covered by insurance;

(viii)     any sale, lease, transfer, or assignment of any of its assets, tangible or intangible, other than for a fair consideration in the Ordinary Course of Business;

(ix)     other than with respect to the MCA Acquisition, the execution of, or any other commitment to any agreement, contract, lease, or license (or series of related agreements, contracts, leases, and licenses) outside the Ordinary Course of Business;

(x)     any acceleration, termination, modification, or cancellation of any agreement, contract, lease, or license (or series of related agreements, contracts, leases, and licenses), involving more than $10,000 to which it is a party or by which it is bound;

(xi)     any Security Interest or Encumbrance imposed upon any of its assets, tangible or intangible;

(xii)     any grant of any license or sublicense of any rights under or with respect to any Buyer Intellectual Property;

(xiii)     any sale, assignment or transfer (including transfers to any employees, affiliates or shareholders) of any Buyer Intellectual Property;

(xiv)     any capital expenditure (or series of related capital expenditures) involving more than $10,000 and outside the Ordinary Course of Business;

(xv)     any capital investment in, any loan to, or any acquisition of the securities or assets of, any other Person (or series of related capital investments, loans, and acquisitions) involving more than $10,000 and outside the Ordinary Course of Business;

(xvi)     any issuance of any note, bond, or other debt security or created, incurred, assumed, or guaranteed any indebtedness for borrowed money or capitalized lease obligation involving more than $10,000;

(xvii)     any delay or postponement of the payment of accounts payable or other liabilities, other than those being contested in good faith as set forth in Schedule 5(g)(xvii);

(xviii)     any cancellation, compromise, waiver, or release of any right or claim (or series of related rights and claims) involving more than $10,000 and outside the Ordinary Course of Business;

(xix)     any loan to, or any entrance into any other transaction with, any of its directors, officers, and employees;

(xx)     the adoption, amendment, modification, or termination of any bonus, profit-sharing, incentive, severance, or other plan, contract, or commitment for the benefit of any of its directors, officers, and employees (or taken away any such action with respect to any other Employee Benefit Plan);

(xxi)     any employment contract or collective bargaining agreement, written or oral, or modified the terms of any existing such contract or agreement;

(xxii)     any increase in the base compensation of any of its directors, officers, and employees;

(xxiii)     any charitable or other capital contribution in excess of $2,500;

(xxiv)     any taking of other action or entrance into any other transaction other than in the Ordinary Course of Business, or entrance into any transaction with any insider of Buyer, except as disclosed in this Agreement and the Disclosure Schedules;

(xxv)  any other event or occurrence that may have or could reasonably be expected to have an Material Adverse Effect on Buyer (whether or not similar to any of the foregoing); or

(xxvi)  any agreement or commitment, whether in writing or otherwise, to do any of the foregoing other than in connection with the MCA Acquisition or the hiring of Chris Wolfington as Chief Executive Officer of Buyer.

(h)    Tax Matters.

(i)    Except as set forth on Schedule 5(h)(i):  (i) Buyer and (ii) each other Person included in any consolidated or combined Tax Return and part of an affiliated group, within the meaning of Section 1504 of the buyer Code, of which Buyer is or has been a member ("**Buyer Tax Affiliate**"), for the years that it was a Buyer Tax Affiliate of Buyer:

(A)    has timely paid or caused to be paid all Taxes required to be paid by it though the date hereof and as of the Closing Date (including any Taxes shown due on any Tax Return);

(B)    has filed or caused to be filed in a timely and proper manner (within any applicable extension periods) all Tax Returns required to be filed by it with the appropriate Governmental Body in all jurisdictions in which such Tax Returns are required to be filed; and all tax returns filed on behalf of Buyer and each Buyer Tax Affiliate were completed and correct in all material respects; and

(C)    has not requested or caused to be requested any extension of time within which to file any Tax Return, which Tax Return has not since been filed.

(ii)    Buyer has previously delivered true, correct and complete copies of all Federal Tax Returns filed by or on behalf of Buyer through the date hereof for the periods ending after December 31, 1999.

