**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| **iGAMES ENTERTAINMENT, INC.,** : | |
| : | |
| Plaintiff, : | C.A. No. 04-180 (KAJ) |
| : | |
| v. : | |
| : | |
| **CHEX SERVICES, INC.** and : | |
| **EQUITEX, INC.,** : | |
| : | JURY TRIAL DEMANDED |
| : | |
| Defendants. : | |

# Appendix of Exhibits To iGames Entertainment, Inc's Motion For Summary Judgement

# Exhibit A
# (Part II)

(1)    shall be non-deductible under, or would otherwise constitute a "parachute payment" within the meaning of Section 280G of the Code (or any corresponding provision of state local or foreign income Tax Law); or

(2)    are or may be subject to the imposition of an excise Tax under Section 4999 of the Code;

(H)    neither Chex nor any of its Subsidiaries has agreed to (nor has any other Person agreed to on its behalf) and is not required to make any adjustments or changes on, before or after the Closing Date, to its accounting methods pursuant to Section 481 of the Code, and the Internal Revenue Service has not proposed any such adjustments or changes in the accounting methods of Chex;

(I)    no claim has been made within the last three years by any taxing authority in a jurisdiction in which Chex or any of its Subsidiaries does not file Tax Returns that Chex or any such Subsidiary is or may be subject to taxation by that jurisdiction;

(J)    the consummation of the Contemplated Transactions will not trigger the realization or recognition of intercompany gain or income to Chex under the Federal consolidated return regulations with respect to Federal, state or local taxes;

(K)    none of Chex's Shareholders are foreign Persons within the meaning of Treasury Regulation § 1.1445-2(b) of the rules and regulations promulgated under Section 1445 of the Code, and Parent has been furnished with a true and accurate certificate of Chex so stating which complies in all respects with Treasury Regulation § 1.1445-2(b)(2) of such rules and regulations; and

(L)    Chex is not currently, nor has it been at any time during the previous five years, a "U.S. real property holding corporation" and, therefore, the Chex Shares is not "U.S. real property interests," as such terms are defined in Section 897 of the Code.

(h)    Title to Assets.  Chex has good and marketable title to, or a valid leasehold interest in, the properties and assets owned or leased and used by it to operate the Business in the manner presently operated by Chex, as reflected in the Chex Financial Information.

(i)    Real Property.  Chex does not own or hold an ownership interest in any Real Property.

(j)    Leased Real Property.  Schedule 6(j) contains a correct legal description, street address and tax parcel identification number of all tracts, parcels and subdivided lots in which Chex has a leasehold interest and an accurate description (by location, name of lessor, date of lease and term expiration date) of all Real Property Leases pursuant to which Chex has a leasehold interest.

(k)    Condition of Facilities.

(i)    Use of the Real Property of Chex for the various purposes for which it is presently being used is permitted as of right under all applicable zoning Legal Requirements and is not subject to "permitted nonconforming" use or structure classifications. All Improvements are in compliance with all applicable Legal Requirements, including those pertaining to zoning, building and the disabled, are in good repair and in good condition, ordinary wear and tear excepted, and are free from latent and patent defects. No part of any Improvement encroaches on any real property not included in the Real Property of Chex, and there are no buildings, structures, fixtures or other Improvements primarily situated on adjoining property which encroach on any part of the Land.

(ii)    Each item of Tangible Personal Property is in good repair and good operating condition, ordinary wear and tear excepted, is suitable for immediate use in the Ordinary Course of Business and is free from latent and patent defects. No item of Tangible Personal Property is in need of repair or replacement other than as part of routine maintenance in the Ordinary Course of Business. Except as disclosed in Schedule 6(k)(ii), all Tangible Personal Property used in the Business is in the possession of Chex.

(l)    Chex Intellectual Property.

(i)    Chex owns, or is licensed or otherwise possesses legal enforceable rights to use all: (i) trademarks and service marks (registered or unregistered), trade dress, trade names and other names and slogans embodying business goodwill or indications of origin, all applications or registrations in any jurisdiction pertaining to the foregoing and all goodwill associated therewith; (ii) patentable inventions, technology, computer programs and software (including password unprotected interpretive code or source code, object code, development documentation, programming tools, drawings, specifications and data) and all applications and patents in any jurisdiction pertaining to the foregoing, including re-issues, continuations, divisions, continuations-in-part, renewals or extensions; (iii) trade secrets, including confidential and other non-public information (iv) copyrights in writings, designs, software programs, mask works or other works, applications or registrations in any jurisdiction for the foregoing and all moral rights related thereto; (v) databases and all database rights; and (vi) Internet web sites, domain names and applications and registrations pertaining thereto (collectively, **"Chex Intellectual Property"**) that are used in the Business except for any such failures to own, be licensed or process that would not be reasonably likely to have a Material Adverse Effect.

(ii)    Except as may be evidenced by patents issued after the date hereof, there are no conflicts with or infringements of any material Chex Intellectual Property by any third party and the conduct of the businesses as currently conducted does not conflict with or infringe any proprietary right of a third party.

(iii)    Schedule 6(l)(iii) sets forth a complete list of all patents, registrations and applications pertaining to the Chex Intellectual Property owned by Chex. Except as set forth on Schedule 6(l)(iii), all such Chex Intellectual Property listed is owned by Chex, free and clear of liens or Encumbrances of any nature.

(iv)    Schedule 6(l)(iv) sets forth a complete list of all material licenses, sublicenses and other agreements in which Chex has granted rights to any person to use the Chex Intellectual Property. Chex will not, as a result of the execution and delivery of this Agreement or

the performance of its obligations under this Agreement, be in Breach of any license, sublicense or other agreement relating to the Chex Intellectual Property.

        (v)    Chex owns or has the right to use all software currently used in and material to the Business.

        (m)    <u>Affiliate Transactions</u>. No officer, director, or employee of Chex or any member of the immediate family of any such officer, director or employee, or any entity in which any of such persons owns any beneficial interest (other than any publicly-held corporation whose stock is traded on a national securities exchange or in the over-the-counter market and less than one percent of the stock of which is beneficially owned by any of such persons), has any agreement with Chex or any interest in any of their property of any nature, used in or pertaining to the business of Chex (other than the ownership of capital stock of the corporation as disclosed in <u>Schedule 6(c)</u>). None of the foregoing Persons has any direct or indirect interest in any competitor, supplier or customer of Chex or in any Person from whom or to whom Chex leases any property or transacts business of any nature.

        (n)    <u>Contracts</u>. <u>Schedule 6(n)</u> is a true, complete and accurate list of all written or oral Contracts, understandings, agreements and other arrangements (including a brief description of all such oral arrangements) executed by an officer or duly authorized employee of Chex or to which Chex is a party either:

        (i)    involving more than $10,000, or

        (ii)    in the nature of a collective bargaining agreement, employment agreement, or severance agreement with any of its directors, officers and employees.

Chex has or will deliver prior to Closing to Buyer a correct and complete copy of each Contract, agreement, and other written arrangement listed in <u>Schedule 6(n)</u> (the **"Chex Contracts"**). Except as disclosed in <u>Schedule 6(n)</u>: (i) Chex has fully complied with all material terms of the Chex Contracts; (ii) other parties to the Chex Contracts have fully complied with the terms of the Chex Contracts; and (iii) there are no disputes or complaints with respect to nor has Parent or Chex received any notices (whether oral or in writing) that any other party to the Chex Contracts is terminating, intends to terminate or is considering terminating, any of the Chex Contracts listed or required to be listed in <u>Schedule 6(n)</u>.

        (o)    <u>Accounts Receivable</u>. All Accounts Receivable that are reflected on the Chex Interim Balance Sheet and that will be reflected on the Closing Balance Sheet represent or will represent, as the case may be, valid obligations arising from sales actually made or services actually performed by Chex in the Ordinary Course of Business. Except to the extent paid prior to the Closing Date, such Accounts Receivable are or will be as of the Closing Date current and collectible net of the respective reserves shown on the Chex Interim Balance Sheet or the Closing Balance Sheet (which reserves are, and shall be, adequate and calculated consistent with past practice and, in the case of the reserve on the Closing Balance Sheet, will not represent a greater percentage of the Accounts Receivable than reflected on the Chex Interim Balance Sheet and will not represent a Material Adverse Effect in the composition of such Accounts Receivable in terms of aging). Subject to such reserves, each of such Accounts Receivable either has been or will be collected in full,

without any setoff, within ninety (90) days after the day on which it first becomes due and payable, except as set forth on Schedule 6(o). There is no contest, claim, defense or right of setoff under any Contract with any account debtor of an Account Receivable relating to the amount or validity of such Account Receivable. Schedule 6(o) contains a complete and accurate list of all Accounts Receivable as of the date of the Chex Interim Balance Sheet, which list sets forth the aging of each such Account Receivable.

(p)    Powers of Attorney. There are no outstanding powers of attorney executed on behalf of Chex.

(q)    Litigation.

(i)    Except as set forth in Schedule 6(q)(i), there is no pending or, to Chex's Knowledge, threatened Proceeding:

(A)    by or against Chex or that otherwise relates to or may affect the Business which, if adversely determined, would have a Material Adverse Effect; or

(B)    that challenges, or that may have the effect of preventing, delaying, making illegal or otherwise interfering with, any of the Contemplated Transactions.

To the Knowledge of Chex, no event has occurred or circumstance exists that is reasonably likely to give rise to or serve as a basis for the commencement of any such Proceeding. Chex has delivered to Buyer copies of all pleadings, correspondence and other documents relating to each Proceeding listed in Schedule 6(q)(i). There are no Proceedings listed or required to be listed in Schedule 6(q)(i) that could reasonably be expected to have a Material Adverse Effect.

(ii)    Except as set forth in Schedule 6(q)(ii):

(A)    there is no material Order to which Chex or the Business is subject; and

(B)    to the Knowledge of Chex, no officer, director, agent or employee of Chex is subject to any Order that prohibits such officer, director, agent or employee from engaging in or continuing any conduct, activity or practice relating to the Business.

(iii)    Except as set forth in Schedule 6(q)(iii):

(A)    Chex has been and is in compliance with all of the terms and requirements of each Order to which it or the Business is or has been subject;

(B)    No event has occurred or circumstance exists that is reasonably likely to constitute or result in (with or without notice or lapse of time) a violation of or failure to comply with any term or requirement of any Order to which Chex or the Business is subject; and

(C)    Chex has not received any notice or other communication (whether oral or written) from any Governmental Body or any other Person regarding any actual, alleged, possible or potential violation of, or failure to comply with, any term or requirement of any Order to which Chex or the Business is subject.

(r)    Employee Benefits.

(i)    Schedule 6(r)(i) lists all material (i) Employee Benefit Plans of Chex, (ii) bonus, stock option, stock purchase, stock appreciation right, incentive, deferred compensation, supplemental retirement, severance, and fringe benefit plans, programs, policies or arrangements, and (iii) employment or consulting agreements, for the benefit of, or relating to, any current or former employee (or any beneficiary thereof) of Chex, in the case of a plan described in (i) or (ii) above, that is currently maintained by Chex or with respect to which Chex has an obligation to contribute, and in the case of an agreement described in (iii) above, that is currently in effect (the "**Chex Employee Plans**"). Chex has heretofore made available to Buyer true and complete copies of the Chex Employee Plans and any amendments thereto, any related trust, insurance contract, summary plan description, and, to the extent required under ERISA or the Code, the most recent annual report on Form 5500 and summaries of material modifications.

(ii)    Except as set forth on Schedule 6(r)(ii), no Chex Employee Plan is (1) a "multiemployer plan" within the meaning of Sections 3(37) or 4001(a)(3) of ERISA, (2) a "multiple employer plan" within the meaning of Section 3(40) of ERISA or Section 413(c) of the Code, or (3) is subject to Title IV of ERISA or Section 412 of the Code.

(iii)    Except as set forth on Schedule 6(r)(iii), there is no Proceeding pending or, to Chex's Knowledge, threatened against the assets of any Chex Employee Plan or, with respect to any Chex Employee Plan, against Chex other than Proceedings that would not reasonably be expected to result in a Material Adverse Effect, and to Chex's Knowledge there is no Proceeding pending or threatened in writing against any fiduciary of any Chex Employee Plan other than Proceedings that would not reasonably be expected to result in a Material Adverse Effect.

(iv)    Each of the Chex Employee Plans has been operated and administered in all material respects in accordance with its terms and applicable law, including, but not limited to, ERISA and the Code.

(v)    Each of the Chex Employee Plans that is intended to be "qualified" within the meaning of Section 401(a) of the Code has received a favorable determination, notification, or opinion letter from the IRS.

(vi)    Except as set forth on Schedule 6(r)(vi), no director, officer, or employee of Chex will become entitled to retirement, severance or similar benefits or to enhanced or accelerated benefits (including any acceleration of vesting or lapsing of restrictions with respect to equity-based awards) under any Chex Employee Plan solely as a result of consummation of the Contemplated Transactions.

(s)    Banking Relationships.  Schedule 6(s) sets forth the names and locations of all banks, trust companies, savings and loan associations and other financial institutions at which Chex

maintains safe deposit boxes or accounts of any nature and the names of all persons authorized to have access thereto, draw thereon or make withdrawals therefrom.

(t)    Insurance.  Schedule 6(t) is an accurate and complete description of all policies of insurance of any kind or nature, including, but not limited to, fire, liability, workmen's compensation and other forms of insurance owned or held by or covering Chex or all or any portion of its property and assets.

(u)    Employees.

(i)    Schedule 6(u)(i) contains a complete and accurate list of the following information for each employee, director, independent contractor, consultant and agent of Chex, including each employee on leave of absence or layoff status: employer; name; job title; date of hiring or engagement; date of commencement of employment or engagement; current compensation paid or payable and any change in compensation since December 31, 2002; sick and vacation leave that is accrued but unused; and service credited for purposes of vesting and eligibility to participate under any Chex Employee Plan, or any other employee or director benefit plan.

(ii)    To the Knowledge of Chex, no officer, director, agent, employee, consultant, or contractor of Chex is bound by any Contract that purports to limit the ability of such officer, director, agent, employee, consultant, or contractor (i) to engage in or continue or perform any conduct, activity, duties or practice relating to the Business or (ii) to assign to Chex or to any other Person any rights to any invention, improvement, or discovery.  No former or current employee of Chex is a party to, or is otherwise bound by, any Contract that in any way adversely affected, affects, or will affect the ability of Chex or Buyer to conduct the Business as heretofore carried on by Chex.

(v)    Labor Relations.  Chex is not a party to any collective bargaining or similar agreement.  To the Knowledge of Chex, there are no strikes, work stoppages, unfair labor practice charges or grievances pending or threatened against Chex by any employee of Chex or any other Person or entity.  Chex believes that its relationship with its employees is good.

(w)    Legal Compliance.

(i)    To the Knowledge of Chex, Chex is in material compliance with all laws (including rules and regulations thereunder) of any Governmental Bodies having jurisdiction over Chex, including any requirements relating to antitrust, consumer protection, currency exchange, equal opportunity, health, occupational safety, pension and securities matters.

(ii)    Schedule 6(r)(ii) contains a complete and accurate list of each Governmental Authorization that is held by Chex or that otherwise relates to the Business.  Each Governmental Authorization listed or required to be listed in Schedule 6(r)(ii) is valid and in full force and effect.  The Governmental Authorizations listed in Schedule 6(r)(ii) collectively constitute all of the Governmental Authorizations necessary to permit Chex to lawfully conduct and operate the Business.

(x)  <u>Brokers' Fees</u>.  Chex has no liability or obligation to pay any fees or commissions to any broker, finder or agent with respect to the Contemplated Transactions for which Chex, Buyer or Parent could become liable or obligated.

(y)  <u>Undisclosed Liabilities</u>.  To the Knowledge of Chex, it has no liability (and to the Knowledge of Chex, there is no basis for any present or future action, suit, Proceeding, hearing, investigation, charge, complaint, claim, or demand against any of them giving rise to any liability), except for

(i)  liabilities reflected or reserved against in the Closing Balance Sheet or the Chex Interim Balance Sheet; or

(ii)  liabilities which have arisen in the Ordinary Course of Business since the date of the Chex Interim Balance Sheet.

(z)  <u>Disclosure</u>.  The representations and warranties of Chex contained in this Agreement do not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements and information contained herein not misleading.

(aa)  <u>Knowledge of Parent</u>.  To the Knowledge of Parent, all representations and warranties contained in this Section 6 were materially correct and complete as of December 31, 2001.

7.  **Pre-Closing Covenants**.  The Parties agree as follows with respect to the period between the execution of this Agreement and the Closing:

(a)  <u>General</u>.  Each of the Parties will use its commercially reasonable efforts to take all action and to do all things necessary, proper or advisable in order to consummate and make effective the Contemplated Transactions (including satisfying the closing conditions set forth in Section 9 below).

(b)  <u>Operation of Business</u>.

(i)  Other than the CSI Transaction, Parent will not cause or permit Chex to engage and Chex agrees not to engage in any practice, take any action, embark on any course of inaction, or enter into any transaction outside the Ordinary Course of Business.

(ii)  Other than the MCA Acquisition, Buyer will not engage in any practice, take any action, embark on any course of inaction, or enter into any transaction outside the Ordinary Course of Business.

(c)  <u>Full Access</u>.

(i)  During the Review Period, Parent will permit and will cause Chex to permit Representatives of Buyer, including counsel, lenders, appraisers and accountants, to have full access, during normal business hours and in a manner so as not to interfere with the normal business operations of Chex, to all premises, properties, books, records, contracts, tax records and documents of or pertaining to Chex. No review, examination or investigation by Buyer shall diminish or

{AGR RAS IGAMES-EQUITEX STOCK PURCHASE AGRT RED 10-31-03 (99236-4).DOC:4}

obviate any of the representations, warranties, covenants or agreements of Chex under this Agreement.

    (ii)    During the Review Period, Buyer will permit Representatives of Parent and Chex, including counsel, lenders, appraisers and accountants, to have full access, during normal business hours and in a manner so as not to interfere with the normal business operations of Buyer, to all premises, properties, books, records, contracts, tax records and documents of or pertaining to Buyer. No review, examination or investigation by Chex or Parent shall diminish or obviate any of the representations, warranties, covenants or agreements of Buyer under this Agreement.

    (d)    <u>Confidentiality</u>. Prior to the Closing and if, for any reason, the Contemplated Transactions are not consummated, neither Buyer, Chex nor Parent nor any of their respective Representatives shall disclose to any Third Party or otherwise use any Confidential Information received from the other party in the course of investigating, negotiating, and performing the Contemplated Transactions; <u>provided</u>, <u>however</u>, that nothing shall be deemed to be Confidential Information which:

    (i)    is known to the party receiving the information at the time of disclosure, unless any individual who knows the information is under an obligation to keep that information confidential;

    (ii)    becomes publicly known or available without the disclosure thereof by the party receiving the information in violation of this Agreement; or

    (iii)    is received by the party receiving the information from a third party not under an obligation to keep that information confidential.

This provision shall not prohibit the disclosure of information required to be made under federal or state securities laws. If any disclosure is so required, the party making such disclosure shall consult with the other party prior to making such disclosure, and the parties shall use all reasonable efforts, acting in good faith, to agree upon a text for such disclosure which is satisfactory to both parties.

    (e)    <u>Notice of Events</u>. Each Party will notify the other Parties within five Business Days of:

    (i)    any event, condition or circumstance occurring from the date hereof through the Closing Date that would constitute a Breach of this Agreement; or

    (ii)    any event, occurrence, transaction or other item which would have been required to have been disclosed on any Schedule or Exhibit attached hereto had such event, occurrence, transaction or item existed on the date hereof, other than items arising in the Ordinary Course of Business which would not adversely alter any of the representations, warranties or other agreements contained in this Agreement.

    (f)    <u>Board Approval</u>. Within five (5) Business Days following execution of this Agreement, the Parent Board shall duly and validly ratify the execution and delivery of this Agreement and approve the consummation of the transactions contemplated hereby, including the Voting Agreements, take all corporate actions required to be taken by the Parent Board for the

consummation of the Contemplated Transactions and have unanimously resolved (i) that this Agreement and the Contemplated Transactions, taken together, are advisable and fair to, and in the best interests of, Parent and its stockholders; and (ii) to recommend that the stockholders of Parent approve and adopt the Contemplated Transactions.    The Parent Board shall direct that the Contemplated Transactions as described in this Agreement be submitted to the stockholders of Parent for their approval.

      (g)    No Solicitation.

      (i)    Chex and Parent shall, and shall direct and use Best Efforts to cause their respective Representatives to, immediately cease any discussions or negotiations with any parties that may be ongoing with respect to a Chex Proposed Transaction (as defined below). Neither Chex nor Parent shall, nor shall either permit any of their respective subsidiaries to, nor shall either authorize or permit any of their respective Representatives, directly or indirectly, to knowingly (i) solicit, initiate or encourage (including by way of furnishing information), or take any other action designed or reasonably likely to facilitate, any inquiries or the making of any proposal which constitutes, or may reasonably be expected to lead to, any Chex Proposed Transaction or (ii) participate in any discussion or negotiations regarding any Chex Proposed TransactionThe term **"Chex Proposed Transaction"** means any inquiry, proposal or offer from any person relating to any form of business combination involving Chex, or any direct or indirect acquisition or purchase of all or substantially all of the assets of Chex or any equity securities of Chex, any tender offer or exchange offer that if consummated would result in any person beneficially owning 10 percent or more of any class of equity securities of Chex, any merger, consolidation, share exchange, business combination, recapitalization, liquidation, dissolution or similar transaction involving Chex, other than the Contemplated Transactions.

      (ii)    Notwithstanding the foregoing, Buyer expressly acknowledges that prior to the date hereof, Parent and Chex have entered into a certain Stock Purchase Agreement for the Acquisition of Chex Services, Inc. by and among Parent, Chex and Cash Systems, Inc. ("CSI"), dated as of July 22, 2003, which provides for the purchase by Cash Systems, Inc. of all of the shares of Chex from Parent (the "CSI Agreement").  Buyer expressly agrees and acknowledges that the transaction contemplated by the CSI Agreement (the **"CSI Transaction"**) does not constitute a Chex Proposed Transaction, and further, that Parent and Chex's having entered the CSI Agreement, or their performance, either prior to the date hereof or subsequent thereto, of any of their respective obligations thereunder, shall not constitute a Breach of this Agreement. Buyer acknowledges that the CSI Agreement contains provisions similar to the provisions of this Section 7(f), and affirms that Parent has not solicited Buyer's proposal for the Chex business, but rather has responded thereto, based upon the good faith determination of the Board of Directors of Parent that the failure to do so could reasonably be expected to result in a Breach of its fiduciary duties to Parent's stockholders under Applicable Law. Buyer further acknowledges that all of Parent's obligations hereunder are subject to and conditioned upon the approval of Parent's shareholders, and that in no event shall the failure to obtain such approval, or the shareholders' approval of the CSI Transaction in lieu of the Contemplated Transactions, constitute a Breach hereof, or be the basis for any liability of Parent or Chex to Buyer.

      (iii)    Notwithstanding the provisions of Section 7(f)(i), if, after the date of this Agreement, the Parent receives an unsolicited written proposal relating to a Chex Proposed

Transaction (which proposal would result in a Superior Proposal) from any Person and the Parent's Board reasonably concludes that the failure to engage in discussions or negotiations with such Person would be inconsistent with the Parent Board's fiduciary duties to the Parent's stockholders under applicable law, then (i) the Parent or the Parent Board may, directly or indirectly, provide access to or furnish or cause to be furnished information concerning the Parent's and Chex's business, properties or assets to such Person pursuant to an appropriate confidentiality agreement and the Parent or the Parent Board may engage in discussions related thereto, and (ii) the Parent or the Parent Board may participate in and engage in discussions and negotiations with such Person regarding such proposal for a Chex Proposed Transaction. If after the date of this Agreement, the Parent Board receives an unsolicited written proposal relating to a Chex Proposed Transaction and the Parent Board determines that such proposal is a Superior Proposal (as defined below), the Parent Board may do any or all of the following: (x) withdraw, modify or change the Parent Board's approval or recommendation of the Contemplated Transactions in the Prospectus/Proxy Statement, (y) approve or recommend to the Parent stockholders such Superior Proposal and/or (z) terminate this Agreement; provided, however, that the Parent Board shall not take any of the actions referred to in clauses (x), (y) or (z) unless all of the following conditions are satisfied: (1) prior to taking any such action, the Parent Board has terminated this Agreement pursuant to Section 11(b)(x) and paid the amounts referred to in Section 11(e)(ii) to the Buyer in immediately available funds; (2) prior to taking any such action, the Parent Board has, in the reasonable exercise of its fiduciary duty under applicable law, approved and recommended the approval of such Superior Proposal by the Parent's stockholders; and (3) the Parent Board has given to the Buyer, at least three (3) Business Days prior to taking any of the actions referred to in clauses (x) or (y), written notice that such actions are to be taken, which notice shall specify the material aspects of the actions to be taken.

(iv)    The Parent shall (i) promptly notify Buyer in writing after receipt by the Parent (or its advisors) of any proposal relating to a Chex Proposed Transaction or any inquiries indicating that any Person is considering making or wishes to make, or which may reasonably be expected to lead to, a proposal for a Chex Proposed Transaction, including the material terms and conditions thereof and the identity of the Person making it, (ii) promptly notify Buyer in writing after receipt of any request for non-public information relating to it or Chex or for access to its or Chex's properties, books or records by any Person that, to the Parent's Knowledge, may be considering making, or has made, a proposal related to a Chex Proposed Transaction, and (iii) receive from any Person that may make or has made a proposal related to a Chex Proposed Transaction and that requests non-public information relating to the Parent and/or Chex, an executed confidentiality letter in reasonably customary form prior to delivery of any such non-public information. Written notice shall be deemed given to Buyer upon notice to Buyer in accordance with Section 12(h).

(v)    The Parent Board will not withdraw or modify, or propose to withdraw or modify, in any manner adverse to Parent, its approval or recommendation of the Contemplated Transactions in the Prospectus/Proxy Statement except in connection with a Superior Proposal.

(vi)    "Superior Proposal" means a bona fide, unsolicited, written proposal related to a Chex Proposed Transaction (other than from Buyer) for the acquisition of all the equity interest in, or all or substantially all of the assets of Chex on terms which a majority of the members of the Parent Board determine in their reasonable judgment (after consultation with the Parent's financial advisor or other nationally-recognized independent financial advisors) and after taking into account all legal, financial, regulatory, timing and other material aspects of the proposal for a Chex

Proposed Transaction, and the Person making the proposal, (i) will result in terms that are more favorable from a financial point of view to the Parent's stockholders than the Contemplated Transaction, and (ii) is reasonably likely to be consummated.

(vii)    Buyer shall not, nor shall it permit any of its subsidiaries to, nor shall it authorize or permit any of its Representatives, directly or indirectly, to knowingly either (i) solicit, initiate or encourage (including by way of furnishing information), or take any other action designed or reasonably likely to facilitate, any inquiries or the making of any proposal which constitutes, or may reasonably be expected to lead to, any Buyer Proposed Transaction or (ii) participate in any discussion or negotiations regarding any Buyer Proposed Transaction, unless in either case Buyer notifies Parent of such activities, and provides Parent with such information concerning the Buyer Proposed Transaction as Parent reasonably requests in writing. Buyer shall not without Parent's written consent engage in any such activities with respect to a Buyer Proposed Transaction the completion of which would have a Material Adverse Effect on Buyer's ability to complete the Contemplated Transactions (a "**Competing Buyer Proposed Transaction**"); *provided, however*, that if, at any time prior to the Closing Date, the Board of Directors of Buyer determines in good faith that the failure to do so could reasonably be expected to result in a Breach of its fiduciary duties to Buyer's stockholders under applicable law, Buyer may, in response to any proposal relating to a Competing Buyer Proposed Transaction, (i) furnish information with respect to Buyer to any person pursuant to a customary confidentiality agreement (as determined by Buyer after consultation with its outside counsel) and (ii) participate in negotiations regarding such Buyer Proposed Transaction. The term "**Buyer Proposed Transaction**" means any inquiry, proposal or offer from any person relating to any form of business combination involving Buyer, or any direct or indirect acquisition or purchase of all or substantially all of the assets of Buyer or 10 percent or more of any class of equity securities of Buyer, any tender offer or exchange offer that if consummated would result in any person beneficially owning 10 percent or more of any class of equity securities of Buyer, any merger, consolidation, share exchange, business combination, recapitalization, liquidation, dissolution or similar transaction involving Buyer, other than the Contemplated Transactions.

(h)    Registration Statement Prospectus/Proxy Statement.

(i)    For the purposes of (i) registering the distribution of Buyer Common Stock to Parent and the stockholders of Parent under the Securities Act, and complying with applicable state securities Laws, and (ii) holding the meeting of Parent's stockholders to vote upon the adoption of this Agreement and the Contemplated Transactions (the "**Parent Proposals**"), Buyer, Chex and Parent will cooperate in the preparation of a registration statement on Form S-4 (such registration statement, together with any and all amendments and supplements thereto, being herein referred to as the "**Registration Statement**"), including a prospectus/proxy statement satisfying all requirements of applicable state securities Laws, the Securities Act and the Exchange Act. Such prospectus/proxy statement in the form mailed by Buyer and Parent to the stockholders of Parent, together with any and all amendments or supplements thereto, is herein referred to as the "**Prospectus/Proxy Statement**." Buyer shall cooperate with Parent, and Parent shall cause Chex to cooperate with Parent, in the preparation and filing of the Prospectus/Proxy Statement, and shall each use all reasonable efforts to have the Prospectus/Proxy Statement cleared by the SEC as promptly thereafter as practicable. Each Party shall, as promptly as practicable after the receipt thereof, provide to the other Party copies of any written comments and advise the other Party of any oral comments with respect to the Prospectus/Proxy Statement received from the staff of the SEC.

Each Party shall have a reasonable opportunity to review and comment on any amendment or supplement to the Prospectus/Proxy Statement prior to filing with the SEC. Parent will use its reasonable best efforts to cause the Prospectus/Proxy Statement to be mailed to its stockholders at the earliest practicable date. The Prospectus/Proxy Statement shall include the unanimous recommendation of the Parent Board, which recommendation is subject to the limitations stated in Section 7(g) hereof, that the holders of the Parent Common Stock vote in favor of the approval of this Agreement and the Contemplated Transaction.

(ii)     Chex and Parent will furnish Buyer with such information concerning Chex and Parent as is necessary in order to cause the Prospectus/Proxy Statement and the Information Statement that Buyer will deliver to its stockholders, insofar as it relates to Chex and Parent, to comply with the Securities Act and the Exchange Act. None of the information relating to Parent and Chex supplied by such parties for inclusion in the Prospectus/Proxy Statement or Information Statement will contain any untrue statement of a material fact or will omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they are made, not misleading. Parent and Chex agree to promptly advise Buyer if, at any time prior to the meeting of the stockholders of Parent referenced herein, any information provided by it in the Prospectus/Proxy Statement or Information Statement is or becomes incorrect or incomplete in any material respect and to provide Buyer with the information needed to correct such inaccuracy or omission. Parent and Chex will furnish Buyer with such supplemental information as may be necessary in order to cause the Prospectus/Proxy Statement or Information Statement , insofar as it relates to Parent or Chex, to comply with the Securities Act and the Exchange Act after the mailing thereof to the stockholders of Parent.

(iii)     Buyer will furnish Parent with such information concerning Buyer as is necessary in order to cause the Prospectus/Proxy statement, insofar as it relates to Buyer, to comply with Applicable Law. None of the information relating to Buyer supplied by Buyer for inclusion in the Prospectus/Proxy Statement will contain any untrue statement of a material fact or will omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading. Buyer agrees promptly to advise Parent if, at any time prior to the meeting of stockholders of Parent referenced herein, any information provided by it in the Prospectus/Proxy Statement is or becomes incorrect or incomplete in any material respect and to provide Parent with the information needed to correct such inaccuracy or omission. Buyer will furnish Parent with such supplemental information as may be necessary in order to cause the Prospectus/Proxy Statement, insofar as it relates to Buyer, to comply with applicable Law after the mailing thereof to the stockholders of Parent.

(iv)     The Parties agree to cooperate and use their best efforts in making any preliminary filings of the Prospectus/Proxy Statement with the SEC pursuant to Rule 14a-6 under the Exchange Act on or before 60 days after execution of this Agreement.

(v)     Buyer will file the Registration Statement with the SEC and appropriate materials with applicable state securities agencies on or before 75 days after execution of this Agreement and will use its reasonable Best Efforts to cause the Registration Statement to become effective under the Securities Act and all such state filed materials to comply with applicable state securities Laws. Buyer shall, provide Parent and Chex for its review a copy of the Registration Statement at least such amount of time prior to each filing thereof as is customary in transactions of

{AGR RAS IGAMES-EQUITEX STOCK PURCHASE AGRT RED 10-31-03 (99236-4).DOC:4}

the type contemplated hereby and shall not make any filing with the SEC without the prior written Consent of Parent and Chex, which Consent shall not be unreasonably withheld or delayed. Parent and Chex authorize Buyer to utilize the Registration Statement and in all such state filed materials, the information concerning Parent and Chex provided to Buyer in connection with, or contained in, the Prospectus/Proxy Statement. Buyer promptly will advise Parent and Chex when the Registration Statement has become effective and, of any supplements or amendments thereto, and Buyer will furnish Parent and Chex with copies of all documents. Except for the Prospectus/Proxy Statement or the preliminary prospectus/proxy statement, neither Buyer, Parent nor Chex shall distribute any written material that might constitute a "prospectus" relating to the Contemplated Transactions or the Parent Proposals within the meaning of the Securities Act, Exchange Act or any applicable state securities Law without the prior written Consent of the other Parties.

(vi)    Buyer acknowledges that if it is the good faith determination of the Board of Directors of Parent that the failure to do so could reasonably be expected to result in a breach of its fiduciary duties to Parent's stockholders under applicable law, Parent may include information relating to the CSI Transaction as well as the Contemplated Transactions in the Prospectus/Proxy Statement.

(i)    Parent Stockholder Approval.    As soon as practicable after the date the Prospectus/Proxy Statement is declared effective by the SEC, Parent shall take all steps necessary to duly call, give notice of, convene and hold a meeting of its stockholders for the purpose of approving the Parent Proposals and for such other purposes as may be necessary or desirable in connection with effectuating the Contemplated Transactions (including without limitation presentation of both the Contemplated Transaction and the CSI Transaction for the choice of its stockholders if it is the good faith determination of the Board of Directors of Parent that the failure to do so could reasonably be expected to result in a Breach of its fiduciary duties to Parent's stockholders under Applicable Law). The Parent Board, together with the Special Committee, have recommended approval and adoption by Parent's stockholders of this Agreement and the Contemplated Transactions and the Parent Board and Special Committee shall not withdraw, amend or modify such recommendation in any manner adverse to Buyer (or publicly announce the intention to do so), except as allowed in Section 7(g).

(j)    Voting Agreements.    Simultaneous with the execution of this Agreement, Henry Fong, Chex, and the trustee of the Mirviss Estate Shares will enter into Voting Agreements in the form attached as **Exhibit C** hereto and shall not take any action to amend, revoke or terminate such Voting Agreements prior to the Closing Date without the prior written consent of Buyer.

(k)    Financial Information.    Both Chex and Buyer agree to update Buyer Interim Balance Sheet and Chex Interim Balance Sheet by providing each other with updated quarterly financial information as it is available.

(l)    Valuation.    The Parties agree to cooperate with each other and to determine and agree on a valuation of the Contemplated Transactions for all documents necessary to consummate the Contemplated Transactions.

(m)    Designated Account and Chex Expenses Prior to Closing Date.    Parent and Chex agree to place the proceeds from the Private Placement and the payment of any Note Receivables in a separate designated account to only be used by Chex for the payment of any outstanding

debentures and/or normal business expenses or commitments of Chex in an amount less than $10,000 or otherwise upon prior written approval of Buyer, which approval shall not be unreasonably withheld, except that if any funds are to be paid to or on behalf of Parent, Buyer can withhold approval for any reason in its sole discretion. Chex shall segregate all expenses related to this transaction. The Parties acknowledge that Chex may advance funds on behalf of Parent to pay certain reasonable expenses of Parent related to this transaction, which advances shall be deemed due and owing to Chex; provided that Buyer shall be given advance written notice of the amount of each such advance and the nature of the expenses being paid. In lieu of cash repayment of such advances, Parent may issue to Chex additional shares of its common stock, in an amount mutually agreed upon by Parent and Buyer, for inclusion in the Private Placement.

(n)    <u>Other Actions</u>. Except as required by Applicable Law, each party shall not, and shall not permit any of their respective Subsidiaries to, voluntarily take any action that would (i) result in any of the representations and warranties of such party set forth in this Agreement that are qualified as to materiality becoming untrue, (ii) result in any of such representations and warranties that are not so qualified becoming untrue in any material respect, (iii) result in any of the conditions to the consummation of the transactions contemplated hereby not being satisfied, or (iv) materially impair, materially delay or prevent the consummation the transactions contemplated hereby.

8.    **Post-Closing Covenants**. The Parties agree as follows with respect to the period following the Closing:

(a)    <u>General</u>. In case at any time after the Closing any further action is necessary or desirable to carry out the purposes of this Agreement, each of the Parties will use commercially reasonable efforts to take such further action (including the execution and delivery of such further instruments and documents) as any other Party reasonably may request, all at the sole cost and expense of the requesting Party.

(b)    <u>Transition</u>. Parent and Chex and each of their Representatives will take no action that is primarily designed or intended to have the effect of discouraging any lessor, licensor, customer, supplier or other business associate of Chex from maintaining the same business relationships with Chex after the Closing as it maintained with Chex prior to the Closing.

(c)    <u>Nondisparagement</u>. After the Closing Date, no Party shall, nor shall either of them permit any Related Person to, disparage each other or their respective shareholders, directors, officers, employees or agents.

(d)    <u>Access to Books and Records</u>. For a period of two years after the Closing Date, Parent shall have reasonable access to Chex's books and records for the purpose of preparing Parent's income Tax Returns. Thereafter, Parent shall have commercially reasonable access to such books and records (to the extent they are available) for the purpose of addressing any dispute with or inquiry by any Governmental Body; provided, however, that such access does not require Buyer to retain any of Chex's books and records for a period of greater than four years.

(e)    <u>NASDAQ Listing Application</u>. Buyer, at the discretion of its Board, will file a listing application with the Nasdaq Stock Market ("NASDAQ") at the earliest time that it is reasonably assured that it satisfies NASDAQ's preliminary listing criteria.

(f)    Indemnification for Undisclosed Liabilities. Parent agrees to indemnify Buyer for all liabilities that are not disclosed in this Agreement or any of the documents attached hereto, and which are not excluded from the representations contained in Section 6(y). At the Closing, the Retained Common Stock Consideration (the "**Escrow Amount**") shall be deposited in escrow pursuant to an escrow agreement among Parent, Buyer and a mutually acceptable escrow agent (the "**Escrow Agreement**") in the form attached hereto as Exhibit D. The Escrow Agreement will provide that the Escrow Amount, exclusive of the Pledged Shares held in escrow pursuant to Section 9(a)(vi)(A), will be held until the CSI Transaction has been terminated in a manner that eliminates any potential liability of Buyer to CSI, to secure the indemnification obligations of the Seller under this Section 8(f), Section 3(f) above and Section 10(b) below, and shall be held and disbursed pursuant to the terms of the Escrow Agreement. The Escrow Amount representing the Pledged Shares will also secure Seller's indemnification obligations and will be held until the earlier of (i) the Termination Date (as defined in the Escrow Agreement or (ii) the date on which the intercompany receivable from Parent recorded on Chex's balance sheet described in Section 9(a)(vi)(A) has been paid in full. If the Parent fails to make any payments required pursuant to Section 9(a)(vi)(A), Buyer shall have the option to request a disbursement of the Escrow Amount of the Pledged Shares in payment of such amounts pursuant to the terms of the Escrow Agreement. Except as described above, no other portion of the Escrow Amount shall be remitted to Parent prior to the Termination Date without the prior written consent of Buyer.

9.    **Conditions to Obligation to Close.**

(a)    Conditions to Obligation of Buyer. The obligation of Buyer to consummate the Contemplated Transactions and perform any actions required to be taken by Buyer at the Closing is subject to satisfaction of the following conditions, any of which may be waived by Buyer, in whole or in part, only in writing:

(i)    Accuracy of Representations. The representations of Parent set forth in Section 4 and the representations of Chex set forth in Section 6 above shall be true and correct in all material respects at and as of the Closing Date and Buyer shall have received a certificate from Parent and Chex to that effect;

(ii)    Disclosure Supplements. Parent and Chex shall have delivered all updates or supplements to the Disclosure Schedule to make the information contained therein not misleading and Buyer shall have received a certificate from Parent and Chex to that effect;

(iii)    Performance. Parent and Chex shall have performed and complied with all of their respective covenants hereunder in all material respects through the Closing Date and Buyer shall have received a certificate from Parent and Chex that such covenants shall have been performed and complied with through the Closing Date;

(iv)    Covenant Not to Compete. The persons outlined in Schedule 9(a)(iv) shall have executed and delivered to Buyer the Covenant Not to Compete attached hereto as Exhibit B.

(v)    Effectiveness of Registration Statement and Parent's Stockholder Approval. The Registration Statement shall have been declared effective by the SEC, and Parent shall have obtained the Parent Requisite Vote approving the Agreement from its shareholders.

(vi)    <u>Private Placement and Note Receivables</u>. Unless otherwise instructed in writing by Buyer, Parent and Chex shall have completed the private placement of all of the shares of Parent that are owned by Chex, and are being acquired by Buyer hereunder, along with all of the shares of Parent that are pledged to Parent to secure the obligation of the Lewis Mirviss Estate (the "**Mirviss Estate Shares**")(collectively, the "**Private Placement**"). The minimum price at which the shares in the Private Placement may be sold is the greater of: (i) $0.80 per share or (ii) 75% of the average closing trading prices of the of Parent common stock for the five trading days prior to the date of such sale, provided that, Buyer may in its sole discretion, elect to purchase all shares of Parent offered in the Private Placement at such terms and conditions as offered to other participants in the Private Placement. Parent acknowledges and agrees that as between Parent and Chex, Chex owns all right, title and interest in and to the Mirviss Estate Shares. Buyer acknowledges that the inclusion of the Mirviss Estate Shares in the Private Placement is subject to approval by the Lewis Mirviss Estate. The parties expressly acknowledge and agree that Buyer may, in its sole discretion, waive this condition to its obligations to consummate the Contemplated Transactions. In addition, the following receivables of Chex shall be treated as follows:

(A)    The intercompany receivable from Parent recorded on Chex's balance sheet and the intercompany receivable recorded from Denaris recorded on Chex's balance sheet in excess of the $750,000 converted or evidenced by a promissory note pursuant to Section 9(a)(vi)(B) shall be repaid to Chex in accordance with a mutually agreed upon repayment schedule that will commence on the Closing Date and end on that date which is one year after the Closing Date. Parent's obligation to repay this receivable shall be secured by a pledge of that number of shares of the Retained Common Stock Consideration having a market value equal to at least 200% of the outstanding principal amount of the receivable (the "**Pledged Shares**"). If the market value of the Pledged Shares declines below an amount equal to 150% of the outstanding principal amount of the receivable, Buyer may require that Parent tender additional cash or marketable securities as additional collateral in order to satisfy such deficiency. Buyer acknowledges that Parent may pay down or off this receivable by tendering shares of the Retained Common Stock Consideration not included in the Escrow Amount to Buyer, which Buyer has agreed to value and apply to pay the receivable at an amount per share equal to the average closing bid price of the Buyer Common Stock for the five (5) trading days preceding the date of its receipt of such stock; and

(B)    Of the intercompany receivable from Denaris of $750,000 recorded on Chex's balance sheet, $443,877 shall be converted into that number of shares of common stock of Denaris equal to 29% of the fully diluted capital stock of Denaris as of the Closing Date. The remaining $306,123 of this receivable shall be evidenced by a promissory note, bearing interest at a rate equal to Buyer's cost of funds that shall in no event be greater than 9% per annum, which is convertible into additional shares of common stock of Denaris equal to 20% of the fully diluted capital stock of Denaris as of the Closing Date. In addition, Buyer will enter into an agreement with Denaris pursuant to which it shall appoint Denaris as its stored value card provider for a minimum of two years at a fee that will guarantee revenues to Denaris of at least $32,500 per month under such other terms and conditions as shall be negotiated by the parties in good faith. In addition, Buyer agrees that, in exchange for a negotiated fee at the time of performance, it will provide to Chex or Denaris such technical consulting

and support services as either of them may request from time to time with respect to Denaris' performance of services for Paymaster Jamaica.

(vii)    Chex Material Adverse Effects.    There shall be no Material Adverse Effects in the Business of Chex taken as a whole, financial or otherwise, or, to Chex's or Parent's Knowledge, its customers, regardless of reason, including those changes that are as a result of any legislative or regulatory change, revocation of any permits, licenses or rights to do business, failure to obtain any permit at the normal time or in the manner applied for by Chex, fire, explosion, accident, casualty, labor trouble, flood, riot, storm, condemnation or act of God or otherwise, and Chex shall have delivered to Buyer, dated the Closing Date, to such effect.

(viii)    Chex Closing Documents Chex and Parent, as the case may be, shall have delivered to Buyer all of the documents listed in Section 2(d)(i).

(ix)    Parent Actions.    All actions to be taken by Parent and Chex in connection with consummation of the Contemplated Transactions hereby and all certificates, opinions, instruments and other documents required to effect the Contemplated Transactions will be reasonably satisfactory in form and substance to Buyer.

(x)    No Injunction.    As of the Closing, there shall not be any injunction, Order or decree in effect preventing the consummation of the Contemplated Transactions.

(xi)    Buyer Bylaws.    Buyer shall amend its Bylaws to provide that (i) its Chief Executive Officer shall report to the Chairman of Buyer's Board of Directors, and (ii) officers and directors must reasonably cooperate with the company in obtaining and maintaining gaming and similar licenses. The failure to cooperate or the failure to qualify for licensure shall be grounds for termination as an officer or director.

(xii)    Fairness Opinion.    On or prior to the meeting of the Parent's stockholders as contemplated in Section 7(h), Parent received an opinion from a reputable independent investment banker as of such date, which opinion shall be confirmed in writing substantially and shall be (i) if the CSI Transaction has been terminated, in a form and substance reasonably satisfactory to Buyer and Buyer's Counsel to the effect that the Common Stock Consideration to be received by Parent pursuant to this Agreement is fair from a financial point of view to Parent's shareholders, a true and complete copy of which written opinion has been or will promptly be delivered to Buyer following its receipt by Parent, or (ii) if the CSI Transaction has not been terminated, in a form and substance reasonably satisfactory to Buyer and Buyer's Counsel.

(xiii)    Proxy.    Parent shall deliver a proxy in the form of Exhibit E to Buyer transferring to Buyer all voting rights of Parent related to the Retained Common Stock Consideration and the Mirviss Estate Shares.

(b)    Conditions to Obligation of Parent.    The obligation of Parent to consummate the Contemplated Transactions and perform any actions required to be taken by Parent at the Closing is subject to satisfaction of the following conditions, any of which may be waived by Parent, in whole or in part, only in writing:

(i) <u>Accuracy of Representations</u>. The representations of Buyer set forth in Section 5 above shall be true and correct in all material respects at and as of the Closing Date and Parent shall have received a certificate from Buyer to that effect;

(ii) <u>Disclosure Supplements</u>. Buyer shall have delivered all updates or supplements to the Disclosure Schedules to make the information contained therein not misleading and Parent shall have received a certificate from Buyer to that effect;

(iii) <u>Performance</u>. Buyer shall have performed and complied with all of its covenants hereunder in all material respects through the Closing Date and Parent shall have received a certificate from Buyer that such covenants shall have been performed and complied with through the Closing Date;

(iv) <u>Effectiveness of Registration Statement and Parent's Stockholder Approval</u>. The Registration Statement shall have been declared effective by the SEC, and Parent shall have obtained the Parent Requisite Vote of the Agreement and the Contemplated Transactions from its shareholders.

(v) <u>Buyer Material Adverse Effects</u>. There shall be no Material Adverse Effects in the business of Buyer taken as a whole, financial or otherwise, or, to Buyer's Knowledge, its customers, regardless of reason, including those changes that are as a result of any legislative or regulatory change, revocation of any permits, licenses or rights to do business, failure to obtain any permit at the normal time or in the manner applied for by Buyer, fire, explosion, accident, casualty, labor trouble, flood, riot, storm, condemnation or act of God or otherwise, and Buyer shall have delivered to Parent, dated the Closing Date, to such effect.

(vi) <u>Buyer Closing Documents</u>. Buyer shall have delivered to Parent all of the documents listed in Section 2(d)(ii).

(vii) <u>Buyer's Actions.</u> All actions to be taken by Buyer in connection with consummation of the Contemplated Transactions and all certificates, opinions, instruments and other documents required to effect the Contemplated Transactions will be reasonably satisfactory in form and substance to Parent;

(viii) <u>No Injunction</u>. As of the Closing, there shall not be any injunction, Order or decree in effect preventing the consummation of the Contemplated Transactions.

(ix) <u>Warrants and Options</u>. Buyer shall have received prior written approval from Parent for the issuance of any warrants, options or other securities, rights or instruments granting the right to purchase or convert into Buyer Common Stock after the date of this Agreement, which approval shall not be unreasonably withheld. The Parties agree to cooperate in the negotiation for all amounts, criteria and vesting schedules for such issuances.

(x) <u>Buyer Management</u>. At the Closing, the Board of Directors of Buyer shall be reconstituted so that it consists of seven members on the Closing Date, two of which shall be nominated by Parent; however, should Parent's nominee(s) be ineligible to serve on Buyer's Board of Directors due to a Regulatory Problem, such nominee shall either resign or remove his name from

nomination and Buyer's Board of Directors shall fill such vacancy with a person nominated by Parent.

(xi)    Officers of Buyer. Chris Wolfington shall be appointed Chairman and CEO of Buyer and Ijaz Anwar shall be appointed CFO of Buyer. Buyer will have two operating segments: (i) a cash services division of which James P. Welbourn will serve as president, and (ii) a gaming division of which Jeremy Stein will serve as president. Messrs. Wolfington, Anwar and Welbourn will enter into three year employment agreements with Buyer for their positions on terms and conditions satisfactory to Buyer and each such individual.

(xii)    Vault Cash Financing.    Buyer shall deliver an industry-standard commitment letter to Parent providing for the re-financing of the existing vault cash of Chex. Such commitment letter shall be subject to the standard contingencies for commitment letters in this area of financing.    Buyer's requirement to provide this commitment letter is subject to Chex's representations to Buyer that its vault cash procedures are similar to those of the Buyer.

(xiv)    MCA Acquisition. The MCA Acquisition shall have been completed by Buyer.

10.    **Remedies for Breaches of this Agreement.**

(a)    Survival. All of the representations and warranties of the Parties contained in this Agreement shall survive and continue in full force and effect for a period of three years from the Closing Date, except:

(i)    with respect to the Covenant Not to Compete, which shall survive for a period of three years from the Closing Date; and

(ii)    with regards to Tax matters which shall survive for a period of time which is equal to the statute of limitations with respect to the Tax liability being asserted.

(b)    Indemnification Provisions for Benefit of Buyer.    Subject to the terms of this Section 10, Parent shall indemnify, defend, reimburse and hold harmless Buyer from and against any and all claims, demands, penalties, fines, liabilities, obligations, losses, settlements, damages, costs and expenses resulting from:

(i)    any inaccuracy in, or Breach of, any representation and warranty or nonfulfillment of any covenant on the part of Parent contained in this Agreement;

(ii)    any misrepresentation in or omission from or nonfulfillment of any covenant on the part of Parent contained in any other agreement, certificate or other instrument furnished or to be furnished to Buyer pursuant to this Agreement;

(iii)    all federal, state, county, local, foreign and other Taxes of Parent or Chex, including, income Taxes, excise Taxes, sales Taxes, use Taxes, gross receipts Taxes, franchise Taxes, employment and payroll related Taxes, property Taxes and import duties, and any penalties or interest, whether or not measured in whole or in part by net income, relating to the taxable periods

or portions thereof ending upon the close of business on the Closing Date or related to the Contemplated Transactions, which are not timely paid by Parent and which Buyer or Chex pays;

      (iv)    any and all negligence claims, resulting from occurrences on or prior to the Closing Date;

      (v)    reasonable fees and disbursements of counsel incident to any of the foregoing; and

      (vi)    any fees, damages, expenses (including attorneys' fees), losses or claims due or payable to CSI as a result of this Agreement or otherwise.

The indemnification of Buyer provided by this Section 10(b) shall be in addition to the tax indemnification set forth in Section 3(f).

    (c)    <u>Indemnification Provisions for Benefit of Parent</u>.  Subject to the terms of this Section 10, Buyer shall indemnify, defend, reimburse and hold harmless Parent from and against any and all claims, demands, penalties, fines, liabilities, obligations, losses, settlements, damages, costs and expenses resulting from:

      (i)    any inaccuracy in, or Breach of, any representation and warranty or nonfulfillment of any covenant on the part of Buyer contained in this Agreement;

      (ii)    all federal, state, county, local, foreign and other Taxes of Chex, including, income Taxes, excise Taxes, sales Taxes, use Taxes, gross receipts Taxes, franchise Taxes, employment and payroll related Taxes, property Taxes and import duties, and any penalties or interest, whether or not measured in whole or in part by net income, relating to the taxable periods or portions thereof commencing after the close of business on the Closing Date which are not timely paid by Chex or Buyer and which Parent pay;

      (iii)    the operation of the Business of Chex and any successor or assign thereof after the Closing Date; and

      (iv)    reasonable fees and disbursements of counsel incident to any of the foregoing.

The indemnification of Parent provided by this Section 10(c) shall be in addition to the tax indemnification set forth in Section 3(f).

    (d)    <u>Indemnification Procedure for Third Party Claims</u>.  The Party seeking indemnification under this Section 10 shall give the Party from whom indemnification is sought prompt written notice of the assertion of any Third Party claim of which said Party has Knowledge which is covered by the indemnity agreements set forth in the Section 10. If the Party obligated to indemnify wishes to defend such claim for which such Party is or may be liable, then such Party may, at its own expense, defend such claim; provided, however, that the indemnitee or indemnitees may retain counsel (at the indemnitee's expense) to monitor the defense of such claim. If the Party obligated to indemnify, within a reasonable period of time after notice of any such claim, fails to defend, the Party seeking indemnification will have the right to undertake the defense, compromise

or settlement of such claim, subject to the right of the indemnifying Party to assume the defense of such claim at any time prior to settlement, compromise or final determination thereof.

(e)     Payment of Sums Due. After any final non-appealable judgment or award shall have been rendered by a court, arbitration board or administrative agency of competent jurisdiction, or a settlement shall have been completed, or the Parties shall have arrived at a mutually binding agreement, with respect to each separate Third Party claim indemnified by the Party obligated to indemnify, the Party seeking indemnification shall forward to the Party obligated to indemnify notice of any sums due and owing (and the times when due) by the Party seeking indemnification with respect to such claim and the Party obligated to indemnify shall pay such sums to the Party seeking indemnification in cash, within 30 days after the date of such notice or, if any such sums are due more than 90 days after the date of such notice, ten days prior to the date each such sum is due.

(f)     Good Faith Efforts to Settle Disputes. Each of the Parties agrees that, prior to commencing any litigation against the other concerning any matter with respect to which such Party intends to claim a right of indemnification in such Proceeding, such Parties shall meet in a timely manner and attempt in good faith to negotiate a settlement of such dispute.

(g)     Fees and Expenses. Notwithstanding any other provision in this Section 10, in the event of any dispute or controversy, the prevailing Party in such dispute shall, in addition to any other remedies the prevailing Party may obtain in such dispute, be entitled to recover from the other Party all of its reasonable legal fees and out-of-pocket costs incurred by such Party in enforcing or defending its rights hereunder, excluding any costs incurred under Section 10(f).

(h)     · Notice of Claims. No claim by any Party for indemnification under this Section 10 shall be valid unless the Party seeking indemnification provides written notice of such claim to the other Party on or before the third anniversary of the Closing Date except that:

(i)     in the case of representations and warranties or covenants regarding tax matters, such notice must be given on or before the expiration of the statue of limitations applicable to the liability underlying the claim; and

(ii)     in the case of any covenant contained herein which by its terms explicitly extends beyond such third anniversary, such notice must be given on or before the expiration of the time period explicitly referenced in such covenant. The liability of any Party for indemnification with respect to any claim for indemnification for which the indemnified Party has timely given notice pursuant to this Section 10(h) shall continue until such liability for indemnification shall have been finally determined pursuant to this Section 10.

(i)     Litigation Support. If, and for so long as, any Party actively is contesting or defending against any action, suit, Proceeding, hearing, investigation, charge, complaint, claim, or demand in connection with

(i)     any Contemplated Transaction, or

(ii)     any fact, situation, circumstance, status, condition, activity, practice, plan, occurrence, event, incident, action, failure to act, or transaction on or prior to the Closing Date involving the Business, the other Party will cooperate with the contesting or defending Party and its

{AGR RAS IGAMES-EQUITEX STOCK PURCHASE AGRT RED 10-31-03 (99236-4).DOC:4}

counsel in the contest or defense, make available its personnel and provide such testimony and access to its books and records as shall be necessary in connection with the contest or defense, all at the sole cost and expense of the contesting or defending Party, unless the contesting or defending Party is entitled to indemnification therefor under this Section 10.

      (j)    <u>Sole Remedy</u>. The Parties hereby agree that the rights and remedies set forth in this Section 10 and the Escrow Agreement shall constitute each Party's sole remedy against each of the other Parties after the Closing for the Breach of any representation, warranty or covenant herein made by such other Party.

**11.    Review Period and Termination.**

      (a)    <u>Review Period</u>. For a period of fifteen (15) Business Days after receipt by Buyer and Parent of the last schedule, documents and/or exhibit required to be delivered with and included as part of the Disclosure Schedules (the **"Review Period"**), Buyer and Parent shall have the right to review such schedules, documents and/or exhibits and request additional documentation as needed to clarify, investigate or determine the nature of any item disclosed which, in the opinion of Buyer, Parent or their counsel or accountants could have a Material Adverse Effect on the operations of Buyer, Parent and/or Chex, as the case may be (**"Adverse Items"**). The Review Period shall be extended for a period of ten (10) Business Days after the receipt of any additional schedule or document requested. If, in their sole and absolute discretion, Buyer and Parent are unable to satisfy themselves that any Adverse Item will not have a Material Adverse Effect on the operations of Buyer, Parent and/or Chex, they shall have the right to either: (i) terminate this Agreement under subsection (b)(viii) or (b)(ix) as the case may be; or (ii) request a reduction in the Consideration sufficient cover the estimated liability for any Adverse Item.

      (b)    <u>Termination of Agreement</u>. In addition to termination during the Review Period, certain parties may terminate this Agreement prior to Closing as follows:

          (i)    Buyer, Parent and Chex may terminate this Agreement by mutual written Consent at any time prior to the Closing;

          (ii)    Buyer, if any representation of Chex or Parent set forth in the Agreement was materially inaccurate when made or becomes materially inaccurate such that the condition set forth in Section 9(a)(i) could not be satisfied;

          (iii)    Parent and Chex, if any representation of Buyer set forth in this Agreement was materially inaccurate when made or becomes materially inaccurate such that the condition set forth in Section 9(b)(i) could not be satisfied;

          (iv)    Buyer, if Chex or Parent fails to perform or comply with any of their respective material obligations that each are required to perform or to comply with under this Agreement such that the condition set forth in Section 9(a)(iii) could not be satisfied;

          (v)    Parent and Chex, if Buyer fails to perform or comply with any of the material obligations that it is required to perform or to comply with under this Agreement such that the condition set forth in Section 9(b)(iii) could not be satisfied;

(vi)     Buyer or Parent and Chex, if following a vote by the stockholders of Parent, this Agreement and the Contemplated Transactions are not duly approved by the stockholders of Parent;

(vii)    Buyer or Parent and Chex, if the Closing does not occur on or before 30 days following Parent's shareholder meeting to approve the Contemplated Transaction or such later date as the Parties may mutually agree (unless the failure to effect the Closing by such date shall be due to the action or failure to act of the Party or Parties seeking to terminate this Agreement in Breach of such Party's or Parties' obligations under this Agreement);

(viii)   Buyer, after the occurrence of any event having, or which would reasonably be likely to have, a Material Adverse Effect on Chex;

(ix)     Parent, after the occurrence of any event having, or which would reasonably be likely to have, a Material Adverse Effect on Buyer; or

(x)      Buyer or Parent and Chex if Parent accepts a Superior Proposal pursuant to Section 7(g)(iii).

Any Party desiring to terminate this Agreement shall give prior written notice of such termination and the reasons therefore to the other Party.  Notwithstanding the foregoing, the right to terminate this Agreement pursuant to this Section 11(b) shall not be available to any Party that has breached in any material respect its obligations under this Agreement in any manner that proximately contributed to the failure of the transactions contemplated hereby to be consummated.

(c)     This Agreement shall automatically terminate without further action by any Party if the Closing is not held on or before 270 days after execution of this Agreement and the Parties have not waived this provision.

(d)     Effect of Termination.

(i)     If any Party terminates this Agreement pursuant to this Section, all rights and obligations of the Parties hereunder shall terminate without any liability of any Party (or of any of its directors, officers, employees, agents, legal or financial advisors or other Representatives) to any other Party except and to the extent set forth in Subsection (e) below, and provided that no such termination shall relieve any party hereto of any liability or damages resulting from any willful breach of any of its representations, warranties, covenants or agreements set forth in this Agreement.

(ii)    If this Agreement is terminated, as provided herein, each Party shall use its reasonable Best Efforts to redeliver all documents, work papers and other material (including any copies thereof) of any other Party relating to the Contemplated Transactions, whether obtained before or after the execution hereof, to the Party furnishing the same.

(e)     Termination Amount and Expenses.

(i)     Except as set forth in this Subsection 11(e), all expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid in accordance with the provisions of Section 12(n).

(ii)    Parent and Chex agree that if this Agreement is terminated pursuant to Sections 11(b)(ii), (iv)(only if such failure is not due to receipt of Parent Board approval pursuant to Section 7(f)), (vi)(only if within twelve months of such Parent stockholder vote, Parent, Chex or any of their Subsidiaries enters into a Chex Proposed Transaction, an agreement with CSI for a Chex Proposed Transaction or the CSI Transaction), (vii)(only if the failure to effect the Closing is not due to any action or failure to act by Buyer), (viii) or (x), then Parent shall pay to Buyer a termination fee in an amount equal to $1,000,000 (the "**Termination Amount**"). The Termination Amount shall be paid immediately upon termination. In addition, upon any such termination Parent and/or Chex shall pay to Buyer, within five (5) Business Days of receipt by Parent of a written notice from Buyer evidencing Buyer's documented costs and expenses otherwise payable by Buyer under Subsection 12(n), an amount equal to such costs and expenses. Any payment required to be made pursuant to this Subsection shall be made on the requisite payment date by wire transfer of immediately available funds to an account designated by Buyer.

(iii)    Buyer agrees that if this Agreement is terminated by Parent pursuant to Sections 11(b)(iii), (v) (vii)(only if the failure to effect the Closing is not due to any action or failure to act by Parent and/or Chex) or (ix), then Buyer shall pay to Parent a termination fee in an amount equal to the Termination Amount. The Termination Amount shall be paid immediately upon termination. In addition, upon any such termination Buyer shall pay to Parent and Chex, within five (5) Business Days of receipt by Buyer of a written notice from Parent evidencing Parent's and Chex's documented costs and expenses otherwise payable by Parent or Chex under Subsection 12(n), an amount equal to such costs and expenses. Any payment required to be made pursuant to this Subsection shall be made on the requisite payment date by wire transfer of immediately available funds to an account designated by Parent.

(iv)    Buyer, Parent and Chex agree that the payments provided for in this Subsection shall be the sole and exclusive remedy of the parties upon a termination of this Agreement; provided, however, that nothing in this Agreement shall relieve a Party of any liability or damages resulting from any willful breach of any of its representations, warranties, covenants or agreements set forth in this Agreement.

(v)    Parent and Chex acknowledge that the agreements contained in this Subsection are an integral part of the Contemplated Transactions, and that, without these agreements, Buyer would not enter into this Agreement. Accordingly, if Parent or Chex fails to pay promptly amounts due hereunder, and, in order to obtain such payment, Buyer commences a suit which results in a judgment against Parent or Chex for such amounts, Parent and/or Chex shall pay Buyer's expenses (including attorneys' fees) incurred in connection with such suit.

12.    **Miscellaneous.**

(a)    <u>Press Releases and Announcements</u>.  No Party shall issue any press release or public announcement relating to the subject matter of this Agreement until after the Closing without the prior written approval of the other Party; provided, however, that any Party may make any public disclosure in a filing with the Securities and Exchange Commission or any state securities commission that it believes in good faith is required by law or regulation (in which case the disclosing Party will advise the other Party prior to making the disclosure). The terms of this

Section 12(a) shall not prevent any Party from communicating with its employees and lenders regarding the content of this Agreement.

(b)    No Third Party Beneficiaries.  This Agreement shall not confer any rights or remedies upon any person other than the Parties and their respective successors and permitted assigns.

(c)    Entire Agreement and Modification.  This Agreement (including the documents referred to herein) constitutes the entire agreement between the Parties and supersedes any prior understandings, agreements or representations by or between the Parties, written or oral, that may have related in any way to the subject matter hereof.  No amendment or modification of any provision of this Agreement shall be valid unless the same shall be in writing and signed by the Party to be charged with the amendment.

(d)    Succession and Assignment.  This Agreement shall be binding upon and inure to the benefit of the Parties named herein and their respective successors and permitted assigns.  No Party may assign either this Agreement or any of its rights, interests or obligations hereunder without the prior written approval of Buyer, Parent and Chex.  Notwithstanding the foregoing, Parent may assign its rights hereunder to a wholly-owned Subsidiary of Parent, provided that Parent shall remain liable for its obligations set forth in this Agreement as if such assignment had not occurred hereunder.

(e)    Disclosure Schedules.

(i)    The information in the Disclosure Schedules constitutes (i) exceptions to particular representations, warranties, covenants and obligations of Chex, Parent and Buyer as set forth in this Agreement or (ii) descriptions or lists of items referred to in this Agreement.  If there is any inconsistency between the statements in this Agreement and those in the Disclosure Schedules (other than an exception expressly set forth as such in the Disclosure Schedules with respect to a specifically identified representation or warranty), the statement in this Agreement will control.

(ii)    The statements in the Disclosure Schedules, and those in any supplement thereto, relate only to the provisions in the Section of this Agreement to which they expressly relate and not to any other provision in this Agreement.

(f)    Counterparts.  This Agreement may be executed and delivered in one or more counterparts, each of which shall be deemed an original, but all of which together will constitute one and the same instrument.  The exchange of copies of this Agreement and of signature pages by facsimile transmission shall constitute effective execution and delivery of this Agreement as to the Parties any may be used in lieu of the original Agreement for all purposes.  Signatures of the Parties transmitted by facsimile shall be deemed to be their original signatures for all purposes.

(g)    Headings.  The section headings contained in this Agreement are inserted for convenience only and shall not in any way affect the meaning or interpretation of this Agreement.

(h)    Notices.  Any and all notices required or permitted hereunder shall be deemed to be sent or delivered when personally delivered to the recipient or when mailed by certified or registered mail with proper first class postage affixed thereto to the Parties hereto, as follows:

If to Chex:

    Chex Services, Inc.
    11100 Wayzata Blvd., Suite 111
    Minnetonka, Minnesota 55305
    Attention: James P. Welbourn, President and CEO
    Facsimile:  (952) 417-4183

With a copy to:

    John W. Kellogg, Esq.
    Friedlob Sanderson Paulson & Tourtillott, LLC
    1775 Sherman Street, Twenty-First Floor
    Denver, CO  80203
    Facsimile: (303) 595-3159

If to Parent:

    Equitex, Inc.
    2401 PGA Boulevard, Suite 190
    Palm Beach Gardens, Florida 33410
    Attention: Henry Fong, President
    Facsimile:  (561) 624-0886

With a copy to:

    John W. Kellogg, Esq.
    Friedlob Sanderson Paulson & Tourtillott, LLC
    1775 Sherman Street, Twenty-First Floor
    Denver, CO  80203
    Facsimile: (303) 595-3159

If to Buyer:

    iGames Entertainment, Inc.
    301 Yamato Road, Suite 2199
    Boca Raton, FL 33431
    Facsimile: (561) 995-1006

With a copy to:

    Klehr, Harrison, Harvey, Branzburg & Ellers LLP
    260 South Broad Street
    Philadelphia, PA  19102
    Attention:  Lawrence D. Rovin
    Facsimile: (215) 568-6603

Any notice required to be made within a stated period of time shall be considered timely mailed if deposited before midnight of the last day of the stated period. Any Party may give any notice or other communication hereunder using any other means (including personal delivery, expedited courier, messenger service, telecopy, telex, ordinary mail or electronic mail), but no such notice, request, demand, claim or other communication shall be deemed to have been duly given unless and until it is actually received by the individual, or by a person at the address of the individual, for whom it is intended. Any Party may change the address to which notices, requests, demands, claims or other communications hereunder are to be delivered by giving the other Party notice in the manner set forth herein.

(i)    <u>Governing Law</u>.  This Agreement shall in all respects be governed by and construed in accordance with the internal laws (and not the law of conflicts) of the State of Delaware.

(j)    <u>Submission to Jurisdiction</u>. Each Party submits to the jurisdiction of any state or federal court sitting in the State of Delaware, New Castle County in any action or Proceeding arising out of or related to this Agreement; agrees that all claims in respect of the action or Proceeding may be heard and determined in any such court; and agrees not to bring any action or Proceeding arising out of or relating to this Agreement in any other court. Each Party waives any defense of inconvenient forum to the maintenance of any action or Proceeding so brought and waives any bond, surety or other security that might be required of any other Party with respect thereto. Each Party agrees that a final judgment in any action or Proceeding so brought shall be conclusive and may be enforced by suit on the judgment or in any other manner provided by law. The Parties agree that any or all of them may file a copy of this paragraph with any court as written evidence of the knowing voluntary and bargained agreement between the Parties irrevocably to waive any objections to venue or to convenience of forum. Process in any Proceeding referred to in the first sentence of this section may be served on any party anywhere in the world.

(k)    <u>Enforcement of Agreement</u>. The Parties acknowledge and agree that they would be irreparably damaged if any of the provisions of this Agreement are not performed in accordance with their specific terms and that any Breach of this Agreement by any Party could not be adequately compensated in all cases by monetary damages alone. Accordingly, in addition to any other right or remedy to which the Party may be entitled, at law or in equity, it shall be entitled to enforce any provision of this Agreement by a decree of specific performance and to temporary, preliminary and permanent injunctive relief to prevent Breaches or threatened Breaches of any of the provisions of this Agreement, without posting any bond or other undertaking.

(l)    <u>Wavier; Remedies Cumulative</u>.  The rights and remedies of the Parties to this Agreement are cumulative and not alternative. Neither any failure nor any delay by any Party in exercising any right, power or privilege under this Agreement or any of the documents referred to in this Agreement will operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power or privilege will preclude any other or further exercise of such right, power or privilege or the exercise of any other right, power or privilege. To the maximum extent permitted by applicable law, (a) no claim or right arising out of this Agreement or any of the documents referred to in this Agreement can be discharged by one Party, in whole or in part, by a waiver or renunciation of the claim or rights unless in writing signed by the other Party; (b) no waiver that may be given by a Party will be applicable except in the specific instance for which it is

given; and (c) no notice to or demand on one Party will be deemed to be a waiver of any obligation of that Party or of the right of the Party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the documents referred to in this Agreement.

(m)     Severability.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.  If the final judgment of a court of competent jurisdiction declares that any term or provision hereof is invalid or unenforceable, the Parties agree that the court making the determination of invalidity or unenforceability shall have the power to reduce the scope, duration or area of the term or provision, to delete specific words or phrases or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Agreement shall be enforceable as so modified after the expiration of time within which the judgment may be appealed.

(n)     Expenses.  Except as otherwise provided in this Agreement, each of the Parties will bear its respective costs and expenses (including legal fees and expenses) incurred in connection with the preparation, negotiation, execution and performance of this Agreement and the Contemplated Transactions.

(o)     Construction.  Time is of the essence of this Agreement.  The language used herein will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction shall be applied against any Party.  Any reference to any federal, state, local or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.

(p)     Incorporation of Exhibits and Schedules.  The Exhibits and Schedules identified in this Agreement are incorporated herein by reference and made a part hereof.

(q)     Litigation.  In the event of litigation arising of or connected with the Contemplated Transactions, the prevailing Party in any such action shall be entitled to recover of the other Party all costs of court, including attorneys' fees and court costs at the trial level.

[THE BALANCE OF THIS PAGE INTENTIONALLY LEFT BLANK]

11/03/2003  22:17    5616240085              FONG HOLLANDER                    PAGE  02

Nov-03-03   07:01pm   From-Friedlob Sanderson Paulson & Tourtillott   303 595 3159        T-812   P.002/002   F-325

IN WITNESS WHEREOF, the Parties have hereunto set their hands and seals as of the date first above written.

PARENT:

EQUITEX, INC.

By:_____
    Henry Fong, President

Subject to ratification by the Board of Directors of Equitex, Inc.

BUYER:

iGAMES ENTERTAINMENT, INC.

By:_____
    Jeremy Stein, President

CHEX:

CHEX SERVICES, INC.

By:_____
    James P. Welbourn, President and Chief
    Executive Officer

IN WITNESS WHEREOF, the Parties have hereunto set their hands and seals as of the date first above written.

PARENT:

EQUITEX, INC.

By: _____
    Henry Fong, President

Subject to ratification by the Board of Directors of Equitex, Inc.

BUYER:

iGAMES ENTERTAINMENT, INC.

By: _____
    Jeremy Stein, President

CHEX:

CHEX SERVICES, INC.

By: _____
    James P. Welbourn, President and Chief
    Executive Officer

{AGRRAS-4_1.DOC:4}
PHIL1 537761-5

61

Nov 03 03 08:52p    Jim/Kathryn    Welbourn    952-472-0734    P.2

Nov-03-03  07:02pm  From-Friedlob Sanderson Paulson & Tourtillott  303 595 3159    T-813  P.002/002  F-326

IN WITNESS WHEREOF, the Parties have hereunto set their hands and seals as of the date first above written.

PARENT:

EQUITEX, INC.

By: _____
Henry Fong, President

Subject to ratification by the Board of Directors of Equitex, Inc.

BUYER:

iGAMES ENTERTAINMENT, INC.

By: _____
Jeremy Stein, President

CHEX:

CHEX SERVICES, INC.

By: *James P Welbourn*
James P. Welbourn, President and Chief Executive Officer

EXHIBITS

EXHIBIT A          Disclosure Schedules
EXHIBIT B          Covenant Not to Compete
EXHIBIT C          Form of Voting Agreement
EXHIBIT D          Form of Escrow Agreement
EXHIBIT E          Form of Proxy

<u>Exhibit B</u>

iGames Entertainment, Inc.

_____

_____

Re:    Covenant Not to Compete respecting that certain Stock Purchase Agreement (the "**Agreement**") between iGames Entertainment, Inc., a Nevada corporation ("**iGames**"), Equitex, Inc., a Delaware corporation ("**Equitex**"), and Chex Services, Inc., a Minnesota corporation ("**Chex**")

Gentlemen:

In consideration of the Closing of that certain the Agreement by, between and among iGames, Equitex and Chex , and whereby iGames will be acquiring all of the outstanding securities of Chex, and to satisfy one of the conditions of iGames required by Section 2(f) thereof, and to protect the rights of iGames in Chex acquired under the Agreement following the Closing Date as also considered by the Parties to be important to the stockholders of iGames and Equitex, the undersigned hereby covenants and agrees not to compete with iGames or Chex in the present or contemplated business operations carried on by either on the Closing Date of the Agreement in the gaming industry any where in the United States, Canada or the Caribbean for a period of three years from the date hereof. The undersigned shall not, as a part of this covenant not to compete, manage, become employed by, invest in (other than a minor stockholder [less than five percent ownership] in a publicly held company), become a partner in or otherwise own, associate deal with or advise or give assistance of any kind or nature whatsoever to any person or entity of any kind that engages in the business operations presently carried on or presently contemplated by iGames or Chex on the Closing Date of the Agreement in the gaming industry.

The no-competition obligations of the undersigned contained herein shall survive any termination of the purpose of this Covenant Not to Compete.

This Covenant Not to Compete contains the entire agreement between the parties with respect to the subject matter contained herein and supersedes any previous understandings, commitments or agreements, oral or written.

The provisions of this Covenant Not to Compete shall inure to the benefit of and be binding upon the parties and their respective representatives, affiliates, subsidiaries, successors and assigns.

This Covenant Not to Compete shall be governed by and construed in accordance with the laws of the State of Delaware without regard to its principles of conflicts of laws. Any action, suit or proceeding arising out of, based on, or in connection with this Covenant Not to Compete, any document relating hereto or delivered in connection with the transactions contemplated hereby, any breach of this Covenant Not to Compete or such documents, may be brought only in the state courts of the State of Minnesota, or in the United States District Court for the District of Minnesota.

Since·a breach of the provisions of this Covenant Not to Compete could not adequately be compensated by money damages, any party shall be entitled, in addition to any other right or remedy available to him or to it, to an injunction restraining such breach or threatened breach and to specific performance of any such provision of this Covenant Not to Compete and, in either case, no bond or other security shall be required in connection therewith, and the parties hereby consent to the issuance of such an injunction and to the ordering of specific performance.

Each of the parties to this Covenant Not to Compete represents and warrants that (i) it has all requisite power and authority to execute, deliver and perform this Covenant Not to Compete and all necessary corporate proceedings have been duly taken in this regard; and (ii) this Covenant Not to Compete has been duly authorized, executed and delivered by such party and it constitutes the legal, valid and binding obligation of such party and is enforceable against it in accordance with its terms.

This Covenant Not to Compete may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one agreement.


Dated:_____.

_____
[Name of Individual]

## IRREVOCABLE PROXY

## iGAMES ENTERTAINMENT, INC.
### [TO BE EXECUTED BY HENRY FONG, EQUITEX, INC. AND TRUSTEE OF MIRVISS ESTATE]

The undersigned, _____ ("Grantee"), agrees to, and hereby grants to Christopher M. Wolfington ("Wolfington"), an irrevocable proxy pursuant to the provisions the Corporations, Partnerships and Associations Law of the State of Nevada to vote, or to execute and deliver written consents or otherwise act with respect to, all shares of capital stock (the "Stock") of iGames Entertainment, Inc. (the "Company") now owned or hereafter acquired by Grantee, to the same extent and with the same effect as Grantee might or could do under any applicable laws or regulations governing the rights and powers of stockholders of a Nevada corporation, provided that, if Grantee delivers an opinion of counsel reasonably acceptable to Wolfington that a grant of this proxy with respect to a particular matter violates any applicable laws or regulations, then this proxy shall not apply to such matter solely to the extent that such legal opinion states that such grant would be a violation. Grantee hereby affirms that this proxy is coupled with an interest and is irrevocable. It is further understood by Grantee that this proxy may be exercised by Wolfington anytime after the date hereof and until such time as Grantee no longer owns any outstanding stock of the Company provided that such period of time may not exceed seven (7) years from the date hereof.

Dated this _____ day of _____, 2003.

By:_____
    Name:  Henry Fong
    Title:

EQUITEX, INC.

By:_____
    Name:
    Title:

By:_____
    Name:
    Title:  Trustee of Mirviss Estate

Address for Notices:

[              ]
Telephone:
Facsimile: