IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| iGAMES ENTERTAINMENT, INC., | : | |
| Plaintiff, | : | C.A. No. 04-180 (KAJ) |
| v. | : | |
| CHEX SERVICES, INC. and EQUITEX, INC., | : | |
| | : | JURY TRIAL DEMANDED |
| Defendants. | : | |

# Appendix of Exhibits To iGames Entertainment, Inc's Motion For Summary Judgement

# Exhibit B

1

1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF DELAWARE
2

                              - - -

3    iGAMES ENTERTAINMENT, INC.   :    C.A. NO. 04-180-KAJ
4          vs.                    :
5    CHEX SERVICES, INC. and      :

     EQUITEX, INC.

6                              - - -

                              - - -

7    EQUITEX, INC. and CHEX       :    C.A. NO. 04-256-KAJ
     SERVICES, INC., d/b/a
8    FASTFUNDS                    :
9          vs.                    :
10   iGAMES ENTERTAINMENT, INC.   :
                              - - -

11                             - - -

     CHEX SERVICES, INC., d/b/a   :    C.A. NO. 04-0885-KAJ
12   FASTFUNDS
                                  :
13         vs.
                                  :
14   iGAMES ENTERTAINMENT, INC.
                              - - -

15
                       September 17, 2004
16
17              Oral deposition of IJAZ ANWAR, taken
     pursuant to notice, was held in the law offices of
18   DUANE MORRIS, LLP, One Liberty Place, 39th Floor,
     Philadelphia, Pennsylvania 19103, commencing at
19   9:15 a.m., on the above date, before Joshua Lieberman,
     a Federally Approved Registered Professional Reporter
20   and Notary Public in and for the Commonwealth of
     Pennsylvania.
21
22              ESQUIRE REPORTING SERVICES
                        15th Floor
23              1835 John F. Kennedy Boulevard
                Philadelphia, Pennsylvania 19103
24                    (215) 988-9191

Ijaz Anwar

---

70

1  accounting software called Great Plains.
2      Q.    Could you just take me through
3  your promotions and different titles.
4      A.    I don't know the exact dates,
5  but I've been very fortunate. I was very
6  fortunate in getting promoted. I became a senior
7  accountant. That was my first position from the
8  data entry or coming in as a temp. I don't know
9  the dates exactly.
10     Q.    That's fine.
11     A.    And then I was promoted to
12 controller, and then I was promoted to the
13 treasurer and then once we went public or we were
14 acquired by Equitex in 2001, I was promoted as a
15 CFO. At the hotel chain in Dubai, I was the
16 controller there.
17     Q.    And you were a CFO for Equitex
18 beginning --
19     A.    For Chex.
20     Q.    -- for Chex beginning in 2001?
21     A.    No, we were acquired in December,
22 2001. I think sometime in 2002, March or April.
23     Q.    And then have you had any
24 promotions since that time or change in your

---

71

1  position?
2      A.    Yes. Once a reverse merger took
3  place, a reverse merger took place in March or
4  June of this year, I was given the additional
5  responsibility of operations in addition to
6  finance. So I'm currently the CFO and COO of
7  FastFunds Financial Corporation.
8      Q.    FastFunds Financial Corporation.
9          And before May or June of 2004,
10     you were CFO of Chex Services, Inc.
11     doing business as FastFunds?
12     A.    That is correct.
13     Q.    You are now CFO and COO of what?
14     A.    FastFunds Financial Corporation
15 and subsidiary Chex Services.
16     Q.    Prior to June, 2004, when you
17 were working for Chex, what did your paycheck
18 say? Just the name of the entity that paid you.
19     A.    Chex Services, Inc.
20     Q.    Have you ever gone by any other
21 names other than Ijaz Anwar?
22     A.    No.
23     Q.    What were your responsibilities
24 as CFO of Chex?

---

72

1      A.    I was responsible for all the
2  financial operations of Chex Services as well as
3  I participated in the various transactions that
4  Equitex was involved in on behalf of Chex or Chex
5  was involved in on behalf of Equitex.
6      Q.    When did you first meet Chris
7  Wolfington?
8      A.    When was the first time I met
9  Chris Wolfington? I think I met Chris Wolfington
10 for the first time during 2001 prior to the
11 acquisition of Chex Services by Equitex. I
12 think.
13     Q.    And do you remember like under
14 what circumstances did you meet him?
15     A.    I clearly remember. I don't
16 remember the date. Don't quote me on the date,
17 please. I remember he and Jake Koldus came in
18 with bright yellow, orange T-shirts and they were
19 wearing khaki slacks. So they were very slick
20 looking individuals. So that still stays in my
21 mind.
22     Q.    Was that some kind of event?
23     A.    I was senior accountant. I was
24 nobody, so they just passed by and shook our

---

73

1  hands and that's it. So that was the first
2  encounter with Mr. Wolfington.
3      Q.    Have you gotten to know Mr.
4  Wolfington over the past few years?
5      A.    Yes.
6      Q.    Have you worked on different
7  various business transactions with him?
8      A.    One business transaction, various
9  business issues, yes.
10     Q.    In the past, have your companies
11 worked together where you shared staff, like COOs
12 shared receivables and things like that?
13     A.    We managed some contracts for
14 MCA. And MCA, being a private entity, was owned
15 by Chris Wolfington.
16     Q.    Did you at one point share some
17 technical people, some IT people, both Chex and
18 MCA?
19     A.    We did various projects together.
20 I'm sure we shared employees back and forth. We
21 were managing contracts on behalf of MCA. So we
22 may have helped them and they may have helped us.
23     Q.    Has Chris Wolfington always
24 operated with integrity, as far as you're

---

19 (Pages 70 to 73)

Ijaz Anwar

74

1  concerned?
2      A.   Yes.
3      Q.   Has he ever lied to you?
4      A.   Not to my knowledge.
5          MR. BEAUSOLEIL: This is going to
6      be iGames-2.
7          (Whereupon an e-mail consisting
8      of three pages dated March 19, 2004, was
9      marked as iGames-2)
10  BY THE WITNESS:
11     Q.   Having worked with Chris over the
12  years and having done projects, as you said,
13  together, do you think Chris would have knowingly
14  breached an agreement?
15         MR. PORETTI: Objection.
16     Speculation.
17  BY MR. BEAUSOLEIL:
18     Q.   Such as the Note or the stock
19  purchase agreement?
20         MR. PORETTI: Objection. It calls
21     for speculation.
22     A.   I would not answer that. I can't
23  answer that question.
24     Q.   Do you think -- do you personally

75

1  believe that Chris would knowingly breach -- in
2  this instance we've talking about the Note and
3  that the payment was due. Do you think Chris
4  knowingly failed to make a payment on that Note?
5          MR. PORETTI: Objection. It calls
6      for speculation.
7  BY MR. BEAUSOLEIL:
8      Q.   You can answer the question just
9  based on your own knowledge and your own beliefs.
10     A.   It calls for speculation.
11     Q.   No, no, that's not a fair
12  objection. He could put that on the record and
13  preserve it, but you have to answer that.
14         MR. PORETTI: I think it is a fair
15     answer. You're asking him to testify
16     the state of mind of Mr. Wolfington. He
17     has no basis for doing that. In fact,
18     his answer is his answer.
19  BY MR. BEAUSOLEIL:
20     Q.   I asked you if you personally
21  believe that Chris Wolfington would knowingly
22  fail to make a payment on that Note?
23         MR. PORETTI: The same objection.
24     A.   I personally cannot answer that

76

1  question. I don't know what Chris Wolfington
2  would do under these circumstances.
3      Q.   Well, you know what he did under
4  these circumstances. You were communicating with
5  him. Do you believe if you had asked him for the
6  payment or told him you believed a payment was
7  due and that if the payment was Note made, he
8  would be in breach, he would have made the
9  payment?
10         MR. PORETTI: Objection. It calls
11     for speculation.
12     A.   I cannot answer that question.
13     Q.   Do you agree that you didn't give
14  him that opportunity?
15     A.   I think the Note itself clearly
16  states when the payment is due.
17     Q.   Well, you say it clear states
18  when the payment is due and you haven't told me
19  yet what you thought it was due.
20     A.   I can talk about the Note, not
21  what Chris Wolfington should have or would have
22  done. The note clearly states when the payment
23  is due and if you comply with the Note.
24     Q.   You told me that Mr. Welbourn

77

1  raised an issue?
2      A.   With me.
3      Q.   With you. If you followed
4  through with Chris Wolfington and told him you
5  believed an amount was due and if he failed to
6  make it, he would be in breach, do you believe he
7  would have made that payment based on your past
8  experiences with him?
9          MR. PORETTI: Objection. It calls
10     for speculation. Lack of foundation.
11     A.   Again I would refer back to the
12  Note which clearly states when the payment is
13  due.
14     Q.   Well, that's a legal issue.
15  We're going to have judges look at that. We're
16  going to have a jury look at that. I'm going to
17  look at it, your lawyer is going to look at it.
18  I don't need to look at the Note.
19         I'm asking you, this is my
20     opportunity to ask you what you believe,
21     what you know, what you may have heard.
22     There's all kinds of ranges of
23     testimony. You just have to be clear
24     with where it's coming from.

20   (Pages 74 to 77)

Ijaz Anwar

102

1 know the dates. I don't remember the dates.
2 **Q.    The first weekend of 2004?**
3 A.    Yes, I believe.
4 **Q.    That's when the termination took**
5 **place?**
6 A.    We exited or we were asked to
7 leave or we discontinued our services, I think,
8 on the first Monday of 2004.
9 **Q.    And how long --**
10 A.    So I think if you backtrack from
11 there during the weekend, yes. late Friday I was
12 in the office. I don't know if that late Friday
13 was 2003 or 2004. But late Friday I was in the
14 office and then we received a termination letter
15 from Seminal. It was faxed over to us and I was
16 in the office and I received that letter.
17 **Q.    That's when you first learned,**
18 **through that fax?**
19 A.    Yes.
20 **Q.    Did you have any warning ahead of**
21 **that fax?**
22 A.    No.
23 **Q.    Did you know there were problems**
24 **before you got that fax?**

103

1 A.    No, we did not know of any
2 problems prior to that fax. I do not recall
3 knowing of any problems before that fax.
4 **Q.    In that contract --**
5 A.    Seminal?
6 **Q.    Seminal contract, yes, were there**
7 **like five casinos that you provided cash services**
8 **for?**
9 A.    Yes, that is correct.
10 **Q.    Did you have to pay commissions**
11 **back to the tribe?**
12 A.    We paid commission to the tribe
13 as well as NACS and NACSF.
14 **Q.    How did you determine the**
15 **commissions?**
16 A.    I don't recall the calculations.
17 I know the NACS and NACSF commissions were a net-
18 based portion of the net profit and the tribe's
19 commission were a percentage of gross revenue.
20 **Q.    And what information would you**
21 **need from the casino or from the booths in order**
22 **to calculate the commission?**
23 A.    It's an accumulation of a lot of
24 information to tabulate or construct the

104

1 financial statements and provide the correct
2 amounts to both the tribe and NACS and NACSF. So
3 it's various information.
4 **Q.    Well, for checks cashed in**
5 **January, how long would it take you to collect**
6 **the information and calculate the commission paid**
7 **and credited to the tribe?**
8 A.    We attempted to pay by the 25th
9 of the following month.
10 A.    Were you always successful?
11 A.    No, we were sometimes not
12 successful. Sometimes we paid ahead of time.
13 Sometimes we paid on the 25th.
14 **Q.    What portion of Chex's revenues**
15 **did the Seminal contracts represent?**
16 A.    As I recall, I believe it was
17 twenty-two-and-a-half percent.
18 **Q.    Would you agree that that's a**
19 **significant portion of Chex's revenues?**
20 A.    Yes, I would agree with that.
21 **Q.    What was the reaction by the**
22 **public over the announcement that you were**
23 **terminated from those contracts?**
24 A.    When you say "public," could you

105

1 just define exactly who you're referring to.
2 **Q.    Well, we could start with the**
3 **industry, people in the industry. What kind of**
4 **feedback, what kind of reaction did you get?**
5 A.    Because I'm on the financial
6 side, I'm not that involved on the day to day
7 interaction from the industry as such. So I
8 can't really comment on the industry side. To my
9 knowledge, I can't recall any positive or
10 negative comment from the industry side.
11 **Q.    Well, you wouldn't expect any**
12 **positive comment, would you?**
13 A.    Any comment, yes.
14 **Q.    You would not expect positive**
15 **comments from that termination, would you?**
16 A.    Yes. Well, you could expect a
17 positive comment if somebody does not like
18 Seminal tribe and you leave the financial
19 services at Seminal, they would be happy at
20 another tribe.
21 **Q.    Did that happen, to your**
22 **knowledge?**
23 A.    Again I'm not involved on the
24 industry side.

27 (Pages 102 to 105)

114

1  Fong?
2      A.    Let me think about that, please.
3  I believe so, yes.
4      Q.    As a managing officer of Chex, as
5  part of the management team of Chex, you
6  understand how investors and the public would
7  react to a significant loss of income or loss
8  like in this case of five casinos at the same
9  time, correct?
10     A.    Generally the market place, yes.
11 Intimately on the Equitex side, no, I would not
12 have knowledge as to how the shareholders of
13 Equitex would directly react.
14     Q.    Well, at the time iGames was
15 acquiring Chex, it was supposed to be a good deal
16 for iGames. It was supposed to be actually for
17 both companies, but it was going to make --
18 iGames was probably traded and it was going to
19 help. They were going to grow in the market and
20 the two companies would be, the two would be
21 better than, two together would be better than
22 two independent companies, correct?
23     A.    That is correct.
24     Q.    You expected some synergies?

115

1      A.    Yes.
2      Q.    So when iGames was in the middle
3  of acquiring Chex and Chex lost 22.5 percent of
4  their operating income was it?
5      A.    Revenue.
6      Q.    Revenue, wouldn't you expect a
7  negative reaction by the public and by the
8  investors in iGames to that news?
9          MR. PORETTI: Objection. It calls
10     for speculation.
11     A.    I don't know the shareholders of
12 iGames. Generally speaking, yes, in the
13 marketplace if a negative event takes place, yes.
14     Q.    Didn't you initiate litigation
15 and claim all those things, for instance, that
16 the termination was going to harm Chex's
17 reputation, irreparably harm their reputation?
18     A.    Which litigation are you
19 referring to?
20     Q.    Against Cash Systems.
21     A.    I'm not intimately involved. I
22 would have to look at the documents if that is
23 one of the claims.
24     Q.    Was that a concern of management

116

1  at the time?
2      A.    Could you repeat that? What
3  concern?
4      Q.    Was the reputation of Chex
5  Services -- was the harm that the loss of those
6  casino to Chex Services -- let me try to figure
7  out my question, sorry.
8          Was the harm to Chex's reputation
9          that resulted from the loss of those
10         casinos a concern to the management of
11         Chex?
12     A.    Yes.
13     Q.    Therefore, wouldn't you expect it
14 was also a concern to iGames?
15     A.    I can't speak on behalf of
16 iGames.
17     Q.    Well, I'm not asking you in all
18 these questions to speak on behalf of iGames.
19 I'm asking you whether you believed it, from your
20 personal experience, believed it was a problem or
21 whether, as part of the management team and part
22 of the person on these e-mails and being included
23 in discussions and board meetings, you learned
24 that yes, it was a problem either for both Chex

117

1  and for iGames?
2      A.    I don't know if it was a problem
3  for iGames. If I was in iGames' shoes, I would
4  be concerned.
5      Q.    And you immediately took legal
6  action because of that loss and you also took
7  internal cost cutting action, correct?
8      A.    We initiated legal action, yes.
9      Q.    You also cut costs in various
10 ways to make up for that loss?
11     A.    That is correct.
12     Q.    If I wrote a check in one of your
13 casinos, if I wanted to cash a hundred dollars,
14 how much would I have to write the check for?
15     A.    The average fee, I believe it's
16 six dollars, six percent.
17     Q.    So if I wanted to cash a hundred
18 dollars, I'd write a $106 check?
19     A.    That is correct.
20     Q.    And if I cashed a $106 check with
21 one of Chex's or FastFunds' booths in September,
22 2003, it bounced, how would you handle it in your
23 accounting?
24     A.    If the check bounced for $107, we

Ijaz Anwar

118

1  would write off that check or expense it in our
2  financial statement.
3      Q.    So if I wrote a check for -- is
4  it 107 or 106?
5      A.    Sorry? 106.
6      Q.    We'll just use that.  So if I
7  wrote a check September 1st, 2003, for $106, how
8  long would it take before you knew it bounced if
9  I wrote a bad check?
10     A.    It depends on the location.  If
11  you have electronic versus manual, most of them
12  are electronic, so I would say within 48 hours.
13     Q.    So within 48 hours -- so within
14  the month of September, if I wrote it September
15  1st, you're going to know it's no good?
16     A.    That is correct.
17     Q.    How then would that be accounted
18  for?  You said you would write it off?
19     A.    Hm-hmm.
20     Q.    Where would that get written off?
21  Would that be when you reconciled the books late
22  in the following month, like the 25th of the
23  following month?
24     A.    Yes.  Basically when it actually

119

1  gets wherein off by the 25th or the 15th,
2  depending on where we are on closing the
3  financial statements for that particular month,
4  you get the bank statement and you actually see
5  the debit in your bank statement and then you
6  write it off in your bank statement, through your
7  bank statement in your financials.
8      Q.    I asked you September 1, 2003,
9  because you're explaining to me under the
10  policies and procedures you had a place at that
11  time, correct?
12     A.    That is correct.
13     Q.    Did you understand?
14     A.    Yes.
15     Q.    What amount would you write off
16  the following month as you explained?
17     A.    Well, the debit, whatever the
18  amount of the debit is in the bank statement.  So
19  if the check was 106 and it bounced or came back
20  as NSF, we would have to expense $106.
21     Q.    Would you then send that check to
22  collections or how would you handle that check?
23     A.    It depends.  Typically the check
24  would go back to operations.  They would try to

120

1  collect it for forty-five days.  And if they're
2  unsuccessful, it would go back to collection.  It
3  would go to the in-house collection.
4      Q.    I'm sorry, who would get it?
5      A.    So when the check becomes bad, so
6  Let's differentiate between when it gets written
7  off versus when the information comes.
8      Q.    September 1, 2003, I'll give you
9  a pen if you want to visualize it, September 1,
10  2003, I write the check; within a day so, by
11  September 3rd, you know it's insufficient funds?
12     A.    If it is electronic, we will know
13  within forty-eight hours.  Electronically it is
14  insufficient funds.  Then the physical check would
15  probably arrive within twenty-four to forty-eight
16  hours after that.
17     Q.    Okay.
18     A.    Once the check arrives, it is
19  given to the operations or people at the booth or
20  the Financial Service Center to collect the check
21  for forty-five days, and if they're unsuccessful,
22  the check would go to collections.  There are
23  also exceptions.
24     Q.    That was the policy and procedure

121

1  in place in September, 2003, correct?
2      A.    That is correct.
3      Q.    And what would happen if you did
4  ultimately collect it; how would you account for
5  it?
6      A.    If you ultimately collected, it
7  would go back as collection revenue.  When you
8  expense it, it's bad check expense, and when you
9  collect it, it's collection revenue.
10     Q.    That accounting procedure was in
11  place last year?
12     A.    That is correct.  Can I get some
13  water, please?
14     Q.    Sure.
15         MR. BEAUSOLEIL:  Let's take a
16  five-minute break.
17         (Whereupon a comfort recess
18  was taken at 11:45 a.m.)
19         (Whereupon the deposition resumed
20  at 11:56 a.m.)
21  BY MR. BEAUSOLEIL:
22     Q.    What I didn't ask you was did you
23  ever -- are you a certified CPA?
24     A.    I've passed the CPA exam.  I

31 (Pages 118 to 121)

Ijaz Anwar

122

1  don't have a CPA valid license.
2      Q.    Have you ever had one?
3      A.    No. I did not go into public
4  accounting.
5      Q.    So after you graduated college,
6  you then sat for the CPA exam?
7      A.    That is correct.
8      Q.    Have you gone to anymore
9  education, any continuing education?
10     A.    Yes, I regularly take continuing
11  education classes and seminars just to keep up
12  with what's going on.
13     Q.    Is that in a particular field?
14     A.    Accounting financing.
15     Q.    Have you worked on any graduate
16  degrees or anything?
17     A.    No, I have not.
18     Q.    Do you have a company, like a
19  written policy or procedure in place as to how to
20  handle bad checks?
21     A.    From operations or finance
22  perspective?
23     Q.    I guess both.
24     A.    Operations we do. Finance we

123

1  don't, or accounting side we don't. Operations
2  we do.
3      Q.    So the operations, you're talking
4  about people in the cash booth?
5      A.    Yes, how the process of
6  collecting the check works.
7      Q.    Do you know generally what they
8  cover?
9      A.    As we discussed earlier.
10     Q.    Forty-five days?
11     A.    Forty-five days.
12     Q.    Basically keeping them from
13  violating any collection laws?
14     A.    We deal with first-party
15  collections, so the collection laws don't really
16  apply to first-party collection because we're
17  collecting checks which are written to us
18  directly.
19     Q.    But you do not have written
20  policies and procedures in the finance part of
21  it?
22     A.    That is correct.
23     Q.    So who sets those -- who
24  determines what the practice will be, is that

124

1  you?
2      A.    That would be the auditors who
3  determine that.
4      Q.    You mean outside auditors?
5      A.    Yes, independent auditors.
6      Q.    Do you have any role in that?
7      A.    Setting the policies and
8  procedures from the audit side of accounting, no.
9  They advise us on what the GAAP requirements are
10  for.
11     Q.    G-A-A-P?
12     A.    G-A-A-P.
13     Q.    How many times in your career
14  have you accepted a Note from a customer who
15  wrote a bad check?
16     A.    From a customer, I don't recall.
17  The Howard LeRoy and Pauline Howard would be in
18  my memory the first customer.
19     Q.    Where Chex ever took a Note and
20  exchanged it for bad checks?
21     A.    That is correct.
22     Q.    Has any one customer ever written
23  more than six hundred thousand dollars in bad
24  checks other than the Howards?

125

1      A.    Well, you would have to -- over a
2  period of time or a week or a day?
3      Q.    Is it my understanding that they
4  wrote six hundred thousand dollars in bad checks
5  in one month?
6      A.    That is correct.
7      Q.    Has any other customer ever done
8  that?
9      A.    I would have to go back and look
10  at the transaction history to determine that.
11     Q.    Are you saying it's possible that
12  in the years you worked at Chex, that some other
13  customer wrote six hundred thousand in bad checks
14  in one month?
15     A.    In bad checks? No. Checks, yes,
16  there's a possibility. I would have to go and
17  looking. Bad checks from one customer for six
18  hundred thousand dollars, no.
19     Q.    And would it be fair to say Chex
20  has never received, other than with the Howards,
21  over a hundred thousand of bad checks from one
22  customer in one month, a hundred thousand
23  dollars?
24     A.    I would not be able to answer

32 (Pages 122 to 125)

Ijaz Anwar

126

1  that question without going back and looking in
2  the data base or the history.
3      Q.    Well, this is the only customer
4  who ever wrote six hundred or more in bad checks;
5  is that right?
6      A.    That is correct.
7      Q.    In one month?
8      A.    Yes.
9      Q.    Are there any other incidents
10 that stick out in your mind, any other
11 significant amounts where one customer wrote that
12 many bad checks in one month?
13     A.    In the range of six hundred?
14     Q.    Well, any item, whether it was
15 two hundred, whether it was three hundred, but
16 any significant number other than this six
17 hundred.
18     A.    Yes. A significant number, well,
19 I guess it depends how you define "significant."
20 To my memory, you know, ten thousand, fifteen
21 thousand is what I remember the maximum amounts
22 from a particular customer sitting right here
23 today.
24     Q.    And the maximum amount that a

127

1  particular customer wrote in a month?
2      A.    No, that went bad.
3      Q.    That went bad?
4      A.    Yes.
5      Q.    So it could have been over a
6  couple months?
7      A.    Yes.
8      Q.    Before you caught it kind of
9  thing?
10     A.    Yes.
11     Q.    When did you first learn that the
12 Howards had written six hundred -- I think my
13 understanding is it's $606,316; does that sound
14 right to you?
15     A.    Yes, it's in the range of six
16 hundred thousand dollars.
17     Q.    So when did you first learn that
18 the Howards had written over six hundred thousand
19 dollars in bad checks?
20     A.    I don't remember the exact date.
21 If they were written during the month of
22 September, I would have found out immediately a
23 few days after that they wrote it.
24     Q.    As we went through the time line

128

1  before, what's the longest it would have taken
2  you to find out if they were manual checks?
3      A.    A material amount like this?
4      Q.    Yes.
5      A.    Within a week.  Maximum, a week.
6      Q.    Okay.  So within a week of them
7  writing checks, you're confident you knew about
8  it?
9      A.    Yes.
10     Q.    Do you know if the checks were
11 written in August or September?
12     A.    I don't.  I don't know that
13 sitting here right now.
14     Q.    Do you know how long after
15 learning about it you got a Note from the
16 Howards?
17     A.    You would have to look at the
18 date of the Note.  I don't know what the date of
19 the Note is.  Well, I don't know.  I can't answer
20 that question, either.  I don't remember the
21 dates.
22     Q.    I'll show you the Note in a
23 minute, but I wanted to see in your mind if you
24 could remember a time frame.  Was it within a

129

1  week, two weeks?
2      A.    No, the Note was executed not
3  within a week or two weeks.  It was executed
4  longer than that.  I don't know exactly when.
5      Q.    Was it executed within a month of
6  you finding out or more?
7      A.    You know, I would have to -- I
8  don't know.  I'm sorry.
9      Q.    How could we find out?  Would you
10 still have the cancelled checks or something like
11 that?
12     A.    The cancelled checks, we have the
13 cancelled checks and I believe we have presented
14 all the communication and documentation with the
15 Howards as well.  So we should be able to
16 determine from those documents.
17     Q.    How did the six hundred thousand
18 in bad checks come to your attention?
19     A.    How did it come to our attention?
20 We received a record from a vendor we used called
21 Solutran, S-O-L-U-T-R-A-N, and it was an
22 electronic report informing us of the bad checks
23 coming back.
24     MR. BEAUSOLEIL:  Would you mark

33 (Pages 126 to 129)

130

1    that as a request. (Speaking to the
2    court reporter)
3    BY MR. BEAUSOLEIL:
4        Q.    Can you just spell it for me?
5        A.    S-O-L-U-T-R-A-N.
6        Q.    Did it take a little while to
7    negotiate the Note with the Howards?
8        A.    Yes.
9        Q.    What first happened when you
10    learned from Solutran that this had happened,
11    that somebody had written six hundred thousand in
12    bad checks?  What was your next step; what did
13    you do?
14        A.    Well, the very first thing we did
15    was we called Solutran and said, "Have you made a
16    mistake in the report?"  And eventually after a
17    few days the check copies were mailed which
18    reverified what had happened.  We communicated to
19    the operations; asked them exactly what happened,
20    and there was a breakdown in the operating
21    policies and procedures.
22        Does that answer your question?
23        Q.    Yes. Do you know how many checks?
24    Can you give me a ballpark?

131

1        A.    Yes.  I think the average check
2    is $7,800 each.  So you can take the 601 divided
3    by 7,800.  It's in that range.
4        Q.    Was disciplinary action taken
5    against any employee because of this?
6        A.    Yes, employees were written up,
7    and one of the directors was demoted.
8        Q.    Who is this?
9        A.    Pam Houle, H-O-U-L-E.  Not solely
10    for this, but an accumulation of events,
11    including what happened at Seminal, from being a
12    director to a lower position in management.  So
13    there was some action taken.
14        Q.    Do you know who was written up?
15        A.    I don't remember.  I don't recall
16    the names of the employees that were written up.
17        Q.    All the disciplinary actions were
18    directed towards people in the casino level?
19        A.    Operations.
20        Q.    Where were the checks written,
21    what casinos?
22        A.    Casino Hollywood for sure and I
23    think the other one -- that's Seminal Casino
24    Hollywood, and I believe the other casino was

132

1    Tampa. I think so.  I'm not sure.
2        Q.    Was that one of the reasons cited
3    by Seminal Tribe for you losing the contracts
4    there?
5        A.    I do not recall that being the
6    reason.
7        Q.    Did that become an issue?
8        A.    With the tribe, no.
9        Q.    Did it affect your relationship
10    with -- did that incident affect your
11    relationship with the tribe?
12        A.    No.
13        Q.    When did Chex first notify iGames
14    about this bad debt?
15        A.    I believe iGames found out
16    through the SEC filings about this incident.
17        Q.    When?
18        A.    I do not exactly remember when.
19        Q.    Would it have been around January
20    27, 2004?
21        A.    The September "Q" was due in
22    November.
23        Q.    What does it become public?
24        A.    Well, it depends if you file

133

1    timely or take an extension.  So I don't know
2    exactly if he filed an extension for the
3    September "Q."  So I can't exactly answer you
4    when was this filed and made public.
5        Q.    Well, generally, you said it was
6    due in November.  Do you know what part of
7    November?
8        A. . By the middle of November.
9        Q.    November 15th; is that right?
10        A.    Yes.
11        Q.    And then you could get an
12    extension, though, beyond that date?
13        A.    Yes, ten working days.
14        Q.    So if it actually was filed by
15    November 15th, when would it become publicly
16    available?
17        A.    Immediately.
18        Q.    What was your next step?  You
19    said that you first took action at the booth
20    level to find out what went wrong.
21        A.    I didn't take action.  The
22    operations.
23        Q.    As part of the management team
24    took action?

34 (Pages 130 to 133)

Ijaz Anwar

134

1    A.    That's correct, yes.
2    Q.    What was the next step reacting
3  to this bad debt?
4    A.    The next step, as I recall, was
5  getting in touch with the Howards and asking them
6  exactly what happened and how can we resolve this
7  issue.
8    Q.    Normally the people in the booth
9  would have handled it for forty-five days,
10  correct?
11    A.    That is correct.
12    Q.    But in this case you took it
13  over?
14    A.    That is correct.
15    Q.    Is that because this was such a
16  significant debt?
17    A.    It was materially high, yes.
18    Q.    And how did your conversations
19  with the Howards go?
20    A.    It went well initially. They
21  were willing to give us a mortgage on their three
22  properties and they immediately initiated the
23  process of refinancing the properties to pay back
24  the debt. And we actually took over the process

135

1  of refinancing, also. So we controlled the
2  process of refinancing their properties.
3    Q.    You said they agreed to give you
4  a Note and to give you a mortgage and you were
5  involved in the refinancing process?
6    A.    Yes.
7    Q.    We'll go through the documents.
8          Did you investigate whether they
9          cashed those checks as part of some kind
10          of scheme, criminal scheme?
11    A.    We did some analytical checks
12  with the casino. What we were concerned with was
13  did they really play the money at the casino or
14  did they just take the cash and not do anything
15  with it. So that's a step we took. The casino
16  was not able to determine, based on the volume
17  that they do, and this did not happen on one
18  particular day. It was over a few days, and I
19  don't remember exactly how many. So they weren't
20  able to determine was the money actually played
21  in the casino or was it just taken out.
22    Q.    Were these checks written within
23  a few days of each other?
24    A.    Yes, they were not on one

136

1  particular day. They were over a few days.
2    Q.    It wasn't more than a week, was
3  it?
4    A.    No. And again, once we get the
5  checks, we can determine the dates.
6    Q.    Who has the cancelled checks?
7    A.    It's there in my possession.
8    Q.    Did you turn or consult with the
9  local police or any authorities concerning this?
10    A.    We consulted attorneys. We
11  consulted attorneys and a determination was made
12  that filing charges would not be the best
13  strategy.
14    Q.    Why?
15    A.    Because based on the consumer
16  protection laws in Florida, you could file
17  charges, but it would go into litigation and
18  collectability, winning a case and collectability
19  is a different issue.
20    Q.    Did you do criminal checks on
21  these people?
22    A.    Did we do criminal checks on
23  these individuals? I do not recall if we did
24  criminal checks.

137

1    Q.    Well, what kind of background,
2  before you took the Note and they promised you
3  mortgages and a refinance, but before you did
4  that, did you do any background checks on the
5  people?
6    A.    We did an asset search, a very
7  extensive asset search on the Howards as a family
8  just to make sure they don't have any other
9  assets.
10    Q.    Did you do that before you took
11  the Note?
12    A.    I don't remember if we did that
13  before or after.
14    Q.    So when you took the Note,
15  searching their background and determining their
16  assets wasn't necessary before you took the Note?
17    A.    I did not understand that
18  question.
19    Q.    Well, before you took the Note,
20  did you think it was important to first see
21  whether these people had assets and whether they
22  had criminal records, particularly in this kind
23  of field of hanging paper?
24    A.    You lost me again. I'm sorry,

35 (Pages 134 to 137)

Ijaz Anwar

138

1  could you please repeat that question?
2      Q.    You took a Note for six hundred
3  thousand dollars?
4      A.    Yes.  Can you tell me what the
5  date of the Note is, if you don't mind?
6      Q.    September 15, 2003, you took the
7  Note.
8      A.    Okay.  But I think the point is
9  this, if I may interrupt, I don't know when we
10 actually executed the Note, but it's dated the
11 15th.  That is directly linked to, I think, your
12 question.
13     Q.    When did you actually negotiate
14 and take the Note?
15     A.    I don't remember that date.
16     Q.    You just need to put it in
17 perspective with other events?
18     A.    Yes. I'm just thinking about it.
19 It was not on September 15th.  It was subsequent
20 to that.
21     Q.    Well, we'll go through some of
22 these documents.  But there was an asset search
23 done like on January 27th.  Was that accomplished
24 before the Note was signed?

139

1      A.    I believe it was after.  I do not
2  recall.
3      Q.    And who decided to date the Note
4  September 15th; who picked that date?
5      A.    I think the determination of
6  September satisfy 5th based on the dates on the
7  checks.  That would have been the logical thing
8  to do.
9      Q.    Whose idea was it?
10     A.    Since I was involved in
11 negotiating the Note with them or working on the
12 Note with them, it would have been my idea.
13     Q.    You said it was the logical
14 thing to do.  Isn't the logical thing to do is to
15 date the Note the day you signed it?
16     A.    No, you sign the Note the date
17 the amount is due.  Rather than the date, you
18 sign it.  So to establish that they owed us money
19 based on bad checks on a certain date, we dated
20 the Note for that particular date.
21     Q.    Did the date on the Note, did you
22 consider at all your transaction with iGames in
23 coming up with this September 15, 2003, date?
24     A.    No, we did not or I did not.

140

1      Q.    Was anyone else involved in the
2  decision to date the Note September 15th?
3      A.    No, not for the dating of the
4  note, no.
5      Q.    You told me before that normally
6  you would immediately write off a check and then
7  begin your collection efforts or during that time
8  begin your Chex efforts.  How did you handle this
9  check on your books, these checks, this six
10 hundred thousand dollars?
11     A.    We basically booked a receivable
12 based on the Note and the collateral that we had.
13     Q.    Go ahead.
14     A.    We call it receivable based on
15 the Note and the collateral that we had to
16 support the valuation of the Note on that
17 particular date.
18     Q.    Well, you said when you do an
19 accounting for that month, you would be doing
20 your accounting in October for the September bad
21 checks, correct?
22     A.    That is correct.
23     Q.    And typically you would write
24 that off?

141

1      A.    That is correct.
2      Q.    And here you said instead of
3  doing that, you put the Note, a receivable in
4  your books?
5      A.    That is correct.
6      Q.    Explain why you did that instead
7  of writing it off.
8      A.    The materiality of the amount
9  based on the consultancy with the management of
10 Equitex as well as the accountants, we made a
11 determination that we had the option of
12 classifying this as a receivable versus writing
13 off the amount on the financial statements.
14     Q.    What purpose would doing that
15 serve?
16     A.    Classifying as a receivable?
17     Q.    Yes.
18     A.    Well, if we have the option to
19 classify that as a receivable, it would obviously
20 reflect less expenses on the financial
21 statements.
22     Q.    Did you do that so that iGames
23 wouldn't realize the problem you had there with
24 the six hundred bad debt?

36 (Pages 138 to 141)

142

1    A.    The overall materiality of the
2  transactions that we do over the course of a
3  particular year, this one particular incident I
4  don't think constitutes material enough to do or
5  classify a transaction in the manner to avoid or
6  be concerned about what the iGames' reaction
7  would be.
8    **Q.    You had no concern about iGames'**
9  **reaction to the $606,000 in bad debt?**
10    A.    When we classified this Note as a
11  receivable, I do not recall our concern was
12  iGames' reaction.
13    **Q.    What about the reaction of your**
14  **investors, was that a concern?**
15    A.    No.  If you look at the overall
16  bad debt expense in our financial statements and
17  compare this amount, our bad debt is around two
18  to three, three-and-a-half million a year.  So I
19  don't think this amount was significantly
20  material to be concerned about the Note holders.
21    **Q.    It was significant enough to**
22  **handle it differently than any other check that**
23  **had ever been handled by you?**
24    A.    True.

143

1    **Q.    But it was not significant enough**
2  **to hide from iGames?**
3    A.    When we classified that as a
4  receivable, the purpose was not to do it because
5  how iGames would react to that particular
6  incident.
7    **Q.    Well, in October you're doing**
8  **your books and you said you didn't write it off,**
9  **you noted it as a receivable?**
10    A.    Hm-hmm.
11    **Q.    But you didn't have a Note at**
12  **that time.  How could you justify marking it as a**
13  **receivable when all you had was discussions with**
14  **the Howards and checks marked NSF?**
15    MR. PORETTI:  Objection.  It
16  assumes facts not in evidence.  It calls
17  for speculation and lacks foundation.
18    MR. BEAUSOLEIL:  Can you read my
19  question again because there's no
20  objection to that question. It's not
21  objectionable.
22    (Whereupon the court reporter
23  read back the last question as follows:)
24    "Question:  But you didn't have a

144

1    Note at that time.  How could you
2  justify marking it as a receivable when
3  all you had was discussions with the
4  Howards and checks marked NSF?"
5    MR. BEAUSOLEIL:  The only change
6  was, I correct myself, it's several
7  checks.
8    MR. PORETTI:  The same objection.
9  I'll also add that I object on the basis
10  that it's vague.
11  BY MR. BEAUSOLEIL:
12    **Q.    You still have to answer.**
13    A.    Could you clarify the question
14  again for me?  I really didn't understand it or
15  break it down, please.
16    **Q.    You told me normally you would**
17  **write a check off, correct?**
18    A.    Yes.
19    **Q.    And in October you're telling me**
20  **you did not write a check off; you did not write**
21  **the six hundred thousand worth of checks off.**
22  **Instead you marked in the books a receivable from**
23  **the Howards?**
24    A.    In September we marked the

145

1  receivable.
2    **Q.    You marked it in September?**
3    A.    Well, in the financial statements
4  is for September.
5    **Q.    You're doing it back for**
6  **September.  You're doing October 1st for**
7  **September.**
8    A.    The checks went bad in September.
9  It is reflected in the financial statements as a
10  receivable in September.  I don't know exactly
11  the date the Note was executed.
12    **Q.    Well, we established it certainly**
13  **wasn't in September, correct?**
14    A.    I believe, yes, that probably is
15  correct, yes.
16    **Q.    My question was then, how, if you**
17  **did not have a Note from the Howards, all you had**
18  **were bad checks, --**
19    A.    In which period?
20    **Q.    For the September period.**
21    A.    Okay.
22    **Q.    -- how could you put in a**
23  **receivable on your books in September when you**
24  **had no Note?**

37 (Pages 142 to 145)

146

1   `A.   The way the accounting GAAP
2   works, if you have established a basis to justify
3   an event in the past, you can classify that Note
4   for that particular date and book a receivable,
5   because the financials for the month of September
6   are not completed anyway until the end of, the
7   middle of October.  And the "Q" especially is
8   filed even later that.  And there's always
9   adjustments from the auditors, and you can go
10  back and rectify things on a particular date from
11  back and do those things.  It was with the
12  consent and the knowledge of the auditors.
13       Q.   Okay.  So you could take your
14  knowledge in October and November, if you end up
15  getting into November, and use that to adjust the
16  books in September, correct?
17       A.   That is correct.
18       Q.   So if you got the Note in October
19  or November and dated it September 15th, you
20  could then go on your books, note a receivable
21  for September because you now have that Note?
22       A.   That is correct.
23       Q.   You also need, in addition to the
24  Note, if they believe that, you could collect on

147

1   that Note?
2       A.   That is correct.
3       Q.   So when you're doing your books
4   for September it's going to be, by the time you
5   complete them, around October 25th or even later,
6   correct?
7       A.   For this particular quarter, it
8   was a "Q" filing, 10-Q filings, so it was even
9   later than October.
10      Q.   It was in November?
11      A.   15th of November or if the
12  extension was filed subsequent to that.
13      Q.   So you're filing at the earliest
14  November 15th, and on that date you need a good
15  faith belief to believe not only that you have a
16  Note but that you could collect the Note?
17      A.   That would be a correct
18  statement.
19      Q.   You said "that would be a correct
20  statement"?
21      A.   A correct statement, yes.
22      Q.   Did you have on November 15,
23  2003, a good faith belief that you could collect
24  six hundred thousand from the Howards?

148

1       A.   Absolutely.  We got valuations
2   from some independent appraisals in giving the
3   initial valuation on the properties, and based on
4   those assessments we were comfortable, so were
5   the auditors, that we could record this as a
6   receivable.
7       Q.   Weren't the Howards in default of
8   the Note a month before November 15th?
9       A.   A month before November 15th?
10  Well, again it depends when the Note was
11  executed.
12      Q.   Okay.  Weren't the Howards in
13  default of the Note as after October 14, 2003?
14      A.   Well, if the Note was not
15  executed on October 14th, we would not know if
16  they were in default.
17           (Whereupon a document entitled
18           Promissory Note dated September 15, 2003,
19           was marked as iGames-3)
20  BY MR. BEAUSOLEIL:
21      Q.   We marked iGames-3.  This is a
22  Promissory Note it says at the top.  Can you look
23  at this document.
24           (Whereupon iGames-3 was

149

1            handed to the witness to peruse)
2            THE WITNESS:  Okay.
3   BY MR. BEAUSOLEIL:
4       Q.   Is that the Note that the Howards
5   signed that we've been discussing?
6       A.   For the record, they're two
7   Notes.  So this is the initial Note the Howards
8   signed.
9       Q.   This is the initial Note that the
10  Howards signed.  And this is dated September 15,
11  2003, correct?
12      A.   That is correct.
13      Q.   This is the Note we've been
14  discussing, correct?
15      A.   I believe so, yes.
16      Q.   So can you give me, looking at
17  that, any estimate of when it was actually
18  signed?
19      A.   I really cannot.  Looking at this
20  document, based on what was going on during 2003,
21  as to what date this Note was executed.
22      Q.   You consider accepting a Note
23  like this in lieu of six hundred thousand dollars
24  worth of bad checks to be in the ordinary course

150

1  of business?
2      A.   Well, ordinary course of
3  business--
4          MR. PORETTI:  I'm going to object
5      to the extent it calls for a legal
6      conclusion, but you go ahead and answer
7      it.
8      A.   A Note like this as in the
9  ordinary course of business, no, it would not be
10 considered in the ordinary course of business.
11     Q.   The Note is dated September 15,
12 2003. In the third paragraph, it says
13 "Notwithstanding anything contained herein to the
14 contrary, on October 14, 2003, the entire
15 outstanding principal balance, together with
16 accrued interest and any other amounts due
17 hereunder, shall be due and payable in full."  Do
18 you know in reading that, does that refresh your
19 recollection as to when the Note was actually
20 signed as opposed to dated?
21     A.   It does not.
22     Q.   It does not?
23     A.   No.
24     Q.   Well, would you agree that as of

151

1  October 14, 2003, the entire outstanding
2  principal balance was not paid?
3      A.   Yes.
4      Q.   Would you agree that they had, in
5  fact, the Howards had, in fact, made zero
6  payments as of October 14, 2003, towards this
7  Note?
8      A.   Yes.
9      Q.   Would you agree, then, that on
10 November 15, 2003, you at that point already knew
11 that the Howards were in default on this Note,
12 had not paid any money?
13         MR. PORETTI:  Objection.  It
14     assumes facts not in evidence.
15     A.   My challenge is I don't know if
16 this Note was signed before November 15th even
17 though it's states the payment was due on October
18 14th.  But if they never signed it on November
19 15th, it's difficult to determine.
20     Q.   So it's possible that you asked
21 them, got them to sign this document after
22 October 14, 2003?  Is that possible?
23     A.   It is possible.  I just don't
24 know the date.

152

1      Q.   And so upon signing it, they
2  became in default of the Note?
3      A.   That would be a correct statement
4  if they read the Note correctly, yes.
5      Q.   Did you do that on purpose?
6      A.   No, I did not do that on purpose.
7      Q.   Did you draft this Note?
8      A.   I believe the attorneys drafted
9  the Note. I did not draft this Note.
10     Q.   What law firm drafted this note?
11     A.   Well, we used two law firms;
12 started with Rider Bennett and also used a law
13 firm out of Florida by the name of, I don't know,
14 you have the documents, Knight.
15     Q.   Holland Knight?
16     A.   Holland Knight.
17     Q.   Whose idea was it to take a Note
18 on this debt?
19     A.   The management collectively
20 discussed and we collectively decided, consulted
21 with the accountants and decided to pursue
22 collectability of the debt through a Note and
23 taking a security interest in the properties.
24     Q.   When did the initial discussion

153

1  take place?
2      A.   I don't know the exact timeframe.
3  Definitely before the 10-Q was filed.
4      Q.   Did Henry Fong or anyone else at
5  Chex or Equitex tell you to bury this debt?
6      A.   Could you define "bury this
7  debt"?
8      Q.   Hide it, paper it.
9      A.   From who?
10     Q.   From investors, stockholders,
11 from iGames, from anyone.
12     A.   It was disclosed in the filings.
13 I don't think anybody buried the debt.  And there
14 was a Note in the 10-Q financial statements
15 clearly disclosing what has taken place.
16     Q.   Clearly disclosing; is that your
17 testimony?
18     A.   Yes, it's in the "Q."
19     Q.   When was it first -- we already
20 asked that.
21         You did not notify iGames about
22     it, correct?
23     A.   That is correct.
24     Q.   They came up; they found it and

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| iGAMES ENTERTAINMENT, INC., | : | |
| Plaintiff, | : | C.A. No. 04-180 (KAJ) |
| v. | : | |
| CHEX SERVICES, INC. and EQUITEX, INC., | : | |
| | : | JURY TRIAL DEMANDED |
| Defendants. | : | |

# Appendix of Exhibits To iGames Entertainment, Inc's Motion For Summary Judgement

# Exhibit C

WLM\206411.1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

- - -

iGAMES ENTERTAINMENT, INC.  :  C.A. NO.
      V.                       :  04-180-KAJ
CHEX SERVICES, INC. and      :
EQUITEX, INC.                :

-------------------------------------------------

EQUITEX, INC. and CHEX       :  C.A. NO.
SERVICES, INC., d/b/a        :  94-256-KAJ
FASTFUNDS                    :
      V.                       :
iGAMES ENTERTINMENT, INC.    :  COPY

-------------------------------------------------

CHEX SERVICES, INC., d/b/a   :  C.A. NO.
FASTFUNDS                    :  04-0885-KAJ
      V.                       :
IGAMES ENTERTAINMENT, INC.   :

- - -

September 22, 2004

- - -

Oral deposition of
CHRISTOPHER WOLFINGTON, held in the
offices of Duane, Morris and Heckscher,
4200 One Liberty Place, 1650 Market
Street, Philadelphia, Pennsylvania 19103
commencing at 10:00 a.m., on the above
date, before Harvey Krauss, a
Federally-Approved Registered
Professional Reporter and a Commissioner
of the Commonwealth of Pennsylvania.

- - -

ESQUIRE DEPOSITION SERVICES
15th Floor
1880 John F. Kennedy Boulevard
Philadelphia, Pennsylvania 19103
(215) 988-9191

CHRISTOPHER WOLFINGTON   .  ..

he had a $500,000 break-up fee if he got
out of the deal, and if I could write
him a letter that would indicate that
this was a higher and better offer for
his shareholders that would help him do
a deal with me and get out and not have
to pay the $500,000 break-up fee because
his only out in his agreement was if he
received an unsolicited higher or better
offer.

    Q.    And --

    A.    And we discussed Credit
Plus in the way that the offer would
have to be structured in order to
accommodate that need.

    Q.    Is there anything untrue in
the July 2nd letter from your
perspective?

    A.    Nothing that comes to mind
immediately, no.

    Q.    When do you believe you had
this conversation with Mr. Fong about
the cash system situation and the
$500,000 termination fee?

CHRISTOPHER WOLFINGTON

MR. TAYLOR: We'll break now for your family thing, which is fine. It's 4:15 and you're leaving at 4:30 anyway.

MR. PORETTI: Yes.

MR. TAYLOR: You can go to 4:30 if you want, but I don't know what you're going to get done in 15 minutes.

MR. PORETTI: Well, we're kind of end point on this particular topic for right now. Well, actually, if you give me five more minutes, I'll touch a few minor bases on the term loan.

MR. TAYLOR: All right.

MR. PORETTI: But if you need to go, because I don't want to rush to interfere with your family.

MR. TAYLOR: No.

BY MR. PORETTI:

Q.     Let me give you back Exhibit 1 the term loan note.

CHRISTOPHER WOLFINGTON

         Did Mr. Anwar at any time
tell you that you, you meaning the
company iGames was now obligated to pay
the interest called for under the term
loan note for any reason?

         A.    Not pay ever?

         Q.    Right.

         A.    Yes.

         Q.    Tell me when that
conversation took place.

         A.    Somewhere between
mid-January -- no, somewhere between --
it had taken place between the end of
January and the end of March or
February, rather.

         Q.    Telephone, in person?

         A.    Telephone.

         Q.    Who called who, do you
recall?

         A.    I don't know.

         Q.    What did Mr. Anwar say to
you that led you to conclude that you
wouldn't have to pay interest?

         A.    We were in the process of

CHRISTOPHER WOLFINGTON

reconciling numerous inter-company payables, receivables.  Our past practices had been to maintain a spreadsheet that he would produce that would show what we owe them, they owe us netted out.  We had done that on numerous occasions with significant amounts of money over the course of God, a year or two prior, and we had dialogue similar to that saying that we would just wait to see how all the numbers shaped up to see who owed what to who.

Q.    Was there any time frame put on when that reconciliation would take place?

A.    No, he didn't know when his people could get around to doing it so I didn't know when they would have the numbers completed.

Q.    In your past practice was that done on a twice a year basis, quarterly, how often did you do the reconciliation?

A.    In the past practices --

C E R T I F I C A T E

I hereby certify that the witness was duly sworn by me and that the deposition is a true record of the testimony given by the witness.

_____

HARVEY KRAUSS

Court Reporter

Dated: October 4, 2004

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying shorthand reporter.)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| iGAMES ENTERTAINMENT, INC., | : | |
| Plaintiff, | : | C.A. No. 04-180 (KAJ) |
| v. | : | |
| CHEX SERVICES, INC. and EQUITEX, INC., | : | |
| | : | JURY TRIAL DEMANDED |
| Defendants. | : | |

# Appendix of Exhibits To iGames Entertainment, Inc's Motion For Summary Judgement

# Exhibit D

DEC 2 8 2004

1              UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF DELAWARE

3                      -    -    -

4    iGAMES ENTERTAINMENT,:   CIVIL ACTION
     INC.,                 :

5              v.          :        **ORIGINAL**
                           :

6    CHEX SERVICES, INC.   :
     and EQUITEX, INC.     :CIVIL ACTION NO.

7                          : C.A. 04-180-KAJ

8                      -    -    -

                  December 15, 2004

9                      -    -    -

                     Volume II

10              Continuation of the oral

11   deposition of IJAZ ANWAR taken pursuant

12   to notice, was held at the law offices of

13   DUANE MORRIS, LLP, 4200 One Liberty

14   Place, 1650 Market Street, Philadelphia,

15   Pennsylvania beginning at 9:56 a.m., on

16   the above date, before Terri L.

17   Ochipinti, a Professional Reporter and

18   Commissioner of Deeds in the Commonwealth

19   of Pennsylvania.

20                      -    -    -

21         ESQUIRE DEPOSITION SERVICES
                    15th Floor

22      1880 John F. Kennedy Boulevard
        Philadelphia, Pennsylvania 19103

23              (215) 988-9191

24

IJAZ ANWAR

1        A.      These are the warrants that

2   were given to -- some where given to

3   Blake Advisors and some were given to

4   White Box and Pandora.  So that's a Black

5   Shore valuation for the warrants.

6        Q.      It also mentions Seven

7   Ventures.  When did you begin -- when

8   were you first contacted -- let me ask

9   you this in a different way.

10              First of all, what is Seven

11  Ventures?

12       A.      Seven Ventures is a shell, a

13  bulletin board shell, so that's what

14  Seven Ventures is.

15       Q.      When did you first become

16  aware of Seven Ventures?

17       A.      I believe sometime during

18  January of 2004.

19       Q.      And how did you become aware

20  of that?

21       A.      We were approached by a

22  representative of -- not a

23  representative, an individual that does

24  deals by name of Mark Savage.  It could

IJAZ ANWAR

1    have been end of December, beginning of

2    January, in that time frame.  So he

3    approached us and said, you know, there's

4    a merchant banking forum that is

5    interested in gaining business and

6    transaction.  Would you be interested in

7    looking into it?  I said, sure.

8         Q.    And was the merchant banker,

9    Maroon Bells?

10        A.    Yes.

11        Q.    I'm going to show you what's

12   he been marked Exhibit 96.

13        A.    Thanks.

14             MR. BEAUSOLEIL:  Do you have

15        that?  It's a prior deposition.

16             MR. ROBBEN:  I'm pretty sure

17        I have it.

18             THE WITNESS:  I got it,

19        thanks.

20   BY MR. BEAUSOLEIL:

21        Q.    Can I see what I handed you?

22        A.    An e-mail from --

23        Q.    And the first e-mail there

24   is from Chris Larson to you?

IJAZ ANWAR

1          Q.        Was White Box told that you

2     were going to terminate the stock

3     purchase agreement before you notified

4     iGames?

5          A.        I don't think we told White

6     Box that.  I don't remember telling White

7     Box that.

8          Q.        Once White Box or -- once

9     iGames was dropped from the term sheets

10    with White Box, was it understood that

11    iGames would not go through -- or was it

12    understood that Chex would not close on

13    the November 3, 2003 stock purchase

14    agreement?

15         A.        I think, yeah, it would be

16    once iGames was dropped, I think it was

17    mutually understood that's why everybody

18    was working on the new merger agreement;

19    that it would be very difficult to close

20    on the signed SPA, yes.

21         Q.        Do you believe that the

22    stock purchase agreement, November 3,

23    2003 agreement was still binding, was

24    still the binding document between

IJAZ ANWAR

1   iGames, Chex and Equitex when you

2   terminated it?

3           A.      Yes.   It was the only

4   binding agreement.

5           Q.      Okay.

6                   (Exhibit 114 marked for

7           identification.)

8   BY MR. BEAUSOLEIL:

9           Q.      Were you still negotiating

10  with Mercantile in February for money?

11          A.      I am quite certain I know I

12  can't pinpoint the date again, but based

13  on the documentation you have, we

14  possibly were.

15          Q.      All right.   Let me hand you

16  Exhibit 114.   Take a look at this and let

17  me know if you have seen it before.

18          A.      (Witness complies).

19          Q.      Have now had a chance to

20  look at Exhibit 114?

21          A.      Yes.

22          Q.      First of all, is Carey the

23  secretary you were trying to think of

24  before, the Blake Advisors assistant or

IJAZ ANWAR

1          Q.     But the first two, the

2   Maroon Bells corporate documents were

3   attached to the document?

4          A.     Yeah.

5          Q.     Those two are attached?

6          A.     Yeah.

7          Q.     And this is dated January

8   15, 2004; is that right?

9          A.     Yes.

10         Q.     And what is this?

11         A.     This is an introductory

12  letter from Chex Services to Maroon Bells

13  Capital, and then confidential evaluation

14  and a mutual loan disclosure agreement to

15  Maroon Bell Capital.  Corporate Capital

16  Management, LLC, as we talked this

17  morning, Mark Savage is with Corporate

18  Capital Management.

19         Q.     Okay.  I'm sorry.  I see

20  that.  What I was looking at is e-mail

21  correspondence to Capital Management,

22  LLC.  What caused you to write this

23  January 15, 2004 letter?

24         A.     When Mark Savage approached

IJAZ ANWAR

1    like any companies that you have been

2    introduced to?

3                A.    I think they are referring

4    -- the first company to is -- first one

5    or the second one, the only company that

6    I'm aware of actually -- two companies

7    can Pay Guard and Pay To, and I think

8    that that's what they're referring to.

9    I'm not certain.  Both out of Europe.

10                Q.    Let me hand you Exhibit 125.

11                (Exhibit 125 marked for

12                identification.)

13   BY MR. BEAUSOLEIL:

14                Q.    Have you seen this document

15   before?

16                A.    From Rick Landry to us.  I

17   do recall receiving this document from

18   Rick Landry.

19                Q.    Okay.  The initial e-mail

20   down below here is from you to Rick

21   Landry at Maroon Bells?

22                A.    Yes.

23                Q.    And you ask him to send you

24   information and he then sends you a list

IJAZ ANWAR

1    discussions I've had with Henry and Jim

2    alluded to that if we have to close and

3    liquidate Equitex that's what we would

4    do.  So I don't think -- I have not heard

5    them taking a position that because of

6    tax consequences we are not going to

7    close on the SPA.  I personally did not

8    hear.

9            Q.      Do you know whether Equitex

10   committed to moving forward on the -- he

11   sorry.  Let me ask you a new question.

12           Do you know when it was

13   finally decided that Equitex would close

14   on the White Box financing?

15           A.      When Equitex decided they

16   would close on the White Box financing?

17   I think after speaking to Chris in

18   January Equitex had the intent to move

19   forward with White Box financing.  I

20   don't -- I can't pin down the exact date

21   of their intent.

22           Q.      Did you participate in the

23   March 3, 2003 board of directors meeting

24   of Equitex which was done via conference

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **iGAMES ENTERTAINMENT, INC.,** | : | |
| Plaintiff, | : | C.A. No. 04-180 (KAJ) |
| v. | : | |
| **CHEX SERVICES, INC.** and **EQUITEX, INC.,** | : | |
| | : | JURY TRIAL DEMANDED |
| Defendants. | : | |

# Appendix of Exhibits To iGames Entertainment, Inc's Motion For Summary Judgement

# Exhibit E

WLM\206411.1

EFiled: Mar 23 2004 4:57PM EST
Filing ID 3309126

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
## IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| EQUITEX, INC. AND CHEX<br>SERVICES INC. D/B/A<br>FASTFUNDS<br>       Plaintiffs | )<br>)<br>)<br>)<br>) | Case No. _____ |
| vs. | )<br>) | NON-ARBITRATION |
| iGAMES ENTERTAINMENT, INC.,<br>       Defendant | )<br>)<br>)<br>)<br>) | |

### EQUITEX, INC. AND CHEX SERVICES, INC. D/B/A FASTFUNDS
### COMPLAINT AGAINST iGAMES ENTERTAINMENT, INC.,
### FOR BREACH OF CONTRACT

Plaintiff Equitex, Inc. ("Equitex") and Plaintiff Chex Services, Inc. d/b/a Fastfunds

("Chex") (collectively "Plaintiffs") for their Complaint against Defendant iGames Entertainment,

Inc. ("Defendant" or "iGames"), state and allege as follows:

### THE PARTIES

1.    Plaintiff Equitex, Inc. is a Delaware corporation with its principal place of business

located at 7315 East Peakview Avenue, Englewood, Colorado 80111.

2.    Plaintiff Chex Services, Inc. d/b/a Fastfunds is a Minnesota corporation with its principal

place of business located at 11100 Wayzata Boulevard, Minnetonka, Minnesota 55305.

3.    Defendant iGames Entertainment, Inc. is a Nevada corporation with its principal place of

business at 700 South Henderson Road, King of Prussia, Pennsylvania 19406.

### JURISDICTION AND VENUE

4.    This Court has subject matter and in personam jurisdiction pursuant to the Stock

Purchase Agreement executed by and between the parties to the above-captioned action.

5.    Plaintiffs and Defendant have consented to the jurisdiction of this Court.

6.    Plaintiffs and Defendant have agreed that venue is proper in this Court.

## FACTS

7.    On or about November 3, 2003, Equitex, Chex and iGames entered into an Agreement wherein iGames agreed to purchase the outstanding capital stock of Chex from Equitex. A copy of the Stock Purchase Agreement ("SPA") is attached hereto as Exhibit "A".

8.    Defendant agreed that the SPA shall be construed according to the laws of the State of Delaware.

9.    Defendant agreed that "Each Party submits to the jurisdiction of any state or federal court sitting in the State of Delaware, New Castle County in any action or Proceeding arising out of or related to this Agreement; agrees that all claims in respect of the action or Proceeding may be heard and determined in any such court; and agrees not to bring any action or Proceeding arising out of or relating to this Agreement in any other court."

10.   Defendant agreed that if it fails to perform or comply with any of the material obligations that it is required to perform or comply with under this Agreement, then Plaintiffs may terminate the Agreement.

11.   Under the terms of the SPA, if Plaintiffs terminate the SPA pursuant to Sections 11(b)(iii), (v), (vii) or (ix) of the SPA, then Defendant agreed to pay to Equitex a termination fee of $1,000,000 immediately upon termination. *See* Exhibit A.

12.   In the event of such a termination Defendant also agreed that it would pay Plaintiffs' documented costs and expenses associated with the SPA and its related transactions.

13.   Plaintiffs have terminated the SPA under Sections 11(b)(v) and (ix) of the SPA. A copy of the termination letter is attached hereto as Exhibit "B".

2

14. Under the terms of the SPA, Defendant agreed that "[i]n the event of litigation arising of or connected with the Contemplated Transactions, the prevailing Party in any such action shall be entitled to recover of the other Party all costs of court, including attorneys' fees and court costs at the trial level." *See* Exhibit A.

## COUNT I – BREACH OF CONTRACT

15. Paragraphs 1 through 14 are hereby incorporated by reference as if fully set forth.

16. The SPA is a valid and binding contract.

17. Plaintiffs have performed all the stipulations, conditions, and agreements required of Plaintiffs under the terms of the SPA.

18. Defendant's actions have given rise to Plaintiffs' right to terminate the SPA, pursuant to the terms of the SPA.

19. Plaintiffs have properly terminated the SPA, pursuant to its terms.

20. Plaintiffs formally notified Defendant of their termination of the SPA on or about March 12, 2004.

21. Under the terms of the SPA, Defendant was required to pay a Termination Amount of $1,000,000 to Plaintiffs immediately upon termination.

22. Defendant has failed to pay the Termination Amount of $1,000,000, pursuant to the terms of the SPA.

23. Defendant's failure to perform according to the terms of the SPA constitutes a breach of contract.

24. As a result of the Defendant's failure to perform according to the terms of the SPA, Plaintiffs have been damaged in an amount of $1,000,000 plus other damages allowed pursuant to the terms of the SPA.

3

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendant as follows:

1.    An award of contractual remedies in the amount of $1,000,000;

2.    An award of additional contractual remedies as provided for in the SPA;

3.    An award of attorneys' fees as provided for in the SPA;

4.    An award of prejudgment interest according to law;

5.    An award of costs and disbursements as provided by law; and

6.    Other just and equitable relief as the Court deems appropriate.

MORRIS, JAMES, HITCHENS & WILLIAMS LLP

James W. Semple ((#396)
James E. Drnec (#3789)
222 Delaware Avenue
P.O. Box 2306
Wilmington, DE 19899
Attorneys for Plaintiffs Equitex, Inc. and Chex
Services Inc.

Dated:  March 23, 2004

4