**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **iGAMES ENTERTAINMENT, INC.,** | : | |
| Plaintiff, | : | C.A. No. 04-180 (KAJ) |
| v. | : | |
| **CHEX SERVICES, INC.** and **EQUITEX, INC.,** | : | |
| | : | JURY TRIAL DEMANDED |
| Defendants. | : | |

# Appendix of Exhibits To iGames Entertainment, Inc's <u>Motion For Summary Judgement</u>

# Exhibit H

WLM\206411.1

CASE TYPE: CONTRACT

STATE OF MINNESOTA                                   DISTRICT COURT

COUNTY OF HENNEPIN                          FOURTH JUDICIAL DISTRICT

---

Chex Services, Inc. d/b/a Fastfunds,                Court File No. CT 03-020211
                                                    (Judge Marilyn Justman Kaman)
                        Plaintiff,

        vs.
                                          PLAINTIFF CHEX SERVICES, INC.'S
Lisa G. Maulson, individually; Native American       SECOND AMENDED COMPLAINT
Cash Systems; Native American Cash Systems
Florida, Inc.; and Cash Systems, Inc.

                        Defendants.

---

        Plaintiff Chex Services, Inc., d/b/a Fastfunds ("Chex") for its Complaint against

Defendants Lisa G. Maulson, Native American Cash Systems, Native American Cash Systems

Florida, Inc., and Cash Systems, Inc. ("Defendants"), states and alleges as follows:

                                        FACTS

        1.      Plaintiff Chex Services, Inc., d/b/a Fastfunds is a Minnesota corporation with its

principal place of business located at 11100 Wayzata Boulevard, Minnetonka, Minnesota 55305.

        2.      Defendant Lisa G. Maulson ("LGM") is a California resident who, upon

information and belief, currently resides in Trinidad, California and is the sole principal of

NACS.

        3.      Defendant Native American Cash Systems ("NACS") is a Nevada corporation

with its principal place of business at 821 Scenic Drive, Trinidad, California 95570.

        4.      Defendant Native American Cash Systems Florida, Inc., ("NASCF") is a Florida

corporation with its principal place of business located at 6510 Osceola Circle West, Hollywood,

Florida 33024.

5.      Defendant Cash Systems, Inc., ("CSI") is a Minnesota corporation with its principal place of business located at 3201 West County Road 42, #106, Burnsville, Minnesota 55306.

## ST. REGIS MOHAWK AGREEMENT BETWEEN NACS AND CHEX

6.      On or about August 9, 2000, LGM, NACS, and Chex entered into a contract (a copy attached to Affidavit of James P. Welbourn In Support of Plaintiff's Application for a Temporary Restraining Order and for Expedited Discovery as Exhibit A (hereinafter "Welbourn Aff., Ex.") and hereinafter referred to as "Casino Contract") to provide financial services including, but not limited to, check cashing, ATM, POS Debit, and Credit Card Cash Advance Services to Native American owned and operated casinos. The Casino Contract was supplemented by an additional agreement between the parties on January 5, 2001. (Welbourn Aff., Ex. A.)

7.      LGM, NACS, and Chex have conducted business at various casinos across the United States. One such casino was the St. Regis Mohawk Casino, located in the State of New York.

8.      The Casino Contract provides that the contract shall be interpreted, enforced, and governed in all respects according to the laws of the State of Minnesota.

9.      The Casino Contract also provides that all notices, demands, and other communications given under the contract shall be in writing and mailed via certified mail to Chex at its corporate offices in Minnesota.

10.      LGM, NACS, and Chex have conducted business and negotiated any disputed terms of their contracts in Minnesota.

11.      Pursuant to the terms of the contracts, LGM and NACS have paid monies to Chex in Minnesota, and have been paid by Chex from Minnesota.

CX/EX00595

12.     On or about September 11, 2002, LGM claimed that Chex was in default of the Casino Contract with respect to the St. Regis Mohawk Casino, and provided a 30-day notice of default pursuant to paragraph 10 of the Casino Contract.

13.     In response to LGM's letter of September 11, 2002, Chex, while disputing that any material breach occurred, entered into a series of conversations with LGM regarding the alleged breaches and exchanged written and voicemail communications in an effort to resolve any outstanding differences of opinion regarding the management and accounting of St. Regis Mohawk Casino.

14.     On or about February 11, 2003, LGM informed Chex that she was terminating the Casino Contract with respect to the St. Regis Mohawk Casino in the state of New York effective immediately.

15.     Without Chex's permission, LGM removed property owned by Chex and placed the property in the casino warehouse.

16.     Without Chex's permission, LGM took control of Chex's cash from the account and sent the cash to Key Bank via Brinks Services.

17.     LGM and NACS' termination, effective February 11, 2003, was well before the termination of the Casino Contract which was to remain in place for the St. Regis Mohawk Casino for as long as defendants were under contract with the tribe.

18.     After recovering its cash, which LGM wrongfully took control of, Chex has discovered a cash shortage.

19.     The Casino Contract also prohibits NACS and LGM from interfering with Chex's other business operations.

CX/EX00596

## THE SEMINOLE TRIBE CASINO AGREEMENT BETWEEN NACSF AND CHEX

20.    While NACS and Chex were working under the St. Regis Mohawk agreement, NACS began pursuing contracts with the Seminole Tribe of Florida to provide financial services for the Seminole Tribe's casinos.

21.    On information and belief, as part of their attempt to secure contracts with the Seminole Tribe of Florida, NACS organized NACSF.

22.    On or about December 4, 2001, NACSF and Chex entered into an agreement under which Chex agreed to perform financial services for five of the Seminole Tribe's casinos including acting as the vendor to supply check cashing booth operations, credit card advance and POS debit systems and cash to fulfill NACSF's obligations of its contract with the Seminole Tribe of Florida. (Welbourn Aff., Ex. C.)

23.    The NACSF Contract provides that the contract shall be interpreted, enforced, and governed in accordance with the laws of the State of Florida.

24.    The NACSF Contract also provides that all notices, demands, and other communications given under the contract shall be in writing and mailed via United States registered or certified mail to Chex at its corporate offices in Minnesota.

25.    Pursuant to the terms of the contract, NACSF has received compensation from Chex from Minnesota.

26.    At NACSF's request, Chex subcontracted with CSI in order to use CSI's credit card cash advance systems in the Seminole casinos. (Welbourn Aff., Ex. D.)

27.    On or about May 6, 2003, Paula Bowers-Sanchez, President of NACSF, sent correspondence to Chex claiming that Chex was in default on the NACSF Contract with respect to the Seminole Tribe casinos. (Welbourn Aff., Ex. E.) As part of that correspondence, Sanchez

CX/EX00597

on behalf of NACSF provided thirty-day notice of default pursuant to Paragraph 8 of the NACSF Contract. (Welbourn Aff., Ex. E.)

28.    In response to NACSF's letter of May 6, 2003, Chex, while disputing that any material breach occurred, entered into a series of discussions with NACSF regarding the alleged breaches in an effort to resolve any outstanding differences or possible settlement of any claims.

29.    On or about September 15, 2003, Chex provided NACSF with correspondence ("Settlement Letter Agreement") whereby the parties agreed that Chex would pay $22,904 to NACSF in exchange for NASCF's agreement that the payment cured any and all prior alleged contract breaches or defaults by Chex up to the date of the letter. (Welbourn Aff., Ex. F.) Furthermore, the correspondence stated that if NACSF agreed and accepted the terms of the letter, the letter would constitute an amendment to the existing contractual relationship between NACSF and Chex. (Welbourn Aff., Ex. F.)

30.    Paula Bowers-Sanchez, as president of NACSF, accepted the settlement payment from Chex, and signed and returned the Settlement Letter Agreement thereby settling any and all alleged defaults of Chex under the NACSF that occurred prior to September 15, 2003. (Welbourn Aff., Ex. F.)

31.    On November 14, 2003, as part of NACS' and LGM's Answer to the original Complaint in this matter, NACSF voluntarily joined this action as a "co-defendant" for the sole purpose of asserting a counterclaim against Chex related to an alleged breach to the NACSF Contract. (Welbourn Aff., Ex. H.)

32.    On November 24, 2003, Chex issued their response to NACS and LGM's purported counterclaim and NACSF's "allegations" in its "counterclaim." Chex also again explicitly stated that the September 15, 2003 Settlement Letter Agreement resolved any dispute between NACSF and Chex. (Welbourn Aff., Ex. I.)

CX/EX00598

33.     On December 17, 2003, in clear contradiction to the terms outlined in the September 15, 2003 Settlement Letter Agreement, NASCF sent correspondence to Chex wrongfully suggesting that the September 15, 2003 Settlement Letter Agreement failed to resolve the issues between NACSF and Chex. (Welbourn Aff., Ex. J.)

34.     Late in the day on Friday, January 2, 2004, NACSF sent additional correspondence to Chex indicating that it was terminating the NACSF contract, effective Sunday January 4, 2004. (Welbourn Aff., Ex. K.)

35.     At midnight, January 4, 2004, NACSF removed Chex from the cash services booths at the Seminole casinos, and replaced Chex with CSI.

36.     Chex's potential merger with iGames Entertainment, Inc. hinges on the continuing relationship with the Seminole casinos and the wrongful termination of the contract by NACSF will likely force the acquisition negotiations to fall apart if NACSF is allowed to proceed with the wrongful termination.

37.     Further, Chex can no longer earn revenue from the Seminole casinos.   The Seminole casinos constitute a significant portion of Chex's revenue and provided Chex with unique relationships for establishing connections and business relationships with other Native American owned casinos.  As NACSF is a Native American owned corporation, NACSF is able to provide Chex with an opportunity to reach a much broader market and otherwise unreachable group of Native American casinos who prefer to only do business with Native American corporations.

38.     The actions of NACSF also will undoubtedly damage Chex's reputation within the Native American gaming community.

## THE AGREEMENT BETWEEN CHEX AND CSI

39.    In November 2002, at the request of NACSF, Chex and CSI entered into an agreement where CSI provided equipment and related software to Chex related to credit card cash advances for use in the Seminole Tribe's casinos (a copy attached hereto as Exhibit D and hereinafter referred to as "Cash Advance Agreement"). (Welbourn Aff., Ex. D.) Chex entered into the agreement only after obtaining CSI's agreement not to compete in the future for the Seminole Contract, as CSI is a competitor of Chex. (Welbourn Aff., Ex. D.)

40.    The Cash Advance Agreement provides that the Agreement shall be governed by, construed and enforced in accordance with the laws of the State of Minnesota.

41.    CSI and Chex negotiated any disputed terms of their contracts in the State of Minnesota.

42.    Pursuant to the underlying Cash Advance Agreement any payments made by either CSI or Chex have been paid to and from the State of Minnesota.

43.    Under Paragraph 12(g) of the Cash Advance Agreement, CSI explicitly agreed that it would not compete with Chex's cash advance platform at any Seminole/Seminole Hard Rock casino locations in Florida during the term of the Cash Advance Agreement or any subsequent renewals of the Cash Advance Agreement. (Welbourn Aff., Ex. D.) CSI further agreed that it would only provide additional services in the Seminole casinos in the event the Seminole Tribe made a "request for proposal" process and Chex did not get an invitation to bid on renewals. (Welbourn Aff., Ex. D.)

44.    On December 17, 2003, in clear contradiction to the terms outlined in the September 15, 2003 Settlement Letter Agreement, NASCF sent correspondence to Chex wrongfully suggesting that the September 15, 2003 Settlement Letter Agreement failed to resolve the issues between NACSF and Chex. (Welbourn Aff., Ex. J.)

CX/EX00600

45.    On January 2, 2004, NACSF sent additional correspondence to Chex indicating that it was terminating the NACSF contract. (Welbourn Aff., Ex. K.)

46.    CSI, despite underlying contractual obligations not to compete with Chex for the Seminole Tribe casinos, now has taken over Chex's position in the Seminole Tribe casinos by providing financial services for those casinos.

47.    At no time has the Seminole Tribe requested bids for the provision of cash services at its casinos.

48.    Chex's potential merger with iGames Entertainment, Inc. hinges on the continuing relationship with the Seminole casinos and the wrongful breach of the contract by CSI will likely force the acquisition negotiations to fall apart if CSI is allowed to proceed with the wrongful breach.

49.    Further, Chex can no longer earn revenue from the Seminole casinos.  The Seminole casinos constitute a significant portion of Chex's revenue and provided Chex with unique relationships for establishing connections and business relationships with other Native American owned casinos.  As NACSF is a Native American owned corporation, NACSF is able to provide Chex with an opportunity to reach a much broader market and otherwise unreachable group of Native American casinos who prefer to only do business with Native American corporations.  CSI's breach of the Cash Advance Agreement by violating the non-compete forces Chex to move further away from their relationship with NACSF and the Seminole Tribe of Florida.

50.    The actions of CSI also will undoubtedly damage Chex's reputation within the Native American gaming community.

CX/EX00601

51.    Furthermore, as a result of NACSF and CSI's wrongful conduct, Chex has no method of calculating the damages arising from the irreparable harm incurred.  Chex further lacks an adequate remedy at law to redress NACSF and CSI's wrongful conduct.

## COUNT I
## BREACH OF CONTRACT AGAINST LGM AND NACS

52.    Paragraphs 1 through 51 are hereby incorporated by reference as if fully set forth.

53.    By virtue of the agreement to service casinos using LGM and NACS' contacts with Native American Tribes and Chex's ability to provide cash access services, LGM and NACS entered into a contract with Chex under which Chex would be paid commissions at various casino locations.

54.    LGM and NACS have failed to pay the amounts due to Chex pursuant to their contract and have therefore breached the contract with Chex.

55.    As a result of the breach of the contract, Chex is entitled to recover unpaid commissions which are immediately due and owing.

56.    LGM and NACS further breached the Casino Contract by interfering with Chex's relationship with NACSF.

57.    LGM's and NACS's breach has caused NACSF to wrongfully terminate its contract with Chex, resulting in Chex suffering substantial damages in excess of $50,000 for which LGM and NACS are liable.

58.    As a result of LGM and NACS's breaches of contract, Chex also seeks attorneys' fees, costs, and disbursements.

## COUNT II
## WRONGFUL TERMINATION OF CONTRACT AGAINST LGM AND NACS

59.    Paragraphs 1 through 58 are hereby incorporated by reference as if fully set forth.

CX/EX00602

60.    LGM and NACS's decision to terminate the Casino Contract with Chex violated the Casino Contract and was without justification.

61.    Pursuant to the provisions of the Casino Contract, LGM and NACS were not entitled to unilaterally terminate the contract nor were they entitled to remove Chex's property or its cash from the location.

62.    As a result of the wrongful termination of the contract, Chex is entitled to recover in an amount in excess of $50,000.

63.    As a result of LGM and NACS's wrongful termination of contract, Chex also seeks attorneys' fees, costs, and disbursements.

COUNT III
DAMAGE TO PROPERTY (WASTE) AGAINST LGM AND NACS

64.    Paragraphs 1 through 63 are hereby incorporated by reference as if fully set forth.

65.    Pursuant to the Casino Contract, in providing services to casinos, Chex utilized its equipment including, but not limited to, ATM machines and computer equipment.

66.    During the course of the wrongful termination of the Casino Contract by LGM and NACS, LGM took control of Chex's property and placed it in storage in a warehouse.

67.    LGM moved Chex's property out of the casino into the warehouse without Chex's permission.

68.    The property was significantly damaged because of LGM's wrongful removal of Chex's property.

69.    Because of the property damage, Chex is entitled to recover damages in an amount yet to be determined.

70.    As a result of the waste by LGM and NACS, Chex also seeks attorneys' fees, costs, and disbursements.

CX/EX00603

## COUNT IV
## BREACH OF CONTRACT AGAINST NACSF

71.     Paragraphs 1 through 70 are hereby incorporated by reference as if fully set forth.

72.     Under the NACSF Contract, Chex contracted with NACSF to provide financial services for five of the Seminole Tribe's casinos on behalf of NACSF.  Furthermore, the term of the NACSF Contract continued for the life of NASCF's contract with the Seminole Tribe of Florida.

73.     The NACSF Contract also contained a provision requiring the non-breaching party to provide the allegedly breaching party with written notice of the alleged breach.  The non-breaching party is required to allow the breaching party thirty days to cure the alleged breach.  If the breaching party cures the alleged breach, the non-breaching party retains no cause of action for the asserted breach.  If the breaching party has not cured their breach within the allotted thirty-day period, the non-breaching party may terminate the NACSF Contract after the thirty-day period has expired.

74.     NACSF wrongfully withdrew from the NACSF Contract thereby preventing Chex from continuing to supply check cashing booth operations, credit card cash advance and POS debit systems and cash to fulfill NACSF's obligation of its contract with the Seminole Tribe of Florida and breached the underlying NACSF Contract.

75.     On December 17, 2003, NACSF sent Chex correspondence suggesting that the September 15, 2003 letter agreement failed to resolve issues between NACSF and Chex.  On January 2, 2004, NACSF terminated the NACSF Contract, effective on Sunday, January 4, 2004.  This termination was in breach of the NACSF Contract, and was without justification.

76.     As all claims by NACSF prior to September 15, 2003, were resolved by the Settlement Letter Agreement, NACSF further wrongfully failed to abide by the notice provisions as required in the NACSF Contract by: 1) failing to provide thirty days written notice for Chex to

CX/EX00604

correct any alleged breach; and 2) terminating the NACSF Contract without allowing Chex to correct any alleged breach.

77.    NACSF has never identified any claimed breach by Chex which allegedly occurred after September 15, 2003.

78.    As a result of NACSF's breaches of contract and wrongful termination of the existing agreement between Chex and NACSF and the resulting irreparable harm, as illustrated above, Chex seeks a judgment against NACSF for temporary and permanent injunctive relief enjoining further violation of the contract.

79.    As a result of NACSF's breaches of contract, Chex has suffered past, present and future damages in an amount to be determined at trial, but substantially in excess of $50,000.

80.    As a result of NACSF's breaches of contract, Chex also seeks attorneys' fees, costs, and disbursements.

## COUNT V
## BREACH OF SETTLEMENT LETTER AGREEMENT AGAINST NACSF

81.    Paragraphs 1 through 80 are hereby incorporated by reference as if fully set forth.

82.    As part of signing the Settlement Letter Agreement of September 15, 2003, NACSF agreed that payment by Chex cured all prior alleged contract breaches and/or defaults by Chex up to the date of the letter and treated the Settlement Letter Agreement as an amendment to the existing contractual relationship between NACSF and Chex.

83.    Despite the terms and plain language of the Settlement Letter Agreement, NACSF sent correspondence to Chex on December 17, 2003 claiming that the Settlement Letter Agreement did not resolve outstanding issues between NACSF and Chex.  NACSF then sent another letter dated January 2, 2004 to Chex terminating the NACSF Contract effective January 4, 2004.

CX/EX00605

84.    As a result of NACSF's breach of the Settlement Letter Agreement and wrongful termination of the existing agreement between Chex and NACSF and the resulting irreparable harm, as illustrated above, Chex seeks a judgment against NACSF for temporary and permanent injunctive relief enjoining further violation of the Settlement Letter Agreement.

85.    NACSF's failure to abide by, and breach of, the terms of the Settlement Letter Agreement has resulted in past, present and future damages to Chex, in an amount in excess of $50,000.

86.    As a result of NACSF's breach of the Settlement Letter Agreement, Chex also seeks attorneys' fees, costs, and disbursements.

## COUNT VI
## BREACH OF CONTRACT AGAINST CASH SYSTEMS

87.    Paragraphs 1 through 86 are hereby incorporated by reference as if fully set forth.

88.    Pursuant to the Cash Advance Agreement between Chex and CSI, during the term of the Cash Advance Agreement or any renewals between the parties CSI agreed not to solicit business from The Seminole Tribe of Florida or compete with Chex with their cash advance platform system at any of the Seminole/Seminole Hard Rock Casino locations in Florida.

89.    CSI further agreed that it would only provide additional services in the Seminole casinos in the event the Seminole Tribe made a "request for proposal" process and Chex did not get an invitation to bid on renewals. Such a request has not occurred, and therefore Cash Systems, *by providing the services which Chex was providing*, is in breach of the Cash Advance Agreement.

90.    Immediately after the wrongful termination of Chex's contract with NACSF and while the Cash Advance Agreement was still valid, CSI moved in and replaced Chex in the Seminole/Seminole Hard Rock Casino facilities. CSI's actions are in direct violation of the underlying Cash Advance Agreement between the parties in that CSI either solicited business

from or is currently competing with Chex's cash advance platform at Seminole/Seminole Hard Rock Casino locations in Florida.

91.    As a result of CSI's breaches of contract and violation of the non-compete provision contained in the underlying Cash Advance Agreement between CSI and Chex and the resulting irreparable harm, as illustrated above, Chex seeks a judgment against NACSF for temporary and permanent injunctive relief enjoining further violation of the contract.

92.    As a result of CSI's breaches of contract, Chex has suffered past, present and future damages in an amount to be determined at trial, but substantially in excess of $50,000.

93.    As a result of CSI's breaches of contract, Chex also seeks attorneys' fees, costs, and disbursements.

WHEREAS, Chex prays for the following relief:

1.    An award of damages in excess of $50,000;

2.    Injunctive relief revoking NACSF's purported termination of the Service and Compensation Agreement Between Native American Cash Systems Florida, Inc. and Chex Services, Inc., which was entered into on December 4, 2001;

3.    Injunctive relief directing NACSF to refrain from violating, breaching, thwarting, and/or avoiding the terms of the Service and Compensation Agreement Between Native American Cash Systems Florida, Inc. and Chex Services, Inc., which was entered into on December 4, 2001;

4.    Injunctive relief directing NACSF to refrain from violating, breaching, thwarting, and/or avoiding the terms of the Letter Settlement Agreement between Native American Cash Systems Florida, Inc. and Chex Services, Inc., which is dated September 15, 2003;

5.    Injunctive relief directing NACSF to continue its contractual relationship with Chex Services under the Service and Compensation Agreement Between Native American Cash Systems Florida, Inc. and Chex Services, Inc., which was entered into on December 4, 2001;

6.    Injunctive relief directing CSI to cease competing with Chex Services, Inc. at any of the Seminole/Seminole Hard Rock casino locations in Florida, as specified in the Cash Advance Agreement entered into between Chex Services, Inc. and Cash Systems, Inc. in November of 2002, during the current term or any renewal of Cash Advance Agreement;

7.    Injunctive relief directing CSI to refrain from providing financial services at the Seminole casinos, which prior to January 4, 2004, Chex Services, Inc. provided;

8.    Injunctive relief directing NACSF to refrain from violating, breaching, thwarting, and/or avoiding the terms of the Cash Advance Agreement entered into between Chex Services, Inc. and Cash Systems, Inc. in November of 2002;

9.    An award of attorneys' fees as provided for in the Casino Contract;

10.    An award of attorneys' fees as provided for in the NACSF Contract;

11.    Other costs and disbursements as allowed by law or under any of the contracts referenced in this Complaint; and

CX/EX00608

12.   Other just and equitable relief as deemed appropriate by the Court.

RIDER BENNETT, LLP

By _____
        Daniel Q. Poretti (185152)
        Douglas J. Frederick (320699)
        Kenneth A. Kimber (320857)
Attorneys for Plaintiff Chex Services Inc. d/b/a
Fastfunds
333 South Seventh Street, Suite 2000
Minneapolis, MN 55402
(612) 340-8900

Dated: January 21, 2004

## ACKNOWLEDGEMENT

The party(ies) upon whose behalf this pleading is submitted, by and through the undersigned, hereby acknowledge(s) that sanctions may be imposed for a violation of Minn. Stat. § 549.211.

By _____

CX/EX00609

1081251-1                                      16

## AFFIDAVIT OF SERVICE BY FACSIMILE

STATE OF MINNESOTA          )
                            )  ss.
COUNTY OF HENNEPIN          )

Eileen M. Sinnott of the City of Brooklyn Park, County of Hennepin, the State of Minnesota, being duly sworn, says that on January 21, 2004, she served the annexed:

### Plaintiff Chex Services, Inc.'s Second Amended Complaint

on the attorney(s) below-named in this action, by faxing each to said attorney thereof at Minneapolis, Minnesota directed to the following:

Melanie Daniel, Esq.                    Mr. Robert Meller, Esq.
Daniel Knudtson                         Best & Flanagan, LLP
394 E. Julian Drive                     225 South Sixth Street, Suite 4000
Gilbert, AZ 85296                       Minneapolis, MN 55402
Fax #: 480-899-5448                     Fax #: (612) 339-5897


Sean A. Shiff, Esq.
Skolnick & Associates, P.A.
2100 Rand Tower
527 Marquette Avenue South
Minneapolis, MN 55402
Fax #: (612) 677-7601

_Eileen M. Sinnott_
Eileen M. Sinnott

Subscribed and sworn to before me
this 21st day of January, 2004.


_Notary Public_
Notary Public

AMY ANN STEWART
Notary Public
Minnesota
My Commission Expires January 31, 2007

CX/EX00610

STATE OF MINNESOTA

COUNTY OF HENNEPIN

DISTRICT COURT

FOURTH JUDICIAL DISTRICT

CASE TYPE:  CONTRACT

---

Chex Services, Inc. d/b/a Fastfunds,

        Plaintiffs,

vs.

Lisa G. Maulson, individually; Native
American Cash Systems; Native American
Cash Systems Florida, Inc.; and Cash Systems,
Inc.,

        Defendants.

Court File No. CT 03-020211

__NOTICE OF APPEARANCE__

---

TO:   Plaintiffs, above-named, and their attorneys of record, Daniel Q. Poretti, Rider Bennett,
LLP, 333 South Seventh Street, Suite 2000, Minneapolis, MN 55402:

     PLEASE TAKE NOTICE that Robert L. Meller, Jr. of Best & Flanagan LLP, hereby

notes his appearance as counsel of record for Defendants Lisa G. Maulson, individually, Native

American Cash Systems, and Native American Cash Systems Florida, Inc. in this matter.

Dated:  January 14, 2004.

               BEST & FLANAGAN LLP

               By
               Robert L. Meller, Jr. (#71912)
               225 South Sixth Street
               Suite 4000
               Minneapolis, MN 55402
               (612) 339-7121

               ATTORNEY FOR DEFENDANTS

016274/230001/282274_1

STATE OF MINNESOTA                                        DISTRICT COURT

COUNTY OF HENNEPIN                                FOURTH JUDICIAL DISTRICT

### CERTIFICATE OF REPRESENTATION AND PARTIES

Date Case Filed:

Chex Services, Inc. d/b/a Fastfunds vs. Lisa G. Maulson, individually; Native American Cash
Systems; Native American Cash Systems Florida, Inc.; and Cash Systems, Inc.

**\*\*(ONLY THE INITIAL FILING LAWYER/PARTY NEEDS TO COMPLETE THIS FORM)\*\***

    This certificate must be filed pursuant to Rule 104 of the General Rules of Practice for the
District Courts, which states: "A party filing a civil case shall, at the time of filing, notify the court
administrator in writing of the name, address, and telephone number of all counsel and unrepresented
parties, if known (see form 104 appended to these rules). If that information is not then known to the
filing party, it shall be provided to the court administrator in writing by the filing party within seven
days of learning it. Any party impleading additional parties shall provide the same information to the
court administrator. The court administrator shall, upon receipt of the completed certificate, notify all
parties or their lawyers, if represented by counsel, of the date of filing the action and the file number
assigned."

LIST ALL LAWYERS/PRO SE PARTIES INVOLVED IN THIS CASE.

| LAWYER FOR PLAINTIFF(S) | LAWYER FOR DEFENDANT(S) |
|---|---|
| | (If not known, name party and address) |
| | Lisa G. Maulson, individually; Native |
| | American Cash Systems; Native American |
| | Cash Systems Florida, Inc. |
| Chex Services, Inc., d/b/a Fastfunds | Name of Party |
| Name of Party | |
| | |
| Daniel Q. Poretti. | Robert L. Meller, Jr. |
| Atty Name  (Not firm name) | Atty Name  (Not firm name) |
| Rider Bennett, LLP | Best & Flanagan LLP |
| 333 South Seventh Street | 225 South Sixth Street |
| Suite 2000 | Suite 4000 |
| Minneapolis, MN 55402 | Minneapolis, MN 55402 |
| Address | Address |
| | |
| (612) 340-8900 | (612) 339-7121 |
| Phone Number | Phone Number |
| | |
| 185152 | 71912 |
| MN Atty ID No. | MN Atty ID No. |

CX/EX00612

LAWYER FOR DEFENDANT(S)

Cash Systems, Inc.
Name of Party

Sean Shiff.
Atty Name   (Not firm name)

Skolnick & Associates, P.A.
2100 Rand Tower
527 Marquette Avenue South
Minneapolis, MN  55402
Address

(612) 677-7600
Phone Number

185152

January 14, 2004
Date


LAWYER FOR DEFENDANT(S)
(If not known, name party and address)

Name of Party

Atty Name    (Not firm name)

Address

Phone Number

Filing Lawyer/Party

281237

CX/EX00613

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| iGAMES ENTERTAINMENT, INC., | : | |
| | : | |
| Plaintiff, | : | C.A. No. 04-180 (KAJ) |
| | : | |
| v. | : | |
| | : | |
| CHEX SERVICES, INC. and | : | |
| EQUITEX, INC., | : | |
| | : | JURY TRIAL DEMANDED |
| | : | |
| Defendants. | : | |
| | : | |

# Appendix of Exhibits To iGames Entertainment, Inc's Motion For Summary Judgement

# Exhibit I

WLM\206411.1

1

1    IN THE UNITED STATES DISTRICT COURT
2         FOR THE DISTRICT OF DELAWARE
3                - - -
4  iGAMES ENTERTAINMENT, INC. : C.A. NO.
             V.                : 04-180-KAJ
5  CHEX SERVICES, INC. and    :
   EQUITEX, INC.              :
6  ------------------------------------------
   EQUITEX, INC. and CHEX     : C.A. NO.
7  SERVICES, INC., d/b/a      : 04-256-KAJ
   FASTFUNDS                  :
8         V.                  :
   iGAMES ENTERTINMENT, INC.  :
9  ------------------------------------------
   CHEX SERVICES, INC., d/b/a : C.A. NO.
10 FASTFUNDS                  : 04-0885-KAJ
             V.               :
11 IGAMES ENTERTAINMENT, INC. :
                - - -
12            September 21, 2004
13              - - -
14

                 Oral deposition of JAMES
15 WELBOURN, held in the offices of Duane,
   Morris and Heckscher, 4200 One Liberty
16 Place, 1650 Market Street, Philadelphia,
   Pennsylvania 19103 commencing at 9:50
17 a.m., on the above date, before Harvey
   Krauss, a Federally-Approved Registered
18 Professional Reporter and a Commissioner
   of the Commonwealth of Pennsylvania.
19              - - -
20
21        ESQUIRE DEPOSITION SERVICES
               15th Floor
22       1880 John F. Kennedy Boulevard
          Philadelphia, Pennsylvania 19103
23             (215) 988-9191
24

JAMES WELBOURN

**162**

1 to terminate the deal with you all Chex
2 and Equitex based on this NACSF contract
3 being pulled?
4         MR. PORETTI: I'm going to
5 just caution you, Mr. Welbourn,
6 not reveal any attorney-client
7 discussions about that impact if
8 you personally formed an opinion.
9         MR. TAYLOR: Counsel,
10 believe me I'm not.
11         MR. PORETTI: I understand
12 that? Suggesting in any way that
13 you are doing anything improper,
14 but I would like to know how in
15 the world and maybe I'll try to
16 correct the question how in the
17 world that question would elicit
18 or in any way ask him to remit
19 anything from an attorney-client
20 communication.
21         MR. PORETTI: His opinion
22 about the effect of that Seminole
23 contract termination on the SPA
24 and whether that gives rise to the

**163**

1 right to terminate is based upon
2 what his lawyers have told him I
3 think it's attorney-client
4 privilege.
5         MR. TAYLOR: Well, I am
6 assuming --
7         MR. PORETTI: That's why I'm
8 telling him not to answer.
9         MR. TAYLOR: I am assuming
10 and again I don't know what -- all
11 the details of this, but there's
12 -- I mean this is a public
13 statement.
14         MR. PORETTI: Sure. All I'm
15 saying to him is I don't want him
16 to reveal attorney-client
17 privilege but he's certainly
18 willing to answer the question.
19 BY MR. TAYLOR:
20     Q.   Let's just have a general
21 understanding Mr. Welbourn, that your
22 counsel is completely correct about one
23 thing. I'm not entitled to know what
24 your private conversations are with your

**164**

1 lawyer, none of my questions so that we
2 can all agree to a standing objection
3 here any of my questions I'm not
4 entitled to those communications between
5 your counsel unless I claim it's been
6 waived somehow. I'm not there -- I'm
7 not even making that suggestion. So, we
8 agree on that. Tell me did you believe
9 Chris would have been well -- when I say
10 Chris I'm kind of using that it's a
11 little I guess informal. IGames Chris
12 Wolfington's company, the company he was
13 with, would have been within its rights
14 to terminate the deal because of this
15 contract situation?
16     A.   No
17     Q.   Why not?
18     A.   Well, again I'm not a
19 lawyer so it will be interpreted
20 somewhere in a court of law what
21 material adverse effect is. But as a
22 businessman the way I look at a material
23 adverse effect is not one isolated case,
24 but what is done about that case. As I

**165**

1 had mentioned earlier, yes, we lost the
2 Seminole Tribe. Yes, it was about 25
3 percent of our revenue. We cut $600,000
4 out of expenses of our company to
5 mitigate that loss. So, do I believe
6 that he'd be in his right under that
7 contract, no.
8     Q.   Well, your dealing at this
9 point with a company that is forced to
10 downsize lost one of its biggest
11 revenues of cash and you're going to
12 look me straight in the eye and tell me
13 that's not a material change?
14     A.   I'm going to tell you it's
15 in my mind it's not a material adverse
16 effect because we did things on the
17 other end to mitigate it.
18     Q.   All right. So when you
19 signed your name do you understand what
20 -- has anyone ever talked to you about
21 sanctions for filing frivolous either
22 affidavits or pleadings? Have you ever
23 had that discussion with anybody?
24     A.   Can I just ask you is that

42 (Pages 162 to 165)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| iGAMES ENTERTAINMENT, INC., | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| CHEX SERVICES, INC. and | : |
| EQUITEX, INC., | : |
| | : |
| Defendants. | : |

C.A. No. 04-180 (KAJ)

JURY TRIAL DEMANDED

# Appendix of Exhibits To iGames Entertainment, Inc's Motion For Summary Judgement

# Exhibit J

WLM\206411.1



CASE TYPE: CONTRACT

STATE OF MINNESOTA

DISTRICT COURT

COUNTY OF HENNEPIN

FOURTH JUDICIAL DISTRICT

---

Chex Services, Inc. d/b/a Fastfunds,

        Plaintiff,

vs.

Lisa G. Maulson, individually; Native American
Cash Systems; Native American Cash Systems
Florida, Inc.; and Cash Systems, Inc.

        Defendants.

Court File No. CT 03-020211
(Judge Marilyn Justman Kaman)

**SUPPLEMENTAL AFFIDAVIT OF
JAMES P. WELBOURN IN SUPPORT
OF PLAINTIFF'S APPLICATION FOR
A TEMPORARY RESTRAINING
ORDER AND FOR EXPEDITED
DISCOVERY**

---

STATE OF MINNESOTA    )
                          ) ss.
COUNTY OF HENNEPIN    )

        James P. Welbourn, being first duly sworn upon oath, hereby states and alleges as

follows:

        1.     I am CEO of Chex Services, Inc. of Minnesota, the Plaintiff in this matter.

        2.     The matters stated herein are true of my own personal knowledge.

        3.     I understand that NACSF has suggested that it received a letter from George

Connors regarding a promised decrease in "cost of cash" expenses.    To the best of my

knowledge, such a letter does not exist.  However, it is Chex's practice to pass on savings to

clients, thus Chex may have indicated to NACSF that the cost of cash expenses may decrease for

NACSF if and when they decrease for Chex.  However, a decrease in cost of cash expenses has

not yet occurred for Chex.

        4.    Chex has never agreed to eliminate the NACSF Contract's Section 8 requirement

of Seminole Tribe approval for termination and replacement of Chex.  All along the parties

understood that this was a deal that was to last for a minimum of five years.

CX/EX00310

5.    Prior to NACSF's notice of termination of the NACSF Contract, Chex was unaware of the December 30, 2003 addendum to the NACSF/Seminole Agreement (i.e., the "Native American cash Systems Florida, Inc. Financial Services Agreement Addendum").

6.    To my knowledge, NACSF is **not** "The Seminole Tribe of Florida."

7.    To my knowledge, "The Seminole Tribe of Florida" has not issued a "request for proposal" to which Cash Systems may respond, as stated in the non-compete provision of the Cash Advance Agreement.

8.    Chex never received any notice that Cash Systems did not desire to renew the Cash Advance Agreement, so pursuant to its terms, in November of 2003, the Cash Advance Agreement automatically renewed through November 2004.

9.    The acknowledgement in the NACSF Contract that NACSF intended to learn the operations does not preclude the potential award and renewal of future Seminole contracts to Chex directly from the Seminole Tribe, nor does it preclude the possible renewal of the NACSF Contract if NACSF has not learned the operations to the extent needed to operate the services on its own.

10.    To the best of my knowledge, over the two years of performing under the NACSF Contract, neither Paula Bowers-Sanchez nor Lisa Maulson have ever taken advantage of, or requested training.

11.    Chex did not seek a TRO in the Chippewa lawsuit because the Chippewa contract was directly with a Tribal entity and Chex decided that Chex did not want to adversely affect its relationship with the Tribe. Chex took legal action by asserting counterclaims in the lawsuit. Attached hereto as **Exhibit Q** is a true and correct copy of Answer and Counterclaim of Chex Services filed in the Chippewa lawsuit. Once the allegations in the lawsuit were confronted, the Chippewa case settled on favorable terms for Chex.

CX/EX00311

12.    The significance and special benefits of the NACSF Contract and the total unjustified termination of it has left Chex with no choice but to seek a TRO. Thus, Chex has sought to stop NACSF from wrongfully terminating the NACSF Contract and destroying Chex's reputation and goodwill.

13.    One of the unquantifiable benefits that Chex receives from providing services at the Seminole casinos, is that it provides Chex with immeasurable reputational benefits and instant credibility for many prospective clients.

14.    Although the negotiations related to iGames Entertainment, Inc.'s ("iGames") possible acquisition of Chex are still taking place, the negotiations have been severely impacted by the termination of the NACSF Contract. As the January 7, 2004 letter (Welbourn Aff., Ex. N) from iGames' attorneys suggests, the termination of the NACSF Contract may give iGames cause to terminate the acquisition agreement and negotiations. Thus, the threat of iGames pulling out of the acquisition remains and immeasurably affects the bargaining position of Chex.

15.    I understand that Defendants have argued that Chex employees pose a security risk to casino patrons. Such an argument is absolutely unfounded and the very suggestion that casino patrons are at risk goes directly to how the termination of NACSF Contract will lead to further reputational harm on behalf of Chex. Such unfounded rumors can have devastating effects in the casino industry.

16.    Chex's employees are held to a high standard of professionalism. This current dispute is not related to any allegations that employees are posing security risks or committing fraud on the public.

17.    As I understand, many of the very same employees who were dealing with the public for Chex, have been hired away and are now employed by Cash Systems. Because of

CX/EX00312

their knowledge of the operations and their established relationships with the Tribe and patrons, these employees are valuable assets for any company providing similar services.

18.    Chex's reputation and credibility among its current customers is now being questioned. Chex has been contacted by a representative from another Native American Tribe, for which Chex is currently providing financial services. The representative asked several questions about the termination of the NACSF Contract and indicated that it raises concerns about Chex credibility.

19.    On January 21, 2004, in order to alleviate concerns of our clients, I sent out a letter to clients of Chex. Attached hereto as **Exhibit R** is a true and correct copy of the January 21, 2004 letter.

20.    Chex has also received communications from concerned note holders. Attached hereto as **Exhibit S** are true and correct copies of such communications.

21.    Chex was not providing "All in 1" or Check Guarantee services at the Seminole casinos.

CX/EX00313

FURTHER YOUR AFFIANT SAYETH NOT.

James P. Welbourn

James P. Welbourn

Subscribed and sworn to before me this
3rd day of February, 2004

Notary Public

KELI R. MAHOWALD
NOTARY PUBLIC - MINNESOTA
My Commission Expires Jan. 31, 2005

CX/EX00314

1086691-2

5

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| iGAMES ENTERTAINMENT, INC., | : | |
| Plaintiff, | : | C.A. No. 04-180 (KAJ) |
| v. | : | |
| CHEX SERVICES, INC. and EQUITEX, INC., | : | |
| | : | JURY TRIAL DEMANDED |
| Defendants. | : | |

# Appendix of Exhibits To iGames Entertainment, Inc's Motion For Summary Judgement

# Exhibit K

WLM\206411.1

FROM KLEHR HARRISON                                    (WED) 1. 21' 04 16:16/ST. 16:15/NO. 4862034594 P  2

## Term Loan Note

$4,000,000

Philadelphia, PA

FOR VALUE RECEIVED, the undersigned, iGAMES ENTERTAINMENT, INC., a Nevada corporation with its chief executive office and principal place of business at 700 S. Henderson Road, Suite 210, King of Prussia, PA 19406 (the "Borrower"), promises to pay to the order of CHEX SERVICES, INC., with offices located at 11100 Wayzata Blvd., Suite 111, Minnetonka, Minnesota 55305 (the "Lender") the principal sum of Four Million Dollars ($4,000,000) or, if less, the aggregate outstanding principal balance of all advances made by the Lender to the Borrower, as provided for herein (the "Term Loans") together with interest, from the date of this note ("Note"), in like money, at said office of the Lender, at the time and at rates per annum as provided herein..

The Borrower and the Lender agree that the Lender shall advance $2,000,000 to the Borrower on the date hereof and shall advance an additional $2,000,000 to the Borrower on that day that is 60 days following the date hereof, provided that at such time the Borrower is in material compliance with the terms of this Note, the Stock Pledge Agreement (as defined below) and the Stock Purchase Agreement (as defined below). The aggregate amount so advanced shall constitute the "Term Loans" hereunder. The Lender agrees to deliver to the Borrower, within 21 days of the date hereof, a binding commitment for financing sufficient to fund the second advance hereunder either (i) from Mercantile Capital, L.P. on terms satisfactory to the Borrower; or (ii) from another institutional lender satisfactory to the Borrower, which financing shall be either (A) funded prior to the end of such 21 day period and placed in escrow subject to release to the Borrower in accordance with the first sentence of this paragraph, or (B) irrevocably committed to be advanced directly by the financing source to the Borrower in accordance with the first sentence of this paragraph without any further action by the Lender. For avoidance of doubt, any financing that could be diverted to other uses by the Lender, or under which the financing source could decline to advance, shall not satisfy the foregoing conditions. In the event that the Lender fails to comply with the foregoing within such 21 day period, then the Borrower shall have the right at any time thereafter to prepay the principal balance of this Note in full, in which case all further payment obligations of the Borrower, other than with respect to amounts accrued through the date of prepayment, shall terminate.

Interest. For the period ending February 1, 2004, the Borrower shall pay to the Lender interest on the outstanding Term Loans at the rate of fifteen percent (15%) per annum, calculated on the basis of a 360-day year and counting the actual number of days elapsed. In addition, in lieu of interest, the Borrower shall, on a monthly basis, pay to the Lender an amount equal to 50% of the Operating Income of the Borrower's Available Money, Inc. subsidiary ("Available Money") (which for the period ending February 1, 2004 shall be reduced by the amount of interest paid under the previous sentence), provided that, in the event that Lender completes a business combination with any party other than Borrower, or completes a direct or indirect acquisition or purchase or sale of assets or securities with any party other than Borrower, or agrees to complete such a transaction pursuant to a letter of intent or otherwise, then, from the date of such agreement, Borrower shall not be obligated to pay Lender 50% of the Operating Income of Available Money but shall be obligated to pay Lender interest on the outstanding Term Loans at the rate of ten percent (10%) per annum, calculated on the basis of a 360-day year and counting the actual number of days elapsed. "Operating Income" shall mean cash receipts of Available Money generated by normal operations, less all operating expenses, capital expenditures, reserves for taxes and reasonable operating reserves. Each payment shall be accompanied by a report of an officer of the Borrower in reasonable detail setting forth the calculation of Operating Income of Available Money for the applicable period.

Treatment of Revenues and Expenses. The Borrower hereby agrees that, notwithstanding its ownership of 100% of the capital stock of Available Money, for a period of 90 days following the date hereof (or such longer period as the Borrower may consent to in its reasonable discretion) the Borrower shall consent to the inclusion by the Lender in its financial statements of 50% of the revenues and expenses of Available Money; provided that the Borrower's and the Lender's independent auditors deliver their respective opinions that such





EXHIBIT

A

treatment is in accordance with generally accepted accounting principles.

**Stock Purchase Agreement Termination.** In the event that the Stock Purchase Agreement is terminated by the Lender and Equitex, Inc. under Section 11(b)(v) thereof, then in addition to any Termination Fee due and payable by the Borrower under the Stock Purchase Agreement, the Borrower shall pay to the Lender as additional interest hereunder the amount of $1,000,000, which shall be due and payable immediately upon demand following termination of the Stock Purchase Agreement.

**Repayment; Lender's Option.**

(a) No repayment of the principal balance of this Note shall be due and payable until 120 days following the earlier to occur of (i) termination without closing under the Stock Purchase Agreement dated November 3, 2003 between the Lender, the Borrower and Equitex, Inc. and other parties (or any successor agreement for the acquisition of the Lender by the Borrower) (the "Stock Purchase Agreement"), or (ii) 100 days from the date hereof (in either case, the "Initial Maturity Date").

(b) On the Initial Maturity Date, if the Borrower does not pay the outstanding principal balance of the Term Loans, and all accrued but unpaid interest due hereunder in full, the Lender shall have the option to purchase 100% of the capital stock of Available Money from the Borrower for a purchase price of $6,000,000 (the "Option"), exercisable by delivery to the Borrower on the Initial Maturity Date of a written notice of exercise, this Note for cancellation and immediately available funds in an amount equal to $6,000,000 less the then-outstanding principal balance of, and all accrued but unpaid interest on, the Term Loans.

(c) If the Lender does not exercise the Option on the Initial Maturity Date, then the maturity date of this Note shall be extended for one or more additional periods of 30 days (the end of each of which shall be a "Subsequent Maturity Date"). On each Subsequent Maturity Date, if the Borrower does not pay the outstanding principal balance of the Term Loans, and all accrued but unpaid interest due hereunder, in full, the Lender shall have the right to exercise the Option on that Subsequent Maturity Date. If the Lender does not exercise the Option, the maturity date of this Note shall continue to be extended pursuant to this Section until the outstanding principal balance of, and all accrued but unpaid interest on, the Term Loans is paid or the Option is exercised.

(d) Notwithstanding any provision hereof to the contrary, the outstanding principal balance of this Note, and all accrued but unpaid interest hereon, shall be due and payable 180 days following the Initial Maturity Date.

**Late Payment Penalty.** In the event that Maker fails to pay any amount when due, Maker agrees to pay a late charge equal to ten percent (10%) of the overdue amount. Such late charge shall be due and payable upon demand. Maker acknowledges that it would be extremely difficult or impracticable to determine Holders actual damages resulting from any late payment, and this late charge is a reasonable estimate of those damages. Acceptance of any late charge shall not limit any of Holders other rights or remedies under this Note or the Stock Purchase Agreement.

**Payments.** All payments required or permitted herein (principal and interest) shall be made to the address from time to time designated by the Holder and shall be paid not later than 5 p.m. (Minnesota time) on the day when due. All payments shall first be applied to interest accrued to the date of payment and the balance of such payment, if any, shall be applied to the unpaid principal remaining due hereon; provided, however, that upon the occurrence of an Event of Default (as defined herein) payment may first be applied to any late charges or sums advanced (if any) by the Lender for the payment of collection costs or other charges or fees (including reasonable attorneys fees). For all purposes herein, the date of payment shall be the date such payment is actually received by the Holder. Payment received by check or draft shall be credited as of the date delivered.

**Security.** The Borrower's obligations hereunder shall be secured by (i) a pledge of the capital

stock of Available Money pursuant to a Stock Pledge Agreement of even date herewith (the "Stock Pledge Agreement"), (ii) the guaranty and suretyship of Money Centers of America, Inc. pursuant to a Corporate Guaranty of even date herewith, and (iii) the guaranty and suretyship of Available Money pursuant to a Corporate Guaranty of even date herewith.

Events of Default. The occurrence of any one or more of the following events shall constitute an "Event of Default" hereunder:

(a) the Borrower shall fail to pay when due, any installment of principal or interest or fee payable hereunder or any Obligation within 10 days following the date when due;

(b) the Borrower shall fail to observe or perform any other material obligation or covenant required to be observed or performed by it hereunder or under the Stock Pledge Agreement;

(c) the Borrower shall admit its inability to pay its debts as they mature, or shall make an assignment for the benefit of its creditors;

(d) any event of default under the Borrower's primary borrowing facility as a result of which the lender thereunder has declared the principal balance thereof to be due and payable;

(e) proceedings in bankruptcy, or for reorganization of the Borrower, or for the readjustment of any of its debts under Bankruptcy Code, as amended, or any part thereof, or under any other laws, whether state or federal, for the relief of debtors, now or hereafter existing, shall be commenced by or against the Borrower and, if commenced against the Borrower, shall not be discharged within ninety (90) days of their commencement; or

(f) a receiver or trustee shall be appointed for the Borrower or for any substantial part of its assets, or any proceedings shall be instituted for the dissolution or the full or partial liquidation of the Borrower, and such receiver or trustee shall not be discharged within ninety (90) days of its appointment;

Acceleration. Immediately upon the occurrence and during the continuation of any Event of Default, the Lender hereof, at its sole option, and without further notice may declare in writing the entire unpaid principal of this Note together with all interest accrued thereon, to forthwith become due and payable.

Notices. All notices or demands required or permitted to be given pursuant to the terms hereof shall be effective on the date of deposit in the U.S. mails if addressed to the the Lender or the Borrower at its last known address as appropriate, postage prepaid, registered or certified mail, return receipt requested.

Time is of the essence hereof.

Costs. Maker agrees to pay all costs of collection, including reasonable attorneys fees, in case payment of this Note is not made in accordance with its terms.

Governing Law; Jurisdiction. This Note is delivered and made in and shall in all respects shall be construed pursuant to the laws of Minnesota and any and every legal proceeding arising out of or in connection with this Note shall be brought in the appropriate courts of the State of Minnesota, each of the parties hereby consenting to the exclusive jurisdiction of said courts for this purpose.

Remedies. The remedies of the Lender as provided herein, or in the Stock Purchase Agreement, shall be cumulative and concurrent, and may be pursued singularly, successively or together, in the sole discretion of the Lender, and may be exercised as often as occasion therefore shall arise. No act of omission or commission of the Lender, including specifically any failure to exercise any right, remedy or recourse, shall be deemed to be a waiver or release of the same; such waiver or release to be effected only through a written document executed by the Lender and then only to the extent specifically recited therein. Without limiting the generality of the preceding

sentence, acceptance by the Lender of any payment with or without knowledge of the occurrence of Event of Default by Maker shall not be deemed a waiver of an Event of Default, and acceptance by the Lender of any payment in an amount less than the amount then due hereunder shall be an acceptance on account only and shall not in any way affect the existence of an Event of Default hereunder or under the Stock Purchase Agreement. A waiver or release with reference to any one event shall not be construed as continuing, as a bar to, or as a waiver or release of, any subsequent right, remedy, or recourse as to a subsequent event.

Maximum Interest Rate. All agreements between Maker and the Lender are expressly limited so that in no contingency or event whatsoever, whether by reason of: error of fact or law; payment, prepayment or advancement of the proceeds hereof; acceleration of maturity of the outstanding principal balance, or otherwise, shall the amount paid or agreed to be paid to the Lender hereof for the use, forbearance or retention of money to be advanced hereunder, including any charges collected or made in connection with the indebtedness evidenced by this Note which may be treated as interest under applicable law, if any, exceed the maximum legal limit (if any such limit is applicable) under United States federal law or state law (to the extent not preempted by federal law, if any), now or hereafter governing the interest payable in connection with such agreements. If, from any circumstances whatsoever, fulfillment of any provision hereof at the time performance of such provision shall be due shall involve transcending the limit of validity (if any) prescribed by law which a court of competent jurisdiction may deem applicable hereto, then, *ipso facto*, the obligation to be fulfilled shall be reduced to the limit of such validity, and if from any circumstances, the Lender shall ever receive as interest an amount which would exceed the maximum legal limit (if any such limit is applicable), such amount which would be excessive interest shall be applied to the reduction of the outstanding principal balance due hereunder and not to the payment of interest or, if necessary, rebated to the Borrower. This provision shall control every other provision of all agreements between Maker and the Lender.

Survival of Obligations. In the event that at any time any payment received by the Lender hereunder shall be deemed by final order of a court of competent jurisdiction to have been a voidable preference or fraudulent conveyance under the bankruptcy or insolvency laws of the United States, or shall otherwise be deemed to be due to any party other than the Lender, then, in any such event, the obligation to make such payment shall survive any cancellation of this Note and/or return thereof to Maker and shall not be discharged or satisfied by any prior payment thereof and/or cancellation or this Note, but shall remain a valid and binding obligation enforceable in accordance with the terms and provisions hereof, and the amount of such payment shall bare interest at the Default Rate from the date of such final order until repaid hereunder.

Waivers. The Maker hereby expressly waives presentment, demand, notice of dishonor, notice of nonpayment and all other notices and demands in connection therewith or in the nature thereof.

FROM KLEHR HARRISON                    (WED) 1. 21' 04 16:18/ST. 16:15/NO. 4862034594 P  7

Note this 6th    IN WITNESS WHEREOF, the undersigned, intending to be legally bound, has duly executed this
      day of January, 2004

iGAMES ENTERTAINMENT, INC.

By: _____ (SEAL)
Name:   Christopher M. Wolfington
Title:   CEO

CHEX SERVICES, INC.

By: _____ (SEAL)
Name:    BAZ ANUATC
Title:    C.F.O.

PHIL1 552321-5

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| iGAMES ENTERTAINMENT, INC., | : |
| Plaintiff, | :     C.A. No. 04-180 (KAJ) |
| v. | : |
| CHEX SERVICES, INC. and EQUITEX, INC., | : |
| | :     JURY TRIAL DEMANDED |
| Defendants. | : |

# Appendix of Exhibits To iGames Entertainment, Inc's Motion For Summary Judgement

# Exhibit L

WLM\206411.1

EXHIBIT

/22
12/15/04710

Ijaz Anwar

**From:** Ijaz Anwar [ianwar@chexff.com]
**Sent:** Thursday, January 15, 2004 5:36 PM
**To:** Pmoore@maroonbells.com
**Cc:** JIM WELBOURN; HENRY FONG; msavage@corporate-capital.com
**Subject:** CHEX SERVICES INC'S INFORMATION

      

MAROON
BELLS.doc    CONFIDENTIALITY MAROON BELLS.ppt ffRetailATMInsert.p ffRetailBrochInside. ffRetailBrochOutsid ffRetailChexGuardI
             - MAROON BELLS...                 df                pdf            e.pdf            nsert.pdf

  

ffRetailCollSolInsert ffRetailOverviewPa   creditguard sell
.pdf                  ge.pdf               sheet art.pdf...

                                        Paul:
        It was a pleasure speaking with you over the phone yesterday.
Please find enclosed some information of interest related to Chex
Services, Inc. I have also included a mutual confidentiality and
non-disclosure agreement. Please kindly execute the agreement and fax
it to my attention as soon as possible at 952-417-1996.
If you have any questions or concerns, please do not hesitate to contact
me. I look forward to working with Maroon Bells Capital, LLC as well as
Corporate Capital Management, LLC. Thanks.

Ijaz.

CX/EX19528

1

January 15, 2004

Maroon Bells Capital
Attn: Paul Moore
269 Market Square
Lake Forest, IL 60045

Dear Mr. Moore:

It was a pleasure speaking with you and your colleagues over the phone yesterday. I want to personally thank you for taking interest in Chex Services, Inc. ("Chex") with respect to future business opportunities.

I would like to bring a number of facts to your attention demonstrating Chex's dominance in the financial services industry, our ability to produce financial results, and our commitment to clientele.

Chex has been in the financial services business for over ten years. During this time, Fastfunds has experienced constant growth due to its commitment to casinos and casino customers. We currently manage over forty-five accounts spanning nine states. Our current clientele includes twenty full booth operations, which qualifies us as the industry leader in full booth operations. In 2003, the total dollars we processed equated to over 800 million, thus providing the maximum money on the floor for the casinos.

Fastfunds has been a profitable entity from its inception to the present. With profitability, strong cash flows, and a very strong banking relationship, Chex can facilitate financial services at any casino with its current portfolio of products.

Chexs' company status as a subsidiary of publicly traded entity further indicates our financial credibility. We are required to follow the stringent guidelines promulgated by GAAP and the SEC. Moreover, we are obligated to have our financials reviewed by independent auditors every quarter and we are also audited annually. Our internal policies and procedures include a commitment to provide the casinos we service with financial and marketing information in a timely manner.

On behalf of Fastfunds, I hope this letter provides you with an insight into the quality and credibility that is a trademark of the manner in which we conduct our business. In all of our years of business, Fastfunds has prided itself on taking the ethical high road and exercises the highest level of business etiquette and judgment. We will not accept a lower standard for ourselves.

Moreover, for a company with an extensive involvement and contacts in the gaming industry, I would encourage you to perform financial and legal due diligence of Chex. I

can say with confidence that upon review of this type of information, you will feel
confident and comfortable to conduct business with us. I will gladly be available to meet
in person to answer any questions you may have regarding our company, its products, or
our business practices. Alternatively, you may contact me at our offices at any time to do
the same.

Again, thank you for giving Fastfunds an opportunity to serve your needs. We look
forward to an ongoing and mutually beneficial business relationship in the future.

Yours Very Truly,


Ijaz Anwar
Chief Financial Officer and Treasurer
Chex Services, Inc
Tel. # 952-852-2663
Fax # 952-417-1996

CX/EX19530

## CONFIDENTIAL EVALUATION AGREEMENT AND MUTUAL NON-DISCLOSURE AGREEMENT

This is an Agreement by and between Chex Inc. a Minnesota corporation, located at 11100 Wayzata Blvd., Suite # 111, Minnetonka, MN 55305(Chex Inc.), and Corporate Capital Management, LLC, having a principal place of business at 10125 Crosstown Circle # 210, Eden Prairie, MN 55344, and Maroon Bells Capital, LLC, having a principal place of business at 269 Market Square, Lake Forest, IL 60045 (hereafter collectively as Receiving Party).

WHEREAS, Chex Inc. and Receiving Party have certain proprietary technical and commercial information including financial information, processes and market-specific information, all of which the respective parties considers confidential and proprietary;

WHEREAS, Receiving Party is considering entering into a strategic partnering relationship with Chex Inc., and as a part of that consideration, Receiving Party desires the opportunity to evaluate the proprietary technical and commercial information on a confidential basis to evaluate entering this relationship;

WHEREAS, Chex Inc. is willing to disclose the proprietary technical and commercial information and associated technology to Receiving Party on a nonexclusive basis solely for an evaluation under terms and conditions that will permit Receiving Party to obtain an overview of the proprietary technical and commercial information sufficient for a decision on whether to continue negotiations as to Receiving Party's role with Chex Inc. while preserving to Chex Inc. the confidential, proprietary nature of the proprietary technical and commercial information;

WHEREAS, Receiving Party is willing to disclose proprietary technical and commercial information to Chex Inc. on a nonexclusive basis solely for an evaluation under terms and conditions that will permit Chex Inc. initially to obtain an overview of the proprietary technical and commercial information sufficient for a decision on whether to continue negotiations as to Chex Inc.'s role with Receiving Party while preserving to Receiving Party the confidential, proprietary nature of the proprietary technical and commercial information; and

NOW, THEREFORE, the parties agree as follows:

1.    This Agreement shall be effective as of January 15, 2004. ("Effective Date").

2.    The confidential and proprietary information of the parties is to be proffered as such. All proprietary technical and commercial information disclosed by the parties will be received and held in confidence, not to be disclose to anyone and not to be used for any purpose whatsoever other than evaluation pursuant to this Agreement.

3.    The fact that conversations and negotiations between the parties are taking place is confidential and not to be disclosed. The subject or nature of the conversations and negotiations are not to be disclosed even without the mention of the names of either party.

4.    To the extent information is disclosed and concurrently or later identified as confidential in accordance with the terms of this Agreement, the information shall be subject to this Agreement as if a part of the proprietary technical and commercial information.

Chex Inc.'s Non-Disclosure with Corporate Capital Management, LLC & Maroon Bells Capital, LLC

Page 1 of 2

Chex Inc. Initials: _____ / Corporate Capital Management Initials: _____ / Maroon Bells Capital Initials: _____

CX/EX19531

5.    The parties shall use their best efforts, including efforts fully commensurate with those employed by the parties for the protection of proprietary technical and commercial information, to protect the parties pursuant to this Agreement. The parties shall be separately and collectively responsible for maintaining the confidential and proprietary information in confidence.

6.    At the request of either Chex Inc. and Receiving Party, the other party will return all confidential information including but not limited to, documents, electronic information, files, or other materials containing confidential information to the requesting party. A written statement attesting that all such confidential information has been returned must also be provided.

7.    The parties agrees that the confidentiality and use provisions of this Agreement shall not apply to any portions of the proprietary technical and commercial information:

   7.1.    that appears in issued patents or printed publications in integrated form or that otherwise is or becomes generally known in the trade other than through the fault of the receiving party;

   7.2    that the receiving party can show by written records was in the receiving party's possession prior to its disclosure by the disclosing party; or

   7.3    that the receiving party can show, by written record, came into its possession, without covenants of secrecy, from a third party who is under no confidentiality obligation to the receiving party.

8.    The terms and conditions of this agreement are of a special character and provide an important and valuable advantage to both parties. Breach of this agreement would create damages that are not readily ascertainable and cannot be adequately remedied at law. Therefore, the parties agree that breach of this agreement entitles the non-breaching party to injunctive and equitable relief without bond of other security in both the event of a breach or the threat of a breach by the other party and consequential damages plus any additional damages proven.

9.    The laws of the state of Minnesota shall govern this agreement and the parties agreed to and waive all objections to venue and personal jurisdiction in this state.

10.    This writing is the entire agreement between the parties. Modifications to this agreement must be done is writing and signed by both parties.

11.    Should any provision of this Agreement be held invalid or unenforceable, the parties desire that it be modified by the court to conform as closely as possible to its original intent without being invalid or unenforceable, and that in such form it be enforced. Invalidity or unenforceability of a provision herein shall not affect the validity or enforceability of any other provision herein. Failure to enforce one part of this agreement shall not be deemed a waiver of the entire agreement or of other sections, terms or conditions of this agreement.

   IN WITNESS WHEREOF, the parties have executed this Agreement in duplicate originals.

| Chex Inc. | Corporate Capital Management, LLC |
|---|---|
| By:_____ | By:_____ |
| Title: _____ | Title: _____ |
| Date:_____ | Date:_____ |

838490-1                    2



Maroon Bells Capital, LLC

By:_____

Title: _____

Date:_____

CX/EX19533





## ATMs

FastFunds offers the latest in technology with the most advanced ATM machines available on the market today. State-of-the-art equipment that will standup to the wear and tear associated with high volume traffic. An ATM in your business allows your customers access to cash via their ATM/Debit cards and/or Credit Cards. The result gives you yet another method by which your business can increase revenue and profit.

• **Buy or Lease Options.** FastFunds offers ATM machines to either buy or lease depending on the needs of your business.

• **Network Participation.** Access to the largest possible networks allow your customers access to their checking, savings or credit card accounts. Funds are always verified prior to being dispensed

• **Revenue Sharing.** A variety of options exist for your business to choose from that can be tailored specific to your needs.

• **Advanced Technology.** State of the art equipment translates to minimal maintenance and down time. Ease of use is top priority.

• **Multiple Language.** ATMs can satisfy your demographic area and most language barriers that may exist.

• **Fast Processing.** With the most advance technology, customer lines are kept minimal by having the most advance communications and processing components.

• **Multiple Services.** ATMs now have the capability to dispense other services such as stamps, movie tickets, prepaid phone cards.

• **Advertising.** Turn your ATM into another revenue generator with on-screen advertising while in the idle state.

With the flexibility of today's ATMs, FastFunds has a solution to your customers cash access needs. A FastFunds Sales Representative can assist with setting up and tailoring a new program specific to your business.

**w w w . f a s t f u n d s o n l i n e . c o m / 8 0 0 . 3 3 3 . 9 8 7 4**

CX/EX19534