## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| iGames Entertainment, Inc.,<br><br>Plaintiff,<br><br>vs.<br><br>Chex Services, Inc. and Equitex, Inc.<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    C.A. No. 04-180-KAJ |

## BRIEF OF CHEX SERVICES, INC. AND EQUITEX, INC. IN OPPOSITION TO THE MOTION FOR SUMMARY JUDGMENT BY IGAMES ENTERTAINMENT, INC.

MORRIS, JAMES, HITCHENS & WILLIAMS LLP

James W. Semple (#396)
James E. Drnec (#3789)
222 Delaware Avenue
P.O. Box 2306
Wilmington, DE 19899
(302) 888-6800
Email: *jdrnec@morrisjames.com*
Attorneys for Chex Services, Inc.
and Equitex, Inc.

OF COUNSEL:

RIDER BENNETT, LLP

Daniel Q. Poretti
Patrick D. Robben
Douglas J. Frederick
33 South Sixth Street, Suite 4900
Minneapolis, MN 55402
(612) 340-8900
Email: *dqporetti@rider.com*

Dated: March 29, 2005

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................... iv

SUMMARY OF ARGUMENT ................................................................1

STATEMENT OF THE FACTS ............................................................4

I.     iGAMES' REPRESENTATIONS UNDER THE SPA............................4

II.    THE PARTIES' OBLIGATIONS REGARDING COMPETING
       TRANSACTIONS. ...............................................................................6

III.   ADDITIONAL FACTUAL BACKGROUND RELEVANT TO
       iGAMES' MOTION................................................................................8

       A.    iGames Took Actions In Violation Of The SPA Either
             Concurrent With Or Promptly Following Execution Of The
             Agreement. ................................................................................8

             1.   iGames failed to disclose a preexisting contract with
                  Lake Street Gaming entitling that company to sell
                  back iGames shares............................................................8

             2.   Within days of the execution of the SPA, iGames
                  made an unauthorized assignment of its rights under
                  the SPA. ...............................................................................9

             3.   Within weeks of the execution of the SPA, iGames
                  made another unauthorized assignment of its rights
                  under the SPA, and encumbered its assets in direct
                  violation of the SPA............................................................10

             4.   iGames did not properly disclose a $3 million debt
                  with the Tunica Biloxi Tribal Casino..............................11

       B.    iGames Defaults On The Term Loan Note. .................................12

       C.    The Howards, Well-Known And Established Casino
             Customers, Promptly Provided A Promissory Note To
             Repay Returned Checks And Gave Additional Security
             Guarantees................................................................................13

       D.    After The Loss Of The Seminole Business, iGames Elected
             To Reaffirm The Parties' Stock Purchase Agreement. ...............14

E.   iGames Was Told About The Whitebox Financing And Consented To The Defendants' Procurement Of The Financing.................................................................................16

F.   iGames Also Consented To Defendants' Forming Of A Relationship With Maroon Bells. .........................................18

G.   When The SPA Fell Through Because Of iGames' Breaches Of The Agreement, Defendants Undertook The Seven Ventures Transaction. ......................................................20

ARGUMENT .............................................................................................22

I.   STANDARD OF REVIEW. ..............................................................22

II.  iGAMES' MOTION FOR SUMMARY JUDGMENT IS MERITLESS. ...................................................................................22

A.   iGames' Motion Is Simply An Attempt To Cloud The Issues.......................................................................................22

B.   iGames Argument That The SPA Is Binding On Equitex Misses The Point...........................................................................23

C.   iGames Has, By Its Own Preexisting Breaches Of The SPA, No Right To Claim That Defendants Breached The Agreement Or To Recover The Termination Amount...............................23

1.   The undisclosed Lake Street Gaming agreement............................24

2.   iGames made unauthorized assignments of its rights under the SPA and encumbered its assets.......................................25

3.   The undisclosed Tunica-Biloxi Debt. .............................................25

4.   iGames defaults on the Note. .........................................................26

D.   iGames' Claims That Defendants Breached The SPA Are Without Merit..................................................................................26

1.   Defendants disclosed the Howard note and properly recorded it as an account receivable. ..............................................27

2.   iGames Elected To Affirm The SPA After The Seminole Contract Was Lost. .........................................................30

3.   Defendants Were Authorized By iGames To Develop A Merchant Banking Relationship With Maroon Bells..................................................................................32

4.      iGames knew about, and consented to, Defendants'
        pursuit of the Whitebox financing. ................................................32

5.      The Defendants' decision, after the SPA was
        terminated, to pursue and finalize an alternate
        business merger with the Seven Ventures group,
        was entirely proper........................................................................34

CONCLUSION.................................................................................................36

## TABLE OF AUTHORITIES

**CASES**

*Bigda v. Fischbach Corp.*, 849 F. Supp. 895
    (S.D.N.Y. 1994) ...................................................................................... 30

*ESPN, Inc. v. Office of Comm'r of Baseball,*
    76 F. Supp. 2d 383 (S.D.N.Y. 1999) ..................................................... 30

*Fields v. Thompson Printing Co.,*
    363 F.3d 259 (3d Cir. 2004) .................................................................... 22

*Honeywell Int'l Inc. v. Air Prods. & Chems., Inc.,*
    858 A.2d 392 (Del. Ch. 2004) ................................................................ 30

*Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.,*
    998 F.2d 1224 (3d Cir. 1993) .................................................................. 22

*Schutzman v Gill,*
    154 A.2d 226 (Del. Ch. 1959) ................................................................ 24


**OTHER AUTHORITIES**

5 WILLISTON ON CONTRACTS § 638 .................................................................. 30


**RULES**

Fed. R. Civ. P. 56(c) ......................................................................................... 22

## SUMMARY OF ARGUMENT

Just over a month ago, iGames Entertainment, Inc. ("iGames") filed a "Motion for Summary Denial of Defendants' Motions for Summary Judgment". (D.I. 93.) In that pleading, iGames protested that there were "numerous issues of disputed material fact remain to be resolved by a finder of fact", and that the Court should "fully address all of the issues at trial". (*See id.* at 3-4.) Now, incredibly, iGames brings the instant motion, claiming it is entitled as a matter of law to judgment on its claim that Defendants Chex Services, Inc. ("Chex") and Equitex, Inc. ("Equitex") violated the parties' Stock Purchase Agreement ("SPA").

Why the sudden change of heart by iGames? Perhaps iGames has concluded that the best defense to Defendants' comprehensive summary judgment motion is a good offense, bringing a motion in an attempt to cloud the issues to create the appearance that factual issues precluding Defendants' motion exist. Whatever the motives for iGames' motion, Defendants submit that iGames' motion is without merit. iGames' motion is entirely premised on the claim that Defendants breached the SPA first, so therefore iGames is entitled to terminate. This argument is entirely unfounded. Even if the Court accepted iGames' description of the alleged breaches, iGames would still not be entitled to claim a right to terminate the agreement, as iGames committed several material breaches of the agreement contemporaneously with its execution of the agreement and subsequently within days thereafter, all of which prevent iGames from recovering the relief its seeks in its motion for summary judgment.

Further, iGames' description in its brief of the facts regarding the issues relating to the Howard Note, the Seminole Contracts, etc., not only misstates important material facts, but also wholly fails to mention other testimony and evidence that is contradictory

to its claims. The standard for summary judgment is that all of the evidence must be weighed in the light most favorable to the non-moving party. iGames tries to turn this standard on its head by submitting a motion putting in only the evidence most favorable to iGames, and omitting central facts that are contrary to its claims. For example, iGames pleads as undisputed material fact that Defendants "secretly" arranged for the Whitebox financing instead of using Mercantile Capital. (iGames' Br. at 14.) This claim completely ignores the following evidence:

- Defendants' counsel sent iGames' counsel an email on January 9, 2004 discussing the Defendants' desire to pursue alternative financing (i.e., Whitebox) for the next $2 million installment on the Term Loan Note rather than that from Mercantile Capital as proposed by iGames;

- Equitex's CEO Henry Fong and Chex's top executives, James Welbourn and Ijaz Anwar, all testified they disclosed the Whitebox financing to iGames' CEO Chris Wolfington in January 2004, and he consented to it;

- Mr. Anwar testified that he called Mr. Wolfington in March 2004 to advise that the Whitebox financing had closed and offered to fund the second $2 million installment under the Term Loan Note, provided that iGames finally deliver the stock pledge agreement it had agreed to provide in January.

This is just one example of the liberties iGames has taken in presenting its motion.

iGames' previous "Motion for Summary Denial of Defendants' Motions for Summary Judgment" stated a concern that the issues before the Court be presented in the most "efficient" manner possible. (D.I. 93 at 4.) iGames' motion, which seeks summary judgment by discussing only the evidence it finds helpful to its position, and ignoring

other evidence clearly demonstrating that genuine issues of material fact abound on the issues it raises, does not advance that goal of judicial economy that iGames claimed to hold dear.  iGames' motion should be denied.

## STATEMENT OF THE FACTS[1]

Chex and Equitex (collectively "Defendants") have set out in their pending

motions for summary judgment the underlying facts regarding the parties' relationship, as

well as the pertinent facts regarding the events that occurred between the time the parties

negotiated and executed the SPA in the fall of 2003, and when Defendants rightfully

terminated the SPA in March 2004.  In the interests of judicial economy, Defendants will

not restate all of those facts here.  However, Defendants will address the facts relevant to

the claims made in iGames' brief.

### I.     iGAMES' REPRESENTATIONS UNDER THE SPA.

On November 3, 2003, iGames (the "Buyer") executed the SPA, making the

following representations:

> 5.  **Representations of Buyer Concerning the
> Transaction.**  Buyer represents to Parent and Chex that the
> statements contained in this Section 5 are correct and
> complete as of the date of this Agreement and will be
> correct and complete as of the Closing Date (as though
> made then as though the Closing Date was substituted for
> the date of this Agreement throughout this Section 5).
>
> * * *
>
> (c) Capitalization of Buyer.... Other than this Agreement
> and as disclosed on Schedule 5(c), there are no outstanding
> or authorized options, warrants, rights, contracts, calls,
> puts, rights to subscribe, conversion rights or other
> agreements or commitments to which Buyer is a party or
> which are binding upon Buyer providing for the issuance,
> disposition or acquisition of any of its capital stock, nor any
> outstanding or authorized stock appreciation, phantom
> stock or similar rights with respect to Buyer.
>
> * * *

---

[1] The facts of this case have been presented to this Court in previously filed motions.  Only those
facts relevant to the Motion at issue will be addressed herein.

(g) <u>Events Subsequent to Buyer Interim Balance Sheet</u>. Since the date of Buyer Interim Balance Sheet, and except as disclosed on <u>Schedule 5(g)</u>, there has not been, occurred or arisen, with respect to Buyer:

(xi) any Security Interest or Encumbrance imposed upon any of its assets, tangible or intangible;

* * *

(xvi) any issuance of any note, bond, or other debt security or created, incurred, assumed, or guaranteed any indebtedness for borrowed money or capitalized lease obligation involving more than $10,000;

* * *

(xix) any loan to, or any entrance into any other transaction with, any of its directors, officers, and employees;

* * *

(xxiv) any taking of other action or entrance into any other transaction other than in the Ordinary Course of Business, or entrance into any transaction with any insider of Buyer, except as disclosed in this Agreement and the Disclosures Schedules;

(xxv) any other event or occurrence that may have or could reasonably be expected to have an [sic] Material Adverse Effect on Buyer (whether or not similar to any of the foregoing);

. . . .

(*See* Robben Aff.[2] Ex. 1 at 16-28 (SPA § 5).)   Section 5(o) of the SPA required iGames

to disclose all of its contracts involving more than $10,000 and contained a representation

---

[2] References to the "Robben Aff." refer to the Affidavit of Patrick D. Robben previously submitted in support of Defendants' motion for summary judgment. (D.I. 89). References to the "Second Robben Aff." will refer to the Second Affidavit of Patrick D. Robben submitting additional exhibits not previously submitted in the previous Robben Affidavit.

that iGames "has fully complied with all material terms of Buyer Contracts." (*See id.* at 24 (SPA § 5(o)).)

Additionally, iGames also agreed it would notify Chex and Equitex within five Business Days of "any event, condition or circumstance occurring from the date hereof through the Closing Date that would constitute a Breach of this Agreement" or any subsequent transaction that would have been disclosed if the transaction would have existed on the date of execution of the SPA. (*See id.* at 40 (SPA § 7(e)).) Thus, iGames was required to disclose its contractual commitments, and security interests or encumbrances it had accepted. Such transactions were required to be disclosed whether or not they existed on November 3, 2003 or would occur subsequent to that date.

Further, when iGames executed the SPA, it also agreed that it may not assign "either this Agreement of any of its rights, interests or obligations hereunder without the prior written approval" of Chex and Equitex. (*See id.* at 57 (SPA § 12(d)).)

## II.     THE PARTIES' OBLIGATIONS REGARDING COMPETING TRANSACTIONS.

Defendants entered into the SPA with iGames after previously receiving an offer to purchase Chex from another company. The SPA set forth in Section 7(g)(i) the parties' assurances that Defendants would not seek out additional bidders:

> Chex and Parent shall, and shall direct and use Best Efforts to cause their respective Representatives to, immediately cease any discussions or negotiations with any parties that may be ongoing with respect to a Chex Proposed Transaction (as defined below). Neither Chex nor Parent shall, nor shall either permit any of their respective subsidiaries to, nor shall either authorize or permit any of their respective Representatives, directly or indirectly, to knowingly (i) solicit, initiate, or encourage (including by way of furnishing information), or take any other action designed or reasonably likely to facilitate, any inquiries or the making of any proposal which constitutes, or may

6

reasonably be expected to lead, to any Chex Proposed Transaction, or (ii) participate in any discussion or negotiations regarding any Chex Proposed Transaction. The term "Chex Proposed Transaction" means any inquiry, proposal or offer from any person relating to any form of business combination involving Chex, or any direct or indirect acquisition or purchase of all or substantially all of the assets of Chex or any equity securities of Chex, any tender offer or exchange offer that if consummated would result in any person beneficially owning 10 percent or more of any class of equity securities of Chex, any merger, consolidation, share exchange, business combination, recapitalization, liquidation, dissolution or similar transaction involving Chex, other than the Contemplated Transactions.

(*See* Robben Aff. Ex. 1 at 41 (SPA § 7(g)(i)).)  However, recognizing that the Equitex

Board had fiduciary duties to its shareholders, iGames agreed:

> . . . if, after the date of this Agreement, the Parent receives an unsolicited written proposal relating to a Chex Proposed Transaction (which proposal would result in a Superior Proposal) from any Person and the Parent's Board reasonably concludes that the failure to engage in discussions or negotiations with such Person would be inconsistent with Parent Board's fiduciary duties to the Parent's stockholders under applicable law, then (i) the Parent or the Parent Board may, directly or indirectly, provide access to or furnish or cause to be furnished information concerning the Parent's and Chex's business, properties or assets to such Person pursuant to an appropriate confidentiality agreement and the Parent or the Parent Board may engage in discussions related thereto, and (ii) the Parent or the Parent Board may participate in and engage in discussions and negotiations with such Person regarding such proposal for a Chex Proposed Transactions. . . .

(*See id.* at 41-42 (SPA § 7(g)(iii)).)

The SPA provided the parties the right to terminate prior to closing of the SPA under given conditions, including if representations made in the agreement were inaccurate or became inaccurate or if a party had materially failed to comply with its

obligations. (*See id*. at 54-56 (SPA § 11(b)).) The right to terminate prior to closing on the SPA under section 11(b), however, "shall not be available to any party that has breached in any material respect its obligations under this Agreement in any manner that proximately contributed to the failure of the transactions contemplated hereby to be consummated." (*See id*. at 55 (SPA § 11(b)).) The SPA does not contain a survival clause indicating that the obligations of the parties to comply with the agreement, including the prohibition on negotiations for alternatives to the SPA transaction, would survive upon such a termination of the agreement.

## III.   ADDITIONAL FACTUAL BACKGROUND RELEVANT TO IGAMES' MOTION.

### A.   iGames Took Actions In Violation Of The SPA Either Concurrent With Or Promptly Following Execution Of The Agreement.

#### 1.   iGames failed to disclose a preexisting contract with Lake Street Gaming entitling that company to sell back iGames shares.

As Chex and Equitex would only fully learn after the lawsuit commenced, iGames was not in compliance with the disclosure provisions of the SPA or the revised agreement when those documents were executed. For example, iGames failed to disclose an Asset Purchase Agreement with Lake Street Gaming. (*See* Robben Aff. Ex. 40 (Stein Dep. Tran. at 61:1-24, 62:1-24).) Under this agreement, which was signed in February 2003, Lake Street Gaming is entitled to sell back to iGames 150,000 shares of iGames' stock that Lake Street Gaming received in consideration for selling certain rights in a casino game called "table slots" to iGames if the fair market value of iGames' stock fell below a certain level. (*See* Second Robben Aff. Ex. 7 (Lake Street Gaming Compl.).) In fact, iGames is now defending a lawsuit in the Eastern District of Pennsylvania regarding

its breach of that agreement.[3]  Mr. Wolfington, CEO of iGames, does not deny that iGames never disclosed this agreement to Defendants.  (*See* Second Robben Aff. Ex. 9 (Wolfington Dep. Tran. at 121:7-14).)  iGames' failure to disclose its agreement with Lake Street Gaming violated sections 5(c) and 5(o) of the SPA and made iGames' representations in respect to those provisions materially false as of the date iGames executed the SPA.

> **2.     Within days of the execution of the SPA, iGames made an unauthorized assignment of its rights under the SPA.**

After this litigation commenced, Chex and Equitex learned in discovery that iGames had assigned its rights under the SPA within days after the SPA was executed. The assignment was made to Mr. Wolfington on November 11, 2003, a mere 8 days after executing the SPA.  (*See* Robben Aff. Ex. 29 (Nov. 11 Assignment).)  Mr. Wolfington did not recall advising Chex and Equitex of this transaction, and did not get the required written approval.  (*See* Robben Aff. Ex. 5 (Wolfington Dep. Tran. at 310:15-23).)  This assignment violated the non-assignment provision of the SPA because iGames never received written approval from Chex and Equitex allowing such an assignment.  (*See* Robben Aff. Ex. 1 at 57 (SPA § 12(d)).)  The assignment also made iGames' representations in respect to SPA sections 5(g)(xix) and/or 5(g)(xxiv) materially false, because it was a transaction between iGames and Mr. Wolfington, who was either a director, officer, employee or "insider" of iGames at the time.  (*See id.* at 19 (SPA § 5(g)).)  iGames' failure to disclose the assignment also violated section 5(o) because it was a contract involving more than $10,000, (*see id.* at 24), and it was further contrary to

---

[3] A copy of the docket to that case, Court File No. 2:04-CV-04965-SP, is attached as Exhibit 8 to the Second Robben Affidavit.

section 7(e) because iGames failed to disclose the transaction within 5 days of its occurrence. (*See id.* at 40 (SPA § 7(e))).)

> **3.    Within weeks of the execution of the SPA, iGames made another unauthorized assignment of its rights under the SPA, and encumbered its assets in direct violation of the SPA.**

Another assignment of the Termination Amount, this time to Mercantile, was made on November 26, 2003.  (*See* Robben Aff. Ex. 30 (Nov. 26 Assignment).) Mr. Wolfington did not specifically recall advising Chex and Equitex of this transaction either, and did not get the required written approval. (*See* Robben Aff. Ex. 5 (Wolfington Dep. Tran. at 325:8-19; 331:13-23).)  As with its prior assignment, this assignment, made without the written approval of Chex and Equitex, was expressly prohibited by the SPA. (*See* Robben Aff. Ex. 1 at 57 (SPA § 12(d))).)    The November 26 assignment accompanied a *Loan and Security Agreement* between iGames and Mercantile. (*See* Robben Aff. Ex. 37) (Loan and Security Agreement).)  As part of the agreement, iGames issued a security interest to Mercantile in all of its assets.   The *Loan and Security Agreement* between Mercantile and iGames encumbered the assets of iGames and made iGames' representations in respect to SPA sections 5(g)(xi), 5(g)(xvi), and 5(o) materially false.   iGames also failed to disclose the transaction within 5 days of its occurrence in contravention of section 7(e) of the SPA. (*See id.* at 40 (SPA § 7(e))).)

Neither Equitex nor Chex learned of the assignments until copies of them were obtained during the discovery phase of this lawsuit.  (*See* Robben Aff. Ex. 56 (Fong Aff. ¶ 3; Anwar Aff. ¶ 2).)

4.    **iGames did not properly disclose a $3 million debt with the Tunica Biloxi Tribal Casino.**

iGames also failed to properly disclose an arrangement dated July 29, 2003, between MCA and the Tunica-Biloxi Tribe ("TB Tribe Agreement") which created a $3 million debt, for which iGames would eventually be responsible. (*See* Robben Aff. Ex. 41 (Shopa Expert Report at 18-22).)   Under the agreement, the Tunica-Biloxi tribe advanced approximately $1.3 million at 9% interest.  The promissory note between the tribe and MCA provided the interest continued to accrue until paid. (*See* Second Robben Aff. Ex. 10).)  In addition, the agreement with the Tunica-Biloxi tribe contains a section entitled "Equity Payments" stating that MCA "will pay TB Tribe an additional $3 million", the timing of which is contingent on certain circumstances. (*See id*. at 3)

MCA did not reflect this potential $3 million debt on its 2003 financial statements.  Expert accountant Thomas Shopa has opined that MCA failed to properly account for the $3 million obligation on MCA's financial statements from the date of the TB Tribe Agreement. (*See* Robben Aff. Ex. 41 (Shopa Expert Report at 21).)  As Mr. Shopa's report notes, this obligation should have been reflected as a debt on iGames/MCA's financial reports.  If treated as a debt, this severely impacts iGames' financials.

When the merger between MCA and iGames was completed on January 2, 2004, iGames became responsible for the $3 million obligation to the Tunica Biloxi Tribe. However, iGames did not properly disclose its obligations under the TB Tribe Agreement, which was contrary to sections 5(g)(xvi), 5(o) and 7(e) of the SPA.

**B.     iGames Defaults On The Term Loan Note.**

As more fully addressed in connection with Chex and Equitex's pending motions for summary judgment, among other breaches of the SPA and events that had a Material Adverse Effect on iGames, iGames also failed to make interest payments and failed to deliver an executed stock pledge agreement and corporate guaranties pursuant to the terms of the Term Loan Note that iGames had executed in favor of Chex. No later than January 21, 2004,[4] iGames had a binding obligation to deliver the stock pledge agreement and corporate guaranties.

Even as of the date of this brief, iGames has not delivered the executed stock pledge agreement and corporate guaranties required under the Term Loan Note. Not only did iGames' failure to provide these documents mean that iGames was in default of the Term Loan Note, it also rendered materially false iGames' representation that it has fully complied with all material terms of its contracts consistent with section 5(o) of the SPA. This is in addition to the Material Adverse Effect that a default on a $2 million loan had on iGames. iGames' failure to deliver the executed stock pledge agreement and corporate guaranties was merely one of the reasons that Chex and Equitex cited for accelerating the Note and terminating the SPA on March 12, 2004. (*See* Robben Aff. Ex. 4 (Clegg letter).) Thus, iGames own actions, including its default on the Term Loan Note, proximately contributed to the failure of the SPA and section 11(b) of the SPA bars iGames' claim to the recovery it seeks.

---

[4] iGames accepted the $2 million loan on January 6, 2004, and the parties fully understood that iGames was required to pledge the stock of Available Money to Chex as security for the loan. Thus, as of that date, iGames had an obligation to deliver an executed stock pledge agreement. Obviously, no later than January 21, 2004, when the Term Loan Note was actually executed, iGames was under an obligation to provide the stock pledge agreement and corporate guaranties that were referred to as documents "of even date herewith." (*See* Robben Aff. Ex. 7 at 2-3 (Term Loan Note, "Security.").)

**C.    The Howards, Well-Known And Established Casino Customers, Promptly Provided A Promissory Note To Repay Returned Checks And Gave Additional Security Guarantees.**

During September 2003, a significant regular customer of Chex, Leroy and Pauline Howard ("the Howards"), cashed approximately $600,000 worth of checks that were returned for insufficient funds. (*See* Second Robben Aff. Ex. 12 (Moose Dep. Tran. at 17:18-25; 18:1-24; 22:1-2).)   The Howards promptly signed a promissory note agreeing to repay the owed sums, and promised to satisfy the obligation through a refinancing of the mortgage on their business properties. (*See* Robben Aff. Ex. 13 (Prom. Note).)   The Howards let Chex management inspect their business property collateral, and also had their mortgage banker speak with Chex officials to vouch for their ability to repay the obligation by refinancing their mortgage. (*See* Second Robben Aff. Ex. 1 (Moose Dep. Tran. at 22:18-25; 23:1-25; 27:21-25; 28:1-18).)   The Howards in fact did grant Chex a mortgage on April 1, 2004, to this effect. (*See* Robben Aff. Ex. 14 (Mortgage).)

Defendants did not conceal the Howard note on its books.   The Howard obligation was listed as an account receivable on Chex's balance sheet.   It was also disclosed in Equitex's 10Q, publicly filed with the SEC on November 19, 2003. (*See* Robben Aff. Ex. 15 (Equitex 10Q for period dated September 30, 2003 at p. bates-stamped CX/EX 15989).)   This account receivable was also listed in a disclosure Chex submitted to iGames[5] during the due diligence process in early December 2003. (*See* Robben Aff. Ex. 16 (Chex Due Diligence Disclosure Schedule).)   The approximately $600,000

---

[5] It should be noted again, for clarification, that on January 2, 2004, the MCA/iGames transaction closed.   iGames acquired all of the issued and outstanding capital stock of MCA and MCA become a subsidiary of iGames.   As part of the transactions, Mr. Wolfington became Chairman of the Board and CEO of iGames.

obligation constituted less than 1% of the $63 million purchase price for Chex under the SPA.

Defendants have produced an expert report from CPA Thomas Shopa noting that "the accounting treatment of the notes receivable from the Howards is consistent with generally accepted accounting principles." (*See* Robben Aff. Ex. 41 at 12-17 (Expert Report of Thomas Shopa dated Jan. 26, 2005).)

### D. After The Loss Of The Seminole Business, iGames Elected To Reaffirm The Parties' Stock Purchase Agreement.

After the close of business on January 2, 2004, Chex learned that its contract with Native American Cash Systems of Florida ("NACSF") was being terminated. This contract allowed Chex to operate cash booths in casinos owned by the Seminole Tribe of Florida. (*See* Robben Aff. Ex. 17 (NACSF termination letter).) Mr. Wolfington was notified of this event on Sunday, January 4, 2004. (*See* Second Robben Aff. Ex. 2 (Fong Dep. Tran. at 132:1-6).) Chex undertook a series of cost-savings measures to minimize the effect of this loss on the company's bottom line. (*See* Second Robben Aff. Ex. 3 (Dec. 15 Anwar Dep. Tran. at 165:15-24).) In a January 5, 2004 press release discussing these measures, iGames and Equitex reaffirmed their intent to close on the SPA. (*See* Robben Aff. Ex. 18 (Equitex and iGames Press Release).) In the press release, Wolfington is quoted as stating that "[t]he synergies and merits of the Chex Services transaction were never dependent on any one contract for its success. We remain committed to the transaction and look forward to closing as soon as possible." (*Id.*)

Prior to the January 2, 2004 termination of the NACSF contract, Mr. Wolfington had requested that Chex borrow $2 million from Mercantile Capital ("Mercantile") and, in turn, Chex would then loan the $2 million to iGames to cover the initial payment for

iGames' acquisition of a company called Available Money, Inc. Mercantile, however, wanted Chex to deposit $2 million into an account controlled by Mercantile as collateral for the loan. (*See* Robben Aff. Ex. 9 (Dec. 15 Anwar Dep. Tran. at 288:1-10).) Mercantile was also going to charge a $100,000 fee, plus 15% interest. (*See* Second Robben Aff. Ex. 4 (Jan. 6 Mercantile Proposal).)

The unexpected termination of the NACSF contract regarding the Seminole casinos had, in fact, given Chex the flexibility to facilitate the Available Money transaction by making available $2 million, which could be loaned to iGames on January 6, 2004. (*See* Robben Aff. Ex. 9 (Dec. 15 Anwar Dep. Tran. at 105:14-24; 106:1-8).) Thus, instead of incurring the cost of the proposed Mercantile loan, the parties decided that the best course of action was to have Chex simply loan the $2 million directly to iGames. (*See* Robben Aff. Ex. 5 (Sept. 22 Wolfington Dep. Tran. at 264:1-24; 265:1-10).) This amount would cover the initial payment and then further financing (again, via Chex) for the second payment, which was due on or about March 6, 2004.

With Chex now in possession of extra funds, the parties agreed to the Term Loan Note ("Note") under which Chex loaned to iGames the money needed for the initial payment for iGames' purchase of Available Money. (*See* Robben Aff. Ex. 7 (Term Loan Note).) The Note provided that financing for the next $2 million from Chex to iGames could come from either Mercantile, or another lender offering financing on terms satisfactory to iGames, and would be conditioned upon iGames' compliance with the terms of the Note, iGames providing a stock pledge agreement and corporate guaranties, and iGames' compliance with the SPA. (*Id.*)

15

This loan occurred during the period in which the parties were negotiating a new agreement to replace the SPA. Accordingly, the Note even included a section contemplating the consequences that would occur if the SPA were terminated before the loan was repaid. (*Id.*) With full knowledge that the loan was made possible because Chex had lost the NACSF contract in regard to the Seminole casinos, iGames accepted the $2 million loan on January 6, 2004, and then executed the Note on January 21, 2004.

### E.    iGames Was Told About The Whitebox Financing And Consented To The Defendants' Procurement Of The Financing.

After the initial $2 million payment under the Note was made on January 6, 2004, Chex continued discussions with Mercantile in regard to financing the second $2 million payment, and various loan documents were drafted. The financing proposed by Mercantile included a requirement that Chex pledge its stock as collateral. (*See* Second Robben Aff. Ex. 4 (Jan. 6 Mercantile Proposal).) With full knowledge that any financing arrangement, by which Chex would be able to obtain another $2 million, would require Chex to encumber its assets, iGames executed the Note on January 21, 2004.

As of January 9, 2004, Chex's counsel had told iGames' counsel that "Chex needs the flexibility to use someone other than Mercantile to obtain the financing. We do have other options that may be more attractive and would, in the end, benefit both our clients. If the money is there, it shouldn't make a difference to you as to who is providing it." (*See* Robben Aff. Ex. 10 (Email from Clegg to Rovin and Anwar dated 1/9/04).) Thus, in regard to Chex's financing of the second advance of $2 million, the language of the Note provided that Chex could obtain the financing from a lender other than Mercantile if iGames found it satisfactory. (*See* Robben Aff. Ex. 7 (Note at 1).) During his deposition,

16

Mr. Wolfington was asked about iGames' ability to withhold consent regarding a lender other than Mercantile, and the following exchange took place:

> Q:    Did you believe that you could withhold that consent unreasonably?
>
>        MR. TAYLOR: Objection as to the form.
>
> A:    Absolutely. So did they.

(*See* Robben Aff. Ex. 5 (Dec. 3 Wolfington Dep. at 386:8-11).)

Mr. Wolfington admits that he was told about the possibility of financing provided by another lender during a January 28, 2004 meeting, which occurred a mere seven days after the signing of the Note. (*See id.* at 387:1-19.) James Welbourn, President of Chex, Henry Fong, CEO of Equitex, and Mr. Anwar have testified that, at that meeting, they disclosed to Mr. Wolfington a preference to have Chex borrow money for the second $2 million installment on the Note from a venture capital firm known as Whitebox. (*See* Robben Aff. Ex. 8 (Sept. 21 Welbourn Dep. at 81:14-24; 82:1-24; 83:1-19); Ex. 3 (Dec. 2 Fong Dep. at 54:1-24; 55:1-24; 56:1-5); Ex. 9 (Dec. 15 Anwar Dep. at 114:13-24; 115:1-21).) Whitebox offered far lower interest rates and more preferable additional terms than iGames' primary lender, Mercantile. (*See* Robben Aff. Ex. 9 (Dec. 15 Anwar Dep. at 124:16-24; 125:1-5; 288:1-10).)

Messrs. Fong, Welbourn, and Anwar testified that Mr. Wolfington consented to use Whitebox to obtain the additional $2 million, provided that any Whitebox transaction did not dilute iGames' percentage of ownership in the merged entity. (*See* Robben Aff. Ex. 8 (Welbourn Dep. at 82:2-15); Ex. 3 (Dec. 2 Fong Dep. at 55:1-5); Ex. 9 (Dec. 15 Anwar Dep. at 114:13-24; 115:1-6).) Consistent with this testimony is an email sent by iGames' counsel on March 8, 2004 stating Mr. Wolfington's understanding that

17

the Whitebox loan was dilutive to Equitex only. (Robben Aff. Ex. 49 (Email from Rovin to Anwar and Fong dated 3/8/04).) Mr. Wolfington admits he was made aware of the Whitebox financing at the January 28th meeting, but denies that he consented to it. (*See* Robben Aff. Ex. 5 (Dec. 3 Wolfington Dep. at 387:10-19).) However, Mr. Wolfington has also testified that at this meeting he stated that he would "listen" to the Whitebox opportunity if all costs of the financing would be dilutive only to Equitex's percentage of ownership in the merged entity. (*See* Robben Aff. Ex. 5 (Dec. 3 Wolfington Dep. at 394:5-14).) Equitex proceeded to obtain $5 million in financing from Whitebox in a deal that closed on or about March 9, 2004. (*See* Robben Aff. Ex. 9 (Dec. 15 Anwar Dep. at 128:1-22).)[6]

When comparing the proposed Mercantile transaction with the obtained Whitebox loan, it is readily apparent that the Whitebox transaction was far superior in terms of interest rate and required collateral. (*See* Robben Aff. Ex. 50 (Expert Report of Gregg A. Jarrell dated 1/26/05 at pp. 17-20 (without exhibits).) Not only were the Whitebox loan terms more beneficial for Chex, but also for iGames, which was acquiring Chex.

**F.    iGames Also Consented To Defendants' Forming Of A Relationship With Maroon Bells.**

Maroon Bells Capital is a merchant banking firm with experience in the gaming industry. (*See* Second Robben Aff. Ex. 2 (Fong Dep. Tran. at p. 121:3-24).) Maroon Bells contacted Defendants in or about January 2004 to discuss potential contract opportunities. (*See id.* at p. 123:8-21.) Defendants received an introductory letter from

_____

[6] iGames' counsel sent an email to Messrs. Fong and Anwar on March 8, 2004, demonstrating that iGames was aware of Defendants' intent to close on the Whitebox financing. (*See* Robben Aff. Ex. 49) (Emailed from Rovin to Anwar and Fong dated 3/8/04).) The email reinforced the position that iGames agreed to the use of the financing provided that any dilution of ownership resulting from a Whitebox agreement be incurred by Defendants.

Mark Savage, who had done work for Maroon Bells in his position with Corporate Capital Management, indicating that Maroon Bells would like to develop a cross-marketing relationship with a financial services company that was similarly involved in the gaming industry. (*See* Second Robben Aff. Ex. 3) (Dec. 15 Anwar Dep. Tran. at 258:19-24; 259:1-17).) Chex sent some financial documentation to Maroon Bells after receiving this introductory letter for purposes of giving background information regarding Defendants to Maroon Bells. (*See id.* at p. 281:10-15.)

Equitex's CEO Henry Fong viewed Maroon Bells not as a substitute merger candidate to iGames but as a "marketing intermediary" that could use its industry contacts to help Defendants develop other business and other potential business deals. From Mr. Fong's perspective, developing this relationship with Maroon Bells in no way hindered Defendants' ability to obtain the next $2 million of financing to facilitate the Available Money purchase, or the ability to close on the SPA. (*See* Second Robben Aff. Ex. 2 (Fong Dep. Tran. at 145:6-24; 260:23-24; 261:1-22; 264:1-5).) Mr. Fong testified that the term sheets Maroon Bells provided Defendants in the spring of 2004 were "just term sheets on how—how Maroon Bells could assist us in their merchant banking activities and provide their particular services, especially in the sales and marketing and international and traditional casino markets." (*See id.* 146:8-16.)

At the January 2004 meeting in Minneapolis between executives from iGames and Defendants (previously discussed herein), Defendants advised Mr. Wolfington of their intent to work with Maroon Bells. (*See id.* at 122:6-13.) Mr. Wolfington told Mr. Fong that Defendants simply needed to make sure the transactions Maroon Bells proposed were accretive—i.e., that they would create value. (*See id.* at 262:1-24;

263:1).) Mr. Fong testified that although the form of the transactions that were ultimately reached with Maroon Bells and Seven Ventures might have had to be modified had the deal with iGames closed, the essential substance of the Maroon Bells (and Seven Ventures transaction, discussed below) could have been achieved while still completing the iGames' transaction. (*See id.* at 263:1-23.)

### G.     When The SPA Fell Through Because Of iGames' Breaches Of The Agreement, Defendants Undertook The Seven Ventures Transaction.

As the Court is aware from Defendants' summary judgment motion, the Defendants terminated the SPA in March 2004 after a number of concerns arose, including iGames' failure to provide a stock pledge agreement as required by the Note. Importantly, Mr. Wolfington has confirmed Defendants' conclusions from that time that iGames was not willing to close on the SPA in March 2004, testifying that prior to the termination, iGames would not have closed on the agreement as written. (*See* Robben Aff. Ex. 5 (Wolfington Dep. Tran. at 213:22-24; 214:1-15).)

A month after the SPA had been terminated,[7] on or about April 12, 2004, Chex and Equitex entered into an *Agreement and Plan of Merger* with Seven Ventures, Inc., a publicly traded Nevada corporation, and Seven Ventures Newco, Inc., a wholly owned subsidiary of Seven Ventures and a Minnesota corporation. (*See* Second Robben Aff. Ex. 5) (Equitex 4/15/04 8-K).) Seven Ventures, Inc. had no business operations when the *Agreement and Plan of Merger* was executed. On or about June 7, 2004, the parties consummated the merger transaction. (*See* Second Robben Aff. Ex. 6 (Equitex 6/8/04 8-K).) In the merger, Seven Ventures Newco, Inc. merged with and into Chex, with Chex surviving the merger as the wholly owned operating subsidiary of Seven Ventures, Inc.

---

[7] iGames has alleged that it terminated the SPA on March 12, 2004.

At the closing of the merger, Equitex exchanged 100% of its equity ownership in Chex for 7,700,000 shares of common stock of Seven Ventures, Inc., representing approximately 93% of the outstanding common stock of Seven Ventures, Inc. following the merger. After the Merger, the sole business of Seven Ventures, Inc. is the conduct of the business of Chex.

## ARGUMENT

### I.     STANDARD OF REVIEW.

To prevail on a motion for summary judgment, the moving party must demonstrate "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The Court must view the evidence in the light most favorable to the non-movant, "draw[ing] all reasonable inferences in favor of the non-moving party." *Fields v. Thompson Printing Co.,* 363 F.3d 259, 265 (3d Cir. 2004).  To raise a genuine issue of material fact, the nonmovant "need not match, item for item, each piece of evidence proffered by the movant but simply must exceed the 'mere scintilla' [of evidence] standard." *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.,* 998 F.2d 1224, 1230 (3d Cir. 1993) (citations omitted).

### II.     iGAMES' MOTION FOR SUMMARY JUDGMENT IS MERITLESS.

#### A.     iGames' Motion Is Simply An Attempt To Cloud The Issues.

As noted above, iGames' motion presents a 180-degree reversal from its recent pronouncement that all of the issues in this case were fact issues that could only be resolved by a jury trial.  iGames' motion improperly attempts to cast a cloud over the relatively straight-forward facts which demonstrate Defendants are entitled to summary judgment.  iGames' motion relies on several misstatements of material fact, or the statement that certain facts are "undisputed" when nothing could be further from the truth.  As can be seen below, when all of the evidence is considered, and not just those deemed favorable by iGames, it is clear that iGames cannot prevail on its motion.

**B.     iGames Argument That The SPA Is Binding On Equitex Misses The Point.**

iGames attempts in its "Factual Background" to take a swipe at Defendants' legal argument that, by the very terms of the SPA, Equitex cannot be bound to pay any Termination Amount, because Equitex's shareholders did not approve the agreement. Defendants have fully set forth this argument in their motion for summary judgment, and will not reiterate the basis for that argument here. However, Defendants will address iGames' claim that "[t]here can be no doubt that the SPA was and is binding on Equitex and Chex." (iGames' Br. at 4.) Defendants have never claimed the SPA is not a contract; rather, their argument is that under the SPA's clear terms, Equitex cannot be liable for the Termination Amount absent shareholder approval for the agreement, which was never obtained. Further, as explained in Chex and Equitex's pending motions for summary judgment, under the express terms of the SPA, Chex is not obligated to pay any Termination Amount.

**C.     iGames Has, By Its Own Preexisting Breaches Of The SPA, No Right To Claim That Defendants Breached The Agreement Or To Recover The Termination Amount.**

iGames concedes that under both the express terms of the SPA, and common law, a party that has committed a material breach of the contract has no right to claim that the other parties breached the SPA or claim a right to the Termination Amount. (iGames' Br. at 37.) This well-established principle of contract law dooms iGames' claim to a right to terminate the SPA and seek damages, including the $1 million Termination Amount. Assuming *arguendo* that each of the alleged breaches that iGames complains of actually occurred, or raises issues for a fact-finder to resolve, iGames still has <u>no</u> basis to claim a right to enforce the SPA and seek damages. A plaintiff that has materially breached a

contract may not enforce its provisions against the defendant. *Schutzman v Gill*, 154 A.2d 226, 230 (Del. Ch. 1959). Moreover, as iGames has conceded, the SPA specifically provided that the Termination Amount would not be available to any party that had committed a material breach of the agreement that proximately contributed to the failure of the contemplated transactions to be consummated. (iGames' Br. at 37-38, citing SPA § 11(b).) As discussed herein, and as illustrated in the briefs filed in connection with Chex and Equitex's pending motions for summary judgment, iGames committed numerous material breaches of the SPA concurrent with the agreement's execution and within days, weeks, and months thereafter.

### 1.    The undisclosed Lake Street Gaming agreement.

Equitex' obligations to close under the SPA only arose if iGames "shall have performed and complied with all of its covenants hereunder in all materials respects." (*See* Robben Aff. Ex. 1 at 50 (SPA § 9(b)(iii)).) Under the SPA, iGames had to disclose all contracts involving more than $10,000. (*See id.* at 24 (SPA § 5(o)).) However, Mr. Wolfington admits that he never informed Defendants of iGames' agreement with Lake Street Gaming. (*See* Second Robben Aff. Ex. 11 (Wolfington Dep. Tran. at 121:7-14).) The materiality of the agreement is demonstrated by the fact that Lake Street Gaming is demanding $165,000 in damages.[8] (*See* Second Robben Aff. Ex. 7 (Lake Street Gaming Compl.).) As expressed in the Statement of Facts above, iGames' failure to disclose its agreement with Lake Street Gaming violated sections 5(c) and 5(o) of the SPA and was an immediate breach of the SPA.

---

[8] iGames' financials show that its revenue for the nine months ending on December 31, 2003, was $168,459 and its "total current assets" were $479,806 at that time. (*See* Second Robben Aff. Ex. 12 at "Item 1: Financial Statements" (iGames' Form 10-QSB for the Fiscal Quarter ended December 31, 2003).) Clearly, a $165,000 liability was material to iGames at that time.

**2.    iGames made unauthorized assignments of its rights under the SPA and encumbered its assets.**

The SPA expressly provided that the parties could not assign their rights under the SPA without the prior written approval of the other parties. (*See* Robben Aff. Ex. 1 at 57 (SPA § 12(d)).)  The SPA also included a representation from iGames that it would not further encumber its assets through security interest or encumbrance prior to closing. (*See id.* at 19 (SPA §5(g)(xi)).)  Within a few days after the SPA was executed, iGames twice assigned its rights under the SPA in violation of this agreement.  The first assignment was to Mr. Wolfington on November 11, 2003; the second was to Mercantile Capital, LP, on November 26, 2003.  (*See* Robben Aff. Exs. 29-30.)  Neither of these assignments was disclosed to Defendants or approved by Defendants.  (*See* Robben Aff. Ex. 5 (Wolfington Dep. Tran. at 310:15-23; 325:8-19; 331:13-23); Ex. 56 (Fong Aff. ¶ 3; Anwar Aff. ¶ 2).)

As explained in the Statement of Facts above, the assignment to Mr. Wolfington violated sections 5(g)(xix) and/or 5(g)(xxiv), 5(o), 7(e), and 12(d) of the SPA.  Also as explained above, the assignment to Mercantile along with the *Loan and Security Agreement*, of which it was a part, violated sections 5(g)(xi), 5(g)(xvi), 5(o), 7(e) and 12(d) of the SPA.  Incredibly, it is iGames that now complains that Defendants granted unauthorized security interests.

**3.    The undisclosed Tunica-Biloxi Debt.**

iGames was required by the SPA to disclose all contracts involving more than $10,000.  (*See* Robben Aff. Ex. 1 at 24 (SPA § 5(o)).)  iGames, which merged with MCA, misrepresented its balance sheet by failing to list its $3 million obligation to the Tunica-Biloxi tribe as a liability on its balance sheet.  This failure to do so was in

violation of generally accepted accounting principles. (*See* Robben Aff. Ex. 41 (Shopa Expert Report at 21).) As explained above, iGames' failure to properly disclose its obligations under the TB Tribe Agreement was contrary to sections 5(g)(xvi), 5(o) and 7(e) of the SPA. The continual misrepresentation of this obligation meant iGames was in violation of the SPA throughout the closing period.

### 4. iGames defaults on the Note.

iGames' default on the Term Loan Note made iGames' representations under section 5(o) of the SPA, that iGames has fully complied with all material terms of its contracts, materially false. This is in addition to the Material Adverse Effect that a default on a $2 million loan had on iGames. iGames' failure to deliver the stock pledge agreement and corporate guaranties was merely one of the reasons that Chex and Equitex cited for accelerating the Note and ending the parties' relationship under the SPA on March 12, 2004. (*See* Robben Aff. Ex. 4 (Clegg letter).) Thus, iGames own actions, including its default on the Note, proximately contributed to the failure of the SPA and section 11(b) of the SPA bars iGames' claim to the recovery it seeks. (*See* Robben Aff. Ex. 1 at 55 (SPA § 11(b)).) Therefore, iGames' motion should be denied.

### D. iGames' Claims That Defendants Breached The SPA Are Without Merit.

Based on iGames' multiple, immediate violations of the SPA, the Court need not look any further before denying iGames' motion for summary judgment. Nonetheless, if the Court examines the alleged grounds for termination that iGames now asserts, the Court will see that these alleged grounds are not supported either by fact or by the law. In some cases, iGames has conveniently failed to address important testimony and evidence directly contradicting its allegations. In other cases, such as the Seminole

incident, iGames now attempts to claim certain events constitute a material adverse event, despite the fact that it issued public press releases at the time denying that the event was a deal-breaker and affirming its election to proceed with the SPA. Simply put, iGames' allegations that these events constituted justification for a claimed termination of the SPA would be unfounded even if iGames had not already waived its right to terminate the agreement based on its own failures to abide by the SPA in several material respects.

### 1.    Defendants disclosed the Howard note and properly recorded it as an account receivable.

iGames' arguments with respect to the Howard note boil down to two basic contentions: (1) that Defendants misrepresented at the time of executing the SPA the nature of the Howard's debt as an account receivable; and (2) that the Howards' account receivable constituted a material adverse event entitling iGames to terminate the SPA. Neither argument is valid.

### a.    Defendants never misrepresented the Howard account receivable.

Shortly after Chex learned that the Howards had written a number of checks at Chex's cash booths in a Florida casino, Chex sent two of its personnel down to meet with them and discuss the matter. (*See* Second Robben Aff. Ex. 1 (Moose Dep. Tran. at 22:18-25; 23:1-25).) The Howards acknowledged that they owed the amount on the checks, and let Chex inspect their business properties to assess their potential collateral value. (*See id.*) The Howards promptly signed a promissory note converting the debt obligation into a formal loan. (*See* Robben Aff. Ex. 13 (Prom. Note).) This loan was later supported by a mortgage the Howards gave to Chex on their personal and business properties. (*See* Robben Aff. Ex. 14 (Mortgage).)

The Howards were well known in the industry as high stakes casino players that had always made good on their obligations. (*See* Second Robben Aff. Ex. 1 (Moose Dep. Tran. at 13:1-25; 14:1-25; 15:1-25).) Deanna Moose, a Chex employee who traveled twice to Florida in the days following the notice of the returned checks to meet with the Howards, not only met with the Howards but also spoke to the Howards' mortgage banker. (*See id.* (Moose Dep. Tran. at 27:21-25; 28:1-18).) The mortgage broker showed Ms. Moose the Howards' refinancing paperwork, and assured Ms. Moose that the Howards would be promptly completing a refinancing of their properties to obtain the funds to repay the loan. (*See id.*) Chex therefore had a good faith basis to believe it could count on obtaining repayment of the loan. The fact that Chex, months later, wrote down some of the Howard debt, and continues to try to work with the Howards on collection, in no way proves that Chex's assessment of the ability of obtaining repayment was made in bad faith at that time.

Further, iGames fails to mention that the issue of whether the Howard loan was properly documented as an account receivable has been the subject of expert analysis. Mr. Thomas Shopa, CPA, CFP, has reviewed the Howard note issue and submitted an expert report. In his report, Mr. Shopa opines that the "accounting treatment of the notes receivable from the Howards is consistent with generally accepted accounting principles." (*See* Robben Aff. Ex. 41 (Shopa Expert Report at 12-17).) At a minimum, a factual issue exists as to whether the note receivable was properly accounted for.

**b.     The Howard note did not constitute a material adverse event.**

iGames' argument that the Howard note receivable constituted a "material adverse event" under the SPA is premised on its claim, refuted above, that the Howards' note should have been classified as an expense. (iGames' Br. at 25.) As discussed above, that

claim is without merit.  Moreover, the size of the account receivable did not have as significant an impact on the value of Chex as iGames would have the Court believe.  The $600,000 Howard obligation was less than 1% of a $63 million dollar transaction.

Further, it is not consistent for iGames to claim this note constituted a material adverse event and deny that the 70% decline in iGames' stock price prior to the merger termination was not.  Defendants have produced an expert report from Dr. Gregg Jarrell, former Chief Economist for the SEC, opining that the dramatic decline in iGames' stock price was a material adverse event.  (*See* Robben Aff. Ex. 50) (Jarrell Expert Report at 13-17).  Therefore, iGames has no basis to complain it is the victim of a material adverse event.

Finally, Defendants note that iGames' claim that Chex's Chief Operating Officer (Mr. Anwar) "conceded the reason Chex deviated from its general practices was to improve its financial statements" is simply false.  (iGames' Br. at 23.)  Mr. Anwar made no such statement.   Anwar only testified that designating the loan as an account receivable would, obviously, reflect better on the balance sheet than a write-off would.  Mr. Anwar testified that independent accountants confirmed that Defendants had the option of classifying the amount as a receivable.  (*See* Second Robben Aff. Ex. 11 (Sept. 17 Anwar Dep. at 141:6-21).)  Mr. Anwar specifically testified that this decision was not influenced by any desire to "hide" the issue from iGames.  (*Id.* at 143:1-6.)  The Howard incident, while certainly atypical, was not "significantly material" to Chex, which as part of its core business of providing check cashing services in casinos, experiences bad debt of $2 million to $3.5 million per year.  (*See id.* at 142:13-20).)

## 2. iGames Elected To Affirm The SPA After The Seminole Contract Was Lost.

iGames has no credible basis for claiming that it is entitled to assert that Chex's loss of the Seminole business was a material adverse event justifying it to claim months later it justified a termination of the SPA. Even assuming *arguendo* that the initial loss of the Seminole business were considered a material adverse effect, iGames' definitive and public decision to reaffirm the SPA meant that it had elected to proceed with the agreement and, correspondingly, given up the right to justify a termination of the SPA on that basis.

The decision of a non-breaching party to continue to perform after it learns the other side has breached the agreement is an election to affirm the contract, which renders irrelevant a contractual clause stating that a party's failure to enforce any provision shall not be construed as a waiver of the party's rights under the contract. *See, e.g., Honeywell Int'l Inc. v. Air Prods. & Chems., Inc.*, 858 A.2d 392, 420-21 (Del. Ch. 2004) (applying New York law); *ESPN, Inc. v. Office of Comm'r of Baseball*, 76 F. Supp. 2d 383, 392 (S.D.N.Y. 1999) ("a party's election to continue rather than end the contract moots its legal justification for termination"); *Bigda v. Fischbach Corp.*, 849 F. Supp. 895, 901 (S.D.N.Y. 1994) ("doctrine of election is the occurrence of an event that requires the party to make a choice between two inconsistent rights, in this case the right to continue the contract or the right to terminate it") (citing 5 WILLISTON ON CONTRACTS § 638, at 27071 (3d ed. 1961)). In the parties' press release dated January 5, 2004, iGames announced publicly its election to proceed with the contract. It cannot now claim that it has since changed its mind.

Moreover, iGames' CEO Wolfington essentially stated in the press release that the loss of the contract would not be a material adverse event that would justify a termination of the contract. The press release quotes Wolfington: "The synergies and merits of the Chex Services transaction were never dependent on any one contract for its success. We remain committed to the transaction and look forward to closing as soon as possible." (*See* Robben Aff. Ex. 18 (Equitex and iGames Press Release).)  Mr. Wolfington testified in his deposition that he understood his obligation to be absolutely truthful in the press release, and he affirmed this quote was his statement. (*See* Second Robben Aff. Ex. 9 (Wolfington Dep. Tran. at 270:11-20; 271:1-24; 272:1-5).)

Further, it was the termination of the NACSF contract regarding the Seminole casinos that unexpectedly made available to Chex the cash it loaned to iGames just days later to facilitate iGames' purchase of Available Money. (*See* Robben Aff. Ex. 9 (Dec. 15 Anwar Dep. at 105, lns. 14-24; p. 106, lns. 1-8).)  Indeed, in iGames' press release of January 8 announcing the closing on the Available Money transaction, iGames touted Chex's financial support to enable the transaction. (*See* Robben Aff. Ex. 19 (iGames' Press Release).)  It is flatly hypocritical of iGames to enjoy the use of Chex's money made available due to the loss of the NACSF contract to purchase Available Money, and then turn around and assert later that the loss of the NACSF contract entitled it to terminate the SPA and seek damages.  Such duplicity on the part of iGames is a clear demonstration of iGames' bad faith conduct with regard to the SPA and the Term Loan Note.

31

### 3. Defendants Were Authorized By iGames To Develop A Merchant Banking Relationship With Maroon Bells.

The Court must accept, for purposes of this motion, Mr. Fong's testimony that he disclosed the Maroon Bells discussions to Mr. Wolfington. iGames' failure to properly acknowledge this testimony is wholly improper. It is not "undisputed", as iGames would have the Court believe, that Defendants were engaged in secret discussions with Maroon Bells, as iGames alleges, for purposes of plotting a reverse merger. On the contrary, as discussed above, Mr. Fong has testified that Mr. Wolfington was told about Defendants' discussions with Maroon Bells in January 2004 and did not object. (*See* Second Robben Aff. Ex. 2 (Fong Dep. Tran. at 122:6-14; 262,:1-24; 263:1).) For the purposes of iGames' motion, this fact alone should result in a denial of iGames' motion.

In any event, Mr. Fong has explained that Maroon Bells offered a merchant banking relationship that would be mutually beneficial to all parties involved, and the arrangement with Maroon Bells was in no way inconsistent with consummation of the SPA. (*See id.* (Fong Dep. Tran. at 145:6-24; 146:8-16; 261:1-22; 264:1-5).) At a minimum, fact issues exist here which preclude iGames' summary judgment motion.

### 4. iGames knew about, and consented to, Defendants' pursuit of the Whitebox financing.

Multiple witnesses have testified that Mr. Wolfington was told about the Whitebox financing in January 2004 at a meeting in Minneapolis. Messrs. Welbourn, Fong and Anwar have testified that, at that meeting, they disclosed to Mr. Wolfington a preference to have Chex borrow money for the second $2,000,000 installment on the Note from a venture capital firm known as Whitebox. (*See* Robben Aff. Ex. 8 (Welbourn Dep. Tran. at 81:14-24; 82:1-24; 83:1-19); Ex. 3 (Dec. 2 Fong Dep. Tran. at 54:1-24; 55:1-24; 56:1-5); Ex. 9 (Dec. 15 Anwar Dep Tran. at 114:13-24; 115; 1-21).) Messrs.

Fong, Welbourn, and Anwar testified that Mr. Wolfington consented to use Whitebox to obtain the additional $2,000,000, provided that any Whitebox transaction did not dilute iGames' percentage of ownership in the merged entity. (*See* Robben Aff. 8 (Welbourn Dep. Tran. at 82:2-15); Ex. 3 (Dec. 2 Fong Dep. Tran. at 55:1-5); Ex. 9 (Dec. 15 Anwar Dep. Tran. 114:13-24; 115:1-6).) iGames' own correspondence on this issue is consistent with this testimony. (*See* Robben Aff. Ex. 49 (Rovin email to Anwar and Fong dated 3/8/04) (stating Whitebox financing needed to be dilutive to Defendants' share of the ownership of the new company).) iGames therefore cannot credibly argue it is an undisputed material fact that Defendants breached the parties' understandings by obtaining the Whitebox financing. The testimony from multiple witnesses establishes that iGames permitted Defendants to obtain the second $2 million installment from Whitebox.

In addition, it is simply not accurate, as iGames claims, that "iGames did not learn that the Defendants actually completed the transaction until after this litigation began." (iGames' Br. at 31.) Mr. Anwar testified that he contacted Mr. Wolfington on March 9, 2004, to inform him that the Whitebox financing had come through and that Chex was prepared to immediately advance the next $2 million called for under the Note, provided that iGames deliver the Stock Pledge Agreement and guaranties as required under the terms of the Note. Mr. Wolfington refused to do so. (*See* Robben Aff. Ex. 9 (Dec. 15 Anwar Dep Tran. at 111:5-24; 112:1-14; 128: 1-16).) At a minimum, material fact disputes, while ignored by iGames in its brief, exist on this issue.

With respect to the Whitebox financing, iGames has made much of the fact that the Whitebox financing encumbered the assets of Chex. (iGames' Br. at 29-32.) Here

again, it is flatly hypocritical of iGames to claim that Chex had financing obligations under the Note knowing full well that Chex would be required to secure the financing with collateral such as its assets, and then turn around and assert that encumbering the assets of Chex to obtain the financing entitled iGames to terminate the SPA and seek damages.

> **5.     The Defendants' decision, after the SPA was terminated, to pursue and finalize an alternate business merger with the Seven Ventures group, was entirely proper.**

iGames relies on nothing more than innuendo to assert that Defendants intentionally solicited, and secretly agreed to, its subsequent transaction with Seven Ventures. The simple fact is that the Seven Ventures agreement was entered into on or about April 12, 2004. The Seven Ventures transaction was consummated on or about June 7, 2004. iGames can point to no evidence showing Defendants secretly planned this agreement with Maroon Bells and then terminated the SPA as a pretext to do a "better deal".[9] The fact that Defendants chose, after the SPA was terminated, to pursue an alternative deal proves nothing. Again, as noted above, Defendants have testified that they advised Mr. Wolfington in January 2004 of their discussions with Maroon Bells and that Mr. Wolfington did not object.

There was nothing to prevent Defendants from pursuing and finalizing another transaction once the SPA had terminated due to iGames' multiple material breaches. iGames has not pointed to any language in the SPA which would prohibit Equitex or Chex from moving ahead with a new deal once the SPA was terminated. Further, it is

---

[9] iGames fails to acknowledge that Defendants terminated the SPA on March 12, 2004, after iGames breached the SPA and Note in numerous aspects, such as by failing for months to provide the corporate guaranties and stock pledge agreement relating to the Available Money stock as it had contractually committed to do.

implausible for iGames to claim entitlement to sue to enforce the SPA, when its CEO has testified iGames would not have closed on the agreement.  (*See* Robben Aff. Ex. 5 (Wolfington Dep. Tran. at 213:22-24; 214:1-15).)  iGames' claims are without merit and should be rejected.

## CONCLUSION

iGames' motion neither addresses the independent reasons set forth in Defendants' motion why they are entitled to summary judgment, nor acknowledges the genuine material fact disputes relating to the issues iGames raises. Simply put, iGames' multiple, immediate violations of the SPA preclude it from claiming any right to terminate the agreement or seek damages. Moreover, iGames has conveniently failed to acknowledge the evidence that directly contradicts the facts it claims are not in dispute.

Defendants therefore respectfully request that the Court deny iGames' motion.

MORRIS, JAMES, HITCHENS & WILLIAMS LLP

James W. Semple (#396)
James E. Drnec (#3789)
222 Delaware Avenue
P.O. Box 2306
Wilmington, DE 19899
(302) 888-6800
Email: _jdrnec@morrisjames.com_

Attorneys for Chex Services, Inc.
and Equitex, Inc.

OF COUNSEL:

RIDER BENNETT, LLP

Daniel Q. Poretti
Patrick D. Robben
Douglas J. Frederick
33 South Sixth Street, Suite 4900
Minneapolis, MN 55402
(612) 340-8900
Email: _dqporetti@rider.com_

Dated: March 29, 2005

## CERTIFICATE OF SERVICE

I hereby certify that on March 29, 2005 I electronically filed: BRIEF OF CHEX

SERVICES, INC. AND EQUITEX, INC. IN OPPOSITION TO THE MOTION FOR

SUMMARY JUDGMENT BY IGAMES ENTERTAINMENT, INC., with the Clerk using

CM/ECF which will send notification of such filing(s) to the following:

Thomas P. McGonigle, Esquire
Matt Neiderman, Esquire
Duane Morris, LLP
1100 North Market Street
12th Floor
Wilmington, Delaware 19801


James E. Drnec (#3789)
Morris, James, Hitchens & Williams, LLP
222 Delaware Avenue
P.O. Box 2306
Wilmington, DE  19899
(302) 888-6950
Email: *jdrnec@morrisjames.com*