# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| **iGAMES ENTERTAINMENT, INC.,** | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 04-180-KAJ |
| | : | |
| **CHEX SERVICES, INC.** and **EQUITEX, INC.,** | : | JURY TRIAL DEMANDED |
| | : | |
| Defendants. | : | |
| | : | |

## PLAINTIFF iGAMES ENTERTAINMENT, INC.'S ANSWERING BRIEF IN OPPOSITION TO CHEX SERVICES, INC.'S MOTION FOR SUMMARY JUDGMENT

DATED:       March 29, 2005

**OF COUNSEL:**
**DUANE MORRIS LLP**
Matthew A. Taylor, Esquire
James L. Beausoleil, Jr., Esquire
One Liberty Place
Philadelphia, Pennsylvania 19103-7396
215.979.1000

**DUANE MORRIS LLP**
Thomas P. McGonigle (Del. I.D. No. 3162)
Matt Neiderman (Del. I.D. No. 4018)
1100 North Market Street, 12th Floor
Wilmington, Delaware  19801
302.657.4900

Attorneys for Plaintiff
iGames Entertainment, Inc.

## TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ............................................................................................ iii

NATURE AND STAGE OF THE PROCEEDING........................................................1

SUMMARY OF ARGUMENT .....................................................................................3

I.  Chex Breached The Term Loan Note ...............................................................3

II.  iGames Never Breached The Term Loan Note.................................................3

III.  Disputed And Intertwined Issues Of Material Fact Continue To Make Summary Judgment Inappropriate ....................................................................4

STATEMENT OF FACTS ............................................................................................5

I.  The Stock Purchase Agreement .......................................................................5

II.  The Acquisition Of Available Money And The Term Loan Note......................8

III.  Equitex And Chex Secretly Negotiate Alternative Deals In Breach Of The SPA.............12

    A.  The Reverse Merger Agreement..............................................................12

    B.  The Whitebox Purchase Agreement .......................................................15

IV.  Chex's Multiple Breaches Of The Term Loan Note And The SPA ..................19

V.  Chex's First Motion For Summary Judgment ..................................................20

ARGUMENT.................................................................................................................22

I.  THE STANDARDS GOVERNING CHEX'S MOTION.................................22

II.  CHEX BREACHED THE TERM LOAN NOTE ............................................23

III.  IGAMES NEVER BREACHED THE TERM LOAN NOTE...........................26

    A.  iGames Had No Obligation To Pay Interest Or 50% Of Operating Income Of Available Money On Or Before February 1, 2004 ...........................26

        1.  The Term Loan Note Contains No Clear Payment Due Dates .................26

        2.  A Subsequent Oral Agreement Between Chex And iGames Postponed Payment Of Any Amount Allegedly Due ...............................33

i

B.      iGames Did Not Breach The Term Loan Note By Failing To Pay 10% Of The "Overdue Amount" Because No Amount Was Yet Due ................................34

C.      iGames Did Not Breach The Term Loan Note By Failing To Deliver The Stock Pledge Agreement By March 12, 2004 ........................................................35

IV.     DISPUTED AND INTERTWINED ISSUES OF MATERIAL FACT CONTINUE TO MAKE SUMMARY JUDGMENT INAPPROPRIATE .......................37

CONCLUSION ..................................................................................................................40

## **TABLE OF AUTHORITIES**

**FEDERAL CASES**                                                            **PAGE**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)...............................................................................22

*Baker v. Aetna Casualty and Surety Co.*,
    1996 U.S. Dist. LEXIS 11600 (D.N.J. Aug. 5, 1996)................................23, 38

*Callahan v. A.E.V., Inc.*,
    182 F.3d 237 (3d Cir. 1999)....................................................................22

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)...............................................................................22

*Heitz v. Nat'l R.R. Passenger Corp.*,
    1993 U.S. Dist. LEXIS 2303 (E.D. Pa. Jan. 15, 1993) .....................................23

*LaSociete Generale Immobiliere v. Minneapolis Community Develop. Agency*,
    44 F.3d 629 (8th Cir. 1994) ......................................................................26

*Mankato Implement, Inc. v. J.I. Case*,
    1991 U.S. Dist. LEXIS 20082 (D. Minn. Aug. 29, 1991) .................................34

*Matshushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)...............................................................................22

*Maurice Sunderland Architecture, Inc. v. Simon*,
    5 F.3d 334 (8th Cir. 1993) .......................................................................27

*Russo Develop. Corp. v. Thomas*,
    735 F. Supp. 631 (D.N.J. 1989) ................................................................23

**STATE CASES**

*Gutierrez v. Red River Distributing, Inc.*,
    523 N.W.2d 907 (Minn. 1994)...................................................................27

*Indep. Consol. Sch. Dist. No. 24 v. Carlstrom*,
    151 N.W.2d 784 (Minn. 1967)...................................................................25

*Inland Products Corporation v. Donovan Inc.*,
    62 N.W.2d 211 (Minn. 1953).....................................................................25

*In re the Estate Of: Richard G. Giguere*,
    366 N.W.2d 345 (Minn. Ct. App. 1985) .......................................................33

*Material Movers, Inc. v. Hill*,
    316 N.W.2d 13 (Minn. 1982)............................................................................27

*Trondson v. Janikula*,
    458 N.W. 2d 679 (Minn. 1990)......................................................................26

## STATUTES AND OTHER AUTHORITIES

Fed. R. Civ. P. 56(c) .....................................................................................................22

## NATURE AND STAGE OF THE PROCEEDING

Chex Services, Inc. ("Chex") filed an action against iGames Entertainment, Inc. ("iGames") in Minnesota state court on March 15, 2004, asserting claims for an alleged breach of a term loan note entered into between Chex and iGames (the "Minnesota Action"). The Minnesota action was transferred to this Court by order dated June 23, 2004, and initially proceeded as C.A. No. 04-885 (KAJ). In ordering a transfer, the court in the Minnesota Action found that the action could not be resolved until this Court ruled on the propriety of the termination of a related Stock Purchase Agreement (the "SPA") by Chex and its parent company, Equitex, Inc. ("Equitex"). By order of the Court dated September 13, 2004, this Court consolidated Chex's contract action with this action for all purposes.

On August 26, 2004, Chex filed a Motion for Summary Judgment on its claims against iGames (the "Initial Motion") and an opening brief in support of its motion. On October 1, 2004, iGames filed its Answering Brief in opposition to Chex's motion for summary judgment, and Chex filed its reply brief on October 13, 2004. Oral argument was held on Chex's Initial Motion on November 12, 2004, after which the Court ruled. The Court denied the Initial Motion for Summary Judgment, finding that disputed issues of material fact exist that must be addressed with the assistance of a finder of fact and concluding the contract claims asserted by Chex are part of a "large knot," which the Court declined to "untie" in piecemeal fashion. Fact and expert discovery in this action have since concluded.

On February 2, 2005, Chex filed what amounts to a renewed motion for summary judgment on its breach of contract claim against iGames (the "Renewed Motion") and an opening brief in support of that motion. Despite the lack of any meaningful change in the parties' respective positions or in the disputed material facts that the Court declined to resolve in

conjunction with Chex's Initial Motion, Chex's Renewed Motion presents precisely the same issues as its Initial Motion, including the very same issues this Court found must be resolved by a trier of fact.  This is iGames' Answering Brief in Opposition to Chex's Renewed Motion for Summary Judgment.

## SUMMARY OF ARGUMENT

### I.     Chex Breached The Term Loan Note

By its Renewed Motion for Summary Judgment, Chex once again seeks judgment in its favor and against iGames on the Term Loan Note.  Chex essentially argues, without regard to its conduct as it relates to the SPA, that iGames breached the Term Loan Note by failing to make payments by certain due dates, and that Chex should therefore be entitled to accelerate payment and immediately collect $2 million from iGames.  This is simply not so.  After making an initial advance under the Term Loan Note and leading iGames into the midst of a $4 million acquisition, Chex stopped performance and never fulfilled its additional funding obligations under the Term Loan Note.  Chex instead purported to declare iGames in default and accelerate payments on the Term Loan Note, based on fabricated breaches supposedly committed by iGames.  As iGames has learned in detail through discovery in this action, Chex's purported termination was pretext.  Chex, together with its parent, Equitex, had secretly been negotiating and was close to consummating an alternative deal and, for that reason, Chex never intended to complete the financing of iGames' acquisition of Available Money.  Chex had no right to terminate when it purported to do so, and Chex thus breached the Term Loan Note by failing to fulfill its obligations.

### II.     iGames Never Breached The Term Loan Note

Chex has long claimed iGames breached the Term Loan Note by failing to make payments supposedly due on specific dates.  As iGames pointed out in earlier briefing on this issue, Chex's unilaterally-imposed due dates find no support in the terms of the note, rather iGames' obligation to make payments was contingent upon the receipt of certain financial information concerning Available Money that was not available at the time Chex purported to terminate.  In addition, the parties entered into an oral agreement that no payments would be due

until they could reconcile amounts owed by Chex to iGames for certain trade show expenses. At the time Chex declared iGames in default, the trade show expenses had yet to be reconciled pursuant to the oral agreement and thus no payments were due.

When Chex later declared iGames in default and refused to continue performance of its obligations under the Term Loan Note, it left iGames scrambling to obtain financing to finalize its acquisition of Available Money, which iGames ultimately did on less advantageous terms and at a significant financial and reputational cost. By its latest Motion, Chex renews its attempt to force accelerated repayment, claiming that all possible deadlines have passed. In so doing, Chex essentially asks the Court to disregard the fact that it has long been in breach of the Term Loan Note. Nevertheless, the fact remains that iGames never breached prior to Chex's purported declaration of breach and refusal to perform, and all that iGames even arguably owes to Chex is the payment of installments when and if it is determined that iGames has a net obligation to Chex.

## III.    Disputed And Intertwined Issues Of Material Fact Continue To Make Summary Judgment Inappropriate

In denying Chex's Initial Motion, this Court properly held that the contract claims asserted by Chex were part of a larger group of core issues the Court would resolve together, rather than in piecemeal fashion, and that must be resolved with the help of a finder of fact. Chex's Renewed Motion fails to resolve those disputed issues of material fact, as it presents the same arguments and fails to present any meaningful additional facts. Issues remain as to whether Chex has breached its duty of good faith and fair dealing and whether Chex is entitled to recover from iGames at all, given Chex's conduct in connection with a closely-related SPA. As with Chex's Initial Motion, summary judgment remains inappropriate on Chex's Renewed Motion.

## STATEMENT OF FACTS

Chex attempts, as it did in its Initial Motion, to present its claim on the Term Loan Note in a vacuum.  In its Renewed Motion, Chex lifts the Term Loan Note from context and, viewed in isolation, asks the Court to declare iGames in breach without giving consideration to: (1) the circumstances in which the Term Loan Note was created; (2) the reasons it was entered into; or (3) the status or circumstances of the related transactions of which the Term Loan Note was an integral and inseparable part.  The inescapable fact is that the Term Loan Note was executed as part of, and for the purposes of, facilitating two inseparable and intertwined business transactions between the parties, which are themselves the subject of numerous claims and allegations in this action.  The parties' respective rights and obligations with respect to those transactions cannot be determined piecemeal.  An understanding of the failed business transactions of which the Term Loan Note was an integral part is therefore necessary to a complete understanding of the Term Loan Note and to an understanding of why Chex is not entitled to summary judgment on its claim.  We therefore begin with a review of the history of that transaction.

## I.    The Stock Purchase Agreement

iGames entered into a stock purchase agreement (the "SPA") with Chex's parent company, Equitex, Inc. ("Equitex"), on November 3, 2003.[1]  Pursuant to the SPA, iGames sought to purchase the capital stock of Chex from Equitex[2] in exchange for a contractually-

---

[1] A true and correct copy of the SPA is attached to the accompanying Appendix of Exhibits as Appendix Ex. "A."

[2] By the time of the November 3, 2003 SPA, the parties were well acquainted.  iGames and Chex previously were involved in joint ventures in which they shared office space, employees, information and financial resources.  (Deposition of Ijaz Anwar ("Anwar Tr."), at 73:3 – 76:12). In fact, the November 3, 2003 SPA represented iGames' second attempt to acquire Chex.  (*Id*.).

designated number of shares of iGames' stock.  In executing the SPA, Equitex represented that

it was the "lawful owner" of the Chex shares to be sold, and that those shares were "free and

clear of any restrictions on transfer" and that the Chex shares to be sold represented "all of the

issued and outstanding capital stock of Chex."  (SPA, § 4(d)).  Equitex further represented that it

had "full power and authority to execute and deliver" the SPA, subject only to the final approval

of its shareholders, which was required to take place <u>after</u> closing on the SPA.  (SPA, § 4(b)).

Equitex and Chex represented and warranted in Section 6(n) of the SPA that, among

other things, Chex had fully complied with all material terms of its customer contracts (including

service contracts with casinos) and that no other party to any contract was terminating, intended

to terminate or was considering terminating.  Chex and Equitex also represented and warranted

that they had received no notice (oral or written) of any such termination or plans to terminate.

(SPA, § 6(n)).  The SPA required both parties to use their best efforts to close the acquisition

and, consistent with basic business ethics, not to do anything to undermine the other parties'

ability to enjoy the benefit of their bargain.  Specifically, the parties covenanted under Section

7(a) to "use commercially reasonable efforts to take all action and to do all things necessary,

proper or advisable" to consummate the transaction.  Under Section 7(b), Equitex similarly

covenanted not to cause or permit Chex to engage, and Chex agreed not to "engage in any

practice, take any action, embark on any course of inaction, or enter into any transaction outside

the Ordinary Course of Business."  (SPA, § 7(b)(i)).[3]

---

[3] The SPA provides that "an action taken by a Person will be deemed to have been taken in the
<u>Ordinary Course of Business</u> only if that action: (i) is consistent in nature, scope and magnitude
with the past practices of such Person and is taken in the ordinary course of the normal, day-to-
day operations of such Person; (ii) does not require authorization by the board of directors or
shareholders of such Person (or by any Person or group of Persons exercising similar authority)
and does not require any other separate or special authorization of any nature; and (iii) is similar

(Continued . . .)

The agreed-upon consideration under the SPA was an exchange of a specified percentage of iGames' stock for all of the outstanding stock of Chex. Upon closing, iGames was to "pay to [Equitex] consideration of that amount of shares of Buyer Common Stock which equals 62.5% of the issued and outstanding shares of Buyer following such issuance on the Closing Date after giving effect to the Stock Split and closing of the MCA Acquisition (the "Common Stock Consideration")."[4]  Equitex intended to retain ownership of 10% of the Common Stock it received from iGames and to distribute the balance of the Common Stock to its stockholders on a pro rata basis as a dividend. (*See* SPA, § 2(b)). The contemplated distribution qualified as a public offering and therefore was "conditioned on the effectiveness of a Registration Statement under the Securities Act registering the issuance of the distributed shares of Buyer Common Stock." (*Id*.). The SPA also contemplated fluctuations in iGames' stock price and provided for an adjustment in the amount of iGames' stock. (*See* SPA, § 2(b)).

The SPA provided iGames the right to terminate it and to collect a Termination Fee for various identified acts or omissions which could either be the result of purposeful conduct or of the mere occurrence of an event. For example, iGames could terminate if any representation of Equitex or Chex was or became materially inaccurate or if Equitex or Chex failed to comply with their material obligations under the SPA. (SPA, §§ 11(b)(ii), 11(b)(v)). iGames could also terminate the SPA upon the occurrence of any event that was likely to have a Material Adverse Effect on Chex. (SPA, § 11(b)(viii)). Upon any such termination, Section 11 of the SPA

---

(. . . Continued)

in nature, scope and magnitude to actions customarily taken, without any separate or special authorization, in the ordinary course of the normal, day-to-day operations of other Persons that are in the same line of business as such Person." (SPA, § 1(ooo)).

[4] iGames was required to, and did, effect a stock split such that its outstanding shares at the time of closing would total 40,000,000. (*See* SPA, § 1(pppp)).

provided that Equitex and Chex were obligated to pay all of iGames' expenses incurred in connection with the proposed transaction, together with a termination fee of $1,000,000 (the "Termination Amount").  (SPA, § 11(e)(ii)).

In Section 6 of the SPA, Equitex and Chex represented and warranted that, after June 30, 2003, there was not with respect to Chex:  (1) any loss, transfer, assignment or encumbrance of assets; (2) any issuance, sale or other disposition of any capital stock or any grant of any options, warrants, or other rights to purchase or obtain any capital stock; (3) any action, transaction or agreement outside the Ordinary Course of Business; (4) any loan to any other person in excess of $10,000 and outside the Ordinary Course of Business; (5) any compromise of any claims; or (6) any other event or circumstance that could reasonably be expected to have a Material Adverse Effect on Chex.  (SPA, § 6(f)).  In this case, discovery has revealed that Chex and Equitex entered into negotiations for a $5,000,000 loan transaction.  While Equitex initially presented the potential loan to iGames as a means to finance the Available Money purchase (as discussed below), iGames objected to it because the proposed financing had "death spiral" components, which iGames did not want to inherit as part of its acquisition of Chex.  Nevertheless, despite iGames' express rejection of the loan and the SPA's prohibitions against such a deal, Chex and Equitex secretly continued their negotiations and eventually closed on the financing.

## II.    The Acquisition Of Available Money And The Term Loan Note

While the parties were attempting to complete iGames' acquisition of Chex via the SPA, iGames learned of an opportunity to acquire a company known as Available Money.  Available Money is in the same business as iGames, and all parties to the SPA believed that iGames' acquisition of Available Money would strengthen and significantly increase the stock price of the new entity resulting from the SPA.  As such, iGames' acquisition of Available Money would

have directly benefited Equitex and its stockholders, who were to have collectively become majority owners of the surviving entity following consummation of the SPA, and would therefore have indirectly owned Available Money.

To effectuate the Available Money acquisition, iGames secured a commitment from Mercantile Capital, L.P. ("Mercantile") to borrow the money necessary for the acquisition of Available Money. Chex, however, represented to iGames that it possessed, or could borrow, the $4,000,000 cash that iGames would need to purchase Available Money. Chex further represented that it could timely provide iGames $4,000,000 of the purchase price and that iGames should therefore obtain the purchase money from or through Chex rather than from Mercantile. (*See* Anwar Tr., at 60:7 – 61:6).[5] As a result, on January 6, 2004, Chex advanced $2,000,000 to iGames, the amount needed to make the initial closing-date payment for the acquisition of Available Money. (Anwar Tr., at 32:24 - 34:4).

Although Chex wired the initial purchase money to the owners of Available Money on or about January 6, 2004, the principals of Chex and Equitex were not available to complete the paperwork on the loan, and the parties therefore did not execute the documents on that date. (Anwar Tr., at 36:14 - 37:6; 272:6 - 275:1). Thereafter, on January 21, 2004, iGames executed the Term Loan Note[6] in favor of Chex, but dated it January 6, 2004, per agreement of the parties. Although the Note contemplates a contemporaneously executed Stock Pledge Agreement and Corporate Guaranty, those documents had not been negotiated or completed at the time the Note was executed on January 21, 2004. In fact, a "final" draft of the Stock Pledge Agreement was

---

[5] Quoted excerpts of the transcript of Mr. Anwar's deposition are attached to the Appendix as Ex. "B."

[6] A true and correct copy of the Term Loan Note is included as Appendix Ex. "C."

not forwarded by Chex's attorneys to counsel for iGames until Friday, March 5, 2004, only one week before Chex wrongfully terminated the SPA and alleged a breach of the Note. (*See* Deposition Exhibit #23 to the Welbourn Deposition (Appendix Ex. "D")).[7]

The Term Loan Note provided for, and was conditioned on, a second advance by Chex to iGames in the amount of $2,000,000, which was to be made sixty days after the first payment (*i.e.*, on or about March 6, 2004). This second payment was also necessary to fund the acquisition of Available Money.

According to the terms of the Term Loan Note, Chex had twenty-one days to obtain a binding commitment for financing sufficient to fund the second $2,000,000 installment. This binding commitment was to contain terms satisfactory to iGames and was to come from either Mercantile or from another institutional lender satisfactory to iGames. (*See* Term Loan Note, p. 1). The second payment was to be made to iGames on or before March 6, 2004. (*Id*). After the first advance under the Term Loan Note was made, iGames repeatedly inquired as to whether Chex was actively seeking the necessary financing to meet its commitment under the Term Loan Note and, on its own initiative, obtained a tentative commitment from Mercantile to provide the financing to Chex. Notwithstanding iGames' efforts, it soon became apparent that Chex was not making a good faith effort to obtain the necessary financing commitment from a satisfactory lender. Indeed, the March 6, 2004 deadline for the second payment passed and Chex never made the second advance as required by the Term Loan Note.

---

[7] The seemingly casual nature of this transaction is understandable given the fact these companies had worked together for years and, as contemplated by the SPA, would soon operate as one company after the merger.

Ten days later, at the close of business on Friday, March 12, 2004, after having defaulted on its obligation to fund the second installment of $2,000,000, Chex, together with Equitex, faxed a letter to iGames stating that iGames was in default on the Term Loan Note and that Chex and Equitex were terminating the SPA (the "Termination Letter").[8]  In its Termination Letter, Chex and Equitex identified three alleged breaches of the Term Loan Note: "(i) failing to pay interest or 50% of the operating income of Available Money, Inc. on or before February 1, 2004, (ii) failure to pay the ten percent (10%) of such overdue amount, and (iii) failure to deliver the stock pledge agreement required under the terms of the Term Loan Note."  (*See* Termination Letter).

The Termination Letter sent by Chex and Equitex, and the grounds for termination referenced in the letter, were pretextual.  Under the plain language of the Term Loan Note, no payment was due at the time Chex declared a "default" on the Term Loan Note.  First, the Note does not contain a due date for any payments.  Second, the Note allowed for an alternative payment method that could not be calculated without reference to financial information that is provided periodically to iGames by third party vendors and were not available at the time to calculate the alternative payment.  Third, Chex and iGames had entered into a subsequent oral agreement to postpone payments by iGames until after a final accounting could be completed with respect to moneys owed by Chex to iGames for certain trade show expenses.  (*See* iGames' July 28, 2004, Answers and Objections to Chex and Equitex's First Set of Interrogatories ("Interrogatory Answers") (Appendix Ex. "C"), at Interrogatory No. 10).  Fourth, the alleged failure to deliver the stock pledge agreement was a farce, as it had just recently been delivered by Chex's attorneys for review and execution by iGames with no deadline imposed and no sense of

---

[8] A true and correct copy of the Termination Letter is attached as Appendix Ex. "E."

urgency communicated.

Nevertheless, on March 15, 2004, the following Monday morning, without any good faith attempt to effect a cure or negotiate a resolution of any purported breaches of the Term Loan Note, Chex filed the Minnesota Action claiming default on the Term Loan Note.

III.   **Equitex And Chex Secretly Negotiate Alternative Deals In Breach Of The SPA**

Disputes as to the proper interpretation of the terms of the Term Loan Note aside, at the time Chex and Equitex purported to declare default on the Term Loan Note and terminate the SPA, they had long been in breach of the SPA and had failed to disclose the existence of material adverse changes.[9]

A.    **The Reverse Merger Agreement**

In late December of 2003 or early January of 2004, Chex was apparently approached by a "dealmaker" named Mark Savage who introduced Chex to Maroon Bells Capital.  (Anwar Tr., at 139:10-140:10).  On January 15, 2004, Mr. Anwar sent an email to Maroon Bells (with copies to Mark Savage, Henry Fong and James Welbourn) stating the following:

> It was a pleasure speaking with you over the phone yesterday. Please find enclosed some information of interest related to Chex Services, Inc.  I have also included a mutual confidentiality and non-disclosure agreement.  Please kindly execute the agreement and fax it to my attention as soon as possible at 952-417-1996.
>
> If you have any questions or concerns, please do not hesitate to contact me.  I look forward to working with Maroon Bells Capital, LLC as well as Corporate Capital Management, LLC.  Thanks.

---

[9] As set forth more fully at pages 20 - 25 of iGames' Opening Brief in Support of its Motion for Summary Judgment, filed March 15, 2005, there were at least two material adverse changes: (i) Chex received a termination notice for Chex's contract to provide cash access services at five Seminole Tribe Casinos in Florida and (ii) around September 30, 2003, Chex cashed $606,316.00 worth of bad checks for a single customer and, rather than immediately write off the bad checks as was its practice, it carried them on their books unpaid, resulting in Equitex's financial statements for the quarter ending September 30, 2003 being materially false.

(Anwar Dep. Ex. 122, (Appendix Ex. "F")).

Attached to the email was "an introductory letter from Chex Services to Maroon Bells Capital" touting Chex's financial stability and superior business ethics.  (Anwar Tr., 258:11-12).  A few days later, on January 20, 2004, Mark Savage sent an email to Henry Fong and Ijaz Anwar regarding a proposed reverse merger.  (Anwar Dep. Ex. 123, (Appendix Ex. "G")).  In his email, Mr. Savage stated that:

> [a]fter talking to Ijaz last week our approach is different than what you are currently working with.  We feel that Chex Services has  a good stand alone business that can be built upon by itself and then go and acquire the other candidates with alot [sic] less shares outstanding at the end of the day.
>
> Please let me know if you would like to continue these discussions if not I wish you well with your current project.

(*Id.*).  Mr. Savage's email was clearly comparing and contrasting the proposed reverse merger with the iGames' SPA and thus reveals that Mr. Anwar had engaged in discussions with Mr. Savage regarding the structure of the iGames deal.  Again, all of these communications regarding an alternative deal occurred after the parties entered the SPA, which prohibited this very activity, and while iGames was investing time and effort to close on the SPA.

Also attached to Mr. Savage's email was a draft proposal to reverse merge Chex into a shell company. (*Id.*)  Not surprisingly, the reverse merger proposed in Mr. Savage's email is remarkably similar to the reverse merger that Chex ultimately completed with a shell company called "Seven Ventures."  Taking things a step further, Mr. Savage proposed that, following a successful merger, "the idea then would be to go and acquire IGME [*i.e.*, iGames].  This makes it more interesting. . . .   [Capital Corporate Management]/Maroon Bells will provide the shell and all of the costs for the shell. . . . "  (*Id.*)  Mr. Savage also predicted in his email that Chex's stock, following the suggested reverse merger into a shell would be a "$5.00+ stock right from the

start." (*Id*.). Mr. Savage proved to be prescient on the subject, because when Chex eventually did complete its reverse merger with Seven Ventures on April 15, 2005, its stock traded at $5.25 the first day and steadily climbed to $7.00 within only seven trading days. (*See* Yahoo Finance Historical Prices for Fastfunds Financial Corp. (Seven Ventures' new name) (Appendix Ex. "H")).

Unbeknownst to iGames, the discussions between Maroon Bells and Chex concerning a reverse merger were on-going while iGames was diligently attempting to close on the SPA. (*See, e.g.*, Anwar Dep. Ex. 124 (Appendix Ex. "I") (March 5, 2005 email from Mark Savage with attached letter that begins "Pursuant to our discussions in connection with the potential reverse merger of Chex . . . into a public shell. . . ." and outlines various potential business arrangements); (Anwar Ex. 125, (Appendix Ex. "J") (March 9, 2004 email from Maroon Bells to Chex regarding list of financial and business information needed as part of due diligence); (Anwar Tr., at 275:11-277:17 (explaining purpose of request in Exhibit 125)); (Anwar Ex. 126 (Appendix Dep. Ex. "K")) (March 12, 2004 email from Maroon Bells to Chex requesting explanations from Mr. Anwar for certain casino contracts that were terminated). Eventually, apparently believing they had cut a better deal, Chex and Equitex sought to terminate the SPA with iGames and instead consummated the reverse merger. [10]

As a result of Chex's initial solicitation of Maroon Bells and the negotiations that followed, Seven Ventures announced on April 15, 2004 that it entered into a definitive agreement with Chex to merge Chex into a wholly-owned subsidiary of Seven Ventures:

> [U]nder the terms of the merger agreement, Equitex, Inc., will

---

[10] Equitex and Chex purported to terminate the SPA on March 12, 2004, the same day they improperly declared the Term Loan Note in default. iGames also tendered written notice of its termination of the SPA on March 12, 2004.

exchange 100% of its equity ownership in Chex Services for 7,700,000 shares representing 93% of Seven Ventures outstanding common stock following the transaction, along with warrants to purchase 800,000 shares of Seven Ventures common stock. As a result, Chex Services will become a wholly-owned subsidiary of Seven Ventures, a publicly traded company. . . . At closing, a bridge loan will be consummated with MBC Global [a.k.a. Maroon Bells Capital]or its affiliates whereby Seven Ventures will receive $400,000 through the issuance of a convertible promissory note. . .

(Seven Ventures SEC Form 8-K, April 15, 2004 (Appendix Ex. "L")).

### B.    The Whitebox Purchase Agreement

iGames has since learned that Chex and Equitex had been secretly negotiating a deal, in direct breach of the explicit terms of the SPA, prior to improperly declaring iGames in default on the Term Loan Note and purporting to terminate the SPA. Specifically, iGames learned after litigation was initiated, based on Equitex's SEC Form 10-K, that Equitex entered into a purchase agreement with Pandora Select Partners, L.P. ("Pandora") and Whitebox Hedged High Yield Partners, L.P. ("Whitebox") on March 8, 2004. (*See* Purchase Agreement, dated March 8, 2004, by and among Equitex, Inc., Pandora Select Partners, L.P. and Whitebox Hedged High Yield Partners, L.P. (the "Whitebox Purchase Agreement") (Appendix Ex. "M")). In other words, while the SPA was still in effect and prior to any notice of default on the Term Loan Note, Chex and Equitex covertly negotiated and entered into a $5,000,000 transaction, a transaction iGames had expressly rejected when approval was previously requested. The terms of that deal -- negotiated while iGames thought the parties were working toward closing on the SPA -- effectively prevented Equitex and Chex from fulfilling the terms of the SPA.

Pursuant to the Whitebox Purchase Agreement, Equitex issued an aggregate of $5,000,000 in convertible notes (the "Equitex Notes"), plus warrants to purchase 800,000 shares of Equitex common stock. The proceeds were then advanced to Chex pursuant to a $5,000,000 note (the "Chex Note"). (*See* Whitebox Purchase Agreement, Recitals and §3.27). The Equitex

Notes were secured by a pledge of Chex's common stock and an assignment of the Chex Note. *Id.* Incredibly, this was the very same stock iGames had already contracted to purchase and the Defendants' agreed to sell "free and clear" of any encumbrances or security interests.

As part of the Whitebox transaction, Equitex also entered into a Security Agreement with Whitebox and Pandora. (*See* Equitex Security Agreement, dated March 8, 2004, by and between Equitex, Inc., Pandora Select Partners, L.P., and Whitebox Hedged High Yield Partners, L.P. (the "Security Agreement") (Appendix Ex. "N"). The Security Agreement essentially required Equitex to pledge all of Chex's assets and for Chex to guarantee the obligations of Equitex under the notes. Again, these were the very same assets iGames agreed to purchase and Defendants agreed to sell, "free and clear" of any encumbrances or security interests. The Whitebox agreements also provided the lenders with complete control over Chex's outstanding common stock under certain circumstances:

> As a condition of making the [$5,000,000] Loan, the Secured Parties [i.e., Whitebox and Pandora] have required Equitex to (i) issue each of the Secured Parties a warrant of this date to purchase additional shares of Equitex Common Stock (the "**Warrants**"), (ii) agree to register the shares of Common Stock issuable upon exercise of the Warrants and upon conversion of the Notes or in payment thereof pursuant to a Registration Rights Agreement of this date (the "**Registration Rights Agreement**"), (iii) pledge certain of Equitex's assets, as more fully described in Exhibit A hereto (together with the rights described herein, (the "**Collateral**")[)], which Collateral consists of all of the outstanding capital stock of Chex, the Chex Loan and Equitex's interest in the Chex Note Security Agreement dated as of this date, as security for the due and prompt payment of all amounts under the Notes and the due and prompt performance of all obligations under the Warrants; and (iv) cause Chex to guarantee the obligations of Equitex under the Notes (the "**Guarantee**"), and to grant to Secured Parties a security interest in all of Chex's assets to secure the performance of Chex's obligations under the Guarantee.

(Security Agreement, at Recital C). (*See also* Security Agreement, at § 2.1 (in which Equitex assigns, grants and pledges all of its estate, right, title and interest in and to the outstanding

common stock of Chex)).

Although it was kept secret at the time, iGames has since learned through discovery that the Whitebox Purchase Agreement was the result of extensive negotiations between Equitex, Chex, Pandora and Whitebox that likely began in late November or early December 2003.[11] iGames has also learned that as early as January 9, 2004, Chex and Equitex were giving serious consideration to a transaction with Whitebox and Pandora. On that date, Whitebox executed a Term Sheet and faxed it to Henry Fong. (Anwar Dep. Ex. 129 (Appendix Ex. "O")). At his deposition, Mr. Anwar was specifically asked: "Do you know when it was finally decided that Equitex would close on the White Box financing?" Mr. Anwar responded that "When Equitex decided they would close on the White Box financing? I think after speaking to Chris in January Equitex had the intent to move forward with White Box financing. I don't - - can't pin down the exact date of their intent." (Anwar Tr., 297:12-19). Mr. Fong also testified that they were committed to the Whitebox financing as early as late January 2004 and that they had a signed term sheet from Whitebox. (Deposition of Henry Fong ("Fong Tr.") (Appendix Ex. "P"), at 123).

The reason for all the secrecy is clear -- the Whitebox transaction expressly prohibited Chex and Equitex from closing on the SPA, as agreed upon and constituted a breach of the SPA. Tellingly, the Whitebox transaction also specifically allowed for the type of shell company

_____

[11] The record developed in discovery is replete with evidence that these secret negotiations began in late 2003 or early 2004. (*See*, *e.g.*, Anwar Dep. Ex. 20 (Appendix Ex. "Q")) (January 2, 2004 email regarding drafting the Whitebox Purchase Agreement which states, "This is another very unique transaction that we have worked on over the last 45 days."); (Anwar Dep. Ex. 41 (Appendix Ex. "R")) (containing January 9, 2004 email regarding Whitebox Purchase Agreement drafting meetings stating that "We have refined the terms over the last 30 days to everyones [sic] satisfaction. . . . ); (Anwar Dep. Ex. 38 (Appendix Ex. "S") (December 19, 2003 email regarding negotiations on Whitebox Purchase Agreement).

reverse merger first presented by Mark Savage and Maroon Bells in January 2004:

> **MERGER OR COMBINATION**.  Equitex will promptly notify (the "**Reorganization Notice**") Secured Parties of the material terms and conditions of any proposed transaction which, if consummated, would result in the merger or consolidation of Chex with, or the acquisition of the business of Chex by, another entity (which transaction is referred to hereunder as a "Reorganization"). Notwithstanding anything to the contrary contained herein, Equitex, with the consent of Secured Parties, which consent will not be unreasonably withheld, may cause or allow Chex to engage in a Reorganization, where Equitex retains ("**Retained Interest**") at least 87.5% of the outstanding capital stock and voting power of the entity surviving such Reorganization.

(Security Agreement, § 2.6 (emphasis added)).  Thus, Equitex could not possibly have closed both on the SPA, which would have resulted in Equitex holding less than 87.5% of the outstanding capital stock of iGames, and also closed on the Seven Ventures reverse merger which resulted in Equitex retaining 93% of the outstanding common stock of Seven Ventures. (Equitex, Inc.'s SEC Form 8-K, April 15, 2004, Item 5).  Indeed, once Chex and Equitex decided to consummate the Seven Ventures reverse merger, rather than the SPA, Chex had no motive to fulfill its obligations under the Term Loan Note, as neither Chex nor Equitex was motivated to assist a would be competitor in an advantageous acquisition.  In fact, Chex instead had every motive to avoid its obligations under the Term Loan Note and secure rapid repayment of its initial advance.

Although the Whitebox Purchase Agreement was a transaction undeniably involving more than $10,000 and which represented numerous breaches of the SPA, Chex and Equitex entered into it without the consent of iGames.  The reason is clear -- Chex and Equitex wanted to complete the Seven Ventures deal, not the SPA.  The culminating event came late in the day on Friday, March 12, 2004, when Chex and Equitex faxed a letter purporting to terminate the SPA and the related Term Loan Note for various unfounded breaches and immediately filed lawsuits,

all as part of a hardball tactic designed to increase their bargaining power in the anticipated post-termination settlement negotiations.

In short, the negotiation and execution by Chex and Equitex of the Whitebox Purchase Agreement, prior to improperly declaring default on the Term Loan Note and terminating the SPA, conclusively establishes a breach of the SPA, but also convincingly evidences that Chex never intended to make the second payment on the Note or to negotiate in good faith with Mercantile for a loan.

## IV.    Chex's Multiple Breaches Of The Term Loan Note And The SPA

Chex breached the terms of the Term Loan Note by, among other things: (1) failing to make good faith efforts to obtain a satisfactory financing commitment; (2) failing to obtain the appropriate financing; and (3) failing to make the second payment of $2,000,000 to iGames on or before March 6, 2004.  iGames' damages resulting from Chex's breaches are numerous:  (1) iGames was forced to seek financing at a higher interest rate and with additional costs from another source; (2) iGames could not timely obtain alternative financing; (3) iGames is now defending a fourth lawsuit and claim for damages, in part, because of the delays surrounding the financing and second payment on the acquisition of Available Money; and, (4) iGames has suffered harm to its reputation and goodwill.  (Complaint, ¶79).

Chex also breached its duty of good faith and fair dealing by taking actions that had the effect of denying iGames the right to receive the fruits of the parties' agreement.  Specifically, Chex breached its duty to act fairly and in good faith towards iGames by secretly entering into the Whitebox Purchase Agreement, which required Chex to provide collateral in the form of stock.  The stock pledged as collateral <u>was the very same stock that was to be purchased by iGames pursuant to the SPA</u>.  In short, when Chex closed on the Whitebox Purchase Agreement on March 8, 2004, it could not possibly have closed on the SPA.

## V.     <u>Chex's First Motion For Summary Judgment</u>

Chex initially attempted to obtain summary judgment on all issues concerning the Term Loan Note by filing its Initial Motion on October 1, 2004.  In its Initial Motion, Chex claimed it was entitled to judgment in its favor and against iGames because it had not breached the Term Loan Note and, even if it did, iGames' exclusive remedy is the repayment (by iGames) of the Term Loan Note with all accrued interest.   The parties fully briefed Defendants' Motion throughout the fall of 2004, and oral argument was held on November 12, 2004.  Following oral argument, the Court entered an Order denying Defendants' Motion in its entirety.

In denying the Initial Motion for Summary Judgment, this Court explained that, because of the "muddy" history between the parties and the interrelated nature of the various transactions at issue, it would not rule on the parties' respective rights or liabilities on "stand-alone" transactions or in piecemeal fashion on summary judgment, but would instead resolve all of the issues in collective fashion at an appropriate stage.  (November 12 Hearing Transcript ("Hearing Tr.") at 26-27).  Importantly, this Court also explained there were numerous "material issues of fact in dispute" that precluded entry of summary judgment on any claims without the assistance of a finder of fact:

> I'm not prepared to take one slice out of – that's even the wrong metaphor.  This is like a knot, and there is a whole bunch of strands in there, and you want me to try to figure out how to get one out and give you the benefit of it, I'm not going to do that.  That is not what Rule 56 provides for.
>
> Now, you can say, gee, it's not fair.  They still have our money.  But the reality is you guys helped make the knot, they helped make the knot.  You all are going to have to figure out how you want to present the evidence at the right time, and then I'll get the thing unknotted at the right time <u>with the help of a fact-finder and we'll figure out who owes who what</u>.
>
> But for right now, <u>there are material issues of fact in dispute</u> – material issues of fact with respect to good faith and fair dealing, material issues of fact with respect to a subsequent oral

modification and material issues of fact with respect to how interest was to be calculated. They raised enough of a scent of factual dispute on those points to convince me, and most importantly and significantly, I reiterate, that <u>this is not some stand-alone thing, it's part of an overall transaction, that I am not prepared to rule that summary judgment can be given under these circumstances</u>.

So I'm going to give you a very short order that says "for the reasons stated in open court, summary judgment motion is denied." We'll get to the merits of this, and we'll resolve this all at once, which is how it occurs to me is the right way to address it.

(Hearing Tr. at 26-27) (emphasis added).

Notwithstanding the Court's November 12 ruling, Chex essentially re-filed its Initial Motion by filing a renewed Motion for Summary Judgment on February 2, 2005, seeking judgment on the same issues raised in the Motion for Summary Judgment that was denied on November 12, 2004. Chex claims that simply because fact discovery is closed, the time has come to "untie the larger knot" and resolve this particular claim at the summary judgment stage. (Defendants' Opening Brief ("Op. Br."), at 3).

## ARGUMENT

## I.    THE STANDARDS GOVERNING CHEX'S MOTION

A motion for summary judgment may be granted only when the evidence of record demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Under Rule 56(c), the moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *Matshushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The summary judgment standard requires the moving party to show that the issue is so one-sided that the moving party should prevail as a matter of law.  *Anderson*, 477 U.S. at 252; *see also Callahan v. A.E.V., Inc.*, 182 F.3d 237, 253 (3d Cir. 1999) ("Our jurisprudence does not require the summary judgment opponent to match, item for item, each piece of evidence proffered by the movant, but rather he or she must only exceed the 'mere scintilla' standard.") (*quoting Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 466 (3d Cir. 1998)).  When a court determines whether the movant has satisfactorily established that there is no genuine issue of material fact, "inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion."  *See Matshushita*, 475 U.S. at 587 (quoting *United States v. Diebold, Inc.*, 369 U.S. 654 (1962)); *see also Anderson*, 477 U.S. at 255 (when reviewing a motion for summary judgment, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").

Finally, courts of this Circuit have refused to grant motions for summary judgment on claims that are intertwined with or inseparable from other claims that involve material issues of

disputed fact. *See, e.g., Russo Develop. Corp. v. Thomas*, 735 F. Supp. 631, 635 (D.N.J. 1989) (denying summary judgment on "EPA Veto" claim that was "intimately tied to" an "EPA Wetlands" claim that required factual determinations to be made); *Heitz v. Nat'l R.R. Passenger Corp.*, 1993 U.S. Dist. LEXIS 2303, *6 (E.D. Pa. Jan. 15, 1993) (refusing to grant summary judgment on equitable estoppel claim because it was "intertwined with" a breach of contract claim involving disputed issues of material fact); *Baker v. Aetna Casualty and Surety Co.*, 1996 U.S. Dist. LEXIS 11600, *60-61 (D.N.J. Aug. 5, 1996) (denying summary judgment on one claim where it was "intertwined with the factual issues" of another claim that required resolution by a finder of fact).

## II.    <u>CHEX BREACHED THE TERM LOAN NOTE</u>

The explicit terms of the Term Loan Note required Chex to make an initial advance of $2,000,000 to iGames for the acquisition of Available Money and to "advance an additional $2,000,000" to iGames within 60 days thereafter.  (*See* Term Loan Note, p. 1).  The Term Loan Note also required Chex to deliver to iGames within 21 days after the date of the Term Loan Note a "binding commitment for financing sufficient to fund the second advance [of $2,000,000]," with such financing to be funded within the 21-day period or irrevocably committed directly to iGames.  (*Id.*).  Chex failed to meet these obligations and instead wrongfully declared iGames in default of the Term Loan Note in order to facilitate the closing of an alternative transaction that Chex and Equitex had secretly negotiated.

As set forth above, Chex agreed to provide financing for iGames' acquisition of Available Money, as all parties, including Chex and Equitex, beleived the acquisition would be mutually beneficial.  For its part, Equitex believed that iGames' acquisition of Available Money would increase the value of iGames stock, which was the consideration to be received by Equitex

pursuant to the SPA.  In other words, following consummation of the SPA, Equitex and its stockholders would become majority owners of the then-merged iGames/Chex entity, and they would therefore have directly reaped any gains to iGames' stock resulting from the acquisition of Available Money.

Although iGames initially lined up its own source of financing (*i.e*., from Mercantile Capital) for the acquisition of Available Money, Chex and Equitex instead offered to provide the financing by way of an initial $2,000,000 advance, followed by an additional $2,000,000 of financing that was to be provided by Chex.  Chex provided the initial advance, and iGames proceeded in good faith with its acquisition of Available Money, with the understanding the parties were working in good faith toward closing on the SPA and that the additional $2,000,000 to be provided by Chex would be forthcoming.  As iGames has learned at great cost, however, that was not to be the case.

Rather than proceed in good faith with the consummation of the SPA, Chex and Equitex secretly entered into negotiations and eventually consummated a transaction that precluded them from closing on the SPA and, therefore, destroyed Chex's incentive to fund iGames' acquisition of Available Money.  At least as early as January 2004, Chex entered into preliminary discussions with an entity known as Maroon Bells Capital and a shell company that Chex would eventually merge into known as "Seven Ventures."  The initial discussion eventually escalated, and by early March 2004, Chex was providing Maroon Bells with due diligence and working toward the closing of a reverse merger in which Chex's stock was to be given as consideration.

Having secretly negotiated a new deal and having thus rendered themselves unable to close on the SPA, Chex and Equitex quickly sought to recover the $2,000,000 it had paid to iGames pursuant to the Term Loan Note by wrongfully claiming default.  Of course, after having

closed on the Whitebox Purchase Agreement, Chex knew that it could not possibly close on the SPA and thus the Term Loan Note was no longer a good deal for Equitex, as it would no longer reap the benefits from iGames' acquisition of Available Money (Equitex would no longer become the majority owner of iGames' stock). In addition, since Chex and Equitex had already decided not to move forward with the SPA, iGames was now its competitor and had the use of its money. Thus, rather than adhering to the terms of the Term Loan Note by making the second advance and collecting the agreed upon monthly payments, Chex sought to have its cake and eat it too by declaring default and attempting to accelerate the payments on the previously advanced $2,000,000. In short, as set forth below, when Chex purported to accelerate the Term Loan Note on March 12, 2004, iGames was not in default, rather the declaration of default was part of Chex and Equitex's larger plan to abandon the SPA and close on another deal.

It was therefore Chex, and not iGames, who breached the Term Loan Note, as Chex never provided the agreed upon funding commitment, never funded any additional financing and never provided the additional $2,000,000 for the acquisition of Available Money. Chex's indefensible breaches of its obligations under the Term Loan Note and the SPA clearly damaged iGames. Having committed itself to the acquisition of Available Money, iGames was required to obtain financing on less favorable terms and incurred the additional expense of securing the alternative financing.[12]   Given that Chex, not iGames, breached the Term Loan Note, Chex

---

[12] In its Opening Brief, Chex points to a remedies provision contained in the Term Loan Note to support its theory that even if Chex breached, iGames effectively has no recourse. (Chex Op. Br. at 29). Chex's theory is legally unfounded. Under controlling Minnesota law, the remedy provided in a contract is exclusive of other possible remedies only where the language in the contract clearly indicates an intent to make it exclusive." *Indep. Consol. Sch. Dist. No. 24 v. Carlstrom*, 151 N.W.2d 784, 787 (Minn. 1967) (emphasis added); *Inland Products Corporation v. Donovan Inc.,* 62 N.W.2d 211, 219 (Minn. 1953). In this case, there was no such agreement between the parties. The language relied on by Chex does not suggest, let alone "clearly
(Continued . . .)

should not now be entitled to accelerate payment and collect a lump sum together with interest from iGames.  Instead, iGames should be entitled to offset its damages against any amounts it may owe to Chex and to satisfy any such obligation by making the monthly payments as was provided for under the Term Loan Note.[13]

## III.  IGAMES NEVER BREACHED THE TERM LOAN NOTE

When Chex purported to declare iGames in breach of the Term Loan Note in its March 12, 2004 Termination Letter, it pointed to three alleged breaches:

> (i) failing to pay interest or 50% of the operating income of Available Money, Inc. on or before February 1, 2004, (ii) failure to pay the ten percent (10%) of such overdue amount, and (iii) failure to deliver the stock pledge agreement required under the terms of the Term Loan Note.

(*See* Termination Letter).  As set forth below, under the plain and explicit terms of the Term Loan Note, as well as the parties' subsequent oral agreements, no such default had occurred, as of March 12, 2004.  Further, no such default has occurred while the parties engaged in litigation.

### A.  iGames Had No Obligation To Pay Interest Or 50% Of Operating Income Of Available Money On Or Before February 1, 2004

#### 1.  The Term LoanNote Contains No Clear Payment Due Dates

Under Minnesota law, "'[a]mbiguity exists when the language of a written document, by itself, is reasonably susceptible to more than one meaning.'"  *LaSociete Generale Immobiliere v. Minneapolis Community Develop. Agency*, 44 F.3d 629, 636 (8th Cir. 1994) (quoting *Trondson*

---

(. . . Continued)

indicate," that there were any limitations on remedies, that repayment was an <u>exclusive</u> remedy or that the parties otherwise clearly had an intention to make repayment the <u>sole</u> remedy.

[13] As set forth in more detail in the Opening Brief in Support of iGames Entertainment, Inc.'s Motion for Summary Judgment, it is very likely that Chex and Equitex will owe iGames in excess of the principal amount of the Term Loan Note.

*v. Janikula*, 458 N.W. 2d 679, 681 (Minn. 1990)). In this case, the Term Loan Note does not provide a payment due date and provides an alternative method of payment that raises significant factual issues concerning the timing and amount of the payments. The "interpretation of an ambiguous contract presents a question of fact, thereby precluding summary judgment." *Maurice Sunderland Architecture, Inc. v. Simon*, 5 F. 3d 334, 337 (8th Cir. 1993). Moreover, when "a written agreement is ambiguous or incomplete, evidence of oral agreements tending to establish the intent of the parties is admissible." *Gutierrez v. Red River Distributing, Inc.*, 523 N.W.2d 907, 908 (Minn. 1994) (quoting *Material Movers, Inc. v. Hill*, 316 N.W.2d 13, 17 (Minn. 1982)).

Contrary to the position taken by Chex's lawyers, the Term Loan Note does not contain a due date and thus there is no basis whatsoever for Chex to claim that a payment was due *on or before* February 1, 2004. In fact, there is no clear indication at all as to when the first payment under the Term Loan Note is due.[14] The only reference in the Term Loan Note to February 1, 2004 is in reference to the period of time when interest *may have accumulated*. In addition to the absence of a payment due date, the Term Loan Note provides that the accumulated interest is subject to an alternative payment method, which is dependant upon the receipt of certain financial information to be provided by third party vendors:

> Interest. For the period ending February 1, 2004, the borrower shall pay to the Lender interest on the outstanding Term Loans at the rate of fifteen percent (15%) per annum, calculated on the basis of a 360-day year and counting the actual number of days elapsed.

---

[14] The fact that no clear due date is anywhere to be found in the Term Loan Note is not anomalous -- it is a function of the context in which it was created. The Note reflected a debt owed by iGames to Chex incurred in connection with a transaction by which iGames was to have acquired 100% of the stock of Chex. Thus, had Chex closed the deal as originally contemplated, the Term Loan Note would in essence have reflected a debt owed by iGames to itself. In that context, the due date for the payment of installments was of little consequence.

> In addition, in lieu of interest, the Borrower shall, on a monthly basis, pay to the Lender an amount equal to 50% of the Operating Income of the Borrower's Available Money, Inc. subsidiary ("Available Money") (which for the period ending February 1, 2004 shall be reduced by the amount of interest paid under the previous sentence), . . . "Operating Income" shall mean cash receipts of Available Money generated by normal operations, less all operating expenses, capital expenditures, reserves for taxes and reasonable operating reserves.    Each payment shall be accompanied by a report of an officer of the Borrower in reasonable detail setting forth the calculation of Operating Income of Available Money for the applicable period.

(*See* Term Loan Note).

Indeed, this structure makes perfect sense when viewed in the larger context of the SPA. Available Money was a competitor of both Chex and iGames and, while the parties to this lawsuit were working towards the goal of closing on the SPA, Available Money became available for acquisition.  It was believed by all parties to the SPA that iGames' acquisition of Available Money would strengthen the market share of iGames and thus benefit Equitex once the two entities merged.  Accordingly, payments on the Term Loan Note were tied to the "Operating Income" of Available Money, because it was the desire of the parties to the Term Loan Note to share in the proceeds from its operations, pending closing on the SPA.  (*See id.*).  This temporary arrangement allowed Chex and Equitex to benefit from iGames' acquisition of Available Money, while the parties worked towards the anticipated closing on the SPA.  (*Id.*).

To that end, The Term Loan Note specifically provides that Borrower (*i.e.*, iGames) could "*in lieu of interest* … pay to the Lender an amount equal to 50% of the Operating Income of the Borrower's Available Money, Inc. subsidiary."  Indeed, Chex's Chairman and CEO, Mr. Fong, testified at his deposition that it was the understanding of those individuals involved in drafting and implementing the Term Loan Note that iGames had the option to pay 50% of the "Operating Income" of Available Money, *in lieu of* any interest payments.  "Operating Income,"

is defined in the Note as the cash receipts of Available Money generated by normal operations, less all operating expenses, capital expenditures, reserves for taxes and reasonable operating reserves. Operating Income, therefore, could not be calculated by iGames until <u>after</u> it received Available Money's financials and had adequate time to analyze them in order to determine the amount owed to Chex. In addition, the express terms of the Note required that "[e]ach payment shall be accompanied by a report of an officer of the Borrower in reasonable detail setting forth the calculation of Operating Income of Available Money for the applicable period." (*See* Term Loan Note, ¶ 3). It was therefore clearly anticipated that a payment would not be made until the financial information necessary to calculate the Operating Income of Available Money was available to iGames' accountants, none of which was available in time to calculate and make a payment when the default was declared.

Mr. Anwar, the CFO, also acknowledged this optional payment method, and the additional time required to determine the amount of the payment, in his September 17, 2004 deposition, stating: "I don't recall the amount due, because I believe, and again I would have to refer back to the Note, there's a provision that either the interest *or* profits from Available Money are due, *one of the two*." (Anwar Tr., at 32:15-19 (emphasis added)). Parting company with his own lawyers, Mr. Anwar further admitted there was no basis to make a payment without having first received the underlying financial information and that Chex never even demanded the payment before purporting to terminate. (*Id.* at 34:5 - 35:19) ("Just to clarify my position, I believe one of the reasons we did not ask for the payment during the month of February was the financial statements from Available Money, the calculations from Fifth Third Bank come for the month of February sometime during March. <u>So if they did not have the basis to make a payment, it would be irrelevant to ask for the payment</u>.") (emphasis added); (*Id.* at 37:23 - 38:23; 40:15 -

41:6). Nor could Mr. Anwar explain how iGames could possibly have calculated the amount of any payment during February, after having just closed on the acquisition of Available Money. (*Id.* at 37:23 - 38:23). In fact, Mr. Anwar was forced to concede that no payment due date was put in writing because payment was based on the operating profits from Available Money. (*Id.* at 41:12-19) ("Q: I'm asking you, as a business man, as chief financial officer of Chex, did you ever put in writing this is the date the payment was due on the Note; this is how much it was for? -- A: I did not put that in writing because the payment was due as fifty percent of profits which are not under my control from Available Money.").

Importantly, Chex and Equitex's own lawyers acknowledged that iGames could base payment on the Operating Income of Available Money, as their March 12, 2004 Termination Letter specifically alleged iGames was in breach of the Term Loan Note for failure to pay "interest or 50% of the operating income of Available Money, Inc. on or before February 1, 2004." (Termination Letter (emphasis added)). However, the lawyers apparently failed to properly consult with their clients as to the practical realities of calculating 50% of the operating income of Available Money, as Mr. Anwar candidly admitted that iGames did not have the basis to make the very payment the lawyers claimed triggered the default.

When asked at his deposition who would be the one to determine the amount to pay on the Term Loan Note and when, at the earliest, the calculation could have been completed, Chex's CFO, Mr. Anwar, also admitted that the financial information from which iGames' payment would be calculated was to be based on documents obtained by iGames from banks and other entities over which it had no control:

> Q:    But you were going to leave up to [iGames] how much and when it was supposed to be made?
>
> A:    No, the Note asks for fifty percent of the profits for Available Money for the month ending February 1st. So when

they would have received the financial statements for Available Money for the month of January, that would have determined the amount owed.

Q:    If I told you they received the financials on February 27th, would you think that was reasonable?

A:    That would be reasonable.

(*Id.* at 54:22 - 55:10).

Incredibly, Chex improperly declared default and instituted the Minnesota Action at a time when Chex itself did not have the information it needed to determine whether a payment was even due and, if so, how much was due. Indeed, at the time Chex called the Term Loan Note, its CFO did not even know whether iGames was in possession of the information that it needed to calculate the payment. With such uncertainty, it was at least incumbent upon Chex to inquire as to whether iGames had received the information necessary to calculate the payments and/or to at least make a demand for payment prior to declaring a breach.[15]

---

[15] According to the terms of the Term Loan Note, a late payment does not constitute an "Event of Default," unless it is more than 10 days late. (Term Loan Note, p. 3) ("(a) the Borrower shall fail to pay when due, any installment of principal or interest or fee payable hereunder or any Obligation <u>within 10 days following the date when due</u>.") (emphasis added). This ten (10) day window provides even greater evidence that a default had not yet occurred when litigation was instituted. As Mr. Anwar testified, it was reasonable to assume that iGames could have received financials in February or even March. (Anwar Tr., at 34:5 – 35:19), which, together with the ten-day grace period would mean that iGames could not possibly have been in default at the time that Chex wrote their March 12 Termination Letter and filed suit.

Mr. Anwar also interestingly revealed in his deposition that he and Mr. Welbourn (the President of Chex) discussed the possibility of informing iGames that they believed a payment was coming due but they ultimately chose to keep this critical fact a secret and not communicate their thoughts to iGames' CEO, Chris Wolfington:

> Q:     Did you ever, prior to March 12, 2004, tell Chris Wolfington or anyone at iGames that you believed an interest payment or some type of payment was due on this Note?
>
> A:     I do not recall informing Chris Wolfington.
>
> Q:     Or anyone at iGames?
>
> A:     Or anyone at iGames.
>
> Q:     And the answer was that you do not recall informing Chris Wolfington or anyone at iGames that any kind of payment was due on the Note prior to March 12, 2004?
>
> A:     I do not recall that.

(Anwar Tr., at 20:2-18).

> Q:     Are you aware of anyone at Chex -- are you aware whether anyone at Chex notified Chris Wolfington or anyone at iGames prior to March 12, 2004, that they believed an interest payment or some type of payment was due on the Note?
>
> A:     I do not recall right now if anyone else contacted Chris Wolfington.

(*Id.* at 21:1-8).

> Q:     Okay.   At any point before terminating or calling in that Note, did anyone in your organization tell Chris that a payment was due and tell him what the amount they thought was due?
>
> A:     I don't recall the amount due, because I believe, and again I would have to refer back to the Note, there's a provision that either the interest or profits from Available Money are due, one of the two.  *So to ask for interest payment without receiving the P&N [sic] or the calculation from Chris Wolfington on the Available Money financial statements would be, I think, premature.*

(*Id.* at 32:10-23 (emphasis added)).

As the above exchange reveals without question, both Chex and iGames understood the Term Loan Note to mean that iGames had the right to make payments based on the calculated "Operating Income" of Available Money. Thus, in the absence of an agreed upon due date, coupled with the existence of an alternative method of payment based on Operating Income that Mr. Anwar himself conceded would take time for the necessary financials to be collected and a payment to be calculated, Chex unilaterally decided to initiate default proceedings. These facts more than suggest that Chex did so not because iGames was truly in default, but because Chex had determined that neither the Term Loan Note and the acquisition of Available Money by iGames pursuant to the SPA was no longer in Chex's economic self interest.

### 2.    A Subsequent Oral Agreement Between Chex And iGames Postponed Payment Of Any Amount Allegedly Due

A subsequent oral agreement between iGames and Chex altered the terms of the Note and provided that iGames would postpone making any payments. The Minnesota Court of Appeals has specifically held that such oral agreements are valid and binding:

> An extension of time of payment is a valid and binding agreement to delay the enforcement of a promissory note. An extension may be made by an oral agreement without violating the rule excluding parol evidence to contradict, add to, or vary a written contract because the evidence is admitted only to prove a new agreement.

*In the Estate Of: Richard G. Giguere,* 366 N.W.2d 345, 347 (Minn. Ct. App. 1985).

In this case, iGames and Chex jointly participated in the "CNIGA" trade show in January 2004. (Anwar Tr., at 41:20 - 44:19). Although a Chex marketing person ordered the handouts and signs, and organized promotional events, iGames paid for most of the expenses. To address this, Mr. Anwar and Mr. Wolfington thereafter entered into an oral agreement that any payments under the Term Loan Note, to the extent any were due, would be postponed until the trade show payments could be reconciled.    (Interrogatory #10); *see also* Deposition of Christopher

33

Wolfington ("Wolfington Tr.") (Appendix Ex. "U"), at 281:1 - 287:24).  Importantly, Minnesota law does not prohibit consideration of evidence of subsequent oral arguments:

> The parol evidence rule, . . . does not preclude plaintiff from introducing evidence of subsequent oral agreement.  Nor are oral modifications of an agreement prohibited, even if the agreement expressly forbids such oral modification.  Since plaintiff has presented evidence from which a reasonable jury could find that the parties subsequently modified their written agreement, summary judgment should be denied on count one as to that issue.

*Mankato Implement, Inc. v. J.I. Case*, 1991 U.S. Dist. LEXIS 20082 *8-9 (D. Minn. Aug. 29, 1991) (internal citations omitted).

As Mr. Anwar candidly acknowledged, at the time Chex terminated the Term Loan Note the numbers from the CNIGA show had not been reconciled.

> Q:    So is it fair to say prior to March 12, 2004, you had not yet reconciled those [the trade show] numbers?
>
> A:    That is correct

(*See* Anwar Tr., at 42:16-19).  It was further determined at Mr. Anwar's deposition that the earliest date upon which the trade show payments were reconciled (as far as Chex was concerned) was March 18, 2004.  Thus, while a material factual issue may exist as to the terms of the oral agreement, it is undisputed that the trade show payments were not reconciled prior to the declared default.

**B.    iGames Did Not Breach The Term Loan Note By Failing To Pay 10% Of The "Overdue Amount" Because No Amount Was Yet Due**

In its Termination Letter, Chex stated that iGames also breached the Term Loan Note by failing to pay ten percent interest on the "overdue amount."  (*See* Termination Letter).  As set forth above, iGames did not yet have the information necessary to calculate 50% of Available Money's Operating Income and, consequently, iGames could not be in breach for failing to make such a payment.  iGames was therefore not obligated to pay 10% of the "overdue amount," since

no amount was in fact overdue as of March 12.[16]

### C.    iGames Did Not Breach the Term Loan Note By Failing To Deliver The Stock Pledge Agreement By March 12, 2004

The Term Loan Note provides in part that iGames' obligations "shall be secured by (i) a pledge of the capital stock of Available Money pursuant to a Stock Pledge Agreement of even date herewith (the "Stock Pledge Agreement")."    (Term Loan Note, pp. 2-3).    In their Termination Letter, Chex and Equitex claimed that iGames defaulted on the Term Loan Note based on a "failure to deliver the stock pledge agreement required under the terms of the Term Loan Note." (Termination Letter, p. 1). This claim fails for several reasons.

First, the Term Loan Note was negotiated quickly, with the understanding that the related documents, such as the Stock Pledge Agreement, would be finalized at a later time.  Mr. Anwar admitted this fact in his deposition testimony:

> Q:    But the money was wired to iGames on January 6th is that correct?
>
> A:    On or about January 6th.
>
> Q:    Why wasn't the paperwork done at the time the money was wired?
>
> A:    Well, at the time when the money was wired Chris Wolfington had negotiated a deal and he was flying all over the country in transit and he called us in a panic saying – not a panic, in a rush saying he's closed the deal; funding needs to be done; I have to catch another plane in a transit lounge of some airport.  I don't remember where.  So we got on a conference call with Henry

---

[16] Moreover, Chex and Equitex always expected to receive 50% of Available Money's operating income and never expected to receive a straight 10% interest payment.  This fact is evidenced by, among other things, a January 8, 2004 press release issued by Equitex, in which Equitex makes clear it expected that the Term Loan Note "will provide [Chex] with a 50% participation in Available Money's revenues and income for not less than 90 days subject to certain extensions, and a 50% participation in Available Money's income until the financing is repaid."   (See January 8, 2004 Press Release (Appendix Ex. "V")).

> Fong and we collectively agreed and Henry instructed me to send
> the funds.  So there was no way to get the Note signed when the
> money was sent.  After that I don't really know when he finally
> arrived at his final destination.

(Anwar Tr., at 272:16 - 273:9).

Correspondence between attorneys for iGames and Chex also demonstrates they did not complete a final draft of the Stock Pledge Agreement until at least March 5, 2004 -- only one week before Chex and Equitex sent the Termination Letter.  (*See* Welbourn Dep. Ex. #23).  Although the parties signed the Term Loan Note on January 21, 2004, many of the Stock Pledge Agreement details needed to finalized.  That being the case, the parties continued to negotiate in good faith, periodically exchanging updated versions of the Stock Pledge Agreement.  On March 9, 2004, Chex's attorneys contacted iGames' attorney, Lawrence Rovin, inquiring as to "how are you [Rovin] doing on obtaining executed Pledge Agreement and Guaranties [from Chris Wolfington]."  (*See* Welbourn Dep. Ex. #24 (Appendix Ex. "W").  The final draft of the Stock Pledge Agreement and Guaranties had just recently been sent to Mr. Rovin for review and execution by Mr. Wolfington on the afternoon of March 5, 2004.  The March 9 communication did not imply any sense of urgency, did not set a deadline for execution of the Stock Pledge Agreement and, more importantly, iGames did not agree to any specific time-frame within which it was to respond to this latest draft.  In the absence of any demand or agreed upon deadline, Chex simply did not have the right to declare a default only three days later.  Yet, on March 12, 2004, Chex and Equitex declared default, based in part on Mr. Wolfington's alleged failure to execute documents that he had been forwarded by Chex's counsel only a few days earlier.

## IV. DISPUTED AND INTERTWINED ISSUES OF MATERIAL FACT CONTINUE TO MAKE SUMMARY JUDGMENT INAPPROPRIATE

In denying the Defendants' Initial Motion for Summary Judgment, this Court explained that, because of the "muddy" history between the parties and the interrelated nature of the various transactions at issue, it would not rule on the parties' respective rights or liabilities on "stand-alone" transactions or in piecemeal fashion on summary judgment, but would instead resolve all of the issues in collective fashion at an appropriate stage. (Hearing Tr. at 26-27). Importantly, this Court also explained that there were numerous "material issues of fact in dispute" that precluded entry of summary judgment on these claims without the assistance of a finder of fact. The Court properly found that those claims were part of a larger "knot" that could not be untied in piecemeal fashion, but must instead be resolved with the assistance of a finder of fact. (Hearing Tr. at 26-27) (emphasis added).

Notwithstanding the Court's November 12 ruling, Chex has essentially re-filed its Initial Motion by filing this motion, seeking judgment on the same issues for which summary judgment was denied on November 12, 2004. Chex claims that simply because fact discovery is now closed, the time has come to "untie the larger knot" and resolve these claims in its favor at the summary judgment stage. (Defendants' Opening Brief ("Op. Br."), at 3).

While Chex raises the same grounds for dismissal in its Renewed Motion that were raised in its Initial Motion for Summary Judgment, Chex fails to point to the emergence of any significant new facts that were not known at the time the Initial Motion was briefed and argued. Instead, Chex seeks to rehash previously addressed arguments -- without explaining why numerous factual issues are either no longer disputed or no longer material. And, in fact, the factual developments resulting from discovery taken since the November 12 hearing before the Court demonstrates without question that Chex was acting in bad faith and never intended to

fulfill its obligations under the Term Loan Note, thus making summary judgment in Chex's favor less, and not more, appropriate. *See Baker v. Aetna Casualty and Surety Co.*, 1996 U.S. Dist. LEXIS 11600, *60-61 (D.N.J. Aug. 5, 1996) (finding summary judgment on one claim inappropriate where it was "intertwined with the factual issues" of another claim requiring factual resolution).

Try as it might, Chex cannot avoid the fact that iGames' acquisition of Available Money and the Term Loan Note (by which the acquisition was to be accomplished) were negotiated and agreed upon as part of iGames' merger with Chex, as contemplated in the SPA. (*Accord* Equitex's Jan. 8, 2004 Press Release) ("We are pleased to assist iGames Entertainment with their acquisition of Available Money and are confident this strategic acquisition will open new avenues for both Chex Services and iGames," stated Chex Services President, Jim Welbourn. "We are here to assist iGames and Available Money in any way we can and are certain this transaction will strengthen the position of both companies as we move toward the timely closure of the Chex – iGames transaction."). When Chex and Equitex abandoned the iGames merger and decided to pursue an alternative transaction, they ignored their obligations under the SPA and Term Loan Note and instead pursued a termination strategy in hopes of curtailing their losses. Having failed to perform its own obligations, Chex went on the offensive purporting to declare iGames in default and dragged the parties into litigation. Given these facts, Chex cannot now claim entitlement to payment in full under the Term Loan Note by pointing to the passing of deadlines. Simply put, before Chex's rights under the Term Loan Note, if any, can be addressed, the following issues must be resolved: (1) whether Chex breached the Term Loan Note by failing to fulfill its obligations to complete funding and, if so, the extent of iGames' damages resulting from that breach; (2) whether Chex and Equitex breached the SPA and, if so, the amount of

damages to which iGames is entitled; (3) whether iGames was in breach of the Term Loan Note as of March 12, 2004 and, of so, what Chex's remedies are; and (4) whether iGames has any outstanding obligation to Chex under the Term Loan Note and, of so, the manner in which iGames should be required to pay any such amounts.  To do otherwise would only serve to untangle (to Chex's sole benefit) a small part of the knot -- a knot both Chex and Equitex created with their secretive dealings and subsequent hardball litigation strategy.

## CONCLUSION

WHEREFORE, for the foregoing reasons, iGames respectfully requests that the Court

deny Chex's Renewed Motion for Summary Judgment in its entirety.


DATED:        March 29, 2005          **DUANE MORRIS LLP**


                                      /s/ Thomas P. McGonigle
                                      Thomas P. McGonigle (Del. I.D. No. 3162)
                                      Matt Neiderman (Del. I.D. No. 4018)
                                      1100 North Market Street, 12th Floor
**OF COUNSEL:**                       Wilmington, Delaware  19801
**DUANE MORRIS LLP**                  302.657.4900
Matthew A. Taylor, Esquire
James L. Beausoleil, Jr., Esquire
One Liberty Place                     Attorneys for Plaintiff
Philadelphia, Pennsylvania 19103-7396 iGames Entertainment, Inc.
215.979.1000