**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

_____
                                             :
**iGAMES ENTERTAINMENT, INC.,**              :
                                             :
          Plaintiff,                         :
                                             :
          v.                                 :        C.A. No. 04-180-KAJ
                                             :
**CHEX SERVICES, INC.** and                  :        JURY TRIAL DEMANDED
**EQUITEX, INC.,**                           :
                                             :
          Defendants.                        :
_____:


**BRIEF IN OPPOSITION TO MOTION BY CHEX SERVICES, INC.
AND EQUITEX, INC. FOR SUMMARY JUDGMENT**


DATED:      March 29, 2005        **DUANE MORRIS LLP**
                                  Thomas P. McGonigle (Del. I.D. No. 3162)
                                  Matt Neiderman (Del. I.D. No. 4018)
**OF COUNSEL:**                   1100 North Market Street, 12th Floor
**DUANE MORRIS LLP**              Wilmington, Delaware  19801
James L. Beausoleil, Jr., Esquire 302.657.4900
Matthew A. Taylor, Esquire
One Liberty Place
Philadelphia, Pennsylvania 19103-7396    Attorneys for Plaintiff
215.979.1000                             iGames Entertainment, Inc.

## <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

TABLE OF AUTHORITIES ............................................................................................. iii

INTRODUCTION AND SUMMARY OF ARGUMENT ................................................. 1

NATURE AND STAGE OF THE PROCEEDING........................................................... 3

FACTUAL BACKGROUND ........................................................................................... 4

I.      The Stock Purchase Agreement And Prior Joint Ventures Of The Parties.............. 4

II.     Chex And Equitex Depart From The Ordinary Course Of Business By
Accepting A Note In Return For The Largest Sum Of Returned Checks
Ever Incurred In Chex's History Of Operations And Then Booking That
Note As A Collectible In Violation Of Its Own Operating Procedures.................. 8

III.    Chex Lost 25% Of Its Revenues In A Forced Eviction From Five
Seminole Casinos That Nearly Destroyed Its Reputation And Ability To
Conduct Business In Native American Casinos ...................................................... 9

IV.    Chex And Equitex Agree To Assist iGames With Financing For Its
Acquisition Of Available Money In Exchange For A 50% Share Of
Available Money's Operating Income But Then Chex And Equitex
Breached The Financing Agreement ..................................................................... 12

V.     Chex Secretly Solicits A Joint Venture With A Venture Capitalist Who
Entices Chex And Equitex Away From The Planned Merger With iGames,
Provides Them With A Shell Company, And Then Oversees A Reverse
Merger Of Chex Into That Shell Company........................................................... 14

VI.    Equitex And Chex Secretly Close On A $5,000,000 Loan Which Requires
Them To Pledge All Of The Common Stock Of Chex, And Prohibits
Them From Closing On The SPA ......................................................................... 18

ARGUMENT .................................................................................................................. 23

I.      The Standards Governing The Defendants' Motion For Summary
Judgment .............................................................................................................. 23

II.     Equitex And Chex Are Both Bound By The Terms Of The Stock Purchase
Agreement And Are Both Liable To iGames For Its Damages, The
Termination Fee And All Associated Costs And Expenses................................... 24

        A.    Equitex Is Liable For The Termination Amount Under The SPA............. 24

B.      iGames Did Nothing To Relieve Chex Of Its Obligations Under The SPA .................................................................................................26

III.    Equitex And Chex Are Equally Liable To iGames For Its Damages And Costs.........................................................................................................30

IV.     Equitex And Chex Are Liable For Breaching The Implied Covenant Of Good Faith And Fair Dealing In The SPA.............................................31

V.      Chex Is Liable To iGames For Its Intentional Breaches Of The Term Loan Note............................................................................................................35

VI.     Equitex And Chex Are Liable For Breaching The Implied Covenant Of Good Faith And Fair Dealing In The Note .........................................37

VII.    The Defendants' Efforts To Tortiously Interfere With iGames' Relationships With Mercantile Capital And The Sellers Of Available Money Resulted In Significant Harm To iGames' Reputation And Its Financial Health ................................................................................................39

CONCLUSION .................................................................................................40

## TABLE OF AUTHORITIES

**FEDERAL CASES**                                                                        **PAGE**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)........................................................................................23

*BRAC Group, Inc. v. Jaeban (U.K.) Ltd.*,
    2004 Bankr. LEXIS 680 (Bankr. D. Del. May 25, 2004).....................................27

*Callahan v. A.E.V., Inc.*,
    182 F.3d 237 (3d Cir. 1999)...........................................................................23

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)........................................................................................23

*LeMond Cycling, Inc. v. PTI Holding, Inc.*,
    2005 U.S. Dist. LEXIS 742 (D. Minn. Jan. 14, 2005)..........................................36

*Matshushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)........................................................................................23

*Resolution Trust Corp. v. Gill*,
    960 F.2d 336 (3d Cir. 1992).............................................................................23

**STATE CASES**

*Aspen Advisors LLC v. United Artists Theatre Co.*,
    843 A.2d 697 (Del. Ch.),
    *aff'd*, 861 A.2d 1251 (Del. 2004) .........................................................................32

*Dave Gretak Enters. v. Mazda Motors of Am., Inc.*,
    622 A.2d 14 (Del. Ch.),
    *aff'd*, 609 A.2d 668 (Del. 1992) .........................................................................33

*Gloucester Holding Corp. v. U.S. Tape & Sticky Prods., LLC*,
    832 A.2d 116 (Del. Ch. 2003).....................................................................32, 34

*In re Hennepin County 1986 Recycling Bond Litig.*,
    540 N.W.2d 494 (Minn. 1995)....................................................................37, 38

*Indep. Consol. Sch. Dist. No. 24 v. Carlstrom*,
    151 N.W.2d 784 (Minn. 1967).........................................................................36

*Inland Products Corporation v. Donovan Inc.*,
    62 N.W.2d 211 (Minn. 1953)..........................................................................36

*Kelly v. McKesson HBOC, Inc.*,
    2002 Del. Super. LEXIS 39 (Jan. 17, 2002) ..........................................................34

*Midwest Sports Mktg., Inc. v. Hillerich & Bradsby of Canada, Ltd.*,
    552 N.W.2d 254 (Minn. Ct. App. 1996)................................................................37

*PAMI-LEMB I Inc. v. EMB-NHC, L.L.C.*,
    857 A.2d 998 (Del. Ch. 2004)........................................................................32, 34

*Star Cellular Telephone Co. v. Baton Rouge CGSA, Inc.*,
    1993 Del. Ch. LEXIS 158 (Del. Ch. July 30, 1999),
    *aff'd*, 1994 Del. LEXIS 190 (Del. June 9, 1994)....................................................27

## STATUTES AND OTHER AUTHORITIES

Fed. R. Civ. P. 56(c) ........................................................................................................23

*Restatement (Second) of Contracts* § 322 (2) ................................................................27

## INTRODUCTION AND SUMMARY OF ARGUMENT

This case arises from a failed business merger involving Equitex, Inc. ("Equitex"), its wholly-owned subsidiary Chex Services, Inc. d/b/a Fastfunds ("Chex" and together with Equitex, the "Defendants"), and iGames Entertainment, Inc. ("iGames").

Chex, Equitex, and iGames were parties to a Stock Purchase Agreement, entered into on November 3, 2003 (the "SPA") whereby iGames sought to acquire Chex. Discovery has revealed that while iGames was spending valuable time and money attempting in good faith to acquire Chex pursuant to the SPA, Chex and Equitex secretly negotiated to sell Chex's stock to a third party, in violation of the SPA, and then to complete a reverse merger with a NASDAQ shell company, also in violation of the SPA. In fact, Chex and Equitex secretly closed on a financing agreement that was a prerequisite to the reverse merger on March 8, 2004 -- just four days before Chex and Equitex purported to terminate the SPA with iGames.

As detailed below, the Defendants breached the SPA long before they purported to terminate it by: (i) advancing the extraordinary sum of over $606,000 in cash to a single customer in exchange for dozens of checks that were immediately returned "NSF" (*i.e.*, insufficient funds) and then doctoring their books in an effort to enhance their balance sheet by accepting a note from that customer in violation of their own operating procedures; (ii) being thrown out of five client casinos, which together accounted for 25% of Chex's overall revenue; (iii) entering into an unauthorized $5,000,000 loan transaction which created irreconcilable and fundamental breaches of the SPA; and (iv) soliciting, negotiating and ultimately entering into an alternative deal to the SPA.

1

In seeking summary judgment in their favor, the Defendants would like this Court to turn a blind eye to their various breaches and to focus instead on excerpts from the SPA that are taken out of context and/or misrepresented in a misguided effort to avoid trial on the merits.  The arguments raised by Defendants are not supported by law or fact, and their Motion for Summary Judgment should be denied in its entirety.  Instead, for the reasons set forth in iGames' Opening Brief in support of its Motion for Summary Judgment filed on March 15, 2005, judgment should be entered in favor of iGames and against Chex and Equitex for their willful material breaches of the SPA and the related Term Loan Note.

## NATURE AND STAGE OF THE PROCEEDING

On March 15, 2004, Chex filed a Complaint in Minnesota state court (the "Minnesota Action"). That action was removed and transferred to this District.

On March 24, 2004, iGames filed a Complaint in this Court against Equitex and its wholly-owned subsidiary Chex. iGames subsequently filed a First Amended Complaint (the "Delaware Federal Complaint").

On March 23, 2004, Equitex filed an action in Delaware state court concerning the same SPA at issue in the Delaware Federal Complaint (the "Delaware State Complaint"). iGames removed that action to the United States District Court for the District of Delaware. This Court issued an Order on September 13, 2004 consolidating the three separate actions after all parties agreed that they have the same operative facts and involve essentially the same parties.

On February 2, 2005, Chex and Equitex filed a Motion for Summary Judgment on all claims related to the SPA. Chex filed another Motion for Summary Judgment on the same date, seeking judgment in its favor on all claims related to the Term Loan Note. All fact and expert discovery closed on March 1, 2005. On March 15, 2005 iGames filed its own Motion for Summary Judgment, seeking judgment in its favor and against the Defendants on all claims. This is iGames' Brief in Opposition to the Motion for Summary Judgment filed by Chex and Equitex on February 2, 2005 on claims related to the SPA.

## FACTUAL BACKGROUND

**I.    The Stock Purchase Agreement And Prior Joint Ventures Of The Parties**

This case arises from a failed business merger involving Equitex, its wholly-owned subsidiary Chex, and iGames.[1]  iGames is in the business of providing cash access and financial management systems for the gaming industry and focused on specialty transactions in the cash access segment of the funds transfer industry through its subsidiaries, Money Centers of America, Inc. and Available Money, Inc.  Defendant Chex provides similar services for the gaming industry and is a competitor of iGames.

Chex, Equitex, and iGames entered into the SPA on November 3, 2003.  By the SPA, iGames agreed to acquire Chex from Equitex through a purchase of Chex's capital stock in exchange for a controlling block of iGames stock.[2]  The parties were well acquainted long before the parties entered into the SPA, as Chex and iGames were involved in various joint ventures whereby they shared office space, employees, information and financial resources.[3]  (*See*, *e.g.*, Deposition of Ijaz Anwar ("Anwar Tr.") Vol. I, at 73:3-76:12).  In fact, the November 3, 2003 SPA represented the second attempt by iGames to acquire Chex.

---

[1] Subsequent to the filing of the Complaint, iGames was merged into Money Centers of America, Inc., which continues in the same business.  The corporate structure now is Money Centers of America, Inc. ("MCA"), a Delaware corporation, that owns 100% of Available Money, Inc. ("Available Money").  iGames, the Nevada corporation, no longer exists.  For the sake of simplicity, we continue to refer to iGames as the plaintiff in these consolidated actions.

[2] A true and correct copy of the November 3, 2003 SPA is attached to the accompanying Appendix as Exhibit "A."

[3] Copies of relevant portions of the deposition transcripts of Ijaz Anwar and Christopher Wolfington are attached as Exhibits "B" and "C" to the accompanying Appendix, respectively.

Equitex made a number of key representations when it entered into the SPA. Specifically, Equitex represented that it owned all shares of Chex "free and clear of any restrictions on transfer (other than any restrictions under the Securities Act or applicable state securities laws), Taxes, Encumbrances, Security Interests, options, warrants, purchase rights, contracts, commitments, equities, claims and demands."  (SPA, § 4(d)). Equitex further represented that it had "full power and authority to execute and deliver" the SPA, subject only to the final approval of its shareholders.  Final approval would have required Equitex's shareholders to vote on the acquisition, but only after closing:

> On the Closing Date, this Agreement shall be duly and validly authorized by all necessary action on the part of Parent and its stockholders in accordance with Applicable Laws and Parent's Governing Documents.  *This Agreement constitutes the valid and legally binding obligation of Parent, enforceable in accordance with its terms and conditions.*  . . .  The affirmative approval of the Board of Directors of Parent (the "**Parent Board**") and of the holders of shares of Parent's issued and outstanding capital stock entitled to vote thereon representing a majority of the votes that may be cast by the holders of such securities as of the record date for the Company (the "**Parent Requisite Vote**") is the only vote of the holders of any class or series of capital stock of the Company necessary to approve the Contemplated Transactions.

(SPA, § 4(b) (italics added, bold in the original)).

There can be no doubt that the SPA was and is binding on Equitex and Chex. Indeed, the enforceability of the SPA was asserted by Equitex in the Delaware State Complaint and was also conceded by Ijaz Anwar (the Chief Financial Officer of Chex) and Henry Fong (the CEO of Equitex) during their depositions.  (*See* Anwar Tr., Vol. II, at 238:21 - 239:4 (Q: Do you believe that the stock purchase agreement, November 3, 2003 agreement was still binding, was still the binding document between iGames, Chex and Equitex when you terminated it?  A: Yes.  It was the only binding agreement.); *see*

*also* the Delaware State Complaint (Appendix Exhibit "D") (alleging breach of SPA and claiming damages thereunder)).  This binding agreement included a number of important representations and warranties by Equitex and Chex that are particularly important in this litigation.

In Section 6(n) of the SPA, Equitex and Chex represented and warranted, among other things, that Chex fully complied with all material terms of its contracts (including service contracts with casinos) and that no other party to a contract was terminating, intended to terminate or was considering terminating any contract.  Chex and Equitex further represented and warranted that they had received no notice (oral or written) of any such termination or plans to terminate.

The SPA was structured so that upon closing, iGames would "pay to [Equitex] consideration of that amount of shares of Buyer Common Stock which equals 62.5% of the issued and outstanding shares of Buyer following such issuance on the Closing Date after giving effect to the Stock Split and closing of the MCA Acquisition (the "Common Stock Consideration")."[4]  After closing, Equitex intended to retain ownership of 10% of the Common Stock it received from iGames and to distribute the balance of the Common Stock to its stockholders on a pro rata basis as a dividend.  (SPA, § 2(b)).  The contemplated distribution qualified as a public offering and therefore was "conditioned on the effectiveness of a Registration Statement under the Securities Act registering the issuance of the distributed shares of Buyer Common Stock."  (SPA, § 2(b)).  The SPA also contemplated fluctuations in iGames' stock price and provided for an adjustment in

---

[4] iGames was required to, and did, effect a stock split, so that its outstanding shares at the time of closing would total 40,000,000.  (SPA, § 1(pppp)).

the amount of iGames' stock.  (SPA, § 2(b)).

> In the event that the average closing bid price of the Buyer Common Stock for the five (5) trading days preceding the date of distribution is less than $2.52 (assuming a 1-for 3.6 Stock Split; this amount will be adjusted proportionately for the actual Stock Split ratio)(the "Target Price"), the Buyer will issue sufficient additional shares of its Buyer Common Stock to Parent to cause the aggregate value of the Common Stock Consideration to equal that amount determined by multiplying the number of shares of Buyer Common Stock initially issued to Parent by the Target Price, which amount shall have an aggregate value of $63,000,000, which shares of Buyer Common Stock shall be considered part of the Common Stock Consideration and either retained by Parent or distributed to Parent's shareholders (proportionately to the amounts otherwise retained or distributed in accordance with this section) in accordance with this Agreement.

(SPA, § 2(b)).

iGames had the right to terminate the SPA and to collect a Termination Fee for various identified acts or omissions which could either be the result of purposeful conduct or of the mere occurrence of an event.  For example, iGames could terminate the SPA if any representation or warranty of Equitex or Chex was or became materially inaccurate or if Equitex or Chex failed to comply with their material obligations under the SPA.  (SPA, §§11(b)(ii), 11(b)(v)).  iGames could also terminate the SPA <u>upon the occurrence</u> of any event that was likely to have a Material Adverse Effect on Chex. (SPA, §11(b)(viii)).  Upon any such termination, Section 11(e)(ii) of the SPA obligated Equitex and Chex to pay all of iGames' expenses incurred in connection with the proposed transaction, together with a termination fee of $1,000,000 (the "Termination Amount").

II.     **Chex And Equitex Depart From The Ordinary Course Of Business By Accepting A Note In Return For The Largest Sum Of Returned Checks Ever Incurred In Chex's History Of Operations And Then Booking That Note As A Collectible In Violation Of Its Own Operating Procedures**

In January 2004, while performing its due diligence review of Equitex's Quarterly Report on SEC Form 10-Q for the quarter ending September 30, 2003 (the "10-Q"), iGames discovered that in September 2003, Chex cashed $606,316 worth of bad checks for a single customer. This sum far surpassed the amount of checks ever written by one customer to Chex. In fact, the loss Chex suffered as a result of this one customer, over one holiday weekend, was greater than the losses Chex suffered for the entire preceding year, for _all_ of the bad checks written by _all_ of Chex's customers. (Anwar Deposition Exhibit ("Anwar Ex.") 11 (Appendix Exhibit "E")). Importantly, the normal course of business for Chex would have been to immediately write off each of these numerous bad checks. (_See_ Anwar Tr., Vol. I, at 117:12-121:13; 149:22-150:10; SEC Form 10-Q, for the quarter ended September 30, 2004 (Appendix Exhibit "F") at page 34, "Returned Checks"). However, in an apparent effort to improve its financial statements, the dishonored checks remained on Chex's books as a valid account receivable until after the SPA was executed. Not surprisingly, the debt remains outstanding today.

These actions constituted a breach of the SPA. First, in Section 6(o) of the SPA, Equitex and Chex represented and warranted, among other things, that all Accounts Receivable (defined as "trade accounts receivable, notes receivable and other rights to the payment of money, including any claim, remedy or other right related to any returned and unpaid checks") were current and collectible net of the reserves set forth on the applicable balance sheets (which reserves were to be adequate and calculated in accordance with past practice and would not represent a Material Adverse Effect in terms

8

of aging), and each Account Receivable would be collected in full, without any setoff, within 90 days of the day on which it first became due and payable.  Importantly, Chex did not reserve for the likelihood of nonpayment on its September 30, 2003 balance sheet in accordance with normal procedures (which would have materially adversely affected its earnings for the quarter then ended), but rather had the customer execute a note for the amount due (the "Howard Note").  Although the Howard Note was in default as of October 14, 2003, it remained on Chex's balance sheet and in its SEC filings as a note receivable in the full amount, without any reserve.  As a result of these maneuvers, Chex's financial statements for the quarter ending September 30, 2003, were materially false.

Second, in Section 6(f) of the SPA, Equitex and Chex represented and warranted that, after June 30, 2003, there was not with respect to Chex, among other things, any action, transaction or agreement outside the Ordinary Course of Business, any loan to any person in excess of $10,000.00 and outside the Ordinary Course of Business, any compromise of any claims or, any other event or circumstance that could reasonably be expected to have a Material Adverse Effect on Chex.  Simply stated, the Howard Note violated each of these provisions.

### III.    Chex Lost 25% Of Its Revenues In A Forced Eviction From Five Seminole Casinos That Nearly Destroyed Its Reputation And Ability To Conduct Business In Native American Casinos

Section 9(a) of the SPA provided that iGames was not obligated to close on its acquisition of Chex unless, among other things, (i) all representations and warranties of Chex and Equitex, including those in Section 6, were true and correct as of the Closing Date, and (ii) there had been no "Material Adverse Effect" on the business of Chex. Section 1(iii) of the SPA defines "Material Adverse Effect" as "any event, change or

effect that is materially adverse, individually or in the aggregate, to the condition (financial or otherwise), properties, assets, liabilities, revenues, income, business, operations, results of operations or prospects of such Person, taken as a whole." Obviously, this section expressly contemplates the potential loss of significant revenue and its impact on the economic desirability of closing on the merger.

By way of background, on December 4, 2001, Native American Cash Systems Florida, Inc. ("NACSF") and Chex entered into agreements under which Chex agreed to perform financial services for five Seminole Tribe casinos. (Plaintiff Chex Services, Inc.'s Second Amended Complaint, State of Minnesota, County of Hennepin, District Court, Fourth Judicial District (CX/EX 00594) ("NACSF Compl.") (Appendix Exhibit "G"), at ¶ 22. At the time the SPA was executed, these five contracts were responsible for approximately 25% of Chex's revenue. (Deposition of James Welbourn "Welbourn Tr."), at 165:2-7 (Appendix Exhibit "H")). However, unbeknownst to iGames, Chex was experiencing significant problems in its relationship with NACSF, both prior to and after Chex executed the SPA. (NACSF Compl. at ¶33).

As a result of certain breaches alleged by NACSF, at midnight on January 4, 2004, with only two days notice, NACSF "removed" Chex from the cash services booth and replaced it with a competitor (*i.e.*, Cash Systems, Inc.). (NACSF Complaint, at ¶¶ 34-35). The termination of the Seminole contracts affected, among other things, Chex's revenues, income, results of operations and prospects. (Anwar Tr., Vol. I, at 104:14-20). Indeed, the termination caused an instantaneous loss of 25% of Chex's revenue (Welbourn Tr., at 165:2-7) and significantly harmed its reputation. In their own words, the "Seminole casinos constitute [sic] a significant portion of Chex's revenue and

provided Chex with unique relationships for establishing connections and business relationships with other Native American owned casinos. . . . The actions of NACSF also will undoubtedly damage Chex's reputation within the Native American gaming community." (NACSF Compl., at ¶¶37-38).

Chex immediately recognized the seriousness of this loss and the impact it would have on its relationship with iGames. (Supplemental Affidavit of James P. Welbourn in Support of Plaintiff's Application for a Temporary Restraining Order and for Expedited Discovery ("Welbourn Aff."), Exhibit 19 to Deposition of James Welbourn, ¶¶12-14, (Appendix Exhibit "I")). As Mr. Welbourn, the President and founder of Chex, stated under oath during the related injunction proceeding, "As the January 7, 2004 letter [(Welbourn Aff., Ex. N)] from iGames' attorneys suggests, the termination of the NACSF Contract may give iGames cause to terminate the acquisition agreement and negotiations. Thus, the threat of iGames pulling out of the acquisition remains and immeasurably affects the bargaining position of Chex." (*Id.* ¶14).

In an attempt to limit the harm to both Equitex and iGames, Christopher Wolfington, CEO of iGames, issued a joint press release, at the urging of Henry Fong, in which Mr. Wolfington is quoted as follows: "The synergies and merits of the Chex Services transaction were never dependent on any one contract for its success. We remain committed to the transaction and look forward to closing as soon as possible. We are confident that Chex Services has more than sufficient remedies to vindicate the wrongful action taken against them. From a business perspective, the recent events have allowed Chex Services to accelerate cost cutting measures we otherwise had to postpone until our transaction closed." (Appendix Exhibit "J") (emphasis added). Despite Equitex

11

and Chex's representations about the merits of their defenses, and their aggressive actions seeking an injunction, Chex ultimately did not prevail and lost this very significant business. Although iGames proceeded with the SPA, it reserved its rights under the SPA in writing, because of this Material Adverse Effect on Chex's business. (Appendix Exhibit "K").

**IV. Chex And Equitex Agree To Assist iGames With Financing For Its Acquisition Of Available Money In Exchange For A 50% Share Of Available Money's Operating Income But Then Chex And Equitex Breached The Financing Agreement**

After the parties executed the SPA, iGames learned of an opportunity to acquire Available Money, Inc. ("Available Money"). Available Money is in the same business as iGames, and all parties to the SPA believed that acquiring Available Money would strengthen the entity that would result from the SPA, thereby benefiting all parties to the SPA. Chex and Equitex agreed that Chex would provide iGames $4,000,000 of the purchase price to facilitate the acquisition. At the time, Chex had $2,000,000 available to it and represented that it would borrow, on terms approved by iGames, the second payment of $2,000,000. On January 6, 2004, Chex advanced $2,000,000 to iGames, the amount needed to make the initial closing date payment for the acquisition of Available Money. iGames thereafter executed a Term Loan Note in favor of Chex dated January 6, 2004.[5]

Although the initial purchase money was wired by Chex to the owners of Available Money on or about January 6, 2004, *id.*, the principals of Chex and Equitex were not available to complete the paperwork on the loan and thus the parties did not

---

[5] A true and correct copy of the Term Loan Note is attached to the Appendix as Exhibit "L."

execute the documents on that date.   (Anwar Tr., at 36:14 - 37:6; 272:6 - 275:1).

Thereafter, on January 21, 2004, iGames executed a Term Loan Note in favor of Chex, the Note January 6, 2004, as per agreement of the parties.  (*Id*

the time

[6] (*See* Welbourn Dep. Ex. 23 (Appendix Exhibit "M")).

The Term Loan Note provided for, and was conditioned on, a second advance by Chex to iGames in the amount of $2,000,000 which was to be made sixty days after the first payment (i.e., March 6, 2004).  According to the Term Loan Note, Chex commitment of financing sufficient to fund the

come from either Mercantile or from another

---

[6] The relatively casual nature of the transaction is understandable given the fact these companies had worked together for years and, pursuant to the

(Continued…)

extraordinary efforts by iGames, it soon became apparent that Chex was not making a good faith effort to obtain the necessary financing commitment from a satisfactory lender. In fact, Chex never did make the second advance as required under the Term Loan Note.

Unfortunately, shortly after Chex advanced the first payment, and before it could obtain a loan from Mercantile for the second payment, secret discussions with a venture capital firm convinced Chex and/or Equitex that Chex would be more valuable to Equitex if it entered into a reverse merger with a NASDAQ shell company than it would be if it closed on the SPA with iGames. As such, no second payment was ever made.

**V.    Chex Secretly Solicits A Joint Venture With A Venture Capitalist Who Entices Chex And Equitex Away From The Planned Merger With iGames, Provides Them With A Shell Company, And Then Oversees A Reverse Merger Of Chex Into That Shell Company**

In light of the prior failed attempts by iGames to acquire or merge with Chex and other related reasons, iGames negotiated a non-solicitation provision as part of the SPA. This was a critical provision, as it strictly prohibited Chex and Equitex from looking for other competing business arrangements and thus provided some assurances to iGames that the SPA would, in fact, close. The provision provides:

> Chex and Parent shall, and shall direct and use Best Efforts to cause their respective Representatives to, immediately cease any discussions or negotiations with any parties that may be ongoing with respect to a Chex Proposed Transaction (as defined below). Neither Chex nor Parent shall, nor shall either permit any of their respective subsidiaries to, nor shall either authorize or permit any of their respective Representatives, directly or indirectly, to

---

(Continued…)

operate as one company after the merger.

knowingly (i) solicit, initiate or encourage (including by way of furnishing information), or take any other action designed or reasonably likely to facilitate, any inquiries or the making of any proposal which constitutes, or may reasonably be expected to lead to, any Chex Proposed Transaction or (ii) participate in any discussion or negotiations regarding any Chex Proposed Transaction. The term "**Chex Proposed Transaction**" means any inquiry, proposal or offer from any person relating to any form of business combination involving Chex, or any direct or indirect acquisition or purchase of all or substantially all of the assets of Chex or any equity securities of Chex, any tender offer or exchange offer that if consummated would result in any person beneficially owning 10 percent or more of any class of equity securities of Chex, any merger, consolidation, share exchange, business combination, recapitalization, liquidation, dissolution or similar transaction involving Chex, other than the Contemplated Transactions.

(SPA, §7(g)(i) (emphasis in original)).

Notwithstanding this provision, Ijaz Anwar, CFO of Chex, testified that in late December or early January, Chex was approached by a "dealmaker" named Mark Savage who introduced Chex to Maroon Bells Capital and the shell company "Seven Ventures," a company which Chex would later merge into following termination of the SPA. (Anwar Tr., Vol. II, at 139:10-140:10). Ignoring the above contractual obligations under the SPA, on January 15, 2004, Mr. Anwar sent an email to Maroon Bells (with copies to Mark Savage, Henry Fong and James Welbourn) stating the following:

It was a pleasure speaking with you over the phone yesterday. Please find enclosed some information of interest related to Chex Services, Inc. I have also included a mutual confidentiality and non-disclosure agreement. Please kindly execute the agreement and fax it to my attention as soon as possible at 952-417-1996.

If you have any questions or concerns, please do not hesitate to contact me. I look forward to working with Maroon Bells Capital, LLC as well as Corporate Capital Management, LLC. Thanks.

(Anwar Dep. Ex. 122, (Appendix Exhibit "N")).

Attached to the email was "an introductory letter from Chex Services to Maroon Bells Capital" touting Chex's financial stability and superior business ethics. (Anwar Tr., Vol. II, 258:11-12). A few days later, on January 20, 2004, Mark Savage sent an email to Henry Fong and Ijaz Anwar, regarding a proposed reverse merger. (Anwar Dep. Ex. 123, (Appendix Exhibit "O")). In his email, Mr. Savage stated that:

> [a]fter talking to Ijaz last week our approach is different than what you are currently working with. We feel that Chex Services has a good stand alone business that can be built upon by itself and then go and acquire the other candidates with alot [sic] less shares outstanding at the end of the day.
>
> Please let me know if you would like to continue these discussions if not I wish you well with your current project.

(*Id*.). Mr. Savage's email was clearly comparing and contrasting the proposed reverse merger with the iGames' SPA and thus reveals that he had discussions with Mr. Anwar regarding the structure of the iGames deal. Again, all of these communications regarding an alternative deal occurred after the parties entered into the SPA, which prohibited this very activity, and while iGames was investing time and effort to close on the SPA.

In fact, attached to Mr. Savage's email is a draft proposal to reverse merge Chex into a shell company. (*Id*.). The proposed reverse merger is remarkably similar to the reverse merger that Chex ultimately completed with Seven Ventures. In the proposal to reverse merge Chex into a shell, Mr. Savage reveals that following a successful merger, "the idea then would be to go and acquire IGME [*i.e.*, iGames]. This makes it more interesting. . . . [Capital Corporate Management]/Maroon Bells will provide the shell and all of the costs for the shell. . . . " (*Id*.) Mr. Savage also predicts that Chex's stock, following a reverse merger into a shell would be a "$5.00+ stock right from the start."

Indeed, when Chex did complete its reverse merger with Seven Ventures on April 15, 2005, its stock traded at $5.25 the first day and steadily climbed to $7.00 within seven trading days. (*See* Yahoo Finance Historical Prices for Fastfunds Financial Corp. (Seven Ventures' new name) (Appendix Exhibit "P")).

Thus, unbeknownst to iGames, the discussions between Maroon Bells and Chex concerning a reverse merger continued while iGames diligently attempted to close on the SPA. (*See, e.g.*, Anwar Dep. Ex. 124 (Appendix Exhibit "Q") (March 5, 2005 email from Mark Savage with attached letter that begins "Pursuant to our discussions in connection with the potential reverse merger of Chex . . . into a public shell. . . ." and outlines various potential business arrangements); (Anwar Dep. Ex. 125, (Appendix Exhibit "R") (March 9, 2004 email from Maroon Bells to Chex regarding list of financial and business information needed as part of due diligence); (Anwar Tr., Vol. II, at 275:11-277:17 (explaining purpose of request in Exhibit 125)); (Anwar Dep. Ex. 126 (Appendix Exhibit "S") (March 12, 2004 email from Maroon Bells to Chex requesting explanations from Mr. Anwar for certain casino contracts that were terminated)). Believing they cut a better deal, defendants purported to terminate the SPA and completed the reverse merger. [7]

Indeed, as a result of Chex's initial solicitation of Maroon Bells and the negotiations that followed, Seven Ventures announced on April 15, 2004 that it had entered into a definitive agreement with Chex to merge Chex into a wholly-owned subsidiary of Seven Ventures. In fact, its SEC Form 8-K provides: "[U]nder the terms of

---

[7] Equitex and Chex purported to terminate the SPA on March 12, 2004. iGames also tendered written notice of its termination of the SPA on March 12, 2004.

the merger agreement, Equitex, Inc., will exchange 100% of its equity ownership in Chex Services for 7,700,000 shares representing 93% of Seven Ventures outstanding common stock following the transaction, along with warrants to purchase 800,000 shares of Seven Ventures common stock.   As a result, Chex Services will become a wholly-owned subsidiary of Seven Ventures, a publicly traded company. . . .   At closing, a bridge loan will be consummated with MBC Global [a.k.a. Maroon Bells Capital]or its affiliates whereby Seven Ventures will receive $400,000 through the issuance of a convertible promissory note. . . ."   (SEC Form 8-K, April 15, 2004 (Appendix Exhibit "T")).

**VI.    Equitex And Chex Secretly Close On A $5,000,000 Loan Which Requires Them To Pledge All Of The Common Stock Of Chex, And Prohibits Them From Closing On The SPA**

Equitex and Chex represented and warranted in Section 6(f) of the SPA that, after June 30, 2003, there was not with respect to Chex, among other things:  (1) any loss, transfer, assignment or encumbrance of assets; (2) any issuance, sale or other disposition of any capital stock or any grant of any options, warrants, or other rights to purchase or obtain any capital stock; (3) any action, transaction or agreement outside the Ordinary Course of Business; (4) any loan to any other person in excess of $10,000 and outside the Ordinary Course of Business; (5) any compromise of any claims; or (6) any other event or circumstance that could reasonably be expected to have a Material Adverse Effect on Chex.  Despite these representations, Chex and Equitex entered into negotiations for a $5,000,000 loan transaction.  While Equitex eventually presented the potential loan to iGames as a means to finance the Available Money purchase, iGames objected to it because the proposed financing had "death spiral" components, which iGames did not want to inherit as part of its acquisition of Chex.  Despite iGames' express rejection of the loan and the SPA's prohibitions against such a deal, Chex and Equitex secretly

continued their negotiations and then closed on the financing, without notice to iGames.

Specifically, iGames learned after litigation was initiated, based on Equitex's SEC Form 10-K, that Equitex entered into a Purchase Agreement with Pandora Select Partners, L.P. ("Pandora") and Whitebox Hedged High Yield Partners, L.P. ("Whitebox") on March 8, 2004. (*See* Purchase Agreement, dated March 8, 2004, by and among Equitex, Inc., Pandora Select Partners, L.P. and Whitebox Hedged High Yield Partners, L.P. (the "Whitebox Purchase Agreement") (Appendix Exhibit "U")). Thus, while the SPA was still in effect, the Defendants negotiated and entered a $5,000,000 transaction that iGames expressly rejected.

Pursuant to the Whitebox Purchase Agreement, Equitex issued an aggregate of $5,000,000 in convertible notes (the "Equitex Notes"), plus warrants to purchase 800,000 shares of Equitex common stock. The proceeds were then advanced to Chex pursuant to a $5,000,000 note (the "Chex Note"). (*See* Whitebox Purchase Agreement, Recitals and §3.27). The Equitex Notes were secured by a pledge of Chex's common stock and an assignment of the Chex Note. (*Id.*). Incredibly, this was the very same stock iGames had already contracted to purchase and the Defendants' agreed to sell "free and clear" of any encumbrances or security interests.

As part of the Whitebox transaction, Equitex also entered into a Security Agreement with Whitebox and Pandora. (*See* Equitex Security Agreement, dated March 8, 2004, by and between Equitex, Inc., Pandora Select Partners, L.P., and Whitebox Hedged High Yield Partners, L.P. (Tab 8) (the "Security Agreement") (Appendix Exhibit "V"). The Security Agreement essentially required Equitex to pledge all of Chex's assets and for Chex to guarantee the obligations of Equitex under the notes. Again, these were

the very same assets that iGames agreed to purchase and Defendants agreed to sell, "free and clear" of any encumbrances or security interests. The Whitebox agreements also provided the lenders with complete control over Chex under certain circumstances.

In particular, the Security Agreement provided in relevant part as follows:

> As a condition of making the [$5,000,000] Loan, the Secured Parties [i.e., Whitebox and Pandora] have required Equitex to (i) issue each of the Secured Parties a warrant of this date to purchase additional shares of Equitex Common Stock (the "**Warrants**"), (ii) agree to register the shares of Common Stock issuable upon exercise of the Warrants and upon conversion of the Notes or in payment thereof pursuant to a Registration Rights Agreement of this date (the "**Registration Rights Agreement**"), (iii) pledge certain of Equitex's assets, as more fully described in <u>Exhibit A</u> hereto (together with the rights described herein, (the "**Collateral**")[)], which Collateral consists of all of the outstanding capital stock of Chex, the Chex Loan and Equitex's interest in the Chex Note Security Agreement dated as of this date, as security for the due and prompt payment of all amounts under the Notes and the due and prompt performance of all obligations under the Warrants; and (iv) cause Chex to guarantee the obligations of Equitex under the Notes (the "**Guarantee**"), and to grant to Secured Parties a security interest in all of Chex's assets to secure the performance of Chex's obligations under the Guarantee.

(Security Agreement, Recital C. *See also* Security Agreement, at § 2.1 (wherein Equitex assigns, grants and pledges all of its estate, right, title and interest in and to the collateral)).

Although it was kept secret, iGames has learned through discovery that the Whitebox Purchase Agreement was the result of extensive negotiations between Equitex, Chex, Pandora and Whitebox, which likely began in late November or early December 2003. (*See*, *e.g.*, Anwar Dep. Ex. 20 (Appendix Exhibit "W")) (January 2, 2004 email regarding drafting the Whitebox Purchase Agreement which states, "This is another very unique transaction that we have worked on over the last 45 days."); (Anwar Dep. Ex. 41

(Appendix Exhibit "X")) (containing January 9, 2004 email regarding Whitebox Purchase Agreement drafting meetings stating that "We have refined the terms over the last 30 days to everyones [sic] satisfaction. . . . ); (Anwar Dep. Ex. 38 (Appendix Exhibit "Y") (December 19, 2003 email regarding negotiations on Whitebox Purchase Agreement). It is clear that, at least as early as January 9, 2004, Chex and Equitex were seriously considering a transaction with Whitebox and Pandora. On that date, Whitebox executed a Term Sheet and faxed it to Henry Fong, CEO of Chex. (Anwar Dep. Ex. 129 (Appendix Exhibit "Z")). At his deposition, Mr. Anwar (CFO of Chex) was specifically asked: "Do you know when it was finally decided that Equitex would close on the White Box financing?" In response, Mr. Anwar stated: "When Equitex decided they would close on the White Box financing? I think after speaking to Chris in January Equitex had the intent to move forward with White Box financing. I don't - - can't pin down the exact date of their intent." (Anwar Tr., Vol. II, 297:12-19). Mr. Fong also testified that they were committed to the Whitebox financing as early as late January 2004 and that they had a signed term sheet from Whitebox. (Deposition of Henry Fong ("Fong Tr.") (Appendix Exhibit "AA"), at 123)). The reason for all the secrecy is clear -- the Whitebox transaction, by its terms, expressly prohibited Chex and Equitex from closing on the SPA. Tellingly, the Whitebox transaction also specifically allowed for the type of shell company reverse merger first presented by Mark Savage and Maroon Bells in January 2004. In particular, the Security Agreement provided as follows:

> **MERGER OR COMBINATION**. Equitex will promptly notify (the "**Reorganization Notice**") Secured Parties of the material terms and conditions of any proposed transaction which, if consummated, would result in the merger or consolidation of Chex with, or the acquisition of the business of Chex by, another entity (which transaction

> is referred to hereunder as a "Reorganization"). <u>Notwithstanding anything to the contrary contained herein, Equitex, with the consent of Secured Parties, which consent will not be unreasonably withheld, may cause or allow Chex to engage in a Reorganization, where Equitex retains ("**Retained Interest**") at least 87.5% of the outstanding capital stock and voting power of the entity surviving such Reorganization.</u>

(Security Agreement, § 2.6 (emphasis added)).  Thus, Equitex could not close on the SPA, which would have resulted in Equitex holding less than 87.5% of the outstanding capital stock of iGames, but could close on the Seven Ventures reverse merger which resulted in Equitex retaining 93% of the outstanding common stock of Seven Ventures. (SEC Form 8-K, April 15, 2004, Item 5).

Although the Whitebox Purchase Agreement clearly involved over $10,000, and represented numerous breaches of the SPA, the defendants entered into it anyway.  The reason is clear.  The defendants were interested in completing the Seven Ventures deal, not the SPA.  To that end, late in the day on Friday, March 12, 2004, Chex and Equitex faxed a letter purporting to terminate the SPA and alleged default on the related Term Loan Note for various unfounded breaches and immediately filed lawsuits in a hardball tactic designed to increase their bargaining power in the anticipated post-termination settlement negotiations.

**ARGUMENT**

**I.     The Standards Governing The Defendants' Motion For Summary Judgment**

A motion for summary judgment may be granted only when the evidence of record demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Under Rule 56(c), the moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Matshushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The summary judgment standard requires the moving party to show that the issue is so one-sided that the moving party should prevail as a matter of law. *Anderson*, 477 U.S. at 252; *see also Callahan v. A.E.V., Inc.*, 182 F.3d 237, 253 (3d Cir. 1999) ("Our jurisprudence does not require the summary judgment opponent to match, item for item, each piece of evidence proffered by the movant, but rather he or she must only exceed the 'mere scintilla' standard.") (*quoting Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 466 (3d Cir. 1998)). "Where the movant bears the burden of proof at trial and the motion does not establish the absence of a genuine factual issue, the . . . court should deny summary judgment even if no opposing evidentiary matter is presented." *Resolution Trust Corp. v. Gill*, 960 F.2d 336, 341 (3d Cir. 1992).

In determining whether the movant has satisfactorily established that there is no genuine issue of material fact, courts must keep in mind that "inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." *See Matshushita*, 475 U.S. at 587 (quoting *United States v. Diebold, Inc.*, 369 U.S. 654 (1962)); *see also Anderson*, 477 U.S. at 255 (when reviewing

a motion for summary judgment, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").

## II.    Equitex And Chex Are Both Bound By The Terms Of The Stock Purchase Agreement And Are Both Liable To iGames For Its Damages, The Termination Fee And All Associated Costs And Expenses

### A.    Equitex Is Liable For The Termination Amount Under The SPA

Equitex attempts to evade liability for its breaches of the SPA by first advancing the audacious argument that it was not bound by SPA because its shareholders "never voted on, approved, or ratified the SPA". (Opening Brief in Support of Chex Services, Inc.'s and Equitex, Inc.'s Motion for Summary Judgment ("Defendant's Op. Br."), at p. 22). This argument ignores the fact that: (1) Equitex asserted in its pleadings that the SPA was a binding contract; (2) Equitex's executives testified under oath that it was and is a binding contract; (3) most of the Defendants' stated defenses are contractually based; (4) Equitex's Board of Directors approved the SPA; and perhaps most importantly, (5) it contradicts the plain language of the SPA.

The specific language Equitex relies on in making this novel argument merely provides that a <u>negative</u> vote by the shareholders would not constitute a "breach" of the SPA. (SPA, § 7(g)(ii)). While the SPA provides that final approval would have required Equitex's shareholders to vote on the acquisition, <u>such approval is only required after closing</u>. The fact that Equitex's shareholders would have the final say as to whether the merger would be finalized does not change the fact that Equitex and Chex were equally bound by the SPA, and that, under its terms and conditions, the parties were to use their best efforts to move towards closing and to eventually have the Board of Directors for Equitex vote in favor of the merger, followed by a vote of the Equitex shareholders following SEC approval of the prospectus and proxy statement. (*See, e.g.*, SPA § 7(h);

24

SPA, § 11(b) (providing that any party could terminate the SPA if "following a vote by the stockholders of [Equitex], this Agreement and the Contemplated Transactions are not duly approved")) (emphasis added).[8]  Breaching and/or purporting to terminate the SPA before any vote could or should have taken place does not relieve Equitex of its responsibilities under the SPA, including its obligation to pay the Termination Fee.

The plain terms of the SPA specifically provide that it was binding on Equitex upon execution:

> On the Closing Date, this Agreement shall be duly and validly authorized by all necessary action on the part of Parent and its stockholders in accordance with Applicable Laws and Parent's Governing Documents. *This Agreement constitutes the valid and legally binding obligation of Parent, enforceable in accordance with its terms and conditions.* . . .  The affirmative approval of the Board of Directors of Parent (the "**Parent Board**") and of the holders of shares of Parent's issued and outstanding capital stock entitled to vote thereon representing a majority of the votes that may be cast by the holders of such securities as of the record date for the Company (the "**Parent Requisite Vote**") is the only vote of the holders of any class or series of capital stock of the Company necessary to approve the Contemplated Transactions.

(SPA, § 4(b) (italics added, bold in the original)).  In the unlikely event Equitex's shareholders did not vote to approve the merger, Equitex was still bound by the SPA and could still be liable for the Termination Fee.  For example, the SPA specifically provided that if it was terminated pursuant to Section 11 (which allowed either party to terminate if

---

[8] It should also be noted that Equitex and Chex are not relieved of any liability if they are in prior breach or their breach was willful, SPA § 11(b)(x) and 11(d)(i).  As is demonstrated in iGames' Opening Brief in Support of Motion for Summary Judgment Against Chex Services, Inc. and Equitex, Inc. (filed on March 15, 2005), both Chex and Equitex materially and intentionally breached the SPA long before they purported to terminate it.

Equitex's shareholders did not vote in favor of the merger) and Chex entered into a merger or acquisition agreement with another entity within one year of termination, as it did in this case with Seven Ventures, then Equitex was required to pay iGames the Termination Fee.  (*Id.* § 11(b)(vi)).

Thus, the SPA, and in particular, Equitex's obligations to move in good faith toward closing and to pay the Termination Fee and costs if it breached its obligations thereunder, was fully binding on Equitex.  In short, the exception that Equitex tries to exploit is inapplicable under the undisputed facts of this case.

**B.     iGames Did Nothing To Relieve Chex Of Its Obligations Under The SPA**

Chex next attempts to avoid its liability for intentionally breaching the SPA and secretly negotiating a reverse merger with Seven Ventures by asserting that iGames was in material breach of the SPA before Chex breached it.  This is simply not true.  Each of the prior breaches alleged by Chex were in fact acts taken by iGames in furtherance of its obligations under the SPA and all were within the ordinary course of business.

Chex first points to an assignment by iGames to Chris Wolfington of a portion of the Termination Fee, and a subsequent assignment by Mr. Wolfington of those rights to Mercantile Capital as collateral for a loan to iGames, as a purported material breach of the SPA.  The section of the SPA that Chex mistakenly relies on for its argument on this point provides in pertinent part that:  "No Party may assign either this Agreement or any of its rights, interests or obligations hereunder without the prior written approval of the Buyer, Parent and Chex."  (SPA, § 12(d)).  Chex's argument fails because it misinterprets both the language and the purpose of the cited provision and fails to reveal important case law in the subject.

This provision specifically prevents the parties from assigning the SPA or any rights and obligations under the SPA.  It is included to prevent non-consensual assignments that could essentially deny a party the benefit of its bargain.  It is hornbook law, however, that such contractual language does not prevent the assignment of rights that are contingent on <u>post-termination events</u>.  *See*, *e.g.*, *Restatement (Second) of Contracts* § 322 (2)(a) ("A contract term prohibiting assignment of rights under the contract, unless a different intention is manifested, does not forbid assignment of a right to damages for breach of the whole contract or a right arising out of the assignor's due performance of his entire obligation . . . ."); *BRAC Group, Inc. v. Jaeban (U.K.) Ltd*., 2004 Bankr. LEXIS 680, at *20-21 (Bankr. D. Del. May 25, 2004) (finding that anti-assignment clause did not prevent assignment of claims because to enforce an anti-assignment clause where the "fundamental purpose of the anti-assignment clauses no longer exists . . . . would exalt form over substance"); *Star Cellular Telephone Co. v. Baton Rouge CGSA, Inc.*, 1993 Del. Ch. LEXIS 158, at *24-25 (Del. Ch. July 30, 1999) (noting that court must consider "the objectives that parties to an antiassignment clause are generally presumed to be seeking to achieve" in order "to ascertain the contracting parties' intent," and explaining that in certain "business relationships the continued personal involvement of the original contracting party is a material premise" while in other circumstances it is not), *aff'd*, 1994 Del. LEXIS 190 (Del. June 9, 1994).

Obviously, any rights that iGames had to the Termination Fee would not be realized until after the SPA was rightfully terminated by iGames, and Equitex and Chex either lived up to their obligations to pay the Termination Fee or were ordered to pay the Termination Fee by a court of law.  Thus, the assignment of this contingent post-

27

termination could not possibly effect the Defendants in any manner and cannot constitute a breach of the SPA.

Chex next asserts that iGames "encumbered its assets" when it entered into a $250,000 line of credit on November 26, 2004 and thereby allegedly violated Section 5(g)(xi) of the SPA.  (Defendants Op. Br. at 22-23).  In Section 5(g)(xi) of the SPA, iGames represented that "except as disclosed on Schedule 5(g), there has not been, occurred or arisen, with respect to Buyer:  (xi) any Security Interest or Encumbrance imposed upon any of its assets, tangible or intangible."  (SPA, § 5(g)) (emphasis added).

However, the November 26, 2004 line of credit did not violate the SPA, as it was in fact identified on Schedule 5(g). (*See* SPA, Schedule 5.1(g) (Appendix Exhibit "BB"). Moreover, the line of credit was: (i) entered into with the knowledge and consent of Chex and Equitex (*Id.*; Deposition of Stein ("Stein Tr."), at 65:17-66:17 (Appendix Exhibit "CC")); (ii) deemed "insignificant" by Henry Fong (Stein Tr., at 65:17-66:17); (iii) in the ordinary course of business and was taken "in connection with" the acquisition of Money Centers of America, Inc. ("MCA") by iGames[9]; (iv) necessary, because "iGames Entertainment, Inc." (*i.e.*, the publicly traded company that acquired MCA as a prerequisite to closing on the SPA) had no income and was losing money at the time it entered into the SPA with Equitex and Chex and needed a revolving line of credit to cover expenses associated with complying with its responsibilities under the SPA, merging with MCA, and complying with its filing obligations with the Securities and Exchange Commission.

---

[9] (*See* SPA, § 1(jjj)) (defining the "MCA Acquisition" as the acquisition of Money Centers of America, Inc. by iGames Entertainment, Inc.); (SPA, § 9 (xiv)) (making the
(Continued…)

Chex's argument also fails to acknowledge provisions of the SPA that specifically address circumstances such as those involving the November 26 line of credit. Specifically, Section 5(g)(xxvi) of the SPA contemplates that actions such as securing a crucial line of credit would be necessary to complete the acquisition of MCA by iGames is expressly permitted.   Section 5(g) requires iGames to represent that "except as disclosed on Schedule 5(g), there has not been, occurred or arisen, with respect to Buyer" any adverse event or voluntary obligation taken outside of the ordinary course of business.  (*See* SPA §§ 5(g)(i)-(xxvi)).   The extensive list of prohibitions described in Section 5(g) includes such things as amendments to Governing Documents, stock splits, loans in excess of $10,000, encumbrances on assets, cancellation of debts owed, and other such actions which are generally considered to be outside of the ordinary course of business.  Significantly, however, Section 5(g)(xxvi) specifically excludes from the list of restricted acts "any agreement or commitment, whether in writing or otherwise" taken "in connection with the MCA Acquisition "   (emphasis added.)  (*Accord*, SPA, §5(g)(iv)) (restricting actions taken with regard to the transfer of stock or the granting of options "other than in connection with the MCA Acquisition"); (SPA, §(5)(g)(ix)) (restricting the right to enter into certain agreements "other than in connection with the MCA Acquisition")).  The November 26 line of credit provided by Mercantile, and any alleged security interests or encumbrances associated with that line of credit, were not only necessary and within the ordinary course of iGames' business, but they were also specifically contemplated and permitted by the express language of the very section of

---

(Continued…)

MCA Acquisition a prerequisite to closing on the SPA).

the SPA that Chex relies on in making its argument.

Chex further argues that the alleged breach by iGames of the Term Loan Note was an action "outside the ordinary course of business" and therefore excused performance by Chex. As discussed in iGames' Answering Brief in Opposition to Chex Services, Inc.'s Motion for Summary Judgment, iGames was not in breach of the Term Loan Note when Equitex and Chex fabricated reasons to terminate the SPA and declare the Term Loan Note in default on March 12, 2004. Rather, it was Chex who had failed to fulfill its obligations under the Term Loan Note. The purported breaches described in Chex and Equitex's March 12 Termination Letter were pure pretext, never occurred and were done as part of an attempt by Chex and Equitex to escape their obligations under the SPA and Term Loan Note in order to pursue an alternative deal they had secretly negotiated.

Chex's final argument concerning alleged prior breaches by iGames is based on a misrepresentation of the testimony by Mr. Wolfington regarding his intention to close on the SPA. A fair and full reading of the testimony cited by the Defendants, especially when read together with Mr. Wolfington's other testimony over the course of his three-day deposition, makes clear that iGames was ready, willing and able to close on the SPA until it determined that it was necessary to terminate the SPA because of the many serious breaches by Chex and Equitex. (*See*, *e.g.*, Wolfington Tr., at 213: 22-24; 214: 1-15).

## III. Equitex And Chex Are Equally Liable To iGames For Its Damages And Costs

Hoping to curtail its liability, Chex incorrectly asserts that its sole owner and parent company, Equitex, is "solely" obligated under § 11(e)(ii) of the SPA to pay the

Termination Fee.  In making this cursory argument, Chex ignores various provisions of the SPA specifically providing that it is fully liable for: (i) all damages, including the Termination Fee; (ii) its willful breaches of the SPA (it is jointly and severally liable for the significant costs and expenses incurred by iGames in negotiating and complying with its obligations under the SPA); and (iii) all expenses and attorneys' fees incurred by iGames in connection with this matter.  (*See* SPA § 11(e)(ii)) (providing that upon termination by iGames "Parent and/or Chex" shall pay iGames' costs and expenses); (SPA § 11(e)(iv)) ("nothing in this Agreement shall relieve a Party of any liability or damages resulting from any willful breach of any of its representations, warranties, covenants or agreements set forth in this Agreement."); (SPA § 11(e)(v)) (providing that upon termination if "Parent or Chex fails to pay promptly amounts due" and iGames must therefore initiate suit, then "Parent and/or Chex" shall pay iGames' expenses, including attorneys' fees, incurred in connection with said suit.); (SPA § 12(q)) ("In the event of litigation arising of or connected with the Contemplated Transactions, the prevailing Party in any such action shall be entitled to recover of the other Party all costs of court, including attorneys' fees and court costs at the trial level.").  In short, Chex's efforts to evade responsibility for its actions are belied by the explicit terms of the SPA, terms by which Chex expressly agreed to be bound.

## IV.    Equitex And Chex Are Liable For Breaching The Implied Covenant Of Good Faith And Fair Dealing In The SPA

The Defendants incorrectly assert in their Opening Brief that iGames' claim for breach of the implied covenant of good faith and fair dealing as to the SPA (Count II) should be dismissed on the grounds that it is purportedly based on the same facts alleged in the breach of the SPA claim (Count I).  The Defendants cannot dispute that an implied

covenant of good faith and fair dealing inheres in *every* contract governed by Delaware law, including the SPA:

> Every contract in Delaware has an obligation of good faith and fair dealing, which is implied into the agreement by law. Although sometimes couched as a duty, this obligation is actually contractual in nature. As such, a party to a contract has made an implied covenant to act reasonably to fulfill the intent of the parties to the agreement. This implied covenant was created to promote the spirit of the agreement and to protect against one side using underhanded tactics to deny the other side the fruits of the parties' bargain. Were it not for this covenant, parties to a contract could undermine and frustrate every legal obligation entered into.

*Gloucester Holding Corp. v. U.S. Tape & Sticky Prods., LLC*, 832 A.2d 116, 128 (Del. Ch. 2003) (footnotes and internal quotation marks omitted); *see also*, *PAMI-LEMB I Inc. v. EMB-NHC, L.L.C.,* 857 A.2d 998, 1016 (Del. Ch. 2004).

Despite the fact that an implied covenant of good faith and fair dealing inheres in every contract under Delaware law, Defendants attempt to argue, contradictorily, both that the covenant cannot be used to expand the scope of the express agreement and that iGames' allegations of a breach of implied covenant cover the same acts alleged to constitute a violation of the SPA. The cases relied upon by the Defendants are inapplicable to iGames' allegations in this case. For instance, the Defendants rely upon *Aspen Advisors LLC v. United Artists Theatre Co.*, 843 A.2d 697 (Del. Ch.), *aff'd*, 861 A.2d 1251 (Del. 2004), for the proposition that the implied covenant cannot be used to provide additional contractual protections not extracted through negotiations. In *Aspen Advisors*, however, the plaintiffs, who were warrant holders of a corporation, were seeking the right to exchange their warrants -- a right not provided for in the contract at issue. *Id.* at 707. Unlike iGames in this case, the plaintiffs in *Aspen Advisors* were

seeking to have the court impose extra-contractual rights and obligations completely unrelated to the transaction at issue.  Similarly, in *Dave Gretak Enters. v. Mazda Motors of Am., Inc.*, 622 A.2d 14 (Del. Ch.), *aff'd*, 609 A.2d 668 (Del. 1992), the Court of Chancery refused to use the implied covenant to inject uncontemplated obligations that were "wholly outside the scope" of the underlying contract."  *Id.* at 23-25.

In this case, iGames' allegations as to the implied covenant of good faith are all based on and seek to vindicate the spirit of the agreement from its express terms. Specifically, as alleged in the Complaint, the Defendants breached the implied covenant, by, among other things: (1) failing to disclose material adverse changes such as the Howard Note and the termination of the Seminole Contracts; (2) pursuing a claim in the Minnesota state court relating to the SPA, even though the SPA dictates that all such claims be brought in Delaware; (3) failing to remedy their breaches of the SPA, including their undisclosed negotiation of an alternative deal, when duly notified of such breaches by iGames and being given opportunity to do so; (4) attempting to terminate the SPA when no good faith basis or contractual ability to do so existed; (5) tortiously using their wrongful "termination" of the SPA as a basis to interfere with iGames' ability to raise money to meet its obligations concerning the acquisition of Available Money; (6) refusing to close and/or threatening to refuse to close on the SPA because of the tax burden that Equitex would incur as a result of the contemplated transaction; and (7) negotiating and entering into the Whitebox Purchase Agreement.  (Complaint ¶ 72).  As further evidence of their failure to operate in good faith, discovery has also revealed that Chex an Equitex secretly negotiated a reverse merger with Seven Ventures and that the Whitebox Purchase Agreement was a prerequisite to that transaction.  As a result of those

33

secretly negotiated transactions, Chex and Equitex were effectively precluded from closing on the SPA. Instead of properly accepting the consequences of their actions, Chex and Equitex took measures they thought they could to curtail their liability to iGames and still move forward with their alternative deal – they attempted to manufactured reasons (albeit baseless reasons) to terminate the SPA and to call in the Term Loan Note without prior notice to iGames. This all occurred when Chex and Equitex were under contractual and common law obligations to act in good faith in order to accomplish the contemplated transaction with iGames. In short, thee Defendants' intentional conduct denied iGames the benefit of its bargain.

The Defendants erroneously attempt to suggest that the factual similarity of iGames' breach of contract claim and its implied covenant claim precludes the latter. However, in *Kelly v. McKesson HBOC, Inc.*, 2002 Del. Super. LEXIS 39, at *31-34 (Jan. 17, 2002), the court specifically <u>rejected</u> the defendant's argument that "claims for breach of this implied duty [of good faith and fair dealing] that mirror breach of contract claims are not permitted." Similarly, in *PAMI-LEMB I*, the plaintiff's allegations concerning a breach of the implied covenant were found to be similar to the allegations in a breach of contract claim, yet the Court of Chancery found that the defendant was liable under <u>either</u> theory. *See PAMI-LEMB I*, 857 A.2d at 1016. Here, the Defendants' conduct has, at a minimum, frustrated the spirit of the agreement between the parties and their use of underhanded tactics has denied iGames the fruits of the parties' bargain in the SPA. *Id.*; *Gloucester Holding Corp.*, 832 A.2d at 128; *Kelly*, 2002 Del. Super. LEXIS 39, at *31-34. Thus, there is no basis upon which to strike Plaintiff's claim for breach of the implied covenant of good faith and fair dealing.

**V.     Chex Is Liable To iGames For Its Intentional Breaches Of The Term Loan Note**

The Term Loan Note at issue in this case required Chex to obtain financing, or at least an unqualified commitment for financing, from Mercantile Capital or another lender approved by iGames within twenty one days of the date of the Term Loan Note.  The Term Loan Note also provides that if no such commitment was obtained, iGames had the "right", but certainly not the obligation, to repay the principal amount of the Term Loan Note without further obligation to Chex.

Chex argues, without foundation, that iGames is limited to only those remedies specifically provided for in the Term Loan Note, and that iGames therefore has no real recourse for Chex's breaches.  However, the language of the Term Loan Note relied on by Chex in attempting to skirt liability does not limit iGames' remedies, nor does it address or anticipate the breaches and intentional torts that Chex committed.   As demonstrated in iGames' Motion for Summary Judgment, and in its Brief in Opposition to Chex Services, Inc.'s Motion for Summary Judgment on the Term Loan Note, Chex not only "failed" to obtain said financing, it purposely, secretly and tortiously entered into the Whitebox Purchase Agreement and committed to a reverse merger with Seven Ventures, before it purported to terminate the SPA.  It then manufactured reasons to terminate the SPA and to call in the Term Loan Note, in direct violation of the terms of the SPA, the Term Loan Note and the implied covenant of good faith and fair dealing.  Chex also immediately issued a press release regarding its allegations in a purposeful attempt to harm iGames' reputation and its stock price.  Even a cursory reading of the Term Loan Note reveals that none of Chex's breaches or intentional torts were anticipated or addressed in the Term Loan Note, as the parties did not even address the

topic of exclusive remedies or liquidated damages for any claims brought by iGames.

Under Minnesota law, parties may contract to have an exclusive remedy but only when the "parties stipulate what the consequences of a breach of agreement shall be" and the remedy is "reasonable." *Indep. Consol. Sch. Dist. No. 24 v. Carlstrom*, 151 N.W.2d 784, 786 (Minn. 1967). However, the remedy provided is only exclusive if "the contract so declares or clearly shows an intention of the parties to make it so." *Id.* In this case, there was no such agreement between the parties. The language relied on by Chex does not suggest there were any limitations on remedies, that repayment was an <u>exclusive</u> remedy or that the parties clearly had an intention to make repayment the <u>sole</u> remedy. "The question of whether or not the remedy is exclusive turns upon the intention of the parties as revealed by the language of the contract as a whole; the specific provisions relating to the remedy; and all the facts of a particular case. The remedy provided in a contract is exclusive of other possible remedies <u>only where the language in the contract clearly indicates an intent to make it exclusive</u>." *Id.* at 787 (emphasis added). *See also Inland Products Corporation v. Donovan Inc.,* 62 N.W.2d 211, 219 (Minn. 1953) ("[I]n the absence of circumstances readily showing that the remedy was intended to be exclusive, we have repeatedly held that a specified remedy should be considered as permissive rather than exclusive and thus not a bar to other remedies provided by law."). In sum, the plain language of the Term Loan Note, read in light of applicable case law, simply does not support Chex's *post hac* efforts to escape liability by attempting to limit iGames' remedies.

**VI.    Equitex And Chex Are Liable For Breaching The Implied Covenant Of Good Faith And Fair Dealing In The Note**

iGames has properly alleged a breach of the implied covenant of good faith and fair dealing in Count IV of the First Amended Complaint.  The implied covenant of good faith and fair dealing applies to every contract in Minnesota.  *See In re Hennepin County 1986 Recycling Bond Litig.*, 540 N.W.2d 494, 502 (Minn. 1995).  In applying the covenant under Minnesota law, courts have explained that "[g]ood faith requires a party to act honestly, whether negligently or not" while "[b]ad faith exists when a party's refusal to fulfill its obligations is based on an ulterior motive."  *LeMond Cycling, Inc. v. PTI Holding, Inc.*, 2005 U.S. Dist. LEXIS 742, at *20 (D. Minn. Jan. 14, 2005).  Dishonesty and ulterior motive on the part of Equitex and Chex are precisely the topics at hand in this case.

Not only did Chex "fail" to obtain the necessary financing as it promised to do, it intentionally misled iGames into believing that it would meet its financing obligations by continuing to negotiate with Mercantile Capital, even after it had closed on the Whitebox Purchase Agreement.  It then fabricated reasons to call in the Term Loan Note, issued a materially false press release and sent a threatening letter to Mercantile Capital.  Chex's efforts in this regard were all designed to interfere with and harm iGames' reputation, its stock prices and its purchase of Available Money.

Defendants mistakenly rely on *Midwest Sports Mktg., Inc. v. Hillerich & Bradsby of Canada, Ltd.*, 552 N.W.2d 254, 268 (Minn. Ct. App. 1996), for the notion that a claim for a breach of the implied covenant of good faith and fair dealing cannot be supported by the same factual allegations on which a party bases other claims for breach of contract, tortious interference with contract, or unfair competition.  While the court in *Midwest*

*Sports* noted that the plaintiffs "base[d] their claim of breach of implied covenant of good faith and fair dealing on the same facts on which they base their claims of breach of contract, tortious interference with contract, and unfair competition," the court did not state this had anything to do with the disposition of the implied covenant claim aside from the fact that the court had already determined that those claims lacked merit. *Id.* Rather, the court granted summary judgment because the plaintiff had not pointed to any facts that showed that the defendants acted in bad faith or hindered performance of the contract. *Id.*

Here, iGames alleged conduct sufficient to establish a claim for breach of the implied covenant of good faith and fair dealing. Specifically, as alleged in the Complaint, Chex and Equitex engaged in bad faith and hindered its performance of the contract by (1) entering into an agreement for the loan of $4,000,000 when it knew, or should have known, that it could not feasibly secure the funds necessary to complete that loan; (2) entering into the Whitebox Purchase Agreement in violation of the terms of the Term Loan Note; (3) refusing to make a good faith attempt to obtain satisfactory financing; (4) refusing to honor its commitment after it obtained financing through the Whitebox Purchase Agreement; and, (5) interfering with iGames' ability to obtain the necessary funding through a third party. (Complaint ¶ 82). iGames' allegations concerning the breach of the implied covenant of good faith an fair dealing properly relates to the scope of the Term Loan Note. *See In re Hennepin County 1986 Recycling Bond Litig.*, 540 N.W.2d at 502.

**VII.    The Defendants' Efforts To Tortiously Interfere With iGames' Relationships With Mercantile Capital And The Sellers Of Available Money Resulted In Significant Harm To iGames' Reputation And Its Financial Health**

The Defendants lastly argue, by pulling selective statements of Mr. Wolfington and others from context, that iGames suffered no damages as a result of the Defendants' breaches of the Term Loan Note.  This argument is based on a misleading interpretation of partial testimony and fails to recognize the complete factual record in this case. iGames' claims for tortious interference arise from the intentional efforts of Chex and Equitex to harm iGames' relationship with Mercantile Capital and with the sellers of Available Money.  As a result of Defendants' conduct, iGames had to obtain last minute financing under unfavorable conditions to complete the purchase of Available Money, while attempting to explain away the significant, yet unfounded, claims alleged by Chex and Equitex.[10]  Thus, on March 22, 2004, the sellers of Available Money sent notice to iGames alleging a default of the SPA between iGames and the sellers of Available Money and claiming that iGames was responsible for the significant financial harm resulting from non-payment.  The sellers of Available Money followed through with their threats and filed suit against iGames.

As is set forth in the First Amended Complaint, iGames has been injured by Defendants' tortious interference in several ways, including but not limited to: (1) financial losses as a result of having to obtain alternative financing under adverse conditions; (2) legal fees and costs spent in defending a lawsuit by the sellers of

---

[10] The fact that iGames immediately secure a replacement loan for the second payment does not eliminate the harm.  Whether "immediate" or not, the replacement loan was not secured until _after_ Chex's original deadline to provide the financing, and was secured at greater expense.

Available Money; (3) losses associated with time-consuming efforts to heal the business relationship with Mercantile; and, (4) harm to its goodwill and reputation. Mr. Wolfington was questioned about these losses at great length on several occasions and consistently testified that as a result of Chex's and Equitex's tortious interference, iGames incurred greater expenses and delays in obtaining new financing from Mercantile, paid a higher interest rate because of the perceived risks involved, and suffered harm to its reputation which made dealing with new vendors and old vendors more difficult and more costly. (Wolfington Tr., at 449:10-T471:11).

In short, there are significant issues of material fact with respect to iGames' claims for tortious interference, and the Defendants' efforts to have such claims dismissed must therefore be rejected.

## CONCLUSION

WHEREFORE, for the foregoing reasons, iGames Entertainment, Inc. respectfully requests that the Court deny the Motion filed on behalf of Chex Services, Inc. and Equitex, Inc. for summary judgment in its entirety.

DATED:        March 29, 2005          **DUANE MORRIS LLP**


                                      /s/ Thomas P. McGonigle
                                      Thomas P. McGonigle (Del. I.D. No. 3162)
                                      Matt Neiderman (Del. I.D. No. 4018)
                                      1100 North Market Street, 12th Floor
                                      Wilmington, Delaware  19801
**OF COUNSEL:**                       302.657.4900
**DUANE MORRIS LLP**
James L. Beausoleil, Jr., Esquire
Matthew A. Taylor, Esquire            Attorneys for Plaintiff
One Liberty Place                     iGames Entertainment, Inc.
Philadelphia, Pennsylvania 19103-7396
215.979.1000

WLM\206904.1

40