IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

_____
                                            :
**iGAMES ENTERTAINMENT, INC.**,             :
                                            :
      Plaintiff,      :
                                            :
      v.              :   C.A. No. 04-180-KAJ
                                            :
**CHEX SERVICES, INC.** and                 :   JURY TRIAL DEMANDED
**EQUITEX, INC.**,                          :
                                            :
      The Defendants. :
_____:


# BRIEF IN OPPOSITION TO THE DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY


DATED:     March 29, 2005          **DUANE MORRIS LLP**
                                   Thomas P. McGonigle (Del. I.D. No. 3162)
                                   Matt Neiderman (Del. I.D. No. 4018)
**OF COUNSEL:**                    1100 North Market Street, 12th Floor
**DUANE MORRIS LLP**               Wilmington, Delaware 19801
James L. Beausoleil, Jr., Esquire  302.657.4900
Matthew A. Taylor, Esquire
One Liberty Place
Philadelphia, Pennsylvania 19103   Attorneys for Plaintiff
215.979.1000                       iGames Entertainment, Inc.

**TABLE OF CONTENTS**

**PAGE**

TABLE OF AUTHORITIES ................................................................................................. i

I.  The Standard Governing The Admission Of Expert Testimony ............................2

II. Elliott Roth's January 25, 2005 Report Should Be Admitted In Its Entirety ..........2

    A.  Roth's Opinion As To Prejudgment Interest Is Admissible .......................2

        1.  iGames' Costs And Expenses .........................................................3

        2.  The Cost To iGames Of Obtaining Funds To Purchase Available Money .................................................................................................5

        3.  The Additional Costs To iGames To Convert Available Money ATM Machines ................................................................................7

        4.  The Credit Facility Loan ................................................................8

        5.  iGames' Projected Loss of Income .................................................9

    B.  Roth's Rebuttal Report Dated February 10, 2005 Is Admissible In Its Entirety ..................................................................................................11

    C.  R. Alan Miller's February 11, 2005 Rebuttal Report Is Admissible .........12

        1.  The Irrelevancy Of The Value Of iGames' Stock With Respect To The Issue Of Whether It Was Feasible For iGames To Complete The Acquisition Of Chex .............................................................12

        2.  The Decline In The Value Of iGames' Stock ...............................13

**TABLE OF AUTHORITIES**

**FEDERAL CASES**                                                                                                   **PAGE**

*Breidor v. Sears, Roebuck and Co.*,
    722 F.2d 1134 (3d Cir. 1983)..................................................................................2

*Chemipal Ltd. v. Slim-Fast Nutritional Foods Int'l, Inc.*,
    350 F. Supp. 2d 582 (D. Del. 2004)...................................................................9, 10

*McNaboe v. NVF Co.*,
    2000 U.S. Dist. LEXIS 4418 (D. Del. Mar. 20, 2000) ...........................................3

**STATE CASES**

*Henne v. Balick*,
    146 A.2d 394 (Del. Super. 1958)............................................................................9

*J.E. Rhoads & Sons, Inc. v. Ammeral, Inc.*,
    1988 Del. Super. LEXIS 116 (Del. Super. Mar. 30, 1988)...................................10

**STATUTES AND OTHER AUTHORITIES**

Fed. R. Civ. P. 59................................................................................................................3

6 *Del. C.* § 2301(a)...............................................................................................................3

## INTRODUCTION AND SUMMARY OF ARGUMENT

In a scattershot approach, the Defendants filed a motion seeking the exclusion of almost all of the testimony from each of iGames' experts, including rebuttal testimony. By the sheer overbreadth of their arguments, the Defendants succeed only in making clear that their real concern is the fact that iGames' experts have reached conclusions unfavorable to them. The Defendants' dissatisfaction with the unfavorable testimony of Plaintiff's experts, however, is no grounds to preclude iGames' experts from testifying. Rather, the Defendants, by cross-examination at trial, can challenge the credibility of iGames' experts and/or the weight to be afforded to their opinions.

**ARGUMENT**

I.  **The Standard Governing The Admission Of Expert Testimony**

Rule 702 of the Federal Rules of Evidence provides that expert testimony is admissible if such testimony consists of "scientific, technical, or other specialized knowledge" that "will assist the trier of fact to understand the evidence or to determine a fact in issue." Although the trial court must perform a "gatekeeping" function under this Rule, the Third Circuit has directed that "[w]here there is a logical basis for an expert's opinion testimony, the credibility and weight of that testimony is to be determined by the jury, not the trial judge." *Breidor v. Sears, Roebuck and Co.*, 722 F.2d 1134, 1138-39 (3d Cir. 1983).

II.  **Elliott Roth's January 25, 2005 Report Should Be Admitted In Its Entirety**

iGames' expert, Elliott A. Roth, submitted his "Report on Damages" dated January 25, 2005 (the "Roth Report").[1] Although the Defendants raise no challenge to Roth's credentials and qualifications as an expert witness, they challenge each and every conclusion set forth in Roth's Report and seek to have those conclusions excluded. However, none of the Defendants' arguments, establishes a sufficient basis for precluding any part of Roth's testimony, and the Defendants are therefore left to raise their challenges by cross-examination of Roth.

A.  **Roth's Opinion As To Prejudgment Interest Is Admissible**

The Defendants do not dispute that, to the extent the fact-finder determines that iGames properly terminated the SPA, iGames is entitled to recover from the Defendants a

---

[1] Because the copy of the Roth Report that the Defendants attach to their Motion is incomplete, attached hereto as Exhibit "A" is a complete copy of the Roth Report.

2

termination fee of $1,000,000. The Defendants also do not dispute that iGames will be entitled to recover prejudgment interest on this liquidated amount. However, the Defendants complain that Roth "without any explanation" uses an interest rate of 6% to calculate the prejudgment interest the Defendants may owe with respect to the termination of the SPA. Roth, of course, is an expert economist and is well-qualified to determine and apply an appropriate rate of interest. Moreover, Roth's 6% figure is consistent with 6 *Del. C.* § 2301(a), which prescribes that the maximum rate of prejudgment interest is "5% over the Federal Reserve discount rate." In this case, the Federal Reserve discount rate on the date iGames alleges it terminated the SPA was 2%, and prejudgment interest may be as high as 7%. Therefore, Roth's 6% figure is not only proper, it is conservative. In any event, to the extent the Defendants insist that the prejudgment interest payable in connection with the termination of the SPA should be based on some interest rate other than 6%, the Court may properly assess this issue in post-judgment proceedings pursuant to Fed. R. Civ. P. 59. *See McNaboe v. NVF Co.*, 2000 U.S. Dist. LEXIS 4418 at *69-70 (D. Del. Mar. 20, 2000) (calculating and awarding prejudgment interest in post-trial proceedings pursuant to Fed. R. Civ. P. 59).

### 1.    iGames' Costs And Expenses

The Defendants also do not dispute that, to the extent the fact-finder determines that iGames properly terminated the SPA, iGames is entitled to recover its "costs and expenses." Instead, the Defendants complain (i) that iGames never made a written demand for payment of its costs and expenses, and even if it did (ii) Roth has included in his calculation certain legal fees that the Defendants argue cannot be recovered under § 12(e) of the SPA. Neither of these arguments, however, establishes a basis for excluding Roth's testimony regarding iGames' costs and expenses.

3

First, the alleged necessity of making a "written" demand for payment of costs and expenses is no basis to exclude Roth's testimony. For one, there is no requirement that iGames make a written demand for payment of costs and expenses, as the parties are in litigation over this very issue and any such demand would be futile. Moreover, iGames in fact made such a demand as evidenced by, among other things, Roth's Report, which sets forth iGames' "costs and expenses" claims. Not surprisingly, the Defendants have not paid the costs and expenses, and indeed, contend that they are not required to do so.

Second, the mere fact that the SPA was terminated in March 2004 is no grounds for preventing Roth from including in his "costs and expenses" calculation legal fees billed through December 2004. All of the fees iGames incurred were payable to the law firm of Klehr, Harrison, Harvey, Branzburg & Ellers LLP, which represented iGames in connection with the SPA, and are payable in connection with the SPA. iGames is expressly entitled to recover such amounts under § 11(e)(ii) of the SPA, which imposes no absolute temporal limitation with respect to the billing date of services rendered. Moreover, iGames is entitled to recover its legal fees under § 11(e)(v) of the SPA. The fact that the Defendants might disagree that the costs in question were incurred in connection with the SPA, or are otherwise recoverable, is no grounds for precluding Roth's testimony regarding such damages before any testimony is offered at trial, but rather, is merely a basis upon which the Defendants might choose to challenge the weight to be afforded to Roth's opinion in this regard.

### 2. The Cost To iGames Of Obtaining Funds To Purchase Available Money

The Defendants also complain that in the event they breached their obligation to pay the second $2 million installment they were obligated to pay pursuant to the parties' Term Loan Note, Roth should not be able to testify as to the additional cost to iGames of procuring funds to "cover" this missed payment, which allowed iGames to satisfy its obligations in connection with its agreement to acquire Available Money. In effect, even though the parties entered into the Term Loan Note for the purpose of funding iGames' acquisition of Available Money, the Defendants propose that the Court, as a matter of law, must now relieve them of any obligation to pay the consequential damages resulting from their breach of their obligation to pay the second installment due under the Term Loan Note.

The Defendants argue they were never required to make the second installment payment, because iGames had a right to prepay the principal balance on the first installment payment. This unsupported argument is refuted by the simple fact that the provision the Defendants cite purports only to relieve iGames of its obligations under the Term Loan Note, and on its face, does not excuse the Defendants of their obligation to pay the second installment.[2] Moreover, this provision does not purport to establish any "remedy," much less an exclusive remedy, which would relieve the Defendants of their obligation to make the second installment payment. Rather, the provision establishes a right of iGames, which iGames -- as a consequence of its obligations with respect to the

---

[2] The provision in question provides that upon prepayment of the principal balance, "all further payment obligations of [iGames], other than with respect to amounts accrued through the date of prepayment, shall terminate." (Term Loan Note, p. 1).

5

acquisition of Available Money -- did not, and could not, exercise. The simple fact is the Defendants breached the SPA by failing to make the second installment payment, and they are liable to iGames for the consequences of their breaches. At the very most, by suggesting that iGames should have prepaid the principal of the Term Loan Note, the Defendants propose a "mitigation" argument, which can be no basis for excluding Roth's testimony regarding the extra costs iGames incurred as a result of the Defendants' breaches.

The Defendants further complain that Roth should not have included in his extra-cost calculations interest iGames was obligated to pay with respect to the first installment payment Chex made to iGames. The Defendants' argument in this regard, however, evidences a fundamental misunderstanding of the nature of the SPA. As Roth notes in his Report, but for the breach, the transaction under the SPA should have closed on March 15, 2004. (Roth Report, at 7). Had the transaction timely closed, iGames and Chex would have "combined into one company," and all of the interest thereafter "payable" by iGames to Chex under the Term Loan Note would, in fact, have been "payable" *by iGames to itself*. (*Id.*). However, because iGames and Equitex breached their obligation to pay the second installment, and actually breached the SPA, iGames was forced to borrow money at a substantially increased cost in order to complete its obligations with respect to the purchase of Available Money. Roth, by calculating the increased cost of this borrowing over the cost of "self-borrowing" as described above, properly calculates the damages that foreseeably and consequently flowed from the Defendants' breaches of the Term Loan Note and the SPA.

6

Finally, the Defendants briefly suggest -- without any supporting authority as to how iGames could have done so -- that in response to the Defendants' breaches iGames should have avoided all of the interest costs it incurred by electing simply to pay back all of the loans. This suggestion ignores that iGames was obligated to purchase Available Money, and that iGames contracted with the Defendants to obtain funds for the express purpose of completing the Available Money transaction. When the Defendants breached their obligations to iGames, iGames obtained the funds necessary to complete the transaction by incurring the costs outlined in the Roth Report. Moreover, the Defendants' argument that iGames should have backed out of the transactions it was obligated to complete is, at most, a "mitigation" argument, which again can be no basis for excluding Roth's testimony regarding the extra costs iGames incurred as a result of the Defendants' breaches.

### 3. The Additional Costs To iGames To Convert Available Money ATM Machines

The Defendants complain that Roth should be precluded from testifying regarding additional costs iGames has incurred to convert ATM machines. First, the Defendants argue that iGames, as a matter of law, cannot recover costs it has incurred to convert ATM machines. To the contrary, iGames is entitled to recover all damages incurred as a consequence of the Defendants' willful breaches of their representations and warranties under the SPA and their obligations under the Term Loan Note. To the extent iGames proves that such additional costs flow from the breaches, iGames is entitled to introduce testimony of the amount of its losses, and Roth's testimony is admissible in this regard.

Second, the Defendants incorrectly argue that the Termination Fee is the sole remedy for any breach of the SPA. However, Section 11(e)(iv) of the SPA expressly

7

provides that additional remedies are available to iGames in the event of the Defendants' willful breach of its representations and warranties under the SPA. Moreover, Section 11(e)(v) of the SPA expressly provides that in the event iGames commenced suit against the Defendants (which iGames did), then iGames is entitled to recover all of its expenses incurred in connection with such suit. Even under the Defendants' argument, iGames' costs to convert the ATM machines are recoverable as expenses "in connection with" this matter. Thus, Roth may properly testify as to the amount of those expenses.

Finally, Roth employed a proper methodology in calculating the damages iGames has and will incur to convert ATM machines. Using the best estimate available, Roth determined that the interest payable after conversion of the ATM machines is $60,000. He then determined for each month in question the amount over $60,000 that iGames would incur in interest and fees, the sum of which represents the excess interest iGames will be required to pay as a result of the delay in converting the ATM machines. To the extent the Defendants challenge this methodology, they are of course entitled to cross-examine Roth. Their present challenges, however, go only to the weight to be afforded to Roth's calculations and not to the admissibility of his calculations.

### 4. The Credit Facility Loan

Without challenging the accuracy of Roth's testimony relating to expenses iGames has incurred in connection with its credit facility loan, the Defendants argue that iGames should not be able to recover such damages. The Defendants, however, are expressly obligated under section 11(e)(ii) of the SPA to pay iGames' "costs and expenses" associated with the SPA. To the extent iGames incurred the credit facility costs in connection with the SPA, the Defendants, under section 11(e)(v), are obligated to pay the costs as damages in this matter. It is irrelevant that iGames may have applied for

8

the credit facility before the Defendants' breaches the SPA, as section 11(e)(v) imposes no such temporal limitations. To the extent the Defendants claim the credit facility was not utilized in connection with the SPA or that iGames should and could have repaid the credit facility earlier, they may attempt to prove as much at trial. However, these arguments in no way render Roth's calculations of the expenses iGames has incurred in connection with the SPA inadmissible.

### 5.     iGames' Projected Loss of Income

The Defendants erroneously suggest that there exists in Delaware a blanket law prohibiting any award of lost income.[3] To the contrary, the very case the Defendants cite in support of this position provides that such damages are recoverable where the claimant has "[laid] a basis for a reasonable estimate of his loss." *Chemipal Ltd. v. Slim-Fast Nutritional Foods Int'l, Inc.*, 350 F. Supp. 2d 582, 595 (D. Del. 2004) (citing *Tanner v. Exxon Corp.*, 1981 Del. Super. LEXIS 819, at *1 (Del. Super. July 23, 1981)). In *Chemipal*, for example, the Court cited various decisions in which lost profit damages have been awarded when calculated on the basis of "an established pre-termination sales history, post-termination performance and market assessment." Here, in comparison, Roth's calculation of iGames' lost income is based on the parties' pre-termination results

---

[3] The Defendants quote *Chemipal* for the proposition that under Delaware law "consequential damages in the form of good will, lost future profits, and lost customers are not awarded in breach of contract actions." (Defendants' Brief at 18 (quoting *Chemipal*, 350 F. Supp. 2d at 595-97)). Incredibly, this quote from *Chemipal* is a quote from one of the party's briefs, *i.e.*, the party opposing the claim for damages. The argument is implicitly rejected by the Court in *Chemipal*, which acknowledged that such claims are appropriate when supported by sufficient evidence, as iGames' claims are here. Indeed, the correct and long-standing rule in Delaware is that "profits which would have been realized if a contract had been performed may be recovered as damages for its breach." *Henne v. Balick*, 146 A.2d 394 (Del. Super. 1958).

of operations, which Roth conservatively projected to assume <u>no growth or business expansion</u>. These damages cannot be deemed unduly speculative, since they are not only conservative, they are also based on the actual results of operations provided by the Defendants themselves.

A claim for lost income should not be excluded unless, viewing the evidence in the light most favorable to the claimant, the evidence in support of the damages claims is insufficient as a matter of law to support the award of damages. *J.E. Rhoads & Sons, Inc. v. Ammeral, Inc.*, 1988 Del. Super. LEXIS 116 at *30-31 (Mar. 30, 1988). For example, in *Chemipal*, the Court dismissed the plaintiff's lost profits claim only after determining that the defendant had demonstrated at deposition that the plaintiff's expert "did not know what he was basing his testimony on," thus rendering the proposed expert testimony so unreliable that preclusion was required. *Chemipal*, 350 F. Supp. 2d at 590. Here, in contrast, the Defendants cite no deposition testimony of Roth, do not contend that Roth does not know what his estimate of lost income is based on, and do not substantively challenge the validity of the "iGames/Equitex Transaction Analysis." Thus, Roth's lost income calculations are admissible.

The Defendants also criticize Roth for utilizing the "iGames/Equitex Transaction Analysis" in formulating his lost income opinion. Contrary to the position advanced by the Defendants, however, the Court in *Chemipal* did not establish that an economic expert cannot rely on a party or third-party economic analysis. Rather, the *Chemipal* court found that the expert's opinion in that case should be precluded because the expert testified that he had no understanding of what the marketing study at issue meant. *Id*. at 590. Here, in contrast, Roth has properly relied upon a transaction analysis which was

10

prepared with the input and consent of representatives of both parties and which was relied upon by both parties and assessing the benefits of the transaction. The analysis was done on the basis of iGames' historical financial data and information provided by the Defendants, themselves, and includes adjustments for the loss of contracts and synergistic effects of the transaction. Moreover, in calculating lost income, Roth used only the most conservative figures -- assuming <u>no growth or business expansion</u>. Indeed, Roth reached the most conservative result possible by assuming "no growth in business, no new products, and no growth due to inflation." There is nothing improper about the scope of Roth's reliance on the transaction analysis, and nothing speculative about the conservative result Roth reached. In short, to the extent the Defendants seek to challenge Roth's opinions in this regard, the Defendants must do so by cross-examination.

       **B.**       **Roth's Rebuttal Report Dated February 10, 2005 Is Admissible In Its Entirety**

The Defendants contend that the part of Roth's Rebuttal Report, dated February 10, 2005, relating to the Howards' note-receivable should be excluded. By his report, the Defendants' expert, Mr. Shopa, proposes to testify that Equitex complied with its "financial reporting" obligations. (Defendants' Exhibit F, at 10 and 12). In rebuttal of Shopa's proposed testimony, Roth has proposed that he will testify that Equitex did not comply with its "financial reporting" obligations, because, among other things, Equitex failed to report that it accepted a number of bad checks from the same person for over $600,000 over the course of a few days. Roth will testify that Equitex's cashing these bad checks was a material adverse change, which should have been reflected on the financial statements and securities filings of Equitex. Equitex's failure to disclose this material adverse change was also a violation of, its obligations under section 6(f) of the

11

SPA. Such testimony is proper to rebut Shopa's suggestion that under GAAP, Equitex properly hid from iGames the fact that it had accepted bad checks totaling over $600,000. To the extent Equitex contends that GAAP standards justify its financial reporting, Equitex may cross-examine Roth on this basis.

    **C.**    **R. Alan Miller's February 11, 2005 Rebuttal Report Is Admissible**

        **1.**    **The Irrelevancy Of The Value Of iGames' Stock With Respect To The Issue Of Whether It Was Feasible For iGames To Complete The Acquisition Of Chex**

Apparently anticipating they will be found to have breached the SPA, the Defendants have proposed they should be relieved of their obligations under the SPA because it supposedly was infeasible for iGames to complete the acquisition of Chex. To support their argument, the Defendants have tendered the Report of Gregg Jarrell, who the Defendants propose will testify that the transaction became "infeasible" for iGames because, following a decline in the value of its stock, iGames would have had to tender a controlling 83% of its shares to complete the transaction. In rebuttal, iGames' expert, R. Alan Miller, will testify that it remained feasible for iGames to complete the transaction because (i) the iGames interest conveyed to Equitex's shareholders would be widely disbursed, and (ii) warrants and options granted to iGames as a part of its transaction with Money Centers of America would partially offset the dilution of the value of iGames' shares. (Defendants' Exhibit C, ¶¶ 10, 13). This expert analysis is proper rebuttal testimony to explain to the jury why Mr. Jarrell's analysis of the effect of the dilution of iGames' share value is irrelevant to the feasibility of completing the transaction under the SPA.

### 2. The Decline In The Value Of iGames' Stock

The Defendants erroneously propose that Mr. Jarrell has opined that the decline in iGames' stock price was a "material adverse event." On the face of his report, however, Mr. Jarrell has offered no such opinion. Rather, Mr. Jarrell has concluded the decline in the market value of iGames' stock is economic evidence that iGames' stand-alone value decreased, which -- Mr. Jarrell is careful to note -- "*Chex* claims constitutes a material adverse event under the SPA." (Defendants' Exhibit G, at 2(b)) (emphasis added).

Putting aside the fact that Chex misstates Mr. Jarrell's conclusions, Mr. Miller's testimony regarding the causes of the decline in the value of iGames' stock is proper rebuttal of Jarrell's opinion that the stand-alone value of iGames decreased. Mr. Miller, an expert in the operation of securities markets and investment banking, will testify that the value of iGames' stock was linked to the Chex transaction, and the decline in iGames' stock value was caused by Chex's loss of the Seminole Contracts and the resulting litigation. Thus, the decline in value of iGames' stock is not indicative of a decline in the stand-alone value of iGames, but rather reflects, a decline in the financial condition and tax status of Chex. Miller supports this conclusion by explaining that:

> Dr. Jarrell's "iGames stand alone value analysis" does not measure what he suggests. That is, iGames stock price before the announcement of the Chex acquisition was based on an "old" iGames data, not on any MCA data, although the parties knew MCA would be acquired and was an integral part of iGames' business plan. The iGames stock price after the termination announcement reflected the Chex bad news and the litigation resulting from the termination. So this analysis as described is flawed and cannot measure the economic status of iGames/MCA as had been anticipated to exist by the parties absent the factors above.

(Defendants' Exhibit C, ¶ 14). This testimony will obviously assist the jury in understanding the cause of the decline in iGames' share value, and in determining whether iGames' stand-alone value decreased materially. The testimony is properly admissible as rebuttal testimony, which the Defendants will have the opportunity to attack on cross-examination should they so desire.

## CONCLUSION

For all of the foregoing reasons, iGames respectfully requests that the Court deny the Defendants' motion to preclude the testimony of Plaintiff's experts in its entirety.

DATED:    March 29, 2005

**DUANE MORRIS LLP**

/s/ Thomas P. McGonigle
Thomas P. McGonigle (Del. I.D. No. 3162)
Matt Neiderman (Del. I.D. No. 4018)
1100 North Market Street, 12th Floor
Wilmington, Delaware 19801
302.657.4900

**OF COUNSEL:**
**DUANE MORRIS LLP**
Matthew A. Taylor, Esquire
James L. Beausoleil, Jr., Esquire
One Liberty Place
Philadelphia, Pennsylvania 19103-7396
215.979.1000

Attorneys for Plaintiff
iGames Entertainment, Inc.

WLM\206996.1

14