# Exhibit A

**iGames Entertainment, Inc.**
v.
**Chex Services, Inc. and Equitex, Inc.**

**Report on Damages**

**January 25, 2005**

GOLDENBERG ROSENTHAL, LLP
BUSINESS ADVISORS • CERTIFIED PUBLIC ACCOUNTANTS



**GOLDENBERG ROSENTHAL, LLP**

BUSINESS ADVISORS • CERTIFIED PUBLIC ACCOUNTANTS

Located in Metropolitan Philadelphia
101 West Avenue • PO Box 458
Jenkintown, PA 19046-0458

215•881•8800
856•354•6054
215•881•8801 Fax
www.grgrp.com

Direct Dial: 215-881-8836

Established 1919

*Celebrating 85 years of client service.*

January 25, 2005

James L. Beausoleil, Jr., Esquire
Duane Morris, LLP
One Liberty Place, Suite 4200
Philadelphia, PA 19103-7396

Re:  iGames Entertainment, Inc.
v.
Chex Services, Inc. and Equitex, Inc.
United States District Court for the District of Delaware
Civil Action No. 04-180

Dear Mr. Beausoleil:

You have asked us to determine the amount of damages incurred by iGames Entertainment, Inc. as a result of Chex Services, Inc. and Equitex, Inc.'s alleged breach of the Stock Purchase Agreement dated November 3, 2003 and of the Term Loan Note.

**EXECUTIVE SUMMARY**

We have determined, to a reasonable degree of accounting certainty, that the damages incurred by iGames as a result of the alleged breach of the Stock Purchase Agreement dated November 3, 2003 and of the Term Loan Note, by Chex Services, Inc. and Equitex, Inc. is $2,331,101. In addition, we have determined the present value of the loss of income for periods subsequent to the termination of the Stock Purchase Agreement to be as follows:

| | |
|---|---|
| Three years | $665,859 |
| Five years | $835,674 |
| Ten years | $965,154 |

James L. Beausoleil, Jr., Esquire
Duane Morris, LLP
January 25, 2005
Page 2

## BACKGROUND

On November 3, 2003, iGames Entertainment, Inc. ("iGames"), Chex Services, Inc. ("Chex") and Equitex, Inc. ("Equitex") entered into a Stock Purchase Agreement (the "SPA") which provided for the acquisition of Chex by iGames from Equitex. iGames and Chex both provide cash access and financial management systems to the gaming industry. Equitex is the parent company of Chex.

Money Centers of America, Inc. ("MCA") is also in the business of providing cash access and financial management systems to the gaming industry and was 100% owned by Christopher Wolfington. In the summer of 2003, MCA agreed to merge into a public shell (iGames) in anticipation of the purchase of Chex. The merger was consummated on January 2, 2004. Subsequent to the merger, MCA operated as a wholly owned subsidiary of iGames, the majority stockholder being Christopher Wolfington. Effective January 16, 2004 iGames officially changed its name to Money Centers of America, Inc.

The SPA contained certain warranties and responsibilities of each of the parties in regard to the completion of the provisions of the stock purchase.

In the first week of January, 2004, Equitex and Chex were informed that their services would no longer be required at five Seminole Tribe casinos in Florida. The revenue from these contracts was estimated to be in excess of 20% of the annual revenues of Chex.

Subsequent to the execution of the SPA, the parties became aware that Available Money, Inc. ("Available Money"), a company in the same business as Chex and MCA was available for purchase. On January 6, 2004, iGames closed on the purchase of Available Money. To finance the purchase of Available Money, iGames signed a Term Loan Note for $4 million in favor of Chex. Chex advanced $2 million to iGames on January 6, 2004, which amount was needed to make the initial payment on the purchase of Available Money. The Term Loan Note provided for an additional $2 million to be advanced to iGames on March 6, 2004.

James L. Beausoleil, Jr., Esquire
Duane Morris, LLP
January 25, 2005
Page 3

In the ensuing two months, the parties continued to negotiate the terms of the Stock Purchase Agreement. However, they were unable to consummate the Agreement. In addition to negotiating the terms of the Stock Purchase Agreement, the parties began to accuse each other of breaches of the Stock Purchase Agreement and the Term Loan Note.

On March 6, 2004, Chex did not advance the second $2 million provided for under the Term Loan Note in conjunction with the purchase of Available Money.

On March 12, attorneys for Equitex and Chex delivered a termination letter to iGames, alleging iGames breached the SPA and Term Loan Note, and asserting their right to terminate. Concurrently, attorneys for iGames sent a letter to Equitex and Chex asserting its rights to terminate the SPA.

Subsequent to the termination letters, this litigation was filed in order to resolve the parties' differences.

## ANALYSIS

### *Termination Fee*

On March 12, 2004, iGames gave notice to Chex and Equitex that it was terminating the purchase agreement in accordance with Sections 11(b) (ii), (iv), and (viii) of the SPA.

Section 11(e) (ii) of the SPA provides certain amounts to be paid to iGames upon termination of the Agreement, as follows:

"(ii) Parent and Chex agree that if this Agreement is terminated pursuant to Sections 11(b)(ii), (iv)(only if such failure is not due to receipt of Parent Board approval pursuant to Section 7(f)), (vi)(only if within twelve months of such Parent stockholder vote, Parent, Chex or any of their Subsidiaries enters into a Chex Proposed Transaction, an agreement with CSI for a Chex Proposed transaction or the CSI Transaction), (vii)(only if the failure to effect the Closing is not due to any action or failure to act by Buyer), (viii) or (x), then Parent shall pay

James L. Beausoleil, Jr., Esquire
Duane Morris, LLP
January 25, 2005
Page 4

> to Buyer a termination fee in an amount equal to $1,000,000 (the **"Termination Amount"**). The Termination Amount shall be paid immediately upon termination. In addition, upon any such termination Parent and/or Chex shall pay to Buyer, within five (5) Business Days of receipt by Parent of a written notice from Buyer evidencing Buyer's documented costs and expenses otherwise payable by Buyer under Subsection 12(n), an amount equal to such costs and expenses. Any payment required to be made pursuant to this Subsection shall be made on the requisite payment date by wire transfer of immediately available funds to an account designated by Buyer."

In accordance with the section quoted above, iGames was entitled to receive the termination amount of $1 million from Equitex on March 12, 2004. This amount has not been paid to iGames; accordingly, we have calculated simple interest on the balance due from March 12, 2004 to August 31, 2005. Interest at 6% totals $88,274 (see Exhibit 2).

## *Costs and Expenses*

As noted in the previous section, in addition to the termination amount, iGames is entitled to receive costs and expenses as described in Subsection 12(n) of the Stock Purchase Agreement. Section 12(n) reads, as follows:

> "Expenses. Except as otherwise provided in this agreement, each of the Parties will bear its respective costs and expenses (including legal fees and expenses) incurred in connection with the preparation, negotiation, execution and performance of this Agreement and the Contemplated Transactions."

Costs incurred by iGames related to the preparation, negotiation, execution and performance of the SPA included legal fees, accounting fees, and other out-of-pocket costs such as travel, meals and entertainment, and delivery charges. These costs totaled $312,386, as detailed in Exhibit 3.

## *Cost of Funds to Purchase Available Money*

On January 6, 2004, iGames agreed to purchase Available Money. The provisions of the purchase required iGames to pay $2 million on January 6, 2004 and $2 million on March 6, 2004. In order to finance the purchase, iGames entered into a Term Loan Note with Chex for $4

James L. Beausoleil, Jr., Esquire
Duane Morris, LLP
January 25, 2005
Page 5

million. The Term Loan Note provided for Chex to advance $2 million to iGames on January 6, 2004 and an additional $2 million on March 6, 2004. (See Exhibit 12 for a copy of the Term Loan Note.) The section of the Term Loan Note, which describes the provision of interest, reads as follows:

> "Interest. For the period ending February 1, 2004, the Borrower shall pay to the Lender interest on the outstanding Term Loans at the rate of fifteen percent (15%) per annum, calculated on the basis of a 360-day year and counting the actual number of days elapsed. In addition, in lieu of interest, the Borrower shall, on a monthly basis, pay to the Lender an amount equal to 50% of the Operating Income of the Borrower's Available Money, Inc. subsidiary ("Available Money") (which for the period ending February 1, 2004 shall be reduced by the amount of interest paid under the previous sentence), provided that, in the event that Lender completes a business combination with any party other than Borrower, or completes a direct or indirect acquisition or purchase or sale of assets or securities with any party other than Borrower, or agrees to complete such a transaction pursuant to a letter of intent or otherwise, then, from the date of such agreement, Borrower shall not be obligated to pay Lender 50% of the Operating Income of Available Money but shall be obligated to pay Lender interest on the outstanding Term Loans at the rate of ten percent (10%) per annum, calculated on the basis of a 360-day year and counting the actual number of days elapsed. "Operating Income" shall mean cash receipts of Available Money generated by normal operations, less all operating expenses, capital expenditures, reserves for taxes and reasonable operating reserves. Each payment shall be accompanied by a report of an officer of the Borrower in reasonable detail setting forth the calculation of Operating Income of Available Money for the applicable period."

Chex did not advance the second payment of $2 million on March 6, 2004, as provided for in the Term Loan Note. Accordingly, iGames was required to obtain financing from another source in order to make the required payment and perform under the agreement to purchase Available Money. On April 30, 2004, iGames borrowed $2,050,000 from Mercantile Capital, L.P. ("Mercantile"). The loan provided for interest at 17% for a term of 1 year with interest and principal payable monthly, based on a 24-month amortization. In addition, iGames was required to pay a $41,000 facility fee and the expenses of Mercantile to draft the documents.

James L. Beausoleil, Jr., Esquire
Duane Morris, LLP
January 25, 2005
Page 6

Had Chex advanced $2 million on March 6, 2004, as provided for under the Term Loan Note and had the parties completed the Stock Purchase Agreement soon thereafter, the cost of funds required to finance the acquisition of Available Money would have been much less. Accordingly, iGames incurred additional costs to finance the acquisition of Available Money because of the failure of Chex to provide $2 million on March 6, 2004, and the alleged breach of the SPA resulting in its termination by iGames. The additional costs incurred by iGames as a result of these events were $616,797 as more fully detailed in Exhibits 4, 5, and 6.

The following is a summary of the assumptions made and procedures used in determining the amount of additional cost of money borrowed by iGames to purchase Available Money.

In accordance with the Term Loan Note, the cost of amounts borrowed by iGames from Chex from January 6, 2004 through April 12, 2004, was 50% of the operating income of Available Money. As detailed in Exhibit 13, Available Money had negative operating income for the months of January, March and April, 2004. Operating income for February 2004 was $15,450; so the cost of funds for that month would be 50% of $15,450 or $7,725.

The Term Loan Note provided that interest on the outstanding Term Loans is payable at the rate of 10% per annum from the date that Chex "completes a business combination with any party other than the borrower" (iGames). On April 12, 2004, Chex completed a merger with Seven Ventures. Accordingly, we have calculated interest on the outstanding balance of the Term Loan Note ($2 million) at 10% per annum from April 12, 2004 to August 31, 2005. Therefore, the cost of obtaining the first $2 million used in the purchase of Available Money was $286,611 (see Exhibit 5).

iGames borrowed the $2 million for the second payment on the purchase of Available Money on April 30, 2004. The loan from Mercantile provided for interest at 17% per annum and repayment of principal and interest using a 24-month amortization period beginning June 1, 2004. The loan provided for a maturity date of May 1, 2005. In order to determine the cost of money through August 31, 2005, we assumed that Mercantile would not call the loan on May 1,

James L. Beausoleil, Jr., Esquire
Duane Morris, LLP
January 25, 2005
Page 7

2005; but would extend the note for another year on the same terms and with no additional fees. We also assumed that iGames made all of the monthly payments of principal and interest on the due dates as provided for in the Loan Agreement. In accordance with these assumptions, the cost of borrowing the second $2 million required for the purchase of Available Money, including payment of the facility fee and reimbursement of Mercantile's cost, would be $415,087 (see Exhibit 5)

Therefore, the total cost of money required to complete the purchase of Available Money, based on the assumptions previously described, is $701,699 (see Exhibit 5).

Had Chex advanced $2 million on March 6, 2004, as provided for in the Term Loan Note and had the parties completed the SPA and combined into one entity, the cost of money to iGames required to finance the Available Money purchase would have been much less. For purposes of this calculation, we assume that the SPA was executed on March 15, 2004 and from that point forward, Chex and iGames (including MCA and Available Money) would be operating as one combined company.

Under these assumptions, Chex would have advanced $2 million to iGames on March 6, 2004, in accordance with the provisions of the Term Loan Note. Accordingly, the cost of funds advanced to iGames by Chex under the provisions of the Term Loan Note from January 6, 2004 to March 15, 2004 would be 50% of the operating income of Available Money per month. As described in the previous section, that amount would total $7,725 through March 15, 2004. As of March 15, 2004, both parties to the Term Loan Note would be combined into one company; therefore, any amounts owed would be payable to itself. However, on March 8, 2004, Chex entered into an agreement to borrow $5 million from Equitex. The loan provided for interest at 7% per annum with interest only being paid through June 8, 2004 and beginning on July 8, 2004, payments of interest and principal would commence for 42 months. We made the assumption that the $2 million advance by Chex to iGames on March 6, 2004 for the purchase of Available Money was obtained as part of the $5 million borrowed from Equitex. Accordingly, even after Chex and iGames were combined on March 15, 2004, the combined entities would be

James L. Beausoleil, Jr., Esquire
Duane Morris, LLP
January 25, 2005
Page 8

responsible for paying interest in accordance with the Note to Equitex for the March 6, 2004 $2 million payment.

The total cost of financing through August 31, 2005 was determined to be $187,204, of which $179,479 related to interest payable after the consummation of the SPA. In accordance with the SPA, the iGames shareholders would be issued 37.5% of the outstanding shares of the combined entity as well as receive warrants to purchase an additional 5.5%, meaning that the shareholders of iGames would own approximately 43% of the combined entity. Therefore, only 43% of the total cost of financing the Available Money acquisition subsequent to March 15, 2004, would be attributable to the shareholders of iGames. This amount totals $77,176 ($179, 479 x 43%). Accordingly, the total cost of money required for the purchase of Available Money under the assumptions as described above would be $84,901 (see Exhibit 6).

Based on the assumptions outlined above, the additional cost of money to iGames, to purchase Available Money, would be $616,797 (see Exhibit 4).

### *Additional Costs to Convert Available Money ATM Machines*

Subsequent to the acquisition of Available Money, iGames determined that it was necessary to change over the ATM machines so that the same company would be getting information about the usage of the machines and coordinating the re-supply of money to those machines. Once the conversion had been completed to the Genpass system, the interest costs would be reduced and stabilized. It was estimated by Christopher Wolfington that the stabilized monthly interest expense for Genpass would be $60,000. Christopher Wolfington estimated that the conversion process would take three months and was scheduled to commence in early March 2004 with a completion date of May 31, 2004. Because of the litigation with Chex and Equitex, the conversion process was not able to commence. According to Christopher Wolfington, since the project did not start on time, it became difficult to obtain a new start time. He has not yet been able to arrange the commencement of the conversion process; but, as of mid-January 2005, Mr. Wolfington indicated that the process will commence soon.

James L. Beausoleil, Jr., Esquire
Duane Morris, LLP
January 25, 2005
Page 9

Since the conversion process was not undertaken, additional interest costs have been incurred by Available Money due to inefficiencies in re-supplying the ATM machines. Since the project was originally slated to begin in March 2004 and end by the end of May 2004, additional interest expense due to inefficiencies was incurred during this period and has been incurred since May 31, 2004. As a basis for estimating damages due to these inefficiencies, we have calculated the excess interest paid to Genpass over $60,000 per month beginning in April 2004. We assumed that one-third of the excess in April 2004, two-thirds of the excess in May 2004 and all of the excess subsequent to May 31, 2004 would not have been incurred had the project begun and completed on time. The additional interest expense incurred by iGames in accordance with the previously described calculations totaled $192,456. (See Exhibit 7)

### *Credit Facility Loan*

On November 26, 2003, iGames entered into a Credit Facility Loan Agreement with Mercantile for a maximum of $250,000. The proceeds of the loan were used to pay expenses related to the Stock Purchase Agreement. The Credit Facility Loan provided for interest at the rate of Wilmington Trust of Pennsylvania's "prime rate" plus 10% calculated on a 360-day year with a floor of 14.5%. The loan also provided for iGames to pay a collateral management fee of 1% per month and to reimburse Mercantile for its fees and expenses related to the Credit Facility Loan Agreement. The Credit Facility Loan Agreement was due after January 31, 2004, upon five days written demand by Mercantile (See Exhibit 16.)

As of the date of this report, Mercantile had not yet demanded repayment of the loan and for purposes of calculation of the cost of funds; we assumed that repayment of the loan would not be demanded prior to August 31, 2005. For purposes of our calculation, we also assumed that the outstanding balance of the loan does not exceed $250,000 and we conservatively estimated that there is no change in the interest rate from January 2005 through August 2005. Based on these assumptions, we determined that the cost of borrowing $250,000

James L. Beausoleil, Jr., Esquire
Duane Morris, LLP
January 25, 2005
Page 10

under the Credit Facility Loan from the time that cash was drawn down against this loan to August 31, 2005 is $121,188 (see Exhibit 8).

### *Projected Loss of Income*

In March 2004 Christopher Wolfington prepared a document called,"iGames /Equitex Transaction Analysis." The document included projected financial statements that were intended to show the projected combined results of operations after the completion of the SPA. Mr. Wolfington received input from Ijaz Anwar of Chex and used historical financial information of Chex and iGames to assist in the preparation of these projections.

The projections included adjustments for the loss of the Seminole contracts, elimination of redundant costs and expenses, and other synergistic benefits of the proposed combination. He made a few different assumptions relative to projected growth in the business and expansion of services. However, the document also included a conservative projection containing no growth or business expansion. That projection provided for Income before taxes of the combined group of $2,120,564. Of that amount, iGames itself was projected to contribute $604,005 (see Exhibit 11).

In order to estimate the amount of profits lost by iGames because of the alleged breach of the SPA by Chex and Equitex, we accepted the conservative projections contained in this document and assumed that these results would be obtained for three, five and ten years after the consummation of the combination. We assumed no growth in the business, no new products and no growth due to inflation.

We multiplied the projected combined results of operations by 43% which represents the approximate ownership percentage of the iGames shareholders of the combined group. From this amount we subtracted the projected contribution of iGames leaving us with the projected remaining income that would have been attributed to the iGames shareholders.

James L. Beausoleil, Jr., Esquire
Duane Morris, LLP
January 25, 2005
Page 11

We then discounted the projected remaining income at a rate of 45.2% (see Exhibit 10) per year. This discount rate represents our estimate of the risks inherent in the projected operations.

The result of the discount calculation leaves us with the estimated present value of the loss of income to iGames for the three, five and ten year periods as follows: (see Exhibit 9).

| | |
|---|---|
| Three years | $665,859 |
| Five years | $835,674 |
| Ten years | $965,154 |

## CONCLUSION

We have determined, to a reasonable degree of accounting certainty, that the damages incurred by iGames as a result of the alleged breach of the Stock Purchase Agreement dated November 3, 2003 and of the Term Loan Note, by Chex Services, Inc. and Equitex, Inc. is $2,331,101 (see Exhibit 1). In addition, we have determined the present value of the loss of income for periods subsequent to the termination of the Stock Purchase Agreement to be as follows:

| | |
|---|---|
| Three years | $665,859 |
| Five years | $835,674 |
| Ten years | $965,154 |

Our Firm's consulting services were performed in accordance with the American Institute of Certified Public Accountants ("AICPA") Statements on Standards of Consulting Services and do not constitute an engagement  to provide audit, compilation, review or attest services as described in the pronouncements on professional standards issued by the AICPA.

James L. Beausoleil, Jr., Esquire
Duane Morris, LLP
January 25, 2005
Page 12


The procedures we performed were limited to the documents and information provided through January 25, 2005. Documents or information obtained subsequent to January 25, 2005 may impact our findings and conclusions. Accordingly, we reserve the right to revise or supplement our analysis should we receive any additional information, through either discovery or trial, which would impact our findings and conclusions.


This report may be used only by the parties and court officials involved in the above captioned litigation and only as it relates to this litigation. This report may not be disclosed, copied, published or used, in whole or in part, without prior permission of Goldenberg Rosenthal, LLP, except as ordered by legal process or a court of competent jurisdiction.


Very truly yours

GOLDENBERG ROSENTHAL, LLP

Elliott A. Roth, Partner


EAR/jcb
26515 Report 1 05

## INDEX OF EXHIBITS

1.  Summary of Damages
2.  Interest on Termination Fee
3.  Cost and Expenses
4.  Comparison of Cost of Funds to Purchase Available Money
5.  Cost of Money Borrowed by iGames to Purchase Available Money
6.  Cost of Money Borrowed from Equitex by iGames if SPA was completed on 3/15/04
7.  Additional Costs to Convert Available Money ATM Machines.
8.  Cost of $250,000 Credit Facility Loan
9.  Projected Results of Operations
10. Determination of Discount Rate
11. iGames/Equitex Proposed Merger
12. $4,000,000 Term Loan Note
13. Statements of Income (Loss) of Available Money, Inc. for the period from January to October, 2004.
14. Excerpts from $2,050,000 Loan and Security Agreement with Mercantile Capital, L.P.
15. $5,000,000 Secured Promissory Note between Chex Services, Inc. and Equitex, Inc.
16. Excerpts from $250,000 loan and security agreement with Mercantile Capital, L.P.
17. Documents Reviewed
18. Elliott A. Roth, CPA, MBA, CFE, CVA Curriculum Vitae (plus List of Cases for past four years & billing rates updated through January 1, 2005)

Exhibit 1

**iGAMES ENTERTAINMENT, INC. v.CHEX SERVICES, INC and EQUITEX, INC.**
**Summary of Damages**

| Description | Exhibit | Amount |
|---|---|---|
| Termination Fee | | $ 1,000,000 |
| Interest on Termination Fee | 2 | $ 88,274 |
| Costs and Expenses | 3 | $ 312,386 |
| Additional Costs to igames | 4 | $ 616,797 |
| Additional Costs to Convert Available Money ATM Machines | 7 | $ 192,456 |
| Costs of Credit Facility Loan | 8 | $ 121,188 |
| Total | | $ 2,331,101 |

| Projected Loss of Value | | |
|---|---|---|
| Three Years | 9 | $ 665,859 |
| Five Years | 9 | $ 835,674 |
| Ten Years | 9 | $ 965,154 |

**iGAMES ENTERTAINMENT, INC. v.CHEX SERVICES, INC and EQUITEX, INC.**
**Interest on Termination Fee**

Interest at 6% on $1,000,000 from 3/12/04 to 8/31/05

| | |
|---|---|
| Principal | $ 1,000,000 |
| Interest rate | 6% |
| Interest /day | 164.38 |
| 3/12/04 to 8/31/05 | 537 Days |
| **Total Interest** | $ 88,274 |

Exhibit 2

iGAMES ENTERTAINMENT, INC. v.CHEX SERVICES, INC and EQUITEX, INC.
Costs and Expenses

Legal fees and expenses

  Klehr, Harrison, Harvey, Branzburg & Ellers LLP
    October 2003 to December 2004         $    264,209

Accounting fees and expenses

  Robert J. Kratz & Co.
    October 2003 to March 2004         $     15,992

Chris Wolfington expenses
  Travel         $     19,689
  Meals and entertainment         $     12,486
  Delivery         $         10

**Total**         $    312,386

Exhibit 3

**iGAMES ENTERTAINMENT, INC. v.CHEX SERVICES, INC and EQUITEX, INC.**
**Comparison of Cost of Funds to Purchase Available Money**

Cost to iGames to finance purchase of
Available Money thru 8/31/05

<u>Assumptions</u>

| | | | |
|---|---|---|---|
| iGames borrows second $2,000,000 from Mercantile SPA not completed Chex merges with Seven Ventures on 3/12/04 | Exhibit 5 | $ | 701,699 |
| Chex advanced second $2,000,000 payment SPA completed on 3/15/04 | Exhibit 6 | $ | 84,901 |
| **Additional cost to iGames** | | $ | 616,797 |

Exhibit 4

**iGAMES ENTERTAINMENT, INC. v.CHEX SERVICES, INC and EQUITEX, INC.**
**Cost of Money Borrowed by iGames to Purchase Available Money**

$2,000,000 borrowed from Equitex

Cost of Money is 50 % of Operating Income of Available Money until 4/12/04.

On 4/12/04 Chex completed a merger with Seven Ventures. At that point the
cost of money becomes 10%.

| Period | Cost | Comment |
|---|---|---|
| **2004** | | |
| January | $            - | 50% of Operating Income of Available Money |
| February | $      7,725.00 | 50% of Operating Income of Available Money |
| March | $            - | 50% of Operating Income of Available Money |
| April 1 to 11 | $            - | 50% of Operating Income of Available Money |
| 4/12 to 8/31/05 | $      278,886 | 10% of $2,000,000 ($555.55/day based on a 360 day year) |
| | $      286,611.10 | |

$2,000,000 borrowed from Mercantile Capital, LP

| | | |
|---|---|---|
| Principal | $      2,000,000 | |
| Interest Rate | 17% | |
| Term | One Year | |
| Maturity Date | May 1, 2005 | |
| Repayment Schedule | Based on 24 Month Amortization | |
| Monthly Payment | $      98,884.53 | |

For calculation of cost of money purposes, assume that the monthly
payments are made on time and that the loan maturity date is extended
to May 1, 2006.

| Period | Interest | Principal | Total Paid |
|---|---|---|---|
| **2004** | | | |
| May | $      28,333.33 | $      70,551.20 | $      98,884.53 |
| June | $      27,333.86 | $      71,550.67 | $      98,884.53 |
| July | $      26,320.22 | $      72,564.31 | $      98,884.53 |
| August | $      25,292.23 | $      73,592.30 | $      98,884.53 |
| September | $      24,249.67 | $      74,634.86 | $      98,884.53 |
| October | $      23,192.34 | $      75,692.19 | $      98,884.53 |
| November | $      22,120.04 | $      76,764.49 | $      98,884.53 |
| December | $      21,032.54 | $      77,851.99 | $      98,884.53 |

Exhibit 5

IGAMES ENTERTAINMENT, INC. v.CHEX SERVICES, INC and EQUITEX, INC.
Cost of Money Borrowed by iGames to Purchase Available Money
(Continued)

| Period | Interest | Principal | Total Paid |
|---|---|---|---|
| 2005 | | | |
| January | $ 19,929.64 | $ 78,954.89 | $ 98,884.53 |
| February | $ 18,811.11 | $ 80,073.42 | $ 98,884.53 |
| March | $ 17,676.74 | $ 81,207.79 | $ 98,884.53 |
| April | $ 16,526.29 | $ 82,358.24 | $ 98,884.53 |
| May | $ 15,359.55 | $ 83,524.98 | $ 98,884.53 |
| June | $ 14,176.28 | $ 84,708.25 | $ 98,884.53 |
| July | $ 12,976.25 | $ 85,908.28 | $ 98,884.53 |
| August | $ 11,759.21 | $ 87,125.32 | $ 98,884.53 |
| | | | |
| Total Interest | $ 325,089.30 | | |

| | | |
|---|---|---|
| Interest | $ | 325,089.30 |
| Facility fee | $ | 41,000.00 |
| Legal fees | $ | 48,998.15 |
| Total | $ | 415,087.45 |

| | | |
|---|---|---|
| Total cost of borrowings for Available Money purchase | $ | 701,699 |

**iGAMES ENTERTAINMENT, INC. v. CHEX SERVICES, INC and EQUITEX, INC.**
**Cost of Money Borrowed from Equitex by iGames if SPA was Completed on 3/15/04**

Cost is 50% of Operating Income of Available Money until Stock Purchase Agreeement
is completed. If we assume that the SPA is completed on 3/15/04 the cost to iGames is
the interest cost on the second $2,000,000 installment which was borrowed by Equitex and
loaned to Chex times iGames percentage ownership of the new combined company.

Equitex loaned a total of $5,000,000 to Chex at 7% interest repayable over 45 months.

| Period | Cost | Comment |
|--------|------|---------|
| January, 2004 | $ - | 50% of Operating Income of Available Money |
| February | $ 7,725.00 | 50% of Operating Income of Available Money |
| March 1 to 15 | $ - | 50% of Operating Income of Available Money |
| March 16 to 31 | $ 6,222.22 | 7% of $2,000,000 |
| April | $ 11,666.67 | 7% of $2,000,000 |
| May | $ 12,055.56 | 7% of $2,000,000 |
| June 1 to 8 | $ 3,111.11 | 7% of $2,000,000 |
| 6/9 - 7/8 | $ 11,666.67 | Per Amortization Schedule |
| 7/9 - 8/8 | $ 11,420.72 | Per Amortization Schedule |
| 8/9 - 9/8 | $ 11,173.35 | Per Amortization Schedule |
| 9/9 - 10/8 | $ 10,924.52 | Per Amortization Schedule |
| 10/9 - 11/8 | $ 10,674.25 | Per Amortization Schedule |
| 11/9 - 12/8 | $ 10,422.52 | Per Amortization Schedule |
| 12/9 - 1/8/05 | $ 10,169.32 | Per Amortization Schedule |
| 1/9 - 2/8 | $ 9,914.64 | Per Amortization Schedule |
| 2/9 - 3/8 | $ 9,658.48 | Per Amortization Schedule |
| 3/9 - 4/8 | $ 9,400.82 | Per Amortization Schedule |
| 4/9 - 5/8 | $ 9,141.66 | Per Amortization Schedule |
| 5/9 - 6/8 | $ 8,880.98 | Per Amortization Schedule |
| 6/9 - 7/8 | $ 8,618.79 | Per Amortization Schedule |
| 7/9 - 8/8 | $ 8,355.07 | Per Amortization Schedule |
| 8/9 - 8/31 | $ 6,002.12 | Per Amortization Schedule (Prorated) |

| | | |
|--------|------|---------|
| Total | $187,204.47 | |
| | $ (7,725.00) | Less 50% of Operating Income |
| | $179,479.47 | |
| | 43% | % owned by iGames |
| | $ 77,176.17 | |
| | $ 7,725.00 | Plus 50% of Operating Income |
| | $ 84,901.17 | Total cost of money |

Exhibit 6

iGAMES ENTERTAINMENT, INC. v.CHEX SERVICES, INC and EQUITEX, INC.
Additional Costs to Convert Available Money ATM Machines

| | April | May | June | July | August | September | October | November |
|---|---|---|---|---|---|---|---|---|
| | | | | 2004 | | | | |
| Genpass interest | $ 112,389 | $ 118,659 | $ 87,453 | $ 84,156 | $ 80,744 | $ 75,441 | $ 92,271 | $ 75,822 |
| Less Base | $ 60,000 | $ 60,000 | $ 60,000 | $ 60,000 | $ 60,000 | $ 60,000 | $ 60,000 | $ 60,000 |
| | $ 52,389 | $ 58,659 | $ 27,453 | $ 24,156 | $ 20,744 | $ 15,441 | $ 32,271 | $ 15,822 |
| Applicable % | 33% | 67% | 100% | 100% | 100% | 100% | 100% | 100% |
| Excess interest cost | $ 17,461 | $ 39,108 | $ 27,453 | $ 24,156 | $ 20,744 | $ 15,441 | $ 32,271 | $ 15,822 |

Total Excess Interest $ 192,456

Exhibit 7

**AvaNable Money, Inc.**
**Statements of Income (Lease)**
**January - November 2004**

| | Jan 04 | Feb 04 | Mar 04 | Apr 04 | May 04 | Jun 04 | Jul 04 | Aug 04 | Sep 04 | Oct 04 | Nov 04 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Ordinary Income/Expense** | | | | | | | | | | | | |
| **Income** | | | | | | | | | | | | |
| Revenue | 57,406 | 68,940 | 60,012 | 839,336 | 894,011 | 830,065 | 917,358 | 698,776 | 828,110 | 899,241 | 599,030 | 6,043,056 |
| **Total Income** | 57,406 | 68,940 | 60,012 | 839,336 | 894,011 | 830,065 | 917,358 | 698,776 | 828,110 | 899,241 | 599,030 | 6,043,056 |
| **Cost of Goods Sold** | | | | | | | | | | | | |
| ATM Maintenance | 0 | 0 | 0 | 475 | 475 | 0 | 0 | 0 | 0 | 0 | 0 | 850 |
| ATM Processing Fees | 0 | 0 | 0 | 2,367 | 2,147 | 2,347 | 0 | 2,037 | 2,142 | 2,072 | 1,047 | 18,301 |
| Charge Terminal Fees | 0 | 0 | 0 | 1,500 | 168 | 1,125 | 2,012 | 1,500 | 375 | 375 | 3,415 | 8,476 |
| Cash Replenishment | 0 | 0 | 0 | 61,616 | 4,597 | 75,035 | 42,616 | 42,452 | 45,338 | 45,079 | 31,235 | 348,213 |
| Commissions | 0 | 0 | 0 | 518,897 | 554,940 | 472,462 | 528,920 | 544,811 | 510,325 | 397,046 | 443,126 | 4,181,278 |
| ISM Up Fees | 0 | 0 | 0 | 1,675 | 2,215 | 1,325 | 966 | 1,545 | 965 | 1,735 | 1,623 | 12,381 |
| Lease Fee - Depreciation | 0 | 0 | 0 | 38,035 | 38,035 | 38,035 | 38,035 | 38,035 | 38,935 | 36,935 | 26,050 | 287,595 |
| Miscellaneous | 0 | 0 | 0 | 10,717 | 327 | 327 | 0 | 0 | 0 | 0 | 0 | 1,294 |
| Payroll Taxes | 207 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 450 | 0 | 0 | 1,428 |
| Pricing Tier Expenses | 0 | 810 | 413 | 33,794 | 35,415 | 33,175 | 36,827 | 34,728 | 33,382 | 34,757 | 25,906 | 287,704 |
| Rents | 0 | 0 | 0 | 46,618 | 42,321 | 42,321 | 41,271 | 41,051 | 45,563 | 41,016 | 41,016 | 342,281 |
| Repairs | 0 | 0 | 0 | 36,679 | 20,571 | 20,475 | 26,918 | 22,309 | 22,159 | 22,139 | 17,558 | 188,780 |
| Surcharge Support | 0 | 0 | 0 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 0 | 600 |
| Telecommunications | 0 | 0 | 0 | 24,252 | 24,122 | 24,406 | 24,610 | 24,396 | 23,945 | 23,267 | 23,330 | 192,338 |
| Terminal Access Fees | 0 | 0 | 0 | 4,550 | 4,550 | 4,550 | 4,550 | 4,550 | 4,559 | 4,550 | 3,600 | 35,450 |
| Wages | 2,700 | 5,400 | 5,400 | | | | | | | | | 13,500 |
| Wire Transfer Fees | 0 | 0 | 0 | 0 | 47 | 25 | 15 | 15 | 45 | 45 | 0 | 123 |
| **Total COGS** | 2,907 | 6,210 | 5,813 | 781,408 | 728,603 | 714,356 | 747,059 | 756,446 | 735,352 | 815,388 | 622,246 | 5,910,091 |
| **Gross Profit** | 54,490 | 60,730 | 60,199 | 58,880 | 165,208 | 112,549 | 170,299 | 113,320 | 92,758 | 58,953 | 66,784 | 1,032,183 |
| **Expense** | | | | | | | | | | | | |
| Bank Service Charges | | | | 0 | 28 | 25 | 0 | 0 | 0 | 137 | (49) | 142 |
| Contributions | | | | 0 | 0 | 0 | 0 | 0 | 0 | 3,000 | 0 | 3,000 |
| Conversion Fees | 42,719 | | | | | | | | | | | 42,719 |
| Licenses and Permits | | | | 45 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 145 |
| Meals & Entertainment | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 183 | 183 |
| Professional Fees | | | | 0 | 3,803 | 0 | 0 | 0 | 306 | 0 | 0 | 3,843 |
| Taxes | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 129 | 427 |
| Travel | | | | 50 | 0 | 0 | 0 | 0 | 0 | 0 | 782 | 762 |
| Utilities | | | | 40 | 47 | 0 | 810 | 600 | 550 | 860 | 550 | 3,563 |
| **Total Expense** | 42,719 | 0 | 0 | 135 | 3,898 | 25 | 810 | 700 | 856 | 5,022 | 1,558 | 55,794 |
| **Net Ordinary Income** | 11,760 | 60,730 | 60,199 | 50,725 | 161,240 | 112,524 | 169,479 | 112,626 | 91,900 | 53,930 | 65,226 | 976,391 |
| **Other Income/Expense** | | | | | | | | | | | | |
| **Other Expense** | | | | | | | | | | | | |
| Amortization Expense | 57,590 | 64,234 | 68,654 | 89,288 | 91,503 | 89,258 | 68,664 | 68,664 | 282,211 | 90,086 | 57,606 | 1,007,501 |
| Depreciation Expense | 1,118 | 1,046 | 1,118 | 1,082 | 1,118 | 1,082 | 1,118 | 1,118 | 1,082 | 1,159 | 1,153 | 12,194 |
| Faulty Fees | | | | 1,708 | 1,708 | 1,708 | 1,708 | 1,705 | 1,708 | 1,708 | 1,708 | 13,664 |
| Interest Expense - Mercantile | | | | 17,204 | 17,204 | 20,018 | 26,473 | 20,019 | 29,028 | 31,263 | 30,748 | 229,330 |
| Interest Expense - Geoquest | | | | | | | 64,196 | 60,744 | 75,441 | 82,371 | 75,822 | 726,035 |
| Interest Expense - Chec | | | | 112,280 | 118,656 | 87,453 | | | | | | 23,348 |
| **Total Other Expense** | 58,707 | 65,280 | 69,782 | 221,671 | 242,557 | 208,068 | 190,119 | 183,153 | 370,370 | 237,137 | 187,087 | 2,010,472 |
| **Net Other Income** | (58,707) | (65,280) | (69,782) | (221,671) | (242,557) | (208,068) | (190,119) | (183,153) | (370,370) | (237,137) | (187,087) | (2,010,472) |
| **Net Income** | (46,927) | (65,280) | (9,387) | (164,945) | (81,317) | (94,385) | (18,840) | (70,527) | (278,470) | (183,207) | (121,830) | (1,034,111) |

**iGAMES ENTERTAINMENT, INC. v.CHEX SERVICES, INC and EQUITEX, INC.**
**Cost of $250,000 Credit Facility Loan**

| Date | Advances | Interest | Fees | Balance | | Rate | Days |
|------|----------|----------|------|---------|--|------|------|
| 12/1/2003 | $ 75,000.00 | | | $ 75,000.00 | | | |
| | | $ 1,872.75 | $ 9,885.00 | $ 86,757.75 | | | |
| 12/5/2003 | $ 36,000.00 | | | $122,757.75 | | | |
| | | $ 841.00 | | $123,598.75 | | | |
| 12/9/2003 | $ 28,000.00 | | | $151,598.75 | | | |
| | | $ 609.00 | | $152,207.75 | | | |
| 12/17/2003 | $ 10,000.00 | | | $162,207.75 | | | |
| | | $ 197.36 | | $162,405.11 | | | |
| 12/31/2003 | $ 38,000.00 | | | $200,405.11 | | | |
| | | $ 489.78 | | $200,894.89 | | | |
| 1/13/2004 | | | $ 165.75 | $201,060.64 | Costs | | |
| 1/20/2004 | $ 27,000.00 | | | $228,060.64 | | | |
| | | $ 130.50 | | $228,191.14 | | | |
| 2/10/2004 | $ 16,610.00 | | | $244,801.14 | | | |
| 2/17/2004 | | | $ 18.75 | $244,819.89 | | | |
| 2/28/2004 | | $ 2,799.32 | $ 2,396.55 | $250,015.76 | Assume loan balance fixed at | | |
| | | $ (15.76) | | $250,000.00 | $250,000 from 3/1/04 | | |
| | | | $ 18.75 | | | | |
| March | | $ 3,121.53 | $ 2,500.00 | | | 14.50% | 31 |
| | | | $ 18.75 | | | | |
| April | | $ 3,020.83 | $ 2,500.00 | | | 14.50% | 30 |
| May | | $ 3,121.53 | $ 2,500.00 | | | 14.50% | 31 |
| June | | $ 3,020.83 | $ 2,500.00 | | | 14.50% | 30 |
| July | | $ 3,121.53 | $ 2,500.00 | | | 14.50% | 31 |
| August | | $ 3,121.53 | $ 2,500.00 | | | 14.50% | 31 |
| September | | $ 3,020.83 | $ 2,500.00 | | | 14.50% | 30 |
| October | | $ 3,175.35 | $ 2,500.00 | | | 14.75% | 31 |
| November | | $ 3,072.92 | $ 2,500.00 | | | 14.75% | 30 |
| December | | $ 3,229.17 | $ 2,500.00 | | | 15.00% | 31 |
| **2005** | | | | | | | |
| January | | $ 3,282.99 | $ 2,500.00 | | | 15.25% | 31 |
| February | | $ 2,965.28 | $ 2,500.00 | | | 15.25% | 28 |
| March | | $ 3,282.99 | $ 2,500.00 | | | 15.25% | 31 |
| April | | $ 3,177.08 | $ 2,500.00 | | | 15.25% | 30 |
| May | | $ 3,282.99 | $ 2,500.00 | | | 15.25% | 31 |
| June | | $ 3,177.08 | $ 2,500.00 | | | 15.25% | 30 |
| July | | $ 3,282.99 | $ 2,500.00 | | | 15.25% | 31 |
| August | | $ 3,282.99 | $ 2,500.00 | | | 15.25% | 31 |
| | | $63,684.37 | $57,503.55 | | | | |

**Total  $   121,188**

Exhibit 8

**IGAMES ENTERTAINMENT, INC. v.CHEX SERVICES, INC and EQUITEX, INC.**
Projected Results of Operations

Combined iGames and Chex

| | | | | | | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | |
| Revenue | $ 32,425,820 | $32,425,820 | $32,425,820 | $32,425,820 | $32,425,820 | $32,425,820 | $32,425,820 | $32,425,820 | $32,425,820 | $32,425,820 | |
| Operating expenses | $ 24,242,894 | $24,242,894 | $24,242,894 | $24,242,894 | $24,242,894 | $24,242,894 | $24,242,894 | $24,242,894 | $24,242,894 | $24,242,894 | |
| Gross Profit | $ 8,182,926 | $ 8,182,926 | $ 8,182,926 | $ 8,182,926 | $ 8,182,926 | $ 8,182,926 | $ 8,182,926 | $ 8,182,926 | $ 8,182,926 | $ 8,182,926 | |
| General and administrative expenses | $ 3,181,313 | $ 3,181,313 | $ 3,181,313 | $ 3,181,313 | $ 3,181,313 | $ 3,181,313 | $ 3,181,313 | $ 3,181,313 | $ 3,181,313 | $ 3,181,313 | |
| Income before interest, depreciation and income taxes | $ 5,001,613 | $ 5,001,613 | $ 5,001,613 | $ 5,001,613 | $ 5,001,613 | $ 5,001,613 | $ 5,001,613 | $ 5,001,613 | $ 5,001,613 | $ 5,001,613 | |
| Interest | $ 1,952,769 | $ 1,952,769 | $ 1,952,769 | $ 1,952,769 | $ 1,952,769 | $ 1,952,769 | $ 1,952,769 | $ 1,952,769 | $ 1,952,769 | $ 1,952,769 | |
| Depreciation | $ 928,280 | $ 928,280 | $ 928,280 | $ 928,280 | $ 928,280 | $ 928,280 | $ 928,280 | $ 928,280 | $ 928,280 | $ 928,280 | |
| Income before income taxes | $ 2,120,564 | $ 2,120,564 | $ 2,120,564 | $ 2,120,564 | $ 2,120,564 | $ 2,120,564 | $ 2,120,564 | $ 2,120,564 | $ 2,120,564 | $ 2,120,564 | |
| iGames Percentage Ownership | 43% | 43% | 43% | 43% | 43% | 43% | 43% | 43% | 43% | 43% | |
| Income before income taxes attributable to iGames | $ 911,843 | $ 911,843 | $ 911,843 | $ 911,843 | $ 911,843 | $ 911,843 | $ 911,843 | $ 911,843 | $ 911,843 | $ 911,843 | |
| iGames income taxes | $ 604,005 | $ 604,005 | $ 604,005 | $ 604,005 | $ 604,005 | $ 604,005 | $ 604,005 | $ 604,005 | $ 604,005 | $ 604,005 | |
| Excess | $ 307,838 | $ 307,838 | $ 307,838 | $ 307,838 | $ 307,838 | $ 307,838 | $ 307,838 | $ 307,838 | $ 307,838 | $ 307,838 | |
| Discounted at 45.2% | $ 307,838 | $ 212,005 | $ 146,012 | $ 100,559 | $ 69,256 | $ 47,697 | $ 32,849 | $ 22,623 | $ 15,591 | $ 10,731 | |

| | | | |
|---|---|---|---|
| Total Present Value | $ 665,859 | $ 835,674 | $ 965,154 |
| | Three Years | Five Years | Ten Years |

*Exhibit 9*

iGAMES ENTERTAINMENT, INC. v.CHEX SERVICES, INC and EQUITEX, INC.
Determination of Discount Rate

<u>Buildup method</u>

| | | |
|---|---|---|
| Risk-free Rate of Return | 3.0% | Intermediate term per Ibbotson |
| Common Stock Equity Risk Premium | 7.6% | Intermediate term per Ibbotson |
| Small Stock Risk premium | 9.8% | Decile 10b per Ibbotson |
| Company Specific Risk Premium | 6.7% | See Below |
| Net Cash Flow Discount Rate (After Tax) | 27.1% | |
| Adjustment for Taxes | 60.0% | Assume 40% effective tax rate |
| Net Cash Flow Discount Rate (Before Tax) | 45.2% | |

<u>Assumptions</u>

All Ibbotson variables from Stocks, Bonds, Bills, and Inflation; Valuation Edition 2004
as of December 31, 2003 or for the period then ended.

Net cash flow before tax is same as earnings before tax

No growth or inflation is built into projections, so there is a 0% sustainable growth rate.

| <u>Company Specific Risk Premium</u> | % |
|---|---|
| Depth of Management | 0.7 |
| Importance of Key personnel | 0.8 |
| Stability of Industry | 0.7 |
| Diversification of Product Line | 0.7 |
| Diversification of Customer Base | 0.9 |
| Diversification / Stability of Suppliers (Cash) | 0.5 |
| Geographic Location | 0.5 |
| Stability of Earnings | 0.5 |
| Financial Structure | 0.8 |
| Earnings Margins | 0.6 |
| | 6.7 |

<u>Scale</u>

0= No risk
1.0= High risk

Exhbit 10

IGames/Equitex
Proposed Merger

| | 2003 Pro Forma | | | Recast | Pro Forma |
|---|---|---|---|---|---|
| | iGames | Equitex | Combined | | |
| Revenue | 17,223,582 | 13,900,000 | 31,123,582 | 1,302,238 | 32,425,820 a |
| Operating expenses | 13,866,215 | 9,380,000 | 23,246,215 | 976,679 | 24,242,894 b |
| Gross profit | 3,337,367 | 4,520,000 | 7,857,367 | 325,560 | 8,182,927 |
| General & administrative | 1,091,313 | 2,840,000 | 3,931,313 | (750,000) | 3,181,313 c |
| EBITDA | 2,246,054 | 1,680,000 | 3,926,054 | - | 5,001,614 |
| Interest | 1,092,769 | 880,000 | 1,952,769 | - | 1,952,769 |
| Depreciation | 549,280 | 379,000 | 928,280 | | 928,280 |
| Income before taxes | 604,005 | 441,000 | 1,045,005 | 1,075,560 | 2,120,564 |
| | | | | | |
| **Percent of Combined** | | | | | |
| Revenue | 55% | 45% | 100% | | |
| EBITDA | 57% | 43% | 100% | | |
| Net Income | 58% | 42% | 100% | | |

**Recast Adjustments**

a  Adjustment to Chex-Services Credit Card Revenue grossed up at 60% for MCA Processing
   (amount is based on 75% of previous projections to account for loss of Seminole)

b  Operating expenses 75% of grossed up revenue

c  Represents cost and expenses that are redundant after the combination including $250,000 at
   Chex Services and $500,000 at Equitex Corporate, Key Nova and Denaris subsidiary.

3

CONFIDENTIAL

IGAMES02789

Confidential

Exhibit 11

### Term Loan Note

$4,000,000                                                                 Philadelphia, PA

FOR VALUE RECEIVED, the undersigned, iGAMES ENTERTAINMENT, INC., a Nevada corporation with its chief executive office and principal place of business at 700 S. Henderson Road, Suite 210, King of Prussia, PA 19406 (the "Borrower"), promises to pay to the order of CHEX SERVICES, INC., with offices located at 11100 Wayzata Blvd., Suite 111, Minnetonka, Minnesota 55305 (the "Lender") the principal sum of Four Million Dollars ($4,000,000) or, if less, the aggregate outstanding principal balance of all advances made by the Lender to the Borrower, as provided for herein (the "Term Loans") together with interest, from the date of this note ("Note"), in like money, at said office of the Lender, at the time and at rates per annum as provided herein..

The Borrower and the Lender agree that the Lender shall advance $2,000,000 to the Borrower on the date hereof and shall advance an additional $2,000,000 to the Borrower on that day that is 60 days following the date hereof, provided that at such time the Borrower is in material compliance with the terms of this Note, the Stock Pledge Agreement (as defined below) and the Stock Purchase Agreement (as defined below). The aggregate amount so advanced shall constitute the "Term Loans" hereunder. The Lender agrees to deliver to the Borrower, within 21 days of the date hereof, a binding commitment for financing sufficient to fund the second advance hereunder either (i) from Mercantile Capital, L.P. on terms satisfactory to the Borrower; or (ii) from another institutional lender satisfactory to the Borrower, which financing shall be either (A) funded prior to the end of such 21 day period and placed in escrow subject to release to the Borrower in accordance with the first sentence of this paragraph, or (B) irrevocably committed to be advanced directly by the financing source to the Borrower in accordance with the first sentence of this paragraph without any further action by the Lender. For avoidance of doubt, any financing that could be diverted to other uses by the Lender, or under which the financing source could decline to advance, shall not satisfy the foregoing conditions. In the event that the Lender fails to comply with the foregoing within such 21 day period, then the Borrower shall have the right at any time thereafter to prepay the principal balance of this Note in full, in which case all further payment obligations of the Borrower, other than with respect to amounts accrued through the date of prepayment, shall terminate.

Interest. For the period ending February 1, 2004, the Borrower shall pay to the Lender interest on the outstanding Term Loans at the rate of fifteen percent (15%) per annum, calculated on the basis of a 360-day year and counting the actual number of days elapsed. In addition, in lieu of interest, the Borrower shall, on a monthly basis, pay to the Lender an amount equal to 50% of the Operating Income of the Borrower's Available Money, Inc. subsidiary ("Available Money") (which for the period ending February 1, 2004 shall be reduced by the amount of interest paid under the previous sentence), provided that, in the event that Lender completes a business combination with any party other than Borrower, or completes a direct or indirect acquisition or purchase or sale of assets or securities with any party other than Borrower, or agrees to complete such a transaction pursuant to a letter of intent or otherwise, then, from the date of such agreement, Borrower shall not be obligated to pay Lender 50% of the Operating Income of Available Money but shall be obligated to pay Lender interest on the outstanding Term Loans at the rate of ten percent (10%) per annum, calculated on the basis of a 360-day year and counting the actual number of days elapsed. "Operating Income" shall mean cash receipts of Available Money generated by normal operations, less all operating expenses, capital expenditures, reserves for taxes and reasonable operating reserves. Each payment shall be accompanied by a report of an officer of the Borrower in reasonable detail setting forth the calculation of Operating Income of Available Money for the applicable period.

Treatment of Revenues and Expenses. The Borrower hereby agrees that, notwithstanding its ownership of 100% of the capital stock of Available Money, for a period of 90 days following the date hereof (or such longer period as the Borrower may consent to in its reasonable discretion) the Borrower shall consent to the inclusion by the Lender in its financial statements of 50% of the revenues and expenses of Available Money; provided that the Borrower's and the Lender's independent auditors deliver their respective opinions that such

PHIL1 352321-3

EXHIBIT

EXHIBIT

A

Exhibit 12

treatment is in accordance with generally accepted accounting principles.

Stock Purchase Agreement Termination. In the event that the Stock Purchase Agreement is terminated by the Lender and Equitex, Inc. under Section 11(b)(v) thereof, then in addition to any Termination Fee due and payable by the Borrower under the Stock Purchase Agreement, the Borrower shall pay to the Lender as additional interest hereunder the amount of $1,000,000, which shall be due and payable immediately upon demand following termination of the Stock Purchase Agreement.

Repayment; Lender's Option.

(a)  No repayment of the principal balance of this Note shall be due and payable until 120 days following the earlier to occur of (i) termination without closing under the Stock Purchase Agreement dated November 3, 2003 between the Lender, the Borrower and Equitex, Inc. and other parties (or any successor agreement for the acquisition of the Lender by the Borrower) (the "Stock Purchase Agreement"), or (ii) 100 days from the date hereof (in either case, the "Initial Maturity Date").

(b)  On the Initial Maturity Date, if the Borrower does not pay the outstanding principal balance of the Term Loans, and all accrued but unpaid interest due hereunder in full, the Lender shall have the option to purchase 100% of the capital stock of Available Money from the Borrower for a purchase price of $6,000,000 (the "Option"), exercisable by delivery to the Borrower on the Initial Maturity Date of a written notice of exercise, this Note for cancellation and immediately available funds in an amount equal to $6,000,000 less the then-outstanding principal balance of, and all accrued but unpaid interest on, the Term Loans.

(c)  If the Lender does not exercise the Option on the Initial Maturity Date, then the maturity date of this Note shall be extended for one or more additional periods of 30 days (the end of each of which shall be a "Subsequent Maturity Date"). On each Subsequent Maturity Date, if the Borrower does not pay the outstanding principal balance of the Term Loans, and all accrued but unpaid interest due hereunder, in full, the Lender shall have the right to exercise the Option on that Subsequent Maturity Date. If the Lender does not exercise the Option, the maturity date of this Note shall continue to be extended pursuant to this Section until the outstanding principal balance of, and all accrued but unpaid interest on, the Term Loans is paid or the Option is exercised.

(d)  Notwithstanding any provision hereof to the contrary, the outstanding principal balance of this Note, and all accrued but unpaid interest hereon, shall be due and payable 180 days following the Initial Maturity Date.

Late Payment Penalty. In the event that Maker fails to pay any amount when due, Maker agrees to pay a late charge equal to ten percent (10%) of the overdue amount. Such late charge shall be due and payable upon demand. Maker acknowledges that it would be extremely difficult or impracticable to determine Holders actual damages resulting from any late payment, and this late charge is a reasonable estimate of those damages. Acceptance of any late charge shall not limit any of Holders other rights or remedies under this Note or the Stock Purchase Agreement.

Payments. All payments required or permitted herein (principal and interest) shall be made to the address from time to time designated by the Holder and shall be paid not later than 5 p.m. (Minnesota time) on the day when due. All payments shall first be applied to interest accrued to the date of payment and the balance of such payment, if any, shall be applied to the unpaid principal remaining due hereon; provided, however, that upon the occurrence of an Event of Default (as defined herein) payment may first be applied to any late charges or sums advanced (if any) by the Lender for the payment of collection costs or other charges or fees (including reasonable attorneys fees). For all purposes herein, the date of payment shall be the date such payment is actually received by the Holder. Payment received by check or draft shall be credited as of the date delivered.

Security. The Borrower's obligations hereunder shall be secured by (i) a pledge of the capital

stock of Available Money pursuant to a Stock Pledge Agreement of even date herewith (the "Stock Pledge Agreement"), (ii) the guaranty and suretyship of Money Centers of America, Inc. pursuant to a Corporate Guaranty of even date herewith, and (iii) the guaranty and suretyship of Available Money pursuant to a Corporate Guaranty of even date herewith.

    **Events of Default.** The occurrence of any one or more of the following events shall constitute an "Event of Default" hereunder:

        (a)  the Borrower shall fail to pay when due, any installment of principal or interest or fee payable hereunder or any Obligation within 10 days following the date when due;

        (b)  the Borrower shall fail to observe or perform any other material obligation or covenant required to be observed or performed by it hereunder or under the Stock Pledge Agreement;

        (c)  the Borrower shall admit its inability to pay its debts as they mature, or shall make an assignment for the benefit of its creditors;

        (d)  any event of default under the Borrower's primary borrowing facility as a result of which the lender thereunder has declared the principal balance thereof to be due and payable;

        (e)  proceedings in bankruptcy, or for reorganization of the Borrower, or for the readjustment of any of its debts under Bankruptcy Code, as amended, or any part thereof, or under any other laws, whether state or federal, for the relief of debtors, now or hereafter existing, shall be commenced by or against the Borrower and, if commenced against the Borrower, shall not be discharged within ninety (90) days of their commencement; or

        (f)  a receiver or trustee shall be appointed for the Borrower or for any substantial part of its assets, or any proceedings shall be instituted for the dissolution or the full or partial liquidation of the Borrower, and such receiver or trustee shall not be discharged within ninety (90) days of its appointment;

    **Acceleration.** Immediately upon the occurrence and during the continuation of any Event of Default, the Lender hereof, at its sole option, and without further notice may declare in writing the entire unpaid principal of this Note together with all interest accrued thereon, to forthwith become due and payable.

    **Notices.** All notices or demands required or permitted to be given pursuant to the terms hereof shall be effective on the date of deposit in the U.S. mails if addressed to the the Lender or the Borrower at its last known address as appropriate, postage prepaid, registered or certified mail, return receipt requested.

    Time is of the essence hereof.

    **Costs.** Maker agrees to pay all costs of collection, including reasonable attorneys fees, in case payment of this Note is not made in accordance with its terms.

    **Governing Law; Jurisdiction.** This Note is delivered and made in and shall in all respects shall be construed pursuant to the laws of Minnesota and any and every legal proceeding arising out of or in connection with this Note shall be brought in the appropriate courts of the State of Minnesota, each of the parties hereby consenting to the exclusive jurisdiction of said courts for this purpose.

    **Remedies.** The remedies of the Lender as provided herein, or in the Stock Purchase Agreement, shall be cumulative and concurrent, and may be pursued singularly, successively or together, in the sole discretion of the Lender, and may be exercised as often as occasion therefore shall arise. No act of omission or commission of the Lender, including specifically any failure to exercise any right, remedy or recourse, shall be deemed to be a waiver or release of the same; such waiver or release to be effected only through a written document executed by the Lender and then only to the extent specifically recited therein.  Without limiting the generality of the preceding

PHIL1 552321-5

sentence, acceptance by the Lender of any payment with or without knowledge of the occurrence of Event of Default by Maker shall not be deemed a waiver of an Event of Default, and acceptance by the Lender of any payment in an amount less than the amount then due hereunder shall be an acceptance on account only and shall not in any way affect the existence of an Event of Default hereunder or under the Stock Purchase Agreement. A waiver or release with reference to any one event shall not be construed as continuing, as a bar to, or as a waiver or release of, any subsequent right, remedy, or recourse as to a subsequent event.

Maximum Interest Rate. All agreements between Maker and the Lender are expressly limited so that in no contingency or event whatsoever, whether by reason of: error of fact or law; payment, prepayment or advancement of the proceeds hereof; acceleration of maturity of the outstanding principal balance, or otherwise, shall the amount paid or agreed to be paid to the Lender hereof for the use, forbearance or retention of money to be advanced hereunder, including any charges collected or made in connection with the indebtedness evidenced by this Note which may be treated as interest under applicable law, if any, exceed the maximum legal limit (if any such limit is applicable) under United States federal law or state law (to the extent not preempted by federal law, if any), now or hereafter governing the interest payable in connection with such agreements. If, from any circumstances whatsoever, fulfillment of any provision hereof at the time performance of such provision shall be due shall involve transcending the limit of validity (if any) prescribed by law which a court of competent jurisdiction may deem applicable hereto, then, *ipso facto*, the obligation to be fulfilled shall be reduced to the limit of such validity, and if from any circumstances, the Lender shall ever receive as interest an amount which would exceed the maximum legal limit (if any such limit is applicable), such amount which would be excessive interest shall be applied to the reduction of the outstanding principal balance due hereunder and not to the payment of interest or, if necessary, rebated to the Borrower. This provision shall control every other provision of all agreements between Maker and the Lender.

Survival of Obligations. In the event that at any time any payment received by the Lender hereunder shall be deemed by final order of a court of competent jurisdiction to have been a voidable preference or fraudulent conveyance under the bankruptcy or insolvency laws of the United States, or shall otherwise be deemed to be due to any party other than the Lender, then, in any such event, the obligation to make such payment shall survive any cancellation of this Note and/or return thereof to Maker and shall not be discharged or satisfied by any prior payment thereof and/or cancellation of this Note, but shall remain a valid and binding obligation enforceable in accordance with the terms and provisions hereof, and the amount of such payment shall bare interest at the Default Rate from the date of such final order until repaid hereunder.

Waiver. The Maker hereby expressly waives presentment, demand, notice of dishonor, notice of nonpayment and all other notices and demands in connection therewith or in the nature thereof.

FROM KLEHR HARRISON                    (WED) 1. 21' 04 16:18/ST. 16:15/NO. 4862034594 P  7

Note this ___ IN WITNESS WHEREOF, the undersigned, intending to be legally bound, has duly executed this
_6_ day of January, 2004

IGAMES ENTERTAINMENT, INC.

By: _____ (SEAL)
Name:   Christopher M. Wolfington
Title:    CEO


CHEX SERVICES, INC.

By: _____ (SEAL)
Name:   IJAZ ANWAR
Title:   C.F.O.


PHLI 552321-5

# Available Money, Inc.
## Statements of Income (Loss)
### January - October 2004

| | Jan 04 | Feb 04 | Mar 04 | Apr 04 | May 04 | Jun 04 | Jul 04 | Aug 04 | Sep 04 | Oct 04 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Ordinary Income/Expense** | | | | | | | | | | | |
| **Income** | | | | | | | | | | | |
| Revenues | 57,406 | 86,940 | 66,012 | 838,283 | 894,011 | 828,605 | 917,356 | 860,775 | 828,110 | 869,341 | 6,254,027 |
| **Total Income** | 57,406 | 86,940 | 66,012 | 838,283 | 894,011 | 828,605 | 917,356 | 860,775 | 828,110 | 869,341 | 6,254,027 |
| **Cost of Goods Sold** | | | | | | | | | | | |
| ATM Maintenance | 0 | 0 | 0 | 475 | 475 | | | | | | 950 |
| ATM Processing Fees | 0 | 0 | 0 | 3,247 | 2,147 | 2,347 | 2,012 | 2,037 | 2,142 | 2,972 | 16,654 |
| Charge Terminal Fees | 0 | 0 | 0 | 1,600 | 188 | 1,125 | | 1,500 | 376 | 375 | 5,063 |
| Cash Replenishment | 0 | 0 | 0 | 61,916 | 4,597 | 75,035 | 42,616 | 42,482 | 45,238 | 45,070 | 316,958 |
| Commissions | 0 | 0 | 0 | 618,897 | 554,940 | 472,482 | 529,820 | 544,811 | 516,825 | 567,580 | 3,703,241 |
| Dial Up Fees | 0 | 0 | 0 | 1,976 | 2,216 | 1,325 | 945 | 945 | 985 | 1,735 | 10,658 |
| Lease Fee - Depreciation | 0 | 0 | 0 | 38,935 | 36,035 | 36,936 | 36,935 | 36,935 | 39,935 | 34,935 | 285,545 |
| Pricing Tier Expenses | 0 | 0 | 0 | 33,794 | 35,415 | 33,175 | 36,827 | 34,726 | 33,282 | 34,757 | 241,778 |
| Rents | 0 | 0 | 0 | 48,018 | 42,321 | 42,321 | 41,771 | 41,051 | 45,563 | 41,619 | 300,663 |
| Repairs | 0 | 0 | 0 | 36,670 | 20,571 | 20,476 | 20,518 | 22,309 | 22,159 | 22,129 | 171,280 |
| Surcharge Support | 0 | 0 | 0 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 700 |
| Telecommunications | 0 | 0 | 0 | 24,262 | 24,122 | 24,406 | 24,810 | 24,386 | 23,945 | 23,297 | 189,017 |
| Terminal Access Fees | 0 | 0 | 0 | 4,650 | 4,650 | 4,650 | 4,650 | 4,650 | 4,650 | 4,650 | 31,659 |
| **Total COGS** | 0 | 0 | 0 | 770,892 | 726,576 | 714,258 | 747,054 | 756,434 | 794,657 | 810,341 | 6,282,206 |
| **Gross Profit** | 57,406 | 86,940 | 66,012 | 67,676 | 165,436 | 112,549 | 170,304 | 113,341 | 93,263 | 59,000 | 991,819 |
| **Expenses** | | | | | | | | | | | |
| Wire Transfer Fees | | | | | | | 16 | 16 | 45 | 48 | 123 |
| Facility Fees | 57,695 | 64,234 | 68,684 | 1,708 | 1,708 | 1,708 | 1,708 | 1,708 | 1,708 | 1,708 | 11,958 |
| Amortization Expense | | | | 89,288 | 91,503 | 89,288 | 68,664 | 68,664 | 262,211 | 100,088 | 850,194 |
| Bank Service Charges | | | | 0 | 28 | 28 | 0 | 0 | 0 | 137 | 189 |
| Contributions | | | | 0 | 0 | 0 | 0 | 0 | 0 | 3,500 | 3,500 |
| Conversion Fees | 42,719 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 42,719 |
| Depreciation Expense | 1,116 | 1,046 | 1,116 | 1,032 | 1,118 | 1,082 | 1,118 | 1,118 | 1,082 | 1,159 | 11,040 |
| Licenses and Permits | | | | 45 | | | | 100 | | | 145 |
| Miscellaneous | 207 | 810 | 413 | 10,717 | 227 | 0 | 0 | 0 | 450 | 0 | 11,393 |
| Payroll Taxes | | | | 80 | | | | | | | 1,450 |
| Professional Fees | | | | | 3,883 | | | | | | 3,843 |
| Taxes | | | | 40 | 47 | | | | | | 908 |
| Utilities | 2,700 | | | | | | 810 | 600 | 308 | 988 | 13,500 |
| Wages | | 5,400 | 5,400 | | | | | | 560 | | |
| **Total Expense** | 104,833 | 71,490 | 75,595 | 102,630 | 98,522 | 92,103 | 72,316 | 72,205 | 265,354 | 98,028 | 1,083,875 |
| **Net Ordinary Income** | (46,926) | 16,450 | (9,583) | (33,954) | 66,913 | 20,446 | 97,988 | 41,136 | (171,102) | (39,028) | (92,056) |
| **Other Income/Expense** | | | | | | | | | | | |
| **Other Expense** | | | | | | | | | | | |
| Interest Expense | 0 | 0 | 0 | 129,893 | 148,228 | 116,631 | 114,029 | 111,663 | 105,980 | 144,182 | 870,194 |
| **Total Other Expense** | 0 | 0 | 0 | 129,593 | 148,228 | 116,631 | 114,029 | 111,663 | 105,980 | 144,182 | 870,194 |
| **Net Other Income** | 0 | 0 | 0 | (128,593) | (148,228) | (116,631) | (114,029) | (111,663) | (105,369) | (144,182) | (870,194) |
| **Net Income** | (46,926) | 16,450 | (9,583) | (164,947) | (81,314) | (96,084) | (16,940) | (70,527) | (276,470) | (183,208) | (932,250) |

Restricted For Management Use Only.

Exhibit 13



## AMENDMENT NO. 1 TO LOAN AND SECURITY AGREEMENT

THIS AMENDMENT NO. 1 TO LOAN AND SECURITY AGREEMENT, as amended, restated, extended or otherwise modified by the parties hereto, their successors and assigns, from time to time, including, without limitation, all exhibits, schedules and attachments hereto ("Agreement"), is made and entered into this ___ day of April, 2004, by and between iGAMES ENTERTAINMENT, INC., a corporation organized and existing under the laws of Nevada with a principal place of business located at 700 S. Henderson Road, Suite 210, King of Prussia, PA 19406, ("iGames"), AVAILABLE MONEY, INC., a Nevada corporation with a principal place of business at 700 S. Henderson Road, Suite 210, King of Prussia, PA 19406 ("Available Money", and collectively with iGames, the "Borrowers") and MERCANTILE CAPITAL, L.P., with offices located at 300 E. Lancaster Ave., Suite 308, Wynnewood, PA 19096-2106 ("Lender").

### WITNESSETH:

### BACKGROUND

iGames is engaged in the business of providing check cashing, credit card advances, POS Debit, ATM and related financial and business services in casinos and other business locations (the "Services"). Pursuant to the terms of that certain Loan and Security Agreement between iGames and Lender dated November 26, 2003 (the "Loan Agreement"), Lender made certain loans, advances and extensions of credit to and for the benefit of iGames from time to time up to a limit of $250,000. The loans made under the Loan Agreement are evidenced by a Demand Note dated November 26, 2003 (the "Demand Note", and, collectively with the Loan Agreement, and all related agreements, instruments and documents, the "November 2003 Loan Documents").

As collateral security for all of iGames' existing and future indebtedness, liabilities and obligations to Lender pursuant to the Loan Agreement, iGames granted to Lender and Lender holds a lien on and security interest in all tangible and intangible assets of iGames. To further induce Lender to extend loans, advances and extensions of credit under the Loan Agreement, Money Centers of America, Inc., a Delaware corporation with a principal place of business at 700 S. Henderson Road, Suite 210, King of Prussia, PA 19406 ("MCA"), guaranteed, as surety, all obligations of iGames to Lender. To further induce Lender to make the loans and advances under the Loan Agreement, iGames pledged to Lender one million shares (1,000,000) of unregistered common stock.

iGames has acquired Available Money, and in order to provide capital to meet its obligations principally arising out of the acquisition of Available Money, Borrowers have requested that Lender amend the Loan Agreement to extend a twelve (12) month term loan ("Term Loan") to Borrowers. The Term Loan shall be in the amount of Two Million, Fifty Thousand Dollars ($2,050,000.00), and shall be secured by the Collateral, as such term is defined in Section 3 herein. Lender is willing to amend the Loan Agreement to extend the Term Loan upon the terms and conditions hereinafter set forth.

IN CONSIDERATION of the mutual covenants and undertakings contained herein, and for other good and valuable consideration, the receipt of which is hereby acknowledged, the parties, intending to be legally bound, agree as follows:

1.     **DEFINITIONS.** All terms defined in Schedule 1 and all other capitalized terms defined in this Agreement, shall have the meanings ascribed to them herein when used in the Loan Documents, unless otherwise defined therein.

2.     **JOINDER AND ASSUMPTION.** Available Money hereby joins in, assumes the Obligations under, and agrees to be bound by all terms, covenants and conditions set forth in the Loan Agreement, the November 2003 Loan Documents and all other documents, agreements and instruments related thereto as if Available Money were an original party to the Loan Agreement and each such document, agreement and instrument. Accordingly, effective immediately, Available Money is a "Borrower" under the Loan Agreement and each of the other November 2003 Loan Documents.

3.     **ACKNOWLEDGEMENT OF EXISTING INDEBTEDNESS.** Borrowers hereby agree that in addition to all amounts that may be loaned or advanced by Lender to Borrowers hereunder, there remains outstanding and uncollected advances and loans made by Lender, as the case may be, under the Loan Agreement and the Demand Note (the "Outstanding Balance"). Borrowers hereby further acknowledge that Borrowers remain jointly and severally liable for payment in full of the Outstanding Balance, and this Agreement, in addition to securing all amounts advanced hereunder, secures the payment in full of the Outstanding Balance. The Outstanding Balance is hereby part of the Obligations under this Agreement.

Exhibit 14

4.    THE LOAN.

4.1    The Term Loan.  Subject to the terms and limitations hereof, Lender shall advance to Borrowers, and Borrowers all borrow from Lender, the sum of Two Million Fifty Thousand Dollars ($2,050,000.00).

4.2    The Term Loan Note.  The Term Loan is evidenced by a promissory note (the "Term Loan Note") in the form of Exhibit "B".  The Term Loan Note does not supersede or extinguish, and is not in replacement of, the Demand Note, which remains in full force and effect.

4.3    Disbursement of the Loan.  The Lender will credit the proceeds of the Loans to or for the benefit of Borrowers via wire transfer or ACH to such accounts as instructed by Borrowers, except for the payment of amounts due to or for the benefit of Lender hereunder which shall be made directly to Lender.

4.4    Interest Rates and Payments of Interest.  Interest will accrue at the rate of seventeen percent (17%) per annum and shall be calculated on the basis of a 360-day year, counting the actual number of days elapsed, on the principal balance of the Loans from time to time outstanding, and shall be payable on the first (1st) day of each month commencing on the first (1st) day of the first month after the Closing Date and continuing on the same day of each month thereafter until all Obligations are satisfied in full.

4.5    Fees and Expenses.  Borrowers hereby agree to pay, at Closing, a facility fee equal to two percent (2%) of the principal amount of the Term Loan (i.e. $41,000.00).  The Borrowers shall promptly pay to or on behalf of Lender from time to time the reasonable fees and expenses of Lender's counsel, appraisers, environmental consultants, auditors and other expenses of Lender in connection with this Agreement and the Obligations.

5.    COLLATERAL SECURITY.

5.1    Grant of Security Interests.  As security for the timely satisfaction of all Obligations, Borrowers hereby grant Lender a continuing lien on and security interest in and to the Collateral, as defined in Schedule 1 attached hereto, which, together with all of Borrowers' other property of any kind held by Lender, shall stand as one general, continuing collateral security for all Obligations of the Borrowers to Lender and may be retained by Lender until all Obligations have been satisfied in full.

5.2    Priority of Liens.  Lender's Liens in and to the Collateral shall be first and prior Liens to all Liens against the collateral now existing or hereafter arising ("Lender's Prior Security Interest").

5.3    Financing Statements.  Borrowers hereby: (a) authorize Lender to file any financing statements (including amendments thereto and continuation statements thereof) in form satisfactory to Lender as Lender may specify; (b) agree to take such other steps as Lender may direct, including the noting of Lender's lien on the Collateral and on any certificates or documents of title therefor, all to perfect Lender's liens on and security interests in the Collateral; and (c) agree to pay or reimburse Lender for all costs and taxes of filing or recording the same in such public offices as Lender may designate. In addition to the foregoing, and not in limitation thereof, a carbon, photographic, or other reproduction of this Agreement shall be sufficient as a financing statement and may be filed in any appropriate office in lieu thereof. Borrower hereby irrevocably appoints Lender as its attorney-in-fact (without requiring Lender to act as such) to execute any financing statements, including amendments thereto and continuation statements thereof in the name of Borrower, and to perform all other acts and deeds that Lender deems appropriate to perfect and continue its security interest in, and to protect and preserve, the Collateral.

5.4    Lender's Special Rights.  Lender (through any of its officers, employees, auditors or agents) shall have the right in its sole discretion and without notice to Borrowers at any time or times hereafter to: (a) confirm Payment Receivable balances and verify the validity of Payment Receivables or any other matter relating to any Payment Receivable by mail, telephone, or otherwise, in the name of Borrowers or Lender or any other name Lender so chooses; (b) notify all Payment Parties that Lender has a security interest in the Payment Receivables; (c) direct all Payment Parties to make payment to Lender of all Payment Receivables; (d) enforce payment and collect, by legal proceedings or otherwise, any Payment Receivables in the name of Lender; and (e) during Borrower's usual business hours, or during the usual business hours of any third party having control over the Records of Borrower, (i) conduct such audits Lender deems appropriate of Borrower's books and Records, and (ii) inspect and verify Borrower's books and Records in order to verify the amount or condition of, or any other matter relating to, the Collateral and Borrowers' financial condition.

5.5    Insecurity Clause.  Borrowers agree that if any of the Collateral shall at any time be insufficient or otherwise unsatisfactory to Lender, Borrowers shall either (a) within five (5) days of notice of such Collateral deficiency, reduce the amount of the outstanding Obligations to an amount such that the value of the Collateral in relation to the outstanding Obligations is satisfactory to Lender, or (b) after such five (5) day period, on demand, forthwith pledge, assign, transfer or grant Lender a continuing lien on and security interest in and to, or deposit with Lender as part of the Collateral, additional property satisfactory to Lender.

# SECURED PROMISSORY NOTE

$5,000,000                                                                                 March 8, 2004

FOR VALUE RECEIVED, the undersigned, Chex Services, Inc., a Minnesota corporation (the "Maker"), hereby promises to pay to the order of Equitex, Inc., a Delaware corporation or its assigns (the "Payee"), at such place as the Payee may designate in writing, the principal sum of Five Million Dollars ($5,000,000), under the terms set forth herein.

1.    <u>Interest</u>.  The unpaid principal balance hereof from time to time outstanding shall bear interest from the date hereof at the rate of 7% per annum;  provided, that upon the occurrence of an event of default, the unpaid principal and interest hereof existing from time to time following the event of default, and up to the date such event of default is cured with the consent of Payee, shall bear interest at the increased rate of 10% per annum, and the incremental increase in interest due under such circumstance shall be added to each installment payment as provided in Section 2 below.

2.    <u>Payment</u>.  Subject to adjustment upon an event of default as provided under Section 1, the payments of principal and interest hereunder are payable as follows:

(a)    Payments in cash of interest only are payable in arrears on April 8, March 8 and June 8, 2004; and

(b)    Commencing on July 8, 2004, and on the 8th day of each of the following 41 months, Maker shall pay amortized principal and interest on this Note of $134,574.01 (the "Monthly Scheduled Payment").

3.    <u>Seniority</u>.  Except as otherwise provided hereunder, the obligations of Maker hereunder are to be treated as "Senior Debt," and as such the Maker will not create, incur, assume or guarantee any debt with respect to any money borrowed (including principal, interest and penalties and the expenses of collection or administration) from any third party, including any bank, finance company, trust company, pension, trust, insurance company or other financial institution, unless the instrument under which such debt is created, incurred, assumed or guaranteed expressly provides that such debt and all other obligations assumed in connection therewith are subordinate to the obligations of the Maker hereunder by containing a provision which defines Senior Debt as provided for in this paragraph and reads substantially as follows, or of like tenor and effect:

"The holder, by acceptance of the terms of this loan/guarantee/etc. (the "Obligation"), agrees that the payment of the principal of and the interest under the Obligation is hereby expressly subordinated to the payment in full of all Senior Debt.  The maker shall not pay any amounts pursuant to this Obligation until all of such Senior Debt of the maker has been paid in full *unless* the holders of the Senior Debt or the instruments by which such Senior Debt was created,

CX/EX01424

Exhibit 15

permit such payment pursuant to this Obligation. Upon (i) the maturity of Senior Debt, including by acceleration or otherwise, or (ii) any distribution of the assets of the maker upon dissolution, winding up, liquidation or reorganization of the maker, the holders of such Senior Debt are entitled to receive payment in full before the holder of this Obligation is entitled to receive any payment. If a payment not permitted by the holders of Senior Debt or by the instruments creating such Senior Debt is made to the lender of this Obligation before all such applicable Senior Debt has been paid in full or provision has been made for such payment, the payment made to the holder must be paid over to the holders of such Senior Debt."

Notwithstanding the foregoing, nothing hereunder prohibits the Maker from guaranteeing any debt incurred by Equitex, Inc. to Pandora Select Partners, LP or Whitebox Hedged High Yield Partners, LP.

4.    <u>Security</u>.  The full and timely payment of this Note shall be secured by the assets of Maker under a Security Agreement of this date (the "Security Agreement").

5.    <u>Optional Prepayments</u>.  The Maker may prepay this Note, in whole or in part, and in cash, without penalty by Maker upon fifteen days written notice to Payee.  Prepayments shall be applied first to accrued but unpaid interest and then to principal.

6.    <u>Default</u>.

      (a)    The occurrence of any one or more of the following events shall constitute an event of default, upon which Payee may declare the entire principal amount of this Note, together with all accrued but unpaid interest, to be immediately due and payable in cash:

            (i)    The Maker shall fail to make any required payment of principal or interest when due, and such failure shall continue for 10 days after the due date thereof.

            (ii)    The Maker shall be in material default of any term or provision of the Security Agreement of this date between Maker and Payee, and such default shall continue for 20 days after notice of such default is given to Maker by Payee.

            (iii)    The Maker shall become insolvent, or if any bankruptcy, reorganization, debt arrangement or other proceeding under any bankruptcy or insolvency law shall be instituted by or against the Maker, which is not terminated within 90 days of the institution thereof.

      (b)    Without limiting the above, the Maker acknowledges that payments on the various scheduled due dates in Section 2 are of essence and that any failure to timely pay any installment of principal or interest (whether as permitted by cash, with stock or by a combination

VER2

MPLS-Word 46033.1

CX/EX01425

thereof and within any permitted grace period above) permits Payee during the existence of an event of default to declare this Note immediately due in cash in its entirety without any prior notice of any kind to Maker.

7.    <u>Restrictions on Transfer</u>.   The Payee of this Note, by acceptance hereof, agrees, represents and warrants that this Note is being acquired for investment purposes, that the Payee has no present intention to resell or otherwise dispose of all or any part of this Note and that the Payee will not offer, sell or otherwise dispose of all or any part of this Note except under circumstances which will not result in a violation of the Securities Act of 1933 or applicable state securities laws.   The Maker may condition any transfer, sale, pledge, assignment or other disposition on the receipt, from the party to whom this Note is to be so transferred, of any representations, agreements and legal opinions reasonably requested by the Maker in order to permit such transfer, sale, pledge, assignment or other disposition to be made pursuant to exemptions from registration under federal and applicable state securities laws.

8.    <u>Applicable Law</u>. THE VALIDITY, CONSTRUCTION AND ENFORCEABILITY OF THE NOTE SHALL BE GOVERNED BY THE INTERNAL LAWS OF THE STATE OF MINNESOTA, WITHOUT GIVING EFFECT TO CONFLICT OF LAWS PRINCIPLES THEREOF.

9.    <u>Waivers</u>.  The Maker hereby waives presentment for payment, notice of dishonor, protest and notice of payment and, except as otherwise provided herein, all other notices of any kind in connection with the enforcement of this Note.

10.    <u>No Setoffs</u>.   The Maker shall pay principal and interest under the Note without any deduction for any setoff or counterclaim.

11.    <u>Costs of Collection</u>.   If this Note is not paid when due, the Maker shall pay Payee's reasonable costs of collection, including reasonable attorney's fees.

Chex Services, Inc.

By _____

James Welbourn, Chief Executive Officer

CX/EX01426

Execution Copy

## LOAN AND SECURITY AGREEMENT

THIS LOAN AND SECURITY AGREEMENT, including, without limitation, all schedules and attachments hereto (this "Loan Agreement") is made and entered into this 26th day of November, 2003 by and between iGAMES ENTERTAINMENT, INC. a Nevada corporation ("Borrower"), and MERCANTILE CAPITAL, L.P., a Pennsylvania limited partnership ("Lender").

## W I T N E S S E T H :

WHEREAS, Borrower has requested that Lender create a credit facility (the "Credit Facility") for Borrower in the principal amount of Two Hundred Fifty Thousand Dollars ($250,000) (the "Credit Facility Amount") to be drawn down by Borrower from time to time, and to be used by Borrower for working capital (each amount that is drawn from the Credit Facility and outstanding, from time to time, the "Loan Amount, " and in the aggregate, the "Loan Amounts"); and

WHEREAS, Lender has agreed to create the Credit Facility, subject to the terms, conditions and covenants set forth in the Loan Agreement and in other documents, instruments and agreements to be entered into in connection with the Loan.

NOW, THEREFORE, in consideration of the mutual promises herein made and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto intending to be legally bound, hereby agree as follows:

1. __DEFINITIONS.__  All capitalized terms in this Agreement shall have the meanings ascribed to them in Schedule 1 or where used, as the case may be.

2. __THE LOAN.__

2.1     __Loan.__  On the date hereof, Lender shall create the Credit Facility for the Credit Facility Amount.  The parties agree that the Credit Facility Amount shall be evidenced by a demand note of even date herewith (the "Note"), in the form attached hereto as Exhibit A, and that the lesser of the Credit Facility Amount, or the Loan Amount, as the case may be, along with all of the Obligations, shall be payable upon written DEMAND of Lender after January 31, 2004, upon five days written notice to the Borrower (the period from the Closing Date through January 31, 2004, the "Initial Term").

2.2     __Disbursement of the Loan.__  In connection with periodic draw-downs of Loan Amounts from the Credit Facility, the Borrower shall, from time to time, submit draw-down certificates (each, a "Draw Down Certificate"), in the form attached hereto as Exhibit B. Each Draw-Down Certificate shall state a Loan Amount (provided, however, that in no instance shall the aggregate Loan Amounts exceed the Credit Facility Amount), the purpose for which the Loan Amount shall be

1

Exhibit 16·     **CONFIDENTIAL**     IGAMES02721

used and shall be counter-signed by both the Borrower and the Surety. The Lender, in its sole and absolute discretion, shall determine whether or not to lend the requested Loan Amount set forth in the Draw-Down Certificate. In the event that the requested Loan Amount is approved by the Lender, the Lender will credit the proceeds of the Loan Amount in question to or for the benefit of Borrower via wire transfer or ACH to Borrower's operating account as Borrower shall designate by written notice to Lender, except for the payment of amounts due to or for the benefit of Lender hereunder which shall be made directly to Lender.

2.3    Interest Rates and Payments of Interest. Interest (the "Interest") shall accrue on the outstanding Loan Amounts from the date of wire at a rate per annum equal to Wilmington Trust of Pennsylvania's "prime rate" plus 10%, floating with daily resets (the "Interest Rate"), calculated on the basis of a 360-day year counting the actual number of days elapsed (provided, however, that such interest rate shall, in no instance, be below 14.5%). Except in an Event of Default, as set forth in Section 8, Obligations due and owing under the Note shall be repayable in whole or part as set forth in Section 2.1. Notwithstanding the foregoing, Interest along with the Collateral Management Fee (as defined in Section 2.4) with respect to the Loan Amount from the period from the Closing Date through January 31, 2004, as set forth in the Draw-Down Certificate tendered at Closing, along with any unpaid expenses as set forth in Section 2.5, shall be due and payable upon the Closing Date, and may be debited from such initial Loan Amount. After the Initial Term, Interest payments and Collateral Management Fee payments shall be received monthly in arrears within five (5) Business Days after the end of the previous calendar month.

2.4    Collateral Management Fee.  Borrower hereby agrees to pay to Lender a non-refundable collateral management fee ("Collateral Management Fee") in an amount equal to One Percent (1%) of the Loan Amount, each calendar month. The Collateral Management Fee shall constitute an additional Obligation hereunder secured by the Collateral.

2.5    Expenses. The Borrower shall promptly pay to or on behalf of Lender, from time to time, the reasonable fees and expenses of Lender's counsel, appraisers, auditors, all charges and fees for recording or perfecting interests in the Collateral and other expenses of Lender in connection with this Agreement and the creation of the Credit Facility. Any expenses hereunder shall constitute an additional Obligation hereunder secured by the Collateral

3.    COLLATERAL SECURITY.

3.1    Grant of Security Interests. As security for the timely satisfaction of all Obligations, Borrower hereby assigns, transfers and sets over to Lender all of its right, title and interest in and to, and grants Lender a continuing lien on and security interest in and to those of the Borrower's Assets described in Schedule 2 wherever located and whenever acquired, together with all replacements therefor and all cash and non-cash Proceeds (including, but without limitation, insurance

2

CONFIDENTIAL

IGAMES02722

**Documents Reviewed**

1.  Complaint in the United States District Court for the District of Delaware, iGames Entertainment, Inc., Plaintiff v. Chex Services, Inc. and Equitex, Inc., Defendants, C.A. No. 04-180
2.  Defendant Equitex, Inc.'s Answers to Plaintiffs first set of Interrogatories
3.  Letter from Lawrence D. Rovin to Henry Fong and James P. Welbourn dated March 12, 2004, re: Stock Purchase Agreement dated November 3, 2003 (Bates Numbers: iGames 02948 to 02952)
4.  Loan and Security Agreement between iGames Entertainment, Inc. and Mercantile Capital, L.P. (Bates Numbers: iGames 02721 to 02779)
5.  Mercantile Capital, L.P. Summary of Interest and Fees on $250,000 Credit Facility for the period from December 1, 2003 to November 30, 2004
6.  Stock Purchase Agreement for the Acquisition of Chex Services, Inc. by iGames Entertainment, Inc. from Equitex, Inc., November 3, 2003
7.  Letter from Craig F. Zappetti to Rider Bennett dated March 15, 2004 re: Termination Letter (Bates Numbers: CX/EX 02413 to 02415)
8.  Answering brief in opposition to Motion for Summary Judgment dated October 1, 2004
9.  Assignment Agreement between iGames Entertainment, Inc. and Mercantile Capital, L.P. (Bates Numbers: iGames 02719 to 02720)
10. Letter from Jeremy Stein, President, iGames Entertainment, Inc. to Christopher M. Wolfington dated November 11, 2003 (Bates Numbers: iGames 003047 to 003048)
11. Affidavit of Ijaz Anwar in support of Chex Services, Inc.'s Motion for Summary Judgment dated August 24, 2004
12. Letter from Samuel K. Freshman to Chris Wolfington dated March 22, 2004 (Bates Number: GT 0091)
13. Equitex, Inc. Minutes of the Board of Directors Meetings (Bates Numbers: CX/EX 20295 to 20317)
14. $5,000,000 purchase of promissory notes and warrants of Equitex, Inc. by Pandora Select Partners, L.P. and Whitebox Hedged High Yield Partners, L.P. dated March 8, 2004 (Bates Numbers: CX/EX 01374 to 01562)
15. $4,000,000 Term Loan Note between iGames Entertainment, Inc. and Chex Services, Inc. dated January 6, 2004
16. Amendment No. 1 to Loan and Security Agreement between iGames Entertainment, Inc.; Available Money, Inc.; and Mercantile Capital, L.P. for $2,050,000 dated April 3, 2004
17. Mercantile Capital, L.P. Interest Statements for $2,050,000 loan for the period from April 30, 2004 to November 30, 2004.
18. iGames Proposal – Management Perspective (Bates Numbers: CX/EX 02132 to 02134)
19. Loan and Security Agreement between iGames Entertainment, Inc. and Mercantile Capital, L.P. for $250,000 Credit Facility dated November 26, 2003.

Exhibit 17

20. Equitex/Whitebox Term Sheet dated Friday, January 9, 2004 (Bates Numbers: CX/EX 02345 to 02348)
21. Equitex, Inc., Form 10K for the fiscal year ended December 31, 2002 (Bates Numbers: GT 0184 to 0293)
22. Equitex, Inc., Form 10Q for the Quarter ended March 31, 2003 (Bates Numbers: GT 0096 to 0123)
23. Equitex, Inc., Form 10Q for the Quarter ended June 30, 2003 (Bates Numbers: GT 0124 to 0153)
24. Equitex, Inc., Form 10Q for the Quarter ended September 30, 2003 (Bates Numbers: GT 0154 to 0183)
25. iGames Entertainment, Inc., Form 10QSB for the fiscal quarter ended June 30, 2003 (Bates Numbers: GT 0338 to 0351)
26. iGames Entertainment, Inc., Form 10QSB for the fiscal quarter ended September 30, 2003 (Bates Numbers: GT 0352 to 0367)
27. iGames Entertainment, Inc., Form 10QSB for the fiscal quarter ended December 31, 2003 (Bates Numbers: GT 0368 to 0384)
28. iGames Entertainment, Inc., Form 8K dated January 2, 2004 (Bates Numbers: GT 0438 to 0442)
29. iGames Entertainment, Inc., Form 8K/A, Amendment No. 1, dated January 2, 2004 (Bates Numbers: GT 0388 to 0420)
30. iGames Entertainment, Inc., Form 8K/A, Amendment No. 1, dated January 6, 2004 (Bates Numbers: GT 0421 to 0437)
31. iGames Entertainment, Inc., Form 10KSB, for the fiscal year ended March 31, 2003 (Bates Numbers: GT 0294 to 0337)
32. iGames Entertainment, Inc., Form PRE 14C filed January 23, 2004
33. Klehr, Harrison, Harvey, Branzburg & Ellers, LLP invoices for services from October 23, 2003 to December 28, 2004
34. Robert J. Kratz & Co. invoices for services from October 2003 to March 2004
35. Letter from Gregory B. Taylor to Board of Directors, Equitex, Inc. dated April 2, 2004 re: Equitex/iGames Analysis Update (Bates Numbers: GT 0001 to 0017)
36. News release from Equitex dated March 31, 2004 (Bates Numbers: GT 0018 to 0019)
37. Memo from Henry Fong to Equitex Board of Directors re: Information and Agenda for Board of Directors Meeting, dated March 24, 2004 (Bates Numbers: CX/EX 03717 to 03718)
38. iGames/Equitex Transaction Analysis March 2004 (Bates Numbers: iGames 02780 to 02809)
39. Report from CBIZ Valuation Group to Board of Directors Equitex, Inc. dated November 7, 2003 re: Chex Services (Bates Numbers: CX/EX 20318 to 20349)
40. Report from CBIZ Valuation Group to Board of Directors Equitex, Inc. dated October 7, 2003 (Bates Numbers: CX/EX 20350 to 20370)
41. Memo from Thomas P. McGonigle to James L. Beausoleil re: iGames Statutory Interest
42. Federal Discount Rates from Internet website http:\\www.frbdiscountwindow.org/current discount rates.cfm

43. Transcript of oral deposition:
    a. Ijaz Anwar, September 17, 2004 and December 15, 2004
    b. James Welbourn, September 21, 2004
    c. Christopher Wolfington, September 22, 2004 and December 3, 2004
    d. Henry Fong, December 2, 2004
    e. Jeremy Stein, December 10, 2004
    f. Lawrence David Rovin, Esquire, December 16, 2004
    g. Joseph Breen, January 5, 2005
    h. Kevin D. Meise, January 5, 2005
44. Money Centers of America interest invoices (Bates Numbers: iGames 007696 to 007724)
45. Equitex, Inc. Minutes of the Board of Directors Meeting (Bates Numbers: CX/EX 20295 to 20317)
46. Equitex, Inc. Internet information (Bates Numbers: GT 0092 to 0095)
47. Miscellaneous Documents (Bates Numbers: CX/EX 18777 to 18778 and CX/EX 03719 to 03723; iGames 00256 to 00257; CX/EX 01985; CX/EX 03701 to 03705; GHP 0957; GT0020 to 0028)
48. Available Money, Inc. Amortization Schedule by Category
49. Money Centers of America/iGames Invoice for April 2004
50. ACH Debit/Credit Notification from Stephanie Raglan @ Genpass Technologies to Scott Kruse at Money Centers of America, dated April 22, 2004
51. Available Money, Inc. financial statements, October 31, 2004
52. Available Money, Inc. Depreciation Schedule by Category for the nine months ended 9/30/04



**GOLDENBERG ROSENTHAL, LLP**

BUSINESS ADVISORS • CERTIFIED PUBLIC ACCOUNTANTS

Established 1919

*Celebrating 85 years of client service.*

Located in Metropolitan Philadelphia
101 West Avenue • PO Box 458
Jenkintown, PA 19046-0458

215•881•8800
856•354•6054
215•881•8801 Fax
www.grgrp.com

## ELLIOTT A. ROTH, CPA, MBA, CFE, CVA
*Partner-in-Charge:*
*Accounting & Auditing*
*Quality Control*
*Litigation and Valuation Services*

**CERTIFICATIONS:**

Certified Public Accountant: Pennsylvania, New Jersey & New York
Certified Fraud Examiner (CFE)
Certified Valuation Analyst (CVA)

**AREAS OF EMPHASIS:**

Accounting & Auditing
Investigative & Forensic Accounting
Business Valuations
Litigation Services
Fraud Investigation

**UP CLOSE:**

Elliott Roth, CPA, MBA, CFE, CVA, has extensive experience in accounting and auditing, financial statement presentation, forensic accounting, litigation support and valuations of closely held businesses.  As Partner-in-Charge of the Accounting and Auditing practice, Elliott consults with numerous companies on accounting and financial statement preparation issues.  He also frequently consults with attorneys on litigation related matters.

Elliott has taught at the university level for over 25 years and is a frequent speaker at universities, PICPA seminars, business and professional organizations, law firms and financial institutions. He has published articles in several legal newsletters and periodicals.

Elliott is a summa cum laude graduate of Case Western Reserve University with a B.S. in Accounting, and received his Master's of Business Administration from Drexel University.

**PROFESSIONAL MEMBERSHIPS:**
American Institute of Certified Public Accountants
Pennsylvania Institute of Certified Public Accountants
Philadelphia Chapter of the Pennsylvania Institute of CPAs
  ▪ Committee on Practitioners
New Jersey Society of CPAs
Association of Certified Fraud Examiners
National Association of Certified Valuation Analysts

Exhibit 18

**CIVIC & COMMUNITY
AFFILIATIONS:**

Peter Nero and the Philly Pops
- Board of Directors – Secretary and Treasurer

Greater Philadelphia Chamber of Commerce
National Liberty Museum
Manor College
- Legal Studies Advisory Committee

**TEACHING AND SPEAKING
ENGAGEMENTS:**

Temple University Executive MBA Program
- Adjunct Lecturer 1986 to present

The Foundation of the Pennsylvania Medical Society
- Instructor in Certificate in Medical Leadership and Management Program – 2001 and 2000

*"Fraud Detection and Prevention,"* Pennsylvania Society of Public Accountants, June 2004

*"Fraud in the Workplace,"* The Greater Philadelphia Manufacturers and Distribution Leadership
   Council, June 2004

*"Forensic Accounting,"* Temple University Beta Alpha Psi, October 2004, March 2004, October 2002,
   October 2001, and February 2000

*"Red Flags of Fraud,"* Air Conditioning Contractors of America – Delaware Valley Chapter,
   January 2004

*"Red Flags of Fraud,"* Hospitality Financial and Technology Professionnals
   – Greater Philadelphia Chapter, October 2003

*"Red Flags of Fraud,"* Auto Dealers Association of the Delaware Valley, September 2003

*"Red Flags of Fraud,"* Pennsylvania Institute of Public Accountants, August 2003

*"Red Flags of Fraud,"* various financial and professional organizations, 2003

*"Financial Statement Analysis,"* various professional organizations, 2003

*"Fraud,"* ACSYS Professional Development Seminar, May and September 2002

*"FASB Update,"* Institute of Management Accountants, North Penn Chapter, January 2002

*"Accounting and Auditing Update,"* PICPA Practitioners Conference - June 2002 and 2001

*"Basic Concepts of Business Valuations,"* Pennsylvania State University, November and
   December 2000

*"Accounting and Auditing Update,"* PICPA Accounting and Auditing Conference, December 2000

*"Fraud,"* PICPA Practitioners Conference, June 2000

*"Accounting and Auditing Update,"* Institute of Management Accountants, North Penn Chapter,
   February 2000

*"Fraud and the Audit Function,"* Wilkes University, November 1999

*"Fraud in Accounting,"* PICPA Committee on Practitioners and Robert Morris Associates,
   November 1999

*"What's New in Accounting and Auditing,"* PICPA Practitioners Forum, June 1999

*"Accounting and Auditing Update,"* Institute of Management Accountants, North Penn Chapter,
   November 1998

*"Understanding Financial Statements,"* Safeguard Business Systems, October 1998

**TEACHING AND SPEAKING
ENGAGEMENTS (Continued):**

"*Forensic Accounting and Reporting*," PICPA Practitioners Forum, June 1998

"*What's New in GAAP and GAAS*," Pennsylvania State University, October 1997

"*Fraud and the Small Practitioner*," Pennsylvania Society of Public Accountants, September 1997

"*Fraud and the Independent Accountant*," PICPA Practitioners Forum, June 1997

"*Detecting Fraud in the Workplace*," PICPA Business, Government and Education Committee,
    May 1997

"*Red Flags of Fraud*," Pennsylvania State University, May 1997

"*Financial Statement Presentation and Analysis*," Harleysville National Bank and Trust Company,
    April 1997

"*New Pronouncements on Fraud*," Pennsylvania State University and Wilkes University,
    November 1996

"*Basic Valuation Principles*," Pennsylvania State University, January 1997 and October 1996

"*GAAP and GAAS Update*," PICPA Practitioners Forum, June 1996

"*What's New in GAAP*," Pennsylvania State University, November and December, 1995

**PUBLICATIONS:**

"*Detecting and Preventing Employee Fraud;*" The Legal Intelligencer, September 1999

# ADDENDUM TO CURRICULUM VITAE
## of
## ELLIOTT A. ROTH, CPA, MBA, CFE, CVA

**In the past four years, I have testified in court in the following matters:**

Joseph and Linda Graziano v. Therm-L-Matic Industries, Inc. and Catherine and Roman Ploskina; Court of Common Pleas of Montgomery County, Pennsylvania, Civil Action No. 00-22615, March 2001. Hearing to determine if a receiver should be appointed.

| | |
|---|---|
| (Forensic Accounting) | (Plaintiff) |

Wright Medical Technology, Inc. and PeopleSoft USA, Inc.; American Arbitration Association Case No. 74J117 00811 00 MS, October 2001.

| | |
|---|---|
| (Damages) | (Claimant) |

Keystone Hollow Corporation v. Hourigan, Kluger & Quinn, P.C. and Terrence J. Herron; Court of Common Pleas, Monroe County, Pennsylvania, Civil Action (No. 4200 CIV 1999), December 2001.

| | |
|---|---|
| (Damages) | (Plaintiff) |

Peter Ciampa and Conversion Sciences, Inc. v. Conversion Sciences, Inc., Annance Consulting, Inc., Mary K. Hamm and Vincent Ciliberti; Court of Common Pleas of Delaware County, Pennsylvania; Civil Division – Equity (No. 99-10057), February 2003.

| | |
|---|---|
| (Damages) | (Plaintiff) |

**In the past four years, I have given a deposition in the following matters:**

American Future Systems, Inc. d/b/a Progressive Business Publications v. Axciom Direct Media, Inc. and Graceland College Center for Professional Development and Lifelong Learning, Inc. d/b/a/ Skillpath Seminars; United States District Court for the Eastern District of Pennsylvania; Civil Action (No. 99-CV-4597), December 2000.

| | |
|---|---|
| (Damages) | (Plaintiff) |

InterVest Financial Services, Inc. v. Bear Stearns Co., Inc., et al; United States District Court for the Eastern District of Pennsylvania, Civil Action (No. 99-CV-5463), September 2001.

| | |
|---|---|
| (Compilation of Expenses) | (Plaintiff) |

Meir Shinnar, M.D., Ph.D. v. Trustees of the University of Pennsylvania; United States District Court for the District of New Jersey (Newark Vicinage); Civil Action [No. 00-CV-02702 (NHP)], June 2002.

| | |
|---|---|
| (Patent Royalties) | (Plaintiff) |

Demotech, Inc., Joseph Colarusso, and Scott Slater v. Foster Wheeler, et al., Superior Court of New Jersey, Law Division, Huntingdon County, Civil Action (Docket No.: HNT-L-637-00), September 2002

| | |
|---|---|
| (Damages) | (Plaintiff) |

Rees Scientific Co. v. Amega Scientific Co., Anthony Amato, and Ron Cangro; Superior Court of New Jersey, Chancery Division, Mercer County, Civil Action, Docket No.: C-117-00; June 2003

| | |
|---|---|
| (Damages) | (Defendant) |

Loftis-Devitt Co., Inc. v. LD Foods, LLC, et al, United States District Court for the Eastern District of Pennsylvania, Civil Action No. 03-2767, March 2004.

| | |
|---|---|
| (Valuation of Business Under a Formula) | (Defendant) |

**Professional fees:**

I will be compensated for my professional services in this engagement at my current hourly rate plus out-of-pocket costs. My hourly rate as of January 1, 2005 is in the range of $325 to $380.

JAN 2 6 2005

# KLEHR, HARRISON, HARVEY, BRANZBURG & ELLERS LLP
## ATTORNEYS AT LAW

260 S BROAD STREET
PHILADELPHIA, PA 19102

(215) 568-6060
FAX: (215) 568-6603

www.klehr.com

LAWRENCE D. ROVIN

Direct Dial: (215) 569-2898
LROVIN@klehr.com

New Jersey Office
457 Haddonfield Road
Suite 510
Cherry Hill, New Jersey 08002-2220
(856) 486-7900

Delaware Office
919 Market Street
Suite 1000
Wilmington, Delaware 19801-3062
(302) 426-1189

January 25, 2005

James L. Beausoleil
Duane Morris LLP
One Liberty Place
Suite 3900
Philadelphia, PA 19103

RE:    iGames Entertainment, Inc. v. Chex Services, Inc. et al
       District of Delaware, Civil No. 04-180-KAJ

Dear Mr. Beausoleil:

In connection with the above-captioned litigation, you have asked me to address several factual issues. In preparation for doing so, I have reviewed the November 3, 2003 Stock Purchase Agreement among iGames Entertainment, Inc. ("iGames"), Equitex, Inc. ("Equitex"), and Chex Services, Inc. ("Chex") (the "Agreement"). I have also reviewed iGames' and Equitex's respective filings with the Securities and Exchange Commission, as well as correspondence between iGames and Equitex, and their respective counsel, related to the termination of the Agreement.

First, you have asked whether the decline in the market price for a share of iGames' common stock from the date on which the Agreement was signed to March 12, 2004, when both iGames and Equitex delivered notices of termination of the Agreement, constituted a "Material Adverse Change" with respect to iGames that would entitle Equitex to terminate the Agreement. I have concluded that it did not, for the following reasons:

1.  The definition of "Material Adverse Change" in Section 1(iii) of the Agreement does not include a decline in stock price. "Material Adverse Change" and "Material Adverse Effect" are defined, with respect to either party to the Agreement, as "any event, change or effect that is materially adverse, individually or in the aggregate, to the condition (financial or otherwise), properties, assets, Liabilities, revenues, income, business, operations, results of operations or prospects of such Person, taken as a whole." A decline in stock price, in and of itself, does not affect any of the enumerated factors and may be the result of outside factors. In my experience, if a party to a transaction were concerned regarding the impact of the stock price of another party on the transaction and

K‌LEHR, H‌ARRISON, H‌ARVEY, B‌RANZBURG & E‌LLERS ‌LLP

James L. Beausoleil
January 25, 2005
Page 2

wishes to have the ability to terminate the agreement if the stock price declines, the definition of Material Adverse Change would specifically include a decline in stock price.

2. The parties clearly specifically negotiated an adjustment in the Purchase Price in the event that iGames' stock price at closing was below a designated benchmark. Section 2(b) of the Agreement clearly states that the Common Stock Consideration (as defined in the Agreement) would be adjusted in the event that the average closing bid price of iGames' common stock did not meet or exceed a designated Target Price in order to ensure an aggregate value of $63,000,000 for the Common Stock Consideration. This leads to two conclusions: (i) the reduction in iGames' stock price did not adversely affect the valuation of Chex in the transaction, and (ii) the parties contemplated the possibility of a price decline, and elected to protect against it with an adjustment to the purchase consideration rather than by granting Equitex the right to terminate.

You have also asked for a further explanation of several of the breaches of the Agreement by Equitex and Chex asserted by iGames, as follows:

1. NCASF contract termination. On January 5, 2004, Equitex issued a press release to the effect that Chex had received a termination notice from NCASF with respect to Chex's contract to provide cash access services at five Seminole Tribe casinos in Florida. This contract represented at least 22% of Chex's 2003 revenues.

Referring to the definition of "Material Adverse Change" and "Material Adverse Effect" set forth above, I believe that the loss of a contract of this magnitude clearly represented an "event, change or effect that is materially adverse, individually or in the aggregate, to the condition (financial or otherwise), properties, assets, Liabilities, revenues, income, business, operations, results of operations or prospects of" Chex and Equitex. Therefore, iGames would have the right, under Section 11(b)(viii) of the Agreement, to terminate the Agreement.

Further, Equitex and Chex represented under Section 6(n) of the Agreement that Chex had fully complied with all material terms of its contracts and that there existed no disputes, complaints or termination notices with respect to any contracts. One condition to closing was that all representations and warranties be true and correct as of closing. The termination of the NCASF contract would have meant that Equitex and Chex could not have made the representation under Section 6(n) at closing, thus entitling iGames to terminate under Section 11(b)(ii) of the Agreement.

KLEHR, HARRISON, HARVEY, BRANZBURG & ELLERS LLP

James L. Beausoleil
January 25, 2005
Page 3

Finally, Section 7(e) of the Agreement required that Equitex and Chex notify iGames within five business days of any event, condition or circumstance that would constitute a breach of the Agreement, or that would have been required to be disclosed on a Schedule to the Agreement if it had existed on November 3, 2003. Equitex and Chex failed to give iGames the required notice, notwithstanding the fact that the termination of the NCASF contract clearly would have been a disclosure item had it occurred prior to November 3, 2003.

2.    Bad checks/"Note receivable."

In reviewing Equitex's Quarterly Report on Form 10-Q for the quarter ended September 30, 2003 (the "10-Q"), which was filed subsequent to the date of the Agreement, iGames discovered a disclosure in Note 3 to the financial statements regarding a note receivable in the principal amount of $606,316 representing a note executed by a customer to evidence the obligation to make good on checks that were returned for insufficient funds. On further enquiry of Chex, iGames established that this customer wrote a substantial number of bad checks in September 2003. Rather than follow its ordinary course of business practice of writing off the amount of the checks pending later collection, Chex took the extraordinary step of converting the bad checks to a "good" note receivable. In November 2003, Equitex and Chex provided written assurances to Equitex's auditors that Equitex and Chex expected the note to be repaid soon thereafter in order to receive the desired accounting treatment in Equitex's September 30, 2003 financial statements included in its quarterly report on Form 10-Q filed with the SEC.

Notwithstanding these assurances, the "note" remained unpaid and apparently was replaced in March 2004 with a non-interest bearing promissory note. As a result of the lack of interest, Chex had to write-down the value of the note by $256,316. Based on a review of FastFunds, Inc.'s (Chex's successor) Form 10-Q for the quarter ended September 30, 2004, this replacement note is now in default.

The existence of the bad debt, subsequent attempted conversion to a note receivable and related actions violated the Agreement in a number of respects, as follows:

A.    In Section 4(f), Equitex represented and warranted, among other things, that all Parent SEC Reports (as defined) complied with applicable rules and did not contain any untrue statement of a material fact. Equitex also represented and warranted that the financial statement included in Parent SEC Reports "presented fairly" the consolidated financial position of Equitex and Chex. The facts and circumstances surrounding the initial creation of the $606,316 note receivable, its subsequent conversion to a non-interest bearing note and resulting write-down,

KLEHR, HARRISON, HARVEY, BRANZBURG & ELLERS LLP

James L. Beausoleil
January 25, 2005
Page 4

and its current delinquent status suggest that the Form 10-Q for the quarter ended
September 30, 2003 and all subsequent Parent SEC Reports breach this
representation and warranty.

B.      In Section 6(f), Equitex and Chex represented and warranted that, after
June 30, 2003, there was not with respect to Chex, among other things:

- any agreement outside the Ordinary Course of Business [6(f)(ix)]. The
  agreement to convert the bad checks to a note was an agreement outside the
  Ordinary Course of Business.

- any loan to any other person in excess of $10,000 and outside the Ordinary
  Course of Business [6(f)(xv)]. In effect, Chex advanced $606,316 to its
  customer.

- any compromise of any claim [6(f)(xviii)]. By agreeing to take a note from its
  customer calling for payment over time, Chex compromised its original claim
  for immediate payment.

- any action or transaction other than in the Ordinary Course of Business
  [6(f)(xxiv)]. The acceptance of the note clearly was a transaction not in the
  Ordinary Course of Business.

- any other event or circumstance that could reasonably be expected to have a
  Material Adverse Effect on Chex [6(f)(xxv)]. Given its size, a $606,316 loss
  could reasonably be expected to have a Material Adverse Effect on Chex.

Notwithstanding the foregoing, neither Equitex nor Chex disclosed the
circumstances surrounding this situation to iGames at any time, thus breaching
Section 6(f) of the Agreement.

C.      In Section 6(n)(i), Equitex and Chex represented and warranted, among
other things, that Schedule 6(n) is a true, complete and accurate list of all written
or oral Contracts, understandings, agreements and other arrangements involving
more than $10,000. Section 6(n) also states that all other parties to these
agreements have complied fully with the terms thereof. The $606,316 promissory
note is not disclosed in Schedule 6(n).

D.      In Section 6(o), Equitex and Chex represented and warranted, among other
things, that all Accounts Receivable (defined as "trade accounts receivable, notes
receivable and other rights to the payment of money, including any claim, remedy
or other right related to any returned or unpaid check") are current and collectible
net of the reserves set forth on the applicable balance sheets (which reserves are

KLEHR, HARRISON, HARVEY, BRANZBURG & ELLERS LLP

James L. Beausoleil
January 25, 2005
Page 5

adequate and calculated in accordance with past practice and will not represent a
Material Adverse Effect in terms of aging), and each Account Receivable will be
collected in full, without any setoff, within 90 days of the day on which it first
became due and payable. This representation and warranty was clearly false with
respect to the $606,316 note.

E.    In Section 7(b)(i), Equitex and Chex covenanted that between the date of
the Agreement and the date of closing they would not engage in any practice, take
any action or enter into any transaction outside the Ordinary Course of Business.
The ongoing efforts to restructure the $606,316 debt clearly were in breach of this
covenant

Under Section 11(b)(ii) of the Agreement, iGames has the right to terminate if any
representation of Equitex or Chex was or becomes materially inaccurate. Under
Section 11(b)(iv) of the Agreement, iGames has the right to terminate if Equitex
or Chex have failed to comply with their material obligations under the
Agreement. Under Section 11(b)(viii) of the Agreement, iGames has the right to
terminate the Agreement upon the occurrence of any event that is likely to have a
Material Adverse Effect on Chex. As the description of relevant provisions of the
Agreement above indicates, it would appear that the failure to disclose to iGames
the existence of the $606,316 note receivable and the circumstances surrounding
its creation and modification involved multiple breaches by Equitex and Chex of
the representations and warranties in the Agreement, breaches of the pre-Closing
covenants of Equitex and Chex and cause for iGames to terminate the Agreement.

3.    "Whitebox" financing.

On March 8, 2004, Equitex closed on a $5,000,000 convertible note financing
with two institutional investors (the "Whitebox Financing"). Under the terms of
the financing, among other things, the proceeds of the financing were advanced
by Equitex to Chex and the notes were secured by a pledge of the capital stock of
Chex (the same stock that Equitex had agreed to sell to iGames) and by a security
interest in all of Chex's assets.

Under Section 4(d) of the Agreement, Equitex represented and warranted that it
owned the stock of Chex free and clear of all encumbrances. As a result of the
Whitebox Financing, this representation and warranty became false.

Furthermore, the consummation of the Whitebox Financing rendered false a
number of representations and warranties in Section 6(f) of the Agreement,
including 6(f)(iii) (no grant of a right to acquire Chex stock); 6(f)(viii) (no
assignment of assets other than in the Ordinary Course of Business); 6(f)(ix) (no
agreement other than in the Ordinary Course of Business); and 6(f)(xi) (no

KLEHR, HARRISON, HARVEY, BRANZBURG & ELLERS LLP

James L. Beausoleil
January 25, 2005
Page 6

creation of a security interest in assets); 6(f)(xvi) (no issuance of a debt security for more than $10,000.

Finally, the consummation of the Whitebox Financing breached Equitex's and Chex's covenant against transactions not in the Ordinary Course of Business in Section 7(b)(i) of the Agreement.

The foregoing would entitle iGames to terminate the Agreement under Sections 7(b)(ii) and 7(b)(iv).

This letter addresses only those issues which you have requested that I consider, and does not attempt to address, in particular, all possible breaches of the Agreement by Equitex and/or Chex.

All of the opinions expressed in this letter have been stated with a reasonable degree of professional certainty.

Very truly yours,

Lawrence D. Rovin

**Lawrence D. Rovin
Partner**





lrovin@klehr.com
**Phone:** 215.569.2898
**Fax:** 215.568.6603

**Department:**
Corporate & Securities

**Office:**
Philadelphia

Lawrence D. Rovin concentrates his practice in the areas of corporate finance, mergers and acquisitions, venture capital and representation of technology and emerging businesses. He represents a wide range of clients, including closely-held businesses and public companies, technology startups and venture investors, on general corporate and business matters.

In the securities area, he represents issuers in public offerings and private placements of securities under the Securities Act of 1933 and applicable state law and advises public companies regarding ongoing compliance requirements under the Securities Exchange Act of 1934 and the Investment Company Act of 1940

Mr. Rovin represents private venture partnerships, hedge funds, public companies engaged in investment activities and other sources of capital in structuring and negotiating investments, including common stock, preferred stock, convertible debt and hybrid structures. He has developed form investment documents for several institutional clients.

Mr. Rovin has substantial experience advising startup and growth-oriented clients, including collaboration with founders in developing business concepts, assisting in choice-of-entity and other structural issues, drafting business plans, employment agreements and other corporate documents and advising clients seeking capital in the investment process.

Mr. Rovin also assists clients in various intellectual property areas, including software development and licensing

agreements, technology transfers and strategic alliances, investments and joint ventures. Finally, he maintains an active general corporate practice advising clients in the full range of corporate activities, including ongoing contractual relationships, corporate joint ventures, acquisitions and divestitures.

Recent experience includes representation of:

- A privately-held Internet incubator in connection with its merger with a publicly-traded company and spin-off of the public company's historic business to its former shareholders, resulting in a publicly traded NASDAQ SmallCap listed Internet incubator having an initial market capitalization of approximately $90 million. Follow-up assignments include securities law compliance, development of investment documentation, advice concerning Investment Company compliance, representation in several investments and advice on general corporate matters;
- A publicly held Internet incubator in connection with 1934 Act registration, registration of the resale of securities under the 1933 Act, development of investment documentation and representation in several investments, advice concerning Investment Company Act compliance, a $50 million private placement of equity securities, ongoing securities law compliance and general corporate matters;
- A private investment fund in several PIPE ("private investment, public entity") investments in technology-oriented public companies;
- A leading provider of online employee benefit administration

services in connection with the development of form agreements for providing services and software licensing, negotiation of joint marketing and joint product development agreements and related matters;

- A developer of proprietary flexible circuit printing technology in several rounds of private equity and debt financing and joint technology development agreements with potential users of the technology;
- A publicly-held manufacturer of non-metallic waste water treatment facility components in securities law compliance and various contractual relationships;
- An early-stage developer and marketer of online loyalty programs in several rounds of private equity investments, technology transfer agreements, joint product development agreements and general corporate matters;
- A developer of an online occupational health services system in connection with financing activities and general corporate matters.

**Articles:**

- Co-Author, "Enron's Impact Felt in New SEC Disclosure Regs," *Technology Times*, June 2002

**Education:**

- A.B. Princeton University, 1972
- J.D. University of Virginia School of Law, 1975; member, Editorial Board, *Virginia Law Review*

