IN THE UNITED STATES DISTRICT COURT

**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **iGAMES ENTERTAINMENT, INC.,** | : | |
| | : | |
| Plaintiff, | : | C.A. No. 04-180 (KAJ) |
| | : | |
| v. | : | |
| | : | |
| **CHEX SERVICES, INC.** and | : | |
| **EQUITEX, INC.,** | : | |
| | : | JURY TRIAL DEMANDED |
| | : | |
| Defendants. | : | |

# Appendix of Exhibits To iGames Entertainment, Inc's Opposition To Chex's Motion For Summary Judgement

# Exhibit B

1

```
                IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF DELAWARE
```

1

2

```
                           - - -
```

3    iGAMES ENTERTAINMENT, INC.   :   C.A. NO. 04-180-KAJ

4         vs.                     :

5    CHEX SERVICES, INC. and      :

     EQUITEX, INC.

6                                 - - -

                                  - - -

7    EQUITEX, INC. and CHEX       :   C.A. NO. 04-256-KAJ

     SERVICES, INC., d/b/a

8    FASTFUNDS                    :

9         vs.                     :

10   iGAMES ENTERTAINMENT, INC.   :

                                  - - -

11                                - - -

     CHEX SERVICES, INC., d/b/a   :   C.A. NO. 04-0885-KAJ

12   FASTFUNDS

                                  :

13        vs.                     :

                                  :

14   iGAMES ENTERTAINMENT, INC.

                                  - - -

15

                         September 17, 2004

16

17              Oral deposition of IJAZ ANWAR, taken

     pursuant to notice, was held in the law offices of

18   DUANE MORRIS, LLP, One Liberty Place, 39th Floor,

     Philadelphia, Pennsylvania 19103, commencing at

19   9:15 a.m., on the above date, before Joshua Lieberman,

     a Federally Approved Registered Professional Reporter

20   and Notary Public in and for the Commonwealth of

     Pennsylvania.

21

22                 ESQUIRE REPORTING SERVICES

                           15th Floor

23              1835 John F. Kennedy Boulevard

                Philadelphia, Pennsylvania 19103

24                      (215) 988-9191

Ijaz Anwar

```
 1              A.      I do not recall calculating.
 2              Q.      Is it fair to say you did not
 3    calculate the number?
 4              A.      On a piece of paper?  I don't
 5    recall calculating the number.
 6              Q.      Did you ever, prior to March 12,
 7    2004, tell Chris Wolfington or anyone at iGames
 8    that you believed an interest payment or some
 9    type of payment was due on this Note?
10              A.      I do not recall informing Chris
11    Wolfington.
12              Q.      Or anyone at iGames?
13              A.      Or anyone at iGames.
14              Q.      And the answer was that you do
15    not recall informing Chris Wolfington or anyone
16    at iGames that any kind of payment was due on the
17    Note prior to March 12, 2004?
18              A.      I do not recall that.
19              Q.      But did I state your answer
20    correctly?
21              A.      Sorry?
22              Q.      Did I understand your answer
23    correctly?
24              A.      Yes.
```

Ijaz Anwar

1          Q.      Are you aware of anyone at Chex--
2    are you aware whether anyone at Chex notified
3    Chris Wolfington or anyone at iGames prior to
4    March 12, 2004, that they believed an interest
5    payment or some type of payment was due on the
6    Note?
7          A.      I do not recall right now if
8    anyone else contacted Chris Wolfington.
9          Q.      Isn't it fair to say that if
10   someone contacted Chris Wolfington or anyone at
11   iGames, you would either have done it yourself or
12   you would have known about the contact?
13         A.      That would be an incorrect
14   statement.
15         Q.      Why would that be incorrect?
16         A.      Not everything that is
17   communicated to a third party is communicated to
18   me.
19         Q.      Well, we're not talking in
20   general.  I'm talking about iGames.  Weren't the
21   primary contact between Chex Services and iGames?
22         A.      I was one of the contacts.  I
23   don't know if I was the primary contact.
24         Q.      Who else would have contacted

Ijaz Anwar

1    iGames concerning this Note?

2          A.      It could have been Jim Welbourn;

3    it could have been Henry Fong; it could have been

4    our counsel.

5          Q.      Jim Welbourn relies on you for

6    the accounting and the financial aspect of the

7    business, correct?

8          A.      Not entirely.

9          Q.      Do you know whether Jim Welbourn

10   Jim Welbourn ever read this Note prior to March

11   12, 2004?

12         A.      I cannot speak on behalf of Jim.

13   I don't know.

14         Q.      Did you ever show him the Note

15   prior to March 12, 2004?

16         A.      I do not recall showing him the

17   Note.

18         Q.      Are you aware that one of the

19   alleged breaches by iGames of the stock purchase

20   agreement was its failure to pay interest on this

21   Note when due?

22         A.      Yes.

23         Q.      As a businessman, who negotiated

24   part of this Note who signed this Note, who

Ijaz Anwar

1    thought iGames owed an interest payment, correct?

2    He didn't raise breach.  He raised iGames owed an

3    interest payment?

4              A.      That is correct.

5              Q.      And you explained your

6    conversation.  Now, you said you did not follow

7    up with Chris with that?

8              A.      I do not recall following up with

9    Chris.

10             Q.      Okay.  At any point before

11   terminating or calling in that Note, did anyone

12   in your organization tell Chris that a payment

13   was due and tell him what the amount they thought

14   was due?

15             A.      I don't recall the amount due,

16   because I believe, and again I would have to

17   refer back to the Note, there's a provision that

18   either the interest or profits from Available

19   Money are due, one of the two.  So to ask for

20   interest payment without receiving the P&N or the

21   calculation from Chris Wolfington on the

22   Available Money financial statements would be, I

23   think, premature.

24             Q.      And how would Chris, Mr.

Ijaz Anwar

1   Wolfington, receive the money on the note?

2   January 6th; is that correct?

3            A.      As I recall, the funds were -- I

4   don't remember.  I think the funds were wired

5   directly into Available Money -- not Available

6   Money -- Available Money or the previous owners

7   of Available Money's banknote.

8            Q.      Okay.

9            A.      Yes, actually that is correct.

10  We had instructions to send "X" amount to one

11  owner and wire amount to one owner.

12           Q.      Do you believe it was done on

13  January 6, 2004, that wiring?

14           A.      I can't recall the date.  As per

15  the Note, yes.  But when was it actually sent?  I

16  would have to look at the records of the bank

17  statements to determine that.

18           Q.      Well, the Note was actually

19  signed sometime later and then dated January 6th,

20  correct?

21           A.      That is correct.

22           Q.      And wasn't it dated January 6th

23  because that's when the money was transferred?

24           A.      I would make an assumption.  For

Ijaz Anwar

1   a fact, I don't know.

2           Q.      You'd agree it was on or about

3   January 6th?

4           A.      I believe so, yes.

5           Q.      All right.  So then you said they

6   would have to wait for Available Money -- in

7   order to calculate what was due, you'd have to

8   wait for Available Money's profits and loss

9   statement?

10          A.      I believe the Note says that

11  fifty percent -- I would have to read the Note.

12          Q.      Go ahead.

13          A.      Just give me a second.

14          Q.      You know the paragraph?

15          A.      Yes, the interest section.

16          Q.      You're referring to iGames-1,

17  correct?

18          A.      That is correct.  Yes, the note

19  asks or requires them to pay fifty percent of the

20  operating income of the borrower's Available

21  Money subsidiary for the period ending February

22  1st, 2004.

23                  Just to clarify my position, I

24  believe one of the reasons we did not ask for the

Ijaz Anwar

1    payment during the month of February was the

2    financial statements from Available Money, the

3    calculations from Fifth Third Bank come for the

4    month of February sometime during March.  So if

5    they did not have the basis to make a payment, it

6    would be irrelevant to ask for the payment.

7            Q.      So basically from your own

8    practices Available Money or iGames wouldn't know

9    or be able to calculate that payment without

10   having the financials, and in your organization

11   that's not done until March 25th or approximately

12   that time period?

13           A.      I believe so.  So January's

14   financial statements would have or should have, I

15   don't know exactly when they did at iGames,

16   arrived sometime in February, in February and

17   March, I would assume. I don't know exact dates,

18   how Fifth Third and Available Money provided the

19   financial statements.

20           Q.      Doesn't that Note provide for one

21   payment for the time period before February 1st

22   and not a separate payment for January?

23               MR. PORETTI:  Objection.  Vague.

24           A.      At least I don't read in the Note

Ijaz Anwar

1    that they can substitute the February payment or

2    the January payment.  Maybe I'm reading it

3    incorrectly.

4            Q.       Could you tell me where in that

5    Note it says there is a January payment or when

6    it's due or how to calculate it?

7                    MR. PORETTI:  Objection.

8            Compound.

9    BY MR. BEAUSOLEIL:

10           Q.       Explain to me the basis for

11   saying there's a January payment due.

12           A.       Funds were given on January 6th,

13   somewhere around January 6th.

14           Q.       And the Note then was negotiated

15   and signed somewhere around January 21st,

16   correct?

17           A.       That would be correct.  I believe

18   so.  I know it's dated January 6th and it was

19   subsequently negotiated or signed and then dated

20   for January 6th.

21           Q.       In fact, this is sent, the fax

22   says January 21, '04.  We could later maybe

23   establish that a little better.  Okay?

24           A.       Yes.

Ijaz Anwar

1          Q.      All right.  So the January 21st

2     Note is signed in terms of settled?

3          A.      I don't know the exact date, but

4     it was signed after January 6th.  Yes, sometime

5     after January 6th.  It was not signed on January

6     6th.

7          Q.      All right.  Then I was asking if

8     you would read that Note and give me the basis

9     for your statement that there was some type of

10    payment due for January.

11               MR. PORETTI:  I object in that the

12               document speaks for itself, but go ahead

13               and answer.

14          A.      It does not refer to a

15    calculation of interest for the month of January.

16          Q.      It combines January and -- tell

17    me, Mr. Anwar, when the first --

18          A.      For the period ending February

19    1st, when it says the period ending February 1st,

20    it's really referring to January, because the

21    period ending February 1st entails the month of

22    January.

23          Q.      Tell me when that payment was due

24    and how you would calculate it.  You don't have

Ijaz Anwar

1    to give me exact numbers. You can just tell me.

2           A.       When was the payment due for the

3    month of January?

4           Q.       Hm-hmm.

5           A.       It doesn't specify a date, but it

6    says in addition, in lieu of interest, the

7    borrower shall, on a monthly basis, pay to the

8    lender and amount equal to fifty percent of the

9    operating income of borrower's Available Money,

10   Inc. subsidiary, Available Money.

11                   So when it says on a monthly basis

12   and you're talking about the month of January,

13   ending February 1st, if you say monthly basis, it

14   would be during the month of February that they

15   would have to pay the interest for the month of

16   fifty percent profits for the month of January.

17          Q.       How would iGames during the month

18   of February, having closed on this January 21st

19   and having just closed on Available Money, known

20   what to pay you?

21          A.       I won't be able to answer that

22   question.  That's iGames and Available Money's

23   internal accounting and workings.

24          Q.       Didn't you explain that when Mr.

Ijaz Anwar

1   Welbourn told you, questioned you about this, you

2   said it wasn't worth talking to Chris because he

3   wouldn't know what was due until the end of

4   March?

5           A.      I did not tell that to Mr.

6   Wolfington.  I said that I did not approach

7   Chris, I believe, because -- first of all, I said

8   I don't recall, but now that I'm thinking about

9   it, I think the reason I did not approach Chris

10  was because the financial statements for the

11  month of January would have come to Available

12  Money, being in the same business, sometime

13  middle or end of February.

14          Q.      So there's no way he could have

15  figured out the interest payment until when?

16          A.      Well, that would depend on when

17  he got the financial statements of Available

18  Money.

19          Q.      Tell me what you think when the

20  first payment was due on their Note.

21          A.      I think the first payment was due

22  on the Note when they received the financial

23  statements of Available Money for the month of

24  January during the month of February.

Ijaz Anwar

1          Q.      Did you ever ask iGames, before
2    the termination letter was sent, whether they had
3    received those receivables?  What did you say?
4          A.      Financials.
5          Q.      Financials, sorry.
6          A.      I don't recall asking him.
7          Q.      At any time prior to March 12th
8    when the termination letter was sent, did you ask
9    Chris Wolfington or anyone at iGames for the
10   payment?
11         A.      We had numerous conversations
12   about a lot of things.  I don't recall asking.
13   It would be highly unlikely if I did not ask, but
14   I don't recall sitting here asking.
15         Q.      Well, isn't that an important
16   thing?  If you're going to terminate a several
17   million-dollar deal, some valued at sixty
18   million, because of failure to make a payment,
19   wouldn't you ask the person for the payment
20   first?
21         A.      That is correct, we would ask for
22   the payment first.
23         Q.      And do you recall asking for the
24   payment?

Ijaz Anwar

1          A.     I, as an individual, do not

2    recall asking, as I said.

3          Q.     Are you aware of anyone else in

4    your organization asking?

5          A.     In my organization, I don't

6    recall.  I'm not aware of anybody asking.

7          Q.     And did you ever put into writing

8    when the payment was due and how much was due in

9    order to establish iGames was in breach?

10         A.     I think the Note speaks for when

11   the payment is due.

12         Q.     I'm asking you, as a business

13   man, as chief financial officer of Chex, did you

14   ever put in writing this is the date the payment

15   was due on the Note; this is how much it was for?

16         A.     I did not put that in writing

17   because the payment was due as fifty percent of

18   profits which are not under my control from

19   Available Money.

20         Q.     Did iGames ever front money for

21   the CNIGA game show for Chex?

22         A.     IGames did not front money for

23   Chex for the CNIGA show.

24         Q.     Well, did Chex owe money to

Ijaz Anwar

1  February that iGames should have made an interest

2  payment when you yourself didn't know what the

3  number would have been?

4          A.      Yes, I do believe that iGames

5  should have made a payment, not an interest

6  payment, a payment for the fifty percent of the

7  profits, yes.

8          Q.      In February they should have

9  paid, written a check in February for payment of

10 fifty percent of profits for Available Money?

11         A.      Yes.  The funds were given in

12 January, on January 6th, two million dollars, and

13 there's a cost involved for those funds.  So we

14 did believe that for the month of January they

15 should have given us some kind of compensation

16 for the funds that we lent them in the month of

17 February.

18         Q.      Some token amount?

19         A.      I wouldn't say token amount.

20 Some true basis of calculation and not a token

21 amount.

22         Q.      But you were going to leave up to

23 them how much and when it was supposed to be

24 made?

Ijaz Anwar

1          A.          No, the Note asks for fifty

2    percent of the profits for Available Money for

3    the month ending February 1st.  So when they

4    would have received the financial statements for

5    Available Money for the month of January, that

6    would have determined the amount owed.

7          Q.          If I told you they received the

8    financials on February 27th, would you think that

9    was reasonable?

10          A.          That would be reasonable.

11          Q.          So the first earliest possible

12    date for iGames with that assumption would have

13    been February 27, 2004, if they immediately made

14    the calculations once they received the

15    financials?

16          A.          That is correct.  Can I get some

17    water, please?

18          Q.          Yes, sure.

19                MR. BEAUSOLEIL:  You want to take

20          a break?

21                MR. PORETTI:  Sure.

22                     (Whereupon a comfort recess

23          was taken 10:15 a.m.)

24                     (Whereupon the testimony resumed

Ijaz Anwar

1          at 10:22 a.m.)

2               MR. PORETTI:  Jim, I think Mr.

3          Anwar needs to clarify an answer.  He

4          misunderstood the question about where

5          the idea of the loan on Available Money

6          came from.  So if you want to give him a

7          chance to fix that, you'll probably save

8          some confusion.

9     BY MR. BEAUSOLEIL:

10          Q.     You want to offer an explanation?

11          A.     Sure.  We were asked to provide

12     financing and then we consented to providing

13     financing.

14          Q.     Can you explain that again?

15          A.     We were asked under Available

16     Money to provide the financing for the first

17     payment.

18          Q.     Wait a minute.  Chex or you

19     personally?

20          A.     All the discussions were with

21     Henry Fong, myself and iGames together.  So I

22     think we were altogether.

23          Q.     Who asked you for that?

24          A.     Chris Wolfington.

Ijaz Anwar

70

1  accounting software called Great Plains.
2      Q.    Could you just take me through
3  your promotions and different titles.
4      A.    I don't know the exact dates,
5  but I've been very fortunate. I was very
6  fortunate in getting promoted. I became a senior
7  accountant. That was my first position from the
8  data entry or coming in as a temp. I don't know
9  the dates exactly.
10     Q.    That's fine.
11     A.    And then I was promoted to
12 controller, and then I was promoted to the
13 treasurer and then once we went public or we were
14 acquired by Equitex in 2001, I was promoted as a
15 CFO. At the hotel chain in Dubai, I was the
16 controller there.
17     Q.    And you were a CFO for Equitex
18 beginning --
19     A.    For Chex.
20     Q.    -- for Chex beginning in 2001?
21     A.    No, we were acquired in December,
22 2001. I think sometime in 2002, March or April.
23     Q.    And then have you had any
24 promotions since that time or change in your

71

1  position?
2      A.    Yes. Once a reverse merger took
3  place, a reverse merger took place in March or
4  June of this year, I was given the additional
5  responsibility of operations in addition to
6  finance. So I'm currently the CFO and COO of
7  FastFunds Financial Corporation.
8      Q.    FastFunds Financial Corporation.
9          And before May or June of 2004,
10     you were CFO of Chex Services, Inc.
11     doing business as FastFunds?
12     A.    That is correct.
13     Q.    You are now CFO and COO of what?
14     A.    FastFunds Financial Corporation
15 and subsidiary Chex Services.
16     Q.    Prior to June, 2004, when you
17 were working for Chex, what did your paycheck
18 say? Just the name of the entity that paid you.
19     A.    Chex Services, Inc.
20     Q.    Have you ever gone by any other
21 names other than Ijaz Anwar?
22     A.    No.
23     Q.    What were your responsibilities
24 as CFO of Chex?

72

1      A.    I was responsible for all the
2  financial operations of Chex Services as well as
3  I participated in the various transactions that
4  Equitex was involved in on behalf of Chex or Chex
5  was involved in on behalf of Equitex.
6      Q.    When did you first meet Chris
7  Wolfington?
8      A.    When was the first time I met
9  Chris Wolfington? I think I met Chris Wolfington
10 for the first time during 2001 prior to the
11 acquisition of Chex Services by Equitex. I
12 think.
13     Q.    And do you remember like under
14 what circumstances did you meet him?
15     A.    I clearly remember. I don't
16 remember the date. Don't quote me on the date,
17 please. I remember he and Jake Koldus came in
18 with bright yellow, orange T-shirts and they were
19 wearing khaki slacks. So they were very slick
20 looking individuals. So that still stays in my
21 mind.
22     Q.    Was that some kind of event?
23     A.    I was senior accountant. I was
24 nobody, so they just passed by and shook our

73

1  hands and that's it. So that was the first
2  encounter with Mr. Wolfington.
3      Q.    Have you gotten to know Mr.
4  Wolfington over the past few years?
5      A.    Yes.
6      Q.    Have you worked on different
7  various business transactions with him?
8      A.    One business transaction, various
9  business issues, yes.
10     Q.    In the past, have your companies
11 worked together where you shared staff, like COOs
12 shared receivables and things like that?
13     A.    We managed some contracts for
14 MCA. And MCA, being a private entity, was owned
15 by Chris Wolfington.
16     Q.    Did you at one point share some
17 technical people, some IT people, both Chex and
18 MCA?
19     A.    We did various projects together.
20 I'm sure we shared employees back and forth. We
21 were managing contracts on behalf of MCA. So we
22 may have helped them and they may have helped us.
23     Q.    Has Chris Wolfington always
24 operated with integrity, as far as you're

19 (Pages 70 to 73)

Ijaz Anwar

74

1   concerned?
2       A.   Yes.
3       Q.   Has he ever lied to you?
4       A.   Not to my knowledge.
5           MR. BEAUSOLEIL: This is going to
6       be iGames-2.
7           (Whereupon an e-mail consisting
8       of three pages dated March 19, 2004, was
9       marked as iGames-2)
10  BY THE WITNESS:
11      Q.   Having worked with Chris over the
12  years and having done projects, as you said,
13  together, do you think Chris would have knowingly
14  breached an agreement?
15          MR. PORETTI: Objection.
16      Speculation.
17  BY MR. BEAUSOLEIL:
18      Q.   Such as the Note or the stock
19  purchase agreement?
20          MR. PORETTI: Objection. It calls
21      for speculation.
22      A.   I would not answer that. I can't
23  answer that question.
24      Q.   Do you think -- do you personally

75

1   believe that Chris would knowingly breach -- in
2   this instance we've talking about the Note and
3   that the payment was due. Do you think Chris
4   knowingly failed to make a payment on that Note?
5           MR. PORETTI: Objection. It calls
6       for speculation.
7   BY MR. BEAUSOLEIL:
8       Q.   You can answer the question just
9   based on your own knowledge and your own beliefs.
10      A.   It calls for speculation.
11      Q.   No, no, that's not a fair
12  objection. He could put that on the record and
13  preserve it, but you have to answer that.
14          MR. PORETTI: I think it is a fair
15      answer. You're asking him to testify
16      the state of mind of Mr. Wolfington. He
17      has no basis for doing that. In fact,
18      his answer is his answer.
19  BY MR. BEAUSOLEIL:
20      Q.   I asked you if you personally
21  believe that Chris Wolfington would knowingly
22  fail to make a payment on that Note?
23          MR. PORETTI: The same objection.
24      A.   I personally cannot answer that

76

1   question. I don't know what Chris Wolfington
2   would do under these circumstances.
3       Q.   Well, you know what he did under
4   these circumstances. You were communicating with
5   him. Do you believe if you had asked him for the
6   payment or told him you believed a payment was
7   due and that if the payment was Note made, he
8   would be in breach, he would have made the
9   payment?
10          MR. PORETTI: Objection. It calls
11      for speculation.
12      A.   I cannot answer that question.
13      Q.   Do you agree that you didn't give
14  him that opportunity?
15      A.   I think the Note itself clearly
16  states when the payment is due.
17      Q.   Well, you say it clear states
18  when the payment is due and you haven't told me
19  yet what you thought it was due.
20      A.   I can talk about the Note, not
21  what Chris Wolfington should have or would have
22  done. The note clearly states when the payment
23  is due and if you comply with the Note.
24      Q.   You told me that Mr. Welbourn

77

1   raised an issue?
2       A.   With me.
3       Q.   With you. If you followed
4   through with Chris Wolfington and told him you
5   believed an amount was due and if he failed to
6   make it, he would be in breach, do you believe he
7   would have made that payment based on your past
8   experiences with him?
9           MR. PORETTI: Objection. It calls
10      for speculation. Lack of foundation.
11      A.   Again I would refer back to the
12  Note which clearly states when the payment is
13  due.
14      Q.   Well, that's a legal issue.
15  We're going to have judges look at that. We're
16  going to have a jury look at that. I'm going to
17  look at it, your lawyer is going to look at it.
18  I don't need to look at the Note.
19          I'm asking you, this is my
20  opportunity to ask you what you believe,
21  what you know, what you may have heard.
22  There's all kinds of ranges of
23  testimony. You just have to be clear
24  with where it's coming from.

20  (Pages 74 to 77)

Ijaz Anwar

102

1    know the dates. I don't remember the dates.
2        Q.    The first weekend of 2004?
3        A.    Yes, I believe.
4        Q.    That's when the termination took
5    place?
6        A.    We exited or we were asked to
7    leave or we discontinued our services, I think,
8    on the first Monday of 2004.
9        Q.    And how long --
10       A.    So I think if you backtrack from
11   there during the weekend, yes. late Friday I was
12   in the office. I don't know if that late Friday
13   was 2003 or 2004. But late Friday I was in the
14   office and then we received a termination letter
15   from Seminal. It was faxed over to us and I was
16   in the office and I received that letter.
17       Q.    That's when you first learned,
18   through that fax?
19       A.    Yes.
20       Q.    Did you have any warning ahead of
21   that fax?
22       A.    No.
23       Q.    Did you know there were problems
24   before you got that fax?

103

1        A.    No, we did not know of any
2    problems prior to that fax. I do not recall
3    knowing of any problems before that fax.
4        Q.    In that contract --
5        A.    Seminal?
6        Q.    Seminal contract, yes, were there
7    like five casinos that you provided cash services
8    for?
9        A.    Yes, that is correct.
10       Q.    Did you have to pay commissions
11   back to the tribe?
12       A.    We paid commission to the tribe
13   as well as NACS and NACSF.
14       Q.    How did you determine the
15   commissions?
16       A.    I don't recall the calculations.
17   I know the NACS and NACSF commissions were a net-
18   based portion of the net profit and the tribe's
19   commission was a percentage of gross revenue.
20       Q.    And what information would you
21   need from the casino or from the booths in order
22   to calculate the commission?
23       A.    It's an accumulation of a lot of
24   information to tabulate or construct the

104

1    financial statements and provide the correct
2    amounts to both the tribe and NACS and NACSF. So
3    it's various information.
4        Q.    Well, for checks cashed in
5    January, how long would it take you to collect
6    the information and calculate the commission paid
7    and credited to the tribe?
8        A.    We attempted to pay by the 25th
9    of the following month.
10       Q.    Were you always successful?
11       A.    No, we were sometimes not
12   successful. Sometimes we paid ahead of time.
13   Sometimes we paid on the 25th.
14       Q.    What portion of Chex's revenues
15   did the Seminal contracts represent?
16       A.    As I recall, I believe it was
17   twenty-two-and-a-half percent.
18       Q.    Would you agree that that's a
19   significant portion of Chex's revenues?
20       A.    Yes, I would agree with that.
21       Q.    What was the reaction by the
22   public over the announcement that you were
23   terminated from those contracts?
24       A.    When you say "public," could you

105

1    just define exactly who you're referring to.
2        Q.    Well, we could start with the
3    industry, people in the industry. What kind of
4    feedback, what kind of reaction did you get?
5        A.    Because I'm on the financial
6    side, I'm not that involved on the day to day
7    interaction from the industry as such. So I
8    can't really comment on the industry side. To my
9    knowledge, I can't recall any positive or
10   negative comment from the industry side.
11       Q.    Well, you wouldn't expect any
12   positive comment, would you?
13       A.    Any comment, yes.
14       Q.    You would not expect positive
15   comments from that termination, would you?
16       A.    Yes. Well, you could expect a
17   positive comment if somebody does not like
18   Seminal tribe and you leave the financial
19   services at Seminal, they would be happy at
20   another tribe.
21       Q.    Did that happen, to your
22   knowledge?
23       A.    Again I'm not involved on the
24   industry side.

27 (Pages 102 to 105)

Ijaz Anwar

114

1  Fong?
2       A.    Let me think about that, please.
3  I believe so, yes.
4       Q.    As a managing officer of Chex, as
5  part of the management team of Chex, you
6  understand how investors and the public would
7  react to a significant loss of income or loss
8  like in this case of five casinos at the same
9  time, correct?
10       A.    Generally the market place, yes.
11  Intimately on the Equitex side, no, I would not
12  have knowledge as to how the shareholders of
13  Equitex would directly react.
14       Q.    Well, at the time iGames was
15  acquiring Chex, it was supposed to be a good deal
16  for iGames.  It was supposed to be actually for
17  both companies, but it was going to make --
18  iGames was probably traded and it was going to
19  help.  They were going to grow in the market and
20  the two companies would be, the two would be
21  better than, two together would be better than
22  two independent companies, correct?
23       A.    That is correct.
24       Q.    You expected some synergies?

115

1       A.    Yes.
2       Q.    So when iGames was in the middle
3  of acquiring Chex and Chex lost 22.5 percent of
4  their operating income was it?
5       A.    Revenue.
6       Q.    Revenue, wouldn't you expect a
7  negative reaction by the public and by the
8  investors in iGames to that news?
9       MR. PORETTI:  Objection.  It calls
10  for speculation.
11       A.    I don't know the shareholders of
12  iGames.  Generally speaking, yes, in the
13  marketplace if a negative event takes place, yes.
14       Q.    Didn't you initiate litigation
15  and claim all those things, for instance, that
16  the termination was going to harm Chex's
17  reputation, irreparably harm their reputation?
18       A.    Which litigation are you
19  referring to?
20       Q.    Against Cash Systems.
21       A.    I'm not intimately involved.  I
22  would have to look at the documents if that is
23  one of the claims.
24       Q.    Was that a concern of management

116

1  at the time?
2       A.    Could you repeat that?  What
3  concern?
4       Q.    Was the reputation of Chex
5  Services -- was the harm that the loss of those
6  casino to Chex Services -- let me try to figure
7  out my question, sorry.
8            Was the harm to Chex's reputation
9       that resulted from the loss of those
10       casinos a concern to the management of
11       Chex?
12       A.    Yes.
13       Q.    Therefore, wouldn't you expect it
14  was also a concern to iGames?
15       A.    I can't speak on behalf of
16  iGames.
17       Q.    Well, I'm not asking you in all
18  these questions to speak on behalf of iGames.
19  I'm asking you whether you believed it, from your
20  personal experience, believed it was a problem or
21  whether, as part of the management team and part
22  of the person on these e-mails and being included
23  in discussions and board meetings, you learned
24  that yes, it was a problem either for both Chex

117

1  and for iGames?
2       A.    I don't know if it was a problem
3  for iGames.  If I was in iGames' shoes, I would
4  be concerned.
5       Q.    And you immediately took legal
6  action because of that loss and you also took
7  internal cost cutting action, correct?
8       A.    We initiated legal action, yes.
9       Q.    You also cut costs in various
10  ways to make up for that loss?
11       A.    That is correct.
12       Q.    If I wrote a check in one of your
13  casinos, if I wanted to cash a hundred dollars,
14  how much would I have to write the check for?
15       A.    The average fee, I believe it's
16  six dollars, six percent.
17       Q.    So if I wanted to cash a hundred
18  dollars, I'd write a $106 check?
19       A.    That is correct.
20       Q.    And if I cashed a $106 check with
21  one of Chex's or FastFunds' booths in September,
22  2003, it bounced, how would you handle it in your
23  accounting?
24       A.    If the check bounced for $107, we

30 (Pages 114 to 117)

Ijaz Anwar

118

1   would write off that check or expense it in our
2   financial statement.
3        Q.    So if I wrote a check for -- is
4   it 107 or 106?
5        A.    Sorry? 106.
6        Q.    Well just use that. So if I
7   wrote a check September 1st, 2003, for $106, how
8   long would it take before you knew it bounced if
9   I wrote a bad check?
10       A.    It depends on the location. If
11  you have electronic versus manual, most of them
12  are electronic, so I would say within 48 hours.
13       Q.    So within 48 hours -- so within
14  the month of September, if I wrote it September
15  1st, you're going to know it's no good?
16       A.    That is correct.
17       Q.    How then would that be accounted
18  for? You said you would write it off?
19       A.    Hm-hmm.
20       Q.    Where would that get written off?
21  Would that be when you reconciled the books late
22  in the following month, like the 25th of the
23  following month?
24       A.    Yes. Basically when it actually

119

1   gets wherein off by the 25th or the 15th,
2   depending on where we are on closing the
3   financial statements for that particular month,
4   you get the bank statement and you actually see
5   the debit in your bank statement and then you
6   write it off in your bank statement, through your
7   bank statement in your financials.
8        Q.    I asked you September 1, 2003,
9   because you're explaining to me under the
10  policies and procedures you had a place at that
11  time, correct?
12       A.    That is correct.
13       Q.    Did you understand?
14       A.    Yes.
15       Q.    What amount would you write off
16  the following month as you explained?
17       A.    Well, the debit, whatever the
18  amount of the debit is in the bank statement. So
19  if the check was 106 and it bounced or came back
20  as NSF, we would have to expense $106.
21       Q.    Would you then send that check to
22  collections or how would you handle that check?
23       A.    It depends. Typically the check
24  would go back to operations. They would try to

120

1   collect it for forty-five days. And if they're
2   unsuccessful, it would go back to collection. It
3   would go to the in-house collection.
4        Q.    I'm sorry, who would get it?
5        A.    So when the check becomes bad, so
6   Let's differentiate between when it gets written
7   off versus when the information comes.
8        Q.    September 1, 2003, I'll give you
9   a pen if you want to visualize it, September 1,
10  2003, I write the check; within a day so, by
11  September 3rd, you know it's insufficient funds?
12       A.    If it is electronic, we will know
13  within forty-eight hours. Electronically it is
14  insufficient funds. Then the physical check would
15  probably arrive within twenty-four to forty-eight
16  hours after that.
17       Q.    Okay.
18       A.    Once the check arrives, it is
19  given to the operations or people at the booth or
20  the Financial Service Center to collect the check
21  for forty-five days, and if they're unsuccessful,
22  the check would go to collections. There are
23  also exceptions.
24       Q.    That was the policy and procedure

121

1   in place in September, 2003, correct?
2        A.    That is correct.
3        Q.    And what would happen if you did
4   ultimately collect it; how would you account for
5   it?
6        A.    If you ultimately collected, it
7   would go back as collection revenue. When you
8   expense it, it's bad check expense, and when you
9   collect it, it's collection revenue.
10       Q.    That accounting procedure was in
11  place last year?
12       A.    That is correct. Can I get some
13  water, please?
14       Q.    Sure.
15            MR. BEAUSOLEIL: Let's take a
16  five-minute break.
17            (Whereupon a comfort recess
18       was taken at 11:45 a.m.)
19            (Whereupon the deposition resumed
20       at 11:56 a.m.)
21  BY MR. BEAUSOLEIL:
22       Q.    What I didn't ask you was did you
23  ever -- are you a certified CPA?
24       A.    I've passed the CPA exam. I

31 (Pages 118 to 121)

122

1  don't have a CPA valid license.
2  **Q.    Have you ever had one?**
3  A.    No.  I did not go into public
4  accounting.
5  **Q.    So after you graduated college,**
6  **you then sat for the CPA exam?**
7  A.    That is correct.
8  **Q.    Have you gone to anymore**
9  **education, any continuing education?**
10  A.    Yes, I regularly take continuing
11  education classes and seminars just to keep up
12  with what's going on.
13  **Q.    Is that in a particular field?**
14  A.    Accounting financing.
15  **Q.    Have you worked on any graduate**
16  **degrees or anything?**
17  A.    No, I have not.
18  **Q.    Do you have a company, like a**
19  **written policy or procedure in place as to how to**
20  **handle bad checks?**
21  A.    From operations or finance
22  perspective?
23  **Q.    I guess both.**
24  A.    Operations we do.  Finance we

123

1  don't, or accounting side we don't.  Operations
2  we do.
3  **Q.    So the operations, you're talking**
4  **about people in the cash booth?**
5  A.    Yes, how the process of
6  collecting the check works.
7  **Q.    Do you know generally what they**
8  **cover?**
9  A.    As we discussed earlier.
10  **Q.    Forty-five days?**
11  A.    Forty-five days.
12  **Q.    Basically keeping them from**
13  **violating any collection laws?**
14  A.    We deal with first-party
15  collections, so the collection laws don't really
16  apply to first-party collection because we're
17  collecting checks which are written to us
18  directly.
19  **Q.    But you do not have written**
20  **policies and procedures in the finance part of**
21  **it?**
22  A.    That is correct.
23  **Q.    So who sets those -- who**
24  **determines what the practice will be, is that**

124

1  **you?**
2  A.    That would be the auditors who
3  determine that.
4  **Q.    You mean outside auditors?**
5  A.    Yes, independent auditors.
6  **Q.    Do you have any role in that?**
7  A.    Setting the policies and
8  procedures from the audit side of accounting, no.
9  They advise us on what the GAAP requirements are
10  for.
11  **Q.    G-A-A-P?**
12  A.    G-A-A-P.
13  **Q.    How many times in your career**
14  **have you accepted a Note from a customer who**
15  **wrote a bad check?**
16  A.    From a customer, I don't recall.
17  The Howard LeRoy and Pauline Howard would be in
18  my memory the first customer.
19  **Q.    Where Chex ever took a Note and**
20  **exchanged it for bad checks?**
21  A.    That is correct.
22  **Q.    Has any one customer ever written**
23  **more than six hundred thousand dollars in bad**
24  **checks other than the Howards?**

125

1  A.    Well, you would have to -- over a
2  period of time or a week or a day?
3  **Q.    Is it my understanding that they**
4  **wrote six hundred thousand dollars in bad checks**
5  **in one month?**
6  A.    That is correct.
7  **Q.    Has any other customer ever done**
8  **that?**
9  A.    I would have to go back and look
10  at the transaction history to determine that.
11  **Q.    Are you saying it's possible that**
12  **in the years you worked at Chex, that some other**
13  **customer wrote six hundred thousand in bad checks**
14  **in one month?**
15  A.    In bad checks?  No.  Checks, yes,
16  there's a possibility.  I would have to go and
17  looking.  Bad checks from one customer for six
18  hundred thousand dollars, no.
19  **Q.    And would it be fair to say Chex**
20  **has never received, other than with the Howards,**
21  **over a hundred thousand of bad checks from one**
22  **customer in one month, a hundred thousand**
23  **dollars?**
24  A.    I would not be able to answer

Ijaz Anwar

126

1  that question without going back and looking in
2  the data base or the history.
3      Q.    Well, this is the only customer
4  who ever wrote six hundred or more in bad checks;
5  is that right?
6      A.    That is correct.
7      Q.    In one month?
8      A.    Yes.
9      Q.    Are there any other incidents
10 that stick out in your mind, any other
11 significant amounts where one customer wrote that
12 many bad checks in one month?
13     A.    In the range of six hundred?
14     Q.    Well, any item, whether it was
15 two hundred, whether it was three hundred, but
16 any significant number other than this six
17 hundred.
18     A.    Yes. A significant number, well,
19 I guess it depends how you define "significant."
20 To my memory, you know, ten thousand, fifteen
21 thousand is what I remember the maximum amounts
22 from a particular customer sitting right here
23 today.
24     Q.    And the maximum amount that a

127

1  particular customer wrote in a month?
2      A.    No, that went bad.
3      Q.    That went bad?
4      A.    Yes.
5      Q.    So it could have been over a
6  couple months?
7      A.    Yes.
8      Q.    Before you caught it kind of
9  thing?
10     A.    Yes.
11     Q.    When did you first learn that the
12 Howards had written six hundred -- I think my
13 understanding is it's $606,316; does that sound
14 right to you?
15     A.    Yes, it's in the range of six
16 hundred thousand dollars.
17     Q.    So when did you first learn that
18 the Howards had written over six hundred thousand
19 dollars in bad checks?
20     A.    I don't remember the exact date.
21 If they were written during the month of
22 September, I would have found out immediately a
23 few days after that they wrote it.
24     Q.    As we went through the time line

128

1  before, what's the longest it would have taken
2  you to find out if they were manual checks?
3      A.    A material amount like this?
4      Q.    Yes.
5      A.    Within a week. Maximum, a week.
6      Q.    Okay. So within a week of them
7  writing checks, you're confident you knew about
8  it?
9      A.    Yes.
10     Q.    Do you know if the checks were
11 written in August or September?
12     A.    I don't. I don't know that
13 sitting here right now.
14     Q.    Do you know how long after
15 learning about it you got a Note from the
16 Howards?
17     A.    You would have to look at the
18 date of the Note. I don't know what the date of
19 the Note is. Well, I don't know. I can't answer
20 that question, either. I don't remember the
21 dates.
22     Q.    I'll show you the Note in a
23 minute, but I wanted to see in your mind if you
24 could remember a time frame. Was it within a

129

1  week, two weeks?
2      A.    No, the Note was executed not
3  within a week or two weeks. It was executed
4  longer than that. I don't know exactly when.
5      Q.    Was it executed within a month of
6  you finding out or more?
7      A.    You know, I would have to -- I
8  don't know. I'm sorry.
9      Q.    How could we find out? Would you
10 still have the cancelled checks or something like
11 that?
12     A.    The cancelled checks, we have the
13 cancelled checks and I believe we have presented
14 all the communication and documentation with the
15 Howards as well. So we should be able to
16 determine from those documents.
17     Q.    How did the six hundred thousand
18 in bad checks come to your attention?
19     A.    How did it come to our attention?
20 We received a record from a vendor we used called
21 Solutran, S-O-L-U-T-R-A-N, and it was an
22 electronic report informing us of the bad checks
23 coming back.
24         MR. BEAUSOLEIL: Would you mark

33 (Pages 126 to 129)

Esquire Deposition Services

Ijaz Anwar

130

1    that as a request. (Speaking to the
2    court reporter)
3    BY MR. BEAUSOLEIL:
4        Q.    Can you just spell it for me?
5        A.    S-O-L-U-T-R-A-N.
6        Q.    Did it take a little while to
7    negotiate the Note with the Howards?
8        A.    Yes.
9        Q.    What first happened when you
10   learned from Solutran that this had happened,
11   that somebody had written six hundred thousand in
12   bad checks? What was your next step; what did
13   you do?
14       A.    Well, the very first thing we did
15   was we called Solutran and said, "Have you made a
16   mistake in the report?" And eventually after a
17   few days the check copies were mailed which
18   reverified what had happened. We communicated to
19   the operations; asked them exactly what happened,
20   and there was a breakdown in the operating
21   policies and procedures.
22       Does that answer your question?
23       Q.    Yes. Do you know how many checks?
24   Can you give me a ballpark?

131

1        A.    Yes. I think the average check
2    is $7,800 each. So you can take the 601 divided
3    by 7,800. It's in that range.
4        Q.    Was disciplinary action taken
5    against any employee because of this?
6        A.    Yes, employees were written up,
7    and one of the directors was demoted.
8        Q.    Who is this?
9        A.    Pam Houle, H-O-U-L-E. Not solely
10   for this, but an accumulation of events,
11   including what happened at Seminal, from being a
12   director to a lower position in management. So
13   there was some action taken.
14       Q.    Do you know who was written up?
15       A.    I don't remember. I don't recall
16   the names of the employees that were written up.
17       Q.    All the disciplinary actions were
18   directed towards people in the casino level?
19       A.    Operations.
20       Q.    Where were the checks written,
21   what casinos?
22       A.    Casino Hollywood for sure and I
23   think the other one -- that's Seminal Casino
24   Hollywood, and I believe the other casino was

132

1    Tampa. I think so. I'm not sure.
2        Q.    Was that one of the reasons cited
3    by Seminal Tribe for you losing the contracts
4    there?
5        A.    I do not recall that being the
6    reason.
7        Q.    Did that become an issue?
8        A.    With the tribe, no.
9        Q.    Did it affect your relationship
10   with -- did that incident affect your
11   relationship with the tribe?
12       A.    No.
13       Q.    When did Chex first notify iGames
14   about this bad debt?
15       A.    I believe iGames found out
16   through the SEC filings about this incident.
17       Q.    When?
18       A.    I do not exactly remember when.
19       Q.    Would it have been around January
20   27, 2004?
21       A.    The September "Q" was due in
22   November.
23       Q.    What does it become public?
24       A.    Well, it depends if you file

133

1    timely or take an extension. So I don't know
2    exactly if he filed an extension for the
3    September "Q." So I can't exactly answer you
4    when was this filed and made public.
5        Q.    Well, generally, you said it was
6    due in November. Do you know what part of
7    November?
8        A. .    By the middle of November.
9        Q.    November 15th; is that right?
10       A.    Yes.
11       Q.    And then you could get an
12   extension, though, beyond that date?
13       A.    Yes, ten working days.
14       Q.    So if it actually was filed by
15   November 15th, when would it become publicly
16   available?
17       A.    Immediately.
18       Q.    What was your next step? You
19   said that you first took action at the booth
20   level to find out what went wrong.
21       A.    I didn't take action. The
22   operations.
23       Q.    As part of the management team
24   took action?

34 (Pages 130 to 133)

Ijaz Anwar

134

1    A.    That's correct, yes.
2    Q.    What was the next step reacting
3 to this bad debt?
4    A.    The next step, as I recall, was
5 getting in touch with the Howards and asking them
6 exactly what happened and how can we resolve this
7 issue.
8    Q.    Normally the people in the booth
9 would have handled it for forty-five days,
10 correct?
11    A.    That is correct.
12    Q.    But in this case you took it
13 over?
14    A.    That is correct.
15    Q.    Is that because this was such a
16 significant debt?
17    A.    It was materially high, yes.
18    Q.    And how did your conversations
19 with the Howards go?
20    A.    It went well initially.  They
21 were willing to give us a mortgage on their three
22 properties and they immediately initiated the
23 process of refinancing the properties to pay back
24 the debt.  And we actually took over the process

135

1 of refinancing, also.  So we controlled the
2 process of refinancing their properties.
3    Q.    You said they agreed to give you
4 a Note and to give you a mortgage and you were
5 involved in the refinancing process?
6    A.    Yes.
7    Q.    We'll go through the documents.
8        Did you investigate whether they
9 cashed those checks as part of some kind
10 of scheme, criminal scheme?
11    A.    We did some analytical checks
12 with the casino.  What we were concerned with was
13 did they really play the money at the casino or
14 did they just take the cash and not do anything
15 with it.  So that's a step we took.  The casino
16 was not able to determine, based on the volume
17 that they do, and this did not happen on one
18 particular day.  It was over a few days, and I
19 don't remember exactly how many.  So they weren't
20 able to determine was the money actually played
21 in the casino or was it just taken out.
22    Q.    Were these checks written within
23 a few days of each other?
24    A.    Yes, they were not on one

136

1 particular day.  They were over a few days.
2    Q.    It wasn't more than a week, was
3 it?
4    A.    No. And again, once we get the
5 checks, we can determine the dates.
6    Q.    Who has the cancelled checks?
7    A.    It's there in my possession.
8    Q.    Did you turn or consult with the
9 local police or any authorities concerning this?
10    A.    We consulted attorneys.  We
11 consulted attorneys and a determination was made
12 that filing charges would not be the best
13 strategy.
14    Q.    Why?
15    A.    Because based on the consumer
16 protection laws in Florida, you could file
17 charges, but it would go into litigation and
18 collectability, winning a case and collectability
19 is a different issue.
20    Q.    Did you do criminal checks on
21 these people?
22    A.    Did we do criminal checks on
23 these individuals?  I do not recall if we did
24 criminal checks.

137

1    Q.    Well, what kind of background,
2 before you took the Note and they promised you
3 mortgages and a refinance, but before you did
4 that, did you do any background checks on the
5 people?
6    A.    We did an asset search, a very
7 extensive asset search on the Howards as a family
8 just to make sure they don't have any other
9 assets.
10    Q.    Did you do that before you took
11 the Note?
12    A.    I don't remember if we did that
13 before or after.
14    Q.    So when you took the Note,
15 searching their background and determining their
16 assets wasn't necessary before you took the Note?
17    A.    I did not understand that
18 question.
19    Q.    Well, before you took the Note,
20 did you think it was important to first see
21 whether these people had assets and whether they
22 had criminal records, particularly in this kind
23 of field of hanging paper?
24    A.    You lost me again.  I'm sorry,

Ijaz Anwar

138

1    could you please repeat that question?
2        Q.    You took a Note for six hundred
3    thousand dollars?
4        A.    Yes. Can you tell me what the
5    date of the Note is, if you don't mind?
6        Q.    September 15, 2003, you took the
7    Note.
8        A.    Okay. But I think the point is
9    this, if I may interrupt, I don't know when we
10   actually executed the Note, but it's dated the
11   15th. That is directly linked to, I think, your
12   question.
13       Q.    When did you actually negotiate
14   and take the Note?
15       A.    I don't remember that date.
16       Q.    You just need to put it in
17   perspective with other events?
18       A.    Yes. I'm just thinking about it.
19   It was not on September 15th. It was subsequent
20   to that.
21       Q.    Well, we'll go through some of
22   these documents. But there was an asset search
23   done like on January 27th. Was that accomplished
24   before the Note was signed?

139

1        A.    I believe it was after. I do not
2    recall.
3        Q.    And who decided to date the Note
4    September 15th; who picked that date?
5        A.    I think the determination of
6    September satisfy 5th based on the dates on the
7    checks. That would have been the logical thing
8    to do.
9        Q.    Whose idea was it?
10       A.    Since I was involved in
11   negotiating the Note with them or working on the
12   Note with them, it would have been my idea.
13       Q.    You said it was the logical
14   thing to do. Isn't the logical thing to do is to
15   date the Note the day you signed it?
16       A.    No, you sign the Note the date
17   the amount is due. Rather than the date, you
18   sign it. So to establish that they owed us money
19   based on bad checks on a certain date, we dated
20   the Note for that particular date.
21       Q.    Did the date on the Note, did you
22   consider at all your transaction with iGames in
23   coming up with this September 15, 2003, date?
24       A.    No, we did not or I did not.

140

1        Q.    Was anyone else involved in the
2    decision to date the Note September 15th?
3        A.    No, not for the dating of the
4    note, no.
5        Q.    You told me before that normally
6    you would immediately write off a check and then
7    begin your collection efforts or during that time
8    begin your Chex efforts. How did you handle this
9    check on your books, these checks, this six
10   hundred thousand dollars?
11       A.    We basically booked a receivable
12   based on the Note and the collateral that we had.
13       Q.    Go ahead.
14       A.    We call it receivable based on
15   the Note and the collateral that we had to
16   support the valuation of the Note on that
17   particular date.
18       Q.    Well, you said when you do an
19   accounting for that month, you would be doing
20   your accounting in October for the September bad
21   checks, correct?
22       A.    That is correct.
23       Q.    And typically you would write
24   that off?

141

1        A.    That is correct.
2        Q.    And here you said instead of
3    doing that, you put the Note, a receivable in
4    your books?
5        A.    That is correct.
6        Q.    Explain why you did that instead
7    of writing it off.
8        A.    The materiality of the amount
9    based on the consultancy with the management of
10   Equitex as well as the accountants, we made a
11   determination that we had the option of
12   classifying this as a receivable versus writing
13   off the amount on the financial statements.
14       Q.    What purpose would doing that
15   serve?
16       A.    Classifying as a receivable?
17       Q.    Yes.
18       A.    Well, if we have the option to
19   classify that as a receivable, it would obviously
20   reflect less expenses on the financial
21   statements.
22       Q.    Did you do that so that iGames
23   wouldn't realize the problem you had there with
24   the six hundred bad debt?

36 (Pages 138 to 141)

Ijaz Anwar

142

1    A.    The overall materiality of the
2  transactions that we do over the course of a
3  particular year, this one particular incident I
4  don't think constitutes material enough to do or
5  classify a transaction in the manner to avoid or
6  be concerned about what the iGames' reaction
7  would be.
8    Q.    You had no concern about iGames'
9  reaction to the $606,000 in bad debt?
10   A.    When we classified this Note as a
11  receivable, I do not recall our concern was
12  iGames' reaction.
13   Q.    What about the reaction of your
14  investors, was that a concern?
15   A.    No.  If you look at the overall
16  bad debt expense in our financial statements and
17  compare this amount, our bad debt is around two
18  to three, three-and-a-half million a year.  So I
19  don't think this amount was significantly
20  material to be concerned about the Note holders.
21   Q.    It was significant enough to
22  handle it differently than any other check that
23  had ever been handled by you?
24   A.    True.

143

1    Q.    But it was not significant enough
2  to hide from iGames?
3    A.    When we classified that as a
4  receivable, the purpose was not to do it because
5  how iGames would react to that particular
6  incident.
7    Q.    Well, in October you're doing
8  your books and you said you didn't write it off,
9  you noted it as a receivable?
10   A.    Hm-hmm.
11   Q.    But you didn't have a Note at
12  that time.  How could you justify marking it as a
13  receivable when all you had was discussions with
14  the Howards and checks marked NSF?
15       MR. PORETTI:  Objection.  It
16   assumes facts not in evidence.  It calls
17   for speculation and lacks foundation.
18       MR. BEAUSOLEIL:  Can you read my
19   question again because there's no
20   objection to that question.  It's not
21   objectionable.
22       (Whereupon the court reporter
23   read back the last question as follows:)
24   "Question:  But you didn't have a

144

1  Note at that time.  How could you
2  justify marking it as a receivable when
3  all you had was discussions with the
4  Howards and checks marked NSF?"
5       MR. BEAUSOLEIL:  The only change
6   was, I correct myself, it's several
7   checks.
8       MR. PORETTI:  The same objection.
9   I'll also add that I object on the basis
10   that it's vague.
11  BY MR. BEAUSOLEIL:
12   Q.    You still have to answer.
13   A.    Could you clarify the question
14  again for me?  I really didn't understand it or
15  break it down, please.
16   Q.    You told me normally you would
17  write a check off, correct?
18   A.    Yes.
19   Q.    And in October you're telling me
20  you did not write a check off; you did not write
21  the six hundred thousand worth of checks off.
22  Instead you marked in the books a receivable from
23  the Howards?
24   A.    In September we marked the

145

1  receivable.
2    Q.    You marked it in September?
3    A.    Well, in the financial statements
4  is for September.
5    Q.    You're doing it back for
6  September.  You're doing October 1st for
7  September.
8    A.    The checks went bad in September.
9  It is reflected in the financial statements as a
10  receivable in September.  I don't know exactly
11  the date the Note was executed.
12   Q.    Well, we established it certainly
13  wasn't in September, correct?
14   A.    I believe, yes, that probably is
15  correct, yes.
16   Q.    My question was then, how, if you
17  did not have a Note from the Howards, all you had
18  were bad checks, --
19   A.    In which period?
20   Q.    For the September period.
21   A.    Okay.
22   Q.    -- how could you put in a
23  receivable on your books in September when you
24  had no Note?

Ijaz Anwar

146

1      A.    The way the accounting GAAP
2 works, if you have established a basis to justify
3 an event in the past, you can classify that Note
4 for that particular date and book a receivable,
5 because the financials for the month of September
6 are not completed anyway until the end of, the
7 middle of October. And the "Q" especially is
8 filed even later that. And there's always
9 adjustments from the auditors, and you can go
10 back and rectify things on a particular date from
11 back and do those things. It was with the
12 consent and the knowledge of the auditors.
13     Q.    Okay. So you could take your
14 knowledge in October and November, if you end up
15 getting into November, and use that to adjust the
16 books in September, correct?
17     A.    That is correct.
18     Q.    So if you got the Note in October
19 or November and dated it September 15th, you
20 could then go on your books, note a receivable
21 for September because you now have that Note?
22     A.    That is correct.
23     Q.    You also need, in addition to the
24 Note, if they believe that, you could collect on

147

1 that Note?
2     A.    That is correct.
3     Q.    So when you're doing your books
4 for September it's going to be, by the time you
5 complete them, around October 25th or even later,
6 correct?
7     A.    For this particular quarter, it
8 was a "Q" filing, 10-Q filings, so it was even
9 later than October.
10     Q.    It was in November?
11     A.    15th of November or if the
12 extension was filed subsequent to that.
13     Q.    So you're filing at the earliest
14 November 15th, and on that date you need a good
15 faith basis to believe not only that you have a
16 Note but that you could collect the Note?
17     A.    That would be a correct
18 statement.
19     Q.    You said "that would be a correct
20 statement"?
21     A.    A correct statement, yes.
22     Q.    Did you have on November 15,
23 2003, a good faith belief that you could collect
24 six hundred thousand from the Howards?

148

1      A.    Absolutely. We got valuations
2 from some independent appraisals in giving the
3 initial valuation on the properties, and based on
4 those assessments we were comfortable, so were
5 the auditors, that we could record this as a
6 receivable.
7     Q.    Weren't the Howards in default of
8 the Note a month before November 15th?
9     A.    A month before November 15th?
10 Well, again it depends when the Note was
11 executed.
12     Q.    Okay. Weren't the Howards in
13 default of the Note as after October 14, 2003?
14     A.    Well, if the Note was not
15 executed on October 14th, we would not know if
16 they were in default.
17          (Whereupon a document entitled
18     Promissory Note dated September 15, 2003,
19     was marked as iGames-3)
20 BY MR. BEAUSOLEIL:
21     Q.    We marked iGames-3. This is a
22 Promissory Note it says at the top. Can you look
23 at this document.
24          (Whereupon iGames-3 was

149

1 handed to the witness to peruse)
2          THE WITNESS: Okay.
3 BY MR. BEAUSOLEIL:
4     Q.    Is that the Note that the Howards
5 signed that we've been discussing?
6     A.    For the record, they're two
7 Notes. So this is the initial Note the Howards
8 signed.
9     Q.    This is the initial Note that the
10 Howards signed. And this is dated September 15,
11 2003, correct?
12     A.    That is correct.
13     Q.    This is the Note we've been
14 discussing, correct?
15     A.    I believe so, yes.
16     Q.    So can you give me, looking at
17 that, any estimate of when it was actually
18 signed?
19     A.    I really cannot. Looking at this
20 document, based on what was going on during 2003,
21 as to what date this Note was executed.
22     Q.    You consider accepting a Note
23 like this in lieu of six hundred thousand dollars
24 worth of bad checks to be in the ordinary course

Ijaz Anwar

150

1  of business?
2      A.   Well, ordinary course of
3  business--
4          MR. PORETTI:  I'm going to object
5          to the extent it calls for a legal
6          conclusion, but you go ahead and answer
7          it.
8      A.   A Note like this as in the
9  ordinary course of business, no, it would not be
10 considered in the ordinary course of business.
11     Q.   The Note is dated September 15,
12 2003.  In the third paragraph, it says
13 "Notwithstanding anything contained herein to the
14 contrary, on October 14, 2003, the entire
15 outstanding principal balance, together with
16 accrued interest and any other amounts due
17 hereunder, shall be due and payable in full."  Do
18 you know in reading that, does that refresh your
19 recollection as to when the Note was actually
20 signed as opposed to dated?
21     A.   It does not.
22     Q.   It does not?
23     A.   No.
24     Q.   Well, would you agree that as of

151

1  October 14, 2003, the entire outstanding
2  principal balance was not paid?
3      A.   Yes.
4      Q.   Would you agree that they had, in
5  fact, the Howards had, in fact, made zero
6  payments as of October 14, 2003, towards this
7  Note?
8      A.   Yes.
9      Q.   Would you agree, then, that on
10 November 15, 2003, you at that point already knew
11 that the Howards were in default on this Note,
12 had not paid any money?
13         MR. PORETTI:  Objection.  It
14         assumes facts not in evidence.
15     A.   My challenge is I don't know if
16 this Note was signed before November 15th even
17 though it's states the payment was due on October
18 14th.  But if they never signed it on November
19 15th, it's difficult to determine.
20     Q.   So it's possible that you asked
21 them, got them to sign this document after
22 October 14, 2003?  Is that possible?
23     A.   It is possible.  I just don't
24 know the date.

152

1      Q.   And so upon signing it, they
2  became in default of the Note?
3      A.   That would be a correct statement
4  if they read the Note correctly, yes.
5      Q.   Did you do that on purpose?
6      A.   No, I did not do that on purpose.
7      Q.   Did you draft this Note?
8      A.   I believe the attorneys drafted
9  the Note. I did not draft this Note.
10     Q.   What law firm drafted this note?
11     A.   Well, we used two law firms;
12 started with Rider Bennett and also used a law
13 firm out of Florida by the name of, I don't know,
14 you have the documents, Knight.
15     Q.   Holland Knight?
16     A.   Holland Knight.
17     Q.   Whose idea was it to take a Note
18 on this debt?
19     A.   The management collectively
20 discussed and we collectively decided, consulted
21 with the accountants and decided to pursue
22 collectability of the debt through a Note and
23 taking a security interest in the properties.
24     Q.   When did the initial discussion

153

1  take place?
2      A.   I don't know the exact timeframe.
3  Definitely before the 10-Q was filed.
4      Q.   Did Henry Fong or anyone else at
5  Chex or Equitex tell you to bury this debt?
6      A.   Could you define "bury this
7  debt"?
8      Q.   Hide it, paper it.
9      A.   From who?
10     Q.   From investors, stockholders,
11 from iGames, from anyone.
12     A.   It was disclosed in the filings.
13 I don't think anybody buried the debt.  And there
14 was a Note in the 10-Q financial statements
15 clearly disclosing what has taken place.
16     Q.   Clearly disclosing; is that your
17 testimony?
18     A.   Yes, it's in the "Q."
19     Q.   When was it first -- we already
20 asked that.
21         You did not notify iGames about
22         it, correct?
23     A.   That is correct.
24     Q.   They came up; they found it and

Esquire Deposition Services

DEC 28 2004

1          UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF DELAWARE

3                    -   -   -

4    iGAMES ENTERTAINMENT,:   CIVIL ACTION
     INC.,                 :

5              v.          :        **ORIGINAL**
                           :

6    CHEX SERVICES, INC.   :
     and EQUITEX, INC.     :CIVIL ACTION NO.

7                          : C.A. 04-180-KAJ

8                    -   -   -

          December 15, 2004

9                    -   -   -

          Volume II

10              Continuation of the oral

11   deposition of IJAZ ANWAR taken pursuant

12   to notice, was held at the law offices of

13   DUANE MORRIS, LLP, 4200 One Liberty

14   Place, 1650 Market Street, Philadelphia,

15   Pennsylvania beginning at 9:56 a.m., on

16   the above date, before Terri L.

17   Ochipinti, a Professional Reporter and

18   Commissioner of Deeds in the Commonwealth

19   of Pennsylvania.

20                    -   -   -

21        ESQUIRE DEPOSITION SERVICES

               15th Floor

22      1880 John F. Kennedy Boulevard

        Philadelphia, Pennsylvania 19103

23            (215) 988-9191

24

IJAZ ANWAR

1        A.    These are the warrants that
2  were given to -- some where given to
3  Blake Advisors and some were given to
4  White Box and Pandora.  So that's a Black
5  Shore valuation for the warrants.
6        Q.    It also mentions Seven
7  Ventures.  When did you begin -- when
8  were you first contacted -- let me ask
9  you this in a different way.
10            First of all, what is Seven
11 Ventures?
12       A.    Seven Ventures is a shell, a
13 bulletin board shell, so that's what
14 Seven Ventures is.
15       Q.    When did you first become
16 aware of Seven Ventures?
17       A.    I believe sometime during
18 January of 2004.
19       Q.    And how did you become aware
20 of that?
21       A.    We were approached by a
22 representative of -- not a
23 representative, an individual that does
24 deals by name of Mark Savage.  It could

IJAZ ANWAR

1   have been end of December, beginning of

2   January, in that time frame.  So he

3   approached us and said, you know, there's

4   a merchant banking forum that is

5   interested in gaining business and

6   transaction.  Would you be interested in

7   looking into it?  I said, sure.

8           Q.      And was the merchant banker,

9   Maroon Bells?

10          A.      Yes.

11          Q.      I'm going to show you what's

12  he been marked Exhibit 96.

13          A.      Thanks.

14          MR. BEAUSOLEIL:  Do you have

15      that?  It's a prior deposition.

16          MR. ROBBEN:  I'm pretty sure

17      I have it.

18          THE WITNESS:  I got it,

19      thanks.

20  BY MR. BEAUSOLEIL:

21          Q.      Can I see what I handed you?

22          A.      An e-mail from --

23          Q.      And the first e-mail there

24  is from Chris Larson to you?

IJAZ ANWAR

1          Q.      Was White Box told that you
2    were going to terminate the stock
3    purchase agreement before you notified
4    iGames?
5          A.      I don't think we told White
6    Box that.  I don't remember telling White
7    Box that.
8          Q.      Once White Box or -- once
9    iGames was dropped from the term sheets
10   with White Box, was it understood that
11   iGames would not go through -- or was it
12   understood that Chex would not close on
13   the November 3, 2003 stock purchase
14   agreement?
15         A.      I think, yeah, it would be
16   once iGames was dropped, I think it was
17   mutually understood that's why everybody
18   was working on the new merger agreement;
19   that it would be very difficult to close
20   on the signed SPA, yes.
21         Q.      Do you believe that the
22   stock purchase agreement, November 3,
23   2003 agreement was still binding, was
24   still the binding document between

1   iGames, Chex and Equitex when you

2   terminated it?

3          A.    Yes.   It was the only

4   binding agreement.

5          Q.    Okay.

6               (Exhibit 114 marked for

7               identification.)

8   BY MR. BEAUSOLEIL:

9          Q.    Were you still negotiating

10  with Mercantile in February for money?

11         A.    I am quite certain I know I

12  can't pinpoint the date again, but based

13  on the documentation you have, we

14  possibly were.

15         Q.    All right.   Let me hand you

16  Exhibit 114.  Take a look at this and let

17  me know if you have seen it before.

18         A.    (Witness complies).

19         Q.    Have now had a chance to

20  look at Exhibit 114?

21         A.    Yes.

22         Q.    First of all, is Carey the

23  secretary you were trying to think of

24  before, the Blake Advisors assistant or

IJAZ ANWAR

1          Q.      But the first two, the

2     Maroon Bells corporate documents were

3     attached to the document?

4          A.      Yeah.

5          Q.      Those two are attached?

6          A.      Yeah.

7          Q.      And this is dated January

8     15, 2004; is that right?

9          A.      Yes.

10         Q.      And what is this?

11         A.      This is an introductory

12     letter from Chex Services to Maroon Bells

13     Capital, and then confidential evaluation

14     and a mutual loan disclosure agreement to

15     Maroon Bell Capital.  Corporate Capital

16     Management, LLC, as we talked this

17     morning, Mark Savage is with Corporate

18     Capital Management.

19         Q.      Okay.  I'm sorry.  I see

20     that.  What I was looking at is e-mail

21     correspondence to Capital Management,

22     LLC.  What caused you to write this

23     January 15, 2004 letter?

24         A.      When Mark Savage approached

IJAZ ANWAR

1  like any companies that you have been

2  introduced to?

3         A.    I think they are referring

4  -- the first company to is -- first one

5  or the second one, the only company that

6  I'm aware of actually -- two companies

7  can Pay Guard and Pay To, and I think

8  that that's what they're referring to.

9  I'm not certain.  Both out of Europe.

10         Q.    Let me hand you Exhibit 125.

11             (Exhibit 125 marked for

12             identification.)

13  BY MR. BEAUSOLEIL:

14         Q.    Have you seen this document

15  before?

16         A.    From Rick Landry to us.  I

17  do recall receiving this document from

18  Rick Landry.

19         Q.    Okay.  The initial e-mail

20  down below here is from you to Rick

21  Landry at Maroon Bells?

22         A.    Yes.

23         Q.    And you ask him to send you

24  information and he then sends you a list

IJAZ ANWAR

1    discussions I've had with Henry and Jim

2    alluded to that if we have to close and

3    liquidate Equitex that's what we would

4    do.  So I don't think -- I have not heard

5    them taking a position that because of

6    tax consequences we are not going to

7    close on the SPA.  I personally did not

8    hear.

9        Q.    Do you know whether Equitex

10   committed to moving forward on the -- he

11   sorry.  Let me ask you a new question.

12            Do you know when it was

13   finally decided that Equitex would close

14   on the White Box financing?

15       A.    When Equitex decided they

16   would close on the White Box financing?

17   I think after speaking to Chris in

18   January Equitex had the intent to move

19   forward with White Box financing.  I

20   don't -- I can't pin down the exact date

21   of their intent.

22       Q.    Did you participate in the

23   March 3, 2003 board of directors meeting

24   of Equitex which was done via conference