**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| **iGAMES ENTERTAINMENT, INC.,** | : | |
| Plaintiff, | : | C.A. No. 04-180 (KAJ) |
| v. | : | |
| **CHEX SERVICES, INC.** and **EQUITEX, INC.,** | : | |
| | : | JURY TRIAL DEMANDED |
| Defendants. | : | |

# Appendix of Exhibits To iGames Entertainment, Inc's Opposition To Chex's Motion For Summary Judgement

# Exhibit C

FROM KLEHR HARRISON                    (WED) 1. 21' 04 16:16/ST. 16:15/NO. 4862034594 P  2

### Term Loan Note

$4,000,000

Philadelphia, PA

FOR VALUE RECEIVED, the undersigned, iGAMES ENTERTAINMENT, INC., a Nevada corporation with its chief executive office and principal place of business at 700 S. Henderson Road, Suite 210, King of Prussia, PA 19406 (the "Borrower"), promises to pay to the order of CHEX SERVICES, INC., with offices located at 11100 Wayzata Blvd., Suite 111, Minnetonka, Minnesota 55305 (the "Lender") the principal sum of Four Million Dollars ($4,000,000) or, if less, the aggregate outstanding principal balance of all advances made by the Lender to the Borrower, as provided for herein (the "Term Loans") together with interest, from the date of this note ("Note"), in like money, at said office of the Lender, at the time and at rates per annum as provided herein..

The Borrower and the Lender agree that the Lender shall advance $2,000,000 to the Borrower on the date hereof and shall advance an additional $2,000,000 to the Borrower on that day that is 60 days following the date hereof, provided that at such time the Borrower is in material compliance with the terms of this Note, the Stock Pledge Agreement (as defined below) and the Stock Purchase Agreement (as defined below). The aggregate amount so advanced shall constitute the "Term Loans" hereunder. The Lender agrees to deliver to the Borrower, within 21 days of the date hereof, a binding commitment for financing sufficient to fund the second advance hereunder either (i) from Mercantile Capital, L.P. on terms satisfactory to the Borrower; or (ii) from another institutional lender satisfactory to the Borrower, which financing shall be either (A) funded prior to the end of such 21 day period and placed in escrow subject to release to the Borrower in accordance with the first sentence of this paragraph, or (B) irrevocably committed to be advanced directly by the financing source to the Borrower in accordance with the first sentence of this paragraph without any further action by the Lender. For avoidance of doubt, any financing that could be diverted to other uses by the Lender, or under which the financing source could decline to advance, shall not satisfy the foregoing conditions. In the event that the Lender fails to comply with the foregoing within such 21 day period, then the Borrower shall have the right at any time thereafter to prepay the principal balance of this Note in full, in which case all further payment obligations of the Borrower, other than with respect to amounts accrued through the date of prepayment, shall terminate.

Interest. For the period ending February 1, 2004, the Borrower shall pay to the Lender interest on the outstanding Term Loans at the rate of fifteen percent (15%) per annum, calculated on the basis of a 360-day year and counting the actual number of days elapsed. In addition, in lieu of interest, the Borrower shall, on a monthly basis, pay to the Lender an amount equal to 50% of the Operating Income of the Borrower's Available Money, Inc. subsidiary ("Available Money") (which for the period ending February 1, 2004 shall be reduced by the amount of interest paid under the previous sentence), provided that, in the event that Lender completes a business combination with any party other than Borrower, or completes a direct or indirect acquisition or purchase or sale of assets or securities with any party other than Borrower, or agrees to complete such a transaction pursuant to a letter of intent or otherwise, then, from the date of such agreement, Borrower shall not be obligated to pay Lender 50% of the Operating Income of Available Money but shall be obligated to pay Lender interest on the outstanding Term Loans at the rate of ten percent (10%) per annum, calculated on the basis of a 360-day year and counting the actual number of days elapsed. "Operating Income" shall mean cash receipts of Available Money generated by normal operations, less all operating expenses, capital expenditures, reserves for taxes and reasonable operating reserves. Each payment shall be accompanied by a report of an officer of the Borrower in reasonable detail setting forth the calculation of Operating Income of Available Money for the applicable period.

Treatment of Revenues and Expenses. The Borrower hereby agrees that, notwithstanding its ownership of 100% of the capital stock of Available Money, for a period of 90 days following the date hereof (or such longer period as the Borrower may consent to in its reasonable discretion) the Borrower shall consent to the inclusion by the Lender in its financial statements of 50% of the revenues and expenses of Available Money; provided that the Borrower's and the Lender's independent auditors deliver their respective opinions that such

PHIL1 552321-5





treatment is in accordance with generally accepted accounting principles.

Stock Purchase Agreement Termination. In the event that the Stock Purchase Agreement is terminated by the Lender and Equitex, Inc. under Section 11(b)(v) thereof, then in addition to any Termination Fee due and payable by the Borrower under the Stock Purchase Agreement, the Borrower shall pay to the Lender as additional interest hereunder the amount of $1,000,000, which shall be due and payable immediately upon demand following termination of the Stock Purchase Agreement.

Repayment: Lender's Option.

(a) No repayment of the principal balance of this Note shall be due and payable until 120 days following the earlier to occur of (i) termination without closing under the Stock Purchase Agreement dated November 3, 2003 between the Lender, the Borrower and Equitex, Inc. and other parties (or any successor agreement for the acquisition of the Lender by the Borrower) (the "Stock Purchase Agreement"), or (ii) 100 days from the date hereof (in either case, the "Initial Maturity Date").

(b) On the Initial Maturity Date, if the Borrower does not pay the outstanding principal balance of the Term Loans, and all accrued but unpaid interest due hereunder in full, the Lender shall have the option to purchase 100% of the capital stock of Available Money from the Borrower for a purchase price of $6,000,000 (the "Option"), exercisable by delivery to the Borrower on the Initial Maturity Date of a written notice of exercise, this Note for cancellation and immediately available funds in an amount equal to $6,000,000 less the then-outstanding principal balance of, and all accrued but unpaid interest on, the Term Loans.

(c) If the Lender does not exercise the Option on the Initial Maturity Date, then the maturity date of this Note shall be extended for one or more additional periods of 30 days (the end of each of which shall be a "Subsequent Maturity Date"). On each Subsequent Maturity Date, if the Borrower does not pay the outstanding principal balance of the Term Loans, and all accrued but unpaid interest due hereunder, in full, the Lender shall have the right to exercise the Option on that Subsequent Maturity Date. If the Lender does not exercise the Option, the maturity date of this Note shall continue to be extended pursuant to this Section until the outstanding principal balance of, and all accrued but unpaid interest on, the Term Loans is paid or the Option is exercised.

(d) Notwithstanding any provision hereof to the contrary, the outstanding principal balance of the Note, and all accrued but unpaid interest hereon, shall be due and payable 180 days following the Initial Maturity Date.

Late Payment Penalty. In the event that Maker fails to pay any amount when due, Maker agrees to pay a late charge equal to ten percent (10%) of the overdue amount. Such late charge shall be due and payable upon demand. Maker acknowledges that it would be extremely difficult or impracticable to determine Holders actual damages resulting from any late payment, and this late charge is a reasonable estimate of those damages. Acceptance of any late charge shall not limit any of Holders other rights or remedies under this Note or the Stock Purchase Agreement.

Payments. All payments required or permitted herein (principal and interest) shall be made to the address from time to time designated by the Holder and shall be paid not later than 5 p.m. (Minnesota time) on the day when due. All payments shall first be applied to interest accrued to the date of payment and the balance of such payment, if any, shall be applied to the unpaid principal remaining due hereon; provided, however, that upon the occurrence of an Event of Default (as defined herein) payment may first be applied to any late charges or sums advanced (if any) by the Lender for the payment of collection costs or other charges or fees (including reasonable attorneys fees). For all purposes herein, the date of payment shall be the date such payment is actually received by the Holder. Payment received by check or draft shall be credited as of the date delivered.

Security. The Borrower's obligations hereunder shall be secured by (i) a pledge of the capital

stock of Available Money pursuant to a Stock Pledge Agreement of even date herewith (the "Stock Pledge Agreement"), (ii) the guaranty and suretyship of Money Centers of America, Inc. pursuant to a Corporate Guaranty of even date herewith, and (iii) the guaranty and suretyship of Available Money pursuant to a Corporate Guaranty of even date herewith.

Events of Default. The occurrence of any one or more of the following events shall constitute an "Event of Default" hereunder:

(a) the Borrower shall fail to pay when due, any installment of principal or interest or fee payable hereunder or any Obligation within 10 days following the date when due;

(b) the Borrower shall fail to observe or perform any other material obligation or covenant required to be observed or performed by it hereunder or under the Stock Pledge Agreement;

(c) the Borrower shall admit its inability to pay its debts as they mature, or shall make an assignment for the benefit of its creditors;

(d) any event of default under the Borrower's primary borrowing facility as a result of which the lender thereunder has declared the principal balance thereof to be due and payable;

(e) proceedings in bankruptcy, or for reorganization of the Borrower, or for the readjustment of any of its debts under Bankruptcy Code, as amended, or any part thereof, or under any other laws, whether state or federal, for the relief of debtors, now or hereafter existing, shall be commenced by or against the Borrower and, if commenced against the Borrower, shall not be discharged within ninety (90) days of their commencement; or

(f) a receiver or trustee shall be appointed for the Borrower or for any substantial part of its assets, or any proceedings shall be instituted for the dissolution or the full or partial liquidation of the Borrower, and such receiver or trustee shall not be discharged within ninety (90) days of its appointment,

Acceleration. Immediately upon the occurrence and during the continuation of any Event of Default, the Lender hereof, at its sole option, and without further notice may declare in writing the entire unpaid principal of this Note together with all interest accrued thereon, to forthwith become due and payable.

Notices. All notices or demands required or permitted to be given pursuant to the terms hereof shall be effective on the date of deposit in the U.S. mails if addressed to the the Lender or the Borrower at its last known address as appropriate, postage prepaid, registered or certified mail, return receipt requested.

Time is of the essence hereof.

Costs. Maker agrees to pay all costs of collection, including reasonable attorneys fees, in case payment of this Note is not made in accordance with its terms.

Governing Law; Jurisdiction. This Note is delivered and made in and shall in all respects shall be construed pursuant to the laws of Minnesota and any and every legal proceeding arising out of or in connection with this Note shall be brought in the appropriate courts of the State of Minnesota, each of the parties hereby consenting to the exclusive jurisdiction of said courts for this purpose.

Remedies. The remedies of the Lender as provided herein, or in the Stock Purchase Agreement, shall be cumulative and concurrent, and may be pursued singularly, successively or together, in the sole discretion of the Lender, and may be exercised as often as occasion therefore shall arise. No act of omission or commission of the Lender, including specifically any failure to exercise any right, remedy or recourse, shall be deemed to be a waiver or release of the same; such waiver or release to be effected only through a written document executed by the Lender and then only to the extent specifically recited therein. Without limiting the generality of the preceding

sentence, acceptance by the Lender of any payment with or without knowledge of the occurrence of Event of Default by Maker shall not be deemed a waiver of an Event of Default, and acceptance by the Lender of any payment in an amount less than the amount then due hereunder shall be an acceptance on account only and shall not in any way affect the existence of an Event of Default hereunder or under the Stock Purchase Agreement. A waiver or release with reference to any one event shall not be construed as continuing, as a bar to, or as a waiver or release of, any subsequent right, remedy, or recourse as to a subsequent event.

Maximum Interest Rate. All agreements between Maker and the Lender are expressly limited so that in no contingency or event whatsoever, whether by reason of: error of fact or law; payment, prepayment or advancement of the proceeds hereof; acceleration of maturity of the outstanding principal balance, or otherwise, shall the amount paid or agreed to be paid to the Lender hereof for the use, forbearance or retention of money to be advanced hereunder, including any charges collected or made in connection with the indebtedness evidenced by this Note which may be treated as interest under applicable law, if any, exceed the maximum legal limit (if any such limit is applicable) under United States federal law or state law (to the extent not preempted by federal law, if any), now or hereafter governing the interest payable in connection with such agreements. If, from any circumstances whatsoever, fulfillment of any provision hereof at the time performance of such provision shall be due shall involve transcending the limit of validity (if any) prescribed by law which a court of competent jurisdiction may deem applicable hereto, then, *ipso facto*, the obligation to be fulfilled shall be reduced to the limit of such validity, and if from any circumstances, the Lender shall ever receive as interest an amount which would exceed the maximum legal limit (if any such limit is applicable), such amount which would be excessive interest shall be applied to the reduction of the outstanding principal balance due hereunder and not to the payment of interest or, if necessary, rebated to the Borrower. This provision shall control every other provision of all agreements between Maker and the Lender.

Survival of Obligations. In the event that at any time any payment received by the Lender hereunder shall be deemed by final order of a court of competent jurisdiction to have been a voidable preference or fraudulent conveyance under the bankruptcy or insolvency laws of the United States, or shall otherwise be deemed to be due to any party other than the Lender, then, in any such event, the obligation to make such payment shall survive any cancellation of this Note and/or return thereof to Maker and shall not be discharged or satisfied by any prior payment thereof and/or cancellation or this Note, but shall remain a valid and binding obligation enforceable in accordance with the terms and provisions hereof, and the amount of such payment shall bare interest at the Default Rate from the date of such final order until repaid hereunder.

Waivers. The Maker hereby expressly waives presentment, demand, notice of dishonor, notice of nonpayment and all other notices and demands in connection therewith or in the nature thereof.

PHIL1 552321-5

Note this 6th _____ IN WITNESS WHEREOF, the undersigned, intending to be legally bound, has duly executed this day of January, 2004

iGAMES ENTERTAINMENT, INC.

By: _____ (SEAL)
Name:   Christopher M. Wolfington
Title:   CEO


CHEX SERVICES, INC.

By: _____ (SEAL)
Name: _____ IJAZ ANWAR
Title: _____ C.F.O.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **iGAMES ENTERTAINMENT, INC.,** | : | |
| Plaintiff, | : | C.A. No. 04-180 (KAJ) |
| v. | : | |
| **CHEX SERVICES, INC.** and **EQUITEX, INC.,** | : | |
| | : | JURY TRIAL DEMANDED |
| Defendants. | : | |

## Appendix of Exhibits To iGames Entertainment, Inc's Opposition To Chex's Motion For Summary Judgement

# Exhibit D

WLM\206411.1

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

iGAMES ENTERTAINMENT, INC.,

          Plaintiff,

          v.

CHEX SERVICES, INC. and
EQUITEX, INC.,

          Defendants.

:
:
:
:
:
:
:
:
:
:
:
:
:

C.A. No. 04-180 (KAJ)

JURY TRIAL DEMANDED

# Appendix of Exhibits To iGames Entertainment, Inc's
# Opposition To Chex's Motion For Summary Judgement

# Exhibit E

WLM\206411.1

# KLEHR, HARRISON, HARVEY, BRANZBURG & ELLERS LLP
### ATTORNEYS AT LAW

LAWRENCE D. ROVIN

Direct Dial: (215) 569 2898
LROVIN@klehr.com

260 S. BROAD STREET
PHILADELPHIA, PA 19102

(215) 568-6060
FAX: (215) 568-6603

www.klehr.com

New Jersey Office
457 Haddonfield Road
Suite 510
Cherry Hill, New Jersey 08002-2220
(856) 486-7900

Delaware Office
919 Market Street
Suite 1000
Wilmington, Delaware 19801-3062
(302) 426-1189

March 12, 2004

Henry Fong, President
Equitex, Inc.
2401 PGA Boulevard, Suite 190
Palm Beach Gardens, FL 33410

James P. Welbourn, President and CEO
Chex Services, Inc.
11100 Wayzata Boulevard, Suite 111
Minnetonka, MN 55305

RE:   **Termination of Stock Purchase Agreement dated November 3, 2003**

Dear Messrs. Fong and Welbourn:

By my letter to you dated January 7, 2004 (the "January 7 Letter"), iGames Entertainment, Inc. ("iGames") notified you of its concerns related to the termination by NCASF, Inc. of its contracts with Chex Services, Inc. ("Chex"), including the impact of such termination on the relative rights of the parties under the November 3, 2003 Stock Purchase Agreement (the "Agreement") among Equitex, Inc. ("Equitex"), Chex and iGames. In particular, the January 7 Letter indicated that the termination of the NCASF, Inc. contracts, and related adverse publicity, would have a Material Adverse Effect on Chex, represented a breach by Equitex and Chex of representations and warranties in the Agreement and a failure to satisfy conditions precedent to iGames' obligations under the Agreement. As a result, iGames is entitled to terminate the Agreement and receive the Termination Amount called for therein.

In addition, by my letter to you dated January 27, 2004 (the "January 27 Letter"), iGames further notified you that the failure to disclose to iGames the existence of a $606,316 note receivable, the circumstances surrounding its execution and the current status of the note receivable constituted multiple breaches by Equitex and Chex of their representations and warranties in the Agreement, breaches of Equitex's and Chex's pre-Closing covenants and failure to satisfy conditions precedent to iGames' obligations under the Agreement. As a result, iGames is entitled to terminate the Agreement and receive the Termination Amount called for therein.

PHIL1 562784.1

KLEHR, HARRISON, HARVEY, BRANZBURG & ELLERS LLP

Henry Fong, President
James P. Welbourn, President and CEO
March 12, 2004
Page 2

Finally, in January 2004 you informed iGames that Equitex could not consummate the transaction as contemplated under the Agreement due to federal income tax consequences to Equitex associated with the structure of the transaction.

Notwithstanding these developments, iGames remained willing to explore terms and conditions upon which a combination of iGames and Chex could be achieved, while reserving its right to exercise its termination rights under the Agreement.

Unfortunately, iGames has concluded that these efforts have been fruitless. Accordingly, this letter shall serve as notice under Section 11(b) of the Agreement that iGames hereby terminates the Agreement pursuant to Sections 11(b)(ii), (iv) and (viii) as a result of the facts and occurrences described in the January 7 Letter and the January 27 Letter. Under Section 11(c) of the Agreement, Equitex and Chex are required to pay to iGames the Termination Amount of $1,000,000 immediately upon receipt of this notice of termination. iGames shall in a timely manner prepare documentation regarding its costs and expenses incurred in connection with the transactions contemplated by the Agreement, which amount shall be due and payable no later than five business days following your receipt of such documentation.

The Termination Amount and cost reimbursement shall be paid by wire transfer to the following account:

> Bank:        PNC Bank # 002998
> Account:     Money Centers of America
> Account No.: 8612826694

Very truly yours,

Lawrence D. Rovin

cc:    Christopher M. Wolfington

CX/EX02029

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| iGAMES ENTERTAINMENT, INC., | : | |
| Plaintiff, | : | C.A. No. 04-180 (KAJ) |
| v. | : | |
| CHEX SERVICES, INC. and EQUITEX, INC., | : | |
| | : | JURY TRIAL DEMANDED |
| Defendants. | : | |

# Appendix of Exhibits To iGames Entertainment, Inc's Opposition To Chex's Motion For Summary Judgement

# Exhibit F

WLM\206411.1

Ijaz Anwar

EXHIBIT
122
12/15/04 7L0

| | |
|---|---|
| **From:** | Ijaz Anwar [ianwar@chexff.com] |
| **Sent:** | Thursday, January 15, 2004 5:36 PM |
| **To:** | Pmoore@maroonbells.com |
| **Cc:** | JIM WELBOURN; HENRY FONG; msavage@corporate-capital.com |
| **Subject:** | CHEX SERVICES INC'S INFORMATION |

      

MAROON
BELLS.doc   CONFIDENTIALITY MAROON BELLS.ppt ffRetailATMInsert.p ffRetailBrochInside. ffRetailBrochOutsid ffRetailChexGuardI
            - MAROON BELLS...                          df              pdf              e.pdf              nsert.pdf

  

ffRetailCollSolInsert ffRetailOverviewPa creditguard sell
.pdf              ge.pdf             sheet art.pdf...

Paul:

It was a pleasure speaking with you over the phone yesterday.
Please find enclosed some information of interest related to Chex
Services, Inc.  I have also included a mutual confidentiality and
non-disclosure agreement.  Please kindly execute the agreement and fax
it to my attention as soon as possible at 952-417-1996.
If you have any questions or concerns, please do not hesitate to contact
me.  I look forward to working with Maroon Bells Capital, LLC as well as
Corporate Capital Management, LLC.  Thanks.

Ijaz.

January 15, 2004

Maroon Bells Capital
Attn: Paul Moore
269 Market Square
Lake Forest, IL 60045

Dear Mr. Moore:

It was a pleasure speaking with you and your colleagues over the phone yesterday. I want to personally thank you for taking interest in Chex Services, Inc. ("Chex") with respect to future business opportunities.

I would like to bring a number of facts to your attention demonstrating Chex's dominance in the financial services industry, our ability to produce financial results, and our commitment to clientele.

Chex has been in the financial services business for over ten years. During this time, Fastfunds has experienced constant growth due to its commitment to casinos and casino customers. We currently manage over forty-five accounts spanning nine states. Our current clientele includes twenty full booth operations, which qualifies us as the industry leader in full booth operations. In 2003, the total dollars we processed equated to over 800 million, thus providing the maximum money on the floor for the casinos.

Fastfunds has been a profitable entity from its inception to the present. With profitability, strong cash flows, and a very strong banking relationship, Chex can facilitate financial services at any casino with its current portfolio of products.

Chexs' company status as a subsidiary of publicly traded entity further indicates our financial credibility. We are required to follow the stringent guidelines promulgated by GAAP and the SEC. Moreover, we are obligated to have our financials reviewed by independent auditors every quarter and we are also audited annually. Our internal policies and procedures include a commitment to provide the casinos we service with financial and marketing information in a timely manner.

On behalf of Fastfunds, I hope this letter provides you with an insight into the quality and credibility that is a trademark of the manner in which we conduct our business. In all of our years of business, Fastfunds has prided itself on taking the ethical high road and exercises the highest level of business etiquette and judgment. We will not accept a lower standard for ourselves.

Moreover, for a company with an extensive involvement and contacts in the gaming industry, I would encourage you to perform financial and legal due diligence of Chex. I

can say with confidence that upon review of this type of information, you will feel confident and comfortable to conduct business with us. I will gladly be available to meet in person to answer any questions you may have regarding our company, its products, or our business practices. Alternatively, you may contact me at our offices at any time to do the same.

Again, thank you for giving Fastfunds an opportunity to serve your needs. We look forward to an ongoing and mutually beneficial business relationship in the future.

Yours Very Truly,


Ijaz Anwar
Chief Financial Officer and Treasurer
Chex Services, Inc
Tel. # 952-852-2663
Fax # 952-417-1996

CX/EX19530

## CONFIDENTIAL EVALUATION AGREEMENT AND MUTUAL NON-DISCLOSURE AGREEMENT

This is an Agreement by and between Chex Inc. a Minnesota corporation, located at 11100 Wayzata Blvd., Suite # 111, Minnetonka, MN 55305(Chex Inc.), and Corporate Capital Management, LLC, having a principal place of business at **10125 Crosstown Circle # 210, Eden Prairie, MN 55344, and Maroon Bells Capital, LLC, having a principal place of business at 269 Market Square, Lake Forest, IL 60045** (hereafter collectively as Receiving Party).

WHEREAS, Chex Inc. and Receiving Party have certain proprietary technical and commercial information including financial information, processes and market-specific information, all of which the respective parties considers confidential and proprietary;

WHEREAS, Receiving Party is considering entering into a strategic partnering relationship with Chex Inc., and as a part of that consideration, Receiving Party desires the opportunity to evaluate the proprietary technical and commercial information on a confidential basis to evaluate entering this relationship;

WHEREAS, Chex Inc. is willing to disclose the proprietary technical and commercial information and associated technology to Receiving Party on a nonexclusive basis solely for an evaluation under terms and conditions that will permit Receiving Party to obtain an overview of the proprietary technical and commercial information sufficient for a decision on whether to continue negotiations as to Receiving Party's role with Chex Inc. while preserving to Chex Inc. the confidential, proprietary nature of the proprietary technical and commercial information;

WHEREAS, Receiving Party is willing to disclose proprietary technical and commercial information to Chex Inc. on a nonexclusive basis solely for an evaluation under terms and conditions that will permit Chex Inc. initially to obtain an overview of the proprietary technical and commercial information sufficient for a decision on whether to continue negotiations as to Chex Inc.'s role with Receiving Party while preserving to Receiving Party the confidential, proprietary nature of the proprietary technical and commercial information; and

NOW, THEREFORE, the parties agree as follows:

1.     This Agreement shall be effective as of January 15, 2004. ("Effective Date").

2.     The confidential and proprietary information of the parties is to be proffered as such. All proprietary technical and commercial information disclosed by the parties will be received and held in confidence, not to be disclose to anyone and not to be used for any purpose whatsoever other than evaluation pursuant to this Agreement.

3.     The fact that conversations and negotiations between the parties are taking place is confidential and not to be disclosed. The subject or nature of the conversations and negotiations are not to be disclosed even without the mention of the names of either party.

4.     To the extent information is disclosed and concurrently or later identified as confidential in accordance with the terms of this Agreement, the information shall be subject to this Agreement as if a part of the proprietary technical and commercial information.

Chex Inc.'s Non-Disclosure with Corporate Capital Management, LLC & Maroon Bells Capital, LLC

Page 1 of 2

Chex Inc. Initials: _____ / Corporate Capital Management Initials: _____ / Maroon Bells Capital Initials: _____

5.  The parties shall use their best efforts, including efforts fully commensurate with those employed by the parties for the protection of proprietary technical and commercial information, to protect the parties pursuant to this Agreement. The parties shall be separately and collectively responsible for maintaining the confidential and proprietary information in confidence.

6.  At the request of either Chex Inc. and Receiving Party, the other party will return all confidential information including but not limited to, documents, electronic information, files, or other materials containing confidential information to the requesting party. A written statement attesting that all such confidential information has been returned must also be provided.

7.  The parties agrees that the confidentiality and use provisions of this Agreement shall not apply to any portions of the proprietary technical and commercial information:

   7.1.  that appears in issued patents or printed publications in integrated form or that otherwise is or becomes generally known in the trade other than through the fault of the receiving party;

   7.2   that the receiving party can show by written records was in the receiving party's possession prior to its disclosure by the disclosing party; or

   7.3   that the receiving party can show, by written record, came into its possession, without covenants of secrecy, from a third party who is under no confidentiality obligation to the receiving party.

8.  The terms and conditions of this agreement are of a special character and provide an important and valuable advantage to both parties. Breach of this agreement would create damages that are not readily ascertainable and cannot be adequately remedied at law. Therefore, the parties agree that breach of this agreement entitles the non-breaching party to injunctive and equitable relief without bond of other security in both the event of a breach or the threat of a breach by the other party and consequential damages plus any additional damages proven.

9.  The laws of the state of Minnesota shall govern this agreement and the parties agreed to and waive all objections to venue and personal jurisdiction in this state.

10. This writing is the entire agreement between the parties. Modifications to this agreement must be done is writing and signed by both parties.

11. Should any provision of this Agreement be held invalid or unenforceable, the parties desire that it be modified by the court to conform as closely as possible to its original intent without being invalid or unenforceable, and that in such form it be enforced. Invalidity or unenforceability of a provision herein shall not affect the validity or enforceability of any other provision herein. Failure to enforce one part of this agreement shall not be deemed a waiver of the entire agreement or of other sections, terms or conditions of this agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement in duplicate originals.

| Chex Inc. | Corporate Capital Management, LLC |
|---|---|
| By:_____ | By:_____ |
| Title: _____ | Title: _____ |
| Date:_____ | Date:_____ |

RB
RIDER BENNETT
EGAN&ARUNDEL

CX/EX19532

Maroon Bells Capital, LLC

By: _____

Title: _____

Date: _____

CX/EX19533





## ATMs

FastFunds offers the latest in technology with the most advanced ATM machines available on the market today. State-of-the-art equipment that will standup to the wear and tear associated with high volume traffic. An ATM in your business allows your customers access to cash via their ATM/Debit cards and/or Credit Cards. The result gives you yet another method by which your business can increase revenue and profit.

• **Buy or Lease Options.** FastFunds offers ATM machines to either buy or lease depending on the needs of your business.

• **Network Participation.** Access to the largest possible networks allow your customers access to their checking, savings or credit card accounts. Funds are always verified prior to being dispensed

• **Revenue Sharing.** A variety of options exist for your business to choose from that can be tailored specific to your needs.

• **Advanced Technology.** State of the art equipment translates to minimal maintenance and down time. Ease of use is top priority.

• **Multiple Language.** ATMs can satisfy your demographic area and most language barriers that may exist.

• **Fast Processing.** With the most advance technology, customer lines are kept minimal by having the most advance communications and processing components.

• **Multiple Services.** ATMs now have the capability to dispense other services such as stamps, movie tickets, prepaid phone cards.

• **Advertising.** Turn your ATM into another revenue generator with on-screen advertising while in the idle state.

With the flexibility of today's ATM's, FastFunds has a solution to your customers cash access needs. A FastFunds Sales Representative can assist with setting up and tailoring a new program specific to your business.

**w w w . f a s t f u n d s o n l i n e . c o m  /  8 0 0 . 3 3 3 . 9 8 7 4**

CX/EX19534