IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

iGAMES ENTERTAINMENT, INC.,

        Plaintiff,

        v.

CHEX SERVICES, INC. and
EQUITEX, INC.,

        Defendants.

:
:
:
:
:
:
:
:
:
:
:
:
:

C.A. No. 04-180 (KAJ)

JURY TRIAL DEMANDED

# Appendix of Exhibits To iGames Entertainment, Inc's Opposition To Chex's Motion For Summary Judgement

# Exhibit P

WLM\206411.1

1

```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF DELAWARE
 2
                           *  *  *
 3
   iGAMES ENTERTAINMENT, INC.,  :  C.A. NO. 04-180-KAJ
 4                   Plaintiff,  :
                vs.              :
 5 CHEX SERVICES, INC. and       :
   EQUITEX, INC.,                :
 6                  Defendants.  :
   ---------------------------x
 7 EQUITEX, INC. and CHEX        :  C.A. NO. 04-256-KAJ
   SERVICES, INC. d/b/a          :
 8 FASTFUNDS,                     :
                   Plaintiffs,  :
 9              vs.              :
   iGAMES ENTERTAINMENT, INC.,  :
10                  Defendant.  :
   ---------------------------x
11 CHEX SERVICES, INC. d/b/a     :  C.A. NO. 04-885-KAJ
   FASTFUNDS,                    :
12                   Plaintiff,  :
                vs.              :
13 iGAMES ENTERTAINMENT, INC.,  :
                    Defendant.  :
14
                           *  *  *
15
               Thursday, December 2, 2004
16
                           *  *  *
17
                     ORAL DEPOSITION
18
                           OF
19
                       HENRY FONG
20
                           *  *  *
21
22          ESQUIRE DEPOSITION SERVICES
            1880 John F. Kennedy Boulevard
23                    15th Floor
            Philadelphia, Pennsylvania  19103
24                  215.988.9191
```

HENRY FONG

**110**

1          Because I think that at that time, the
2 note being fully collateralized and not being bare
3 with no promissory note and no collateral, lends a
4 lot of credence to the fact that the note is fully
5 secured.
6     Q.   Isn't it true that I believe the
7 people's name was the Howards, correct?
8     A.   Yes.
9     Q.   Isn't it true that they were in default
10 of the note by October 15th?
11     A.   Yes.
12     Q.   Did anyone tell Chris that they were in
13 default of the note?
14     A.   I don't know whether that was part of
15 the schedules or the conversations that happened.
16 I'm not aware of what he was told, what he wasn't
17 told.
18     Q.   You didn't tell him?
19     A.   No. The point I'd like to make is, I
20 believe this was fully disclosed.
21     Q.   And is it your testimony it was
22 disclosed by your public filings?
23     A.   As well as the schedules themselves.
24     Q.   The schedules that you believe were

**111**

1 given to Mr. Wolfington?
2     A.   Yes.
3     Q.   When were those schedules given to him,
4 do you know? It was after the signing of the stock
5 purchase agreement, correct?
6     A.   Yes.
7     Q.   Do you know why they weren't given to
8 him before the stock purchase agreement was entered
9 into?
10     A.   We were -- schedules are always the
11 laborious part of a stock purchase agreement or
12 acquisition. Schedules go on sometimes for months
13 and months and months.
14          The way, typically, a lot of these
15 transactions are set up, you have a right to look
16 at the schedules and reject them or accept them
17 after a period of time.
18          So, frequently, schedules take a long
19 period of time to prepare. Some of them are
20 onerous. Some of them are long and . . .
21     Q.   Whose idea, for lack of a better word,
22 was it to have these customers, the Howards,
23 execute a note for the amount due, which Chex then
24 reflected on its balance sheet as a note receivable

**112**

1 in the full amount, without any reserve?
2     A.   I don't know it was any particular
3 person's idea. I think it was an outgrowth of
4 collectibility and attempt to collect the note in
5 what would be the best way of doing this.
6          In the process, we said the amounts were
7 so large, let's get a promissory note. This is not
8 a bounced hundred dollar check.
9     Q.   I understand.
10     A.   And the parties are willing to refinance
11 their real estate. They're prepared to pay. And,
12 hence, the process began.
13     Q.   Well, would you agree that this
14 acceptance of the note, at least as far as the
15 business of Chex Services, this acceptance of the
16 note for these bad checks was a transaction outside
17 of the ordinary course of Chex's business?
18     MR. PORETTI: Objection. Calls for a
19 legal conclusion.
20 BY MR. TAYLOR:
21     Q.   You can answer it.
22     A.   No.
23     Q.   You believe that it was within the
24 ordinary course of business to accept a

**113**

1 $600,000-plus note for bad checks?
2     A.   Yes.
3     Q.   Had it ever been done before?
4     A.   No.
5     Q.   Anything even remotely close to that
6 been done before?
7     A.   Not to my knowledge.
8     Q.   What was ordinary about it, in your
9 mind?
10     A.   That it was a transaction in which
11 customers cash checks. It was a transaction
12 whereby checks were returned. And the dollar
13 amount was typically larger than most.
14          But the way it was handled in terms of a
15 promissory note and ultimately a securitization of
16 that note, in my view, did not make it an
17 out-of-the-ordinary transaction.
18     Q.   Well, would you agree that the
19 acceptance of this note constituted a loan to a
20 person or an individual in excess of $10,000?
21     MR. PORETTI: Objection. Calls for a
22 legal conclusion.
23     A.   I don't know the answer to that one.
24 BY MR. TAYLOR:

29 (Pages 110 to 113)

**122**

1      And they were -- they in for -- on a fee
2  basis. They had several transactions. They had
3  worked with Cash Systems. They had offered us the
4  opportunity to work on some of the agreements that
5  Cash Systems could reach agreement on.
6      And in the January meeting, we mentioned
7  to Mr. Wolfington that there's a group called
8  Maroon Bells that can bring us some of these more
9  traditional casino contracts.
10     Q.  And what was Mr. Wolfington's reaction
11  to that?
12     A.  That there was no reaction. There was
13  no comment, as I recall.
14     Q.  Well, as it was structured, the Whitebox
15  deal, Maroon Bells has some oversight role in
16  connection with that transaction, correct?
17     A.  I don't understand the question, sir.
18     Q.  Well, you tell me in your own words,
19  what's Maroon Bells' role in connection with the
20  Whitebox financing? What was it?
21     A.  No.
22     Q.  You have since struck some sort of a
23  deal with Maroon Bells, correct?
24     A.  Yes.

**123**

1      Q.  And what is that?
2      A.  A merchant banking advisory agreement to
3  bring us business and acquisitions.
4      Q.  Was that entered into after the closing
5  on the Whitebox financing or at the same time?
6      A.  Somewhere around the time frame. It all
7  happened sometime in the -- probably subsequent.
8      Q.  So backing up a little bit. When did
9  you first get involved with Maroon Bells?
10     A.  We received some information and some --
11  they had contacted us sometime around, I want to
12  say, January, February time frame regarding
13  potential contractual opportunities.
14     Q.  '03? Sometime in 2003?
15     A.  2004, the early part of this year.
16     Q.  Who introduced you to Maroon Bells?
17     A.  There's a gentleman that was -- that did
18  a lot of work with Maroon Bells. And he was the
19  gentleman that did the reverse merger for Craig
20  Potts and Cash Systems. Mark Savage, Corporate
21  Capital Management.
22     Q.  Let's look at some documents.
23     MR. PORETTI:  Is this a good time for a
24  break?

**124**

1      MR. TAYLOR: Sure.
2          * * *
3      (Whereupon, a recess was taken from
4  2:50 p.m. to 3:02 p.m.)
5          * * *
6      MR. TAYLOR:  Let's go back on the
7  record.
8  BY MR. TAYLOR:
9      Q.  From your perspective, what were the
10  benefits of going forward with the stock purchase
11  agreement as opposed to pursuing the Cash Systems
12  deal?
13     A.  Well, the Cash Systems deal had a lot of
14  issues that the iGames transaction didn't have.
15      I think primary in that, the iGames deal
16  had a floor price. There was some concern about
17  the volatile nature of iGames stock. We thought
18  that -- our opinion was that the $63 million
19  obviated that.
20      Then in the Cash Systems deal, the
21  noteholders had signed a petition saying that if we
22  move forward with the Cash Systems deal, they would
23  be more inclined to call their notes.
24     Q.  Who was the largest proponent of going

**125**

1  forward with the deal of iGames/Money Centers and
2  in lieu of the deal with Cash Systems, within your
3  organizations?
4      A.  I believe collectively we all had -- had
5  great enthusiasm.
6      MR. TAYLOR:  Let's mark this with the
7  next number.
8          * * *
9      (Whereupon, the court reporter marked
10  for identification iGames Exhibit Number 39.)
11         * * *
12  BY MR. TAYLOR:
13     Q.  Sir, you have been handed iGames Number
14  39 with today's date. It's a spreadsheet, three
15  pages with columns. And the heading is, "iGames
16  Proposal, Management Perspective."
17     A.  Uh-hum.
18     Q.  I want to know, do you recognize this
19  document?
20     A.  I recall seeing this.
21     Q.  Did you have any part of preparing this?
22     A.  No.
23     Q.  Do you know who did?
24     A.  It was prepared within Chex Services.

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| **iGAMES ENTERTAINMENT, INC.,** | : | |
| Plaintiff, | : | C.A. No. 04-180 (KAJ) |
| v. | : | |
| **CHEX SERVICES, INC.** and **EQUITEX, INC.,** | : | JURY TRIAL DEMANDED |
| Defendants. | : | |

## Appendix of Exhibits To iGames Entertainment, Inc's
## <u>Opposition To Chex's Motion For Summary Judgement</u>

# Exhibit Q

**Ijaz Anwar**

From:      Wayne Mills [blakecap@hotmail.com]
Sent:      Friday, January 02, 2004 2:34 PM
To:        JRobbins@MANDKlaw.com; rfrommelt@felhaber.com
Cc:        gkohler@whiteboxadvisors.com; ianwar@chexff.com; hfong@equitex.net;
           jwelbourn@chexff.com
Subject:   Tuesday Pandora/EQTX meeting

Gentlemen,
Please confirm your availability to meet Tuesday 1pm. We will start the
process of creating the documents required for Pandora to lend $5M to
Equitex.
This is another very unique transaction that we have worked on over the last
45 days. Both parties now want to get it closed.
We can meet at any location convenient-my office or Whitebox.
Confirm your availability, I will confirm the location.
Thank you,
Wayne

Take advantage of our limited-time introductory offer for dial-up Internet
access. http://join.msn.com/?page=dept/dialup



CX/EX03117

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| iGAMES ENTERTAINMENT, INC., | : | |
| | : | |
| Plaintiff, | : | C.A. No. 04-180 (KAJ) |
| | : | |
| v. | : | |
| | : | |
| CHEX SERVICES, INC. and | : | |
| EQUITEX, INC., | : | |
| | : | JURY TRIAL DEMANDED |
| | : | |
| Defendants. | : | |

# Appendix of Exhibits To iGames Entertainment, Inc's Opposition To Chex's Motion For Summary Judgement

# Exhibit R

18

Ijaz Anwar

| | |
|---|---|
| **From:** | Wayne Mills [blakecap@hotmail.com] |
| **Sent:** | Sunday, January 11, 2004 10:59 PM |
| **To:** | ianwar@chexff.com; jwelbourn@chexff.com |
| **Cc:** | hfong@equitex.net |
| **Subject:** | RE: EQTX-Whitebox Drafting Meeting |

Ijaz,
I didn't expect to be successful at putting everyone in one room in such a
short notice. I have Gary Kohler now committed to moving the process
forward. Whitebox might also have a conflict at that time.
It will be fine for me to attend with just both lawyers. I am confident I
can represent the terms and the intent of our agreement accurately, making
clear the importance of certain issues to Chex.

I want to start these attorneys drafting—Jim and you will be involved in
every issue and draft and Roger Frommelt will represent you. He is very
aggressive at protecting the company's concerns, especially a public
company.
You guys focus on the business, I will handle the early work with the
lawyers. I will get to you immediately as issues or questions arise.

Wayne Mills


>From: ianwar@chexff.com
>To: "Wayne Mills" <blakecap@hotmail.com>
>CC: jwelbourn@chexff.com, hfong@equitex.net, bclegg@riderlaw.com
>Subject: RE: EQTX-Whitebox Drafting Meeting
>Date: Sun, 11 Jan 2004 19:44:07 -0600
>
>Wayne,
>Unfortunately, I will be unable to attend a meeting on Monday, either at
>1:30 p.m. or at any other time. My day is fully booked, and compounding
>that, Jim is also out of the office. As we are unable to send a
>representative
>from Chex to the drafting meeting, we would appreciate a copy of the
>initial
>draft and minutes of the meeting once you have those prepared.  Please
>email
>both documents to my attention, and I will then have our representatives
>and attorneys review them, and we will get back to you with our comments
>and/or concerns.
>Thanks in advance, we look forward to hearing from you.
>Ijaz
>
> >-- Original Message --
> >From: "Wayne Mills" <blakecap@hotmail.com>
> >To: JRobbins@MANDKlaw.com, rfrommelt@felhaber.com
> >Cc: jwelbourn@chexff.com, smalloy@whiteboxadvisors.com,
>gkohler@whiteboxadvisors.com,
> >ianwar@chexff.com
> >Subject: EQTX-Whitebox Drafting Meeting
> >Date: Fri, 09 Jan 2004 19:40:13 -0600
> >
> >
> >Gentlemen,
> >Whitebox has signed a term sheet to invest in Equitex (EQTX) and we would
> >
> >like to meet Monday @ 1:30pm.
> >Jeff, it would be great to meet at the Messerli & Kramer office.
> >We have refined the terms over the last 30 days to everyones



EXHIBIT

i Games -41

SAM GOLDFARB

12\2\04

CX/EX02204

```
> >satisfaction-now it is time for the LAWYERS to go to work!
> >Please try to make this schedule work.
> >Thank you,
> >Wayne
> >
> > _____
> >Rethink your business approach for the new year with the helpful tips
>here.
> >
> >http://special.msn.com/bcentral/prep04.armx
> >
>
>
```

_____
High-speed users—be more efficient online with the new MSN Premium Internet
Software. http://join.msn.com/?pgmarket=en-us&page=byoa/prem&ST=1

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| iGAMES ENTERTAINMENT, INC., | : | |
| | : | |
| Plaintiff, | : | C.A. No. 04-180 (KAJ) |
| | : | |
| v. | : | |
| | : | |
| CHEX SERVICES, INC. and | : | |
| EQUITEX, INC., | : | |
| | : | JURY TRIAL DEMANDED |
| | : | |
| Defendants. | : | |

## Appendix of Exhibits To iGames Entertainment, Inc's
## Opposition To Chex's Motion For Summary Judgement

# Exhibit S

WLM\206411.1

**Ijaz Anwar**

| | |
|---|---|
| **From:** | Jim Welbourn [jwelbourn@chexff.com] |
| **Sent:** | Friday, December 19, 2003 10:47 AM |
| **To:** | Ijaz Anwar |
| **Subject:** | FW: EQTX-PANDORA CHANGES |



DEC19 EQTX PAND
CHANGES.doc

```
-----Original Message-----
From: Wayne Mills [mailto:blakecap@hotmail.com]
Sent: Friday, December 19, 2003 1:53 AM
To: jwelbourn@chexff.com
Subject: EQTX-PANDORA CHANGES


Jim,
Here is some language I put together that tries to cover what we discussed
today.
Take a look and let me know in the am.
wayne
ps-Jamaica=big, biG, bIG, BIG!!!
```

Have fun customizing MSN Messenger — learn how here!
http://www.msnmessenger-download.com/tracking/reach_customize



EXHIBIT
iGAMES - 38
SAM GOLDFARB
12|2|04

**12/19/2003**
**EQUITEX DIVIDEND OF IGAM SHARES.**

EQTX WILL RESERVE THE NUMBER OF SHARES OF IGAM
THAT WOULD BE DUE PANDORA IF THE OUTSTANDING
BALANCE OF THE NOTE ON THE X DIVIDEND DATE
WERE CONVERTED TO EQTX AT THE CONVERSION
PRICE OF $1.50.

THESE IGAM SHARES WILL BE PLACED IN SEGRAGATED
COLLATERAL ACCOUNT AS SPECIFIC COLLATERAL FOR
PANDORA.
PANDORA WILL SELL THE IGAM SHARES AT THE
**MINIMUM RATE OF 3% OF THE AVERAGE DAILY
VOLUME.**

AT THE 1 YEAR ANNIVERSARY OF THE DIVIDEND,
PANDORA WILL ESTABLISH A VALUE OF ITS
REMAINING IGAM SHARES BASED ON THE AVERAGE
CLOSING BID PRICE FOR THE 30 DAYS BEFORE AND THE
30 DAYS AFTER THE ANNIVERSARY DATE.
ON THE 13TH MONTH, PANDORA WILL APPLY THE
VALUE OF THE SHARES, LESS A 15% DISCOUNT,
AGAINST THE OUTSTANDING NOTE.
IF THE VALUE OF THE SHARES AT THE 15% DISCOUNT
EXCEEDS THE VALUE OF THE NOTE, THE EXCESS
SHARES WILL BE RETURNED TO EQTX.

EQTX, IGAM OR ITS AFFILIATTES SHALL HAVE THE
RIGHT TO REPURCHASE ANY OR ALL OF THE IGAM
SHARES AT ANY TIME WITH 100% OF THE PROCEEDS
GOING TO OFFSET THE NOTE.

12/19/2003
**EQUITEX PANDORA STRUCTURE SUGGESTIONS**

**THE IGAM DIVIDEND SHARES:**
1) TREAT THE IGAM DIVIDEND AS COLLATERAL THAT WILL BE RETURNED TO EQTX OR PURCHASED BY IGAM SO AS NOT TO DILLUTE THE EQTX COMMON SHAREHOLDERS.
2) STRUCTURE THE IGAM COLLATERAL SO THAT PANDORA WILL MAKE A 15% SPREAD IF REQUIRED TO TAKE OWNERSHIP OF THE STOCK.
3) IF AT ANYTIME THE PROCEEDS FROM THE EQTX PAYMENTS AND THE VALUE OF THE IGAM SHARES EXCEED THE BALANCE OF THE NOTE, *(how to calculate IGAM value??)* THE EXCESS IGAM SHARES WILL BE RETURNED TO EQUITEX.

**THE FASTFUNDS NOTE TO EQTX:**
1) EQUITEX WOULD LIKE TO LOAN THE FINANCING PROCEEDS TO FASTFUNDS AT 7% OR LESS.
2) PANDORA WILL HAVE AS COLLATERAL:
   *SENIOR POSITION
   *THE FASTFUNDS *SENIOR* NOTE TO EQTX.
   *THE IGAM DIVIDEND SHARES

CX/EX02213

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| iGAMES ENTERTAINMENT, INC., | : | |
| | : | |
| Plaintiff, | : | C.A. No. 04-180 (KAJ) |
| | : | |
| v. | : | |
| | : | |
| CHEX SERVICES, INC. and | : | |
| EQUITEX, INC., | : | |
| | : | JURY TRIAL DEMANDED |
| | : | |
| Defendants. | : | |

## Appendix of Exhibits To iGames Entertainment, Inc's Opposition To Chex's Motion For Summary Judgement

# Exhibit T

20

1

1      IN THE UNITED STATES DISTRICT COURT
2          FOR THE DISTRICT OF DELAWARE
3                    -   -   -
4   iGAMES ENTERTAINMENT, INC. : C.A. NO.
           V.            : 04-180-KAJ
5   CHEX SERVICES, INC. and    :
    EQUITEX, INC.              :
6   -----------------------------------------
    EQUITEX, INC. and CHEX    : C.A. NO.
7   SERVICES, INC., d/b/a     : 04-256-KAJ
    FASTFUNDS                 :
8          V.                 :
    iGAMES ENTERTINMENT, INC.  :
9   -----------------------------------------
    CHEX SERVICES, INC., d/b/a : C.A. NO.
10  FASTFUNDS                 : 04-0885-KAJ
           V.                 :
11  IGAMES ENTERTAINMENT, INC. :
                     -   -   -
12              September 21, 2004
13                   -   -   -
14

              Oral deposition of JAMES
15  WELBOURN, held in the offices of Duane,
    Morris and Heckscher, 4200 One Liberty
16  Place, 1650 Market Street, Philadelphia,
    Pennsylvania 19103 commencing at 9:50
17  a.m., on the above date, before Harvey
    Krauss, a Federally-Approved Registered
18  Professional Reporter and a Commissioner
    of the Commonwealth of Pennsylvania.
19                   -   -   -
20
21        ESQUIRE DEPOSITION SERVICES
              15th Floor
22       1880 John F. Kennedy Boulevard
          Philadelphia, Pennsylvania 19103
23              (215) 988-9191
24

JAMES WELBOURN

**78**

1  idea.
2      Q.  Well --
3      A.  I know by -- I will say
4  that when Chris and Henry came into town
5  and Chris and Henry and Ijaz and I all
6  met in our seventh floor conference room
7  I want to say it was the third week of
8  January. We told Chris about the
9  possibility that the Seven Ventures
10  actually want to do a deal in and bring
11  all the companies together into it. And
12  Chris wasn't too keen on that. So, we
13  pretty much dropped it then.
14      Q.  Does the Seven Ventures
15  group, the shell have a connection with
16  Whitebox?
17      A.  When you say a connection,
18  only in the sense that we borrowed
19  money, we meaning Equitex Chex Services
20  borrowed money from Whitebox, and Seven
21  Ventures/ Maroon Bells since they were
22  going to be a partial shareholder wanted
23  to make sure that there were --
24  basically make sure that they had

**79**

1  protection if there was say a default by
2  Equitex on that Whitebox loan. So there
3  were some agreements signed between
4  Equitex, White, and I believe Maroon
5  Bells regarding that. I don't know the
6  exact content of the documents.
7      Q.  You had said Chris had some
8  concerns about Seven Ventures; is that
9  right?
10      A.  I don't think he had -- I'm
11  not sure that he had concerns about
12  Seven Ventures other than I think he
13  believed that we had gone so far down
14  the road on this deal that there was no
15  sense in bringing something else into
16  the mix.
17      Q.  And was that something else
18  the Whitebox deal?
19      A.  No.
20      Q.  They were completely
21  separate?
22      A.  Yes. Yeah, Whitebox and
23  seven ventures are completely separate.
24  They had nothing to do with each other.

**80**

1      Q.  All right. And in this
2  time frame early January were you
3  considering a deal with Whitebox as
4  well, either you or Henry Fong? When I
5  say you I mean Chex Services?
6      A.  We had talked to Whitebox
7  about funding. Our -- the way our
8  business is structured is we're always
9  looking for additional whether it be
10  through a venture capital group, if you
11  will, like Whitebox or the deventure
12  holders that we have in our company. In
13  order to grow our company you have to
14  raise more money.
15      Q.  Again in layman's terms,
16  what's understanding of the type of deal
17  that you have with Whitebox? I'm not
18  asking for a chapter or verse on the
19  deal, but what does Whitebox do?
20      A.  Whitebox is a -- they are
21  basically, a venture capital group that
22  loans money out for interest and
23  options, warrants, stock whatever. How
24  they structure they're deals I'm sure

**81**

1  are different based on the individual
2  deal.
3      Q.  And that's the nature of
4  your agreement with Whitebox to provide
5  you checks with capital?
6      A.  They provided had they
7  loaned -- I think the exact agreement is
8  that they loaned Equitex $5 million of
9  which of which Chex Services had to
10  guarantee the loan.
11      Q.  And what was your
12  understanding with -- did you have
13  discussions with Chris Wolfington about
14  a potential deal with Whitebox?
15      A.  Yes.
16      Q.  And when were those
17  discussions? When did those discussions
18  start?
19      A.  Those discussions happened
20  at the same meeting that I alluded to a
21  little earlier. I believe it was the
22  third week in January. Henry Ijaz,
23  Chris and myself.
24      Q.  And what was Chris'

21 (Pages 78 to 81)

JAMES WELBOURN

162

1  to terminate the deal with you all Chex
2  and Equitex based on this NACSF contract
3  being pulled?
4         MR. PORETTI: I'm going to
5  just caution you, Mr. Welbourn,
6  not reveal any attorney-client
7  discussions about that impact if
8  you personally formed an opinion.
9         MR. TAYLOR: Counsel,
10 believe me I'm not.
11        MR. PORETTI: I understand
12 that? Suggesting in any way that
13 you are doing anything improper,
14 but I would like to know how in
15 the world and maybe I'll try to
16 correct the question how in the
17 world that question would elicit
18 or in any way ask him to remit
19 anything from an attorney-client
20 communication.
21        MR. PORETTI: His opinion
22 about the effect of that Seminole
23 contract termination on the SPA
24 and whether that gives rise to the

163

1  right to terminate is based upon
2  what his lawyers have told him I
3  think it's attorney-client
4  privilege.
5         MR. TAYLOR: Well, I am
6  assuming --
7         MR. PORETTI: That's why I'm
8  telling him not to answer.
9         MR. TAYLOR: I am assuming
10 and again I don't know what -- all
11 the details of this, but there's
12 -- I mean this is a public
13 statement.
14        MR. PORETTI: Sure. All I'm
15 saying to him is I don't want him
16 to reveal attorney-client
17 privilege but he's certainly
18 willing to answer the question.
19 BY MR. TAYLOR:
20     Q.  Let's just have a general
21 understanding Mr. Welbourn, that your
22 counsel is completely correct about one
23 thing. I'm not entitled to know what
24 your private conversations are with your

164

1  lawyer, none of my questions so that we
2  can all agree to a standing objection
3  here any of my questions I'm not
4  entitled to those communications between
5  your counsel unless I claim it's been
6  waived somehow. I'm not there -- I'm
7  not even making that suggestion. So, we
8  agree on that. Tell me did you believe
9  Chris would have been well -- when I say
10 Chris I'm kind of using that it's a
11 little I guess informal. IGames Chris
12 Wolfington's company, the company he was
13 with, would have been within its rights
14 to terminate the deal because of this
15 contract situation?
16     A.  No
17     Q.  Why not?
18     A.  Well, again I'm not a
19 lawyer so it will be interpreted
20 somewhere in a court of law what
21 material adverse effect is. But as a
22 businessman the way I look at a material
23 adverse effect is not one isolated case,
24 but what is done about that case. As I

165

1  had mentioned earlier, yes, we lost the
2  Seminole Tribe. Yes, it was about 25
3  percent of our revenue. We cut $600,000
4  out of expenses of our company to
5  mitigate that loss. So, do I believe
6  that he'd be in his right under that
7  contract, no.
8      Q.  Well, your dealing at this
9  point with a company that is forced to
10 downsize lost one of its biggest
11 revenues of cash and you're going to
12 look me straight in the eye and tell me
13 that's not a material change?
14     A.  I'm going to tell you it's
15 in my mind it's not a material adverse
16 effect because we did things on the
17 other end to mitigate it.
18     Q.  All right. So when you
19 signed your name do you understand what
20 -- has anyone ever talked to you about
21 sanctions for filing frivolous either
22 affidavits or pleadings? Have you ever
23 had that discussion with anybody?
24     A.  Can I just ask you is that

JAMES WELBOURN

230

```
1        Q.   Okay. I believe earlier in
2   the deposition you had talked about, you
3   know, in the ordinary course of business
4   you all wouldn't have had to necessarily
5   tell Chris if you're discussing with a
6   potential lender, correct?
7        A.   Correct.
8        Q.   Do you know why Chris was
9   not advised the day of the closing of
10  Whitebox that it closed?
11       A.   No.
12       Q.   Don't you think that would
13  have been the right thing to do under
14  the agreement?
15       A.   No.
16       Q.   Do you believe that was
17  your only obligation to tell him that?
18       A.   At the point in time where
19  I believe he breached not paid the note,
20  not paid the interest, no, I don't
21  believe that.
22       Q.   Even though you didn't give
23  him written notice of all of those
24  breaches?
```

231

```
1        A.   To me that's a moot point.
2   You're obligated to the terms of the
3   agreement.
4        Q.   Okay. Why were you not
5   obligated, you not -- forget about what
6   Chris either did or did not do. That
7   you weren't obligated to advise Chris,
8   Chris we just closed on Whitebox?
9        A.   Because as I mentioned
10  earlier we -- we had two possibilities
11  of doing financing. We gave Chris the
12  term sheet in the January meeting said
13  he'd get back to us. He never did. So,
14  we in our beliefs we believed we could
15  go forward with that otherwise there
16  would have been an objection.
17       Q.   Okay. Number 25 I think
18  it's been marked it's sitting in front
19  of you.
20            Just take a moment Mr.
21  Welbourn to read Henry Fong's memorandum
22  which is number 25 dated March 11, 2004.
23  I know it's to the Equitex board of
24  directors. I guess before you read it
```

232

```
1   have you ever seen this document before?
2        A.   Well, I can't tell you
3   before I've read it.
4            (Marked as Exhibit Number 25
5        for identification.)
6        Q.   That is fair enough. Take
7   your time.
8        A.   I don't believe I've seen
9   this document before.
10       Q.   Tell me if I am wrong
11  anywhere in this document is there any
12  indication that iGames is in default of
13  the note with Chex as of March 11, 2004?
14       A.   He doesn't mention it in
15  this memorandum.
16       Q.   Right. Do they discuss
17  anywhere in this transaction or this
18  memorandum that the next day they're
19  going to issue a termination letter to
20  iGames?
21            MR. PORETTI: Objection.
22       The document speaks for itself.
23       A.   Do you still want me to
24  answer.
```

233

```
1        Q.   Yes.
2            MR. PORETTI: Yes.
3        A.   I don't see that in the
4   document.
5        Q.   Who made the decision at
6   least from your perspective as one of
7   the parties to the stock purchase
8   agreement that on March the 12th the
9   next day a termination letter was going
10  to go out for Chris to iGames that he
11  was in breach of the note and the stock
12  purchase agreement?
13       A.   That was discussed by Henry
14  Ijaz and myself.
15       Q.   And that was on this same
16  day or the next day on the 12th?
17       A.   The next day. I don't
18  recall if we discussed it on the 11th.
19       Q.   And did you direct your
20  lawyers that next day to get that letter
21  out or it was at that already in the
22  works?
23       A.   No.
24            MR. PORETTI: Objection.
```

59 (Pages 230 to 233)

JAMES WELBOURN

234

1  Hang on a second. Can you read
2  back that question, please.
3           - - -
4           (Whereupon, the requested
5  portion of the notes of testimony
6  was read by the court reporter.)
7           - - -
8           MR. PORETTI: I think this
9  question may transgress
10  attorney-client privilege. I'm
11  not going to instruct him not to
12  answer, but I'm not waiving.
13          MR. TAYLOR: I certainly
14  wouldn't claim that you're
15  anything with that.
16      A.   I don't remember if they
17  were instructed the day before or on the
18  12th.
19      Q.   Who interfaced, for
20  example, with the Rider Bennett folks,
21  their lawyers, in connection with the
22  communicates that went out on their
23  letterhead calling Chris in default and
24  terminating the stock purchase

235

1  agreement?
2      A.   I believe Ijaz contacted
3  them.
4      Q.   All right. Was that part
5  of your duties in this time frame --
6  strike that. Was that part of your
7  practice that you would also deal with
8  Rider Bennett folks on this issue with
9  iGames or did you leave that up to Ijaz?
10     A.   The decision was made. Who
11  called the attorneys really doesn't
12  matter.
13     Q.   But the decision was made
14  the 12th, correct?
15     A.   The next day. I said I
16  don't recall what day it was made. I
17  believe it was made on the 12th.
18     Q.   Okay. And do you believe
19  that the next day then Ijaz was the one
20  that advised Rider Bennett to sent out
21  the communicate that was instructed
22  Rider Bennett to sent out the
23  communicate that was sent on the 12th.
24  I'll represent to you that's when it was

236

1  sent?
2      A.   I believe so.
3      Q.   And do you know when the
4  Rider Bennett folks started to work on
5  that letter and the reasons for the
6  different defaults and terminations?
7      A.   No.
8      Q.   Who was the lead, who was
9  the partner in charge of this
10  relationship at Rider Bennett in terms
11  of your main interface. I know there
12  may be associates or paralegals that
13  also worked on it, but who was the guy
14  or woman at Rider Bennett that kind of
15  led that the legal team there?
16     A.   I'm not really sure. I
17  wasn't involved in most of the
18  correspondence so I don't recall.
19     Q.   Do you know any of the
20  lawyers at Rider Bennett. Obviously you
21  know Dan?
22     A.   Yes, Dan.
23     Q.   Do you know any of the
24  other lawyers?

237

1      A.   Greg Wyant.
2      Q.   I don't mean socially. I
3  mean generally in this?
4      A.   Yeah. I've met a number of
5  the lawyers.
6      Q.   We can send a subpoena
7  30(b)(6) find out who that was. I just
8  thought maybe you know.
9      A.   I don't.
10          MR. TAYLOR: Give me a
11  couple minutes. I think I'm
12  finished for now. You need to get
13  to the airport or get moving on
14  the airport. Take five.
15          (Recess was taken at 2:45
16  p.m.)
17          MR. TAYLOR: I am going to
18  adjourn the deposition at this
19  moment and reserve all rights to
20  bring the witness back at a later
21  date.
22          MR. PORETTI: I understand
23  your position, Matt. I'm not
24  arguing with you. I do want to

60  (Pages 234 to 237)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| iGAMES ENTERTAINMENT, INC., | : | |
| | : | |
| Plaintiff, | : | C.A. No. 04-180 (KAJ) |
| | : | |
| v. | : | |
| | : | |
| CHEX SERVICES, INC. and | : | |
| EQUITEX, INC., | : | |
| | : | JURY TRIAL DEMANDED |
| | : | |
| Defendants. | : | |

# Appendix of Exhibits To iGames Entertainment, Inc's Opposition To Chex's Motion For Summary Judgement

# Exhibit U

WLM\206411.1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

— — —

iGAMES ENTERTAINMENT, INC.   :   C.A. NO.
      V.   :   04-180-KAJ
CHEX SERVICES, INC. and   :
EQUITEX, INC.   :

— — — — — — — — — — — — — — — — — — — — — — — —

— — — — — — — —

EQUITEX, INC. and CHEX   :   C.A. NO.
SERVICES, INC., d/b/a   :   94-256-KAJ
FASTFUNDS   :
      V.   :
iGAMES ENTERTINMENT, INC.   :

COPY

— — — — — — — — — — — — — — — — — — — — — — — —

— — — — — — — —

CHEX SERVICES, INC., d/b/a  :   C.A. NO.
FASTFUNDS   :   04-0885-KAJ
      V.   :
IGAMES ENTERTAINMENT, INC.  :

— — —

September 22, 2004

— — —

Oral deposition of
CHRISTOPHER WOLFINGTON, held in the
offices of Duane, Morris and Heckscher,
4200 One Liberty Place, 1650 Market
Street, Philadelphia, Pennsylvania 19103
commencing at 10:00 a.m., on the above
date, before Harvey Krauss, a
Federally-Approved Registered
Professional Reporter and a Commissioner
of the Commonwealth of Pennsylvania.

— — —

ESQUIRE DEPOSITION SERVICES
15th Floor
1880 John F. Kennedy Boulevard
Philadelphia, Pennsylvania 19103
(215) 988-9191

CHRISTOPHER WOLFINGTON   .  ..

he had a $500,000 break-up fee if he got

out of the deal, and if I could write

him a letter that would indicate that

this was a higher and better offer for

his shareholders that would help him do

a deal with me and get out and not have

to pay the $500,000 break-up fee because

his only out in his agreement was if he

received an unsolicited higher or better

offer.

      Q.    And --

      A.    And we discussed Credit

Plus in the way that the offer would

have to be structured in order to

accommodate that need.

      Q.    Is there anything untrue in

the July 2nd letter from your

perspective?

      A.    Nothing that comes to mind

immediately, no.

      Q.    When do you believe you had

this conversation with Mr. Fong about

the cash system situation and the

$500,000 termination fee?

CHRISTOPHER WOLFINGTON

MR. TAYLOR: We'll break now for your family thing, which is fine. It's 4:15 and you're leaving at 4:30 anyway.

MR. PORETTI: Yes.

MR. TAYLOR: You can go to 4:30 if you want, but I don't know what you're going to get done in 15 minutes.

MR. PORETTI: Well, we're kind of end point on this particular topic for right now. Well, actually, if you give me five more minutes, I'll touch a few minor bases on the term loan.

MR. TAYLOR: All right.

MR. PORETTI: But if you need to go, because I don't want to rush to interfere with your family.

MR. TAYLOR: No.

BY MR. PORETTI:

Q.    Let me give you back Exhibit 1 the term loan note.

CHRISTOPHER WOLFINGTON

Did Mr. Anwar at any time tell you that you, you meaning the company iGames was now obligated to pay the interest called for under the term loan note for any reason?

A.    Not pay ever?

Q.    Right.

A.    Yes.

Q.    Tell me when that conversation took place.

A.    Somewhere between mid-January -- no, somewhere between -- it had taken place between the end of January and the end of March or February, rather.

Q.    Telephone, in person?

A.    Telephone.

Q.    Who called who, do you recall?

A.    I don't know.

Q.    What did Mr. Anwar say to you that led you to conclude that you wouldn't have to pay interest?

A.    We were in the process of

CHRISTOPHER WOLFINGTON

reconciling numerous inter-company payables, receivables.  Our past practices had been to maintain a spreadsheet that he would produce that would show what we owe them, they owe us netted out.  We had done that on numerous occasions with significant amounts of money over the course of God, a year or two prior, and we had dialogue similar to that saying that we would just wait to see how all the numbers shaped up to see who owed what to who.

Q.    Was there any time frame put on when that reconciliation would take place?

A.    No, he didn't know when his people could get around to doing it so I didn't know when they would have the numbers completed.

Q.    In your past practice was that done on a twice a year basis, quarterly, how often did you do the reconciliation?

A.    In the past practices --

ROUGH DRAFT

1    referenced the interest due under the

2    note as part of the reconciliation

3    process?

4         A.    That amongst other things.

5    Didn't refer to interest I believe.    I

6    think it referred to monies owed.

7         Q.    Now, you had the operating

8    profit calculations done for available

9    money for the month of January by

10   February 27, 2004; is that correct?

11             MR. TAYLOR:  Is that a

12        statement or a question?

13             MR. PORETTI:  I am asking

14        him a question.

15             MR. TAYLOR:  Well, it wasn't

16        a question.

17        Q.    By 2004, correct that was

18   the question?

19             MR. TAYLOR:  All right.  It

20        assumes facts not in evidence, no

21        foundation.

22        A.    Did we have what by then?

23        Q.    The operating income

24   calculation for available monies January

ROUGH DRAFT

1    2004 operations?

2          A.    What about that?

3          Q.    Did you have that number

4    that calculation in your possession

5    February 27, 2004?

6          A.    No.

7          Q.    When did your company first

8    determine the amount of operating

9    income, that available money made, for

10   the month of January 2004?

11         A.    Probably mid-March.

12         Q.    Once the available money

13   deal closed January 6, 2004, it's now

14   part of the iGames family of companies,

15   right?

16         A.    Um-hum.

17         Q.    Is that a yes?  You need to

18   answer out loud.

19         A.    Yes.

20         Q.    The revenues that are being

21   generated on a daily basis from the

22   available money activities are now going

23   into iGames accounts.  Is that right?

24         A.    Ask that question again.

ROUGH DRAFT

1        Q.       Sure.   The revenues being
2   generated from the activities of the
3   former iGames entity after January 6th
4   are now going into iGames accounts,
5   right?
6        A.       No, I believe -- keep in
7   mind this was the very first month of
8   the business was operating under our
9   management.   So I believe we were busy
10  setting up accounts for specifically
11  available monies so we could keep the
12  funds segregated.   We were setting up
13  trying -- our accountants were trying to
14  get, you know, internal doing our
15  accounting trying to appropriate
16  numbers, you know, what expenses go to
17  which calculations because at that point
18  now you have iGames --
19            MR. TAYLOR:  Slow down.
20       A.       Which numbers and expenses
21  are applicable to available money versus
22  iGames versus Money Centers of America
23  separating those accounts up, separating
24  up those accounting procedures so we

ROUGH DRAFT

1    could make sure that we allocated

2    expenses and revenues to the appropriate

3    entity.

4              Q.       What was your understanding

5    at the time you signed the term loan

6    note as to when interest payments would

7    be due under the note, Exhibit 1?

8              MR. TAYLOR:  Objection to

9              the form.  Asks for a legal

10             conclusion.  You can answer it.

11             A.       On an ongoing basis once the

12   financials for the operating entity were

13   reconciled on a monthly basis, and in

14   the case of the first month, I didn't

15   think anything was due because based on

16   my peripheral discussions with Ijaz and

17   Jodi Dilascio who is their marketing

18   person they owed us money.

19             Q.       I'm sorry, I didn't hear

20   that last part?

21             A.       They owed us money.

22             Q.       We're going back to this

23   reconciliation issue, right?

24             A.       Yes.

ROUGH DRAFT

1          Q.      Setting aside the

2    reconciliation, did you believe that as

3    of February 1st, there was an amount due

4    and owing for interest, setting aside

5    whether it's going to get offset later

6    on against other expenses or

7    inter-company receivables did you

8    believe that iGames owed interest

9    payments under the note due and payable

10   on February 1st?

11              MR. TAYLOR:  Objection.

12          Calls for legal conclusion, and

13          two, asks him to assume facts

14          which are not in evidence and it's

15          an improper.  You're asking him --

16          I mean you didn't say

17          hypothetical.  So it's not a

18          hypothetical.  Those facts not in

19          evidence now and he's answered the

20          question.

21          Q.      Go ahead, sir.

22          A.      No.

23          Q.      And why didn't you believe

24   that interest would be due and payable

EXHIBITS

## C E R T I F I C A T E

I hereby certify that the witness was duly sworn by me and that the deposition is a true record of the testimony given by the witness.

_____

HARVEY KRAUSS

Court Reporter

Dated: October 4, 2004

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying shorthand reporter.)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| iGAMES ENTERTAINMENT, INC., | : | |
| Plaintiff, | : | C.A. No. 04-180 (KAJ) |
| v. | : | |
| CHEX SERVICES, INC. and EQUITEX, INC., | : | |
| | : | JURY TRIAL DEMANDED |
| Defendants. | : | |

# Appendix of Exhibits To iGames Entertainment, Inc's Opposition To Chex's Motion For Summary Judgement

# Exhibit V

WLM\206411.1

FOCUS - 6 of 6 DOCUMENTS

Copyright 2004 Business Wire, Inc.
Business Wire

January 8, 2004 Thursday
Correction Appended

**DISTRIBUTION:** Business Editors

**LENGTH:** 727 words

**HEADLINE:** Equitex Subisidiary Chex Services to Receive 50% Participation Interest in Available Money, Inc.

**DATELINE:** ENGLEWOOD, Colo. & PALM BEACH GARDENS, Fla., Jan. 8, 2004

**BODY:**

The release was issued in error. Please replace the release with the following corrected version.

The corrected release reads:

EQUITEX SUBSIDIARY CHEX SERVICES TO RECEIVE 50% PARTICIPATION INTEREST IN AVAILABLE MONEY, INC.

Equitex, Inc. (NASDAQ: EQTX) announced today that its wholly owned subsidiary, Chex Services, Inc., has provided financing assistance for closing on iGames Entertainment, Inc.'s acquisition of Available Money, Inc. announced today. This financing was provided in the spirit of the pending acquisition of Chex Services by iGames as previously announced. Under the terms of the financing, Chex Services, Inc. provided $2,000,000 in cash at closing, and agreed to provide an additional $2,000,000 in 60 days to fund the second installment of the purchase price. The terms of the financing will provide Chex Services, Inc. with a 50% participation in Available Money's revenues and income for not less than 90 days subject to certain extensions, and a 50% participation in Available Money's income until the financing is repaid.

Available Money, Inc. of Los Angeles, California, generates over $10 million in annual revenue through cash access services in 18 locations, 15 of which are traditional casino operations. Available Money provides a majority of its services through ATM transactions and processed approximately 5.8 million transactions at 103 ATM machines in 2003.

"We are pleased to assist iGames Entertainment with their acquisition of Available Money and are confident this strategic acquisition will open new avenues for both Chex Services and iGames," stated Chex Services President, Jim Welbourn. "We are here to assist iGames and Available Money in any way we can and are certain this transaction will strengthen the position of both companies as we move toward the timely closure of the Chex - iGames transaction."

Equitex, Inc. is a holding company operating through its wholly owned subsidiary Chex Services of Minnetonka, Minnesota, as well as its majority owned subsidiary Denaris Corporation. Chex Services provides comprehensive cash access services to casinos and other gaming facilities. Denaris was formed to provide stored value card services.

The statements included in this press release concerning predictions of economic performance and management's plans and objectives constitute forward- looking statements made pursuant to the safe harbor provisions of Section 21E of the Securities Exchange Act of 1934, as amended, and Section 27A of the Securities Act of 1933, as amended. These statements involve risks and uncertainties that could cause actual results to differ materially from the forward-looking statements. Factors which could cause or contribute to such differences include, but are not limited to, factors detailed in Equitex's Securities and Exchange Commission filings; completion of due diligence, shareholder approval, regulatory

Business Wire January 8, 2004 ThursdayCorrection Appended

approvals and certain other pre-closing conditions for all incomplete merger or acquisition transactions; economic downturns affecting the operations of Equitex its subsidiaries or companies proposed for merger or acquisition; the loss of contracts or failure to acquire new contracts; failure to successfully implement newly developed product lines including projected increases in revenues or earnings; the termination of previously announced acquisitions; delays or the inability to obtain regulatory approvals for previously announced acquisitions; the inability to initiate or complete any contemplated restructuring, offering, acquisition, disposition or other transaction; adverse financial performance by Equitex or any of its subsidiaries; failure to obtain or maintain regulatory approval for products and services offered by Equitex or its subsidiaries; the inability to collect amounts due to Equitex from the FDIC or Net First National Bank; adverse equity market conditions and declines in the value of Equitex common stock; and the unavailability of financing to complete management's plans and objectives. The forward-looking statements contained in this press release speak only as of the date hereof and Equitex disclaims any intent or obligation to update these forward-looking statements.

CONTACT: Equitex, Inc.
Thomas B. Olson, 303-796-8940


URL: http://www.businesswire.com

**LOAD-DATE:** January 9, 2004

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| **iGAMES ENTERTAINMENT, INC.,** | : | |
| Plaintiff, | : | C.A. No. 04-180 (KAJ) |
| v. | : | |
| **CHEX SERVICES, INC.** and **EQUITEX, INC.,** | : | JURY TRIAL DEMANDED |
| Defendants. | : | |

# Appendix of Exhibits To iGames Entertainment, Inc's
# Opposition To Chex's Motion For Summary Judgement

# Exhibit W

WLM\206411.1

REDACTED