IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| iGAMES ENTERTAINMENT, INC., | : | |
| | : | |
| Plaintiff, | : | C.A. No. 04-180 (KAJ) |
| | : | |
| v. | : | |
| | : | |
| CHEX SERVICES, INC. and | : | |
| EQUITEX, INC., | : | |
| | : | JURY TRIAL DEMANDED |
| | : | |
| Defendants. | : | |

# Appendix of Exhibits To iGames's Opposition To The Motion By Chex's And Equitex For Summary Judgment

# Exhibit B

WLM\207128.1

1

```
1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF DELAWARE
2

                         - - -

3   iGAMES ENTERTAINMENT, INC. :    C.A. NO. 04-180-KAJ
4           vs.                     :
5   CHEX SERVICES, INC. and         :

    EQUITEX, INC.
6                        - - -

                         - - -
7   EQUITEX, INC. and CHEX          :    C.A. NO. 04-256-KAJ
    SERVICES, INC., d/b/a
8   FASTFUNDS                       :
9           vs.                     :
10  iGAMES ENTERTAINMENT, INC.      :
                         - - -
11                       - - -
    CHEX SERVICES, INC., d/b/a :    C.A. NO. 04-0885-KAJ
12  FASTFUNDS
                                    :
13          vs.
                                    :
14  iGAMES ENTERTAINMENT, INC.
                         - - -
15
                    September 17, 2004
16
17          Oral deposition of IJAZ ANWAR, taken
    pursuant to notice, was held in the law offices of
18  DUANE MORRIS, LLP, One Liberty Place, 39th Floor,
    Philadelphia, Pennsylvania 19103, commencing at
19  9:15 a.m., on the above date, before Joshua Lieberman,
    a Federally Approved Registered Professional Reporter
20  and Notary Public in and for the Commonwealth of
    Pennsylvania.
21
22          ESQUIRE REPORTING SERVICES
                    15th Floor
23          1835 John F. Kennedy Boulevard
            Philadelphia, Pennsylvania 19103
24                  (215) 988-9191
```

Ijaz Anwar

1          A.      I do not recall calculating.

2          Q.      Is it fair to say you did not

3    calculate the number?

4          A.      On a piece of paper?  I don't

5    recall calculating the number.

6          Q.      Did you ever, prior to March 12,

7    2004, tell Chris Wolfington or anyone at iGames

8    that you believed an interest payment or some

9    type of payment was due on this Note?

10         A.      I do not recall informing Chris

11   Wolfington.

12         Q.      Or anyone at iGames?

13         A.      Or anyone at iGames.

14         Q.      And the answer was that you do

15   not recall informing Chris Wolfington or anyone

16   at iGames that any kind of payment was due on the

17   Note prior to March 12, 2004?

18         A.      I do not recall that.

19         Q.      But did I state your answer

20   correctly?

21         A.      Sorry?

22         Q.      Did I understand your answer

23   correctly?

24         A.      Yes.

Ijaz Anwar

1           Q.      Are you aware of anyone at Chex--
2      are you aware whether anyone at Chex notified
3      Chris Wolfington or anyone at iGames prior to
4      March 12, 2004, that they believed an interest
5      payment or some type of payment was due on the
6      Note?
7           A.      I do not recall right now if
8      anyone else contacted Chris Wolfington.
9           Q.      Isn't it fair to say that if
10     someone contacted Chris Wolfington or anyone at
11     iGames, you would either have done it yourself or
12     you would have known about the contact?
13          A.      That would be an incorrect
14     statement.
15          Q.      Why would that be incorrect?
16          A.      Not everything that is
17     communicated to a third party is communicated to
18     me.
19          Q.      Well, we're not talking in
20     general.  I'm talking about iGames.  Weren't the
21     primary contact between Chex Services and iGames?
22          A.      I was one of the contacts.  I
23     don't know if I was the primary contact.
24          Q.      Who else would have contacted

Ijaz Anwar

1    iGames concerning this Note?

2              A.     It could have been Jim Welbourn;

3    it could have been Henry Fong; it could have been

4    our counsel.

5              Q.     Jim Welbourn relies on you for

6    the accounting and the financial aspect of the

7    business, correct?

8              A.     Not entirely.

9              Q.     Do you know whether Jim Welbourn

10   Jim Welbourn ever read this Note prior to March

11   12, 2004?

12             A.     I cannot speak on behalf of Jim.

13   I don't know.

14             Q.     Did you ever show him the Note

15   prior to March 12, 2004?

16             A.     I do not recall showing him the

17   Note.

18             Q.     Are you aware that one of the

19   alleged breaches by iGames of the stock purchase

20   agreement was its failure to pay interest on this

21   Note when due?

22             A.     Yes.

23             Q.     As a businessman, who negotiated

24   part of this Note who signed this Note, who

Ijaz Anwar

```
1   thought iGames owed an interest payment, correct?
2   He didn't raise breach.  He raised iGames owed an
3   interest payment?
4           A.      That is correct.
5           Q.      And you explained your
6   conversation.  Now, you said you did not follow
7   up with Chris with that?
8           A.      I do not recall following up with
9   Chris.
10          Q.      Okay.  At any point before
11  terminating or calling in that Note, did anyone
12  in your organization tell Chris that a payment
13  was due and tell him what the amount they thought
14  was due?
15          A.      I don't recall the amount due,
16  because I believe, and again I would have to
17  refer back to the Note, there's a provision that
18  either the interest or profits from Available
19  Money are due, one of the two.  So to ask for
20  interest payment without receiving the P&N or the
21  calculation from Chris Wolfington on the
22  Available Money financial statements would be, I
23  think, premature.
24          Q.      And how would Chris, Mr.
```

Ijaz Anwar

```
 1  Wolfington, receive the money on the note?
 2  January 6th; is that correct?
 3           A.     As I recall, the funds were -- I
 4  don't remember.  I think the funds were wired
 5  directly into Available Money -- not Available
 6  Money -- Available Money or the previous owners
 7  of Available Money's banknote.
 8           Q.     Okay.
 9           A.     Yes, actually that is correct.
10  We had instructions to send "X" amount to one
11  owner and wire amount to one owner.
12           Q.     Do you believe it was done on
13  January 6, 2004, that wiring?
14           A.     I can't recall the date.  As per
15  the Note, yes.  But when was it actually sent?  I
16  would have to look at the records of the bank
17  statements to determine that.
18           Q.     Well, the Note was actually
19  signed sometime later and then dated January 6th,
20  correct?
21           A.     That is correct.
22           Q.     And wasn't it dated January 6th
23  because that's when the money was transferred?
24           A.     I would make an assumption.  For
```

Ijaz Anwar

1    a fact, I don't know.

2            Q.      You'd agree it was on or about

3    January 6th?

4            A.      I believe so, yes.

5            Q.      All right.  So then you said they

6    would have to wait for Available Money -- in

7    order to calculate what was due, you'd have to

8    wait for Available Money's profits and loss

9    statement?

10           A.      I believe the Note says that

11   fifty percent -- I would have to read the Note.

12           Q.      Go ahead.

13           A.      Just give me a second.

14           Q.      You know the paragraph?

15           A.      Yes, the interest section.

16           Q.      You're referring to iGames-1,

17   correct?

18           A.      That is correct.  Yes, the note

19   asks or requires them to pay fifty percent of the

20   operating income of the borrower's Available

21   Money subsidiary for the period ending February

22   1st, 2004.

23                   Just to clarify my position, I

24   believe one of the reasons we did not ask for the

Ijaz Anwar

1    payment during the month of February was the

2    financial statements from Available Money, the

3    calculations from Fifth Third Bank come for the

4    month of February sometime during March.  So if

5    they did not have the basis to make a payment, it

6    would be irrelevant to ask for the payment.

7            Q.     So basically from your own

8    practices Available Money or iGames wouldn't know

9    or be able to calculate that payment without

10   having the financials, and in your organization

11   that's not done until March 25th or approximately

12   that time period?

13           A.     I believe so.  So January's

14   financial statements would have or should have, I

15   don't know exactly when they did at iGames,

16   arrived sometime in February, in February and

17   March, I would assume. I don't know exact dates,

18   how Fifth Third and Available Money provided the

19   financial statements.

20           Q.     Doesn't that Note provide for one

21   payment for the time period before February 1st

22   and not a separate payment for January?

23                  MR. PORETTI:  Objection.  Vague.

24           A.     At least I don't read in the Note

Ijaz Anwar

1    that they can substitute the February payment or

2    the January payment.  Maybe I'm reading it

3    incorrectly.

4                Q.       Could you tell me where in that

5    Note it says there is a January payment or when

6    it's due or how to calculate it?

7                     MR. PORETTI:  Objection.

8             Compound.

9    BY MR. BEAUSOLEIL:

10               Q.       Explain to me the basis for

11   saying there's a January payment due.

12               A.       Funds were given on January 6th,

13   somewhere around January 6th.

14               Q.       And the Note then was negotiated

15   and signed somewhere around January 21st,

16   correct?

17               A.       That would be correct.  I believe

18   so.  I know it's dated January 6th and it was

19   subsequently negotiated or signed and then dated

20   for January 6th.

21               Q.       In fact, this is sent, the fax

22   says January 21, '04.  We could later maybe

23   establish that a little better.  Okay?

24               A.       Yes.

Ijaz Anwar

1          Q.     All right.  So the January 21st

2     Note is signed in terms of settled?

3          A.     I don't know the exact date, but

4     it was signed after January 6th.  Yes, sometime

5     after January 6th.  It was not signed on January

6     6th.

7          Q.     All right.  Then I was asking if

8     you would read that Note and give me the basis

9     for your statement that there was some type of

10     payment due for January.

11               MR. PORETTI:  I object in that the

12               document speaks for itself, but go ahead

13               and answer.

14          A.     It does not refer to a

15     calculation of interest for the month of January.

16          Q.     It combines January and -- tell

17     me, Mr. Anwar, when the first --

18          A.     For the period ending February

19     1st, when it says the period ending February 1st,

20     it's really referring to January, because the

21     period ending February 1st entails the month of

22     January.

23          Q.     Tell me when that payment was due

24     and how you would calculate it.  You don't have

Ijaz Anwar

1  to give me exact numbers. You can just tell me.

2          A.      When was the payment due for the

3  month of January?

4          Q.      Hm-hmm.

5          A.      It doesn't specify a date, but it

6  says in addition, in lieu of interest, the

7  borrower shall, on a monthly basis, pay to the

8  lender and amount equal to fifty percent of the

9  operating income of borrower's Available Money,

10  Inc. subsidiary, Available Money.

11              So when it says on a monthly basis

12  and you're talking about the month of January,

13  ending February 1st, if you say monthly basis, it

14  would be during the month of February that they

15  would have to pay the interest for the month of

16  fifty percent profits for the month of January.

17          Q.      How would iGames during the month

18  of February, having closed on this January 21st

19  and having just closed on Available Money, known

20  what to pay you?

21          A.      I won't be able to answer that

22  question.  That's iGames and Available Money's

23  internal accounting and workings.

24          Q.      Didn't you explain that when Mr.

Ijaz Anwar

1   Welbourn told you, questioned you about this, you

2   said it wasn't worth talking to Chris because he

3   wouldn't know what was due until the end of

4   March?

5          A.     I did not tell that to Mr.

6   Wolfington.  I said that I did not approach

7   Chris, I believe, because -- first of all, I said

8   I don't recall, but now that I'm thinking about

9   it, I think the reason I did not approach Chris

10  was because the financial statements for the

11  month of January would have come to Available

12  Money, being in the same business, sometime

13  middle or end of February.

14         Q.     So there's no way he could have

15  figured out the interest payment until when?

16         A.     Well, that would depend on when

17  he got the financial statements of Available

18  Money.

19         Q.     Tell me what you think when the

20  first payment was due on their Note.

21         A.     I think the first payment was due

22  on the Note when they received the financial

23  statements of Available Money for the month of

24  January during the month of February.

Ijaz Anwar

1        Q.        Did you ever ask iGames, before

2   the termination letter was sent, whether they had

3   received those receivables?  What did you say?

4        A.        Financials.

5        Q.        Financials, sorry.

6        A.        I don't recall asking him.

7        Q.        At any time prior to March 12th

8   when the termination letter was sent, did you ask

9   Chris Wolfington or anyone at iGames for the

10  payment?

11       A.        We had numerous conversations

12  about a lot of things.  I don't recall asking.

13  It would be highly unlikely if I did not ask, but

14  I don't recall sitting here asking.

15       Q.        Well, isn't that an important

16  thing?  If you're going to terminate a several

17  million-dollar deal, some valued at sixty

18  million, because of failure to make a payment,

19  wouldn't you ask the person for the payment

20  first?

21       A.        That is correct, we would ask for

22  the payment first.

23       Q.        And do you recall asking for the

24  payment?

Ijaz Anwar

1          A.       I, as an individual, do not

2    recall asking, as I said.

3          Q.       Are you aware of anyone else in

4    your organization asking?

5          A.       In my organization, I don't

6    recall.  I'm not aware of anybody asking.

7          Q.       And did you ever put into writing

8    when the payment was due and how much was due in

9    order to establish iGames was in breach?

10         A.       I think the Note speaks for when

11   the payment is due.

12         Q.       I'm asking you, as a business

13   man, as chief financial officer of Chex, did you

14   ever put in writing this is the date the payment

15   was due on the Note; this is how much it was for?

16         A.       I did not put that in writing

17   because the payment was due as fifty percent of

18   profits which are not under my control from

19   Available Money.

20         Q.       Did iGames ever front money for

21   the CNIGA game show for Chex?

22         A.       IGames did not front money for

23   Chex for the CNIGA show.

24         Q.       Well, did Chex owe money to

Ijaz Anwar

1   February that iGames should have made an interest

2   payment when you yourself didn't know what the

3   number would have been?

4          A.      Yes, I do believe that iGames

5   should have made a payment, not an interest

6   payment, a payment for the fifty percent of the

7   profits, yes.

8          Q.      In February they should have

9   paid, written a check in February for payment of

10  fifty percent of profits for Available Money?

11         A.      Yes.  The funds were given in

12  January, on January 6th, two million dollars, and

13  there's a cost involved for those funds.  So we

14  did believe that for the month of January they

15  should have given us some kind of compensation

16  for the funds that we lent them in the month of

17  February.

18         Q.      Some token amount?

19         A.      I wouldn't say token amount.

20  Some true basis of calculation and not a token

21  amount.

22         Q.      But you were going to leave up to

23  them how much and when it was supposed to be

24  made?

Ijaz Anwar

1          A.       No, the Note asks for fifty

2   percent of the profits for Available Money for

3   the month ending February 1st.  So when they

4   would have received the financial statements for

5   Available Money for the month of January, that

6   would have determined the amount owed.

7          Q.       If I told you they received the

8   financials on February 27th, would you think that

9   was reasonable?

10          A.       That would be reasonable.

11          Q.       So the first earliest possible

12   date for iGames with that assumption would have

13   been February 27, 2004, if they immediately made

14   the calculations once they received the

15   financials?

16          A.       That is correct.  Can I get some

17   water, please?

18          Q.       Yes, sure.

19               MR. BEAUSOLEIL:  You want to take

20          a break?

21               MR. PORETTI:  Sure.

22                   (Whereupon a comfort recess

23          was taken 10:15 a.m.)

24                   (Whereupon the testimony resumed

Ijaz Anwar

1           at 10:22 a.m.)

2                   MR. PORETTI:  Jim, I think Mr.

3           Anwar needs to clarify an answer.  He

4           misunderstood the question about where

5           the idea of the loan on Available Money

6           came from.  So if you want to give him a

7           chance to fix that, you'll probably save

8           some confusion.

9    BY MR. BEAUSOLEIL:

10          Q.      You want to offer an explanation?

11          A.      Sure.  We were asked to provide

12   financing and then we consented to providing

13   financing.

14          Q.      Can you explain that again?

15          A.      We were asked under Available

16   Money to provide the financing for the first

17   payment.

18          Q.      Wait a minute.  Chex or you

19   personally?

20          A.      All the discussions were with

21   Henry Fong, myself and iGames together.  So I

22   think we were altogether.

23          Q.      Who asked you for that?

24          A.      Chris Wolfington.

Ijaz Anwar

**70**

1  accounting software called Great Plains.
2      Q.    Could you just take me through
3  your promotions and different titles.
4      A.    I don't know the exact dates,
5  but I've been very fortunate. I was very
6  fortunate in getting promoted. I became a senior
7  accountant. That was my first position from the
8  data entry or coming in as a temp. I don't know
9  the dates exactly.
10      Q.    That's fine.
11      A.    And then I was promoted to
12  controller, and then I was promoted to the
13  treasurer and then once we went public or we were
14  acquired by Equitex in 2001, I was promoted as a
15  CFO. At the hotel chain in Dubai, I was the
16  controller there.
17      Q.    And you were a CFO for Equitex
18  beginning --
19      A.    For Chex.
20      Q.    -- for Chex beginning in 2001?
21      A.    No, we were acquired in December,
22  2001. I think sometime in 2002, March or April.
23      Q.    And then have you had any
24  promotions since that time or change in your

**71**

1  position?
2      A.    Yes. Once a reverse merger took
3  place, a reverse merger took place in March or
4  June of this year, I was given the additional
5  responsibility of operations in addition to
6  finance. So I'm currently the CFO and COO of
7  FastFunds Financial Corporation.
8      Q.    FastFunds Financial Corporation.
9           And before May or June of 2004,
10  you were CFO of Chex Services, Inc.
11  doing business as FastFunds?
12      A.    That is correct.
13      Q.    You are now CFO and COO of what?
14      A.    FastFunds Financial Corporation
15  and subsidiary Chex Services.
16      Q.    Prior to June, 2004, when you
17  were working for Chex, what did your paycheck
18  say? Just the name of the entity that paid you.
19      A.    Chex Services, Inc.
20      Q.    Have you ever gone by any other
21  names other than Ijaz Anwar?
22      A.    No.
23      Q.    What were your responsibilities
24  as CFO of Chex?

**72**

1      A.    I was responsible for all the
2  financial operations of Chex Services as well as
3  I participated in the various transactions that
4  Equitex was involved in on behalf of Chex or Chex
5  was involved in on behalf of Equitex.
6      Q.    When did you first meet Chris
7  Wolfington?
8      A.    When was the first time I met
9  Chris Wolfington? I think I met Chris Wolfington
10  for the first time during 2001 prior to the
11  acquisition of Chex Services by Equitex. I
12  think.
13      Q.    And do you remember like under
14  what circumstances did you meet him?
15      A.    I clearly remember. I don't
16  remember the date. Don't quote me on the date,
17  please. I remember he and Jake Koldus came in
18  with bright yellow, orange T-shirts and they were
19  wearing khaki slacks. So they were very slick
20  looking individuals. So that still stays in my
21  mind.
22      Q.    Was that some kind of event?
23      A.    I was senior accountant. I was
24  nobody, so they just passed by and shook our

**73**

1  hands and that's it. So that was the first
2  encounter with Mr. Wolfington.
3      Q.    Have you gotten to know Mr.
4  Wolfington over the past few years?
5      A.    Yes.
6      Q.    Have you worked on different
7  various business transactions with him?
8      A.    One business transaction, various
9  business issues, yes.
10      Q.    In the past, have your companies
11  worked together where you shared staff, like COOs
12  shared receivables and things like that?
13      A.    We managed some contracts for
14  MCA. And MCA, being a private entity, was owned
15  by Chris Wolfington.
16      Q.    Did you at one point share some
17  technical people, some IT people, both Chex and
18  MCA?
19      A.    We did various projects together.
20  I'm sure we shared employees back and forth. We
21  were managing contracts on behalf of MCA. So we
22  may have helped them and they may have helped us.
23      Q.    Has Chris Wolfington always
24  operated with integrity, as far as you're

**19 (Pages 70 to 73)**

Ijaz Anwar

74

1 concerned?
2  A.  Yes.
3  Q.  Has he ever lied to you?
4  A.  Not to my knowledge.
5  MR. BEAUSOLEIL: This is going to
6  be iGames-2.
7  (Whereupon an e-mail consisting
8  of three pages dated March 19, 2004, was
9  marked as iGames-2)
10 BY THE WITNESS:
11  Q.  Having worked with Chris over the
12 years and having done projects, as you said,
13 together, do you think Chris would have knowingly
14 breached an agreement?
15  MR. PORETTI: Objection.
16  Speculation.
17 BY MR. BEAUSOLEIL:
18  Q.  Such as the Note or the stock
19 purchase agreement?
20  MR. PORETTI: Objection. It calls
21  for speculation.
22  A.  I would not answer that. I can't
23 answer that question.
24  Q.  Do you think -- do you personally

75

1 believe that Chris would knowingly breach -- in
2 this instance we've talking about the Note and
3 that the payment was due. Do you think Chris
4 knowingly failed to make a payment on that Note?
5  MR. PORETTI: Objection. It calls
6  for speculation.
7 BY MR. BEAUSOLEIL:
8  Q.  You can answer the question just
9 based on your own knowledge and your own beliefs.
10  A.  It calls for speculation.
11  Q.  No, no, that's not a fair
12 objection. He could put that on the record and
13 preserve it, but you have to answer that.
14  MR. PORETTI: I think it is a fair
15  answer. You're asking him to testify
16  the state of mind of Mr. Wolfington. He
17  has no basis for doing that. In fact,
18  his answer is his answer.
19 BY MR. BEAUSOLEIL:
20  Q.  I asked you if you personally
21 believe that Chris Wolfington would knowingly
22 fail to make a payment on that Note?
23  MR. PORETTI: The same objection.
24  A.  I personally cannot answer that

76

1 question. I don't know what Chris Wolfington
2 would do under these circumstances.
3  Q.  Well, you know what he did under
4 these circumstances. You were communicating with
5 him. Do you believe if you had asked him for the
6 payment or told him you believed a payment was
7 due and that if the payment was Note made, he
8 would be in breach, he would have made the
9 payment?
10  MR. PORETTI: Objection. It calls
11  for speculation.
12  A.  I cannot answer that question.
13  Q.  Do you agree that you didn't give
14 him that opportunity?
15  A.  I think the Note itself clearly
16 states when the payment is due.
17  Q.  Well, you say it clear states
18 when the payment is due and you haven't told me
19 yet what you thought it was due.
20  A.  I can talk about the Note, not
21 what Chris Wolfington should have or would have
22 done. The note clearly states when the payment
23 is due and if you comply with the Note.
24  Q.  You told me that Mr. Welbourn

77

1 raised an issue?
2  A.  With me.
3  Q.  With you. If you followed
4 through with Chris Wolfington and told him you
5 believed an amount was due and if he failed to
6 make it, he would be in breach, do you believe he
7 would have made that payment based on your past
8 experiences with him?
9  MR. PORETTI: Objection. It calls
10  for speculation. Lack of foundation.
11  A.  Again I would refer back to the
12 Note which clearly states when the payment is
13 due.
14  Q.  Well, that's a legal issue.
15 We're going to have judges look at that. We're
16 going to have a jury look at that. I'm going to
17 look at it, your lawyer is going to look at it.
18 I don't need to look at the Note.
19  I'm asking you, this is my
20  opportunity to ask you what you believe,
21  what you know, what you may have heard.
22  There's all kinds of ranges of
23  testimony. You just have to be clear
24  with where it's coming from.

20 (Pages 74 to 77)

Ijaz Anwar

102

1    know the dates. I don't remember the dates.
2        Q.    The first weekend of 2004?
3        A.    Yes, I believe.
4        Q.    That's when the termination took
5    place?
6        A.    We exited or we were asked to
7    leave or we discontinued our services, I think,
8    on the first Monday of 2004.
9        Q.    And how long --
10       A.    So I think if you backtrack from
11   there during the weekend, yes. late Friday I was
12   in the office. I don't know if that late Friday
13   was 2003 or 2004. But late Friday I was in the
14   office and then we received a termination letter
15   from Seminal. It was faxed over to us and I was
16   in the office and I received that letter.
17       Q.    That's when you first learned,
18   through that fax?
19       A.    Yes.
20       Q.    Did you have any warning ahead of
21   that fax?
22       A.    No.
23       Q.    Did you know there were problems
24   before you got that fax?

103

1        A.    No, we did not know of any
2    problems prior to that fax. I do not recall
3    knowing of any problems before that fax.
4        Q.    In that contract --
5        A.    Seminal?
6        Q.    Seminal contract, yes, were there
7    like five casinos that you provided cash services
8    for?
9        A.    Yes, that is correct.
10       Q.    Did you have to pay commissions
11   back to the tribe?
12       A.    We paid commission to the tribe
13   as well as NACS and NACSF.
14       Q.    How did you determine the
15   commissions?
16       A.    I don't recall the calculations.
17   I know the NACS and NACSF commissions were a net-
18   based portion of the net profit and the tribe's
19   commission were a percentage of gross revenue.
20       Q.    And what information would you
21   need from the casino or from the booths in order
22   to calculate the commission?
23       A.    It's an accumulation of a lot of
24   information to tabulate or construct the

104

1    financial statements and provide the correct
2    amounts to both the tribe and NACS and NACSF. So
3    it's various information.
4        Q.    Well, for checks cashed in
5    January, how long would it take you to collect
6    the information and calculate the commission paid
7    and credited to the tribe?
8        A.    We attempted to pay by the 25th
9    of the following month.
10       A.    Were you always successful?
11       A.    No, we were sometimes not
12   successful. Sometimes we paid ahead of time.
13   Sometimes we paid on the 25th.
14       Q.    What portion of Chex's revenues
15   did the Seminal contracts represent?
16       A.    As I recall, I believe it was
17   twenty-two-and-a-half percent.
18       Q.    Would you agree that that's a
19   significant portion of Chex's revenues?
20       A.    Yes, I would agree with that.
21       Q.    What was the reaction by the
22   public over the announcement that you were
23   terminated from those contracts?
24       A.    When you say "public," could you

105

1    just define exactly who you're referring to.
2        Q.    Well, we could start with the
3    industry, people in the industry. What kind of
4    feedback, what kind of reaction did you get?
5        A.    Because I'm on the financial
6    side, I'm not that involved on the day to day
7    interaction from the industry as such. So I
8    can't really comment on the industry side. To my
9    knowledge, I can't recall any positive or
10   negative comment from the industry side.
11       Q.    Well, you wouldn't expect any
12   positive comment, would you?
13       A.    Any comment, yes.
14       Q.    You would not expect positive
15   comments from that termination, would you?
16       A.    Yes. Well, you could expect a
17   positive comment if somebody does not like
18   Seminal tribe and you leave the financial
19   services at Seminal, they would be happy at
20   another tribe.
21       Q.    Did that happen, to your
22   knowledge?
23       A.    Again I'm not involved on the
24   industry side.

27 (Pages 102 to 105)

114

1 Fong?
2       A.    Let me think about that, please.
3 I believe so, yes.
4       Q.    As a managing officer of Chex, as
5 part of the management team of Chex, you
6 understand how investors and the public would
7 react to a significant loss of income or loss
8 like in this case of five casinos at the same
9 time, correct?
10      A.    Generally the market place, yes.
11 Intimately on the Equitex side, no, I would not
12 have knowledge as to how the shareholders of
13 Equitex would directly react.
14      Q.    Well, at the time iGames was
15 acquiring Chex, it was supposed to be a good deal
16 for iGames.  It was supposed to be actually for
17 both companies, but it was going to make --
18 iGames was probably traded and it was going to
19 help.  They were going to grow in the market and
20 the two companies would be, the two would be
21 better than, two together would be better than
22 two independent companies, correct?
23      A.    That is correct.
24      Q.    You expected some synergies?

115

1       A.    Yes.
2       Q.    So when iGames was in the middle
3 of acquiring Chex and Chex lost 22.5 percent of
4 their operating income was it?
5       A.    Revenue.
6       Q.    Revenue, wouldn't you expect a
7 negative reaction by the public and by the
8 investors in iGames to that news?
9             MR. PORETTI: Objection.  It calls
10      for speculation.
11      A.    I don't know the shareholders of
12 iGames.  Generally speaking, yes, in the
13 marketplace if a negative event takes place, yes.
14      Q.    Didn't you initiate litigation
15 and claim all those things, for instance, that
16 the termination was going to harm Chex's
17 reputation, irreparably harm their reputation?
18      A.    Which litigation are you
19 referring to?
20      Q.    Against Cash Systems.
21      A.    I'm not intimately involved.  I
22 would have to look at the documents if that is
23 one of the claims.
24      Q.    Was that a concern of management

116

1 at the time?
2       A.    Could you repeat that?  What
3 concern?
4       Q.    Was the reputation of Chex
5 Services -- was the harm that the loss of those
6 casino to Chex Services -- let me try to figure
7 out my question, sorry.
8             Was the harm to Chex's reputation
9       that resulted from the loss of those
10      casinos a concern to the management of
11      Chex?
12      A.    Yes.
13      Q.    Therefore, wouldn't you expect it
14 was also a concern to iGames?
15      A.    I can't speak on behalf of
16 iGames.
17      Q.    Well, I'm not asking you in all
18 these questions to speak on behalf of iGames.
19 I'm asking you whether you believed it, from your
20 personal experience, believed it was a problem or
21 whether, as part of the management team and part
22 of the person on these e-mails and being included
23 in discussions and board meetings, you learned
24 that yes, it was a problem either for both Chex

117

1 and for iGames?
2       A.    I don't know if it was a problem
3 for iGames.  If I was in iGames' shoes, I would
4 be concerned.
5       Q.    And you immediately took legal
6 action because of that loss and you also took
7 internal cost cutting action, correct?
8       A.    We initiated legal action, yes.
9       Q.    You also cut costs in various
10 ways to make up for that loss?
11      A.    That is correct.
12      Q.    If I wrote a check in one of your
13 casinos, if I wanted to cash a hundred dollars,
14 how much would I have to write the check for?
15      A.    The average fee, I believe it's
16 six dollars, six percent.
17      Q.    So if I wanted to cash a hundred
18 dollars, I'd write a $106 check?
19      A.    That is correct.
20      Q.    And if I cashed a $106 check with
21 one of Chex's or FastFunds' booths in September,
22 2003, it bounced, how would you handle it in your
23 accounting?
24      A.    If the check bounced for $107, we

Ijaz Anwar

**118**

1 would write off that check or expense it in our
2 financial statement.
3     **Q.**   So if I wrote a check for -- is
4 it 107 or 106?
5     A.   Sorry? 106.
6     **Q.**   Well just use that. So if I
7 **wrote a check September 1st, 2003, for $106, how**
8 **long would it take before you knew it bounced if**
9 **I wrote a bad check?**
10     A.   It depends on the location. If
11 you have electronic versus manual, most of them
12 are electronic, so I would say within 48 hours.
13     **Q.**   So within 48 hours -- so within
14 **the month of September, if I wrote it September**
15 **1st, you're going to know it's no good?**
16     A.   That is correct.
17     **Q.**   How then would that be accounted
18 **for? You said you would write it off?**
19     A.   Hm-hmm.
20     **Q.**   Where would that get written off?
21 **Would that be when you reconciled the books late**
22 **in the following month, like the 25th of the**
23 **following month?**
24     A.   Yes. Basically when it actually

**119**

1 gets wherein off by the 25th or the 15th,
2 depending on where we are on closing the
3 financial statements for that particular month,
4 you get the bank statement and you actually see
5 the debit in your bank statement and then you
6 write it off in your bank statement, through your
7 bank statement in your financials.
8     **Q.**   I asked you September 1, 2003,
9 **because you're explaining to me under the**
10 **policies and procedures you had a place at that**
11 **time, correct?**
12     A.   That is correct.
13     **Q.**   Did you understand?
14     A.   Yes.
15     **Q.**   What amount would you write off
16 **the following month as you explained?**
17     A.   Well, the debit, whatever the
18 amount of the debit is in the bank statement. So
19 if the check was 106 and it bounced or came back
20 as NSF, we would have to expense $106.
21     **Q.**   Would you then send that check to
22 **collections or how would you handle that check?**
23     A.   It depends. Typically the check
24 would go back to operations. They would try to

**120**

1 collect it for forty-five days. And if they're
2 unsuccessful, it would go back to collection. It
3 would go to the in-house collection.
4     **Q.**   I'm sorry, who would get it?
5     A.   So when the check becomes bad, so
6 Let's differentiate between when it gets written
7 off versus when the information comes.
8     **Q.**   September 1, 2003, I'll give you
9 **a pen if you want to visualize it, September 1,**
10 **2003, I write the check; within a day so, by**
11 **September 3rd, you know it's insufficient funds?**
12     A.   If it is electronic, we will know
13 within forty-eight hours. Electronically it is
14 insufficient funds. Then the physical check would
15 probably arrive within twenty-four to forty-eight
16 hours after that.
17     **Q.**   Okay.
18     A.   Once the check arrives, it is
19 given to the operations or people at the booth or
20 the Financial Service Center to collect the check
21 for forty-five days, and if they're unsuccessful,
22 the check would go to collections. There are
23 also exceptions.
24     **Q.**   That was the policy and procedure

**121**

1 **in place in September, 2003, correct?**
2     A.   That is correct.
3     **Q.**   And what would happen if you did
4 **ultimately collect it; how would you account for**
5 **it?**
6     A.   If you ultimately collected, it
7 would go back as collection revenue. When you
8 expense it, it's bad check expense, and when you
9 collect it, it's collection revenue.
10     **Q.**   That accounting procedure was in
11 **place last year?**
12     A.   That is correct. Can I get some
13 water, please?
14     **Q.**   Sure.
15     MR. BEAUSOLEIL: Let's take a
16 five-minute break.
17     (Whereupon a comfort recess
18 was taken at 11:45 a.m.)
19     (Whereupon the deposition resumed
20 at 11:56 a.m.)
21 BY MR. BEAUSOLEIL:
22     **Q.**   What I didn't ask you was did you
23 **ever -- are you a certified CPA?**
24     A.   I've passed the CPA exam. I

**31 (Pages 118 to 121)**

Ijaz Anwar

122

1  don't have a CPA valid license.
2      Q.    Have you ever had one?
3      A.    No.  I did not go into public
4  accounting.
5      Q.    So after you graduated college,
6  you then sat for the CPA exam?
7      A.    That is correct.
8      Q.    Have you gone to anymore
9  education, any continuing education?
10      A.    Yes, I regularly take continuing
11  education classes and seminars just to keep up
12  with what's going on.
13      Q.    Is that in a particular field?
14      A.    Accounting financing.
15      Q.    Have you worked on any graduate
16  degrees or anything?
17      A.    No, I have not.
18      Q.    Do you have a company, like a
19  written policy or procedure in place as to how to
20  handle bad checks?
21      A.    From operations or finance
22  perspective?
23      Q.    I guess both.
24      A.    Operations we do.  Finance we

123

1  don't, or accounting side we don't.  Operations
2  we do.
3      Q.    So the operations, you're talking
4  about people in the cash booth?
5      A.    Yes, how the process of
6  collecting the check works.
7      Q.    Do you know generally what they
8  cover?
9      A.    As we discussed earlier.
10      Q.    Forty-five days?
11      A.    Forty-five days.
12      Q.    Basically keeping them from
13  violating any collection laws?
14      A.    We deal with first-party
15  collections, so the collection laws don't really
16  apply to first-party collection because we're
17  collecting checks which are written to us
18  directly.
19      Q.    But you do not have written
20  policies and procedures in the finance part of
21  it?
22      A.    That is correct.
23      Q.    So who sets those -- who
24  determines what the practice will be, is that

124

1  you?
2      A.    That would be the auditors who
3  determine that.
4      Q.    You mean outside auditors?
5      A.    Yes, independent auditors.
6      Q.    Do you have any role in that?
7      A.    Setting the policies and
8  procedures from the audit side of accounting, no.
9  They advise us on what the GAAP requirements are
10  for.
11      Q.    G-A-A-P?
12      A.    G-A-A-P.
13      Q.    How many times in your career
14  have you accepted a Note from a customer who
15  wrote a bad check?
16      A.    From a customer, I don't recall.
17  The Howard LeRoy and Pauline Howard would be in
18  my memory the first customer.
19      Q.    Where Chex ever took a Note and
20  exchanged it for bad checks?
21      A.    That is correct.
22      Q.    Has any one customer ever written
23  more than six hundred thousand dollars in bad
24  checks other than the Howards?

125

1      A.    Well, you would have to -- over a
2  period of time or a week or a day?
3      Q.    Is it my understanding that they
4  wrote six hundred thousand dollars in bad checks
5  in one month?
6      A.    That is correct.
7      Q.    Has any other customer ever done
8  that?
9      A.    I would have to go back and look
10  at the transaction history to determine that.
11      Q.    Are you saying it's possible
12  in the years you worked at Chex, that some other
13  customer wrote six hundred thousand in bad checks
14  in one month?
15      A.    In bad checks?  No.  Checks, yes,
16  there's a possibility.  I would have to go and
17  looking.  Bad checks from one customer for six
18  hundred thousand dollars, no.
19      Q.    And would it be fair to say Chex
20  has never received, other than with the Howards,
21  over a hundred thousand of bad checks from one
22  customer in one month, a hundred thousand
23  dollars?
24      A.    I would not be able to answer

32  (Pages 122 to 125)

Ijaz Anwar

126

1    that question without going back and looking in
2    the data base or the history.
3        Q.    Well, this is the only customer
4    who ever wrote six hundred or more in bad checks;
5    is that right?
6        A.    That is correct.
7        Q.    In one month?
8        A.    Yes.
9        Q.    Are there any other incidents
10   that stick out in your mind, any other
11   significant amounts where one customer wrote that
12   many bad checks in one month?
13       A.    In the range of six hundred?
14       Q.    Well, any item, whether it was
15   two hundred, whether it was three hundred, but
16   any significant number other than this six
17   hundred.
18       A.    Yes. A significant number, well,
19   I guess it depends how you define "significant."
20   To my memory, you know, ten thousand, fifteen
21   thousand is what I remember the maximum amounts
22   from a particular customer sitting right here
23   today.
24       Q.    And the maximum amount that a

127

1    particular customer wrote in a month?
2        A.    No, that went bad.
3        Q.    That went bad?
4        A.    Yes.
5        Q.    So it could have been over a
6    couple months?
7        A.    Yes.
8        Q.    Before you caught it kind of
9    thing?
10       A.    Yes.
11       Q.    When did you first learn that the
12   Howards had written six hundred -- I think my
13   understanding is it's $606,316; does that sound
14   right to you?
15       A.    Yes, it's in the range of six
16   hundred thousand dollars.
17       Q.    So when did you first learn that
18   the Howards had written over six hundred thousand
19   dollars in bad checks?
20       A.    I don't remember the exact date.
21   If they were written during the month of
22   September, I would have found out immediately a
23   few days after that they wrote it.
24       Q.    As we went through the time line

128

1    before, what's the longest it would have taken
2    you to find out if they were manual checks?
3        A.    A material amount like this?
4        Q.    Yes.
5        A.    Within a week. Maximum, a week.
6        Q.    Okay. So within a week of them
7    writing checks, you're confident you knew about
8    it?
9        A.    Yes.
10       Q.    Do you know if the checks were
11   written in August or September?
12       A.    I don't. I don't know that
13   sitting here right now.
14       Q.    Do you know how long after
15   learning about it you got a Note from the
16   Howards?
17       A.    You would have to look at the
18   date of the Note. I don't know what the date of
19   the Note is. Well, I don't know. I can't answer
20   that question, either. I don't remember the
21   dates.
22       Q.    I'll show you the Note in a
23   minute, but I wanted to see in your mind if you
24   could remember a time frame. Was it within a

129

1    week, two weeks?
2        A.    No, the Note was executed not
3    within a week or two weeks. It was executed
4    longer than that. I don't know exactly when.
5        Q.    Was it executed within a month of
6    you finding out or more?
7        A.    You know, I would have to -- I
8    don't know. I'm sorry.
9        Q.    How could we find out? Would you
10   still have the cancelled checks or something like
11   that?
12       A.    The cancelled checks, we have the
13   cancelled checks and I believe we have presented
14   all the communication and documentation with the
15   Howards as well. So we should be able to
16   determine from those documents.
17       Q.    How did the six hundred thousand
18   in bad checks come to your attention?
19       A.    How did it come to our attention?
20   We received a record from a vendor we used called
21   Solutran, S-O-L-U-T-R-A-N, and it was an
22   electronic report informing us of the bad checks
23   coming back.
24       MR. BEAUSOLEIL: Would you mark

33 (Pages 126 to 129)

130

```
 1        that as a request. (Speaking to the
 2        court reporter)
 3   BY MR. BEAUSOLEIL:
 4        Q.   Can you just spell it for me?
 5        A.   S-O-L-U-T-R-A-N.
 6        Q.   Did it take a little while to
 7   negotiate the Note with the Howards?
 8        A.   Yes.
 9        Q.   What first happened when you
10   learned from Solutran that this had happened,
11   that somebody had written six hundred thousand in
12   bad checks?  What was your next step; what did
13   you do?
14        A.   Well, the very first thing we did
15   was we called Solutran and said, "Have you made a
16   mistake in the report?"  And eventually after a
17   few days the check copies were mailed which
18   reverified what had happened.  We communicated to
19   the operations; asked them exactly what happened,
20   and there was a breakdown in the operating
21   policies and procedures.
22             Does that answer your question?
23        Q.   Yes. Do you know how many checks?
24   Can you give me a ballpark?
```

131

```
 1        A.   Yes.  I think the average check
 2   is $7,800 each.  So you can take the 601 divided
 3   by 7,800.  It's in that range.
 4        Q.   Was disciplinary action taken
 5   against any employee because of this?
 6        A.   Yes, employees were written up,
 7   and one of the directors was demoted.
 8        Q.   Who is this?
 9        A.   Pam Houle, H-O-U-L-E.  Not solely
10   for this, but an accumulation of events,
11   including what happened at Seminal, from being a
12   director to a lower position in management.  So
13   there was some action taken.
14        Q.   Do you know who was written up?
15        A.   I don't remember.  I don't recall
16   the names of the employees that were written up.
17        Q.   All the disciplinary actions were
18   directed towards people in the casino level?
19        A.   Operations.
20        Q.   Where were the checks written,
21   what casinos?
22        A.   Casino Hollywood for sure and I
23   think the other one -- that's Seminal Casino
24   Hollywood, and I believe the other casino was
```

132

```
 1   Tampa. I think so.  I'm not sure.
 2        Q.   Was that one of the reasons cited
 3   by Seminal Tribe for you losing the contracts
 4   there?
 5        A.   I do not recall that being the
 6   reason.
 7        Q.   Did that become an issue?
 8        A.   With the tribe, no.
 9        Q.   Did it affect your relationship
10   with -- did that incident affect your
11   relationship with the tribe?
12        A.   No.
13        Q.   When did Chex first notify iGames
14   about this bad debt?
15        A.   I believe iGames found out
16   through the SEC filings about this incident.
17        Q.   When?
18        A.   I do not exactly remember when.
19        Q.   Would it have been around January
20   27, 2004?
21        A.   The September "Q" was due in
22   November.
23        Q.   What does it become public?
24        A.   Well, it depends if you file
```

133

```
 1   timely or take an extension.  So I don't know
 2   exactly if he filed an extension for the
 3   September "Q." So I can't exactly answer you
 4   when was this filed and made public.
 5        Q.   Well, generally, you said it was
 6   due in November.  Do you know what part of
 7   November?
 8        A.   By the middle of November.
 9        Q.   November 15th; is that right?
10        A.   Yes.
11        Q.   And then you could get an
12   extension, though, beyond that date?
13        A.   Yes, ten working days.
14        Q.   So if it actually was filed by
15   November 15th, when would it become publicly
16   available?
17        A.   Immediately.
18        Q.   What was your next step?  You
19   said that you first took action at the booth
20   level to find out what went wrong.
21        A.   I didn't take action.  The
22   operations.
23        Q.   As part of the management team
24   took action?
```

34 (Pages 130 to 133)

Ijaz Anwar

134

1    A.    That's correct, yes.
2    Q.    What was the next step reacting
3  to this bad debt?
4    A.    The next step, as I recall, was
5  getting in touch with the Howards and asking them
6  exactly what happened and how can we resolve this
7  issue.
8    Q.    Normally the people in the booth
9  would have handled it for forty-five days,
10  correct?
11    A.    That is correct.
12    Q.    But in this case you took it
13  over?
14    A.    That is correct.
15    Q.    Is that because this was such a
16  significant debt?
17    A.    It was materially high, yes.
18    Q.    And how did your conversations
19  with the Howards go?
20    A.    It went well initially. They
21  were willing to give us a mortgage on their three
22  properties and they immediately initiated the
23  process of refinancing the properties to pay back
24  the debt. And we actually took over the process

135

1  of refinancing, also. So we controlled the
2  process of refinancing their properties.
3    Q.    You said they agreed to give you
4  a Note and to give you a mortgage and you were
5  involved in the refinancing process?
6    A.    Yes.
7    Q.    We'll go through the documents.
8        Did you investigate whether they
9      cashed those checks as part of some kind
10      of scheme, criminal scheme?
11    A.    We did some analytical checks
12  with the casino. What we were concerned with was
13  did they really play the money at the casino or
14  did they just take the cash and not do anything
15  with it. So that's a step we took. The casino
16  was not able to determine, based on the volume
17  that they do, and this did not happen on one
18  particular day. It was over a few days, and I
19  don't remember exactly how many. So they weren't
20  able to determine was the money actually played
21  in the casino or was it just taken out.
22    Q.    Were these checks written within
23  a few days of each other?
24    A.    Yes, they were not on one

136

1  particular day. They were over a few days.
2    Q.    It wasn't more than a week, was
3  it?
4    A.    No. And again, once we get the
5  checks, we can determine the dates.
6    Q.    Who has the cancelled checks?
7    A.    It's there in my possession.
8    Q.    Did you turn or consult with the
9  local police or any authorities concerning this?
10    A.    We consulted attorneys. We
11  consulted attorneys and a determination was made
12  that filing charges would not be the best
13  strategy.
14    Q.    Why?
15    A.    Because based on the consumer
16  protection laws in Florida, you could file
17  charges, but it would go into litigation and
18  collectability, winning a case and collectability
19  is a different issue.
20    Q.    Did you do criminal checks on
21  these people?
22    A.    Did we do criminal checks on
23  these individuals? I do not recall if we did
24  criminal checks.

137

1    Q.    Well, what kind of background,
2  before you took the Note and they promised you
3  mortgages and a refinance, but before you did
4  that, did you do any background checks on the
5  people?
6    A.    We did an asset search, a very
7  extensive asset search on the Howards as a family
8  just to make sure they don't have any other
9  assets.
10    Q.    Did you do that before you took
11  the Note?
12    A.    I don't remember if we did that
13  before or after.
14    Q.    So when you took the Note,
15  searching their background and determining their
16  assets wasn't necessary before you took the Note?
17    A.    I did not understand that
18  question.
19    Q.    Well, before you took the Note,
20  did you think it was important to first see
21  whether these people had assets and whether they
22  had criminal records, particularly in this kind
23  of field of hanging paper?
24    A.    You lost me again. I'm sorry,

35 (Pages 134 to 137)

Ijaz Anwar

138

1  could you please repeat that question?
2      Q.    You took a Note for six hundred
3  thousand dollars?
4      A.    Yes.  Can you tell me what the
5  date of the Note is, if you don't mind?
6      Q.    September 15, 2003, you took the
7  Note.
8      A.    Okay.  But I think the point is
9  this, if I may interrupt, I don't know when we
10  actually executed the Note, but it's dated the
11  15th.  That is directly linked to, I think, your
12  question.
13      Q.    When did you actually negotiate
14  and take the Note?
15      A.    I don't remember that date.
16      Q.    You just need to put it in
17  perspective with other events?
18      A.    Yes. I'm just thinking about it.
19  It was not on September 15th.  It was subsequent
20  to that.
21      Q.    Well, we'll go through some of
22  these documents.  But there was an asset search
23  done like on January 27th.  Was that accomplished
24  before the Note was signed?

139

1      A.    I believe it was after.  I do not
2  recall.
3      Q.    And who decided to date the Note
4  September 15th; who picked that date?
5      A.    I think the determination of
6  September satisfy 5th based on the dates on the
7  checks.  That would have been the logical thing
8  to do.
9      Q.    Whose idea was it?
10      A.    Since I was involved in
11  negotiating the Note with them or working on the
12  Note with them, it would have been my idea.
13      Q.    You said it was the logical
14  thing to do.  Isn't the logical thing to do is to
15  date the Note the day you signed it?
16      A.    No, you sign the Note the date
17  the amount is due.  Rather than the date, you
18  sign it.  So to establish that they owed us money
19  based on bad checks on a certain date, we dated
20  the Note for that particular date.
21      Q.    Did the date on the Note, did you
22  consider at all your transaction with iGames in
23  coming up with this September 15, 2003, date?
24      A.    No, we did not or I did not.

140

1      Q.    Was anyone else involved in the
2  decision to date the Note September 15th?
3      A.    No, not for the dating of the
4  note, no.
5      Q.    You told me before that normally
6  you would immediately write off a check and then
7  begin your collection efforts or during that time
8  begin your Chex efforts.  How did you handle this
9  check on your books, these checks, this six
10  hundred thousand dollars?
11      A.    We basically booked a receivable
12  based on the Note and the collateral that we had.
13      Q.    Go ahead.
14      A.    We call it receivable based on
15  the Note and the collateral that we had to
16  support the valuation of the Note on that
17  particular date.
18      Q.    Well, you said when you do an
19  accounting for that month, you would be doing
20  your accounting in October for the September bad
21  checks, correct?
22      A.    That is correct.
23      Q.    And typically you would write
24  that off?

141

1      A.    That is correct.
2      Q.    And here you said instead of
3  doing that, you put the Note, a receivable in
4  your books?
5      A.    That is correct.
6      Q.    Explain why you did that instead
7  of writing it off.
8      A.    The materiality of the amount
9  based on the consultancy with the management of
10  Equitex as well as the accountants, we made a
11  determination that we had the option of
12  classifying this as a receivable versus writing
13  off the amount on the financial statements.
14      Q.    What purpose would doing that
15  serve?
16      A.    Classifying as a receivable?
17      Q.    Yes.
18      A.    Well, if we have the option to
19  classify that as a receivable, it would obviously
20  reflect less expenses on the financial
21  statements.
22      Q.    Did you do that so that iGames
23  wouldn't realize the problem you had there with
24  the six hundred bad debt?

Ijaz Anwar

142

1    A.    The overall materiality of the
2    transactions that we do over the course of a
3    particular year, this one particular incident I
4    don't think constitutes material enough to do or
5    classify a transaction in the manner to avoid or
6    be concerned about what the iGames' reaction
7    would be.
8        Q.    You had no concern about iGames'
9    reaction to the $606,000 in bad debt?
10       A.    When we classified this Note as a
11   receivable, I do not recall our concern was
12   iGames' reaction.
13       Q.    What about the reaction of your
14   investors, was that a concern?
15       A.    No.  If you look at the overall
16   bad debt expense in our financial statements and
17   compare this amount, our bad debt is around two
18   to three, three-and-a-half million a year.  So I
19   don't think this amount was significantly
20   material to be concerned about the Note holders.
21       Q.    It was significant enough to
22   handle it differently than any other check that
23   had ever been handled by you?
24       A.    True.

143

1        Q.    But it was not significant enough
2    to hide from iGames?
3        A.    When we classified that as a
4    receivable, the purpose was not to do it because
5    how iGames would react to that particular
6    incident.
7        Q.    Well, in October you're doing
8    your books and you said you didn't write it off,
9    you noted it as a receivable?
10       A.    Hm-hmm.
11       Q.    But you didn't have a Note at
12   that time.  How could you justify marking it as a
13   receivable when all you had was discussions with
14   the Howards and checks marked NSF?
15           MR. PORETTI:  Objection.  It
16       assumes facts not in evidence.  It calls
17       for speculation and lacks foundation.
18           MR. BEAUSOLEIL:  Can you read my
19       question again because there's no
20       objection to that question.  It's not
21       objectionable.
22           (Whereupon the court reporter
23       read back the last question as follows:)
24           "Question:  But you didn't have a

144

1    Note at that time.  How could you
2    justify marking it as a receivable when
3    all you had was discussions with the
4    Howards and checks marked NSF?"
5            MR. BEAUSOLEIL:  The only change
6        was, I correct myself, it's several
7        checks.
8            MR. PORETTI:  The same objection.
9        I'll also add that I object on the basis
10       that it's vague.
11   BY MR. BEAUSOLEIL:
12       Q.    You still have to answer.
13       A.    Could you clarify the question
14   again for me?  I really didn't understand it or
15   break it down, please.
16       Q.    You told me normally you would
17   write a check off, correct?
18       A.    Yes.
19       Q.    And in October you're telling me
20   you did not write a check off; you did not write
21   the six hundred thousand worth of checks off.
22   Instead you marked in the books a receivable from
23   the Howards?
24       A.    In September we marked the

145

1    receivable.
2        Q.    You marked it in September?
3        A.    Well, in the financial statements
4    is for September.
5        Q.    You're doing it back for
6    September.  You're doing October 1st for
7    September.
8        A.    The checks went bad in September.
9    It is reflected in the financial statements as a
10   receivable in September.  I don't know exactly
11   the date the Note was executed.
12       Q.    Well, we established it certainly
13   wasn't in September, correct?
14       A.    I believe, yes, that probably is
15   correct, yes.
16       Q.    My question was then, how, if you
17   did not have a Note from the Howards, all you had
18   were bad checks, --
19       A.    In which period?
20       Q.    For the September period.
21       A.    Okay.
22       Q.    -- how could you put in a
23   receivable on your books in September when you
24   had no Note?

37  (Pages 142 to 145)

Ijaz Anwar

146

1    A.    The way the accounting GAAP
2  works, if you have established a basis to justify
3  an event in the past, you can classify that Note
4  for that particular date and book a receivable,
5  because the financials for the month of September
6  are not completed anyway until the end of, the
7  middle of October.  And the "Q" especially is
8  filed even later that.  And there's always
9  adjustments from the auditors, and you can go
10 back and rectify things on a particular date from
11 back and do those things.  It was with the
12 consent and the knowledge of the auditors.
13    Q.    Okay.  So you could take your
14 knowledge in October and November, if you end up
15 getting into November, and use that to adjust the
16 books in September, correct?
17    A.    That is correct.
18    Q.    So if you got the Note in October
19 or November and dated it September 15th, you
20 could then go on your books, note a receivable
21 for September because you now have that Note?
22    A.    That is correct.
23    Q.    You also need, in addition to the
24 Note, if they believe that, you could collect on

147

1  that Note?
2    A.    That is correct.
3    Q.    So when you're doing your books
4  for September it's going to be, by the time you
5  complete them, around October 25th or even later,
6  correct?
7    A.    For this particular quarter, it
8  was a "Q" filing, 10-Q filings, so it was even
9  later than October.
10    Q.    It was in November?
11    A.    15th of November or if the
12 extension was filed subsequent to that.
13    Q.    So you're filing at the earliest
14 November 15th, and on that date you need a good
15 faith basis to believe not only that you have a
16 Note but that you could collect the Note?
17    A.    That would be a correct
18 statement.
19    Q.    You said "that would be a correct
20 statement"?
21    A.    A correct statement, yes.
22    Q.    Did you have on November 15,
23 2003, a good faith belief that you could collect
24 six hundred thousand from the Howards?

148

1    A.    Absolutely.  We got valuations
2  from some independent appraisals in giving the
3  initial valuation on the properties, and based on
4  those assessments we were comfortable, so were
5  the auditors, that we could record this as a
6  receivable.
7    Q.    Weren't the Howards in default of
8  the Note a month before November 15th?
9    A.    A month before November 15th?
10 Well, again it depends when the Note was
11 executed.
12    Q.    Okay.  Weren't the Howards in
13 default of the Note as after October 14, 2003?
14    A.    Well, if the Note was not
15 executed on October 14th, we would not know if
16 they were in default.
17       (Whereupon a document entitled
18       Promissory Note dated September 15, 2003,
19       was marked as iGames-3)
20 BY MR. BEAUSOLEIL:
21    Q.    We marked iGames-3.  This is a
22 Promissory Note it says at the top.  Can you look
23 at this document.
24       (Whereupon iGames-3 was

149

1  handed to the witness to peruse)
2       THE WITNESS:  Okay.
3  BY MR. BEAUSOLEIL:
4    Q.    Is that the Note that the Howards
5  signed that we've been discussing?
6    A.    For the record, they're two
7  Notes.  So this is the initial Note the Howards
8  signed.
9    Q.    This is the initial Note that the
10 Howards signed.  And this is dated September 15,
11 2003, correct?
12    A.    That is correct.
13    Q.    This is the Note we've been
14 discussing, correct?
15    A.    I believe so, yes.
16    Q.    So can you give me, looking at
17 that, any estimate of when it was actually
18 signed?
19    A.    I really cannot.  Looking at this
20 document, based on what was going on during 2003,
21 as to what date this Note was executed.
22    Q.    You consider accepting a Note
23 like this in lieu of six hundred thousand dollars
24 worth of bad checks to be in the ordinary course

38 (Pages 146 to 149)

Ijaz Anwar

150

1  of business?
2      A.  Well, ordinary course of
3  business--
4          MR. PORETTI:  I'm going to object
5      to the extent it calls for a legal
6      conclusion, but you go ahead and answer
7      it.
8      A.  A Note like this as in the
9  ordinary course of business, no, it would not be
10 considered in the ordinary course of business.
11     Q.  The Note is dated September 15,
12 2003.  In the third paragraph, it says
13 "Notwithstanding anything contained herein to the
14 contrary, on October 14, 2003, the entire
15 outstanding principal balance, together with
16 accrued interest and any other amounts due
17 hereunder, shall be due and payable in full."  Do
18 you know in reading this, does that refresh your
19 recollection as to when the Note was actually
20 signed as opposed to dated?
21     A.  It does not.
22     Q.  It does not?
23     A.  No.
24     Q.  Well, would you agree that as of

151

1  October 14, 2003, the entire outstanding
2  principal balance was not paid?
3      A.  Yes.
4      Q.  Would you agree that they had, in
5  fact, the Howards had, in fact, made zero
6  payments as of October 14, 2003, towards this
7  Note?
8      A.  Yes.
9      Q.  Would you agree, then, that on
10 November 15, 2003, you at that point already knew
11 that the Howards were in default on this Note,
12 had not paid any money?
13         MR. PORETTI:  Objection.  It
14     assumes facts not in evidence.
15     A.  My challenge is I don't know if
16 this Note was signed before November 15th even
17 though it's states the payment was due on October
18 14th.  But if they never signed it on November
19 15th, it's difficult to determine.
20     Q.  So it's possible that you asked
21 them, got them to sign this document after
22 October 14, 2003?  Is that possible?
23     A.  It is possible.  I just don't
24 know the date.

152

1      Q.  And so upon signing it, they
2  became in default of the Note?
3      A.  That would be a correct statement
4  if they read the Note correctly, yes.
5      Q.  Did you do that on purpose?
6      A.  No, I did not do that on purpose.
7      Q.  Did you draft this Note?
8      A.  I believe the attorneys drafted
9  the Note.  I did not draft this Note.
10     Q.  What law firm drafted this note?
11     A.  Well, we used two law firms;
12 started with Rider Bennett and also used a law
13 firm out of Florida by the name of, I don't know,
14 you have the documents, Knight.
15     Q.  Holland Knight?
16     A.  Holland Knight.
17     Q.  Whose idea was it to take a Note
18 on this debt?
19     A.  The management collectively
20 discussed and we collectively decided, consulted
21 with the accountants and decided to pursue
22 collectability of the debt through a Note and
23 taking a security interest in the properties.
24     Q.  When did the initial discussion

153

1  take place?
2      A.  I don't know the exact timeframe.
3  Definitely before the 10-Q was filed.
4      Q.  Did Henry Fong or anyone else at
5  Chex or Equitex tell you to bury this debt?
6      A.  Could you define "bury this
7  debt"?
8      Q.  Hide it, paper it.
9      A.  From who?
10     Q.  From investors, stockholders,
11 from iGames, from anyone.
12     A.  It was disclosed in the filings.
13 I don't think anybody buried the debt.  And there
14 was a Note in the 10-Q financial statements
15 clearly disclosing what has taken place.
16     Q.  Clearly disclosing; is that your
17 testimony?
18     A.  Yes, it's in the "Q."
19     Q.  When was it first -- we already
20 asked that.
21         You did not notify iGames about
22     it, correct?
23     A.  That is correct.
24     Q.  They came up; they found it and

39 (Pages 150 to 153)

```
 1              UNITED STATES DISTRICT COURT
 2            FOR THE DISTRICT OF DELAWARE
 3                      -   -   -
 4    iGAMES ENTERTAINMENT,:   CIVIL ACTION
      INC.,                  :
 5             v.            :
                            :        ORIGINAL
 6    CHEX SERVICES, INC.   :
      and EQUITEX, INC.     :CIVIL ACTION NO.
 7                          : C.A. 04-180-KAJ
 8                      -   -   -
             December 15, 2004
 9                      -   -   -
                 Volume II
10                  Continuation of the oral
11    deposition of IJAZ ANWAR taken pursuant
12    to notice, was held at the law offices of
13    DUANE MORRIS, LLP, 4200 One Liberty
14    Place, 1650 Market Street, Philadelphia,
15    Pennsylvania beginning at 9:56 a.m., on
16    the above date, before Terri L.
17    Ochipinti, a Professional Reporter and
18    Commissioner of Deeds in the Commonwealth
19    of Pennsylvania.
20                      -   -   -
21          ESQUIRE  DEPOSITION  SERVICES
                   15th Floor
22        1880 John F. Kennedy Boulevard
          Philadelphia, Pennsylvania 19103
23                (215) 988-9191
24
```

IJAZ ANWAR

1          A.      These are the warrants that
2    were given to -- some where given to
3    Blake Advisors and some were given to
4    White Box and Pandora.  So that's a Black
5    Shore valuation for the warrants.
6          Q.      It also mentions Seven
7    Ventures.  When did you begin -- when
8    were you first contacted -- let me ask
9    you this in a different way.
10                First of all, what is Seven
11   Ventures?
12         A.      Seven Ventures is a shell, a
13   bulletin board shell, so that's what
14   Seven Ventures is.
15         Q.      When did you first become
16   aware of Seven Ventures?
17         A.      I believe sometime during
18   January of 2004.
19         Q.      And how did you become aware
20   of that?
21         A.      We were approached by a
22   representative of -- not a
23   representative, an individual that does
24   deals by name of Mark Savage.  It could

IJAZ ANWAR

1    have been end of December, beginning of

2    January, in that time frame.  So he

3    approached us and said, you know, there's

4    a merchant banking forum that is

5    interested in gaining business and

6    transaction.  Would you be interested in

7    looking into it?  I said, sure.

8            Q.     And was the merchant banker,

9    Maroon Bells?

10           A.     Yes.

11           Q.     I'm going to show you what's

12   he been marked Exhibit 96.

13           A.     Thanks.

14                  MR. BEAUSOLEIL:  Do you have

15           that?  It's a prior deposition.

16                  MR. ROBBEN:  I'm pretty sure

17           I have it.

18                  THE WITNESS:  I got it,

19           thanks.

20   BY MR. BEAUSOLEIL:

21           Q.     Can I see what I handed you?

22           A.     An e-mail from --

23           Q.     And the first e-mail there

24   is from Chris Larson to you?

IJAZ ANWAR

1      Q.      Was White Box told that you

2  were going to terminate the stock

3  purchase agreement before you notified

4  iGames?

5      A.      I don't think we told White

6  Box that.  I don't remember telling White

7  Box that.

8      Q.      Once White Box or -- once

9  iGames was dropped from the term sheets

10  with White Box, was it understood that

11  iGames would not go through -- or was it

12  understood that Chex would not close on

13  the November 3, 2003 stock purchase

14  agreement?

15      A.      I think, yeah, it would be

16  once iGames was dropped, I think it was

17  mutually understood that's why everybody

18  was working on the new merger agreement;

19  that it would be very difficult to close

20  on the signed SPA, yes.

21      Q.      Do you believe that the

22  stock purchase agreement, November 3,

23  2003 agreement was still binding, was

24  still the binding document between

1   iGames, Chex and Equitex when you

2   terminated it?

3           A.    Yes.  It was the only

4   binding agreement.

5           Q.    Okay.

6           (Exhibit 114 marked for

7           identification.)

8   BY MR. BEAUSOLEIL:

9           Q.    Were you still negotiating

10  with Mercantile in February for money?

11          A.    I am quite certain I know I

12  can't pinpoint the date again, but based

13  on the documentation you have, we

14  possibly were.

15          Q.    All right.  Let me hand you

16  Exhibit 114.  Take a look at this and let

17  me know if you have seen it before.

18          A.    (Witness complies).

19          Q.    Have now had a chance to

20  look at Exhibit 114?

21          A.    Yes.

22          Q.    First of all, is Carey the

23  secretary you were trying to think of

24  before, the Blake Advisors assistant or

IJAZ ANWAR

1          Q.      But the first two, the

2    Maroon Bells corporate documents were

3    attached to the document?

4          A.      Yeah.

5          Q.      Those two are attached?

6          A.      Yeah.

7          Q.      And this is dated January

8    15, 2004; is that right?

9          A.      Yes.

10          Q.      And what is this?

11          A.      This is an introductory

12    letter from Chex Services to Maroon Bells

13    Capital, and then confidential evaluation

14    and a mutual loan disclosure agreement to

15    Maroon Bell Capital.  Corporate Capital

16    Management, LLC, as we talked this

17    morning, Mark Savage is with Corporate

18    Capital Management.

19          Q.      Okay.  I'm sorry.  I see

20    that.  What I was looking at is e-mail

21    correspondence to Capital Management,

22    LLC.  What caused you to write this

23    January 15, 2004 letter?

24          A.      When Mark Savage approached

1  like any companies that you have been

2  introduced to?

3          A.    I think they are referring

4  -- the first company to is -- first one

5  or the second one, the only company that

6  I'm aware of actually -- two companies

7  can Pay Guard and Pay To, and I think

8  that that's what they're referring to.

9  I'm not certain.  Both out of Europe.

10          Q.    Let me hand you Exhibit 125.

11          (Exhibit 125 marked for

12          identification.)

13  BY MR. BEAUSOLEIL:

14          Q.    Have you seen this document

15  before?

16          A.    From Rick Landry to us.  I

17  do recall receiving this document from

18  Rick Landry.

19          Q.    Okay.  The initial e-mail

20  down below here is from you to Rick

21  Landry at Maroon Bells?

22          A.    Yes.

23          Q.    And you ask him to send you

24  information and he then sends you a list

IJAZ ANWAR

1    discussions I've had with Henry and Jim

2    alluded to that if we have to close and

3    liquidate Equitex that's what we would

4    do.  So I don't think -- I have not heard

5    them taking a position that because of

6    tax consequences we are not going to

7    close on the SPA.  I personally did not

8    hear.

9           Q.    Do you know whether Equitex

10   committed to moving forward on the -- he

11   sorry.  Let me ask you a new question.

12           Do you know when it was

13   finally decided that Equitex would close

14   on the White Box financing?

15           A.    When Equitex decided they

16   would close on the White Box financing?

17   I think after speaking to Chris in

18   January Equitex had the intent to move

19   forward with White Box financing.  I

20   don't -- I can't pin down the exact date

21   of their intent.

22           Q.    Did you participate in the

23   March 3, 2003 board of directors meeting

24   of Equitex which was done via conference