**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| **iGAMES ENTERTAINMENT, INC.,** | : | |
| | : | |
| Plaintiff, | : | C.A. No. 04-180 (KAJ) |
| | : | |
| v. | : | |
| | : | |
| **CHEX SERVICES, INC.** and | : | |
| **EQUITEX, INC.,** | : | |
| | : | JURY TRIAL DEMANDED |
| | : | |
| Defendants. | : | |

## Appendix of Exhibits To iGames's Opposition To The Motion By Chex's And Equitex For Summary Judgment

# Exhibit C

WLM\207128.1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

- - -

iGAMES ENTERTAINMENT, INC. : C.A. NO.
V.                         : 04-180-KAJ

CHEX SERVICES, INC. and    :
EQUITEX, INC.              :

- - - - - - - - - - - - - - - - - - - - - - - - -

EQUITEX, INC. and CHEX     : C.A. NO.
SERVICES, INC., d/b/a      : 94-256-KAJ
FASTFUNDS                  :
     V.                    :
iGAMES ENTERTINMENT, INC.  :

- - - - - - - - - - - - - - - - - - - - - - - - -

CHEX SERVICES, INC., d/b/a : C.A. NO.
FASTFUNDS                  : 04-0885-KAJ
     V.                    :
IGAMES ENTERTAINMENT, INC. :

- - -

September 22, 2004

- - -

Oral deposition of
CHRISTOPHER WOLFINGTON, held in the
offices of Duane, Morris and Heckscher,
4200 One Liberty Place, 1650 Market
Street, Philadelphia, Pennsylvania 19103
commencing at 10:00 a.m., on the above
date, before Harvey Krauss, a
Federally-Approved Registered
Professional Reporter and a Commissioner
of the Commonwealth of Pennsylvania.

- - -

ESQUIRE DEPOSITION SERVICES
15th Floor
1880 John F. Kennedy Boulevard
Philadelphia, Pennsylvania 19103
(215) 988-9191

CHRISTOPHER WOLFINGTON

me had a $500,000 break-up fee if he got out of the deal, and if I could write him a letter that would indicate that this was a higher and better offer for his shareholders that would help him do a deal with me and get out and not have to pay the $500,000 break-up fee because his only out in his agreement was if he received an unsolicited higher or better offer.

Q.      And --

A.      And we discussed Credit Plus in the way that the offer would have to be structured in order to accommodate that need.

Q.      Is there anything untrue in the July 2nd letter from your perspective?

A.      Nothing that comes to mind immediately, no.

Q.      When do you believe you had this conversation with Mr. Fong about the cash system situation and the $500,000 termination fee?

CHRISTOPHER WOLFINGTON

MR. TAYLOR: We'll break now for your family thing, which is fine. It's 4:15 and you're leaving at 4:30 anyway.

MR. PORETTI: Yes.

MR. TAYLOR: You can go to 4:30 if you want, but I don't know what you're going to get done in 15 minutes.

MR. PORETTI: Well, we're kind of end point on this particular topic for right now. Well, actually, if you give me five more minutes, I'll touch a few minor bases on the term loan.

MR. TAYLOR: All right.

MR. PORETTI: But if you need to go, because I don't want to rush to interfere with your family.

MR. TAYLOR: No.

BY MR. PORETTI:

Q.    Let me give you back Exhibit 1 the term loan note.

CHRISTOPHER WOLFINGTON

Did Mr. Anwar at any time tell you that you, you meaning the company iGames was now obligated to pay the interest called for under the term loan note for any reason?

A.    Not pay ever?

Q.    Right.

A.    Yes.

Q.    Tell me when that conversation took place.

A.    Somewhere between mid-January -- no, somewhere between -- it had taken place between the end of January and the end of March or February, rather.

Q.    Telephone, in person?

A.    Telephone.

Q.    Who called who, do you recall?

A.    I don't know.

Q.    What did Mr. Anwar say to you that led you to conclude that you wouldn't have to pay interest?

A.    We were in the process of

CHRISTOPHER WOLFINGTON

reconciling numerous inter-company payables, receivables.  Our past practices had been to maintain a spreadsheet that he would produce that would show what we owe them, they owe us netted out.  We had done that on numerous occasions with significant amounts of money over the course of God, a year or two prior, and we had dialogue similar to that saying that we would just wait to see how all the numbers shaped up to see who owed what to who.

Q.    Was there any time frame put on when that reconciliation would take place?

A.    No, he didn't know when his people could get around to doing it so I didn't know when they would have the numbers completed.

Q.    In your past practice was that done on a twice a year basis, quarterly, how often did you do the reconciliation?

A.    In the past practices --

ROUGH DRAFT

1  referenced the interest due under the

2  note as part of the reconciliation

3  process?

4        A.    That amongst other things.

5  Didn't refer to interest I believe.  I

6  think it referred to monies owed.

7        Q.    Now, you had the operating

8  profit calculations done for available

9  money for the month of January by

10 February 27, 2004; is that correct?

11            MR. TAYLOR:  Is that a

12       statement or a question?

13            MR. PORETTI:  I am asking

14       him a question.

15            MR. TAYLOR:  Well, it wasn't

16       a question.

17       Q.    By 2004, correct that was

18 the question?

19            MR. TAYLOR:  All right.  It

20       assumes facts not in evidence, no

21       foundation.

22       A.    Did we have what by then?

23       Q.    The operating income

24 calculation for available monies January

ROUGH DRAFT

1    2004 operations?

2            A.      What about that?

3            Q.      Did you have that number

4    that calculation in your possession

5    February 27, 2004?

6            A.      No.

7            Q.      When did your company first

8    determine the amount of operating

9    income, that available money made, for

10   the month of January 2004?

11           A.      Probably mid-March.

12           Q.      Once the available money

13   deal closed January 6, 2004, it's now

14   part of the iGames family of companies,

15   right?

16           A.      Um-hum.

17           Q.      Is that a yes?  You need to

18   answer out loud.

19           A.      Yes.

20           Q.      The revenues that are being

21   generated on a daily basis from the

22   available money activities are now going

23   into iGames accounts.  Is that right?

24           A.      Ask that question again.

ROUGH DRAFT

1      Q.     Sure.  The revenues being

2  generated from the activities of the

3  former iGames entity after January 6th

4  are now going into iGames accounts,

5  right?

6      A.     No, I believe -- keep in

7  mind this was the very first month of

8  the business was operating under our

9  management.  So I believe we were busy

10 setting up accounts for specifically

11 available monies so we could keep the

12 funds segregated.  We were setting up

13 trying -- our accountants were trying to

14 get, you know, internal doing our

15 accounting trying to appropriate

16 numbers, you know, what expenses go to

17 which calculations because at that point

18 now you have iGames --

19              MR. TAYLOR:  Slow down.

20     A.     Which numbers and expenses

21 are applicable to available money versus

22 iGames versus Money Centers of America

23 separating those accounts up, separating

24 up those accounting procedures so we

ROUGH DRAFT

1    could make sure that we allocated

2    expenses and revenues to the appropriate

3    entity.

4         Q.    What was your understanding

5    at the time you signed the term loan

6    note as to when interest payments would

7    be due under the note, Exhibit 1?

8              MR. TAYLOR:  Objection to

9         the form.  Asks for a legal

10        conclusion.  You can answer it.

11        A.    On an ongoing basis once the

12   financials for the operating entity were

13   reconciled on a monthly basis, and in

14   the case of the first month, I didn't

15   think anything was due because based on

16   my peripheral discussions with Ijaz and

17   Jodi Dilascio who is their marketing

18   person they owed us money.

19        Q.    I'm sorry, I didn't hear

20   that last part?

21        A.    They owed us money.

22        Q.    We're going back to this

23   reconciliation issue, right?

24        A.    Yes.

ROUGH DRAFT

1      Q.      Setting aside the

2   reconciliation, did you believe that as

3   of February 1st, there was an amount due

4   and owing for interest, setting aside

5   whether it's going to get offset later

6   on against other expenses or

7   inter-company receivables did you

8   believe that iGames owed interest

9   payments under the note due and payable

10  on February 1st?

11              MR. TAYLOR:  Objection.

12          Calls for legal conclusion, and

13          two, asks him to assume facts

14          which are not in evidence and it's

15          an improper.  You're asking him --

16          I mean you didn't say

17          hypothetical.  So it's not a

18          hypothetical.  Those facts not in

19          evidence now and he's answered the

20          question.

21          Q.      Go ahead, sir.

22          A.      No.

23          Q.      And why didn't you believe

24   that interest would be due and payable

296

C E R T I F I C A T E

I hereby certify that the witness was duly sworn by me and that the deposition is a true record of the testimony given by the witness.

_____

HARVEY KRAUSS

Court Reporter

Dated: October 4, 2004

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying shorthand reporter.)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **iGAMES ENTERTAINMENT, INC.,** | : | |
| | : | |
| Plaintiff, | : | C.A. No. 04-180 (KAJ) |
| | : | |
| v. | : | |
| | : | |
| **CHEX SERVICES, INC.** and | : | |
| **EQUITEX, INC.,** | : | |
| | : | JURY TRIAL DEMANDED |
| | : | |
| Defendants. | : | |

# Appendix of Exhibits To iGames's Opposition To The Motion By Chex's And Equitex For Summary Judgment

# Exhibit D

WLM\207128.1

EFiled: Mar 23 2004 4:57PM EST
Filing ID 3309126

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
## IN AND FOR NEW CASTLE COUNTY

EQUITEX, INC. AND CHEX                )
SERVICES INC. D/B/A                    )
FASTFUNDS                              )
      Plaintiffs            )          Case No. _____
                                       )
      vs.                   )
                                       )          NON-ARBITRATION
iGAMES ENTERTAINMENT, INC.,)
                                       )
      Defendant             )
                                       )

### EQUITEX, INC. AND CHEX SERVICES, INC. D/B/A FASTFUNDS
### COMPLAINT AGAINST iGAMES ENTERTAINMENT, INC.,
### FOR BREACH OF CONTRACT

Plaintiff Equitex, Inc. ("Equitex") and Plaintiff Chex Services, Inc. d/b/a Fastfunds

("Chex") (collectively "Plaintiffs") for their Complaint against Defendant iGames Entertainment,

Inc. ("Defendant" or "iGames"), state and allege as follows:

### THE PARTIES

1.    Plaintiff Equitex, Inc. is a Delaware corporation with its principal place of business

located at 7315 East Peakview Avenue, Englewood, Colorado 80111.

2.    Plaintiff Chex Services, Inc. d/b/a Fastfunds is a Minnesota corporation with its principal

place of business located at 11100 Wayzata Boulevard, Minnetonka, Minnesota 55305.

3.    Defendant iGames Entertainment, Inc. is a Nevada corporation with its principal place of

business at 700 South Henderson Road, King of Prussia, Pennsylvania 19406.

### JURISDICTION AND VENUE

4.    This Court has subject matter and in personam jurisdiction pursuant to the Stock

Purchase Agreement executed by and between the parties to the above-captioned action.

5.    Plaintiffs and Defendant have consented to the jurisdiction of this Court.

6.    Plaintiffs and Defendant have agreed that venue is proper in this Court.

## FACTS

7.    On or about November 3, 2003, Equitex, Chex and iGames entered into an Agreement wherein iGames agreed to purchase the outstanding capital stock of Chex from Equitex. A copy of the Stock Purchase Agreement ("SPA") is attached hereto as Exhibit "A".

8.    Defendant agreed that the SPA shall be construed according to the laws of the State of Delaware.

9.    Defendant agreed that "Each Party submits to the jurisdiction of any state or federal court sitting in the State of Delaware, New Castle County in any action or Proceeding arising out of or related to this Agreement; agrees that all claims in respect of the action or Proceeding may be heard and determined in any such court; and agrees not to bring any action or Proceeding arising out of or relating to this Agreement in any other court."

10.    Defendant agreed that if it fails to perform or comply with any of the material obligations that it is required to perform or comply with under this Agreement, then Plaintiffs may terminate the Agreement.

11.    Under the terms of the SPA, if Plaintiffs terminate the SPA pursuant to Sections 11(b)(iii), (v), (vii) or (ix) of the SPA, then Defendant agreed to pay to Equitex a termination fee of $1,000,000 immediately upon termination. *See* Exhibit A.

12.    In the event of such a termination Defendant also agreed that it would pay Plaintiffs' documented costs and expenses associated with the SPA and its related transactions.

13.    Plaintiffs have terminated the SPA under Sections 11(b)(v) and (ix) of the SPA. A copy of the termination letter is attached hereto as Exhibit "B".

2

14.    Under the terms of the SPA, Defendant agreed that "[i]n the event of litigation arising of or connected with the Contemplated Transactions, the prevailing Party in any such action shall be entitled to recover of the other Party all costs of court, including attorneys' fees and court costs at the trial level." *See* Exhibit A.

## COUNT I – BREACH OF CONTRACT

15.    Paragraphs 1 through 14 are hereby incorporated by reference as if fully set forth.

16.    The SPA is a valid and binding contract.

17.    Plaintiffs have performed all the stipulations, conditions, and agreements required of Plaintiffs under the terms of the SPA.

18.    Defendant's actions have given rise to Plaintiffs' right to terminate the SPA, pursuant to the terms of the SPA.

19.    Plaintiffs have properly terminated the SPA, pursuant to its terms.

20.    Plaintiffs formally notified Defendant of their termination of the SPA on or about March 12, 2004.

21.    Under the terms of the SPA, Defendant was required to pay a Termination Amount of $1,000,000 to Plaintiffs immediately upon termination.

22.    Defendant has failed to pay the Termination Amount of $1,000,000, pursuant to the terms of the SPA.

23.    Defendant's failure to perform according to the terms of the SPA constitutes a breach of contract.

24.    As a result of the Defendant's failure to perform according to the terms of the SPA, Plaintiffs have been damaged in an amount of $1,000,000 plus other damages allowed pursuant to the terms of the SPA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendant as follows:

1.    An award of contractual remedies in the amount of $1,000,000;

2.    An award of additional contractual remedies as provided for in the SPA;

3.    An award of attorneys' fees as provided for in the SPA;

4.    An award of prejudgment interest according to law;

5.    An award of costs and disbursements as provided by law; and

6.    Other just and equitable relief as the Court deems appropriate.

MORRIS, JAMES, HITCHENS & WILLIAMS LLP

James W. Semple ((#396)
James E. Drnec (#3789)
222 Delaware Avenue
P.O. Box 2306
Wilmington, DE 19899

Dated: March 23, 2004

Attorneys for Plaintiffs Equitex, Inc. and Chex
Services Inc.

4

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

iGAMES ENTERTAINMENT, INC.,   :

   Plaintiff,      :  C.A. No. 04-180 (KAJ)

   v.         :

CHEX SERVICES, INC. and   :
EQUITEX, INC.,       :

            :  JURY TRIAL DEMANDED

   Defendants.    :

# Appendix of Exhibits To iGames's Opposition To The Motion By Chex's And Equitex For Summary Judgment

# Exhibit E

WLM\207128.1

**Ijaz Anwar**

| | |
|---|---|
| **From:** | Ijaz Anwar [ianwar@chexff.com] |
| **Sent:** | Monday, September 29, 2003 11:45 AM |
| **To:** | John K Ziegler Jr |
| **Subject:** | RE: CHEX DATA |

      

SGA 06-2003.xls   BAL SHEET Final.xls  BS 12-2002 (AUDIT   SAU 12-2002.xls
FINAL).xls

Please see attachment as per our discussion this morning.  Also, I believe the SGA will increase by 10%.  Thanks.

Ijaz.

-----Original Message-----
From: John K Ziegler Jr [mailto:jziegler@irvineandassociates.com]
Sent: Monday, September 29, 2003 9:09 AM
To: ianwar@chexff.com
Cc: mca4cash@aol.com
Subject: RE: CHEX DATA

Ijaz,

Please also forward to me the volumes for each line of revenue for 2002.
It was included on the june but not 2002.

JOhn

-----Original Message-----
From: ianwar@chexff.com [mailto:ianwar@chexff.com]
Sent: Sunday, September 28, 2003 2:36 PM
To: jziegler@irvineandassociates.com
Cc: mca4cash@aol.com
Subject: CHEX DATA

John:
        I have enclosed 12-2002 YTD as well as 06-2003 YTD P-Ls.  For 2003,
please multiply the 06-2003 total with 2 for projected 12-2003 YTD.  As
far as 2004 is concerned, we are targeting a 30% increase in net profits
and all other categories should increase proportionately.  There are always
some fixed expenses that do not increase in propotion to variable expenses
and revenues. For the purpose of this exercise, lets  assume that 30% increase
will take place accross all categories, thus resulting in a 30% increase
in net income.

Please note the following exceptions :

1) Chex interest cost should reduce by 20% in 2004. A 30% increase based
on the above assumption and a 20% reduction based on Mercantile financing
thus resulting in a 10% increase to support a 30% overall increase in net
income
2) Creditcard revunues will increase by 60% based on our previous calculations,
we should save $850k by using either MCA's or our new product

EXHIBIT

i G-amr 11
9-17-04

CX/EX01886

1

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED