**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **iGAMES ENTERTAINMENT, INC.,** | : | |
| | : | |
| Plaintiff, | : | C.A. No. 04-180 (KAJ) |
| | : | |
| v. | : | |
| | : | |
| **CHEX SERVICES, INC.** and | : | |
| **EQUITEX, INC.,** | : | |
| | : | JURY TRIAL DEMANDED |
| | : | |
| Defendants. | : | |

# Appendix of Exhibits To iGames's Opposition To The
# Motion By Chex's And Equitex For Summary Judgment

# Exhibit F

```
<DOCUMENT>
<TYPE>10-Q
<SEQUENCE>1
<FILENAME>eqtx10q903.txt
<DESCRIPTION>SEPTEMBER 30, 2003 FORM 10-Q
<TEXT>
```

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549


FORM 10-Q


(X) QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE
SECURITIES EXCHANGE ACT OF 1934

For the quarter ended September 30, 2003


( ) TRANSITION REPORT PURSUANT TO SECTION 13 OR 15 (d)
OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from _____ to_____


Commission File No. 0-12374


EQUITEX, INC.
----------------------------------------------------
(Exact Name of Registrant as Specified in its Charter)


| Delaware | 84-0905189 |
|---|---|
| ------------------------------- | ----------- |
| (State or other jurisdiction of incorporation or organization) | (IRS Employer Identification No.) |


7315 East Peakview Avenue
Englewood, Colorado 80111
----------------------------------------------------
(Address of principal executive offices) (Zip code)


(303) 796-8940
----------------------------------------------------
(Registrant's telephone number including area code)


Indicate by check mark whether the Registrant (1) has filed all reports required
to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during
the preceding 12 months, and (2) has been subject to such filing requirements
for the past 90 days. Yes [X] No [ ]

Number of shares of common stock outstanding at November 19, 2003: 30,822,455

```
<PAGE>
```

EQUITEX, INC. AND SUBSIDIARIES

```
<TABLE>
<CAPTION>
```

PART I    FINANCIAL INFORMATION

```
<S>
```

    Item 1.   Financial statements:

                Independent accountants' report

                Condensed consolidated balance sheets - September 30, 2003 (unaudited) and December 31, 2002

                Condensed consolidated statements of operations- three and nine months ended September 30, 2003 and 2002 (unaudited)

                Condensed consolidated statement of changes in stockholders' equity - nine months ended September 30, 2003 (unaudited)

                Condensed consolidated statements of cash flows - nine months ended September 30, 2003 and 2002 (unaudited)

                Notes to condensed consolidated financial statements

    Item 2.   Management's discussion and analysis of financial condition and results of operations

    Item 3.   Quantitative and qualitative disclosures of market risk

    Item 4.   Disclosure controls and procedures

PART II    OTHER INFORMATION

    Item 1.   Legal proceedings

    Item 2.   Changes in securities and use of proceeds

    Item 3.   Defaults upon senior securities

    Item 4.   Submission of matters to a vote of security holders

    Item 5.   Other information

    Item 6.   Exhibits and reports on Form 8-K

                Signature

```
</TABLE>
```

2

```
<PAGE>
```

INDEPENDENT ACCOUNTANTS' REPORT

Board of Directors
Equitex, Inc.

We have reviewed the accompanying condensed consolidated balance sheet of
Equitex, Inc. and subsidiaries as of September 30, 2003, and the related
condensed consolidated statements of operations and cash flows for the
three-month and nine-month periods ended September 30, 2003 and 2002, and the
related condensed consolidated statement of stockholders' equity for the nine
months ended September 30, 2003. These financial statements are the
responsibility of the Company's management.

We conducted our reviews in accordance with standards established by the
American Institute of Certified Public Accountants. A review of interim
financial information consists principally of applying analytical procedures to
financial data and making inquiries of persons responsible for financial and
accounting matters. It is substantially less in scope than an audit conducted in
accordance with auditing standards generally accepted in the United States of
America, the objective of which is the expression of an opinion regarding the
financial statements taken as a whole. Accordingly, we do not express such an
opinion.

Based on our reviews, we are not aware of any material modifications that should
be made to the accompanying condensed consolidated financial statements referred
to above for them to be in conformity with accounting principles generally
accepted in the United States of America.

We have previously audited, in accordance with auditing standards generally
accepted in the United States of America, the consolidated balance sheet of
Equitex, Inc. and subsidiaries as of December 31, 2002, and the related
consolidated statements of operations, stockholders' equity, and cash flows for
the year then ended (not presented herein); and in our report dated April 3,
2003, (which includes an explanatory paragraph relating to the adoption of
Statement of Financial Accounting Standards No. 141, BUSINESS COMBINATIONS and
Statement of Financial Accounting Standards No. 142, GOODWILL AND OTHER
INTANGIBLE ASSETS) we expressed an unqualified opinion on those consolidated
financial statements. In our opinion, the information set forth in the
accompanying condensed consolidated balance sheet as of December 31, 2002, is
fairly stated, in all material respects, in relation to the consolidated balance
sheet from which it has been derived.


/s/ GELFOND HOCHSTADT PANGBURN, P.C.

Denver, Colorado
November 18, 2003


                                    3
<PAGE>


                        EQUITEX, INC. AND SUBSIDIARIES

                     CONDENSED CONSOLIDATED BALANCE SHEETS

                                  ASSETS
<TABLE>
<CAPTION>
                                                     September 30,  Decem

|                                                                                                  | 2003         | 20      |
|--------------------------------------------------------------------------------------------------|--------------|---------|
|                                                                                                  | (Unaudited)  |         |
| <S>                                                                                              | <C>          | <C>     |
| Current assets:                                                                                  |              |         |
|   Cash and cash equivalents                                                            | $ 6,262,499  | $ 8,93  |
|   Receivables, net                                                                     | 3,379,289    | 3,50    |
|   Current portion of notes receivable, including related<br>    parties of $182,700 (2003) and $245,322 (2002) | 789,016 | 24 |
|   Interest receivable, related parties                                                 | 62,157       | 9       |
|   Prepaid expenses and other                                                           | 450,761      | 35      |
|     Total current assets                                                     | 10,943,722   | 13,13   |
| Notes receivable, net, including related parties of<br>  $1,100,428 (2003) and $1,206,436 (2002) | 2,046,821 | 1,98 |
| Property, equipment and leaseholds, net                                                          | 1,173,352    | 1,20    |
| Deferred tax asset                                                                               | 1,380,000    | 1,38    |
| Intangible and other assets, net                                                                 | 3,543,393    | 4,09    |
| Goodwill                                                                                         | 5,636,000    | 5,63    |
|                                                                                                  | 13,779,566   | 14,29   |
|                                                                                                  | $24,723,288  | $27,43  |

</TABLE>

<center>(Continued)

4</center>

<PAGE>

<center>EQUITEX, INC. AND SUBSIDIARIES

CONDENSED CONSOLIDATED BALANCE SHEETS (CONTINUED)

LIABILITIES AND STOCKHOLDERS' EQUITY</center>

<TABLE>
<CAPTION>

|                                                                                                  | September<br>2003 |
|--------------------------------------------------------------------------------------------------|-------------------|
|                                                                                                  | (Unaudited        |
| <S>                                                                                              | <C>               |
| Current liabilities:                                                                             |                   |
|   Accounts payable                                                                      | $  1,103,1        |
|   Accrued expenses and other liabilities, including related<br>    party accruals of $250,135 (2003) and $375,109 (2002) | 1,855,9 |
|   Accrued liabilities on casino contracts                                              | 648,0             |
|   Current portion of long-term debt                                                    | 51,7              |
|   Line of credit, notes and loans payable                                              | 11,961,4          |
|   Notes payable, related parties                                                        | 155,4             |
|   Due to credit card holders                                                           | 326,9             |
|     Total current liabilities                                                | 16,102,6          |
| Long-term debt, net of current portion                                                           | 75,1              |
|     Total liabilities                                                        | 16,177,8          |

Commitments and contingencies

Stockholders' equity:
  Preferred stock; 2,000,000 shares authorized:
    Series D, 6%; stated value $1,000 per share; 408 shares (2003) and
    575 shares (2002) issued and outstanding; liquidation preference
    of $584,000 ........................................................... 408,0
    Series G, 6%; stated value $1,000 per share; 370 shares
    issued and outstanding; liquidation preference of $562,000 ........... 370,0
    Series I, 6%; stated value $1,000 per share; 1,600 shares (2003) and
    1,690 shares (2002) issued and outstanding; liquidation preference
    of $2,339,000 ......................................................... 1,600,0
    Series J, 6%; stated value $1,000 per share; 1,380 shares (2002)
    issued and outstanding
    Less preferred treasury stock; Series J, at cost; 650 shares (2002)
  Common stock, $0.02 par value; 50,000,000 shares authorized;
    31,752,346 (2003) and 26,527,282 (2002) shares issued;
    29,390,278 (2003) and 26,111,425 (2002) shares outstanding ........... 635,0
  Additional paid-in capital ............................................... 15,002,1
  Accumulated deficit ...................................................... (8,372,5
  Less treasury stock at cost; 2,362,068 shares (2003) and
  415,857 shares (2002) .................................................... (1,097,1
                                        ----------

    Total stockholders' equity ........................................... 8,545,4
                                        ----------
                                       $ 24,723,2
                                        ==========

    </TABLE>
       See notes to condensed consolidated financial statements.
                            5
    <PAGE>
               EQUITEX, INC. AND SUBSIDIARIES

         CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS

      THREE AND NINE MONTHS ENDED SEPTEMBER 30, 2003 AND 2002

                   (UNAUDITED)

    <TABLE>
    <CAPTION>

|  | Three months ended Septembe | |
|---|---|---|
|  | 2003 | 2002 |
|  | ------------ | -------- |
| <S> | <C> | <C> |
| Fee revenue | $ 4,825,045 | $ 5,039 |
| Credit card income, net of provision for losses | 85,702 | 297 |
| Application fees, net of direct marketing costs | | 1 |
| Other | | 539 |
|  | ------------ | -------- |
|     Total revenues | 4,910,747 | 5,877 |
|  | ------------ | -------- |
|  | | |
| Fees paid to casinos | 1,715,741 | 1,636 |
| Salaries, wages and employee benefits | 1,729,708 | 2,079 |
| Third party servicing fees | 57,669 | 108 |
| Other operating expenses | 1,844,556 | 1,918 |
| Impairment of FDIC receivable | | 2,151 |
|  | ------------ | -------- |
|  | 5,347,674 | 7,894 |
|  | ------------ | -------- |
| Loss from operations | (436,927) | (2,016 |

|  |  |  |
|---|---|---|
| Other income (expense): |  |  |
| Interest income, including related party interest of $33,786 and $57,735 for the three and nine months ended September 30, 2003 and $48,756 and $91,931 for the three and nine months ended September 30, 2002 | 33,786 | 53 |
| Interest expense, including related party interest of $144,349 and $421,148 for the three and nine months ended September 30, 2003, and $181,368 and $516,847 for the three and nine months ended September 30, 2002 | (350,573) | (392 |
|  | (316,787) | (339 |
| Loss before income taxes | (753,714) | (2,356 |
| Income tax expense | 8,000 | 14 |
| Net loss | (761,714) | (2,370 |
| Repricing of warrants issued to preferred stockholders | (235,000) |  |
| Additional warrants issued to preferred stockholders Warrant accretion | (3,300) |  |
| Redemption of convertible preferred stock in excess of beneficial conversion features |  |  |
| Deemed preferred stock dividends | (57,000) | (82 |
| Net loss applicable to common stockholders | $ (1,057,014) | $ (2,452 |
| Basic and diluted net loss per common share | $ (0.04) | $ ( |
| Weighted average number of common shares outstanding | 29,170,051 | 23,568 |

</TABLE>
           See notes to condensed consolidated financial statements.
                                    6
<PAGE>

                    EQUITEX, INC. AND SUBSIDIARIES

        CONDENSED CONSOLIDATED STATEMENT OF CHANGES IN STOCKHOLDERS' EQUITY

                  NINE MONTHS ENDED SEPTEMBER 30, 2003

                            (UNAUDITED)

<TABLE>
<CAPTION>

|  | Convertible preferred stock | | Pr tr s |
|---|---|---|---|
|  | Shares | Amount |  |
| <S> | <C> | <C> | <C> |
| Balances, January 1, 2003 | 4,015 | $ 4,015,000 | $( |
| Exercises of warrants for common stock |  |  |  |
| Warrants issued for services |  |  |  |
| Purchase of shares of common stock by subsidiary from a related party |  |  |  |

| | | |
|---|---|---|
| Redemption of Series I preferred stock for cash | (90) | (90,000) |
| Conversion of Series D preferred stock to common stock | (167) | (167,000) |
| Conversion of Series J preferred stock to common stock | (1,380) | (1,380,000) |
| Conversion of accounts and notes payable to common stock | | |
| Sale of treasury stock for cash | | |
| Repricing of warrants | | |
| Net loss | | |
| Balances, September 30, 2003 | 2,378 | $ 2,378,000 | $ |

</TABLE>

(Continued)

7

<PAGE>

EQUITEX, INC. AND SUBSIDIARIES

CONDENSED CONSOLIDATED STATEMENT OF CHANGES IN STOCKHOLDERS' EQUITY (CONTINUED)

NINE MONTHS ENDED SEPTEMBER 30, 2003

(UNAUDITED)

<TABLE>
<CAPTION>

| | Common treasury stock | Additional paid-in capital | Acc d |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| Balances, January 1, 2003 | $ (256,851) | $12,719,855 | $ (6 |
| Exercises of warrants for common stock 261,687 | (105,050) | 346,706 | |
| Warrants issued for services | | 254,000 | |
| Purchase of shares of common stock by subsidiary from a related party | (207,000) | | |
| Redemption of Series I preferred stock for cash | | (10,942) | |
| Conversion of Series D preferred stock to common stock | | 157,655 | |
| Conversion of Series J preferred stock to common stock | (650,000) | 1,310,073 | |
| Conversion of accounts and notes payable to common stock | | 175,756 | |

```
Sale of treasury stock for cash                          121,760         26,034

Repricing of warrants                                                    23,000

Net loss                                                                         (1

                                                       -----------    -----------    ---
Balances, September 30, 2003                           $(1,097,141)   $15,002,137    $(8
                                                       ===========    ===========    ===
</TABLE>
```

See notes to condensed consolidated financial statements.

8

<PAGE>

EQUITEX, INC. AND SUBSIDIARIES

CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS

NINE MONTHS ENDED SEPTEMBER 30, 2003 AND 2002

(UNAUDITED)

```
<TABLE>
<CAPTION>
                                                                        2003
                                                                     ----------
<S>                                                                  <C>
Cash flows provided by operating activities:
Net loss                                                             $(1,521,54
                                                                     ----------
Adjustments to reconcile net loss to net cash
  provided by operating activities:
  (Recovery of) increase in provision for losses                        (14,59
  Depreciation and amortization                                        836,06
  Beneficial conversion features on convertible promissory notes
  Amortization of discount on convertible promissory notes
  Stock-based compensation expense                                     277,00
  Impairment of FDIC receivable
  Gain on sale of equipment
(1,268)
  Changes in assets and liabilities:
   Increase (decrease) in accounts receivable                         159,92
   (Increase) decrease in other assets                                (96,32
   (Decrease) increase in due to credit card holders                  (76,43
   Increase in accounts payable and accrued liabilities               507,56
                                                                     ----------
Total adjustments                                                   1,593,18
                                                                     ----------
Net cash provided by operating activities                             71,64
                                                                     ----------

Cash flows from investing activities:
   Proceeds from sale of equipment                                     5,23
   Net decrease (increase) in credit card receivables                  3,40
   Purchases of furniture, fixtures and equipment                    (269,40
   Issuance of related party notes receivable                        (286,77
   Issuance of notes receivable, other                               (606,31
   Repayment of related party notes receivable                        295,40
                                                                     ----------
Net cash used in investing activities                                (858,45
                                                                     ----------

Cash flows from financing activities:
```

```
Sale of treasury stock                                                    147,79
Redemption of Series I preferred stock for cash        -   ` `           (100,94
Proceeds from the exercise of warrants                                    261,68
Proceeds from common stock private placement (net of offering costs)
Purchase of Equitex shares for treasury by subsidiary                    (207,00
Increase in deferred costs
Issuance of notes payable, related parties and other                    1,187,64
Repayment of notes payable, related parties and other                  (2,171,57
Net payments on line of credit                                         (1,000,00
                                                                      ----------
Net cash (used in) provided by financing activities                    (1,882,39
                                                                      ----------
```

</TABLE>

(Continued)

9

<PAGE>

EQUITEX, INC. AND SUBSIDIARIES

CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS (CONTINUED)

NINE MONTHS ENDED SEPTEMBER 30, 2003 AND 2002

(UNAUDITED)

<TABLE>
<CAPTION>

|  | 2003 |
|---|---|
| <S> | <C> |
| Decrease in cash and cash equivalents | (2,669,2 |
| Cash and cash equivalents, beginning | 8,931,7 |
| Cash and cash equivalents, ending | $ 6,262,4 |

Supplemental disclosure of cash flow information:

| Cash paid for interest | $ 1,077,1 |
|---|---|
| Cash paid for taxes | $   126,1 |

Supplemental disclosure of non-cash investing and financing activities:

| Conversion of preferred stock to common stock | $ 1,547,0 |
|---|---|

Warrants attached to convertible promissory notes

Amortization of additional warrants issued to preferred
stockholders

Termination of agreement to issue common stock and warrants for
Services

Related party note receivable exchanged for related party note payable

Conversion of promissory notes, accrued interest and accounts payable
to common stock

Conversion of accounts and note payable to common stock
by subsidiary                                                      $    180,9
                                                                  =========

Equipment exchanged for a reduction in a note payable             $     12,6
                                                                  =========

Reclassification of receivables due from Net First and liabilities
due to Net First card holders to a net receivable due from the FDIC:

  Credit card receivables, net
  Other receivables
  Accounts payable
  Due to credit card holders

  Receivable from FDIC, as receiver for Net First

</TABLE>
        See notes to condensed consolidated financial statements.
                                    10
<PAGE>
                        EQUITEX, INC. AND SUBSIDIARIES

              NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS

              THREE AND NINE MONTHS ENDED SEPTEMBER 30, 2003 AND 2002
                                 (UNAUDITED)

1. INTERIM FINANCIAL STATEMENTS, BASIS OF PRESENTATION AND RECENT EVENTS:

   INTERIM FINANCIAL STATEMENTS:

   The condensed consolidated interim financial statements of Equitex, Inc. and
      subsidiaries (the "Company") for the three-month and nine-month periods
      ended September 30, 2003 and 2002, have been prepared by the Company
      without audit by the Company's independent auditors. In the opinion of the
      Company's management, all adjustments necessary to present fairly the
      financial position, results of operations, and cash flows of the Company as
      of September 30, 2003, and for the periods ended September 30, 2003 and
      2002, have been made. Except as described below, those adjustments consist
      only of normal and recurring adjustments.

   Certain information and note disclosures normally included in the Company's
      annual financial statements prepared in accordance with accounting
      principles generally accepted in the United States of America have been
      condensed or omitted. These condensed consolidated financial statements
      should be read in conjunction with a reading of the consolidated financial
      statements and notes thereto included in the Company's Form 10-K annual
      report filed with the Securities and Exchange Commission (`SEC") on April
      15, 2003. The results of operations for the three months and nine months
      ended September 30, 2003, are not necessarily indicative of the results to
      be expected for the full year.

   BASIS OF PRESENTATION:

The accompanying financial statements present the consolidated financial position of Equitex, Inc. and its wholly-owned subsidiaries, Key Financial Systems, Inc. ("Key"), Nova Financial Systems, Inc. ("Nova"), Chex Services, Inc. ("Chex"), and its wholly-owned subsidiary Collection Solutions, Inc. ("Collection") and Equitex's majority-owned subsidiary, Denaris Corporation ("Denaris") as of September 30, 2003 and December 31, 2002. The results of operations and cash flows of the Company for the three and nine months ended September 30, 2003 present the consolidated results of Equitex, Key, Nova, Chex, Collection, and Denaris. The financial statements presented for the three and nine month periods ended September 30, 2002 consist of the consolidated results of Equitex, Key, Nova and Chex. During the three and nine months ended September 30, 2003, the net loss incurred by the Company's majority-owned subsidiary Denaris, exceeded the minority interest in the common equity (deficiency) of the subsidiary. The excess of 2003 losses applicable to the minority interest have been charged to the Company, and no minority interest is reflected in the Company's September 30, 2003 consolidated financial statements. All significant intercompany accounts and transactions have been eliminated in consolidation.

RECENT EVENTS:

PROPOSED SALE OF CHEX:

In July 2003, the Company announced that it executed a definitive agreement for the sale of its wholly-owned subsidiary, Chex Services, Inc. to Cash Systems, Inc. ("Cash Systems"), a publicly-traded Delaware Corporation. Terms of the agreement are for Cash Systems to issue 9,000,000 shares of common stock to Equitex for all of the outstanding common stock of Chex. As part of the agreement Equitex will distribute to its stockholders the number of shares required for Equitex to hold less than ten percent of Cash Systems' outstanding common stock following the transaction or 1,500,000 shares, whichever is less. Closing of the transaction is subject to certain requirements including necessary stockholder and regulatory approval, completion of final documents, due diligence and other customary pre-closing conditions.

11

<PAGE>

EQUITEX, INC. AND SUBSIDIARIES

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

THREE AND NINE MONTHS ENDED SEPTEMBER 30, 2003 AND 2002
(UNAUDITED)

1. INTERIM FINANCIAL STATEMENTS, BASIS OF PRESENTATION AND RECENT EVENTS (CONTINUED):

PROPOSED SALE OF CHEX (CONTINUED):

In November 2003, the Company announced that it executed a definitive agreement for the sale of Chex to iGames Entertainment, Inc. ("iGames"), a publicly traded Nevada Corporation. Terms of the agreement are for iGames to issue at least 62.5% of its common stock to Equitex, with the shares having a value of at least $63 million for all of the outstanding common stock of Chex. In addition, the agreement includes a $780,000 two-year agreement between iGames and Equitex's majority-owned subsidiary, Denaris, for various services to be provided by Denaris. As part of the agreement Equitex is to distribute to its stockholders the number of shares required

for Equitex to hold less than ten percent of iGames' outstanding common stock following the transaction. Closing of the transaction is subject to certain requirements including necessary stockholder and regulatory approval, completion of final documents, due diligence and other customary pre-closing conditions.

The Equitex Board of Directors intends to place both transactions before its stockholders and recommend that its stockholders approve the iGames transaction.

NASDAQ STOCK MARKET LISTING:

In July 2002, the Company received notice from the Nasdaq Stock Market ("Nasdaq") that the minimum bid price of the Company's common stock had fallen below the $1.00 per share price required for continued inclusion. In June 2003 the Company received notification that the Company regained compliance with Nasdaq pertaining to the $1.00 minimum bid price requirement for continuing listing.

AGREEMENT WITH PAYMASTER JAMAICA:

In August 2002, the Company entered into a binding agreement with Paymaster (Jamaica) Limited ("Paymaster Jamaica") to form a jointly-owned and operated company to replicate Paymaster Jamaica's financial services business model throughout the Caribbean, North America and ultimately, worldwide. This newly-formed company was to be named Paymaster Worldwide, Inc. ("PWI"). Under the terms of the agreement, the Company advanced $500,000 to Paymaster Jamaica that could be converted into stock of PWI if the Company was formed by August 15, 2003. Because the Company was not formed by this date, the $500,000 advance became a promissory note under the terms of the agreement. The note bears interest at 6%, is due in semi-annual payments of principal and interest, and is collateralized by shares of Paymaster Jamaica stock sufficient to represent on a fully diluted basis, 20% of the share ownership of the Company, which have been pledged by the President of Paymaster Jamaica.

Paymaster Jamaica, headquartered in Kingston, Jamaica, commenced operations in 1997, and offers revenue collection and customer care to businesses, institutions and consumers on the island of Jamaica. It offers its customers an alternative to retaining their own commercial offices. In addition, through its bill payment services, Paymaster Jamaica is developing cash remittance services, affording its customers the convenience to send and receive various types of remittances nationally or internationally via cash or debit cards.

12

<PAGE>

EQUITEX, INC. AND SUBSIDIARIES

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

THREE AND NINE MONTHS ENDED SEPTEMBER 30, 2003 AND 2002
(UNAUDITED)

1. INTERIM FINANCIAL STATEMENTS, BASIS OF PRESENTATION AND RECENT EVENTS (CONTINUED):

RECENT EVENTS (CONTINUED):

NET FIRST NATIONAL BANK CLOSURE AND KEY AND NOVA OPERATIONS:

Through March 1, 2002, Key's credit card products were marketed for Net First National Bank ("Net First") under an agreement that provided the Company with a 100% participation interest in the receivables and related rights associated with credit cards issued, and required the payment of monthly servicing fees to Net First. The Company provided collection and customer services related to the credit cards issued. On March 1, 2002, federal banking regulators closed Net First, which was the sole issuing bank for Key's PAY AS YOU GO credit card program.

On March 4, 2002, the Federal Deposit Insurance Corporation ("FDIC") notified the Company that it had been appointed receiver of all funds due from Net First to Key. As receiver, the FDIC elected to disaffirm, to the full extent, all contracts Key was a party to with Net First. On March 10, 2002, the Company was made aware that the FDIC was notifying Net First credit card holders that their accounts were to be closed, and accordingly, Key would not be able to transfer the existing PAY AS YOU GO credit card portfolio to a successor financial institution. In November 2002, the Company filed a lawsuit seeking to recover the full amount of a claim with the FDIC for all funds due from Net First to Key through the date federal banking regulators closed Net First (Note 4).

The Company immediately implemented steps to eliminate Key's operating costs associated with marketing and servicing the Net First program. These steps included employee lay-offs of all but essential management and employee personnel necessary to re-establish its marketing and servicing capabilities upon the establishment of a new relationship with another financial institution. The Company had discussions with financial institutions to initiate a new credit card program; however, the Company has not been successful in establishing such a relationship, and no longer intends to actively pursue such a relationship. At September 30, 2003, Key and Nova operations consist solely of processing residual payments on remaining active accounts.

13

<PAGE>

EQUITEX, INC. AND SUBSIDIARIES

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

THREE AND NINE MONTHS ENDED SEPTEMBER 30, 2003 AND 2002
(UNAUDITED)

1. INTERIM FINANCIAL STATEMENTS, BASIS OF PRESENTATION AND RECENT EVENTS (CONTINUED):

STOCK OPTIONS:

The Company applies Accounting Principles Board Opinion No. 25 "Accounting for Stock Issued to Employees" and related interpretations in accounting for its stock option plans. Accordingly, no compensation expense has been recognized for options granted at fair market value. Had compensation cost for the Company's stock option plans been determined based on the fair values at the grant dates for awards under the plans consistent with the fair-value based method of accounting prescribed by Statement of Financial Accounting Standard No. 123 "Accounting for Stock-Based Compensation", the Company's results would have been changed to the pro forma amounts indicated below (in thousands):

<TABLE>

<CAPTION>

| | Three Months Ended | |
|---|---|---|
| | September 30, 2003 | September 30, 2002 |
| | ------------- | ------------- |
| <S> | <C> | <C> |
| Net loss | $ (761,714) | $ (2,370,328) |
| ADD: Stock-based employee compensation expense included in reported net income, (loss) net of related tax effects | -- | -- |
| DEDUCT: Total stock-based employee compensation expense determined under fair value based method for all awards, net of related tax effects | -- | -- |
| | ------------- | ------------- |
| Pro forma net loss | $ (761,714) | $ (2,370,328) |
| | ============= | ============= |
| Net loss per share: | | |
| Basic and diluted - as reported | $ (0.04) | $ (0.10) |
| | ============= | ============= |
| Basic and diluted - pro forma | $ (0.04) | $ (0.10) |
| | ============= | ============= |

</TABLE>

RECENTLY ISSUED ACCOUNTING PRONOUNCEMENTS:

In May 2003, the Financial Accounting Standards Board ("FASB") issued SFAS No. 150, Accounting for CertaiN Financial Instruments with Characteristics of Both Liabilities and Equity. SFAS No. 150 establishes new standards on how an issuer classifies and measures certain financial instruments with characteristics of both liabilities and equity. Under previous guidance, issuers could account for many of those instruments as equity. SFAS No.150 requires that those instruments be classified as liabilities in statements of financial position. This statement does not affect the classification or measurement of convertible bonds, puttable stock, or other outstanding shares that are conditionally redeemable. SFAS No. 150 is effective for all financial instruments entered into or modified after May 31, 2003, and otherwise is effective at the beginning of the first interim period beginning after June 15, 2003 for public companies. The Company currently has no financial instruments that embody an unconditional obligation of the Company. Therefore, the adoption of SFAS No. 150 did not impact the Company's results of operations or financial condition.

14

<PAGE>

EQUITEX, INC. AND SUBSIDIARIES

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

THREE AND NINE MONTHS ENDED SEPTEMBER 30, 2003 AND 2002
(UNAUDITED)

2. RECEIVABLES:

Receivables at September 30, 2003 and December 31, 2002 consist of the following:

|  | September 30, 2003 | December 31, 2002 |
|---|---|---|
| Credit card and ATM processors | $ 2,373,248 | $ 2,652,504 |
| Credit card receivables, net of allowance for losses of $1,665 (2003) and $3,465 (2002) | 154,394 | 155,997 |
| Other receivables | 851,647 | 698,924 |
|  | $ 3,379,289 | $ 3,507,425 |

Amounts due from credit card and ATM processors arise primarily from credit card and ATM advances by Chex to casino patrons. Credit card receivables include refundable and earned fees, which represent the balance reported to customers. Credit card receivables are reduced by allowances for refundable fees and losses. Other receivables at September 30, 2003 include approximately $552,233 due from Paymaster Jamaica, which represents amounts due for services performed by Denaris, which has been recorded as deferred revenue at September 30, 2003. Also included in other receivables at September 30, 2003 and December 31, 2002, is $299,414 and $433,293, respectively, due from third party financial institutions to Key. These amounts are held in trust under agreements to secure payment of reservation fees due customers.

3. NOTES RECEIVABLE:

Included in related party notes receivable at December 31, 2002, are notes due from shareholders of $918,936, notes due from an affiliated company of Equitex of $522,721, and notes due from Chex employees of $10,101. Included in related party notes receivable at September 30, 2003, are notes are due from shareholders of $630,936, notes due from an affiliated company of Equitex of $649,492, and notes due from Chex employees of $2,700. During the quarter ending September 30, 2003, the Company recorded an allowance of $160,000 against the related party receivable due from an affiliated company of Equitex.

Included in other receivables at September 30, 2003 and December 31, 2002, is a note due from Paymaster Jamaica of $500,000. As of December 31, 2002 and September 30, 2003, the Company also had a note due from a deceased Chex officer's estate of $273,594 and $446,393, respectively, net of allowances. The loan is collateralized by unregistered shares of the Company's common stock and accordingly, the Company reviews the valuation allowance regarding the note in relation to the shares pledged. As of December 31, 2002 and September 30, 2003, the valuation allowance was $1,211,100 and $1,038,300, respectively.

Also included in notes receivable at September 30, 2003, is a note due from a customer of $606,316, representing the repayment of checks that were originally cashed at two casino locations and subsequently were returned for insufficient funds. The note provides for direct payment to the Company from funds anticipated to be available to the makers of the note during the fourth quarter of 2003.

4. GOODWILL, INTANGIBLE AND OTHER ASSETS:

SFAS No. 142, GOODWILL AND OTHER INTANGIBLE ASSETS, prescribes a two-phase
process for impairment testing of goodwill, which is performed once
annually, absent indicators of impairment. The first phase screens for
impairment, while the second phase (if necessary) measures the impairment.
The Company has elected to perform its annual analysis during the fourth
calendar quarter of each year. No indicators of impairment were identified
during the nine months ended September 30, 2003.

15

<PAGE>

EQUITEX, INC. AND SUBSIDIARIES

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

THREE AND NINE MONTHS ENDED SEPTEMBER 30, 2003 AND 2002
(UNAUDITED)

4. GOODWILL, INTANGIBLE AND OTHER ASSETS (CONTINUED):

Intangible and other assets consist of the following at September 30, 2003
and December 31, 2002:

|  | September 30, 2003 | | | |
|  | Gross carrying amount | Accumulated amortization | Net carrying amount | Gross carrying amount |
| <S> | <C> | <C> | <C> | <C> |
| Casino contracts | $ 4,300,000 | $ 1,199,440 | $ 3,100,560 | $ 4,300,000 |
| Non-compete agreements | 350,000 | 147,300 | 202,700 | 350,000 |
| Customer lists | 250,000 | 159,600 | 90,400 | 250,000 |
| Trade names | 100,000 | | 100,000 | 100,000 |
| Total intangible assets | 5,000,000 | 1,506,340 | 3,493,660 | 5,000,000 |
| Other assets | 49,733 | | 49,733 | 49,733 |
|  | $ 5,049,733 | $ 1,506,340 | $ 3,543,393 | $ 5,049,733 |

The net carrying amount of intangible assets at September 30, 2003 is
scheduled to be fully amortized by the end of 2009. Amortization expense
for the net carrying amount of intangible assets at September 30, 2003, is
estimated to be $185,000 for the remainder of 2003, and $735,000, $664,000,
$659,000, and $600,000 in 2004, 2005, 2006 and 2007, respectively.

5. COMMITMENTS AND CONTINGENCIES:

LITIGATION:

In May 2002, Key filed a claim with the FDIC for all funds due from Net First
to Key under the Credit Card Program Agreement through the date federal
banking regulators closed Net First. The total amount of the claim was
$4,311,027. In October 2002, the FDIC notified Key that it had determined
to disallow all but $111,734 of the total claim. The notification
states that as the FDIC liquidates the assets of the receivership, Key may
periodically receive payments on the allowed portion of this claim through
dividends. The Company does not agree with this disallowance. In November

2002, the Company filed a lawsuit in the United States District Court for the Southern District of Florida seeking to recover the full amount of its claim. The FDIC answered the complaint, asserting a counterclaim for $1,000,000, which the FDIC asserts is for refunds to be made to customers who did not receive credit cards as a result of FDIC actions.

While the Company believes that it will ultimately be successful in collecting on its claim, there is no assurance that collection will eventually occur. Accordingly, the Company has allowed for 100% of the net remaining balance due of $2,151,207 from the FDIC, as receiver for Net First, in addition to amounts previously allowed for.

16

<PAGE>

EQUITEX, INC. AND SUBSIDIARIES

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

THREE AND NINE MONTHS ENDED SEPTEMBER 30, 2003 AND 2002
(UNAUDITED)

5. COMMITMENTS AND CONTINGENCIES (CONTINUED):

LITIGATION (CONTINUED):

In August 2000, William G. Hays, Jr., liquidating agent for RDM Sports Group, Inc. and related debtors, filed an adversary proceeding against Equitex, Smith Gambrell and Russell, LLP, David J. Harris, P.C. and David J. Harris, in the United States Bankruptcy Court for the Northern District of Georgia, Newnan Division, Adversary Proceeding No. 00-1065. The liquidating agent alleges that the Company breached its October 29, 1987, consulting agreement with RDM, breached fiduciary duties allegedly owed to RDM, and that Equitex is liable for civil conspiracy and acting in concert with directors of RDM. The liquidating agent is seeking unspecified compensatory and punitive damages, along with attorney's fees, costs and interest. In connection with the Company's distribution of its assets and liabilities to Equitex 2000 on August 6, 2001, Equitex 2000 has agreed to indemnify the Company and assume defense in this matter, as well as certain other legal actions existing at August 6, 2001. The costs to defend this matter may be material, and an unfavorable outcome may have a material adverse effect on the Company should Equitex 2000 not be in a position to fulfill its indemnification to the Company for any losses that may be incurred.

In November 2003, Equitex reached a tentative settlement agreement with the liquidating agent pursuant to which Equitex is to pay the sum of $400,000 no later than May 21, 2004, in exchange for the dismissal of the adversary proceeding and the execution of a mutual release of claims by both parties. Should Equitex 2000 be unable to fulfill its obligations under the indemnification and settlement as agreed, Equitex would be required to perform under the proposed agreement.

The Company is involved in various other claims and legal actions arising in the ordinary course of business. In the opinion of management, the ultimate disposition of these matters will not have a material adverse impact either individually or in the aggregate on consolidated results of operations, financial position or cash flows of the Company.

BONUS TO OFFICER:

In June 2003, the Company's Board of Directors approved a bonus arrangement

with the Company's president. The bonus arrangement, effective June 2, 2003, provides for an annual bonus to be calculated quarterly based on 5% of the increase in the market value of the Company's common stock, accrued quarterly, beginning with the closing price as reported by Nasdaq on December 31 of each year, and ending with the closing price on December 31 of the following year. Payments under the bonus arrangement are to be made at the discretion of the Company's management from time to time, as cash flow permits. Total compensation expense recorded under this arrangement for the three and six months ended September 30, 2003 was approximately $209,000, of which approximately $15,000 has been paid and approximately $194,000 is included in accrued liabilities at September 30, 2003.

<div align="center">17</div>

<PAGE>

<div align="center">EQUITEX, INC. AND SUBSIDIARIES</div>

<div align="center">NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)</div>

<div align="center">THREE AND NINE MONTHS ENDED SEPTEMBER 30, 2003 AND 2002
(UNAUDITED)</div>

6. STOCKHOLDERS' EQUITY:

SERIES D CONVERTIBLE PREFERRED STOCK:

The Series D Preferred Stock is convertible, together with any cumulative unpaid dividends, at any time into shares of the Company's common stock at a conversion price equal to 65% of the average closing bid price of the Company's common stock as specified in the agreement.

The holder of each share of Series D convertible preferred stock is entitled to a 6% cumulative annual dividend, payable quarterly. Dividends are payable in cash or, at the Company's option, in shares of the Company's common stock. The Series D Preferred Stock contains liquidation preference equal to the sum of the stated value of each share plus an amount equal to 130% of the stated value plus the aggregate of all cumulative unpaid dividends on each share of Series D Preferred Stock until the most recent dividend payment date or date of liquidation, dissolution or winding up of the Company.

During the nine months ended September 30, 2003, 167 shares of Series D Preferred Stock, plus unpaid dividends of $49,135 were converted into 467,253 shares of common stock at conversion prices of $0.25 to $0.66 per share.

SERIES G CONVERTIBLE PREFERRED STOCK:

The Series G Preferred Stock is convertible, together with any cumulative unpaid dividends, at any time into shares of the Company's common stock at a conversion price per share equal to the lesser of $6.50 or 65% of the average closing bid price of the Company's common stock as specified in the agreement.

The holder of each share of the Series G Preferred Stock is entitled to cumulative dividends at 6% per annum plus a 4% dividend default rate, payable quarterly. Dividends are payable in cash or, at the Company's option, in shares of the Company's common stock. The Series G Preferred Stock contains a liquidation preference equal to the sum of the stated value of each share plus an amount equal to 130% of the stated par value plus the aggregate of all cumulative unpaid dividends on each share of

Series G Preferred Stock until the most recent dividend payment date or date of liquidation, dissolution or winding up of the Company. All outstanding shares of Series G Preferred Stock were to automatically convert into common stock on August 31, 2003. However, the Company has been negotiating with the holder to extend the terms, therefore the holder has not elected to convert the preferred shares to common stock. The Series G Preferred Stock is redeemable at the Company's option at any time prior to its conversion, at a redemption price equal to $1,350 per share plus any cumulative unpaid dividends.

SERIES I CONVERTIBLE PREFERRED STOCK:

The Series I Preferred Stock is convertible, together with any cumulative unpaid dividends, at any time into shares of the Company's common stock at a conversion price per share equal to the lesser of $5.98 or 65% of the average closing price of the Company's common stock as specified in the agreement.

18

<PAGE>

EQUITEX, INC. AND SUBSIDIARIES

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

THREE AND NINE MONTHS ENDED SEPTEMBER 30, 2003 AND 2002
(UNAUDITED)

6. STOCKHOLDERS' EQUITY (CONTINUED):

SERIES I CONVERTIBLE PREFERRED STOCK (CONTINUED):

The holder of each share of Series I Preferred Stock is entitled to cumulative dividends at 6% per annum plus a 4% dividend default rate, payable quarterly. Dividends are payable in cash, or at the Company's option, in shares of the Company's common stock. The Series I Preferred Stock contains a liquidation preference equal to the sum of the stated value of each share plus an amount equal to 125% of the stated value plus the aggregate of all cumulative unpaid dividends on each share of Series I Preferred Stock until the most recent dividend payment date or date of liquidation, dissolution or winding up of the Company. All outstanding shares of the Series I Preferred Stock automatically convert into common stock on July 20, 2004. The Series I Preferred Stock is redeemable at the Company's option at any time through July 20, 2004, at a redemption price equal to $1,250 per share plus any cumulative unpaid dividends.

In February 2003, the Company redeemed 90 shares of Series I Preferred Stock for $100,000. The redemption price was less than the amount originally allocated to the beneficial conversion feature, and as a result, loss applicable to common stockholders was reduced by $38,430 for the three months ended March 31, 2003.

In September 2003, the Company redeemed accrued unpaid dividends on the Series I Preferred Stock for $942.

SERIES J CONVERTIBLE PREFERRED STOCK:

The Series J Preferred Stock was convertible, together with any cumulative unpaid dividends, at any time into shares of the Company's common stock at a conversion price per share equal to 65% of the average closing bid price of the Company's common stock as specified in the agreement (but in no

event less than $0.40 per share).

Dividends on the Series J Preferred Stock were at 6% per annum plus a 4% dividend default rate, payable quarterly. Dividends were payable in cash or, at the Company's option, in shares of the Company's common stock.

In January 2003, all of the outstanding shares of Series J Preferred Stock and unpaid dividends of $18,542 were converted into 3,496,354 shares of common stock at $0.40 per share.

ISSUANCES OF COMMON STOCK:

During the nine months ended September 30, 2003, the Company issued 1,001,566 shares of common stock upon the conversion of warrants for $366,737, at an average conversion price of $0.37 per share. Of these shares, 225,000 were issued to a subsidiary of the Company at exercise prices of $0.38 to $0.50 per share. The shares issued to the subsidiary are presented as common treasury stock. Accordingly common treasury stock was increased by $105,050.

During the nine months ended September 30, 2003, the Company also converted accounts payable of $180,954 into 259,891 shares of common stock at conversion prices of $0.64 to $0.72 per share, the market price of the common stock at the date of issuance.

                                    19
<PAGE>
                        EQUITEX, INC. AND SUBSIDIARIES

            NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

                THREE AND NINE MONTHS ENDED SEPTEMBER 30, 2003 AND 2002
                                (UNAUDITED)

6. STOCKHOLDERS' EQUITY (CONTINUED):

STOCK OPTIONS AND WARRANTS:

In January 2003, the Company issued a one-year warrant to a consultant for services to purchase 100,000 shares of the Company's common stock at $0.41 per share (the market price of the common stock at the date of the grant). These warrants were valued at $12,000 based upon the Black-Scholes option pricing model.

In January 2003, the Company also issued two-year warrants to consultants and unrelated parties to purchase 400,000 shares of common stock at $0.54 per share (the market price of the common stock at the date of the grant). These warrants were valued at $64,000 based upon the Black-Scholes option pricing model.

In April 2003, the Company issued two-year warrants to a consultant for services to purchase 70,000 shares of common stock at $0.52 per share (the market price of the common stock at the date of the grant). These warrants were valued at $12,500 based upon the Black-Scholes option pricing model.

In May 2003, the Company issued two-year warrants to a consultant for services to purchase 450,000 shares of common stock. The exercise price on 200,000 warrants is $0.68 per share (the market price of the common stock at the date of the grant). The next 200,000 warrants have an exercise price

of $0.88 per share and the remaining 50,000 warrants have an exercise price of $0.90 per share. These warrants were valued at approximately $78,000 based upon the Black-Scholes option pricing model.

In May 2003 the Company also issued four month warrants to consultants for services to purchase 500,000 shares of common stock at $0.69 per share (the market price of the common stock at the date of the grant). These warrants were valued at $68,500 based upon the Black-Scholes option pricing model. A related party received 200,000 of these warrants.

In May and June 2003 the Company granted five-year options to purchase 1,400,000 shares of common stock to directors, officers and employees of the Company (which includes 760,000 options to Chex employees) and 100,000 options to a consultant for services. The options were granted under the 2003 Stock Option Plan (the "2003 Plan"). Common stock reserved for options under the 2003 Plan total 3,500,000. The options have exercise prices between $0.68 and $1.03 per share (the market price of the common stock at the respective grant dates). The options granted to the consultant were valued at $19,000 based upon the Black-Scholes option pricing model.

In May and June 2003, the Company reduced the exercise price of certain existing warrants to purchase up to 221,625 shares of the Company's common stock, including 80,000 warrants issued to Chex. As a result of the reduction in exercise price, the Company recognized an additional $23,000 of stock based compensation expense relating to these repriced warrants.

In September 2003, the Company reduced the exercise price of certain existing warrants to purchase up to 946,400 shares of the Company's common stock to induce the holders to exercise these warrants. The warrants were initially issued in connection with the sale of preferred stock. As a result of the reduction in the exercise price, loss applicable to common stockholders was increased by $235,000 for the three months ended September 30, 2003.

<div align="center">20</div>

<PAGE>

<div align="center">

EQUITEX, INC. AND SUBSIDIARIES

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

THREE AND NINE MONTHS ENDED SEPTEMBER 30, 2003 AND 2002
(UNAUDITED)

</div>

6. STOCKHOLDERS' EQUITY (CONTINUED):

TREASURY STOCK TRANSACTIONS:

In January 2003, Chex converted 650 shares of the Company's Series J Preferred Stock plus unpaid dividends of $8,884 into 1,647,211 shares of common stock. The cost of the preferred stock was $650,000, which has been reclassified from preferred treasury stock to common treasury stock.

In April 2003, Chex exercised a warrant to purchase 160,000 shares of Equitex common stock at $0.50 per share. The cost of the shares issued ($80,000) has been added to treasury stock.

In June 2003, Chex purchased 300,000 shares of Equitex common stock from its affiliate, Equitex 2000, Inc. for $0.69 per share (the market price of the common stock at the date of the purchase). The cost of the shares ($207,000) has been added to treasury stock.

In August 2003, Chex exercised warrants to purchase 65,000 shares of Equitex common stock at $0.385 per share. The cost of these shares issued ($25,050) has been added to treasury stock.

During the nine months ended September 30, 2003, Chex sold 226,000 shares of Equitex common stock between $0.57 and $0.70 per share (the market prices of the common stock at the date of each sale). The stock was acquired at an average cost of approximately $0.54 per share and the cost of the shares sold ($121,760) has been removed from treasury stock. The difference between the sales price and cost of the shares sold ($26,034) has been classified as additional paid in capital.

<div align="center">21</div>

<PAGE>

<div align="center">

EQUITEX, INC. AND SUBSIDIARIES

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

THREE AND NINE MONTHS ENDED SEPTEMBER 30, 2003 AND 2002
(UNAUDITED)

</div>

7. OPERATING SEGMENTS:

As of and for the three-month period ended September 30, 2003, segment results were as follows:

| | Credit card services | Cash disbursement services | Corporate activities | Total |
|---|---|---|---|---|
| | (Key and Nova) | (Chex) | | |
| Revenues | $ 85,702 | $ 4,825,045 | | $ 4,910,747 |
| Net income (loss) | (32,695) | 72,814 | $ (801,833) | (761,714) |
| Total assets | 475,773 | 22,856,661 | 1,390,854 | 24,723,288 |

As of and for the three-month period ended September 30, 2002, segment results were as follows:

| | Credit card services | Cash disbursement services | Corporate activities | Total |
|---|---|---|---|---|
| | (Key and Nova) | (Chex) | | |
| Revenues | $ 837,728 | $ 5,039,923 | | $ 5,877,651 |
| Net income (loss) | (2,259,446) | 140,171 | $ (251,053) | (2,370,328) |
| Total assets | 1,650,422 | 25,951,041 | 933,210 | 28,534,673 |

As of and for the nine-month period ended September 30, 2003, segment results were as follows:

| | Credit card services | Cash disbursement services | Corporate activities | Total |
|---|---|---|---|---|
| | (Key and Nova) | (Chex) | | |

|  | | Credit card<br>services | | Cash<br>disbursement<br>services | | Corporate<br>activities | | Total |
|---|---|---|---|---|---|---|---|---|
| Revenues | $ | 350,994 | $ | 13,944,482 | | | $ | 14,295,476 |
| Net income (loss) | | 20,244 | | 539,656 | $ | (2,081,449) | | (1,521,549) |

As of and for the nine-month period ended September 30, 2002, segment results
were as follows:

|  | | Credit card<br>services<br>--------------<br>(Key and Nova) | | Cash<br>disbursement<br>services<br>------------<br>(Chex) | | Corporate<br>activities<br>----------- | | Total<br>------------ |
|---|---|---|---|---|---|---|---|---|
| Revenues | $ | 4,402,080 | $ | 15,012,805 | | | $ | 19,414,885 |
| Net income (loss) | | (2,315,369) | | 430,269 | $ | (1,275,914) | | (3,161,014) |

<div align="center">22</div>

&lt;PAGE&gt;

<div align="center">

ITEM TWO
MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION
AND RESULTS OF OPERATIONS

</div>

THIS REPORT MAY CONTAIN CERTAIN "FORWARD-LOOKING" STATEMENTS AS SUCH TERM IS
DEFINED IN THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 OR BY THE
SECURITIES AND EXCHANGE COMMISSION IN ITS RULES, REGULATIONS AND RELEASES, WHICH
REPRESENT THE COMPANY'S EXPECTATIONS OR BELIEFS, INCLUDING BUT NOT LIMITED TO,
STATEMENTS CONCERNING THE COMPANY'S OPERATIONS, ECONOMIC PERFORMANCE, FINANCIAL
CONDITION, GROWTH AND ACQUISITION STRATEGIES, INVESTMENTS, AMOUNTS RECEIVABLE
FROM NET FIRST NATIONAL BANK, AND FUTURE OPERATIONAL PLANS, FOR THIS PURPOSE,
ANY STATEMENTS CONTAINED HEREIN THAT ARE NOT STATEMENTS OF HISTORICAL FACT MAY
BE DEEMED TO BE FORWARD-LOOKING STATEMENTS. WITHOUT LIMITING THE GENERALITY OF
THE FOREGOING, WORDS SUCH AS "MAY", "WILL", "EXPECT", "BELIEVE", "ANTICIPATE",
"INTENT", "COULD", "ESTIMATE", "MIGHT", OR "CONTINUE" OR THE NEGATIVE OR OTHER
VARIATIONS THEREOF OR COMPARABLE TERMINOLOGY ARE INTENDED TO IDENTIFY
FORWARD-LOOKING STATEMENTS. THESE STATEMENTS BY THEIR NATURE INVOLVE SUBSTANTIAL
RISKS AND UNCERTAINTIES, CERTAIN OF WHICH ARE BEYOND THE COMPANY'S CONTROL, AND
ACTUAL RESULTS MAY DIFFER MATERIALLY DEPENDING ON THE VARIETY OF IMPORTANT
FACTORS, INCLUDING UNCERTAINTY RELATED TO THE COMPANY'S OPERATIONS, MERGERS OR
ACQUISITIONS, GOVERNMENTAL REGULATION, THE VALUE OF THE COMPANY'S ASSETS AND ANY
OTHER FACTORS DISCUSSED IN THIS AND OTHER COMPANY FILINGS WITH THE SECURITIES
AND EXCHANGE COMMISSION.

OVERVIEW

The following discussion and analysis of our financial condition and results of
operations should be read in conjunction with the consolidated/combined
financial statements and notes thereto for the years ended December 31, 2002,
2001 and 2000. The financial results presented for the nine months ended
September 30, 2003 are those of Chex Services, Inc. ("Chex"), Key Financial
Systems, Inc. ("Key"), Nova Financial Systems, Inc. ("Nova") and Denaris
Corporation ("Denaris"), formed in August 2002, on a consolidated basis with
those of Equitex, Inc. The financial results presented for the nine months ended
September 30, 2002 are those of Chex, Key and Nova on a consolidated basis with
Equitex.

LIQUIDITY AND CAPITAL RESOURCES

For the year ending December 31, 2003, we presently anticipate our liquidity and

capital resource needs will be satisfied from cash flows generated from our operating activities. Although the closure of Net First National Bank ("Net First") and subsequent closure of Key operations have eliminated positive cash flows at Key, we implemented actions in 2002 to reduce personnel, marketing and other operating costs.

Our other operating subsidiary, Chex, anticipates positive cash flows in 2003. Additionally, Chex has begun to introduce new products during the year. These products are complementary to its existing products and services. Future products may include: cashless gaming smart cards, debit cards and customized funds transfer systems for multi-jurisdictional gaming operators.

<div align="center">23</div>

<PAGE>

Cash flow activity for the nine months ended September 30, 2003, includes the activity of Chex, Key and Nova, Equitex, and Denaris. Cash flow activity for the three months ended September 30, 2002 includes the activity of Chex, Key and Nova and Equitex. For the nine months ended September 30, 2003, net cash provided by operating activities was $71,640 compared to $1,531,101 for the nine months ended September 30, 2002. The most significant portion of this change was the changes in current assets and liabilities which provided cash and adjusted the net loss by $494,720 for the nine months ended September 30, 2003 compared to the changes in the same assets and liabilities for the nine months ended September 30, 2002 of $876,662. Additionally, non-cash adjustments to the current year's results were $1,098,469 including depreciation and amortization of $836,068 and stock based compensation of $277,000 compared to total non-cash adjustments of $3,815,453, mostly comprised of $2,151,207 for the impairment of the FDIC receivable, and $961,893 and $487,500, respectively, for depreciation and amortization and stock based compensation for the nine months ended September 30, 2002. For the nine months ended September 30, 2003 there was a decrease in the provision for losses of $14,599 compared to an increase in the provision for the nine months ended September 30, 2002 of $117,821. During the nine months ended September 30, 2003, the company reduced a provision that had previously been recorded based upon the improvement in the collateral provided as security for a note receivable.

Cash used in investing activities for the nine months ended September 30, 2003 was $858,458 compared to $1,872,130 for the nine months ended September 30, 2002. Cash used in 2003 investing activities was primarily attributable to net advances of $597,686 to related parties and others on notes receivable. Cash used in 2002 investing activities was primarily due to an increase of $486,227 in credit card receivables, and net advances of $1,387,853 to related parties and others on notes receivable.

Cash provided by financing activities for the nine months ended September 30, 2002 was $312,851 compared to cash used in financing activities of $1,882,396 for the nine months ended September 30, 2003. The significant activity for the nine months ended September 30, 2003, included the Company making repayments on notes payable (related parties and other) and on its line of credit of $2,171,585 and $1,000,000, respectively, offset by the Company receiving $261,687 from the exercise of warrants; also Chex sold 226,000 shares of the Company's common stock for $147,794. The Company also received proceeds of $1,187,640 upon the issuance of short-term notes payable to related parties. During the nine months ended September 30, 2003, the Company redeemed 90 shares of its Series I Preferred Stock for $100,942 in cash. The significant activity for the nine months ended September 30, 2002, included the company receiving $1,112,709 from the exercise of warrants and the issuance of common stock, proceeds received of $1,980,806 upon the issuance of short term related party and third party notes payable, and payments of $2,286,597 on short term notes

payable to related parties and third parties. In addition, the Company redeemed 300 shares of its Series I Preferred stock for $382,867 in cash.

For the nine months ended September 30, 2003, net cash decreased $2,669,214 compared to a decrease of $28,178 for the nine months ended September 30, 2002, and ending cash at September 30, 2003, was $6,262,499 compared to $7,802,248 at September 30, 2002. Significantly all of the Chex's cash is required to be utilized for its casino operations, and they are prohibited from using it for other corporate purposes. Consequently Equitex needs to rely on other sources for its liquidity needs.

Other sources available to us that we may utilize include the sale of equity securities through private placements of common and/or preferred stock as well as the exercise of stock options and/or warrants, all of which may cause dilution to our stockholders. In October 2003, the Company recieved cash of approximately $828,000 upon the exercise the exercise of approximately 1,432,000 warrants.  We may also be able to borrow funds from related and/or third parties.

<div align="center">24</div>

<PAGE>

RESULTS OF OPERATIONS

REVENUES

Consolidated revenues for the nine months ended September 30, 2003, were, $14,295,476 compared to consolidated revenues of $19,414,885 for the nine months ended September 30, 2002. Consolidated revenues for the three months ended September 30, 2003, were $4,910,947, compared to consolidated revenues of $5,877,651 for the three months ended September 30, 2002. The decrease in each of the periods was due primarily to the reduction of revenues from Key and Nova resulting from the closure of Net First and our subsequent termination of our credit card programs.

REVENUE BY SEGMENT

| Segment | Three months ended September 30, | | Nine months ended September 30, | |
|---------|-----------|-----------|-----------|-----------|
|         | 2003      | 2002      | 2003      | 2002      |
| Cash disbursement services | $4,825,045 | $5,039,922 | $13,944,482 | $15,012,805 |
| Credit card services | 85,702 | 837,729 | 350,994 | 4,402,080 |
|         | $4,910,747 | $5,877,651 | $14,295,476 | $19,414,885 |

CASH DISBURSEMENT SERVICES SEGMENT

Chex processed over $611 million and $638 million in cash transactions for the nine months ended September 30, 2003 and 2002, respectively. Revenues are derived principally from check cashing fees, credit and debit card advance fees, automated teller machine ("ATM") surcharges and transaction fees.

Chex cashes personal checks at its cash access locations for fees of between 5 and 6 percent based on its casino contracts. Chex also cashes "other" checks, comprised of tax and insurance refunds, casino employee payroll checks and casino jackpot winnings at a reduced rate. For the nine months ended September 30, 2003, Chex cashed over $122 million of personal checks and also over $109 million of "other checks". Fees earned on personal and "other" checks were

approximately $6,271,000 and $807,000, respectively, for the nine months ended September 30, 2003. For the nine months ended September 30, 2002, Chex cashed over $128 million personal checks and also over $116 million of "other checks". Fees earned on personal and "other checks" were approximately $6,733,000 and $940,000, respectively.

For the nine months ended September 30, 2003, Chex processed approximately 327,000 credit/debit card transactions with approximately $112 million in advances and earned fees of $3,983,000 on these transactions. For the nine months ended September 30, 2002, Chex processed approximately 377,000 credit/debit card transactions with approximately $138 million in advances and earned fees of $4,281,000 on these transactions. For the nine months ended September 30, 2003, Chex processed over 2,700,000 ATM transactions and earned commissions or fees of $2,459,000 on approximately $266 million of transactions. For the nine months ended September 30, 2002, Chex processed approximately 2,500,000 million ATM transactions and earned commissions or fees of $2,589,000 on approximately $255 million of transactions. Chex collected fees of $377,000 on returned checks and had other income of $47,000 for the nine months ended September 30, 2003, compared to $336,000 on returned checks and other income of $134,000 for the nine months ended September 30, 2002.

For the three months ended September 30, 2003, Chex cashed over $43 million of personal checks and over $36 million of "other checks", earning fees of approximately $2,205,000 and $266,000, respectively. For the three months ended September 30, 2002, Chex cashed over $45 million of personal checks and over $38 million of "other checks", earning fees of approximately $2,330,000 and $257,000, respectively.

For the three months ended September 30, 2003, Chex processed over 940,000 ATM transactions, earning fees of $833,000 on over $92 million in transactions, compared to 880,000 transactions, earning fees of $919,000 on over $87 million in transactions for the three months ended September 30, 2002.

25

<PAGE>

For the three months ended September 30, 2003, Chex processed approximately 113,000 credit/debit card transactions, with approximately $39 million in advances, and earned fees of approximately $1,378,000 on these transactions. For the three months ended September 30, 2002, Chex processed approximately 118,000 transactions, with approximately $42 million in advances, and earned fees of approximately $1,369,000 on these transactions.

For the three months ended September 30, 2003 and September 30, 2002, Chex collected fees of $131,000 and $112,000, respectively on returned checks and had other income of approximately $12,000 and $53,000, respectively.

CREDIT CARD SERVICES SEGMENT

CREDIT CARD INCOME

On March 1, 2002, the Office of the Comptroller of the Currency closed Net First National Bank ("Net First") and appointed the FDIC as receiver. Key immediately ceased all marketing and processing of new credit card accounts at the close of business on March 1, 2002. In addition, the FDIC repudiated Key's contract with Net First effective March 4, 2002, and has closed all the credit card accounts subject to Key's contract with Net First. The FDIC's action results in the termination of all future credit card servicing revenues to Key from the Net First portfolio after March 4, 2002.

Through February 28, 2002, the Net First portfolio provided $2,121,220 of credit card servicing fees. For the nine months ended September 30, 2002, credit card servicing fees, application fees and other was $4,402,080 compared to $350,994 for the nine months ended September 30, 2003. For the three months ended September 30, 2003, credit card servicing fees were $85,702 compared to $350,944 for the three months ended September 30, 2002. The revenue in the current period is the residual payments on remaining active accounts.

Prior to March 1, 2002, credit card servicing fees were the major component of credit card income, which was Key and Nova's principal source of earnings before the closure of Net First. Credit card fees were assessed on credit card accounts owned by each company's client banks. These include monthly membership fees, late charges, over limit fees, and return check fees. The fees were paid to Key and Nova under a 100% loan participation agreement with the client bank. Credit card servicing fees for the nine months ended September 30, 2002, were $2,857,587. The Company has not issued any new cards since March 1, 2002, due to the closure of Net First.

APPLICATION FEES, NET OF DIRECT MARKETING COSTS

Key and Nova no longer receive application fees due to the closure of Net First and the termination of all marketing programs related to the Net First credit card. Application fees were $354,048 for the nine months ended September 30, 2002, and $1,259 for the three months ended September 30, 2002..

OTHER INCOME, NET

Other income for Key and Nova for the nine months ended September 30, 2003, was $14,189 compared to $1,190,445 for the nine months ended September 30, 2002. There was no other income for Key and Nova for the three months ended September 30, 2003 and $539,286 for the nine months ended September 30, 2002. This income is mostly comprised of other marketing and lead income, which was significantly higher in 2002 when Key and Nova were producing marketing and lead revenues after the March 1, 2002, closure of Net First.

26

<PAGE>

OPERATING EXPENSES

Total operating expenses for the three and nine months ended September 30, 2003, was $5,347,674 and $14,803,966 compared to $7,894,613 and $21,403,804 the three and nine months ended September 30, 2002, respectively. The 2002 periods include expenses for the Company, Chex, Key and Nova. The 2003 periods include expenses of the Company, Chex, Key Nova, and Denaris.

| Segment | Three months ended September 30, | | Nine months ended September 30, | |
|---|---|---|---|---|
| | 2003 | 2002 | 2003 | 2002 |
| Cash disbursement services | $4,452,851 | $4,564,381 | $12,516,898 | $13,526,055 |
| Credit card services | 118,397 | 3,097,174 | 329,181 | 6,717,448 |
| Corporate activities | 776,426 | 233,058 | 1,957,387 | 1,160,301 |
| | $5,347,674 | $7,894,613 | $14,803,966 | $21,403,804 |

CASH DISBURSEMENT SERVICES SEGMENT

Chex operating expenses of $4,452,851 and $4,564,381 for the three months ending September 30, 2003 and 2002, and $12,516,898 and $13,526,055 for the nine months ended September 30, 2003 and 2002 were comprised as follows:

<TABLE>
<CAPTION>

| | Three months ended September 30, 2003 | Three months ended September 30, 2002 | Nine months ended September 30, 2003 | N S |
|---|---|---|---|---|
| <S> | <C> | <C> | <C> | |
| Fees to casinos | $1,715,741 | $1,636,759 | $ 4,763,827 | |
| Salaries and related costs | 1,522,554 | 1,522,464 | 4,467,414 | |
| Returned checks, net of collections | 176,735 | 253,044 | 300,166 | |
| General operating expenses | 763,529 | 856,714 | 2,172,269 | |
| Depreciation and amortization | 274,292 | 295,400 | 813,231 | |
| | $4,452,851 | $4,564,381 | $12,516,898 | $ = |

</TABLE>

CREDIT CARD SERVICES SEGMENT

The closing of Net First and the shut down of their portfolio has had a significant impact in reducing operating expenses from $6,717,448 for the nine months ending September 30, 2002, compared to $329,681 for the nine months ending September 30, 2003. Included in the operating expenses for the three and nine months ended September 30, 2002, is the impairment of the FDIC receivable for $2,151,207. The majority of the remaining operating expenses were directly related to Key's credit card marketing efforts and portfolio servicing responsibilities under the contract with Net First. Effective March 11, 2002, Key has eliminated all direct costs associated with the Net First program. Included in operating expenses for the nine months ended September 30, 2003, were third party servicing fees of $202,459 associated with the remaining active accounts. Additionally, for the nine months ended September 30, 2003, there were general operating expenses of $126,801. Third party servicing fees for the nine months ended September 30, 2002 were $1,570,358 and personnel costs were $1,740,800. Other expenses including occupancy costs were $1,255,083 for the nine months ended September 30, 2002.

27

<PAGE>

CORPORATE ACTIVITY

Included in the three and nine months ended September 30, 2003, are operating expenses for Equitex and Denaris of $776,426 and $1,957,387. For the three months ended September 30, 2003, these operating expenses are comprised of selling, general and administrative expenses of $569,272 and personnel costs of $207,154. Included in the general and administrative expenses is a reserve of $160,000 on a related party note, as well as $183,951 of expenses related to previously incurred professional fees associated with preparing Chex for an initial public offering. The remaining major components of the general and administrative expenses are legal, accounting, and professional services of $109,500 and general office expenses of $115,821. For the nine months ended September 30, 2003, total costs comprise of general and administrative expenses of $1,377,522 and $579,865 in personnel costs. Included in the general and administrative expenses are $160,000 reserve on a note receivable from an affiliate, and the $183,951 expenses described above, as well as $277,000 of

stock-based compensation expense. Other general and administrative expenses for the nine months ended September 30, 2003, include professional fees of $385,641 and general office expenses of $370,930. Stock-based compensation expense represents non-cash expenses related to issuances of warrants and options to third party consultants for services.

Operating expenses for the three and nine months ended September 30, 2002, were $233,058 and $1,169,301, respectively. For the nine months, these expenses are comprised of professional fees of $367,145, salaries and related costs of $235,796, charges related to a late registration filing regarding the Series I convertible preferred shares of $263,600, stock-based compensation of $49,500 and $194,260 of other general operating costs.

For the three months ended September 30, 2002, costs were comprised of professional fees of $117,635, salaries and related costs of $102,311, other general operating costs of $39,612, offset by a reduction in stock-based compensation of $26,500.

## ITEM THREE
### QUANTITATIVE AND QUALITATIVE DISCLOSURES OF MARKET RISK

Market risk is the potential loss arising from adverse changes in market rates and prices, such as interest rates and a decline in the stock market. The Company does not enter into derivatives or other financial instruments for trading or speculative purposes. The Company has limited exposure to market risk related to changes in interest rates. The Company does not currently invest in equity instruments of public or private companies for business or strategic purposes.

The principal risks of loss arising from adverse changes in market rates and prices to which the Company and its subsidiaries are exposed relate to interest rates on debt. The Company has both fixed and variable rate debt. Chex has $11,732,678 and $13,644,132 of debt outstanding as of September 30, 2003 and December 31, 2002, respectively, of which $11,437,776 and $12,208,766 has been borrowed at fixed rates ranging from 8% to 12% at September 30, 2003 and December 31, 2002, respectively. This fixed rate debt is subject to renewal annually and is payable upon demand with 90 days written notice by the debt holder. Chex also has $301,902 and $1,455,356 of variable rate debt at September 30, 2003 and December 31, 2002, respectively, owed to a bank. The lender presently charges interest at 0.5% to 0.75% over the prime rate.

As most of the Company's average outstanding indebtedness is renewed annually and carries a fixed rate of interest, a change in interest rates is not expected to have a material impact on the consolidated financial position, results of operations or cash flows of the Company during the year ending December 31, 2003.

## ITEM FOUR
### DISCLOSURE CONTROLS AND PROCEDURES

A review and evaluation was performed by the Company's management, including the Company's Chief Executive Officer (the "CEO")/Chief Financial Officer (the "CFO"), of the effectiveness of the design and operation of the Company's disclosure controls and procedures as of the end of the period covered by this quarterly report. Based on that review and evaluation, the CEO/CFO has concluded that the Company's current disclosure controls and procedures, as designed and implemented, were effective. There have been no significant changes in the Company's internal controls or in other factors that could significantly affect the Company's internal controls subsequent to the date of their evaluation.

There were no significant material weaknesses identified in the course of such review and evaluation and, therefore, no corrective measures were taken by the Company.

28

<PAGE>

PART II. OTHER INFORMATION

Item 1. Legal Proceedings

        None.

Item 2. Changes in Securities

        None

Item 3. Defaults upon Senior Securities

        None.

Item 4. Submission of Matters to a Vote of Security Holders

        None.

Item 5. Other Information

        None.

Item 6. Exhibits and Reports on Form 8-K

        Exhibit 31 - Certification pursuant to Section 302 of the
        Sarbanes-Oxley Act of 2002

        Exhibit 32 - Certification pursuant to Section 906 of the
        Sarbanes-Oxley Act of 2002

29

<PAGE>

                            SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

                              Equitex, Inc.
                              (Registrant)

Date: November 19, 2003       By: /s/ Henry Fong
                              -----------------------------------
                                  Henry Fong
                                  President, Treasurer and
                                  Chief Financial Officer

30

```
</TEXT>
</DOCUMENT>
```

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| iGAMES ENTERTAINMENT, INC., | : | |
| | : | |
| Plaintiff, | : | C.A. No. 04-180 (KAJ) |
| | : | |
| v. | : | |
| | : | |
| CHEX SERVICES, INC. and | : | |
| EQUITEX, INC., | : | |
| | : | JURY TRIAL DEMANDED |
| | : | |
| Defendants. | : | |

## Appendix of Exhibits To iGames's Opposition To The Motion By Chex's And Equitex For Summary Judgment

# Exhibit G

8

CASE TYPE: CONTRACT

STATE OF MINNESOTA

DISTRICT COURT

COUNTY OF HENNEPIN

FOURTH JUDICIAL DISTRICT

Chex Services, Inc. d/b/a Fastfunds,

Court File No. CT 03-020211
(Judge Marilyn Justman Kaman)

Plaintiff,

vs.

**PLAINTIFF CHEX SERVICES, INC.'S
SECOND AMENDED COMPLAINT**

Lisa G. Maulson, individually; Native American
Cash Systems; Native American Cash Systems
Florida, Inc.; and Cash Systems, Inc.

Defendants.

Plaintiff Chex Services, Inc., d/b/a Fastfunds ("Chex") for its Complaint against

Defendants Lisa G. Maulson, Native American Cash Systems, Native American Cash Systems

Florida, Inc., and Cash Systems, Inc. ("Defendants"), states and alleges as follows:

### FACTS

1.    Plaintiff Chex Services, Inc., d/b/a Fastfunds is a Minnesota corporation with its

principal place of business located at 11100 Wayzata Boulevard, Minnetonka, Minnesota 55305.

2.    Defendant Lisa G. Maulson ("LGM") is a California resident who, upon

information and belief, currently resides in Trinidad, California and is the sole principal of

NACS.

3.    Defendant Native American Cash Systems ("NACS") is a Nevada corporation

with its principal place of business at 821 Scenic Drive, Trinidad, California 95570.

4.    Defendant Native American Cash Systems Florida, Inc., ("NASCF") is a Florida

corporation with its principal place of business located at 6510 Osceola Circle West, Hollywood,

Florida 33024.

CX/EX00594

5.     Defendant Cash Systems, Inc., ("CSI") is a Minnesota corporation with its principal place of business located at 3201 West County Road 42, #106, Burnsville, Minnesota 55306.

## ST. REGIS MOHAWK AGREEMENT BETWEEN NACS AND CHEX

6.     On or about August 9, 2000, LGM, NACS, and Chex entered into a contract (a copy attached to Affidavit of James P. Welbourn In Support of Plaintiff's Application for a Temporary Restraining Order and for Expedited Discovery as Exhibit A (hereinafter "Welbourn Aff., Ex.") and hereinafter referred to as "Casino Contract") to provide financial services including, but not limited to, check cashing, ATM, POS Debit, and Credit Card Cash Advance Services to Native American owned and operated casinos.  The Casino Contract was supplemented by an additional agreement between the parties on January 5, 2001. (Welbourn Aff., Ex. A.)

7.     LGM, NACS, and Chex have conducted business at various casinos across the United States.  One such casino was the St. Regis Mohawk Casino, located in the State of New York.

8.     The Casino Contract provides that the contract shall be interpreted, enforced, and governed in all respects according to the laws of the State of Minnesota.

9.     The Casino Contract also provides that all notices, demands, and other communications given under the contract shall be in writing and mailed via certified mail to Chex at its corporate offices in Minnesota.

10.     LGM, NACS, and Chex have conducted business and negotiated any disputed terms of their contracts in Minnesota.

11.     Pursuant to the terms of the contracts, LGM and NACS have paid monies to Chex in Minnesota, and have been paid by Chex from Minnesota.

CX/EX00595

12.     On or about September 11, 2002, LGM claimed that Chex was in default of the Casino Contract with respect to the St. Regis Mohawk Casino, and provided a 30-day notice of default pursuant to paragraph 10 of the Casino Contract.

13.     In response to LGM's letter of September 11, 2002, Chex, while disputing that any material breach occurred, entered into a series of conversations with LGM regarding the alleged breaches and exchanged written and voicemail communications in an effort to resolve any outstanding differences of opinion regarding the management and accounting of St. Regis Mohawk Casino.

14.     On or about February 11, 2003, LGM informed Chex that she was terminating the Casino Contract with respect to the St. Regis Mohawk Casino in the state of New York effective immediately.

15.     Without Chex's permission, LGM removed property owned by Chex and placed the property in the casino warehouse.

16.     Without Chex's permission, LGM took control of Chex's cash from the account and sent the cash to Key Bank via Brinks Services.

17.     LGM and NACS' termination, effective February 11, 2003, was well before the termination of the Casino Contract which was to remain in place for the St. Regis Mohawk Casino for as long as defendants were under contract with the tribe.

18.     After recovering its cash, which LGM wrongfully took control of, Chex has discovered a cash shortage.

19.     The Casino Contract also prohibits NACS and LGM from interfering with Chex's other business operations.

CX/EX00596

## THE SEMINOLE TRIBE CASINO AGREEMENT BETWEEN NACSF AND CHEX

20.     While NACS and Chex were working under the St. Regis Mohawk agreement, NACS began pursuing contracts with the Seminole Tribe of Florida to provide financial services for the Seminole Tribe's casinos.

21.     On information and belief, as part of their attempt to secure contracts with the Seminole Tribe of Florida, NACS organized NACSF.

22.     On or about December 4, 2001, NACSF and Chex entered into an agreement under which Chex agreed to perform financial services for five of the Seminole Tribe's casinos including acting as the vendor to supply check cashing booth operations, credit card advance and POS debit systems and cash to fulfill NACSF's obligations of its contract with the Seminole Tribe of Florida. (Welbourn Aff., Ex. C.)

23.     The NACSF Contract provides that the contract shall be interpreted, enforced, and governed in accordance with the laws of the State of Florida.

24.     The NACSF Contract also provides that all notices, demands, and other communications given under the contract shall be in writing and mailed via United States registered or certified mail to Chex at its corporate offices in Minnesota.

25.     Pursuant to the terms of the contract, NACSF has received compensation from Chex from Minnesota.

26.     At NACSF's request, Chex subcontracted with CSI in order to use CSI's credit card cash advance systems in the Seminole casinos. (Welbourn Aff., Ex. D.)

27.     On or about May 6, 2003, Paula Bowers-Sanchez, President of NACSF, sent correspondence to Chex claiming that Chex was in default on the NACSF Contract with respect to the Seminole Tribe casinos. (Welbourn Aff., Ex. E.)  As part of that correspondence, Sanchez

CX/EX00597

on behalf of NACSF provided thirty-day notice of default pursuant to Paragraph 8 of the NACSF Contract. (Welbourn Aff., Ex. E.)

28.    In response to NACSF's letter of May 6, 2003, Chex, while disputing that any material breach occurred, entered into a series of discussions with NACSF regarding the alleged breaches in an effort to resolve any outstanding differences or possible settlement of any claims.

29.    On or about September 15, 2003, Chex provided NACSF with correspondence ("Settlement Letter Agreement") whereby the parties agreed that Chex would pay $22,904 to NACSF in exchange for NASCF's agreement that the payment cured any and all prior alleged contract breaches or defaults by Chex up to the date of the letter. (Welbourn Aff., Ex. F.) Furthermore, the correspondence stated that if NACSF agreed and accepted the terms of the letter, the letter would constitute an amendment to the existing contractual relationship between NACSF and Chex. (Welbourn Aff., Ex. F.)

30.    Paula Bowers-Sanchez, as president of NACSF, accepted the settlement payment from Chex, and signed and returned the Settlement Letter Agreement thereby settling any and all alleged defaults of Chex under the NACSF that occurred prior to September 15, 2003. (Welbourn Aff., Ex. F.)

31.    On November 14, 2003, as part of NACS' and LGM's Answer to the original Complaint in this matter, NACSF voluntarily joined this action as a "co-defendant" for the sole purpose of asserting a counterclaim against Chex related to an alleged breach to the NACSF Contract. (Welbourn Aff., Ex. H.)

32.    On November 24, 2003, Chex issued their response to NACS and LGM's purported counterclaim and NACSF's "allegations" in its "counterclaim." Chex also again explicitly stated that the September 15, 2003 Settlement Letter Agreement resolved any dispute between NACSF and Chex. (Welbourn Aff., Ex. I.)

CX/EX00598

33.    On December 17, 2003, in clear contradiction to the terms outlined in the September 15, 2003 Settlement Letter Agreement, NASCF sent correspondence to Chex wrongfully suggesting that the September 15, 2003 Settlement Letter Agreement failed to resolve the issues between NACSF and Chex. (Welbourn Aff., Ex. J.)

34.    Late in the day on Friday, January 2, 2004, NACSF sent additional correspondence to Chex indicating that it was terminating the NACSF contract, effective Sunday January 4, 2004. (Welbourn Aff., Ex. K.)

35.    At midnight, January 4, 2004, NACSF removed Chex from the cash services booths at the Seminole casinos, and replaced Chex with CSI.

36.    Chex's potential merger with iGames Entertainment, Inc. hinges on the continuing relationship with the Seminole casinos and the wrongful termination of the contract by NACSF will likely force the acquisition negotiations to fall apart if NACSF is allowed to proceed with the wrongful termination.

37.    Further, Chex can no longer earn revenue from the Seminole casinos.    The Seminole casinos constitute a significant portion of Chex's revenue and provided Chex with unique relationships for establishing connections and business relationships with other Native American owned casinos.  As NACSF is a Native American owned corporation, NACSF is able to provide Chex with an opportunity to reach a much broader market and otherwise unreachable group of Native American casinos who prefer to only do business with Native American corporations.

38.    The actions of NACSF also will undoubtedly damage Chex's reputation within the Native American gaming community.

## THE AGREEMENT BETWEEN CHEX AND CSI

39.    In November 2002, at the request of NACSF, Chex and CSI entered into an agreement where CSI provided equipment and related software to Chex related to credit card cash advances for use in the Seminole Tribe's casinos (a copy attached hereto as Exhibit D and hereinafter referred to as "Cash Advance Agreement"). (Welbourn Aff., Ex. D.)  Chex entered into the agreement only after obtaining CSI's agreement not to compete in the future for the Seminole Contract, as CSI is a competitor of Chex. (Welbourn Aff., Ex. D.)

40.    The Cash Advance Agreement provides that the Agreement shall be governed by, construed and enforced in accordance with the laws of the State of Minnesota.

41.    CSI and Chex negotiated any disputed terms of their contracts in the State of Minnesota.

42.    Pursuant to the underlying Cash Advance Agreement any payments made by either CSI or Chex have been paid to and from the State of Minnesota.

43.    Under Paragraph 12(g) of the Cash Advance Agreement, CSI explicitly agreed that it would not compete with Chex's cash advance platform at any Seminole/Seminole Hard Rock casino locations in Florida during the term of the Cash Advance Agreement or any subsequent renewals of the Cash Advance Agreement. (Welbourn Aff., Ex. D.)  CSI further agreed that it would only provide additional services in the Seminole casinos in the event the Seminole Tribe made a "request for proposal" process and Chex did not get an invitation to bid on renewals. (Welbourn Aff., Ex. D.)

44.    On December 17, 2003, in clear contradiction to the terms outlined in the September 15, 2003 Settlement Letter Agreement, NASCF sent correspondence to Chex wrongfully suggesting that the September 15, 2003 Settlement Letter Agreement failed to resolve the issues between NACSF and Chex. (Welbourn Aff., Ex. J.)

CX/EX00600

45.     On January 2, 2004, NACSF sent additional correspondence to Chex indicating that it was terminating the NACSF contract. (Welbourn Aff., Ex. K.)

46.     CSI, despite underlying contractual obligations not to compete with Chex for the Seminole Tribe casinos, now has taken over Chex's position in the Seminole Tribe casinos by providing financial services for those casinos.

47.     At no time has the Seminole Tribe requested bids for the provision of cash services at its casinos.

48.     Chex's potential merger with iGames Entertainment, Inc. hinges on the continuing relationship with the Seminole casinos and the wrongful breach of the contract by CSI will likely force the acquisition negotiations to fall apart if CSI is allowed to proceed with the wrongful breach.

49.     Further, Chex can no longer earn revenue from the Seminole casinos.   The Seminole casinos constitute a significant portion of Chex's revenue and provided Chex with unique relationships for establishing connections and business relationships with other Native American owned casinos.  As NACSF is a Native American owned corporation, NACSF is able to provide Chex with an opportunity to reach a much broader market and otherwise unreachable group of Native American casinos who prefer to only do business with Native American corporations.  CSI's breach of the Cash Advance Agreement by violating the non-compete forces Chex to move further away from their relationship with NACSF and the Seminole Tribe of Florida.

50.     The actions of CSI also will undoubtedly damage Chex's reputation within the Native American gaming community.

CX/EX00601

51.    Furthermore, as a result of NACSF and CSI's wrongful conduct, Chex has no method of calculating the damages arising from the irreparable harm incurred. Chex further lacks an adequate remedy at law to redress NACSF and CSI's wrongful conduct.

## COUNT I
### BREACH OF CONTRACT AGAINST LGM AND NACS

52.    Paragraphs 1 through 51 are hereby incorporated by reference as if fully set forth.

53.    By virtue of the agreement to service casinos using LGM and NACS' contacts with Native American Tribes and Chex's ability to provide cash access services, LGM and NACS entered into a contract with Chex under which Chex would be paid commissions at various casino locations.

54.    LGM and NACS have failed to pay the amounts due to Chex pursuant to their contract and have therefore breached the contract with Chex.

55.    As a result of the breach of the contract, Chex is entitled to recover unpaid commissions which are immediately due and owing.

56.    LGM and NACS further breached the Casino Contract by interfering with Chex's relationship with NACSF.

57.    LGM's and NACS's breach has caused NACSF to wrongfully terminate its contract with Chex, resulting in Chex suffering substantial damages in excess of $50,000 for which LGM and NACS are liable.

58.    As a result of LGM and NACS's breaches of contract, Chex also seeks attorneys' fees, costs, and disbursements.

## COUNT II
### WRONGFUL TERMINATION OF CONTRACT AGAINST LGM AND NACS

59.    Paragraphs 1 through 58 are hereby incorporated by reference as if fully set forth.

CX/EX00602

60.    LGM and NACS's decision to terminate the Casino Contract with Chex violated the Casino Contract and was without justification.

61.    Pursuant to the provisions of the Casino Contract, LGM and NACS were not entitled to unilaterally terminate the contract nor were they entitled to remove Chex's property or its cash from the location.

62.    As a result of the wrongful termination of the contract, Chex is entitled to recover in an amount in excess of $50,000.

63.    As a result of LGM and NACS's wrongful termination of contract, Chex also seeks attorneys' fees, costs, and disbursements.

## COUNT III
## DAMAGE TO PROPERTY (WASTE) AGAINST LGM AND NACS

64.    Paragraphs 1 through 63 are hereby incorporated by reference as if fully set forth.

65.    Pursuant to the Casino Contract, in providing services to casinos, Chex utilized its equipment including, but not limited to, ATM machines and computer equipment.

66.    During the course of the wrongful termination of the Casino Contract by LGM and NACS, LGM took control of Chex's property and placed it in storage in a warehouse.

67.    LGM moved Chex's property out of the casino into the warehouse without Chex's permission.

68.    The property was significantly damaged because of LGM's wrongful removal of Chex's property.

69.    Because of the property damage, Chex is entitled to recover damages in an amount yet to be determined.

70.    As a result of the waste by LGM and NACS, Chex also seeks attorneys' fees, costs, and disbursements.

CX/EX00603

## COUNT IV
## BREACH OF CONTRACT AGAINST NACSF

71.     Paragraphs 1 through 70 are hereby incorporated by reference as if fully set forth.

72.     Under the NACSF Contract, Chex contracted with NACSF to provide financial services for five of the Seminole Tribe's casinos on behalf of NACSF. Furthermore, the term of the NACSF Contract continued for the life of NASCF's contract with the Seminole Tribe of Florida.

73.     The NACSF Contract also contained a provision requiring the non-breaching party to provide the allegedly breaching party with written notice of the alleged breach. The non-breaching party is required to allow the breaching party thirty days to cure the alleged breach. If the breaching party cures the alleged breach, the non-breaching party retains no cause of action for the asserted breach. If the breaching party has not cured their breach within the allotted thirty-day period, the non-breaching party may terminate the NACSF Contract after the thirty-day period has expired.

74.     · NACSF wrongfully withdrew from the NACSF Contract thereby preventing Chex from continuing to supply check cashing booth operations, credit card cash advance and POS debit systems and cash to fulfill NACSF's obligation of its contract with the Seminole Tribe of Florida and breached the underlying NACSF Contract.

75.     On December 17, 2003, NACSF sent Chex correspondence suggesting that the September 15, 2003 letter agreement failed to resolve issues between NACSF and Chex. On January 2, 2004, NACSF terminated the NACSF Contract, effective on Sunday, January 4, 2004. This termination was in breach of the NACSF Contract, and was without justification.

76.     As all claims by NACSF prior to September 15, 2003, were resolved by the Settlement Letter Agreement, NACSF further wrongfully failed to abide by the notice provisions as required in the NACSF Contract by: 1) failing to provide thirty days written notice for Chex to

CX/EX00604

correct any alleged breach; and 2) terminating the NACSF Contract without allowing Chex to correct any alleged breach.

77.     NACSF has never identified any claimed breach by Chex which allegedly occurred after September 15, 2003.

78.     As a result of NACSF's breaches of contract and wrongful termination of the existing agreement between Chex and NACSF and the resulting irreparable harm, as illustrated above, Chex seeks a judgment against NACSF for temporary and permanent injunctive relief enjoining further violation of the contract.

79.     As a result of NACSF's breaches of contract, Chex has suffered past, present and future damages in an amount to be determined at trial, but substantially in excess of $50,000.

80.     As a result of NACSF's breaches of contract, Chex also seeks attorneys' fees, costs, and disbursements.

## COUNT V
## BREACH OF SETTLEMENT LETTER AGREEMENT AGAINST NACSF

81.     Paragraphs 1 through 80 are hereby incorporated by reference as if fully set forth.

82.     As part of signing the Settlement Letter Agreement of September 15, 2003, NACSF agreed that payment by Chex cured all prior alleged contract breaches and/or defaults by Chex up to the date of the letter and treated the Settlement Letter Agreement as an amendment to the existing contractual relationship between NACSF and Chex.

83.     Despite the terms and plain language of the Settlement Letter Agreement, NACSF sent correspondence to Chex on December 17, 2003 claiming that the Settlement Letter Agreement did not resolve outstanding issues between NACSF and Chex. NACSF then sent another letter dated January 2, 2004 to Chex terminating the NACSF Contract effective January 4, 2004.

CX/EX00605

84.    As a result of NACSF's breach of the Settlement Letter Agreement and wrongful termination of the existing agreement between Chex and NACSF and the resulting irreparable harm, as illustrated above, Chex seeks a judgment against NACSF for temporary and permanent injunctive relief enjoining further violation of the Settlement Letter Agreement.

85.    NACSF's failure to abide by, and breach of, the terms of the Settlement Letter Agreement has resulted in past, present and future damages to Chex, in an amount in excess of $50,000.

86.    As a result of NACSF's breach of the Settlement Letter Agreement, Chex also seeks attorneys' fees, costs, and disbursements.

## COUNT VI
### BREACH OF CONTRACT AGAINST CASH SYSTEMS

87.    Paragraphs 1 through 86 are hereby incorporated by reference as if fully set forth.

88.    Pursuant to the Cash Advance Agreement between Chex and CSI, during the term of the Cash Advance Agreement or any renewals between the parties CSI agreed not to solicit business from The Seminole Tribe of Florida or compete with Chex with their cash advance platform system at any of the Seminole/Seminole Hard Rock Casino locations in Florida.

89.    CSI further agreed that it would only provide additional services in the Seminole casinos in the event the Seminole Tribe made a "request for proposal" process and Chex did not get an invitation to bid on renewals.  Such a request has not occurred, and therefore Cash Systems, *by providing the services which Chex was providing,* is in breach of the Cash Advance Agreement.

90.    Immediately after the wrongful termination of Chex's contract with NACSF and while the Cash Advance Agreement was still valid, CSI moved in and replaced Chex in the Seminole/Seminole Hard Rock Casino facilities.  CSI's actions are in direct violation of the underlying Cash Advance Agreement between the parties in that CSI either solicited business

from or is currently competing with Chex's cash advance platform at Seminole/Seminole Hard Rock Casino locations in Florida.

91.     As a result of CSI's breaches of contract and violation of the non-compete provision contained in the underlying Cash Advance Agreement between CSI and Chex and the resulting irreparable harm, as illustrated above, Chex seeks a judgment against NACSF for temporary and permanent injunctive relief enjoining further violation of the contract.

92.     As a result of CSI's breaches of contract, Chex has suffered past, present and future damages in an amount to be determined at trial, but substantially in excess of $50,000.

93.     As a result of CSI's breaches of contract, Chex also seeks attorneys' fees, costs, and disbursements.

WHEREAS, Chex prays for the following relief:

1.     An award of damages in excess of $50,000;

2.     Injunctive relief revoking NACSF's purported termination of the Service and Compensation Agreement Between Native American Cash Systems Florida, Inc. and Chex Services, Inc., which was entered into on December 4, 2001;

3.     Injunctive relief directing NACSF to refrain from violating, breaching, thwarting, and/or avoiding the terms of the Service and Compensation Agreement Between Native American Cash Systems Florida, Inc. and Chex Services, Inc., which was entered into on December 4, 2001;

4.     Injunctive relief directing NACSF to refrain from violating, breaching, thwarting, and/or avoiding the terms of the Letter Settlement Agreement between Native American Cash Systems Florida, Inc. and Chex Services, Inc., which is dated September 15, 2003;

CX/EX00607

5.  Injunctive relief directing NACSF to continue its contractual relationship with Chex Services under the Service and Compensation Agreement Between Native American Cash Systems Florida, Inc. and Chex Services, Inc., which was entered into on December 4, 2001;

6.  Injunctive relief directing CSI to cease competing with Chex Services, Inc. at any of the Seminole/Seminole Hard Rock casino locations in Florida, as specified in the Cash Advance Agreement entered into between Chex Services, Inc. and Cash Systems, Inc. in November of 2002, during the current term or any renewal of Cash Advance Agreement;

7.  Injunctive relief directing CSI to refrain from providing financial services at the Seminole casinos, which prior to January 4, 2004, Chex Services, Inc. provided;

8.  Injunctive relief directing NACSF to refrain from violating, breaching, thwarting, and/or avoiding the terms of the Cash Advance Agreement entered into between Chex Services, Inc. and Cash Systems, Inc. in November of 2002;

9.  An award of attorneys' fees as provided for in the Casino Contract;

10.  An award of attorneys' fees as provided for in the NACSF Contract;

11.  Other costs and disbursements as allowed by law or under any of the contracts referenced in this Complaint; and

CX/EX00608

12.    Other just and equitable relief as deemed appropriate by the Court.

RIDER BENNETT, LLP

By _____
        Daniel Q. Poretti (185152)
        Douglas J. Frederick (320699)
        Kenneth A. Kimber (320857)
Attorneys for Plaintiff Chex Services Inc. d/b/a
Fastfunds
333 South Seventh Street, Suite 2000
Minneapolis, MN 55402
(612) 340-8900

Dated: January 21, 2004

## ACKNOWLEDGEMENT

The party(ies) upon whose behalf this pleading is submitted, by and through the undersigned, hereby acknowledge(s) that sanctions may be imposed for a violation of Minn. Stat. § 549.211.

By _____

CX/EX00609

1081251-1                                              16

## AFFIDAVIT OF SERVICE BY FACSIMILE

STATE OF MINNESOTA      )
                              )   ss.

COUNTY OF HENNEPIN     )

Eileen M. Sinnott of the City of Brooklyn Park, County of Hennepin, the State of Minnesota, being duly sworn, says that on January 21, 2004, she served the annexed:

### Plaintiff Chex Services, Inc.'s Second Amended Complaint

on the attorney(s) below-named in this action, by faxing each to said attorney thereof at Minneapolis, Minnesota directed to the following:

Melanie Daniel, Esq.
Daniel Knudtson
394 E. Julian Drive
Gilbert, AZ 85296
Fax #: 480-899-5448

Mr. Robert Meller, Esq.
Best & Flanagan, LLP
225 South Sixth Street, Suite 4000
Minneapolis, MN 55402
Fax #: (612) 339-5897

Sean A. Shiff, Esq.
Skolnick & Associates, P.A.
2100 Rand Tower
527 Marquette Avenue South
Minneapolis, MN 55402
Fax #: (612) 677-7601

_Eileen M. Sinnott_
Eileen M. Sinnott

Subscribed and sworn to before me
this 21st day of January, 2004.

_Amy Stewart_
Notary Public

AMY ANN STEWART
Notary Public
Minnesota
My Commission Expires January 31, 2007

CX/EX00610

STATE OF MINNESOTA

COUNTY OF HENNEPIN

DISTRICT COURT

FOURTH JUDICIAL DISTRICT

CASE TYPE:  CONTRACT

Court File No. CT 03-020211

---

Chex Services, Inc. d/b/a Fastfunds,

        Plaintiffs,

vs.

Lisa G. Maulson, individually; Native
American Cash Systems; Native American
Cash Systems Florida, Inc.; and Cash Systems,
Inc.,

        Defendants.

**NOTICE OF APPEARANCE**

---

TO:    Plaintiffs, above-named, and their attorneys of record, Daniel Q. Poretti, Rider Bennett,
LLP, 333 South Seventh Street, Suite 2000, Minneapolis, MN 55402:

    PLEASE TAKE NOTICE that Robert L. Meller, Jr. of Best & Flanagan LLP, hereby

notes his appearance as counsel of record for Defendants Lisa G. Maulson, individually, Native

American Cash Systems, and Native American Cash Systems Florida, Inc. in this matter.

Dated:  January 14, 2004.

BEST & FLANAGAN LLP

By
Robert L. Meller, Jr. (#71912)
225 South Sixth Street
Suite 4000
Minneapolis, MN 55402
(612) 339-7121

ATTORNEY FOR DEFENDANTS

016274/230001/282274_1

STATE OF MINNESOTA                                    DISTRICT COURT

COUNTY OF HENNEPIN                          FOURTH JUDICIAL DISTRICT

### CERTIFICATE OF REPRESENTATION AND PARTIES

Date Case Filed:

Chex Services, Inc. d/b/a Fastfunds vs. Lisa G. Maulson, individually; Native American Cash
Systems; Native American Cash Systems Florida, Inc.; and Cash Systems, Inc.

**(ONLY THE INITIAL FILING LAWYER/PARTY NEEDS TO COMPLETE THIS FORM)**

This certificate must be filed pursuant to Rule 104 of the General Rules of Practice for the
District Courts, which states: "A party filing a civil case shall, at the time of filing, notify the court
administrator in writing of the name, address, and telephone number of all counsel and unrepresented
parties, if known (see form 104 appended to these rules). If that information is not then known to the
filing party, it shall be provided to the court administrator in writing by the filing party within seven
days of learning it. Any party impleading additional parties shall provide the same information to the
court administrator. The court administrator shall, upon receipt of the completed certificate, notify all
parties or their lawyers, if represented by counsel, of the date of filing the action and the file number
assigned."

LIST ALL LAWYERS/PRO SE PARTIES INVOLVED IN THIS CASE.

LAWYER FOR PLAINTIFF(S)               LAWYER FOR DEFENDANT(S)
                                      (If not known, name party and address)
                                      Lisa G. Maulson, individually; Native
                                      American Cash Systems; Native American
Chex Services, Inc., d/b/a Fastfunds   Cash Systems Florida, Inc.
Name of Party                          Name of Party


Daniel Q. Poretti                      Robert L. Meller, Jr.
Atty Name   (Not firm name)            Atty Name   (Not firm name)
Rider Bennett, LLP                     Best & Flanagan LLP
333 South Seventh Street               225 South Sixth Street
Suite 2000                             Suite 4000
Minneapolis, MN  55402                 Minneapolis, MN  55402
Address                                Address


(612) 340-8900                         (612) 339-7121
Phone Number                           Phone Number


185152                                 71912
MN Atty ID No.                         MN Atty ID No.

CX/EX00612

LAWYER FOR DEFENDANT(S)

Cash Systems, Inc.
Name of Party

Sean Shiff.
Atty Name   (Not firm name)

Skolnick & Associates, P.A.
2100 Rand Tower
527 Marquette Avenue South
Minneapolis, MN  55402
Address

(612) 677-7600
Phone Number

185152

January 14, 2004
Date


LAWYER FOR DEFENDANT(S)
(If not known, name party and address)

Name of Party

Atty Name     (Not firm name)

Address

Phone Number

Filing Lawyer/Party

281237