**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **iGAMES ENTERTAINMENT, INC.,** | : | |
| | : | |
| Plaintiff, | : | C.A. No. 04-180 (KAJ) |
| | : | |
| v. | : | |
| | : | |
| **CHEX SERVICES, INC.** and | : | |
| **EQUITEX, INC.,** | : | |
| | : | JURY TRIAL DEMANDED |
| | : | |
| Defendants. | : | |

# Appendix of Exhibits To iGames's Opposition To The Motion By Chex's And Equitex For Summary Judgment

# Exhibit H

WLM\207128.1

1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2            FOR THE DISTRICT OF DELAWARE
 3                     -  -  -
 4   iGAMES ENTERTAINMENT, INC. : C.A. NO.
             V.                 : 04-180-KAJ
 5   CHEX SERVICES, INC. and    :
     EQUITEX, INC.              :
 6   ----------------------------------------
     EQUITEX, INC. and CHEX     : C.A. NO.
 7   SERVICES, INC., d/b/a      : 04-256-KAJ
     FASTFUNDS                  :
 8          V.                  :
     iGAMES ENTERTINMENT, INC.  :
 9   ----------------------------------------
     CHEX SERVICES, INC., d/b/a :  C.A. NO.
10   FASTFUNDS                  :  04-0885-KAJ
            V.                  :
11   IGAMES ENTERTAINMENT, INC. :
                     -  -  -
12               September 21, 2004
13                     -  -  -
14
                Oral deposition of JAMES
15   WELBOURN, held in the offices of Duane,
     Morris and Heckscher, 4200 One Liberty
16   Place, 1650 Market Street, Philadelphia,
     Pennsylvania 19103 commencing at 9:50
17   a.m., on the above date, before Harvey
     Krauss, a Federally-Approved Registered
18   Professional Reporter and a Commissioner
     of the Commonwealth of Pennsylvania.
19                     -  -  -
20
21        ESQUIRE DEPOSITION SERVICES
                 15th Floor
22        1880 John F. Kennedy Boulevard
         Philadelphia, Pennsylvania 19103
23                (215) 988-9191
24
```

JAMES WELBOURN

78

1  idea.
2      Q.   Well --
3      A.   I know by -- I will say
4  that when Chris and Henry came into town
5  and Chris and Henry and Ijaz and I all
6  met in our seventh floor conference room
7  I want to say it was the third week of
8  January. We told Chris about the
9  possibility that the Seven Ventures
10  actually want to do a deal in and bring
11  all the companies together into it. And
12  Chris wasn't too keen on that. So, we
13  pretty much dropped it then.
14      Q.   Does the Seven Ventures
15  group, the shell have a connection with
16  Whitebox?
17      A.   When you say a connection,
18  only in the sense that we borrowed
19  money, we meaning Equitex Chex Services
20  borrowed money from Whitebox, and Seven
21  Ventures/ Maroon Bells since they were
22  going to be a partial shareholder wanted
23  to make sure that there were --
24  basically make sure that they had

79

1  protection if there was say a default by
2  Equitex on that Whitebox loan. So there
3  were some agreements signed between
4  Equitex, White, and I believe Maroon
5  Bells regarding that. I don't know the
6  exact content of the documents.
7      Q.   You had said Chris had some
8  concerns about Seven Ventures; is that
9  right?
10      A.   I don't think he had -- I'm
11  not sure that he had concerns about
12  Seven Ventures other than I think he
13  believed that we had gone so far down
14  the road on this deal that there was no
15  sense in bringing something else into
16  the mix.
17      Q.   And was that something else
18  the Whitebox deal?
19      A.   No.
20      Q.   They were completely
21  separate?
22      A.   Yes. Yeah, Whitebox and
23  seven ventures are completely separate.
24  They had nothing to do with each other.

80

1      Q.   All right. And in this
2  time frame early January were you
3  considering a deal with Whitebox as
4  well, either you or Henry Fong? When I
5  say you I mean Chex Services?
6      A.   We had talked to Whitebox
7  about funding. Our -- the way our
8  business is structured is we're always
9  looking for additional whether it be
10  through a venture capital group, if you
11  will, like Whitebox or the deventure
12  holders that we have in our company. In
13  order to grow our company you have to
14  raise more money.
15      Q.   Again in layman's terms,
16  what's understanding of the type of deal
17  that you have with Whitebox? I'm not
18  asking for a chapter or verse on the
19  deal, but what does Whitebox do?
20      A.   Whitebox is a -- they are
21  basically, a venture capital group that
22  loans money out for interest and
23  options, warrants, stock whatever. How
24  they structure they're deals I'm sure

81

1  are different based on the individual
2  deal.
3      Q.   And that's the nature of
4  your agreement with Whitebox to provide
5  you checks with capital?
6      A.   They provided had they
7  loaned -- I think the exact agreement is
8  that they loaned Equitex $5 million of
9  which of which Chex Services had to
10  guarantee the loan.
11      Q.   And what was your
12  understanding with -- did you have
13  discussions with Chris Wolfington about
14  a potential deal with Whitebox?
15      A.   Yes.
16      Q.   And when were those
17  discussions? When did those discussions
18  start?
19      A.   Those discussions happened
20  at the same meeting that I alluded to a
21  little earlier. I believe it was the
22  third week in January. Henry Ijaz,
23  Chris and myself.
24      Q.   And what was Chris'

21 (Pages 78 to 81)

162

1 to terminate the deal with you all Chex
2 and Equitex based on this NACSF contract
3 being pulled?
4          MR. PORETTI: I'm going to
5 just caution you, Mr. Welbourn,
6 not reveal any attorney-client
7 discussions about that impact if
8 you personally formed an opinion.
9          MR. TAYLOR: Counsel,
10 believe me I'm not.
11          MR. PORETTI: I understand
12 that? Suggesting in any way that
13 you are doing anything improper,
14 but I would like to know how in
15 the world and maybe I'll try to
16 correct the question how in the
17 world that question would elicit
18 or in any way ask him to remit
19 anything from an attorney-client
20 communication.
21          MR. PORETTI: His opinion
22 about the effect of that Seminole
23 contract termination on the SPA
24 and whether that gives rise to the

163

1 right to terminate is based upon
2 what his lawyers have told him I
3 think it's attorney-client
4 privilege.
5          MR. TAYLOR: Well, I am
6 assuming --
7          MR. PORETTI: That's why I'm
8 telling him not to answer.
9          MR. TAYLOR: I am assuming
10 and again I don't know what -- all
11 the details of this, but there's
12 -- I mean this is a public
13 statement.
14          MR. PORETTI: Sure. All I'm
15 saying to him is I don't want him
16 to reveal attorney-client
17 privilege but he's certainly
18 willing to answer the question.
19 BY MR. TAYLOR:
20     Q.   Let's just have a general
21 understanding Mr. Welbourn, that your
22 counsel is completely correct about one
23 thing. I'm not entitled to know what
24 your private conversations are with your

164

1 lawyer, none of my questions so that we
2 can all agree to a standing objection
3 here any of my questions I'm not
4 entitled to those communications between
5 your counsel unless I claim it's been
6 waived somehow. I'm not there -- I'm
7 not even making that suggestion. So, we
8 agree on that. Tell me did you believe
9 Chris would have been well -- when I say
10 Chris I'm kind of using that it's a
11 little I guess informal. IGames Chris
12 Wolfington's company, the company he was
13 with, would have been within its rights
14 to terminate the deal because of this
15 contract situation?
16     A.   No
17     Q.   Why not?
18     A.   Well, again I'm not a
19 lawyer so it will be interpreted
20 somewhere in a court of law what
21 material adverse effect is. But as a
22 businessman the way I look at a material
23 adverse effect is not one isolated case,
24 but what is done about that case. As I

165

1 had mentioned earlier, yes, we lost the
2 Seminole Tribe. Yes, it was about 25
3 percent of our revenue. We cut $600,000
4 out of expenses of our company to
5 mitigate that loss. So, do I believe
6 that he'd be in his right under that
7 contract, no.
8     Q.   Well, your dealing at this
9 point with a company that is forced to
10 downsize lost one of its biggest
11 revenues of cash and you're going to
12 look me straight in the eye and tell me
13 that's not a material change?
14     A.   I'm going to tell you it's
15 in my mind it's not a material adverse
16 effect because we did things on the
17 other end to mitigate it.
18     Q.   All right. So when you
19 signed your name do you understand what
20 -- has anyone ever talked to you about
21 sanctions for filing frivolous either
22 affidavits or pleadings? Have you ever
23 had that discussion with anybody?
24     A.   Can I just ask you is that

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| iGAMES ENTERTAINMENT, INC., | : | |
| | : | |
| Plaintiff, | : | C.A. No. 04-180 (KAJ) |
| | : | |
| v. | : | |
| | : | |
| CHEX SERVICES, INC. and | : | |
| EQUITEX, INC., | : | |
| | : | JURY TRIAL DEMANDED |
| | : | |
| Defendants. | : | |

# Appendix of Exhibits To iGames's Opposition To The Motion By Chex's And Equitex For Summary Judgment

# Exhibit I

EXHIBIT NO. 19
9-2-04
H. KRAUSS

CASE TYPE: CONTRACT

STATE OF MINNESOTA

COUNTY OF HENNEPIN

DISTRICT COURT

FOURTH JUDICIAL DISTRICT

---

Chex Services, Inc. d/b/a Fastfunds,

Plaintiff,

vs.

Lisa G. Maulson, individually; Native American
Cash Systems; Native American Cash Systems
Florida, Inc.; and Cash Systems, Inc.

Defendants.

Court File No. CT 03-020211
(Judge Marilyn Justman Kaman)

**SUPPLEMENTAL AFFIDAVIT OF
JAMES P. WELBOURN IN SUPPORT
OF PLAINTIFF'S APPLICATION FOR
A TEMPORARY RESTRAINING
ORDER AND FOR EXPEDITED
DISCOVERY**

---

STATE OF MINNESOTA )
) ss.
COUNTY OF HENNEPIN )

James P. Welbourn, being first duly sworn upon oath, hereby states and alleges as follows:

1. I am CEO of Chex Services, Inc. of Minnesota, the Plaintiff in this matter.

2. The matters stated herein are true of my own personal knowledge.

3. I understand that NACSF has suggested that it received a letter from George Connors regarding a promised decrease in "cost of cash" expenses. To the best of my knowledge, such a letter does not exist. However, it is Chex's practice to pass on savings to clients, thus Chex may have indicated to NACSF that the cost of cash expenses may decrease for NACSF if and when they decrease for Chex. However, a decrease in cost of cash expenses has not yet occurred for Chex.

4. Chex has never agreed to eliminate the NACSF Contract's Section 8 requirement of Seminole Tribe approval for termination and replacement of Chex. All along the parties understood that this was a deal that was to last for a minimum of five years.

5.    Prior to NACSF's notice of termination of the NACSF Contract, Chex was unaware of the December 30, 2003 addendum to the NACSF/Seminole Agreement (i.e., the "Native American cash Systems Florida, Inc. Financial Services Agreement Addendum").

6.    To my knowledge, NACSF is **not** "The Seminole Tribe of Florida."

7.    To my knowledge, "The Seminole Tribe of Florida" has not issued a "request for proposal" to which Cash Systems may respond, as stated in the non-compete provision of the Cash Advance Agreement.

8.    Chex never received any notice that Cash Systems did not desire to renew the Cash Advance Agreement, so pursuant to its terms, in November of 2003, the Cash Advance Agreement automatically renewed through November 2004.

9.    The acknowledgement in the NACSF Contract that NACSF intended to learn the operations does not preclude the potential award and renewal of future Seminole contracts to Chex directly from the Seminole Tribe, nor does it preclude the possible renewal of the NACSF Contract if NACSF has not learned the operations to the extent needed to operate the services on its own.

10.    To the best of my knowledge, over the two years of performing under the NACSF Contract, neither Paula Bowers-Sanchez nor Lisa Maulson have ever taken advantage of, or requested training.

11.    Chex did not seek a TRO in the Chippewa lawsuit because the Chippewa contract was directly with a Tribal entity and Chex decided that Chex did not want to adversely affect its relationship with the Tribe. Chex took legal action by asserting counterclaims in the lawsuit. Attached hereto as **Exhibit Q** is a true and correct copy of Answer and Counterclaim of Chex Services filed in the Chippewa lawsuit. Once the allegations in the lawsuit were confronted, the Chippewa case settled on favorable terms for Chex.

CX/EX00311

12.     The significance and special benefits of the NACSF Contract and the total unjustified termination of it has left Chex with no choice but to seek a TRO. Thus, Chex has sought to stop NACSF from wrongfully terminating the NACSF Contract and destroying Chex's reputation and goodwill.

13.     One of the unquantifiable benefits that Chex receives from providing services at the Seminole casinos, is that it provides Chex with immeasurable reputational benefits and instant credibility for many prospective clients.

14.     Although the negotiations related to iGames Entertainment, Inc.'s ("iGames") possible acquisition of Chex are still taking place, the negotiations have been severely impacted by the termination of the NACSF Contract. As the January 7, 2004 letter (Welbourn Aff., Ex. N) from iGames' attorneys suggests, the termination of the NACSF Contract may give iGames cause to terminate the acquisition agreement and negotiations. Thus, the threat of iGames pulling out of the acquisition remains and immeasurably affects the bargaining position of Chex.

15.     I understand that Defendants have argued that Chex employees pose a security risk to casino patrons. Such an argument is absolutely unfounded and the very suggestion that casino patrons are at risk goes directly to how the termination of NACSF Contract will lead to further reputational harm on behalf of Chex. Such unfounded rumors can have devastating effects in the casino industry.

16.     Chex's employees are held to a high standard of professionalism. This current dispute is not related to any allegations that employees are posing security risks or committing fraud on the public.

17.     As I understand, many of the very same employees who were dealing with the public for Chex, have been hired away and are now employed by Cash Systems. Because of

CX/EX00312

their knowledge of the operations and their established relationships with the Tribe and patrons, these employees are valuable assets for any company providing similar services.

18.    Chex's reputation and credibility among its current customers is now being questioned. Chex has been contacted by a representative from another Native American Tribe, for which Chex is currently providing financial services.. The representative asked several questions about the termination of the NACSF Contract and indicated· that it raises concerns about Chex credibility.

19.    On January 21, 2004, in order to alleviate concerns of our clients, I sent out a letter to clients of Chex. Attached hereto as **Exhibit R** is a true and correct copy of the January 21, 2004 letter.

20.    Chex has also received communications from concerned note holders. Attached hereto as **Exhibit S** are true and correct copies of such communications.

21.    Chex was not providing "All in 1" or Check Guarantee services at the Seminole casinos.

CX/EX00313

FURTHER YOUR AFFIANT SAYETH NOT.

James P. Welbourn

Subscribed and sworn to before me this
3RD day of February, 2004

Notary Public



KELI R. MAHOWALD
NOTARY PUBLIC - MINNESOTA
My Commission Expires Jan. 31, 2005

CX/EX00314

1086691-2                                          5

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| iGAMES ENTERTAINMENT, INC., | : | |
| | : | |
| Plaintiff, | : | C.A. No. 04-180 (KAJ) |
| | : | |
| v. | : | |
| | : | |
| CHEX SERVICES, INC. and | : | |
| EQUITEX, INC., | : | |
| | : | JURY TRIAL DEMANDED |
| | : | |
| Defendants. | : | |

# Appendix of Exhibits To iGames's Opposition To The Motion By Chex's And Equitex For Summary Judgment

# Exhibit J

WLM\207128.1



# YAHOO! FINANCE

Search - Finance Home - Yahoo! - Help

Welcome [Sign In]

**Financial News**

EXHIBIT NO. 36
9-22-04
H. KRAUSS

To track stocks & more, Regis



Enter symbol(s) [          ] Basic [  ]  Symbol Lookup



Click Here | TD Waterhouse | HARRISdirect.. Open an account, get $100 | 7 TRADES online market orders

---

**Press Release**                                   Source: Equitex, Inc.

## iGames Entertainment and Equitex Reaffirm Previously Announced Transaction

Monday January 5, 3:00 pm ET

LAS VEGAS, ENGLEWOOD, Colo. & PALM BEACH GARDENS, Fla.--(BUSINESS WIRE)--Jan. 5, 2004--iGames Entertainment, Inc. (OTCBB: IGME - News) and Equitex, Inc. (NASDAQ: EQTX - News) jointly announced today that they have reaffirmed their transaction announced on November 12, 2003, for the acquisition of Equitex subsidiary, Chex Services, Inc., by iGames Entertainment under the previously outlined terms. The companies stated they are moving forward in the most expeditious manner to file the appropriate proxy statements and bring the transaction to a vote of stockholders as quickly as possible.



ADVERTISEMENT

Get 25 Commission Free Equity Trades.

Open an Account

Christopher Wolfington, Chairman and Chief Executive Officer of iGames Entertainment stated: "The synergies and merits of the Chex Services transaction were never dependent on any one contract for its success. We remain committed to the transaction and look forward to closing as soon as possible. We are confident that Chex Services has more than sufficient remedies to vindicate the wrongful action taken against them. From a business perspective, the recent events have allowed Chex Services to accelerate cost-cutting measures we otherwise had to postpone until our transaction closed," continued Mr. Wolfington.

"Despite the loss of the Seminole Tribe of Florida contract, Chex Services remains a strong vibrant company with our dozens of other contracts," stated Henry Fong, President of Equitex, Inc. "We are confident the cost-savings measures we are currently finalizing along with new product introductions for 2004 will minimize the effect of this loss and help position Chex for further success. I believe the combination of Chex with iGames and Money Centers of America will only strengthen the combined companies' position within the industry. We intend to outline the Chex Services cost-savings measures in a press release later this week," stated Mr. Fong.



**Related Quotes**

EQTX 9-Jan @ 3:56pm (C)Yahc

| EQTX | 1.25 | +0.01 | Nev |
| IGME.OB | 1.42 | -0.08 | Nev |

**View Detailed Quotes**
Delayed 20 mins
Quote data provided by Reuters

**Related News Stories**

- Equitex Subsidiary Chex Services Details Cost Reduction Initiatives - Business Wire (2:30 pm)

- CORRECTING and REPLACING Equitex Subsidiary Chex Services to Receive 50% Participation Interest in Available Money, Inc. - Business Wire (Thu Jan 8)

- iGames Entertainment, Inc. Announces Closing Of Acquisition To Purchase Available Money, Inc. - PR Newswire (Thu Jan 8)

- iGames Entertainment, Inc. Announces Closing of Money Centers of America Merger an Appointment of Christopher M Wolfington As Chairman & CEO - PR Newswire (Mon Jan 5)

More

- By industry: Banking, Computers, Entertainment, Gambling

**Top Stories**

- Stocks Fall on Jobs Report, Telecoms - Reuters (4:41 pm)

- Enron's Lea Fastow Nixes Ple Pact - Reuters (4:08 pm)

- Payrolls Barely Rise in Weak Jobs Report - Reuters (1:15 pm)

EXHIBIT
B

CX/EX00529

Closing of the Chex Services - iGames Entertainment transaction is subject to certain requirements including necessary stockholder approval, completion of final documentation, due diligence and other customary pre-closing conditions.

iGames Entertainment, Inc. develops, manufactures and markets technology-based products for the gaming industry. The Company's growth strategy is to become the innovator in cash access and financial management systems for the gaming industry. The business model is specifically focused on specialty transactions in the cash access segment of the funds transfer industry. For a complete corporate profile on iGames Entertainment Inc., please visit the Company's corporate website at http://www.igamesentertainment.com/.

Equitex, Inc. is a holding company operating through its wholly owned subsidiary Chex Services of Minnetonka, Minnesota, as well as its majority owned subsidiary Denaris Corporation. Chex Services provides comprehensive cash access services to casinos and other gaming facilities. Denaris was formed to provide stored value card services.

The statements included in this press release concerning predictions of economic performance and management's plans and objectives constitute forward-looking statements made pursuant to the safe harbor provisions of Section 21E of the Securities Exchange Act of 1934, as amended, and Section 27A of the Securities Act of 1933, as amended. These statements involve risks and uncertainties that could cause actual results to differ materially from the forward-looking statements. Factors which could cause or contribute to such differences include, but are not limited to, factors detailed in Equitex's Securities and Exchange Commission filings; completion of due diligence, shareholder approval, regulatory approvals and certain other pre-closing conditions for all incomplete merger or acquisition transactions; economic downturns affecting the operations of Equitex its subsidiaries or companies proposed for merger or acquisition; the loss of contracts or failure to acquire new contracts; failure to successfully implement newly developed product lines including projected increases in revenues or earnings; the termination of previously announced acquisitions; delays or the inability to obtain regulatory approvals for previously announced acquisitions; the inability to initiate or complete any contemplated restructuring, offering, acquisition, disposition or other transaction; adverse financial performance by Equitex or any of its subsidiaries; failure to obtain or maintain regulatory approval for products and services offered by Equitex or its subsidiaries; the inability to collect amounts due to Equitex from the FDIC or Net First National Bank; adverse equity market conditions and declines in the value of Equitex common stock; and the unavailability of financing to complete management's plans and objectives. The forward-looking statements contained in this press release speak only as of the date hereof and Equitex disclaims any intent or obligation to update these forward-looking statements.

Contact:

    Equitex, Inc.
    Thomas B. Olson, 303-796-8940
       or
    iGames Entertainment, Inc.
    Christopher Wolfington, 610-354-8888

Source: Equitex, Inc.

Email this story - Set a News Alert

· Dollar Wilts to New Low Vs Euro - Reuters (4:27 pm)

More

· Most-emailed articles
· Most-viewed articles

Sponsored Links

<u>Stock Quotes at the Wall Street Journal</u>
Start a 2-week free trial. If you don't like it, cancel and pay zero.
interactive.wsj.com

<u>How We Make a Consistent $600-$720</u>
Trading blue chip stocks from home, e.g. latest stock quote, 4-day $8211 profit closed in Dell, opportunity
unfolding in Home Depot. Witness our simple 4-step strategy, starting today.
www.tradingtrix.net

<u>Stock Quotes and Reports</u>
Get a free Morningstar Analyst Report on the stock of your choice.
www.Morningstar.com

(What's This?)

Copyright © 2004 Yahoo! Inc. All rights reserved. <u>Privacy Policy</u> - <u>Terms of Service</u> - <u>Copyright Policy</u> - <u>Ad Feedback</u>
Copyright © 2004 Business Wire. All rights reserved. All the news releases provided by Business Wire are copyrighted. Any forms of copying other
than an individual user's personal reference without express written permission is prohibited. Further distribution of these materials by posting,
archiving in a public web site or database, or redistribution in a computer network is strictly forbidden.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| iGAMES ENTERTAINMENT, INC., | : | |
| | : | |
| Plaintiff, | : | C.A. No. 04-180 (KAJ) |
| | : | |
| v. | : | |
| | : | |
| CHEX SERVICES, INC. and | : | |
| EQUITEX, INC., | : | |
| | : | JURY TRIAL DEMANDED |
| | : | |
| Defendants. | : | |

# Appendix of Exhibits To iGames's Opposition To The Motion By Chex's And Equitex For Summary Judgment

# Exhibit K

REDACTED

REDACTED

REDACTED

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| iGAMES ENTERTAINMENT, INC., | : | |
| | : | |
| Plaintiff, | : | C.A. No. 04-180 (KAJ) |
| | : | |
| v. | : | |
| | : | |
| CHEX SERVICES, INC. and | : | |
| EQUITEX, INC., | : | |
| | : | JURY TRIAL DEMANDED |
| | : | |
| Defendants. | : | |

# Appendix of Exhibits To iGames's Opposition To The
# Motion By Chex's And Equitex For Summary Judgment

# Exhibit L

WLM207128.1

FROM KLEHR HARRISON                    (WED) 1.21'04 16:16/ST. 16:15/NO. 4862034594 P  2

<u>**Term Loan Note**</u>

$4,000,000

Philadelphia, PA

FOR VALUE RECEIVED, the undersigned, iGAMES ENTERTAINMENT, INC., a Nevada corporation with its chief executive office and principal place of business at 700 S. Henderson Road, Suite 210, King of Prussia, PA 19406 (the "Borrower"), promises to pay to the order of CHEX SERVICES, INC., with offices located at 11100 Wayzata Blvd., Suite 111, Minnetonka, Minnesota 55305 (the "Lender") the principal sum of Four Million Dollars ($4,000,000) or, if less, the aggregate outstanding principal balance of all advances made by the Lender to the Borrower, as provided for herein (the "Term Loans") together with interest, from the date of this note ("Note"), in like money, at said office of the Lender, at the time and at rates per annum as provided herein..

The Borrower and the Lender agree that the Lender shall advance $2,000,000 to the Borrower on the date hereof and shall advance an additional $2,000,000 to the Borrower on that day that is 60 days following the date hereof, provided that at such time the Borrower is in material compliance with the terms of this Note, the Stock Pledge Agreement (as defined below) and the Stock Purchase Agreement (as defined below). The aggregate amount so advanced shall constitute the "Term Loans" hereunder. The Lender agrees to deliver to the Borrower, within 21 days of the date hereof, a binding commitment for financing sufficient to fund the second advance hereunder either (i) from Mercantile Capital, L.P. on terms satisfactory to the Borrower; or (ii) from another institutional lender satisfactory to the Borrower, which financing shall be either (A) funded prior to the end of such 21 day period and placed in escrow subject to release to the Borrower in accordance with the first sentence of this paragraph, or (B) irrevocably committed to be advanced directly by the financing source to the Borrower in accordance with the first sentence of this paragraph without any further action by the Lender. For avoidance of doubt, any financing that could be diverted to other uses by the Lender, or under which the financing source could decline to advance, shall not satisfy the foregoing conditions. In the event that the Lender fails to comply with the foregoing within such 21 day period, then the Borrower shall have the right at any time thereafter to prepay the principal balance of this Note in full, in which case all further payment obligations of the Borrower, other than with respect to amounts accrued through the date of prepayment, shall terminate.

<u>Interest</u>. For the period ending February 1, 2004, the Borrower shall pay to the Lender interest on the outstanding Term Loans at the rate of fifteen percent (15%) per annum, calculated on the basis of a 360-day year and counting the actual number of days elapsed. In addition, in lieu of interest, the Borrower shall, on a monthly basis, pay to the Lender an amount equal to 50% of the Operating Income of the Borrower's Available Money, Inc. subsidiary ("Available Money") (which for the period ending February 1, 2004 shall be reduced by the amount of interest paid under the previous sentence), provided that, in the event that Lender completes a business combination with any party other than Borrower, or completes a direct or indirect acquisition or purchase or sale of assets or securities with any party other than Borrower, or agrees to complete such a transaction pursuant to a letter of intent or otherwise, then, from the date of such agreement, Borrower shall not be obligated to pay Lender 50% of the Operating Income of Available Money but shall be obligated to pay Lender interest on the outstanding Term Loans at the rate of ten percent (10%) per annum, calculated on the basis of a 360-day year and counting the actual number of days elapsed. "Operating Income" shall mean cash receipts of Available Money generated by normal operations, less all operating expenses, capital expenditures, reserves for taxes and reasonable operating reserves. Each payment shall be accompanied by a report of an officer of the Borrower in reasonable detail setting forth the calculation of Operating Income of Available Money for the applicable period.

<u>Treatment of Revenues and Expenses</u>. The Borrower hereby agrees that, notwithstanding its ownership of 100% of the capital stock of Available Money, for a period of 90 days following the date hereof (or such longer period as the Borrower may consent to in its reasonable discretion) the Borrower shall consent to the inclusion by the Lender in its financial statements of 50% of the revenues and expenses of Available Money; provided that the Borrower's and the Lender's independent auditors deliver their respective opinions that such

PHIL1 552321-5





FROM KLEHR HARRISON                                (WED) 1. 21' 04 16:17/ST. 16:15/NO. 4862034594 P 4

treatment is in accordance with generally accepted accounting principles.

Stock Purchase Agreement Termination. In the event that the Stock Purchase Agreement is terminated by the Lender and Equitex, Inc. under Section 11(b)(v) thereof, then in addition to any Termination Fee due and payable by the Borrower under the Stock Purchase Agreement, the Borrower shall pay to the Lender as additional interest hereunder the amount of $1,000,000, which shall be due and payable immediately upon demand following termination of the Stock Purchase Agreement.

Repayment; Lender's Option.

(a) No repayment of the principal balance of this Note shall be due and payable until 120 days following the earlier to occur of (i) termination without closing under the Stock Purchase Agreement dated November 3, 2003 between the Lender, the Borrower and Equitex, Inc. and other parties (or any successor agreement for the acquisition of the Lender by the Borrower) (the "Stock Purchase Agreement"), or (ii) 100 days from the date hereof (in either case, the "Initial Maturity Date").

(b) On the Initial Maturity Date, if the Borrower does not pay the outstanding principal balance of the Term Loans, and all accrued but unpaid interest due hereunder in full, the Lender shall have the option to purchase 100% of the capital stock of Available Money from the Borrower for a purchase price of $6,000,000 (the "Option"), exercisable by delivery to the Borrower on the Initial Maturity Date of a written notice of exercise, this Note for cancellation and immediately available funds in an amount equal to $6,000,000 less the then-outstanding principal balance of, and all accrued but unpaid interest on, the Term Loans.

(c) If the Lender does not exercise the Option on the Initial Maturity Date, then the maturity date of this Note shall be extended for one or more additional periods of 30 days (the end of each of which shall be a "Subsequent Maturity Date"). On each Subsequent Maturity Date, if the Borrower does not pay the outstanding principal balance of the Term Loans, and all accrued but unpaid interest due hereunder, in full, the Lender shall have the right to exercise the Option on that Subsequent Maturity Date. If the Lender does not exercise the Option, the maturity date of this Note shall continue to be extended pursuant to this Section until the outstanding principal balance of, and all accrued but unpaid interest on, the Term Loans is paid or the Option is exercised.

(d) Notwithstanding any provision hereof to the contrary, the outstanding principal balance of this Note, and all accrued but unpaid interest hereon, shall be due and payable 180 days following the Initial Maturity Date.

Late Payment Penalty. In the event that Maker fails to pay any amount when due, Maker agrees to pay a late charge equal to ten percent (10%) of the overdue amount. Such late charge shall be due and payable upon demand. Maker acknowledges that it would be extremely difficult or impracticable to determine Holders actual damages resulting from any late payment, and this late charge is a reasonable estimate of those damages. Acceptance of any late charge shall not limit any of Holders other rights or remedies under this Note or the Stock Purchase Agreement.

Payments. All payments required or permitted herein (principal and interest) shall be made to the address from time to time designated by the Holder and shall be paid not later than 5 p.m. (Minnesota time) on the day when due. All payments shall first be applied to interest accrued to the date of payment and the balance of such payment, if any, shall be applied to the unpaid principal remaining due hereon; provided, however, that upon the occurrence of an Event of Default (as defined herein) payment may first be applied to any late charges or sums advanced (if any) by the Lender for the payment of collection costs or other charges or fees (including reasonable attorneys fees). For all purposes herein, the date of payment shall be the date such payment is actually received by the Holder. Payment received by check or draft shall be credited as of the date delivered.

Security. The Borrower's obligations hereunder shall be secured by (i) a pledge of the capital

PHIL1 552321-5

stock of Available Money pursuant to a Stock Pledge Agreement of even date herewith (the "Stock Pledge Agreement"), (ii) the guaranty and suretyship of Money Centers of America, Inc. pursuant to a Corporate Guaranty of even date herewith, and (iii) the guaranty and suretyship of Available Money pursuant to a Corporate Guaranty of even date herewith.

Events of Default. The occurrence of any one or more of the following events shall constitute an "Event of Default" hereunder:

(a) the Borrower shall fail to pay when due, any installment of principal or interest or fee payable hereunder or any Obligation within 10 days following the date when due;

(b) the Borrower shall fail to observe or perform any other material obligation or covenant required to be observed or performed by it hereunder or under the Stock Pledge Agreement;

(c) the Borrower shall admit its inability to pay its debts as they mature, or shall make an assignment for the benefit of its creditors;

(d) any event of default under the Borrower's primary borrowing facility as a result of which the lender thereunder has declared the principal balance thereof to be due and payable;

(e) proceedings in bankruptcy, or for reorganization of the Borrower, or for the readjustment of any of its debts under Bankruptcy Code, as amended, or any part thereof, or under any other laws, whether state or federal, for the relief of debtors, now or hereafter existing, shall be commenced by or against the Borrower and, if commenced against the Borrower, shall not be discharged within ninety (90) days of their commencement; or

(f) a receiver or trustee shall be appointed for the Borrower or for any substantial part of its assets, or any proceedings shall be instituted for the dissolution or the full or partial liquidation of the Borrower, and such receiver or trustee shall not be discharged within ninety (90) days of its appointment;

Acceleration. Immediately upon the occurrence and during the continuation of any Event of Default, the Lender hereof, at its sole option, and without further notice may declare in writing the entire unpaid principal of this Note together with all interest accrued thereon, to forthwith become due and payable.

Notices. All notices or demands required or permitted to be given pursuant to the terms hereof shall be effective on the date of deposit in the U.S. mails if addressed to the the Lender or the Borrower at its last known address as appropriate, postage prepaid, registered or certified mail, return receipt requested.

Time is of the essence hereof.

Costs. Maker agrees to pay all costs of collection, including reasonable attorneys fees, in case payment of this Note is not made in accordance with its terms.

Governing Law; Jurisdiction. This Note is delivered and made in and shall in all respects shall be construed pursuant to the laws of Minnesota and any and every legal proceeding arising out of or in connection with this Note shall be brought in the appropriate courts of the State of Minnesota, each of the parties hereby consenting to the exclusive jurisdiction of said courts for this purpose.

Remedies. The remedies of the Lender as provided herein, or in the Stock Purchase Agreement, shall be cumulative and concurrent, and may be pursued singularly, successively or together, in the sole discretion of the Lender, and may be exercised as often as occasion therefore shall arise. No act of omission or commission of the Lender, including specifically any failure to exercise any right, remedy or recourse, shall be deemed to be a waiver or release of the same; such waiver or release to be effected only through a written document executed by the Lender and then only to the extent specifically recited therein. Without limiting the generality of the preceding

sentence, acceptance by the Lender of any payment with or without knowledge of the occurrence of Event of Default by Maker shall not be deemed a waiver of an Event of Default, and acceptance by the Lender of any payment in an amount less than the amount then due hereunder shall be an acceptance on account only and shall not in any way affect the existence of an Event of Default hereunder or under the Stock Purchase Agreement. A waiver or release with reference to any one event shall not be construed as continuing, as a bar to, or as a waiver or release of, any subsequent right, remedy, or recourse as to a subsequent event.

Maximum Interest Rate. All agreements between Maker and the Lender are expressly limited so that in no contingency or event whatsoever, whether by reason of: error of fact or law; payment, prepayment or advancement of the proceeds hereof; acceleration of maturity of the outstanding principal balance, or otherwise, shall the amount paid or agreed to be paid to the Lender hereof for the use, forbearance or retention of money to be advanced hereunder, including any charges collected or made in connection with the indebtedness evidenced by this Note which may be treated as interest under applicable law, if any, exceed the maximum legal limit (if any such limit is applicable) under United States federal law or state law (to the extent not preempted by federal law, if any), now or hereafter governing the interest payable in connection with such agreements. If, from any circumstances whatsoever, fulfillment of any provision hereof at the time performance of such provision shall be due shall involve transcending the limit of validity (if any) prescribed by law which a court of competent jurisdiction may deem applicable hereto, then, ipso facto, the obligation to be fulfilled shall be reduced to the limit of such validity, and if from any circumstances, the Lender shall ever receive as interest an amount which would exceed the maximum legal limit (if any such limit is applicable), such amount which would be excessive interest shall be applied to the reduction of the outstanding principal balance due hereunder and not to the payment of interest or, if necessary, rebated to the Borrower. This provision shall control every other provision of all agreements between Maker and the Lender.

Survival of Obligations. In the event that at any time any payment received by the Lender hereunder shall be deemed by final order of a court of competent jurisdiction to have been a voidable preference or fraudulent conveyance under the bankruptcy or insolvency laws of the United States, or shall otherwise be deemed to be due to any party other than the Lender, then, in any such event, the obligation to make such payment shall survive any cancellation of this Note and/or return thereof to Maker and shall not be discharged or satisfied by any prior payment thereof and/or cancellation or this Note, but shall remain a valid and binding obligation enforceable in accordance with the terms and provisions hereof, and the amount of such payment shall bare interest at the Default Rate from the date of such final order until repaid hereunder.

Waivers. The Maker hereby expressly waives presentment, demand, notice of dishonor, notice of nonpayment and all other notices and demands in connection therewith or in the nature thereof.

FROM KLEHR HARRISON                    (WED) 1.21'04 16:18/ST.16:15/NO. 4862034594 P 7

IN WITNESS WHEREOF, the undersigned, intending to be legally bound, has duly executed this
Note this 6th day of January, 2004

IGAMES ENTERTAINMENT, INC.

By: _____ (SEAL)
Name:   Christopher M. Wolfington
Title:   CEO

CHEX SERVICES, INC.

By: _____ (SEAL)
Name:   FRIZ ANWAR
Title:   C.F.O.

PHLI 552321-5

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| iGAMES ENTERTAINMENT, INC., | : | |
| | : | |
| Plaintiff, | : | C.A. No. 04-180 (KAJ) |
| | : | |
| v. | : | |
| | : | |
| CHEX SERVICES, INC. and | : | |
| EQUITEX, INC., | : | |
| | : | JURY TRIAL DEMANDED |
| | : | |
| Defendants. | : | |

# Appendix of Exhibits To iGames's Opposition To The Motion By Chex's And Equitex For Summary Judgment

# Exhibit M

14

WLM\207128.1

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED