**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| **iGAMES ENTERTAINMENT, INC.,** | : | |
| | : | |
| Plaintiff, | : | C.A. No. 04-180 (KAJ) |
| | : | |
| v. | : | |
| | : | |
| **CHEX SERVICES, INC.** and | : | |
| **EQUITEX, INC.,** | : | |
| | : | JURY TRIAL DEMANDED |
| | : | |
| Defendants. | : | |

# Appendix of Exhibits To iGames's Opposition To The Motion By Chex's And Equitex For Summary Judgment

# Exhibit U

WLM\207128.1

# PURCHASE AGREEMENT

**THIS PURCHASE AGREEMENT** (the *"Agreement"*) is entered into as of the 8th day of March, 2004, by and among **Equitex, Inc.**, a Delaware corporation (the *"Company"*), and **Pandora Select Partners, L.P.**, a British Virgin Islands limited partnership (*"Pandora"* or a *"Purchaser"*), and **Whitebox Hedged High Yield Partners, L.P.**, a British Virgin Islands limited partnership (*"Whitebox"* or a *"Purchaser"*) (together, the *"Purchasers"*).

## R E C I T A L S :

**WHEREAS,** in consideration of $5,000,000, the Company proposes to issue to the Purchasers, and the Purchasers, severally and jointly, desire to purchase promissory notes in the form attached as Exhibit A (the *"Notes"*) convertible at each Purchaser's option into shares of the Company's Common Stock, $0.02 par value (the *"Shares"*), and warrants in the form of Exhibit B (the *"Warrants,"* and individually, a *"Warrant"*) to purchase an aggregate of 800,000 Shares (subject to certain adjustments).

**NOW, THEREFORE,** in consideration of the foregoing recitals and the mutual promises hereinafter set forth, the parties hereto agree as follows:

## SECTION 1. AGREEMENT TO SELL AND PURCHASE.

**1.1.    Authorization of Transaction.** On or prior to the closing under Section 2.1 of this Agreement (the *"Closing"*), the Company shall have authorized the sale and issuance to the Purchasers of the Notes, Warrants and Shares issuable upon conversion of the Notes or exercise of the Warrants.

**1.2.    Sale and Purchase.** Subject to the terms and conditions hereof, at the Closing, the Company hereby agrees to issue and sell to Purchasers, and Purchasers, severally and jointly, agree to purchase from the Company, the Notes and Warrants for an aggregate Purchase Price of $5,000,000. The principal amount of each Purchaser's Note shall be as designated by the Purchasers prior to Closing (as defined below), and the number of Shares purchasable under a Warrant shall be in the same proportion as the principal balance of a Note bears to $5,000,000.

## SECTION 2. CLOSING, DELIVERY AND PAYMENT

**2.1.    Closing.** The Closing shall take place at 10:00 a.m. on the date hereof at the offices of the Purchaser's legal counsel, Messerli & Kramer P.A., in Minneapolis, Minnesota, or at such other time or place as the Company and the Purchaser may mutually agree (the *"Closing Date"*). At the Closing, subject to the terms and conditions hereof, the Company will issue, sell and deliver to each Purchaser the Purchaser's Note and Warrant, against payment of the Purchaser's respective Purchase Price by certified check or wire transfer of immediately available funds. At that time, the Company shall also execute and deliver to the Purchasers the Registration Rights Agreement in the form attached as Exhibit C (the *"Registration Rights*

VER4

*Agreement"*) and the Security Agreement covering certain of the Company assets (the *"Company Collateral"*) in the form attached as Exhibit D (the *"Company Security Agreement"*). The Company Collateral will consist of a first priority interest in all of the outstanding common stock of Chex Services, Inc., a Minnesota corporation and wholly-owned subsidiary of the Company (*"Chex"*), a promissory note issued by Chex in favor of the Company in the principal amount of $5,000,000 (the *"Chex Note"*) and the Company's interest in the Chex Note Security Agreement dated as of this date. At that time, the Company will also cause Chex to execute and deliver to the Purchasers a Guarantee of the Notes (the *"Guarantee"*), and a Security Agreement pledging all of Chex's assets to secure the Guarantee (the *"Chex Collateral"*) in the form attached as Exhibit E (the *"Chex Guarantee Security Agreement"*).

## SECTION 3. REPRESENTATIONS AND WARRANTIES OF THE COMPANY

The Company hereby makes the following representations and warranties to each Purchaser as of the date of the Closing.

**3.1. Organization, Good Standing and Qualification.** The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware. Each of the Company and Chex has all requisite corporate power and authority to own and operate its respective properties and assets and to carry on its business as presently conducted and as presented proposed to be conducted. The Company has all requisite corporate power and authority to execute and deliver this Agreement, each Note, each Warrant, the Registration Rights Agreement and the Company Security Agreement (together, the *"Company Transaction Documents"*); to pledge the Company Collateral as security for each Note; to issue and sell the Shares upon conversion of each Note or exercise of each Warrant (the *"Conversion Shares"*); and to carry out the provisions of the Company Transaction Documents. Chex has all requisite corporate power and authority to execute and deliver the Chex Guarantee Security Agreement, to pledge the Chex Collateral as security for each Note and to carry out the provisions of this Agreement and the Chex Guarantee Security Agreement. Each of the Company and Chex is duly qualified and is authorized to do business and is in good standing in each jurisdiction in which the nature of its activities and of its properties (both owned and leased) makes such qualification necessary, except for those jurisdictions in which failure to be so qualified would not have a materially adverse effect on the Company or its business, taken as a whole.

**3.2. Capitalization.** The Company is authorized to issue 2,000,000 shares of Preferred Stock, par value $1,000 per share, of which 408 shares of Series D, 370 shares of Series G and 1,600 shares of Series I are issued and outstanding, and 50,000,000 shares of Common Stock, par value $0.02 per share, of which 31,752,346 shares are issued and 29,390,278 shares are outstanding. Except as set forth Schedule 3.2 or in the Company's quarterly, annual and other filings (the *"SEC Reports"*) with the U.S. Securities and Exchange Commission (the *"Commission"*), the Company has no (i) outstanding options, warrants or other rights to acquire any capital stock, or securities convertible or exchangeable for capital stock or for securities themselves convertible or exchangeable for capital stock (together, *"Convertible*

-2-

VER4

*Securities"*) or (ii) agreement or commitment to sell or issue any shares of capital stock or Convertible Securities. All issued and outstanding shares of the Company's capital stock (i) have been duly authorized and validly issued, (ii) are fully paid and nonassessable, (iii) are free from any preemptive and cumulative voting rights and (iv) were issued pursuant to an effective registration statement filed with the Commission and applicable state securities authorities or pursuant to valid exemptions under federal and state securities laws. Except as set forth on Schedule 3.2, there are no outstanding rights of first refusal or proxy or shareholder agreements of any kind relating to any of the Company's securities to which the Company or any of its executive officers and directors is a party or as to which the Company otherwise has knowledge of. When issued in compliance with the provisions of the Notes or Warrants (and upon payment as provided by each such Note or Warrant), the Shares so issued will be validly issued, fully paid and nonassessable, and will be free of any liens or encumbrances; provided, *however,* that the Shares may be subject to restrictions on transfer under state and/or federal securities laws as set forth herein or as otherwise required by such laws at the time a transfer is proposed. Chex does not have any outstanding Convertible Securities or agreements or commitments to sell or issue any shares of capital stock or Convertible Securities.

    **3.3.  Authorization; Binding Obligations.** All corporate action on the part of the Company and Chex, and their respective officers, directors and shareholders necessary for the authorization (in the case of the Company) of the Company Transaction Documents, and (in the case of Chex) the Guarantee and Chex Guarantee Security Agreement (together, the *"Transaction Documents"*), the performance of all obligations of the Company hereunder at the Closing, and the performance of the respective obligations of the Company and Chex under the Transaction Documents, including the pledge of the Company Collateral and the Chex Collateral (together, the *"Collateral"*) as security for the Notes and Guarantee, respectively, and the authorization, sale, issuance and delivery of the Shares upon conversion of each Note or upon exercise of each Warrant has been taken. The Transaction Documents, when executed and delivered, will be valid and binding obligations of the Company and/or Chex, as applicable, enforceable in accordance with their terms, except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium or other laws of general application affecting enforcement of creditors' rights, (ii) according to general principles of equity that restrict the availability of equitable remedies and (iii) to the extent that the enforceability of the indemnification provisions of the Registration Rights Agreement may be limited by applicable laws. The sale of the Shares upon exercise of each Warrant or upon conversion of each Note is not and will not be subject to any preemptive rights or rights of first refusal.

    **3.4.  Financial Statements.** The Company's unaudited consolidated balance sheet at, and the statements of operations and cash flows for the nine months ended, September 30, 2003 (the *"Latest Financial Statements"* with September 30, 2003 being the *"Latest Statement Date"*) and the audited consolidated balance sheets at, and the statements of operations, cash flows and changes in stockholders' equity of the Company for the fiscal years ended, December 31, 2002 and 2001 (all of the foregoing together, the *"Financial Statements"*), as contained in the SEC Reports, fairly present in all material respects the consolidated financial position, results of operations, cash flows and changes in stockholders' equity of the Company as of the

VER4

respective dates and for the respective periods covered thereby in accordance with generally accepted accounting principles consistently applied.

**3.5. Liabilities.** The Company has no material liabilities and, to the best of its knowledge, the Company knows of no material contingent liabilities not disclosed in the Latest Financial Statements or SEC Reports, except current liabilities incurred in the ordinary course of business subsequent to the Latest Statement Date that have not been, either in any individual case or in the aggregate, materially adverse.

**3.6. Certain Agreements and Actions.** Except as disclosed in the SEC Reports, the Company has not (i) declared or paid any dividends, or authorized or made any distribution upon or with respect to any class or series of its capital stock, (ii) since the Latest Statement Date incurred any indebtedness for money borrowed or any other material liabilities out of the ordinary course of business, (iii) made any loans or advances to any person, other than ordinary advances for travel or entertainment expenses or (iv) sold, exchanged or otherwise disposed of any of its assets or rights, other than in the ordinary course of business.

**3.7. Obligations of or to Related Parties.** Except as disclosed on Schedule 3.7 or in the SEC Reports, there are no obligations of the Company to officers, directors, shareholders, employees or consultants of the Company, or to any members of their immediate families or other affiliates, other than (i) for payment of salary for services rendered since the commencement of the Company's most recent payroll period, (ii) reimbursement for expenses reasonably incurred on behalf of the Company and (iii) for other standard employee benefits made generally available to all employees (including stock option agreements outstanding under any stock option plan approved by the Board of Directors of the Company). Except as disclosed on Schedule 3.7 or in the SEC Reports, none of the officers or directors, or, to the Company's knowledge, any affiliate, employee or consultant, of the Company, or, to the Company's knowledge, any members of their immediate families, are indebted to the Company for any material amount or have any direct or indirect material ownership interest in any firm, corporation or other entity with which the Company is affiliated or with which the Company has a business relationship, or any firm, corporation or other entity that competes with the Company. Except as disclosed in the SEC Reports, no officer or director, or, to the Company's knowledge, any affiliate, employee or consultant of the Company, or, to the Company's knowledge, any member of their immediate families or other affiliates, is, directly or indirectly, interested in or a party to any material contract with the Company. Except as disclosed on Schedule 3.7 or in the SEC Reports, the Company is not a guarantor or indemnitor of any indebtedness of any other person, firm or corporation.

**3.8. Changes.** Since the Latest Statement Date, and except as disclosed in the SEC Reports, there has not been, to the Company's knowledge, any event or condition of any character that, either individually or cumulatively, has materially and adversely affected the business, assets, liabilities, financial condition, operations or prospects of the Company.

VER4

CX/EX01386

**3.9.    Title to Properties and Assets; Liens.** Except as set forth on Schedule 3.9 or in the SEC Reports, the Company has good and marketable title to its properties and assets, including the properties and assets reflected in the Latest Financial Statements, and good title to its leasehold estates, in each case subject to no mortgage, pledge, lien, lease, encumbrance or charge, other than (i) those resulting from taxes that have not yet become delinquent, (ii) minor liens and encumbrances that do not materially detract from the value of the property subject thereto or materially impair the operations of the Company and (iii) those that have otherwise arisen in the ordinary course of business. All facilities, machinery, equipment, fixtures and other properties owned, leased or used by the Company are in good operating condition and repair and are reasonably fit and usable for the purposes for which they are being used, reasonable wear and tear excepted.

**3.10.    Patents and Trademarks.** Except as set forth on Schedule 3.10 or in the SEC Reports, the Company owns or licenses all patents, trademarks, service marks, trade names, copyrights, trade secrets, information and other proprietary rights and processes necessary for its business as now conducted and as proposed to be conducted, without any known infringement of the rights of others. The Company is not aware that any of its employees is obligated under any contract (including licenses, covenants or commitments of any nature) or other agreement, or subject to any judgment, decree or order of any court or administrative agency, that would interfere with their duties to the Company or that would conflict with the Company's business as proposed to be conducted. Neither the execution, delivery or performance of the Transaction Documents, the pledge of the Collateral by the Company and Chex to secure the Notes and the Guarantee, respectively, the carrying on of the Company's and Chex's business by the respective employees of the Company and Chex, nor the conduct of the Company's and Chex's business as currently conducted or proposed, will conflict with or result in a breach of the terms, conditions or provisions of, or constitute a default under, any contract, covenant or instrument under which any employee of the Company  or Chex now obligated. The Company does not believe it is or will be necessary to utilize any inventions, trade secrets or proprietary information of any of its or Chex's employees made prior to their employment by the Company or Chex, except for inventions, trade secrets or proprietary information that have been assigned to the Company or Chex.

**3.11.    Compliance with Other Instruments.** Except as disclosed in the SEC Reports, the Company is not in material violation or default of any term of its Articles or Bylaws, or of any provision of any mortgage, indenture, contract, agreement, instrument or contract to which it is party or by which it is bound or of any judgment, decree, order, writ or, to its knowledge, any statute, rule or regulation applicable to the Company, that, in any such case, would materially and adversely affect the business, assets, liabilities, financial condition, operations or prospects of the Company.  The execution, delivery, and performance of and compliance with the Transaction Documents, and the issuance and sale of the Shares upon conversion of each Note or exercise of each Warrant, will not, with or without the passage of time or giving of notice, result in any such material violation, or be in conflict with or constitute a default under any such term, or result in the creation of any mortgage, pledge, lien, encumbrance or charge upon any of the properties or assets of the Company or the suspension, revocation, impairment, forfeiture or

VER4

nonrenewal of any permit, license, authorization or approval applicable to the Company, its business or operations or any of its assets or properties that, in any such case, would materially and adversely affect the business, assets, liabilities, financial condition, operations or prospects of the Company.

**3.12.  Litigation.**  Except as disclosed in the SEC Reports, there is no action, suit, proceeding or investigation pending or, to the Company's knowledge, currently threatened against the Company that questions the validity of this Agreement or the other agreements contemplated hereby, or the right of the Company to enter into any of such agreements, or to consummate the transactions contemplated hereby or thereby.  Except as disclosed in the SEC Reports, there is no action, suit, proceeding or investigation or, to the Company's knowledge, currently threatened against the Company that might result, either individually or in the aggregate, in any material adverse change in the assets, condition, affairs or prospects of the Company, financial or otherwise, or any change in the current equity ownership of the Company, nor is the Company aware that there is any basis for the foregoing.  The foregoing includes, without limitation, actions pending or threatened (or any basis therefor known to the Company) involving asbestos and other environmental-related claims and the prior employment of any of the employees of the Company, their use in connection with the Company's business of any information or techniques allegedly proprietary to any of their former employers or their obligations under any agreements with prior employers.  Except as disclosed in the SEC Reports, the Company is not a party or subject to the provisions of any order, writ, injunction, judgment or decree of any court or government agency or instrumentality.

**3.13.  Tax Returns and Payments.**  The Company has timely filed all tax returns (federal, state and local) required to be filed by it.  All taxes shown to be due and payable on such returns, any assessments imposed, and, to the Company's knowledge, all other taxes due and payable by the Company on or before the Closing have been paid or will be paid prior to the time they become delinquent.  The Company has not been advised (i) that any of its returns, federal, state or other, have been or are being audited as of the date hereof or (ii) of any deficiency in assessment or proposed judgment to its federal, state or other taxes.  The Company has no knowledge of any liability of any tax to be imposed upon the properties or assets of the Company as of the date of this Agreement that is not adequately provided for.

**3.14.  Employees.**  The Company has no collective bargaining agreements with any of its employees.  There is no labor union organizing activity pending or, to the Company's knowledge, threatened with respect to the Company.  Except as set forth on Schedule 3.14 or in the SEC Reports, no employee has any agreement or contract, written or verbal, regarding his employment.  Except as disclosed on Schedule 3.14 or in the SEC Reports, the Company is not a party to or bound by any currently effective employment contract, deferred compensation arrangement, bonus plan, incentive plan, profit sharing plan, retirement agreement or other employee compensation plan or agreement.  To the Company's knowledge, no employee of the Company, nor any consultant with whom the Company has contracted, is in violation of any material term of any employment contract, proprietary information agreement or any other agreement relating to the right of any such individual to be employed by, or to contract with, the

VER4

CX/EX01388

Company because of the nature of the business to be conducted by the Company; and, to the Company's knowledge, the continued employment by the Company of its present employees, and the performance of the Company's contracts with its independent contractors, will not result in any such violation. The Company has not received any notice alleging that any such violation has occurred. Except as disclosed on Schedule 3.14 or in the SEC Reports, no employee of the Company has been granted the right to continued employment by the Company or to any material compensation following termination of employment with the Company. The Company is not aware that any officer or key employee, or that any group of key employees, intends to terminate their employment with the Company, nor does the Company have a present intention to terminate the employment of any officer, key employee or group of key employees.

**3.15.  Registration Rights.**  Except as disclosed in the SEC Reports or required pursuant to the Registration Rights Agreement, the Company is presently not under any obligation, and has not granted any rights, to register (as defined in the Registration Rights Agreement) any of the Company's presently outstanding securities or any of its securities that may hereafter be issued.

**3.16.  Compliance with Laws; Permits.**  Except as disclosed in the SEC Reports, the Company is not in violation of any applicable statute, rule, regulation, order or restriction of any domestic or foreign government or any instrumentality or agency thereof in respect of the conduct of its business or the ownership of its properties that would materially and adversely affect the business, assets, liabilities, financial condition, operations or prospects of the Company, including laws, rules, regulations and permits relating to gaming operations (*"Gaming Rules"*). No governmental orders, permissions, consents, approvals or authorizations are required to be obtained and no registrations or declarations are required to be filed in connection with the execution, delivery and performance of the Transaction Documents, the pledge of the Collateral to secure each Note and the Guarantee, or the issuance of the Shares upon conversion of each Note or exercise of each Warrant, except such as has been duly and validly obtained or filed, or with respect to any filings that must be made after the Closing, as will be filed in a timely manner, including those with respect to Gaming Rules. The Company has all franchises, permits, licenses and any similar authority necessary for the conduct of its business as now being conducted by it, including with respect to Gaming Rules, the lack of which could materially and adversely affect the business, properties, prospects or financial condition of the Company, and the Company believes it can obtain any similar authority for the conduct of its business as planned to be conducted.

**3.17.  Environmental and Safety Laws.**  Except as disclosed in the SEC Reports, neither the Company nor any of the Subsidiaries is in violation of any applicable statute, law or regulation relating to the environment or occupational health and safety, and to the Company's knowledge, no material expenditures are or will be required in order to comply with any such existing statute, law or regulation. Without limiting the foregoing, and except as disclosed in the SEC Reports:

VER4

CX/EX01389

(a)     with respect to any real property owned, leased or otherwise utilized by the Company or its Subsidiaries (*"Real Property"*), neither the Company nor any Subsidiaries is or has in the past been in violation of any Hazardous Substance Law which violation could reasonably be expected to result in a material liability to the Company or its properties and assets;

(b)     none of the Company nor any of the Company's Subsidiaries nor, to the knowledge of the Company, any third party has used, released, generated, manufactured, produced or stored, in, on, under, or about any Real Property, or transported thereto or therefrom, any Hazardous Substances that could reasonably be expected to subject the Company or any of the Subsidiaries to material liability, under any Hazardous Substance Law;

(c)     to the knowledge of the Company, there are no underground tanks, whether operative or temporarily or permanently closed, located on any Real Property that could reasonably be expected to subject the Company or any of the Subsidiaries to material liability under any Hazardous Substance Law;

(d)     there are no Hazardous Substances used, stored or present at, or on, or to the knowledge of the Company that could reasonably be expected to migrate onto any Real Property, except in compliance with Hazardous Substance Laws; and

(e)     to the knowledge of the Company, there neither is nor has been any condition, circumstance, action, activity or event that could reasonably be expected to be a material violation by the Company or any of the Subsidiaries of any Hazardous Substance Law, or to result in liability to the Company or any of the Subsidiaries under any Hazardous Substance Law.

For purposes hereof, **"Hazardous Substances"** means (statutory acronyms and abbreviations having the meaning given them in the definition below of *"Hazardous Substances Laws"*) substances defined as "hazardous substances," "pollutants" or "contaminants" in Section 101 of the CERCLA;  those substances defined as "hazardous waste," "hazardous materials" or "regulated substances" by the RCRA;  those substances designated as a "hazardous substance" pursuant to Section 311 of the CWA;  those substances defined as "hazardous materials" in Section 103 of the HMTA;  those substances regulated as a hazardous chemical substance or mixture or as an imminently hazardous chemical substance or mixture pursuant to Sections 6 or 7 of the TSCA;  those substances defined as "contaminants" by Section 1401 of the SDWA, if present in excess of permissible levels;  those substances regulated by the Oil Pollution Act;  those substances defined as a pesticide pursuant to Section 2(u) of the FIFRA;  those substances defined as a source, special nuclear or by-product material by Section 11 of the AEA;  those substances defined as "residual radioactive material" by Section 101 of the UMTRCA;  those substances defined as "toxic materials" or "harmful physical agents" pursuant to Section 6 of the OSHA;  those substances defined as hazardous wastes in 40 C.F.R. Part 261.3;  those substances defined as hazardous waste constituents in 40 C.F.R. Part 260.10, specifically including Appendix VII and VIII of Subpart D of 40 C.F.R. Part 261;  those

VER4

substances designated as hazardous substances in 40 C.F.R. Parts 116.4 and 302.4;  those substances defined as hazardous substances or hazardous materials in 49 C.F.R. Part 171.8; those substances regulated as hazardous materials, hazardous substances, or toxic substances in 40 C.F.R. Part 1910;  any chemical, material, toxin, pollutant, or waste regulated by or in any other Hazardous Substances Laws;  and in the regulations adopted and publications promulgated pursuant to said laws, whether or not such regulations or publications are specifically referenced herein.

**"Hazardous Substances Law"** means any of:

(i) the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended (42 U.S.C. Section 9601 *et seq.*) ("CERCLA");

(ii) the Federal Water Pollution Control Act (33 U.S.C. Section 1251 *et seq.*) ("**Clean Water Act**" or "**CWA**");

(iii) the Resource Conservation and Recovery Act (42 U.S.C. Section 6901 *et seq.*) ("RCRA");

(iv) the Atomic Energy Act of 1954 (42 U.S.C. Section 2011 *et seq.*) ("**AEA**");

(v) the Clean Air Act (42 U.S.C. Section 7401 *et seq.*) ("**CAA**");

(vi) the Emergency Planning and Community Right to Know Act (42 U.S.C. Section 11001 *et seq.*) ("**EPCRA**");

(vii) the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. Section 136 *et seq.*) ("**FIFRA**");

(viii) the Oil Pollution Act of 1990 (33 U.S.C.A. Section 2701 *et seq.*);

(ix) the Safe Drinking Water Act (42 U.S.C. Sections 300f *et seq.*) ("**SDWA**");

(x) the Surface Mining Control and Reclamation Act of 1974 (30 U.S.C. Sections 1201 *et seq.*) ("**SMCRA**");

(xi) the Toxic Substances Control Act (15 U.S.C. Section 2601 *et seq.*) ("**TSCA**");

(xii) the Hazardous Materials Transportation Act (49 U.S.C. Section 5101 *et seq.*) ("**HMTA**");

(xiii) the Uranium Mill Tailings Radiation Control Act of 1978 (42 U.S.C. Section 7901 et seq.) ("**UMTRCA**");

-9-

VER4

(xiv)  the Occupational Safety and Health Act (29 U.S.C. Section 651 et seq.) ("**OSHA**"); and

(xv)  all other federal, state and local governmental rules which govern Hazardous Substances, and the regulations adopted and publications promulgated pursuant to all such foregoing laws.

**3.18.  Offering Valid.**  Assuming the accuracy of the representations and warranties of the Purchasers contained in Section 4, the offer, sale and issuance of each Note and each Warrant (and the Conversion Shares upon conversion of each Note or exercise of each Warrant) will be exempt from the registration requirements of the Securities Act of 1933, as amended (the "*Securities Act*") and will have been registered or qualified (or are exempt from registration and qualification) under the registration, permit or qualification requirements of the State of Minnesota.

**3.19.  Insurance.**  The Company has fire and casualty insurance policies with coverage customary for companies similarly situated to the Company.

**3.20.  Investment Company Act.**  The Company is not, and will not use the proceeds from each Note in a manner so as to become, an "investment company," or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended.

**3.21.  Security Interest in Company Collateral and Chex Collateral.**  Except as set forth on Schedule 3.21, the Company and Chex own their respective Collateral, free and clear of all claims, liens or encumbrances of any kind, except as contemplated by the Transaction Documents.  Subject to the perfection of the security interests by effecting appropriated filings under the UCC or the retaining of possession where required, then, upon consummation of the transactions as contemplated hereby, the Purchasers together will have a first priority security interest in the Company Collateral (which consists of a first priority interest in the Chex Collateral), and a second priority security interest in the Chex Collateral by virtue of the Chex Guarantee Security Agreement.

**3.22.  NASDAQ Compliance.**  The Company's Common Stock is registered pursuant to Section 12(g) of the Securities Exchange Act of 1934, as amended (the "*Exchange Act*") , and is listed on The Nasdaq Stock Market, Inc. SmallCap Market (the "*Nasdaq Market*").  The Company has taken no action designed to, or likely to have the effect of, and the transactions contemplated by this Agreement will not have the effect of, terminating the registration of the Common Stock under the Exchange Act or de-listing the Common Stock from the Nasdaq Market.  The Company has not received any notification that the Commission or the National Association of Securities Dealers, Inc. (the "*NASD*") is contemplating terminating such registration or listing.  Without limiting the foregoing, the Transaction Documents and the transactions contemplated by them require no stockholder approval under the rules or interpretations of the Nasdaq Market.

VER4

CX/EX01392

**3.23.  Reporting Status.**  The Company has filed in a timely manner all documents that the Company was required to file under the Exchange Act during the 12 months preceding the date of this Agreement.   The SEC Reports complied in all material respects with the Commission's requirements as of their respective filing dates, and the information contained therein as of the date thereof did not contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.  As of the date hereof, the Company satisfies the eligibility requirements for the use of Form S-2 under the Securities Act of 1933, as amended, set forth in General Instruction I to Form S-2.

**3.24.  No Manipulation of Stock.**  Neither the Company, nor any of its directors, officers or controlling persons, has taken or will, in violation of applicable law, take, any action designed to or that might reasonably be expected to cause or result in, or which has constituted, stabilization or manipulation of the price of the Common Stock to facilitate the sale or resale of the securities issued or issuable in connection with the transactions contemplated hereunder.

**3.25.  Foreign Corrupt Practices; Sarbanes-Oxley.**

**(a)**     Neither the Company, nor to the knowledge of the Company, any agent or other person acting on behalf of the Company, has (i) directly or indirectly, used any funds of the Company for unlawful contributions, gifts, entertainment or other unlawful expenses related to foreign or domestic political activity, (ii) made any unlawful payment to foreign or domestic government officials or employees or to any foreign or domestic political parties or campaigns from corporate funds, (iii) failed to disclose fully any contribution made by the Company (or made by any person acting on its behalf of which the Company is aware) which is in violation of law, or (iv) violated in any material respect any provision of the Foreign Corrupt Practices Act of 1977, as amended.

**(b)**    The Company is in compliance in all material respects with all provisions of the Sarbanes-Oxley Act of 2002 that are applicable to it as of the Closing Date.

**3.26.  Full Disclosure.**  The SEC Reports, as of their respective filing dates, do not contain any untrue statement of a material fact, nor, to the Company's knowledge and belief, omit to state a material fact necessary in order to make the statements contained therein not misleading.

**3.27.  Use of Loan Proceeds.**   Concurrent with the Closing, Equitex will loan $5,000,000 to Chex, and will receive in return the Chex Note, and the pledge of all of the Chex Collateral, subject to no prior liens or encumbrances, as security for the Chex Note under the terms of the Chex Note Security Agreement,.

VER4

CX/EX01393

## SECTION 4.  REPRESENTATIONS AND WARRANTIES OF EACH PURCHASER

Each Purchaser, as to itself, hereby represents and warrants to the Company as of the Closing Date, and agrees, as follows:

**4.1.    Investment Representations.**  Each Purchaser understands that neither the offer nor the sale of its respective Note, Warrant or Conversion Shares has been registered under the Securities Act.  Each Purchaser also understands that its respective Note and Warrant are being offered and sold pursuant to an exemption from registration contained in the Securities Act based in part upon each Purchaser's representations contained in the Agreement.  Each Purchaser hereby represents and warrants as follows:

**(a)    Purchaser Bears Economic Risk.**  Each Purchaser has substantial experience in evaluating and investing in private placement transactions of securities in companies similar to the Company so that it is capable of evaluating the merits and risks of its investment in the Company and has the capacity to protect its own interests.  Each Purchaser acknowledges that it may have to bear the economic risk of this investment.  Except as contemplated by the Registration Rights Agreement, each Purchaser has no present intention of selling or otherwise transferring its respective Note, Warrant or Conversion Shares, or any interest therein.  Each Purchaser also understands that there is no assurance that any exemption from registration under the Securities Act will be available and that, even if available, that such exemption may not allow each Purchaser to transfer all or any portion of its respective Note, Warrant or Conversion Shares under the circumstances, in the amounts or at the times each Purchaser might propose.

**(b)    Acquisition for Own Account.**  Each Purchaser is acquiring its respective Note, Warrant and Conversion Shares for each Purchaser's own account for investment only, and not with a view towards their public distribution.

**(c)    Purchaser Can Protect Its Interest.**  Each Purchaser represents that by reason of its, or of its management's, business or financial experience, each Purchaser has the capacity to protect its own interests in connection with the transactions contemplated in this Agreement, its respective Note and Warrant and the Registration Rights Agreement.  Further, each Purchaser is aware of no publication of any advertisement in connection with the transactions contemplated in the Agreement.

**(d)    Accredited Investor.**  Each Purchaser represents that it is an accredited investor within the meaning of Regulation D of the Securities Act.

**(e)    Residence.**  Each Purchaser represents that it is organized under the laws of the jurisdiction indicated in the opening paragraph of this Agreement and that its principal office is located in the State of Minnesota.

**(f)    Rule 144.**  Each Purchaser acknowledges and agrees that its respective Note and Warrant, and, if issued, its Conversion Shares, must be held indefinitely unless the offer and sale

-12-

VER4

of each is subsequently registered under the Securities Act or an exemption from such registration is available. Each Purchaser has been advised or is aware of the provisions of Rule 144 promulgated under the Securities Act, which permits limited resale of securities purchased in a private placement subject to the satisfaction of certain conditions, including, among other things: the availability of certain current public information about the Company, the resale occurring not less than one year after a party has purchased and paid for the security to be sold, the sale being through an unsolicited "broker's transaction" or in transactions directly with a market maker (as such term is defined under the Securities Exchange Act of 1934, as amended) and the amount of securities being sold during any three-month period not exceeding specified limitations.

    **4.2.    Transfer Restrictions.**    Each Purchaser acknowledges and agrees that its respective Note and Warrant and, if issued, its Conversion Shares, are subject to restrictions on transfer and will bear restrictive legends.

    **4.3.    Acquisition of Shares.**    Until its Note is paid in full, no Purchaser may acquire "beneficial ownership" (as defined by Rule 13d-3 of the Securities Exchange Act of 1934, as amended) of Shares except for those which are or may be acquired as payment on its Note, upon conversion of its Note or upon exercise of its Warrant. The foregoing covenant shall lapse upon an event of default under any Note.

## SECTION 5. CONDITIONS FOR CLOSING

    **5.1.    Conditions for the Company to Satisfy.**    The obligation of the Purchasers to purchase the Notes and Warrants as contemplated by this Agreement are subject to satisfaction of the following contingencies at or prior to Closing:

    **(a)**    The Company and Chex shall have obtained all third party consents required in connection herewith, including consents to pledge the Collateral to each Purchaser as security for each Note and with respect to the Gaming Rules.

    **(b)**    The Company and Chex, where appropriate, shall have executed and delivered the Transaction Documents to the Purchasers at Closing.

    **(c)**    The Company shall have paid Gary S. Kohler and Scot W. Malloy, together, a $150,000 cash origination fee related to the transactions contemplated hereby.

    **(d)**    Felhaber, Larson, Fenlon & Vogt, P.A., special legal counsel to the Company, shall have delivered an opinion to the Purchasers with respect to the matters set forth in Exhibit F.

    **(e)**    The Company shall have a cash balance (on a consolidated basis) immediately following the transactions contemplated by this Agreement, as compared to the principal and interest due under the Notes, in a ratio equal to at least 1.4 to 1.

VER4

CX/EX01395

**5.2     Conditions for the Purchasers to Satisfy.** The obligation of the Company to sell the Notes and Warrants as contemplated in this Agreement is subject to the satisfaction of the following contingencies at or prior to closing:

**(a)**     Both Purchasers, where appropriate, shall have executed and delivered the Transaction Documents at Closing; and

**(b)**     Both Purchasers shall have delivered to the Company the full purchase price for the Notes and Warrants, as directed by the Company.

## SECTION 6. MISCELLANEOUS

**6.1.     Governing Law.** This Agreement shall be governed by the laws of the State of Minnesota as such laws are applied to agreements between Minnesota residents entered into and performed entirely in Minnesota.

**6.2.     Survival.** The representations, warranties, covenants and agreements made herein shall survive any investigation made by the Purchasers and the closing of the transactions contemplated hereby. All statements as to factual matters contained in any certificate or other instrument delivered by or on behalf of the Company pursuant hereto in connection with the transactions contemplated hereby shall be deemed to be representations and warranties by the Company hereunder solely as of the date of such certificate or instrument.

**6.3.     Successors and Assigns.** Except as otherwise expressly provided herein, the provisions hereof shall inure to the benefit of, and be binding upon, the successors, assigns, heirs, executors and administrators of the parties hereto and shall inure to the benefit of and be enforceable by each person who shall be a holder of a Note, Warrant or Conversion Shares from time to time.

**6.4.     Entire Agreement.** The Transaction Documents and the other documents delivered pursuant hereto, constitute the full and entire understanding and agreement between the parties with regard to the subjects hereof and no party shall be liable or bound to any other in any manner by any representations, warranties, covenants and agreements except as specifically set forth herein and therein.

**6.5.     Severability.** In case any provision of the Agreement shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

**6.6.     Amendment and Waiver.** This Agreement may be amended or modified, and any provision hereunder may be waived, only upon the written consent of the Company and the Purchasers.

VER4

CX/EX01396

      **6.7.   Notices.** All notices, requests, consents, and other communications hereunder shall be in writing and shall be deemed effectively given and received when delivered in person or by national overnight courier service or by certified or registered mail, return receipt requested, or by telecopier, addressed as follows:

      **(a)**    If to the Company, at:

          Equitex, Inc.
          7315 East Peakview Avenue
          Englewood, Colorado 80111
          Attention: Henry Fong, President, and Ijaz Anwar, Treasurer
          Facsimile: (561) 624-0886 (Henry) and (952) 417-1996 (Ijaz)
          E-mail: hfong@equitex.net and ianwar@chexss.com

          with a copy to:

          Felhaber, Larson, Fenlon & Vogt, P.A.
          220 South Sixth Street, Suite 2200
          Minneapolis, Minnesota 55402
          Attention: Roger H. Frommelt, Esq.
          Facsimile: (612) 338-4608
          E-mail: rfrommelt@felhaber.com

      **(b)**    If to the Purchasers, in care of:

          Whitebox Advisors, LLC
          3033 Excelsior Boulevard, Suite 300
          Minneapolis, Minnesota 55416
          Attention: Jonathan D. Wood, Chief Financial Officer
          Facsimile: (612) 253-6151
          E-mail: jwood@whitebox-advisors.com

          with a copy to:

          Messerli & Kramer P.A.
          150 South Fifth Street, Suite 1800
          Minneapolis, Minnesota 55402
          Attention: Jeffrey C. Robbins, Esq.
          Facsimile: (612) 672-3777
          E-mail: jrobbins@mandklaw.com

      **6.8.   Indemnification by the Company.** The Company agrees to indemnify and hold each Purchaser harmless against any loss, liability, damage or expense (including reasonable legal fees and costs) that either Purchaser may suffer, sustain or become subject to as a result of

VER4

or in connection with the breach by the Company of any representation, warranty, covenant or agreement of the Company contained in any of the Transaction Documents.

     **6.9.**    **Expenses.**  At Closing, the Company shall pay or reimburse the Purchasers $20,000 as an amount of reasonable legal fees and expenses incurred together by them in connection with the transactions contemplated hereby.

     **6.10.**   **Titles and Subtitles.**  The titles of the sections and subsections of the Agreement are for convenience of reference only and are not to be considered in construing this Agreement.

     **6.11.**   **Counterparts.**  This Agreement may be delivered via facsimile and may be executed in counterparts, each of which shall be an original, but all of which together shall constitute one instrument.

     **6.12**   **Collection Agent.**  The following shall relate to the enforcement of the Notes, the Guaranty, the Company Security Agreement, the Chex Guarantee Security Agreement and the Registration Rights Agreement, and shall survive until the termination of the last of the forenamed documents:

     **(a)**    The Purchasers hereby appoint Whitebox Advisors, LLC as the initial collection agent and attorney-in-fact for the Purchasers under this Agreement (in such capacity, the "Collection Agent") to serve from the date hereof until the payment in full of each Note (and with respect to the Registration Rights Agreement, until the termination or fulfillment of the Company's obligation thereunder), or until the Collection Agent's successor is duly appointed by agreement among the Purchasers and their successors in interest and the Purchasers and their successors in interest notify the Company in writing of the newly appointed successor Collection Agent. Each Purchaser hereby authorizes the Collection Agent to act as exclusive agent of and for both Purchasers for purposes of taking any action to (i) enforce or collect on either or both of the Notes, (ii) enforce the Guarantee, (iii) enforce rights and dispose of any Collateral under the Company Security Agreement and the Chex Guarantee Security Agreement, and (iv) enforce and exercise rights under the Registration Rights Agreement. Each Purchaser agrees that it shall not take any action against the Company or Chex to enforce or collect on the Notes or the Guarantee, or enforce or exercise rights under the Registration Rights Agreement or foreclose on the Collateral, except through and as directed by the Collection Agent.

     **(b)**    Each Purchaser hereby irrevocably authorizes the Collection Agent to take such action and to exercise such powers hereunder as provided herein or as requested in writing by either of the Purchasers. The Collection Agent may rely upon advice of counsel concerning legal matters, advice of certified public accountants with respect to accounting matters and advice of other experts as to any other mattes which it reasonably believes to be genuine or to have been presented by an appropriate person under the circumstances. The Collection Agent may execute any of its duties hereunder by or through agents or employees and shall be entitled to request and act in reliance upon the advice of counsel concerning all matters pertaining to its duties hereunder and shall not be liable for any action taken or omitted to be taken by it in good faith in

VER4

CX/EX01398

accordance therewith. The Collection Agent may take any and all actions that the Collection Agent deems necessary or appropriate, in its reasonable discretion, in exercising its powers hereunder, including, but not limited to, initiating any action in the name of the Purchasers against the Company or Chex whether on the Notes, the Guarantee, or under the Registration Rights Agreement, foreclosing on the Company Collateral and the Chex Collateral pursuant to the Company Security Agreement or the Chex Guarantee Security Agreement, respectively, or exercising any other rights available to the Collection Agent on behalf of the Purchasers at law or in equity.

(c)    The Company and Chex may rely on all orders and directions of the Collection Agent appointed under subsection (a) above as acting on behalf, and with the authority, of the Purchasers, or either of them, without liability to any Purchaser or their successors in interest. This Section 6.12 is entered into for the benefit of the Company and Chex (as a third-party beneficiary, and may not be amended or eliminated without the express written consent of both the Company and Chex.

IN WITNESS WHEREOF, the parties hereto have hereunto affixed their signatures.

**Equitex, Inc.**

By_____
     Henry Fong, President

**Pandora Select Partners, L.P.**

By_____

Its_____

**Whitebox Hedged High Yield Partners, L.P.**

By_____

Its_____

CX/EX01399

accordance therewith. The Collection Agent may take any and all actions that the Collection Agent deems necessary or appropriate, in its reasonable discretion, in exercising its powers hereunder, including, but not limited to, initiating any action in the name of the Purchasers against the Company or Chex whether on the Notes, the Guarantee, or under the Registration Rights Agreement, foreclosing on the Company Collateral and the Chex Collateral pursuant to the Company Security Agreement or the Chex Guarantee Security Agreement, respectively, or exercising any other rights available to the Collection Agent on behalf of the Purchasers at law or in equity.

(c)    The Company and Chex may rely on all orders and directions of the Collection Agent appointed under subsection (a) above as acting on behalf, and with the authority, of the Purchasers, or either of them, without liability to any Purchaser or their successors in interest. This Section 6.12 is entered into for the benefit of the Company and Chex (as a third-party beneficiary, and may not be amended or eliminated without the express written consent of both the Company and Chex.

IN WITNESS WHEREOF, the parties hereto have hereunto affixed their signatures.

**Equitex, Inc.**                          **Pandora Select Partners, L.P.**

By_____        By_____

Henry Fong, President             Its_____

                                  **Whitebox Hedged High Yield Partners, L.P.**

                                  By_____

                                  Its_____

CX/EX01400

VER6

**Exhibit A**
**Form of Note**

CX/EX01401

VER4

**Exhibit B**
**Form of Warrant**

CX/EX01402

VER4

**Exhibit C**
**Form of Registration Rights Agreement**

CX/EX01403

VER4

**Exhibit D**
**Form of Company Security Agreement**

CX/EX01404

VER4

**Exhibit E**
**Form of Chex Guarantee Security Agreement**

CX/EX01405

VER4

**Exhibit F**
**Form of Felhaber Legal Opinion**

CX/EX01406

VER4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| iGAMES ENTERTAINMENT, INC., | : | |
| | : | |
| Plaintiff, | : | C.A. No. 04-180 (KAJ) |
| | : | |
| v. | : | |
| | : | |
| CHEX SERVICES, INC. and | : | |
| EQUITEX, INC., | : | |
| | : | JURY TRIAL DEMANDED |
| | : | |
| Defendants. | : | |

# Appendix of Exhibits To iGames's Opposition To The Motion By Chex's And Equitex For Summary Judgment

# Exhibit V

23

WLM\207128.1

## EQUITEX SECURITY AGREEMENT

**THIS SECURITY AGREEMENT** (this "**Agreement**") is made as of March 8, 2004, by and between Equitex, Inc., a Delaware corporation ("**Equitex**"), and Pandora Select Partners, L.P., a British Virgin Islands limited partnership ("**Pandora**"), and Whitebox Hedged High Yield Partners, L.P., a British Virgin Islands limited partnership ("**WHHY**"), as secured parties (Pandora and WHHY individually are each a "**Secured Party**" and together are the "**Secured Parties**").

## RECITALS

A.    Equitex has entered into a Purchase Agreement of this date, pursuant to which Pandora is purchasing a $3,000,000, and WHHY is purchasing a $2,000,000, face amount promissory note from Equitex (the "**Notes**") in consideration for a $5,000,000 loan by Secured Parties to Equitex (the "**Loan**"), which Equitex will concurrently loan on a secured basis to Chex Services, Inc., a Minnesota corporation and wholly-owned subsidiary of Equitex ("**Chex**") for use in Chex's business (the "**Chex Loan**");

B.    The Notes are convertible into shares of Equitex Common Stock (the "**Common Stock**") and Equitex may repay a portion of the Notes by issuance of additional shares of its Common Stock; and

C.    As a condition of making the Loan, the Secured Parties have required Equitex to (i) issue each of the Secured Parties a warrant of this date to purchase additional shares of Equitex Common Stock (the "**Warrants**"), (ii) agree to register the shares of Common Stock issuable upon exercise of the Warrants and upon conversion of the Notes or in payment thereof pursuant to a Registration Rights Agreement of this date (the "**Registration Rights Agreement**"), (iii) pledge certain of Equitex's assets, as more fully described on Exhibit A hereto (together with the rights described herein, (the "**Collateral**"), which Collateral consists of all of the outstanding capital stock of Chex, the Chex Loan and Equitex's interest in the Chex Note Security Agreement dated as of this date, as security for the due and prompt payment of all amounts under the Notes and the due and prompt performance of all obligations under the Warrants; and (iv) cause Chex to guarantee the obligations of Equitex under the Notes (the "**Guarantee**"), and to grant to Secured Parties a security interest in all of Chex's assets to secure the performance of Chex's obligations under the Guarantee.

**NOW, THEREFORE**, in consideration of the agreements herein and in reliance upon the representations and warranties set forth herein and therein, the parties agree as follows:

## ARTICLE 1.
## DEFINED TERMS

**1.1    DEFINITIONS.** Unless otherwise defined herein or unless the context otherwise requires, terms used in this Agreement, including its preamble and recitals, have the meanings

VER5

provided in the Uniform Commercial Code in effect in the State of Minnesota (the "UCC"). In addition, the following terms when used in this Agreement, including its preamble and recitals, shall have the following meanings:

"**Loan Documents**" means the Notes, the Warrants, the Registration Rights Agreement and this Agreement.

"**Obligations**" means the payment and other performance obligations under the Notes.

## ARTICLE 2.
## SECURITY INTEREST

**2.1    GRANT OF SECURITY INTEREST.**  To secure the timely payment and performance in full of the Obligations, Equitex does hereby assign, grant and pledge to Secured Parties, all of its estate, right, title and interest in and to the Collateral. As to Equitex's equity interest (the "**Pledged Equity Interest**") in Chex, the Collateral includes Equitex's share of:

(a)    all rights to receive income, gain, profit, dividends and other distributions allocated or distributed to Equitex in respect of or in exchange for all or any portion of such Pledged Equity Interest;

(b)    all of Equitex's capital or ownership interest, including capital accounts, in Chex, and all accounts, deposits or credits of any kind with Chex;

(c)    all of Equitex's voting rights in or rights to control or direct the affairs of Chex;

(d)    all of Equitex's rights, title and interest, as a member or shareholder of Chex, in, to or under any and all of Chex's assets or properties;

(e)    all other rights, title and interest in or to Chex derived from the Pledged Equity Interest;

(f)    all indebtedness or other obligations of Chex owed to Equitex;

(g)    all claims of Equitex for damages arising out of, or for any breach or default relating to, the Pledged Equity Interest;

(h)    all rights of Equitex to terminate, amend, supplement, modify, or cancel, the governing documents of Chex, to take all actions thereunder and to compel performance and otherwise exercise all remedies thereunder; and

(i)    all securities, notes, certificates and other instruments representing or evidencing any of the foregoing rights and interests or the ownership thereof and any interest of Equitex reflected in the books of any financial intermediary pertaining to such rights and

CX/EX01477

interests and all non-cash dividends, cash, options, warrants, stock splits, reclassifications, rights, instruments or other investment property and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such rights and interests.

**2.2    DELIVERY OF CERTIFICATES.**  All certificates, notes and other instruments representing or evidencing Pledged Equity Interest shall be delivered to and held by or on behalf of Secured Parties, or its designee pursuant hereto, in the manner set forth in <u>Section 4.6</u> (Delivery of Collateral; Proxy).

**2.3    FINANCING STATEMENTS.**

(a)    Equitex hereby authorizes Secured Parties to file all financing statements, continuation statements, assignments, certificates, and other documents and instruments with respect to the Collateral pursuant to the UCC and otherwise as may be necessary or reasonably requested by Secured Parties to perfect or from time to time to publish notice of, or continue or renew the security interests granted hereby (including, such financing statements, continuation statements, certificates, and other documents as may be necessary or reasonably requested to perfect a security interest in any replacements or proceeds of the Collateral), in each case in form and substance satisfactory to Secured Parties.

(b)    Secured Parties will pay the cost of filing the same in all public offices where filing is necessary or reasonably requested by Secured Parties and will pay any and all recording, transfer or filing taxes that may due in connection with any such filing.  Equitex grants Secured Parties the right, at any time and at Secured Parties' option to file any or all such financing statements, continuation statements, and other documents pursuant to the UCC and otherwise as Secured Parties reasonably may deem necessary or desirable.

(c)    Equitex hereby authorizes the filing of any financing statements or continuation statements, and amendments to financing statements, or any similar document in any jurisdictions and with any filing offices as Secured Parties may reasonably determine are necessary or advisable to perfect the security interests granted to Secured Parties.  Such financing statements may describe the Collateral in the same manner as described herein or may contain an indication or description of collateral that describes such property in any other manner as Secured Parties may reasonably determine is necessary, advisable or prudent to ensure the perfection of the security interest in the Collateral granted to Secured Parties herein.

**2.4    DEBTOR REMAINS LIABLE.**

(a)    Anything herein contained to the contrary notwithstanding, Equitex shall remain liable under its certificate of incorporation, bylaws or other constituent documents (together, the "Constituent Documents"), to perform all of the obligations undertaken by it thereunder, all in accordance with and pursuant to the terms and provisions thereof, and Secured Parties shall have no obligations or liabilities under the Constituent Documents by reason of or arising out of this Agreement, nor shall Secured Parties be required or obligated in any manner to

-3-

VER5

perform or fulfill any obligations of Equitex thereunder or to make any payment, or to make any inquiry as to the nature or sufficiency of any payment received by it, or present or file any claim, or take any action to collect or enforce the payment of any amounts which may have been assigned to it or to which it may be entitled at any time or times.

(b)    If any default by Equitex under any of the Constituent Documents shall occur, Secured Parties shall, at their option, be permitted (but shall not be obligated) to remedy any such default by giving written notice of such intent to Equitex and to the parties to such agreement.    Any cure by Secured Parties of Equitex's default under a Constituent Document shall not be construed as an assumption by Secured Parties of any obligations, covenants or agreements of Equitex under the Constituent Documents, and Secured Parties shall not incur any liability to Equitex or any other Person as a result of any actions undertaken by Secured Parties in curing or attempting to cure any such default.    This Agreement shall not be deemed to release or to affect in any way the obligations of Equitex under any of the Constituent Documents.

**2.5    RETENTION OF CERTAIN RIGHTS.**    So long as Secured Parties have not exercised remedies with respect to the Collateral under and in accordance with this Agreement, upon the occurrence and during the continuance of an Event of Default, Equitex reserves the right, subject to its obligations under Section 2.6, to exercise all voting rights with respect to the Pledged Equity Interest; *provided,* that no vote shall be cast, right exercised or other action taken which could materially impair the Collateral.

**2.6    MERGER OR COMBINATION.**    Equitex will promptly notify (the "**Reorganization Notice**") Secured Parties of the material terms and conditions of any proposed transaction which, if consummated, would result in the merger or consolidation of Chex with, or the acquisition of the business of Chex by, another entity (which transaction is referred to hereunder as a "**Reorganization**").    Notwithstanding anything to the contrary contained herein, Equitex, with the consent of Secured Parties, which consent will not be unreasonably withheld, may cause or allow Chex to engage in a Reorganization, where Equitex retains ("**Retained Interest**") at least 87.5% of the outstanding capital stock and voting power of the entity surviving such Reorganization. Secured Parties shall be deemed to provide such consent if they have not notified Equitex of their denial of that consent, and the reasons for such denial, within 20 days of the Reorganization Notice.    Any consent provided by Secured Parties, whether by action or inaction, shall be conditioned upon the substitution of the Retained Interest for the Chex shares of common stock as a Pledged Equity Interest under this Agreement, in a manner reasonably satisfactory to Secured Parties.    Upon granting such consent, Secured Parties will deliver or cause to be delivered all documentation relating to Pledged Equity Interests reasonably required by Equitex or Chex to consummate the proposed Reorganization.    Secured Parties' consent will not be deemed to have been given with respect to any Reorganization, the terms and conditions of which vary in any material way from that set forth in the Reorganization Notice. Among other reasons, it shall be deemed reasonable for Secured Parties to deny their consent if satisfactory arrangements (in Secured Parties' sole discretion) are not made to:

-4-

VER5

(i)    prevent a diminution of the value (as determined by Secured Parties in their sole discretion) of their interests in the Warrants or their conversion rights under the Notes (which may, with Secured Parties' consent, be satisfied by the agreed upon grant of (x) additional rights to convert all or a portion of the Secured Parties' Notes into, or to exercise all or a portion of their Warrants for, shares of the Chex-reorganized entity, and (y) further rights to acquire equity securities of the Chex-reorganized entity), and

(ii)    compensate Secured Parties in a manner acceptable to them (which may, with Secured Parties' consent, include the methods described above) for the loss of value of the Collateral by virtue of the Reorganization.

## ARTICLE 3.
## REPRESENTATIONS AND WARRANTIES OF DEBTOR

Equitex makes the following representations and warranties to and in favor of Secured Parties as of the date hereof.  All of these representations and warranties shall survive the execution and delivery of this Agreement:

**3.1    ORGANIZATION.** Equitex and Chex:

(a)    are corporations duly incorporated and validly existing and in good standing under the laws of the State of Delaware and Minnesota, respectively;

(b)    are each duly qualified, authorized to do business as a foreign corporation in each jurisdiction where the character of its properties or the nature of its activities makes such qualification necessary; and

(c)    each has the corporate power (A) to enter into the Loan Documents and to perform its obligations thereunder and to consummate the transactions contemplated thereby, and (B) to carry on its business as now being conducted and as proposed to be conducted by it.

(d)    Equitex has the corporate power (A) to execute, deliver and perform this Agreement, (B) to take all action as may be necessary to consummate the transactions contemplated hereunder and (C) to grant the liens and security interests provided for in this Agreement.

**3.2    OFFICES, LOCATION OF COLLATERAL.**  The chief executive office or chief place of business of both Equitex and Chex is located at 7315 Peakview Avenue, Englewood, Colorado 80111.

**3.3    TITLE AND LIENS.**  The Pledged Equity Interest owned by Equitex (a) has been duly authorized and validly issued and (b) is fully paid and non-assessable.  Equitex has good, valid, and marketable title to its Collateral, free from all liens and encumbrances of any kind.  As a result of this Agreement, Secured Parties will have a first priority security interest in the Collateral.

-5-                                    VERS

**3.4    UCC ARTICLE 8.**  The shares of Chex that constitute the Pledged Equity Interest are securities governed by Article 8 of the UCC.

**3.5    AUTHORIZATION; NO CONFLICT.**  Equitex has duly authorized, executed and delivered this Agreement, and Equitex's execution and delivery hereof and its consummation of the transactions contemplated hereby and the compliance with the terms thereof:

(a)    does not or will not contravene the Constituent Documents of Chex or any other legal requirements applicable to or binding on Equitex which could reasonably be expected to have a material adverse effect upon the Collateral or Secured Parties' rights therein;

(b)    does not or will not contravene or result in any breach of or constitute any default, or result in or require the creation of any lien upon any of Equitex's property, under any agreement or instrument to which Equitex is a party or by which it or any of its properties may be bound or affected; and

(c)    does not or will not require the consent or approval of any third party which has not already been obtained.

**3.6    ENFORCEABILITY.**  This Agreement is a legal, valid and binding obligation of Equitex, enforceable against Equitex in accordance with its terms, except to the extent that enforceability may be limited by applicable bankruptcy, insolvency, moratorium, reorganization or other similar laws affecting the enforcement of creditors' rights or by the effect of general equitable principles.

## ARTICLE 4.
## COVENANTS OF DEBTOR

Equitex covenants to and in favor of Secured Parties as follows:

**4.1    COMPLIANCE WITH OBLIGATIONS.**  Equitex shall perform and comply in all material respects with all obligations and conditions on its part to be performed with respect to the Collateral.

**4.2    INFORMATION CONCERNING COLLATERAL.**  Equitex shall, promptly upon request, provide to Secured Parties all information and evidence they may reasonably request concerning the Collateral to enable Secured Parties to enforce the provisions of this Agreement.

**4.3    DEFENSE OF COLLATERAL.**  Equitex shall defend its title to the Collateral and the interests of Secured Parties in the Collateral pledged hereunder against the claims and demands of all third parties whomsoever.

VERS

CX/EX01481

**4.4    MAINTENANCE OF COLLATERAL.** Equitex shall not (i) take any action to terminate, modify or amend any Constituent Document of Chex which impairs the Secured Parties' interest in the Collateral, except with the consent of Secured Parties, (ii) fail to deliver to Secured Parties a copy of each demand or notice received or given by it relating to any Constituent Document of Chex or to any other Collateral which could reasonably be expected to have a material adverse effect upon the Collateral or Secured Parties' rights therein, or (iii) sell, contract to sell, assign, transfer or dispose of any of the Collateral, except with the consent of Secured Parties.

**4.5    EVENTS OF DEFAULT.** Equitex shall give to Secured Parties prompt notice of any material default under any Constituent Document of Chex or otherwise with respect to the Collateral of which Equitex has knowledge or has received notice.

**4.6    DELIVERY OF PLEDGED EQUITY INTEREST; PROXY.** All certificates or instruments representing or evidencing the Pledged Equity Interest shall be delivered to and held by or on behalf of Secured Parties pursuant hereto. All such certificates or instruments shall be in suitable form for transfer by delivery, or shall be accompanied by duly executed instruments of transfer or assignment in blank, all in form and substance acceptable to Secured Parties. Secured Parties shall have the right, at any time in their discretion and without prior notice to Equitex, following the occurrence and during the continuation of an Event of Default, to transfer to or to register in the name of Secured Parties or any of its nominees any or all of the Pledged Equity Interest and to exchange certificates or instruments representing or evidencing Pledged Equity Interest for certificates or instruments of smaller or larger denominations; *provided, however,* that once such Event of Default has been cured, Secured Parties will promptly transfer to or register in the name or cause its nominees to transfer to or register in the name of Equitex all such Pledged Equity Interest. In furtherance of the foregoing, Equitex shall further execute and deliver to Secured Parties as to Chex a proxy in the form attached hereto as Exhibit B.

**4.7    PRESERVATION OF VALUE; LIMITATION OF LIENS.** Equitex shall not take any action in connection with the Collateral which would impair in any material respect the interests or rights of Secured Parties therein or with respect thereto, except as expressly permitted hereby. Equitex shall not directly or indirectly create, incur, assume or suffer to exist any liens on or with respect to all or any part of the Collateral (other than the lien created by this Agreement). Equitex shall at its own cost and expense promptly take such action as may be necessary to discharge any such liens.

**4.8    NO OTHER FILINGS.** Equitex shall not file or authorize to be filed in any jurisdiction any financing statements under the UCC or any like statement relating to the Collateral.

**4.9    MAINTENANCE OF RECORDS.** Equitex shall, at all times, keep accurate and complete records of the Collateral. Equitex shall permit representatives of Secured Parties, upon reasonable prior notice, at any time during normal business hours of Equitex to inspect and make abstracts from Equitex's books and records pertaining to the Collateral. Upon the occurrence

CX/EX01482

and during the continuation of any Event of Default, at Secured Parties' request, Equitex shall promptly deliver copies of any and all such records to Secured Parties.

**4.10    PAYMENT OF TAXES.**  Equitex shall pay or cause to be paid, before any fine, penalty, interest or cost attaches thereto, all taxes, assessments and other governmental or non-governmental charges or levies (other than those taxes that it is contesting in good faith and by appropriate proceedings, and in respect of which it has established adequate reserves for such taxes) now or hereafter assessed or levied against the Collateral pledged by it hereunder and shall retain copies of, and, upon request, permit Secured Parties to examine receipts showing payment of any of the foregoing.

**4.11    NAME; JURISDICTION OF ORGANIZATION.**  Equitex shall give Secured Parties at least 30 days prior written notice before Equitex change its name, jurisdiction of organization or entity type and shall at the expense of Equitex execute and deliver such instruments and documents as may be required by Secured Parties or applicable legal requirements to maintain a first perfected security interest in the Collateral.

**4.12    PROCEEDS OF COLLATERAL.**  Equitex shall, at all times, keep pledged to Secured Parties pursuant hereto all Collateral, and all dividends, distributions, interest, principal and other proceeds received by Equitex with respect thereto, and all other Collateral and other securities, instruments, proceeds and rights from time to time received by or distributable to Equitex in respect of the Collateral, and shall not permit Chex to issue any shares of stock or other equity interests which shall not have been immediately duly pledged to Secured Parties hereunder.

**ARTICLE 5.**
**RIGHTS AND REMEDIES**

**5.1    EVENT OF DEFAULT DEFINED.**  Any event of default under either of the Notes shall constitute an "Event of Default" hereunder.

**5.2    REMEDIES UPON EVENT OF DEFAULT.**

(a)    During any period during which an Event of Default shall have occurred and be continuing, Secured Parties may (but shall be under no obligation to), directly or by using agent or broker:

(i)    in connection with any acceleration and foreclosure, vote or exercise any and all of Equitex's rights or powers incident to its ownership of Chex, including any rights or powers to manage or control Chex;

(ii)    proceed to protect and enforce the rights vested in it by this Agreement and under the UCC;

VER5

CX/EX01483

(iii)    cause all moneys and other property pledged as security to be paid and/or delivered directly to it, and demand, sue for, collect and receive any such moneys and property;

(iv)    cause any action at law or suit in equity or other proceeding to be instituted and prosecuted to collect or enforce any Obligations of Equitex or rights included in the Collateral, or for specific enforcement of any covenant or agreement contained herein, or in aid of the exercise of any power therein or herein granted, or for any foreclosure hereunder and sale under a judgment or decree in any judicial proceeding, or to enforce any other legal or equitable right vested in it by this Agreement or by law;

(v)    foreclose or enforce any other agreement or other instrument by or under or pursuant to which the Obligations of Debtor are issued or secured;

(vi)    subject to Section 5.2(b), sell, lease or otherwise dispose of any or all of the Collateral, in one or more transactions, at such prices as Secured Parties may deem best, and for cash or on credit or for future delivery, without assumption of any credit risk, at any broker's board or at public or private sale, without demand of performance or notice of intention to sell, lease or otherwise dispose of, or of time or place of disposition (except such notice as is required by applicable statute and cannot be waived), it being agreed that Secured Parties may be purchasers on their own behalf at any such sale and that Secured Parties or anyone else who may be the purchaser or recipient for value of any or all of the Collateral so disposed of shall, upon such disposition, acquire all of the Equitex's rights therein. Secured Parties may adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for the same, and such sale may, without further notice or publication, be made at any time or place to which the same may be so adjourned. If Secured Parties, after reasonable inquiry as to the credit worthiness of the purchaser, sell any of the Collateral upon credit, Equitex will be credited only with payments actually made by the purchaser, received by Secured Parties and applied to the indebtedness of the purchaser. In the event the purchaser fails to pay for the Collateral, Secured Parties may resell the Collateral and Equitex shall be credited with the proceeds of the sale;

(vii)    incur expenses, including reasonable attorneys' fees, consultants' fees, and other costs appropriate to the exercise of any right or power under this Agreement;

(viii)    perform any obligation of Equitex hereunder and make payments, purchase, contest or compromise any encumbrance, charge, or lien, and pay taxes and expenses;

(ix)    make any reasonable compromise or settlement deemed desirable with respect to any or all of the Collateral and extend the time of payment, arrange for payment installments, or otherwise modify the terms of, any or all of the Collateral;

(x)    secure the appointment of a receiver of any or all of the Collateral;

VER5

CX/EX01484

(xi)    exercise any other or additional rights or remedies granted to Secured Parties under any other provision of this Agreement or exercisable by a secured party under the UCC, whether or not the UCC applies to the affected Collateral, or under any other applicable law, and take any other action which Secured Parties deems necessary or desirable to protect or realize upon their security interests in the Collateral or any part thereof; and/or

(xii)    appoint a third party (who may be an employee, officer or other representative of Secured Parties) to do any of the foregoing, or take any other action permitted hereunder, on behalf of Secured Parties.

(b)    If, pursuant to any law, prior notice of any action described in Section 5.2(a) is required to be given to Equitex, Equitex hereby acknowledges that the minimum time required by such law, or if no minimum is specified, 10 days shall be deemed a reasonable notice period.

(c)    Any action or proceeding to enforce this Agreement may be taken by Secured Parties either in Equitex's name or in Secured Parties' names, as Secured Parties may deem necessary.

(d)    Secured Parties shall incur no liability as a result of the sale of any or all of the Collateral at any private sale pursuant to Section 5.2(a) conducted in a commercially reasonable manner. Equitex hereby waives any claims against Secured Parties arising by reason of the fact that the price at which any or all of the Collateral may have been sold at such a private sale was less than the price that might have obtained at a public sale or was less than the aggregate amount of the Obligations, even if Secured Parties accept the first offer received and do not offer the Collateral to more than one offeree.

5.3    **ATTORNEYS-IN-FACT.**  Upon the occurrence and during the continuation of an Event of Default, Equitex hereby irrevocably constitutes and appoints Secured Parties as its true and lawful attorneys-in-fact to enforce all rights of Equitex with respect to the Collateral, including the right to give appropriate receipts, releases and satisfactions for and on behalf of and in the name of Equitex or, at the option of Secured Parties, in the name of Secured Parties, with the same force and effect as Equitex could do if this Agreement had not been made. This power of attorney is a power coupled with an interest and shall be irrevocable.

5.4    **EXPENSES; INTEREST.**   All costs and expenses (including reasonable attorneys' fees and expenses) incurred by Secured Parties in connection with exercising any actions taken under Article 5, together with interest thereon (to the extent permitted by law) computed at a rate of 10% per annum (or if less, the maximum rate permitted by law) from the date on which such costs or expenses are invoiced to, and become payable by, Equitex, to the date of payment thereof, shall constitute part of the Obligations secured by this Agreement, and shall be paid by Equitex to Secured Parties within 10 days after written demand.

5.5    **NO IMPAIRMENT OF REMEDIES.**  If under applicable law, Secured Parties proceed by either judicial foreclosure or by non-judicial sale or enforcement, Secured Parties

VERS

CX/EX01485

may, at their sole option, determine which of their remedies or rights to pursue without affecting any of its rights and remedies under this Agreement. If, by exercising any right and remedy, Secured Parties forfeit any of their other rights or remedies, including any right to enter a deficiency judgment against Equitex or any third party (whether because of any applicable law pertaining to "election of remedies" or the like), Equitex nevertheless hereby consents to such action by Secured Parties. To the extent permitted by applicable law, Secured Parties also waive any claim based upon such action, even if such action by Secured Parties results in a full or partial loss of any rights of subrogation, indemnification or reimbursement which Equitex might otherwise have had but for such action by Secured Parties or the terms herein. Any election of remedies which results in the denial or impairment of the right of Secured Parties to seek a deficiency judgment against any third party shall not, to the extent permitted by applicable law, impair Equitex's obligations hereunder. If Secured Parties bid at any foreclosure or trustee's sale or at any private sale permitted by law or this Agreement, Secured Parties may bid all or less than the amount of the Obligations. To the extent permitted by applicable law, the amount of the successful bid at any such sale, whether Secured Parties or any other party is the successful bidder, shall be conclusively deemed to be the fair market value of the Collateral and the difference between such bid amount and the remaining balance of the Obligations shall be conclusively deemed to be the amount of the Obligations.

## ARTICLE 6.
## CERTAIN WAIVERS

**6.1    MODIFICATION OF OBLIGATIONS.** Equitex's liability hereunder shall not be reduced, limited, impaired, discharged or terminated if Secured Parties at any time with Equitex's consent (or, to the extent permissible by the terms of the Loan Documents and law, without notice to or demand of Equitex):

(a)    renew, extend, accelerate, increase the rate of interest on, or otherwise change the time, place, manner or terms, or otherwise modifies any of the Obligations (including any payment terms);

(b)    extend or waive the time for Equitex's performance of, or compliance with, any term, covenant or agreement on its part to be performed or observed under the Loan Documents, or waive such performance or compliance or consent to a failure of, or departure from, such performance or compliance;

(c)    settle, compromise, release or discharge, or accept or refuse any offer of performance with respect to, or substitutions for, any of the Obligations or any agreement relating thereto and/or subordinate the payment of the same to the payment of any other obligations;

(d)    request and accept other guaranties of any of the Obligations and take and hold security for the payment hereof or any of the Obligations;

-11-

VER5

(e)    release, surrender, exchange, substitute, compromise, settle, rescind, waive, alter, subordinate or modify, with or without consideration, any security for payment of any of the Obligations, any other guaranties of any of the Obligations, or any other obligation of any third party with respect to any of the Obligations;

(f)    to the extent permitted by law, enforce and apply any security, if any, now or hereafter held by or for the benefit of Secured Parties in respect hereof or any of the Obligations and direct the order or manner of sale thereof, or exercise any other right or remedy that Secured Parties may have against any such security, in each case as Secured Parties in their discretion may determine, including foreclosure on any collateral pursuant to one or more judicial or nonjudicial sales, whether or not every aspect of any such sale is commercially reasonable; or

(g)    exercise any other rights available to them under any of the Loan Documents, at law or in equity.

6.2    **SECURITY INTERESTS ABSOLUTE.**  All rights of Secured Parties and the security interests hereunder, and all obligations of Equitex hereunder, shall be absolute and unconditional irrespective of:

(a)    any failure or omission to assert or enforce, or agreement or election not to assert or enforce, or the stay or enjoining, by order of court, by operation of law or otherwise, of the exercise or enforcement of, any claim or demand or any right, power or remedy (whether arising under any Loan Document, at law, in equity or otherwise) with respect to any of the Obligations or any agreement relating thereto, or with respect to any other guaranty of or security for the payment of any of the Obligations;

(b)    any rescission, waiver, amendment or modification of, or any consent to departure from, any of the terms or provisions (including provisions relating to events of default) hereof, in any other Loan Document or any agreement or instrument executed pursuant thereto, or of any other guaranty or security for any of the Obligations, in each case, whether or not in accordance with the terms hereof or any other Loan Document or any agreement relating to such other guaranty or security;

(c)    the application of payments received from any source (other than payments received from the proceeds of any security for any of the Obligations, except to the extent such security also serves as collateral for indebtedness other than the Obligations) to the payment of indebtedness of Equitex to Secured Parties other than the Obligations, even though Secured Parties might have elected to apply such payment to any part or all of the Obligations;

(d)    Secured Parties' consent to the change, reorganization or termination of the corporate structure or existence of Equitex or Chex and to any corresponding restructuring of any of the Obligations;

-12-

VERS

(e)   any other act or thing or omission, or delay to do any other act or thing, which may or might in any manner or to any extent vary the risk of Equitex as an obligor in respect of any of the Obligations;

(f)   any of the Obligations, or any agreement relating thereto, at any time being found to be illegal, invalid or unenforceable in any respect; and

(g)   any defenses, set-offs or counterclaims which Equitex may allege or assert against Secured Parties in respect of any of the Obligations.

6.3    **CERTAIN WAIVERS.**  Except as provided in Section 7.16, Equitex hereby waives any and all defenses afforded to a surety, including promptness, diligence, notice of acceptance and any other notice with respect to any of the Obligations and this Agreement and any requirement that Secured Parties protect, secure, perfect or insure any security interest or lien, or any property subject thereto, or exhaust any right or take any action against Equitex or any other third party or entity or any collateral securing any of the Obligations, as the case may be.

6.4    **POSTPONEMENT OF SUBROGATION.**  Equitex agrees that it will not exercise any rights which it may acquire by way of rights of subrogation under this Agreement, by any payment made hereunder or otherwise, while this Agreement is in effect, unless such action is required to stay or prevent the running of any applicable statute of limitations.  Any amount paid to Equitex on account of any such subrogation rights prior to such time shall be held in trust for Secured Parties and shall immediately be paid to Secured Parties and credited and applied against the Obligations.  Any time after this Agreement has terminated and if Equitex has made payment to Secured Parties of all of the Obligations, or if an action is required to stay or prevent the running of any applicable statute of limitations, then, at Equitex's request, Secured Parties will execute and deliver to Equitex appropriate documents (without recourse and without representation or warranty) necessary to evidence the transfer by subrogation to Equitex of an interest in the Obligations resulting from such payment by Equitex.

## ARTICLE 7.
## MISCELLANEOUS

7.1    **NOTICES.**  Any communications, including notices and instructions, between the parties hereto or notices provided herein to be given may be given to the following addresses:

If to Secured Parties, in care of:

Whitebox Advisors, LLC
3033 Excelsior Boulevard, Suite 300
Minneapolis, Minnesota 55416
Attention: Jonathan D. Wood, Chief Financial Officer
Facsimile: (612) 253-6151
E-mail: jwood@whitebox-advisors.com

-13-

VER5

With a copy to:

      Messerli & Kramer P.A.
      150 South Fifth Street, Suite 1800
      Minneapolis, Minnesota 55402
      Attention:  Jeffrey C. Robbins, Esq.
      Facsimile:  (612) 672-3777
      E-mail:  jrobbins@mandklaw.com

If to Equitex, in care of:

      Equitex, Inc.
      7315 East Peakview Avenue
      Englewood, Colorado  80111
      Attention:  Henry Fong, President, and Ijaz Anwar, Treasurer
      Facsimile:  (561) 624-0886 (Henry) and (952) 417-1996 (Ijaz)
      E-mail:  hfong@equitex.net and ianwar@chexss.com

With a copy to:

      Felhaber, Larson, Fenlon & Vogt, P.A.
      220 South Sixth Street, Suite 2200
      Minneapolis, Minnesota 55402
      Attention:  Roger H. Frommelt, Esq.
      Facsimile:  (612) 338-4608
      E-mail:  rfrommelt@felhaber.com

      All notices or other communications required or permitted to be given hereunder shall be in writing and shall be considered as properly given (a) on the date received in person, (b) on the date received by overnight delivery service (including Federal Express, UPS, ETA, Emery, DHL, AirBorne and other similar overnight delivery services), (c) on the fourth business day following the date mailed by first class United States mail, postage prepaid, registered or certified with return receipt requested, (d) on the next business day after being transmitted by telecopy or by other electronic means (including electronic mail).  Any party shall have the right to change its address for notice hereunder to any other location within the continental United States by giving of notice to the other parties in the manner set forth hereinabove.

      **7.2**    **DELAY AND WAIVER; REMEDIES CUMULATIVE.**  No failure or delay by Secured Parties in exercising any right or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  Any waiver, permit, consent or approval of any kind or character on the part of Secured Parties of any breach or default under the

VER5

Agreement or any waiver on the part of Secured Parties of any provision or condition of this Agreement must be in writing and shall be effective only to the extent in such writing specifically set forth. No right, power or remedy herein conferred upon or reserved to Secured Parties hereunder is intended to be exclusive of any other right, power or remedy, and every such right, power and remedy shall, to the extent permitted by law, be cumulative and in addition to every other right, power and remedy given hereunder or now or hereafter existing at law or in equity or otherwise. The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy. Resort to any or all security now or hereafter held by Secured Parties, may be taken concurrently or successively and in one or several consolidated or independent judicial actions or lawfully taken nonjudicial proceedings, or both.

7.3    **ENTIRE AGREEMENT.** This Agreement and any agreement, document or instrument referred to herein integrate all the terms and conditions mentioned herein or incidental hereto and supersede all oral negotiations and prior writings in respect of the subject matter hereof.

7.4    **GOVERNING LAW.** This Agreement shall be governed by and construed in accordance with the laws of the State of Minnesota, exclusive of its conflict of laws rules.

7.5    **SEVERABILITY.** In case any one or more of the provisions contained in this Agreement should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

7.6    **HEADINGS.** Paragraph headings have been inserted in this Agreement as a matter of convenience for reference only and it is agreed that such paragraph headings are not a part of this Agreement and shall not be used in the interpretation of any provision of this Agreement.

7.7    **WAIVER OF JURY TRIAL.** EQUITEX HEREBY KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT OR ANY COURSE OR CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN), OR ACTIONS OF SECURED PARTIES. THIS PROVISION IS A MATERIAL INDUCEMENT FOR SECURED PARTIES TO MAKE THE LOAN.

7.8    **CONSENT TO JURISDICTION.** Each party hereto agrees that any legal action or proceeding with respect to or arising out of this Agreement may be brought in or removed to the federal or state courts located in Hennepin County, Minnesota, as Secured Parties may elect. By execution and delivery of this Agreement, each party hereto accepts, for themselves and in respect of their property, generally and unconditionally, the jurisdiction of the aforesaid courts. Each of the parties hereto irrevocably consents to the service of process out of any of the aforementioned courts in any manner permitted by law. Nothing herein shall affect the right of Secured Parties to bring legal action or proceedings in any other competent jurisdiction. Each

VERS

party hereto hereby waives any right to stay or dismiss any action or proceeding under or in connection with this Agreement brought before the foregoing courts on the basis of *forum non-conveniens*.

**7.9    SUCCESSORS AND ASSIGNS.**  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

**7.10    COUNTERPARTS.**  This Agreement may be executed in one or more duplicate counterparts and when signed by all of the parties listed below, shall constitute a single binding agreement.  Delivery of an executed signature page of this Agreement by facsimile transmission shall be as effective as delivery of a manually executed counterpart thereof.

**7.11    BENEFIT OF AGREEMENT.**  Nothing in this Agreement, express or implied, shall give or be construed to give, any person other than the parties hereto and their respective permitted successors, transferees and assigns any legal or equitable right, remedy or claim under this Agreement, or under any covenants and provisions of this Agreement, each such covenant and provision being for the sole benefit of the parties hereto and their respective permitted successors, transferees and assigns.

**7.12    AMENDMENTS AND WAIVERS.**  No amendment, modification, termination or waiver of any provision of this Agreement or consent to any departure therefrom shall be effective unless the same shall be in writing and signed by each of the parties hereto.  Each amendment, modification, termination or waiver shall be effective only in the specific instance and for the specific purpose for which it was given.

**7.13    SURVIVAL OF AGREEMENTS.**  The provisions regarding the payment of expenses and indemnification obligations shall survive and remain in full force and effect regardless of the termination of this Agreement pursuant to Section 7.14.

**7.14    RELEASE AND SATISFACTION.**  Upon the indefeasible payment (whether in cash and/or other consideration which is satisfactory to Secured Parties in its sole discretion) and performance in full of the Obligations, (i) this Agreement and the security interests created hereby shall terminate and Secured Parties will return the Collateral, including all documentation evidencing or affecting the Collateral, and (ii) upon written request of Equitex, Secured Parties shall execute and deliver to Equitex, at Equitex's expense and without representation or warranty by or recourse to Secured Parties, releases and satisfactions of all financing statements, mortgages, notices of assignment and other registrations of security.

**7.15    REINSTATEMENT.**  This Agreement shall continue to be effective or be automatically reinstated, as the case may be, if at any time any payment pursuant to this Agreement is rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, reorganization, liquidation of Equitex or upon the dissolution of, or appointment of any intervenor or conservator of, or trustee or similar official for, Equitex or any substantial part of Equitex's assets, or otherwise, all as though such payments had not been made.

VERS

**7.16   LIMITATION ON DUTY OF SECURED PARTIES WITH RESPECT TO THE COLLATERAL.** The powers conferred on Secured Parties hereunder are solely to protect their interest in the Collateral and shall not impose any duty on Secured Parties or any of their designated agents to exercise any such powers. Except for the safe custody of any Collateral in its possession and the accounting for monies actually received by it hereunder, Secured Parties shall have no duty with respect to any Collateral and no implied duties or obligations shall be read into this Agreement against Secured Parties. Secured Parties shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral in their possession if the Collateral is accorded treatment that is substantially equivalent to that which Secured Parties accord their own property, it being expressly agreed, to the maximum extent permitted by applicable law, that Secured Parties shall have no responsibility for (a) taking any necessary steps to preserve rights against any parties with respect to any Collateral or (b) taking any action to protect against any diminution in value of the Collateral, but, in each case, Secured Parties may do so and all expenses reasonably incurred in connection therewith shall be part of the Obligations.

**IN WITNESS WHEREOF,** the undersigned have hereunto affixed their signatures.

**Equitex:**                                             **Secured Parties:**

Equitex, Inc.                                            Pandora Select Partners, L.P.

By_____                   By_____

Its_____                  Its_____

                                                         Whitebox Hedged High Yield Partners, L.P.

                                                         By_____

                                                         Its_____

-17-                                                     VER5

**7.16   LIMITATION ON DUTY OF SECURED PARTIES WITH RESPECT TO THE COLLATERAL**   The powers conferred on Secured Parties hereunder are solely to protect their interest in the Collateral and shall not impose any duty on Secured Parties or any of their designated agents to exercise any such powers.  Except for the safe custody of any Collateral in its possession and the accounting for monies actually received by it hereunder, Secured Parties shall have no duty with respect to any Collateral and no implied duties or obligations shall be read into this Agreement against Secured Parties.  Secured Parties shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral in their possession if the Collateral is accorded treatment that is substantially equivalent to that which Secured Parties accord their own property, it being expressly agreed, to the maximum extent permitted by applicable law, that Secured Parties shall have no responsibility for (a) taking any necessary steps to preserve rights against any parties with respect to any Collateral or (b) taking any action to protect against any diminution in value of the Collateral, but, in each case, Secured Parties may do so and all expenses reasonably incurred in connection therewith shall be part of the Obligations.

    **IN WITNESS WHEREOF,** the undersigned have hereunto affixed their signatures.

**Equitex:**                                          **Secured Parties:**

Equitex, Inc.                                         Pandora Select Partners, L.P.

By _____                            By _____

Its _____                           Its _____

                                                      Whitebox Hedged High Yield Partners, L.P.

                                                      By _____

                                                      Its _____



-17-

CX/EX01493

# EXHIBIT A
## DESCRIPTION OF EQUITEX COLLATERAL

A.  2,170,000 shares of the common stock of Chex Services, Inc., being all of the outstanding capital stock of Chex Services, Inc., represented by Certificate number____, and any distributions made with respect to said shares.

B.  Promissory note the ("Chex Note") executed by Chex Services, Inc. in favor of Equitex, Inc., dated March 8, 2004, in the principal amount of $5,000,000.

C.  Equitex's rights, title and interest in the Security Agreement, providing collateral security for payment of the Chex Note, dated March 8, 2004, which collateral consists of substantially all of the assets of Chex Services, Inc.

The Collateral shall include all substitutes and replacements for and proceeds of any and all of the foregoing property.

A-1

VER5

CX/EX01494

**EXHIBIT B**
**IRREVOCABLE PROXY**

The undersigned hereby appoints _____ ("**Secured Parties**") as Proxy with full power of substitution, and hereby authorizes Secured Parties to represent and vote (or to execute a consent in lieu of voting) all 2,170,000 shares of Common Stock, _____ par value, of Chex Services, Inc., a Minnesota corporation, as represented by Certificate No. _____ (for 2,170,000 shares), together with any other shares or securities issued pursuant to a stock split or dividend, reorganization or other event affecting or relating to any of the foregoing shares, owned by the undersigned on the date of exercise hereof during the continuance of an Event of Default under, and as defined in, that certain Security Agreement dated as of March 8, 2004 by and among Equitex, Inc. and Secured Parties, at any meeting or at any other time chosen by Secured Parties in its sole discretion.

Date:   March 8, 2004                              Equitex, Inc.


By_____

Its_____


B-1                                                                    VER5

CX/EX01495