IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| iGAMES ENTERTAINMENT, INC., | : |
| Plaintiff, | : C.A. No. 04-180 (KAJ) |
| v. | : |
| CHEX SERVICES, INC. and EQUITEX, INC., | : |
| | : JURY TRIAL DEMANDED |
| Defendants. | : |

# Appendix of Exhibits To iGames's Opposition To The Motion By Chex's And Equitex For Summary Judgment

# Exhibit CC

```
                                                           1
 1        UNITED STATES DISTRICT COURT
 2         FOR THE DISTRICT OF DELAWARE
 3                  - - -
 4   iGAMES ENTERTAINMENT,:  CIVIL ACTION
     INC.,                :
 5        v.              :
                          :
 6   CHEX SERVICES, INC.  :
     and EQUITEX, INC.    :CIVIL ACTION NO.
 7                        : C.A. 04-180-KAJ
 8                  - - -
             December 10, 2004
 9                  - - -
10
11           Oral deposition of JEREMY
12   STEIN taken pursuant to notice, was held
13   at the law offices of DUANE MORRIS, LLP,
14   4200 One Liberty Place, 1650 Market
15   Street, Philadelphia, Pennsylvania
16   beginning at 10:05 a.m., on the above
17   date, before Terri L. Ochipinti, a
18   Professional Reporter and Commissioner of
19   Deeds in the Commonwealth of
20   Pennsylvania.
21                  - - -
22        ESQUIRE DEPOSITION SERVICES
                 15th Floor
23      1880 John F. Kennedy Boulevard
        Philadelphia, Pennsylvania 19103
24             (215) 988-9191
```

JEREMY STEIN

**Page 62**

1  this assets purchase agreement, Exhibit
2  96, to anyone at Chex or Equitex
3  personally? 95, excuse me.
4      A.  When I would discuss the
5  business of iGames this product would be
6  mentioned.
7      Q.  I understand that that was
8  one of the products that iGames was
9  selling in 2003, correct?
10     A.  Marketing, correct.
11     Q.  Marketing. My question to
12 you is, do you believe that the asset
13 purchase agreement, Exhibit 95 was ever
14 provided to anyone at Equitex or Chex?
15     A.  I don't know.
16     Q.  Okay.
17     A.  I'd have to refer to the
18 closing docs.
19     Q.  Do you know if you ever told
20 anyone at Equitex or Chex about the terms
21 of this assets purchase agreement,
22 Exhibit 95?
23     A.  I don't recall discussing
24 terms.

**Page 63**

1       MR. PORETTI: Do you want to
2  grab Exhibit 83, please, Matt.
3       MR. TAYLOR: Sure.
4       MR. PORETTI: I've got a
5  copy for you. That's your copy.
6  BY MR. PORETTI:
7      Q.  Do you recognize Exhibit 83?
8      A.  Yes.
9      Q.  That's a letter addressed to
10 you dated September 18, 2003 from
11 Mercantile Capital; is that correct?
12     A.  That's correct
13     Q.  You were introduced to
14 Mercantile Capital by Mr. Wolfington,
15 right?
16     A.  Correct.
17     Q.  You understood at the time,
18 in September of 2003, that Mr. Wolfington
19 had an ongoing banking relationship with
20 Mercantile Capital?
21     A.  I don't know the nature of
22 their relationship, but I know there was
23 one.
24     Q.  Okay. This relates to a

**Page 64**

1  potential $250,000 loan from Mercantile
2  to iGames; is that correct?
3      A.  Are you referring to this
4  document?
5      Q.  Yes.
6      A.  Correct.
7       MR. PORETTI: Can you hand
8  him Exhibit 84, please?
9       MR. TAYLOR: 84? Sure.
10 BY MR. PORETTI:
11     Q.  You have been given Exhibit
12 84, Mr. Stein. If you would turn to Page
13 22 of that document, can you confirm
14 that's your signature on Page 22?
15      MR. TAYLOR: You are on the
16 wrong page.
17      MR. PORETTI: There's two
18 Page 22s.
19      MR. TAYLOR: Oh.
20 BY MR. PORETTI:
21     Q.  That's Bates number 2742.
22     A.  That is my signature.
23     Q.  Okay. And I don't need you
24 to review this document in detail, but

**Page 65**

1  would you agree with me that this is the
2  document that was entered into as part of
3  the $250,000 loan referenced in Exhibit
4  83?
5       MR. TAYLOR: Objection to
6  the form. The document speaks for
7  itself. You can answer.
8       THE WITNESS: That's what it
9  appears.
10 BY MR. PORETTI:
11     Q.  Did you ever, you
12 personally, ever provide the loan and
13 security agreement, Exhibit 84, to anyone
14 at Equitex or Chex?
15     A.  I don't believe I gave them
16 this agreement.
17     Q.  Do you believe that you
18 verbally informed anyone at Equitex or
19 Chex that iGames was taking out a
20 $250,000 loan with Mercantile in November
21 of 2003?
22     A.  Yes.
23     Q.  Who do you think you told
24 that to?

**Page 66**

1  A. Ijaz.
2  Q. When do you think you
3  referenced that or disclosed that to
4  Mr. Anwar?
5  A. I don't recall an exact
6  conversation, but over a few phone calls,
7  financial conditions were discussed.
8  Q. What was the purpose for
9  this loan; what was iGames going to do
10 with the 250,000?
11 A. The loan was to assist in
12 paying some of the operating expenses of
13 iGames.
14 Q. Do you believe that you
15 informed Mr. Anwar of the loan before
16 November 26 or after?
17 A. I believe before.
18 Q. You can't recall a specific
19 meeting or a telephone conversation where
20 that was discussed?
21 A. Not specifically.
22 Q. Okay. Do you know if Chex
23 or Equitex ever gave iGames written
24 permission to enter into that loan

**Page 67**

1  agreement?
2  A. I'm not aware of it.
3  Q. Let me give you Exhibit 53.
4  Is that your signature on the second
5  page?
6  A. Yes, it is.
7  Q. All right. This is an
8  assignment agreement also dated November
9  26, 2003 in which iGames is assigning
10 certain rights to a million-dollar
11 termination fee to Mercantile Capital; is
12 that your understanding?
13     MR. TAYLOR: The document
14   speaks for itself. Objection.
15   The document speaks for itself.
16     THE WITNESS: That's what it
17   states in the document.
18 BY MR. PORETTI:
19 Q. Did you ever inform anyone
20 at Chex or Equitex that this
21 million-dollar termination fee called for
22 under the stock purchase agreement was
23 being assigned or transferred to
24 Mercantile?

**Page 68**

1  A. Not that I recall.
2  Q. Let me give you Exhibit 52.
3  A. Yes.
4  Q. Is that your signature, sir,
5  on the first page?
6  A. Yes, it is.
7  Q. This one's dated November 3,
8  2003 and also talks about signing a --
9  assigning certain rights to a portion of
10 the termination fee to Mr. Wolfington.
11 My first question to you is, why was
12 iGames assigning the rights to the
13 termination fee to Mr. Wolfington?
14     MR. TAYLOR: Two issues.
15   One, objection. The question
16   mischaracterizes the document.
17   Two, the document speaks for
18   itself. You can answer the
19   question -- and objection to the
20   form.
21     THE WITNESS: The document's
22   November 11. I believe you said
23   the 3rd. But why did we assign
24   the termination --

**Page 69**

1     MR. PORETTI: That's the
2   question.
3     THE WITNESS: -- funds to
4   Chris?
5  BY MR. PORETTI:
6  Q. Yes.
7  A. He was putting certain risks
8  out there in attempting to help us close
9  or attempt to close this deal. And if
10 this deal didn't close, wanted to make
11 sure he felt protected in that he could
12 recover any losses that he may incur.
13 Q. Did you inform Mercantile
14 Capital before you executed Exhibit 53 of
15 the existence of the November 11
16 agreement, Exhibit 52?
17 A. Mercantile and Chris had a
18 working relationship and understood the
19 terms of our agreements.
20 Q. The question is this, did
21 you personally inform Mercantile of the
22 existence of the November 11 letter,
23 Exhibit 52.
24 A. No.