(iii)    Except as set forth in Schedule 5(h)(iii):

(A)    since January 1, 2000, neither Buyer nor any Buyer Tax Affiliate (for the years that it was a Buyer Tax Affiliate) has been notified by the Internal Revenue Service or any other Governmental Body that any issues have been raised (and no such issues are currently pending) by the Internal Revenue Service or any other Governmental Body in connection with any Tax Return filed by or on behalf of Buyer or any Buyer Tax Affiliate; there are no pending Tax audits and no waivers of statutes of limitations have been given or requested with respect to Buyer or any Buyer Tax Affiliate (for years that it was a Buyer Tax Affiliate); no Tax liens have been filed against Buyer or unresolved deficiencies or additions to Taxes have been proposed, asserted or assessed against Buyer or any Buyer Tax Affiliate (for the years that it was a Buyer Tax Affiliate);

(B)    full and adequate accrual has been made ((i)) on the Buyer Interim Balance Sheet, and the books and records of Buyer and each of its Subsidiaries for all

income taxes currently due and all accrued Taxes not yet due and payable by Buyer and each of its Subsidiaries, respectively, as if they were stand-alone corporations for all periods ending on or prior to the Buyer Interim Balance Sheet Date, and ((ii)) on the books and records of Buyer and each of its Subsidiaries for all Taxes payable by Buyer and each of its Subsidiaries, respectively, as if they were stand-alone corporations for all periods beginning after the Buyer Interim Balance Sheet Date;

(C)     neither Buyer nor any of its Subsidiaries has incurred any Liability for Taxes from and after the Buyer Interim Balance Sheet Date other than Taxes incurred in the Ordinary Course of Business and consistent with past practices;

(D)     neither Buyer nor any of its Subsidiaries has ((i)) made an election (or had an election made on its behalf by another person) to be treated as a "consenting corporation" under Section 341(f) of the Code or ((ii)) a "personal holding company" within the meaning of Section 542 of the Code;

(E)     Buyer and each of its Subsidiaries has complied in all material respects with all Applicable Laws relating to the collection or withholding of Taxes (such as Taxes or withholding of Taxes from the wages of employees);

(F)     neither Buyer nor any of its Subsidiaries has any liability in respect of any Tax sharing agreement with any Person and all Tax sharing agreements to which either Buyer or any of its Subsidiaries has been bound have been terminated;

(G)     neither Buyer nor any of its Subsidiaries has incurred any Liability to make any payments either alone or in conjunction with any other payments that:

(1)     shall be non-deductible under, or would otherwise constitute a "parachute payment" within the meaning of Section 280G of the Code (or any corresponding provision of state local or foreign income Tax Law); or

(2)     are or may be subject to the imposition of an excise Tax under Section 4999 of the Code;

(H)     neither Buyer nor any of its Subsidiaries has agreed to (nor has any other Person agreed to on its behalf) and is not required to make any adjustments or changes on, before or after the Closing Date, to its accounting methods pursuant to Section 481 of the Code, and the Internal Revenue Service has not proposed any such adjustments or changes in the accounting methods of Buyer;

(I)     no claim has been made within the last three years by any taxing authority in a jurisdiction in which Buyer or any of its Subsidiaries does not file Tax Returns that Buyer or any such Subsidiary is or may be subject to taxation by that jurisdiction;

(J)     the consummation of the Contemplated Transactions will not trigger the realization or recognition of intercompany gain or income to Buyer under the Federal consolidated return regulations with respect to Federal, state or local taxes;

(K)    none of Buyer's Shareholders are foreign Persons within the meaning of Treasury Regulation § 1.1445-2(b) of the rules and regulations promulgated under Section 1445 of the Code, and Parent has been furnished with a true and accurate certificate of Buyer so stating which complies in all respects with Treasury Regulation § 1.1445-2(b)(2) of such rules and regulations; and

(L)    Buyer is not currently, nor has it been at any time during the previous five years, a "U.S. real property holding corporation" and, therefore, the Buyer Common Stock is not "U.S. real property interests," as such terms are defined in Section 897 of the Code.

(i)    Title to Assets.  Buyer has good and marketable title to, or a valid leasehold interest in, the properties and assets owned or leased and used by it to operate the business in the manner presently operated by Buyer, as reflected in Buyer Financial Information.

(j)    Real Property.  Buyer does not own or hold an ownership interest in any Real Property.

(k)    Leased Real Property. Schedule 5(k) contains a correct legal description, street address and tax parcel identification number of all tracts, parcels and subdivided lots in which Buyer has a leasehold interest and an accurate description (by location, name of lessor, date of lease and term expiration date) of all Real Property Leases pursuant to which Buyer has a leasehold interest.

(l)    Condition of Facilities.

(i)    Use of the Real Property of Buyer for the various purposes for which it is presently being used is permitted as of right under all applicable zoning Legal Requirements and is not subject to "permitted nonconforming" use or structure classifications. All Improvements are in compliance with all applicable Legal Requirements, including those pertaining to zoning, building and the disabled, are in good repair and in good condition, ordinary wear and tear excepted, and are free from latent and patent defects.  To the Knowledge of Buyer, no part of any Improvement encroaches on any real property not included in the Real Property of Buyer, and there are no buildings, structures, fixtures or other Improvements primarily situated on adjoining property which encroach on any part of the Land.

(ii)    Each item of Tangible Personal Property is in good repair and good operating condition, ordinary wear and tear excepted, is suitable for immediate use in the Ordinary Course of Business and is free from latent and patent defects.  No item of Tangible Personal Property is in need of repair or replacement other than as part of routine maintenance in the Ordinary Course of Business. Except as disclosed in Schedule 5(l)(ii), all Tangible Personal Property used in the Business is in the possession of Buyer.

(m)    Buyer Intellectual Property.

(i)    Buyer owns, or is licensed or otherwise possesses legal enforceable rights to use all: (i) trademarks and service marks (registered or unregistered), trade dress, trade names and other names and slogans embodying business goodwill or indications of origin, all applications or registrations in any jurisdiction pertaining to the foregoing and all goodwill associated therewith; (ii)

{AGR RAS IGAMES-EQUITEX STOCK PURCHASE AGRT RED 10-31-03 (99236-4).DOC:4}
PHIL1 537761-5                                          22

patentable inventions, technology, computer programs and software (including password unprotected interpretive code or source code, object code, development documentation, programming tools, drawings, specifications and data) and all applications and patents in any jurisdiction pertaining to the foregoing, including re-issues, continuations, divisions, continuations-in-part, renewals or extensions; (iii) trade secrets, including confidential and other non-public information (iv) copyrights in writings, designs, software programs, mask works or other works, applications or registrations in any jurisdiction for the foregoing and all moral rights related thereto; (v) databases and all database rights; and (vi) Internet Web sites, domain names and applications and registrations pertaining thereto (collectively, **"Buyer Intellectual Property"**) that are used in its business except for any such failures to own, be licensed or process that would not be reasonably likely to have a Material Adverse Effect.

       (ii)    Except as may be evidenced by patents issued after the date hereof, there are no conflicts with or infringements of any material Buyer Intellectual Property by any Third Party and the conduct of the businesses as currently conducted does not conflict with or infringe any proprietary right of a Third Party.

       (iii)    Schedule 5(m)(iii) sets forth a complete list of all patents, registrations and applications pertaining to Buyer Intellectual Property owned by Buyer.  Except as set forth on Schedule 5(m)(iii), all such Buyer Intellectual Property listed is owned by Buyer, free and clear of liens or Encumbrances of any nature.

       (iv)    Schedule 5(m)(iv) sets forth a complete list of all material licenses, sublicenses and other agreements in which Buyer has granted rights to any person to use Buyer Intellectual Property.  Buyer will not, as a result of the execution and delivery of this Agreement or the performance of its obligations under this Agreement, be in Breach of any license, sublicense or other agreement relating to Buyer Intellectual Property.

       (v)    Buyer owns or has the right to use all software currently used in and material to its business.

       (n)    SEC Reports and Financial Statements.  Since April 4, 2002, Buyer has filed with the SEC all reports and other filings required to be filed by Buyer in accordance with the Securities Act and the Exchange Act and the rules and regulations promulgated thereunder (the **"Buyer SEC Reports"**). As of their respective dates, Buyer SEC Reports complied in all material respects with the applicable requirements of the Securities Act, the Exchange Act and the respective rules and regulations promulgated thereunder applicable to such Buyer SEC Reports and, except to the extent that information contained in any Buyer SEC Report has been revised or superseded by a later Buyer SEC Report filed and publicly available prior to the date of this Agreement, none of Buyer SEC Reports contained any untrue statement of a material fact or omitted to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading.  The financial statements of Buyer included in Buyer SEC Reports were prepared from and are in accordance with the accounting books and other financial records of Buyer, were prepared in accordance with GAAP (except, in the case of unaudited statements, as permitted by the rules of the SEC) applied on a consistent basis during the periods involved (except as may be indicated in the notes thereto) and presented fairly the consolidated financial position of Buyer and its consolidated subsidiaries as of the dates thereof and

the consolidated results of their operations and cash flows for the periods then ended (subject, in the case of unaudited statements, to normal year-end audit adjustments). Except as set forth in Buyer SEC Reports, Buyer has no liabilities or obligations of any nature (whether accrued, absolute, contingent or otherwise) other than liabilities or obligations incurred in the Ordinary Course of Business. Buyer SEC Reports accurately disclose (i) the terms and provisions of all stock option plans, (ii) transactions with affiliates, and (iii) all material contracts required to be disclosed pursuant to Item 601(b)(10) of Regulation S-B promulgated by the SEC.

      (o)   <u>Contracts</u>. Schedule 5(o) is a true, complete and accurate list of all written or oral contracts, understandings, agreements and other arrangements (including a brief description of all such oral arrangements) executed by an officer or duly authorized employee of Buyer or to which Buyer is a party either:

         (i)     involving more than $10,000, or

         (ii)    in the nature of a collective bargaining agreement, employment agreement, or severance agreement with any of its directors, officers and employees.

Buyer has delivered or will, prior to Closing, deliver to Parent and Chex a correct and complete copy of each contract, agreement (redacted copies for names are acceptable), and other written arrangement listed in <u>Schedule 5(o)</u> (the **"Buyer Contracts"**). Except as disclosed in <u>Schedule 5(o)</u>: (i) Buyer has fully complied with all material terms of Buyer Contracts; (ii) to the Knowledge of Buyer, other parties to Buyer Contracts have fully complied with the terms of Buyer Contracts; and (iii) there are no disputes or complaints with respect to nor has Buyer received any notices (whether oral or in writing) that any other party to Buyer Contracts is terminating, intends to terminate or is considering terminating, any of Buyer Contracts listed or required to be listed in <u>Schedule 5(o)</u>.

      (p)   <u>Accounts Receivable</u>. All Accounts Receivable that are reflected on Buyer Interim Balance Sheet and that will be reflected on the Closing Balance Sheet represent or will represent, as the case may be, valid obligations arising from sales actually made or services actually performed by Buyer in the Ordinary Course of Business. Except to the extent paid prior to the Closing Date, such Accounts Receivable are or will be as of the Closing Date current and collectible net of the respective reserves shown on Buyer Interim Balance Sheet or the Closing Balance Sheet (which reserves are, and shall be, adequate and calculated consistent with past practice and, in the case of the reserve on the Closing Balance Sheet, will not represent a greater percentage of the Accounts Receivable than reflected on Buyer Interim Balance Sheet and will not represent a Material Adverse Effect in the composition of such Accounts Receivable in terms of aging). Subject to such reserves, each of such Accounts Receivable either has been or will be collected in full, without any setoff, within ninety (90) days after the day on which it first becomes due and payable, except to the extent that the inability to collect such Accounts Receivable will not have a Material Adverse Effect, either individually or in the aggregate. There is no contest, claim, defense or right of setoff under any Contract with any account debtor of an Account Receivable relating to the amount or validity of such Account Receivable. <u>Schedule 5(p)</u> contains a complete and accurate list of all Accounts Receivable as of the date of Buyer Interim Balance Sheet, which list sets forth the aging of each such Account Receivable.

(q) <u>Powers of Attorney</u>. There are no outstanding powers of attorney executed on behalf of Buyer.

(r) <u>Litigation</u>.

(i) Except as set forth in <u>Schedule 5(r)(i)</u>, there is no pending or, to Buyer's Knowledge, threatened Proceeding:

(A) by or against Buyer or that otherwise relates to or may affect its business which, if adversely determined, would have a Material Adverse Effect; or

(B) that challenges, or that may have the effect of preventing, delaying, making illegal or otherwise interfering with, any of the Contemplated Transactions.

To the Knowledge of Buyer, no event has occurred or circumstance exists that is reasonably likely to give rise to or serve as a basis for the commencement of any such Proceeding. Buyer has delivered to Parent and Chex copies of all pleadings, correspondence and other documents relating to each Proceeding listed in <u>Schedule 5(r)(i)</u>. There are no Proceedings listed or required to be listed in <u>Schedule 5(r)(i)</u> that could reasonably be expected to have a Material Adverse Effect.

(ii) Except as set forth in <u>Schedule 5(r)(ii)</u>:

(A) there is no material Order to which Buyer or its business is subject; and

(B) to the Knowledge of Buyer, no officer, director, agent or employee of Buyer is subject to any Order that prohibits such officer, director, agent or employee from engaging in or continuing any conduct, activity or practice relating to its business.

(iii) Except as set forth in <u>Schedule 5(r)(iii)</u>:

(A) Buyer has been and is in compliance with all of the terms and requirements of each Order to which it or its business is or has been subject;

(B) No event has occurred or circumstance exists that is reasonably likely to constitute or result in (with or without notice or lapse of time) a violation of or failure to comply with any term or requirement of any Order to which Buyer or its business is subject; and

(C) Buyer has not received any notice, or received but subsequently resolved to the satisfaction of the Governmental Body or other Person (evidence of such approval is attached as <u>Schedule 5(r)(iii)</u>, or other communication (whether oral or written) from any Governmental Body or any other Person regarding any actual, alleged, possible or potential violation of, or failure to comply with, any term or requirement of any Order to which Buyer or its business is subject.

(s) <u>Employee Benefits</u>.

(i)    Schedule 5(s)(i) lists all material (i) Employee Benefit Plans of Buyer, (ii) bonus, stock option, stock purchase, stock appreciation right, incentive, deferred compensation, supplemental retirement, severance, and fringe benefit plans, programs, policies or arrangements, and (iii) employment or consulting agreements, for the benefit of, or relating to, any current or former employee (or any beneficiary thereof) of Buyer, in the case of a plan described in (i) or (ii) above, that is currently maintained by Buyer or with respect to which Buyer has an obligation to contribute, and in the case of an agreement described in (iii) above, that is currently in effect (the **"Buyer Employee Plans"**).   Buyer has heretofore made available to Parent and Chex true and complete copies of Buyer Employee Plans and any amendments thereto, any related trust, insurance contract, summary plan description, and, to the extent required under ERISA or the Code, the most recent annual report on Form 5500 and summaries of material modifications.

(ii)    Except as set forth on Schedule 5(s)(ii), no Buyer Employee Plan is (1) a "multiemployer plan" within the meaning of Sections 3(37) or 4001(a)(3) of ERISA, (2) a "multiple employer plan" within the meaning of Section 3(40) of ERISA or Section 413(c) of the Code, or (3) is subject to Title IV of ERISA or Section 412 of the Code.

(iii)    Except as set forth on Schedule 5(s)(iii), there is no Proceeding pending or, to Buyer's Knowledge, threatened against the assets of any Buyer Employee Plan or, with respect to any Buyer Employee Plan, against Buyer other than Proceedings that would not reasonably be expected to result in a Material Adverse Effect, and to Buyer's Knowledge there is no Proceeding pending or threatened in writing against any fiduciary of any Buyer Employee Plan other than Proceedings that would not reasonably be expected to result in a Material Adverse Effect.

(iv)    Each of Buyer Employee Plans has been operated and administered in all material respects in accordance with its terms and applicable law, including, but not limited to, ERISA and the Code.

(v)    Each of Buyer Employee Plans that is intended to be "qualified" within the meaning of Section 401(a) of the Code has received a favorable determination, notification, or opinion letter from the IRS.

(vi)    Except as set forth on Schedule 5(s)(vi), no director, officer, or employee of Buyer will become entitled to retirement, severance or similar benefits or to enhanced or accelerated benefits (including any acceleration of vesting or lapsing of restrictions with respect to equity-based awards) under any Buyer Employee Plan solely as a result of consummation of the Contemplated Transactions.

(t)    Insurance.  Schedule 5(t) is an accurate and complete description of all policies of insurance of any kind or nature, including, but not limited to, fire, liability, workmen's compensation and other forms of insurance owned or held by or covering Buyer or all or any portion of its property and assets.

(u)    Employees.

(i)    Schedule 5(u)(i) contains a complete and accurate list of the following information for each employee, director, independent contractor, consultant and agent of Buyer,

including each employee on leave of absence or layoff status: employer; name; job title; date of hiring or engagement; date of commencement of employment or engagement; current compensation paid or payable and any change in compensation since December 31, 2002; sick and vacation leave that is accrued but unused; and service credited for purposes of vesting and eligibility to participate under any Buyer Employee Plan, or any other employee or director benefit plan.

(ii)    To the Knowledge of Buyer, no officer, director, agent, employee, consultant, or contractor of Buyer is bound by any Contract that purports to limit the ability of such officer, director, agent, employee, consultant, or contractor (i) to engage in or continue or perform any conduct, activity, duties or practice relating to Buyer's business or (ii) to assign to Buyer or to any other Person any rights to any invention, improvement, or discovery. No former or current employee of Buyer is a party to, or is otherwise bound by, any Contract that in any way adversely affected, affects, or will affect the ability of Buyer to conduct its business.

(v)    Labor Relations.  Buyer is not a party to any collective bargaining or similar agreement.  To the Knowledge of Buyer, there are no strikes, work stoppages, unfair labor practice charges or grievances pending or threatened against Buyer by any employee of Buyer or any other person or entity.

(w)    Legal Compliance.

(i)    To the Knowledge of Buyer, Buyer is in material compliance with all Applicable Laws of any Governmental Bodies having jurisdiction over Buyer, including any requirements relating to antitrust, consumer protection, currency exchange, equal opportunity, health, occupational safety, pension and securities matters.

(ii)    Schedule 5(w)(ii) contains a complete and accurate list of each Governmental Authorization that is held by Buyer or that otherwise relates to its business.  Each Governmental Authorization listed or required to be listed in Schedule 5(w)(ii) is valid and in full force and effect.  The Governmental Authorizations listed in Schedule 5(w)(ii) collectively constitute all of the Governmental Authorizations necessary to permit Buyer to lawfully conduct and operate its business.

(x)    Brokers' Fees.  Buyer has no liability or obligation to pay any fees or commissions to any broker, finder or agent with respect to the Contemplated Transactions for which Chex, Buyer or Parent could become liable or obligated.

(y)    Undisclosed Liabilities. To the Knowledge of Buyer, it has no liability (and to the Knowledge of Buyer, there is no basis for any present or future action, suit, Proceeding, hearing, investigation, charge, complaint, claim, or demand against any of them giving rise to any liability), except for

(i)    liabilities reflected or reserved against in the Closing Balance Sheet or Buyer Interim Balance Sheet; or

(ii)    liabilities which have arisen in the Ordinary Course of Business since the date of Buyer Interim Balance Sheet.

(z) <u>Disclosure</u>. The representations and warranties of Buyer contained in this Agreement do not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements and information contained herein not misleading.

6.    **Representations Concerning Chex.** Chex represents and warrants to Buyer that the statements contained in this Section 6 from (a) through (z) are correct and complete as of the date of this Agreement and will be correct and complete as of the Closing Date (as though made then and as though the Closing Date were substituted for the date of this Agreement throughout this Section 6), except as set forth in the schedules to be provided. Parent represents and warrants to the Buyer that the statements contained in this Section 6 are correct and complete as of the date of this Agreement and will be correct and complete as of the Closing Date (as though made then and as though the Closing Date were substituted for the date of this Agreement throughout this Section 6); provided that such representation and warranty is limited to Parent's Knowledge in so far as such representations relate to facts, circumstances, conditions and other matters prior to December 31, 2001.

(a)    <u>Organization and Good Standing</u>.

(i)    Chex is a corporation duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation. Chex is duly qualified to do business as a foreign corporation and is in good standing under the laws of each state or other jurisdiction in which either the ownership or use of the properties owned or used by it, or the nature of the activities conducted by it, requires such qualification and the failure to be so qualified would have a Material Adverse Effect on Chex. <u>Schedule 6(a)(i)</u> contains a complete and accurate list of every jurisdiction in which Chex is qualified to do business.

(ii)    Chex has no Subsidiary and does not own any shares of capital stock or other securities of any other Person, other than as set forth on <u>Schedule 6(a)(ii)</u>.

(b)    <u>Corporate Documents</u>. <u>Schedule 6(b)</u> shall consist of true and correct copies of:

(i)    the Articles or Certificate of Incorporation, as amended, and the Bylaws, as amended, of Chex;

(ii)    the minute book of Chex containing all existing records of all Proceedings, Consents, actions and meetings of the shareholders and Board of Directors of Chex; and

(iii)    the stock transfer ledger of Chex and a shareholder list setting forth all owners of the capital stock of Chex as they appear in the stock transfer ledger of Chex.

(c)    <u>Capitalization of Chex</u>. The entire authorized capital stock of Chex consists of 10,000,000 shares of common stock having a par value of $0.01 per share, of which _____ shares are issued and outstanding. All of Chex's issued and outstanding shares of common stock have been duly authorized, are validly issued, fully paid and nonassessable, and are held of record by Parent as set forth on <u>Schedule 6(c)</u>. Other than this Agreement, there are no outstanding or authorized options, warrants, rights, contracts, calls, puts, rights to subscribe, conversion rights or other agreements or commitments to which Chex is a party or which are binding upon Chex

providing for the issuance, disposition or acquisition of any of its capital stock, nor any outstanding or authorized stock appreciation, phantom stock or similar rights with respect to Chex.

    (d)    <u>Noncontravention</u>.  Neither the execution and delivery of this Agreement, nor consummation of the Contemplated Transactions, by Chex will:

        (i)    violate any Applicable Law, Legal Requirement, Order, stipulation, charge or other restriction of any Governmental Body or court to which Chex is subject or any provision of its Governing Documents; or

        (ii)    conflict with, result in a Breach of, constitute a default under, result in the acceleration of, create in any Person the right to accelerate, terminate, modify or cancel, or require any notice under any contract, lease, sublease, license, sublicense, franchise, permit, indenture, agreement or mortgage for borrowed money, instrument of indebtedness, Security Interest or other arrangement to which Chex is a party or by which it is bound or to which any of its assets is subject (or result in the imposition of any Security Interest upon any of its assets), except the CSI Agreement or where the violation, conflict, Breach, default, acceleration, termination, modification, cancellation, failure to give notice, or Security Interest would not have a Material Adverse Effect on the financial condition of Chex or on the ability of the Parties to consummate the Contemplated Transactions.  Chex does not need to give any notice to, make any filing with, or obtain any authorization, Consent, or approval of any government or governmental agency in order for the Parties to consummate the Contemplated Transactions.

    (e)    <u>Chex Financial Information</u>.  <u>Schedule 6(e)</u> shall include the following financial information (collectively, the "**Chex Financial Information**"):

        (i)    audited consolidated and consolidating balance sheets and statements of income, changes in stockholders' equity and cash flow as of and for the year ended December 31, 2002, for Chex; and

        (ii)    unaudited consolidated and consolidating balance sheets and statements of income, changes in stockholders' equity and cash flow as of and for the quarter ended June 30, 2003 (the "**Chex Interim Balance Sheet**") for Chex.  The Chex Financial Information present fairly the financial condition of Chex as of such dates and the results of operations of Chex for such periods, in accordance with GAAP and are consistent with the books and records of Chex (which books and records are correct and complete).

    (f)    <u>Events Subsequent to Chex Interim Balance Sheet</u>.  Since the date of the Chex Interim Balance Sheet, and except as disclosed on <u>Schedule 6(f)</u>, there has not been, occurred or arisen, with respect to Chex:

        (i)    any change or amendment in its other Governing Documents;

        (ii)    any reclassification, split up or other change in, or amendment of or modification to, the rights of the holders of any of its capital stock;

        (iii)    any direct or indirect redemption, purchase or acquisition by any Person of any of its capital stock or of any interest in or right to acquire any such stock;

(iv)    any issuance, sale, or other disposition of any capital stock, or any grant of any options, warrants, or other rights to purchase or obtain (including upon conversion, exchange, or exercise) any capital stock, except for the CSI Agreement;

(v)    any declaration, set aside, or payment of any dividend or any distribution with respect to its capital stock (whether in cash or in kind) or any redemption, purchase, or other acquisition of any of its capital stock;

(vi)    the organization of any Subsidiary or the acquisition of any shares of capital stock by any Person or any equity or ownership interest in any business;

(vii)    any damage, destruction or loss of any of the its properties or assets whether or not covered by insurance;

(viii)    any sale, lease, transfer, or assignment of any of its assets, tangible or intangible, other than for a fair consideration in the Ordinary Course of Business;

(ix)    the execution of, or any other commitment to any agreement, contract, lease, or license (or series of related agreements, contracts, leases, and licenses) outside the Ordinary Course of Business, except for the CSI Agreement;

(x)    any acceleration, termination, modification, or cancellation of any agreement, contract, lease, or license (or series of related agreements, contracts, leases, and licenses) involving more than $10,000 to which it is a party or by which it is bound;

(xi)    any Security Interest or Encumbrance imposed upon any of its assets, tangible or intangible;

(xii)    any grant of any license or sublicense of any rights under or with respect to any Chex Intellectual Property;

(xiii)    any sale, assignment or transfer (including transfers to any employees, affiliates or shareholders) of any Chex Intellectual Property;

(xiv)    any capital expenditure (or series of related capital expenditures) involving more than $10,000 and outside the Ordinary Course of Business;

(xv)    any capital investment in, any loan to, or any acquisition of the securities or assets of, any other Person (or series of related capital investments, loans, and acquisitions) involving more than $10,000 and outside the Ordinary Course of Business;

(xvi)    any issuance of any note, bond, or other debt security or created, incurred, assumed, or guaranteed any indebtedness for borrowed money or capitalized lease obligation involving more than $10,000;

(xvii)    any delay or postponement of the payment of accounts payable or other liabilities, other than those being contested in good faith as set forth in Schedule 6(f)(xvii);

(xviii) any cancellation, compromise, waiver, or release of any right or claim (or series of related rights and claims) involving more than $10,000 and outside the Ordinary Course of Business;

(xix) any loan to, or any entrance into any other transaction with, any of its directors, officers, and employees either involving more than $500 singly or $2,500 in the aggregate;

(xx) the adoption, amendment, modification, or termination of any bonus, profit-sharing, incentive, severance, or other plan, contract, or commitment for the benefit of any of its directors, officers, and employees (or taken away any such action with respect to any other Employee Benefit Plan);

(xxi) any employment contract or collective bargaining agreement, written or oral, or modified the terms of any existing such contract or agreement;

(xxii) any increase in the base compensation of any of its directors, officers, and employees;

(xxiii) any charitable or other capital contribution in excess of $2,500;

(xxiv) any taking of other action or entrance into any other transaction other than in the Ordinary Course of Business, or entrance into any transaction with any insider of Chex, except as disclosed in this Agreement and the Disclosure Schedules;

(xxv) any other event or occurrence that may have or could reasonably be expected to have a Material Adverse Effect on Chex (whether or not similar to any of the foregoing); or

(xxvi) any agreement or commitment, whether in writing or otherwise, to do any of the foregoing.

(g)    Tax Matters.

(i)    Except as set forth on Schedule 6(g)(i):  (i) Chex and (ii) each other Person included in any consolidated or combined Tax Return and part of an affiliated group, within the meaning of Section 1504 of the Chex Code, of which Chex is or has been a member ("**Chex Tax Affiliate**"), for the years that it was a Chex Tax Affiliate of Chex:

(A)    has timely paid or caused to be paid all Taxes required to be paid by it though the date hereof and as of the Closing Date (including any Taxes shown due on any Tax Return);

(B)    has filed or caused to be filed in a timely and proper manner (within any applicable extension periods) all Tax Returns required to be filed by it with the appropriate Governmental Body in all jurisdictions in which such Tax Returns are required to be filed; and all tax returns filed on behalf of Chex and each Chex Tax Affiliate were completed and correct in all material respects; and

(C)    has not requested or caused to be requested any extension of time within which to file any Tax Return, which Tax Return has not since been filed.

(ii)    Chex has previously delivered true, correct and complete copies of all Federal Tax Returns filed by or on behalf of Chex through the date hereof for the periods ending after December 31, 1999.

(iii)    Except as set forth in Schedule 6(g)(iii):

(A)    since January 1, 2000, neither Chex nor any Chex Tax Affiliate (for the years that it was a Chex Tax Affiliate) has been notified by the Internal Revenue Service or any other Governmental Body that any issues have been raised (and no such issues are currently pending) by the Internal Revenue Service or any other Governmental Body in connection with any Tax Return filed by or on behalf of Chex or any Chex Tax Affiliate; there are no pending Tax audits and no waivers of statutes of limitations have been given or requested with respect to Chex or any Chex Tax Affiliate (for years that it was a Chex Tax Affiliate); no Tax liens have been filed against Chex or unresolved deficiencies or additions to Taxes have been proposed, asserted or assessed against Chex or any Chex Tax Affiliate (for the years that it was a Chex Tax Affiliate);

(B)    full and adequate accrual has been made ((i)) on the Chex Interim Balance Sheet, and the books and records of Chex and each of its Subsidiaries for all income taxes currently due and all accrued Taxes not yet due and payable by Chex and each of its Subsidiaries, respectively, as if they were stand-alone corporations for all periods ending on or prior to the Chex Interim Balance Sheet Date, and ((ii)) on the books and records of Chex and each of its Subsidiaries for all Taxes payable by Chex and each of its Subsidiaries, respectively, as if they were stand-alone corporations for all periods beginning after the Chex Interim Balance Sheet Date;

(C)    neither Chex nor any of its Subsidiaries has incurred any Liability for Taxes from and after the Chex Interim Balance Sheet Date other than Taxes incurred in the Ordinary Course of Business and consistent with past practices;

(D)    neither Chex nor any of its Subsidiaries has ((i)) made an election (or had an election made on its behalf by another person) to be treated as a "consenting corporation" under Section 341(f) of the Code or ((ii)) a "personal holding company" within the meaning of Section 542 of the Code;

(E)    Chex and each of its Subsidiaries has complied in all material respects with all Applicable Laws relating to the collection or withholding of Taxes (such as Taxes or withholding of Taxes from the wages of employees);

(F)    neither Chex nor any of its Subsidiaries has any liability in respect of any Tax sharing agreement with any Person and all Tax sharing agreements to which either Chex or any of its Subsidiaries has been bound have been terminated;

(G)    neither Chex nor any of its Subsidiaries has incurred any Liability to make any payments either alone or in conjunction with any other payments that: