## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| iGames Entertainment, Inc.,<br><br>        Plaintiff,<br><br>  vs.<br><br>Chex Services, Inc. and Equitex, Inc.,<br><br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

C.A. No. 04-180-KAJ

## REPLY BRIEF IN SUPPORT OF
## CHEX SERVICES, INC.'S MOTION FOR SUMMARY JUDGMENT

MORRIS, JAMES, HITCHENS & WILLIAMS LLP

James W. Semple (#396)
James E. Drnec (#3789)
222 Delaware Avenue
P.O. Box 2306
Wilmington, DE 19899
(302) 888-6800
Email: *jdrnec@morrisjames.com*

Attorneys for Chex Services, Inc.
and Equitex, Inc.

OF COUNSEL:

RIDER BENNETT, LLP

Daniel Q. Poretti
Patrick D. Robben
Douglas J. Frederick
33 South Sixth Street, Suite 4900
Minneapolis, MN 55402
(612) 340-8900
Email: *dqporetti@rider.com*

Dated: April 5, 2005

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................ ii

Summary of Reply Argument..........................................................................1

ARGUMENT ....................................................................................................2

    I.     IGAMES AGREES THAT THE CLAIMS ON THE
          NOTE CAN BE ADJUDICATED SEPARATELY
          FROM THE CLAIMS ON THE STOCK PLEDGE
          AGREEMENT ........................................................................2

    II.    IGAMES' BRIEF IN OPPOSITION TO CHEX'S
          MOTION FAILS TO ADDRESS THE RECENT
          EVENTS AND EXPRESS TERMS OF THE NOTE
          DEMONSTRATING THAT THERE IS NO
          GENUINE ISSUE OF MATERIAL FACT
          REGARDING CHEX'S CLAIM ON THE NOTE ......................3

    III.   EVEN IF THE COURT FINDS IT NECESSARY TO
          ADDRESS THE ALLEGED "DISPUTES" THAT
          IGAMES ATTEMPTS TO CREATE, IGAMES
          CANNOT WITHSTAND SUMMARY JUDGMENT .................5

          A.    By March 12, 2004, iGames Was Clearly In
               Default On The Note Because It Had Flatly
               Refused To Deliver The Stock Pledge
               Agreement And Corporate Guaranties As
               Expressly Required Under The Note .................................6

          B.    iGames' Other Arguments Are Unavailing And
               Fail to Create Any Genuine Issue of Material
               Fact..................................................................................11

          C.    iGames Cannot Use the Implied Covenant of
               Good Faith and Fair Dealing to Modify the
               Express Terms of the Note...........................................13

CONCLUSION.................................................................................................17

# TABLE OF AUTHORITIES

**CASES**

*Cincinnati SMSA, Ltd. P'ship v. Cincinnati Bell Cellular Sys. Co.*,
     708 A.2d 989 (Del. 1998) ...............................................................14

*Cooley v. Major Media Mgt. Corp.*,
     402 N.W.2d 815 (Minn. Ct. App. 1987 ......................................16

*Erickson v. Horing*,
     No. 00364, 2002 WL 31163611 (Minn. Ct. App. Oct. 1, 2002)..................14

*Firstar Eagan Bank, N.A. v. Marquette Bank Minneapolis, N.A.*,
     466 N.W.2d 8 (Minn. Ct. App. 1991) .........................................16

*General Mills, Inc. v. Hunt-Wesson, Inc.*,
     889 F.Supp. 1119 (D. Minn. 1995)..............................................16

*Sterling Capital Advisors, Inc. v. Herzog*,
     575 N.W.2d 121 (Minn. Ct. App. 1998)......................................15

**OTHER AUTHORITIES**

17A Am. Jur. 2d *Contracts* § 370 (West 2005) ...............................13

## <u>SUMMARY OF REPLY ARGUMENT</u>

iGames Entertainment, Inc. ("iGames") has submitted a brief in opposition to Chex Services, Inc.'s ("Chex") well-reasoned motion for summary judgment in respect to Chex's claim that iGames breached the Term Loan Note ("Note"). (*See* C.A. No. 04-180 D.I. 111 (iGames' Br. in Opp'n).)   iGames' opposition brief simply fails to address the recent events, the express terms of the Note, and the testimony of its own Chief Executive Officer demonstrating that there are no *genuine* issues of material fact regarding iGames' breach of the Note and its liability to immediately pay the principal amount, plus accrued interest, applicable late payment penalties, and the costs of collection to Chex.   iGames is essentially attempting to steal over $2 million that rightfully belongs to Chex by evading its obligations under the Note for more than a year and now claiming that it does not have to repay Chex at all.   As illustrated in Chex's opening brief, and supplemented by this Reply Brief, Chex is entitled to summary judgment and the Court should not allow iGames to escape its contractual duties by ignoring the material facts and misconstruing other facts that have no bearing on this motion.

## ARGUMENT

I.    **iGames Agrees That The Claims On The Note Can Be Adjudicated Separately From The Claims On The Stock Pledge Agreement**

During the November 12, 2004 hearing regarding Chex's prior motion for summary judgment on the Note, this Court had concerns about handling this litigation in a piecemeal fashion. Thus, on February 2, 2005, when Chex brought this current motion for summary judgment on the Note, Chex and Equitex brought a companion motion for summary judgment on all of iGames' claims so that the Court can address all the issues at one time. However, as demonstrated by the terms of the Note and by the subsequent actions of the parties, it is evident that the parties are in agreement that this Court can address and fully adjudicate the issues related to the Note, separately from those related to the Stock Purchase Agreement ("SPA").

This agreement is demonstrated in the following ways. First, as explained previously, the parties expressly agreed to separate adjudication in the "Remedies" provision of the Note. Second, when bringing Chex's prior motion, Chex expressly relinquished its right to the $1 million of "additional interest" that would have required adjudication of the SPA prior to entering judgment for that particular remedy under the Note. (*See* C.A. No. 04-0885 D.I. 40 at 1-2 (Chex's opening brief on prior motion).) Thus, Chex has consistently taken the position that its relinquishment of that additional contractual remedy allows this Court to enter final judgment on the Note in its favor without first adjudicating the SPA issues.

Third, and most importantly, iGames filed a motion for summary judgment *solely* in respect to its claims on the SPA. (*See* C.A. No. 04-180 D.I. 97 & 98.) In doing so, iGames essentially conceded that the issues related to the SPA can be and should be

2

adjudicated separately from the issues related to the Note. Thus, iGames cannot now deny that it is appropriate for this Court to enter final judgment on the Note at this time.

**II.    iGames' Brief In Opposition To Chex's Motion Fails To Address The Recent Events And Express Terms Of The Note Demonstrating That There Is No <u>Genuine Issue Of Material Fact Regarding Chex's Claim On The Note</u>**

Based on recent events regarding the date of January 6, 2005, Chex set forth the indisputable facts that under the "<u>Repayment: Lender's Option</u>" provision of the Note, regardless of whether iGames had previously breached the Note, iGames was required to pay "the outstanding principal balance of this Note, and all accrued but unpaid interest thereon" on January 6, 2005. (*See* C.A. No. 04-180 D.I. 85 at 21-22 (Chex's Opening Br.); *see also* Robben Aff.[1] Ex. 7 ("Repayment: Lender's Option").) As stated in that provision, iGames was contractually bound by this absolute repayment deadline "[n]otwithstanding any provision [of the Note] to the contrary," including the provision allowing iGames to prepay the Note in the event that Chex did not provide proof of adequate financing for the second advance of another $2 million. Thus, even if Chex did not provide proof of adequate financing for the second advance of an additional $2 million within 21 days from the date of the Note, and iGames did not chose to exercise its right to prepay the Note in full as expressly provided for in that circumstance, (*see* Robben Aff. Ex. 7 at 1), such an event would <u>not relieve</u> iGames of its obligations in respect to the absolute repayment deadline provided in the "<u>Repayment: Lender's Option</u>" provision of the Note.

---

[1] References to the "Robben Aff." refer to the Affidavit of Patrick D. Robben in Support of Equitex, Inc.'s and Chex Services, Inc.'s Motion for Summary Judgment previously submitted in this matter. (C.A. No. 04-180 D.I. 88 and 89.)

Importantly, iGames' brief in opposition simply fails to address this recent event and its undeniable effect. iGames does not dispute the Note's express language in the "<u>Repayment: Lender's Option</u>" provision or that the provision clearly dictated that the absolute deadline for repayment would be January 6, 2005. iGames does not dispute that it never made a payment on or before January 6, 2005 or anytime thereafter. iGames does not dispute that in a letter dated January 18, 2005, Chex demanded the total amount due under the Note and demanded the applicable late payment penalty of 10% for iGames' failure to "pay any amount when due" as expressly provided in the Note. Indeed, iGames offers <u>no defense</u> for its failure to comply with the absolute, clearly defined deadline under the "<u>Repayment: Lender's Option</u>" provision. As such, iGames' liability for the principal amount, accrued interest, applicable late payment penalties, and costs of collection is undisputed and summary judgment is appropriate at this time.

Second, iGames' brief does not dispute, and never even addresses, the method for calculating interest, which Chex adopted from iGames' own expert report for the purpose of this motion.[2] Chex's opening brief clearly set forth the amount that iGames was required to pay on January 6, 2005, even if iGames had not previously breached the Note; Chex also set forth the amount of the applicable late payment penalty for iGames' failure to make the January 6, 2005 payment. (*See* C.A. No. 04-180 D.I. 85 at 27-28.) iGames does not dispute that as of January 6, 2005, the amount of principal, plus accrued interest under that calculation totaled $2,157,169.44. Additionally, iGames does not dispute that 10% of that amount is $215,716.94. Thus, there is no dispute that because of iGames'

---

[2] Although Chex has, for purposes of this motion only, adopted the calculation method set forth by iGames' expert witness, Chex has reserved its right to seek all amounts owed to it if this motion is denied.

failure to make the required payment on January 6, 2005, and because Chex demanded the 10% late payment penalty, iGames is liable for $2,372,886.39 as of January 6, 2005. Further, iGames does not dispute that interest continues to accrue daily at a rate of $555.56. Once again, using iGames' own method for calculating interest, for the 89 days from January 6, 2005 to April 5, 2005, iGames owes an additional $49,444.84. Thus, as of the date of this Reply Brief, iGames owes Chex a total of $2,422,331.23, with interest continuing to accrue at the rate of $555.56 each day.

Third, iGames simply buries its head in the sand and ignores the language of the Note's "Remedies" provision, wherein iGames agreed that claims on the Note can be adjudicated separately from claims on the SPA in the sole discretion of Chex. (Robben Aff. Ex. 7 ("Remedies").) Chex clearly explained the effect of the "Remedies" provision in its opening brief. (*See* C.A. No. 04-180 D.I. 85 at 28-29.) iGames has not disputed the express language of that provision, nor has iGames disputed that it expressly agreed to such separate adjudication when iGames executed the Note. Further, iGames does not dispute that it is contractually bound by the "Remedies" provision of the Note.

iGames has not disputed, and indeed cannot dispute, the foregoing items. Therefore, even when viewing the facts in a light most favorable to iGames, summary judgment is proper on these simple, straight-forward and undisputed facts alone.

### III.   Even If The Court Finds It Necessary To Address The Alleged "Disputes" That iGames Attempts To Create, iGames Cannot Withstand Summary Judgment

iGames' brief sets forth many irrelevant, inaccurate and misrepresented facts. The inaccuracy of iGames' representations to this Court have been more fully addressed in the substantial amount of briefing in this matter, and need not be addressed once again herein. However, if the Court finds it necessary to address the alleged "disputes" that

iGames attempts to create in respect to this particular motion, there are certain misrepresentations made by iGames that Chex finds it necessary to address here.

>    **A.    By March 12, 2004, iGames Was Clearly In Default On The Note Because It Had Flatly Refused To Deliver The Stock Pledge Agreement And Corporate Guaranties As Expressly Required Under The Note**

iGames does not dispute that the Note expressly required iGames to deliver executed Corporate Guaranties and an executed Stock Pledge Agreement to Chex. Further, iGames does not dispute that it never delivered the Corporate Guaranties and Stock Pledge Agreement as required. Instead, iGames misrepresents the events that occurred in respect to these documents and Chex is left to set the record straight.

Chex's opening brief clearly details the undisputed events regarding the drafting of the documents and the fact that from the initial communications regarding these documents, Chex expressly told iGames and iGames' counsel that the documents were "critical" from Chex's perspective. (*See* C.A. No. 04-180 D.I. 85 at 8-11.) iGames does not dispute that in an email from Chex's counsel to iGames' counsel dated January 9, 2004, Chex expressly agreed to versions of the documents that iGames' own counsel had revised. (*See id.* at 10.) Further, iGames does not dispute that the Chief Executive Officer of iGames, Mr. Chris Wolfington, had signed these documents in January of 2004 and yet never delivered them to Chex. (*See id.* at 24-25.)

It was iGames' obligation to execute and deliver the Stock Pledge Agreement and the Corporate Guaranties in order to be in compliance with the terms of the Note. Even though Mr. Wolfington had actually signed the documents during January 2004, but failed to deliver them to Chex, iGames has continuously attempted to skirt its obligations under the Note by arguing that Chex should have set a deadline for the delivery of the

documents. (*See* C.A. No. 04-180 D.I. 111 at 36.) This is so even though the Note clearly contemplated that the documents were to be executed and delivered on the same date as the Note itself.[3] (Robben Aff. Ex. 7 at 2-3 ("Security").)

Importantly, iGames does not dispute that the Corporate Guaranties were in final form and retained by iGames' counsel as of January 9, 2004. iGames' failure to deliver the two Corporate Guaranties constitutes <u>two separate and independent breaches</u> of the Note regardless of whether the Stock Pledge Agreement was finalized. (*See id.*)

iGames simply ignores these facts and argues that details of the Stock Pledge Agreement needed to be finalized and thus iGames had no obligation to deliver *any* of the documents. (*See* C.A. No. 04-180 D.I. 111 at 36.) However, even accepting iGames' argument that the Stock Pledge Agreement was not finalized until March 5, 2004, (*see id.*), iGames cannot withstand summary judgment for the following reasons. First, iGames expressly ignores Mr. Wolfington's own testimony regarding his understanding of the Note. Mr. Wolfington testified as follows:

> Q. And the lender is Chex, right?
>
> A. Yes.
>
> Q. Okay. The term loan note second paragraph reads, "The borrower and the lender agree that the lender shall advance two million to the borrower on the date hereof and shall advance an additional two million to the borrower on that date, that is, 60 days following the

---

[3] Importantly, iGames does not and cannot argue that the delivery of the Stock Pledge Agreement and Corporate Guaranties were in any way conditioned upon Chex providing proof of adequate financing for the second advance of an additional $2 million. Such an argument would contradict the express terms of the Note. (*See* Robben Aff. Ex. 7 at 2-3 ("Security").) iGames had already taken the initial $2 million advance, which was required to be secured by those documents, and the Note specifically contemplated what iGames would be entitled to do in the instance that Chex did not provide proof of adequate financing. (*See id.* at 1.)

date hereof provided that at such time the borrower is in material compliance with the terms of this note, stock pledge agreement as defined below and the stock purchase agreement as defined below." Do you see where I was reading?

A.   Yes.

Q.   When you signed this agreement with that language, isn't it true that you understood that if you had not provided the stock pledge agreement, as called for in this note that the second $2 million would not be forthcoming from Chex?

A.   If by March 6th that was the case, that's how I understand that. It says on that day, that is, 60 days following the date hereof provided that. So by that 60th day I would have had to have been in compliance with those things that you're saying, which would have been March 6th.

(Robben Aff. Ex. 5 at 240-41 (Wolfington Dep. at 240-41).) Despite iGames' rendition of the facts, wherein iGames admits that it had in its possession the final version of the documents on March 5, 2004, it is undisputed that iGames never delivered an executed Stock Pledge Agreement or the required Corporate Guaranties on or before March 6, 2004, and did not deliver the documents on March 7, March 8, March 9, March 10, March 11, or March 12, 2004. Thus, according to Mr. Wolfington's own understanding of the Note, iGames was not in material compliance with the terms of the Note as of March 6, 2004, and therefore Chex was under no obligation to advance the second $2 million. (*See id.*)

Second, despite iGames' admitted non-compliance with the express terms of the Note, as explained in Chex's opening brief, Chex gave iGames another opportunity to comply with the terms of the Note, when Mr. Anwar, Chex's CFO, telephoned Mr. Wolfington on March 9 or 10, and inquired as to whether iGames would comply with the terms of the Note by delivering the required documents, however, Mr. Wolfington refused to deliver them to Chex. (*See* C.A. No. 04-180 D.I. 85 at 18-19.) Instead, during

8

the morning of March 12, 2004, iGames' counsel, Mr. Lawrence Rovin, sent a letter to

Chex and Equitex threatening that iGames was going to terminate the SPA and attaching

a draft version of an unsigned termination letter. (*See* Drnec Aff.[4] Ex. 1 (Letter from

Rovin to Fong & Welbourn dated March 12, 2004).) In that initial March 12, 2004 letter,

iGames expressly admitted that it had no intention of complying with the terms of the

Note. Mr. Rovin, wrongfully accusing Chex of not complying with the Note because

Chex did not provide the second $2 million advance on March 6, 2004, stated:

> iGames has been forced to make alternative financing arrangements. The
> arrangements are likely to require not only guarantees from iGames,
> Available Money, Inc. and Chris, but a pledge of the stock of Available
> Money held by iGames. Accordingly, as a result of Chex's failure to
> perform, ***iGames is likely to not be in a position to pledge those shares to
> Chex.***

(*See id.* at 2 (emphasis added).) Thus, as of March 12, 2004, iGames admitted that it had

no intention of attempting to cure its admitted breach of the Note.

Importantly, the Note contains an "Events of Default" provision. That provision,

at subsection (b), expressly provides that if "the borrower shall fail to observe or perform

any other material obligation or covenant required to be observed or performed by it

hereunder or under the Stock Pledge Agreement" then an Event of Default has occurred.

(Robben Aff. Ex. 7 at 3 ("Events of Default").) By failing to deliver the required security

under the Note, iGames failed to perform a material obligation, which constituted an

Event of Default. (*See id.*) Upon an "Event of Default" Chex had the right to declare,

without presentment or notice, the entire unpaid principal of the Note together with all

interest accrued thereon, as ***immediately*** due and payable. (*See id.* at 3-4 ("Acceleration"

---

[4] References to the "Drnec Aff." refer to the Affidavit of James E. Drnec, Esquire in
Support of Chex Services, Inc.'s Motion for Summary Judgment submitted herewith.

and "Waivers").)  Thus, after receiving iGames' initial March 12, 2004 letter indicating that iGames had no further intention of curing its admitted default under the Note, Chex responded in a letter sent to iGames later that day, declaring a default under the Note and accelerating the Note. [5]  (*See* Robben Aff. Ex. 4 (Clegg letter).)

Chex's actions in declaring default and accelerating the Note on March 12, 2004, were in accordance with the express terms of the Note, and were entirely proper.  (*See* Robben Aff. Ex. 7.)  Therefore, when viewing the foregoing evidence in a light most favorable to iGames, it is indisputable that even according to Mr. Wolfington's understanding of the Note, no later than March 12, 2004, iGames was clearly in default on the Note and is liable for the accelerated principal amount, plus accrued interest, applicable late payment penalties, and the costs of collection.

Under iGames' admitted default of the Note, using the interest calculation method of iGames' own expert, which has been adopted by Chex solely for the purpose of this motion, it is undisputed that on March 12, 2004, when Chex appropriately accelerated the Note, iGames immediately owed $2 million in principal, plus $7,725 as 50% of Available Money's Operating Income for the month of February.  Additionally, it is undisputed that despite Chex's demands, iGames has not paid a dime to Chex pursuant to the Note and is subject to the 10% late payment penalty of such overdue amount.  (*See* Robben Aff. Ex. 7 ("Late Payment Penalty").)  Ten percent of $2,007,725 is $200,772.50.  Thus, because

---

[5] iGames complains that Chex never provided notice that it was going to accelerate the Note.  However, when iGames executed the Note, it agreed that "The Maker [iGames] hereby expressly waives presentment, demand, notice of dishonor, notice of nonpayment and all other notices and demands in connection therewith or in the nature thereof."  (Robben Aff. Ex. 7 at 4 ("Waivers").)  Thus, iGames' position is directly contrary to the express language of the Note, and as explained, *infra*, even an implied covenant cannot modify the express terms of a contract.

Chex accelerated the Note on March 12, 2004, and because iGames failed to pay, iGames is obligated to pay $2,208,497.50 for the March 12, 2004 acceleration and late payment penalty. Further, again using iGames' own method for interest calculation, iGames owes an additional $198,890.48 in interest for the 358 days from April 12, 2004 to April 5, 2005. Thus, if the Court finds it necessary to address these issues, under the March 12, 2004 acceleration scenario, as of the date of this Reply Brief, iGames owes Chex $2,407,387.98, with interest continuing to accrue at a daily rate of $555.56.

As shown above, even if the Court delves into the alleged disputes that iGames attempts to create, the undeniable facts and the express terms of the Note demonstrate that summary judgment is appropriate at this time.[6]

### B.    iGames' Other Arguments Are Unavailing And Fail to Create Any Genuine Issue of Material Fact

Because iGames was clearly in default of the Note as of March 12, 2004, in a feeble attempt to skirt the undeniable consequences of its default, iGames suggests, without fully setting forth its arguments, that (1) iGames has some form of "remedy"

---

[6] Having withstood Chex's prior summary judgment motion by clouding the issues related to when interest payments were due, iGames, once again, reasserts the same arguments in opposition to Chex's now pending motion. (*Compare* C.A. No. 04-180 D.I. 49 *with* C.A. No. 04-180 D.I. 111).) As shown above, the Court does not need to address the issues related to timing of interest payments. However, it is appropriate for Chex to point out the misrepresentations made by iGames. For example, iGames argues that the plain language of the Note did not obligate iGames to make any interest payments before March 12, 2004. (*See* C.A. No. 04-180 D.I. 111 at 26-32).) On the other hand, iGames argues that the due dates for the interest payments were postponed by an alleged oral agreement. (*See id.* at 33-34.) iGames' positions are contradictory. There would be no need to enter such an oral agreement if no payments were due. Further, iGames' allegations in no way meet the clear and convincing evidentiary standard required for proving oral modification of a written agreement, and fail to acknowledge that Mr. Wolfington himself admitted that there was <u>no discussion</u> of waiver of the interest payments under the Note. (*See* C.A. No. 04-180 D.I. 85 at 26.)

other than the "right" that the Note expressly provided for in the event that Chex did not provide proof of adequate financing within 21 days, and (2) that iGames is entitled to some form of "setoff" or "offset" in respect to its alleged damages from the SPA. As discussed below, these arguments have no merit.

First, even assuming, *arguendo*, that Chex failed to provide proof of adequate financing for the second advance of an additional $2 million within 21 days, iGames cannot demonstrate how that would even be a "breach" by Chex, let alone a breach entitling iGames to some remedy that would allow iGames to keep the principal amount and not pay interest. The Note does <u>not</u> state that Chex's failure to obtain proof of financing constitutes a breach or an Event of Default under the Note.[7] What the Note does expressly provide is that if Chex failed to obtain the proof of adequate financing within 21 days, iGames would have the "right" to prepay the principal balance and all accrued interest to the date of prepayment, and then iGames' obligations regarding paying the 50% of the Operating Income of Available Money and paying interest payments would cease. (*See* Robben Aff. Ex. 7 at 1.) Simply because iGames refused to exercise its contractual "right" to prepay the Note, does not mean that Chex breached the Note, and does not mean that iGames is no longer bound by the provisions of Note.[8]

_____

[7] Additionally, the Note's "<u>Remedies</u>" provision addresses remedies of the Lender (i.e., Chex) and thus indicates that iGames has no "remedies" under the Note unless stated elsewhere. Obviously, with the elaborate Remedies provisions of the SPA, the parties knew how to provide remedies for the separate parties in particular circumstances.

[8] Even if it could somehow be construed as a "breach" on behalf of Chex, iGames has failed to demonstrate how the plain language of the Note does not clearly indicate the parties' intent to make it an exclusive remedy in that foreseeable circumstance, and thus iGames' sole recourse under Minnesota law. (*See* C.A. No. 04-180 D.I. 85 at 29-31.)

Second, in regard to iGames' suggestions that it can "setoff" amounts owed under the Note against amounts allegedly owed to iGames under the SPA, iGames has cited no authority for its suggestions. The SPA never contemplated the Note, and as explained in Chex and Equitex's brief in opposition to iGames' motion for summary judgment, iGames is not entitled to recovery under the SPA. Further, the Termination Amount under the SPA is payable solely by Equitex, not Chex. Thus, iGames has no basis to setoff alleged damages owed under the SPA for its willful breach of the Note. Lastly, iGames fails to demonstrate how a "setoff" would create a genuine issue of material fact precluding summary judgment on the Note.

### C.    iGames Cannot Use the Implied Covenant of Good Faith and Fair Dealing to Modify the Express Terms of the Note

iGames, while ignoring the express provisions of the Note as discussed above, makes several suggestions that Chex did not act in good faith in regard to Chex's acceleration of the Note on March 12, 2004.[9]  As illustrated, Chex did not breach any implied covenant of good faith and, no matter how hard iGames may try, iGames cannot use an implied covenant to essentially steal more than $2 million from Chex.

It is widely-accepted black letter law that "[t]he implied duty to act in good faith does not obligate a party to a contract to accept a material change in the terms of the contract or to assume obligations that vary or contradict the contract's express provisions, nor does the duty of good faith inject substantive terms into the parties' contract." 17A Am. Jur. 2d *Contracts* § 370 (West 2005).  Thus, in Minnesota as well as Delaware,

---

[9] iGames has also asserted that Equitex breached an implied covenant of good faith and fair dealing in respect to the Note. (*See* C.A. No. 04-180 D.I. 113 at 37-38.) However, Equitex was not a party to the Note. (*See* Robben Aff. Ex. 7.)  iGames' assertions in this respect have no basis in law or fact.

"[t]he covenant cannot be used to rewrite the express terms of a contract or impose duties inconsistent with those terms." *Erickson v. Horing*, No. 00364, 2002 WL 31163611, *13 (Minn. Ct. App. Oct. 1, 2002) (unpublished)[10] (citing *Cincinnati SMSA, Ltd. P'ship v. Cincinnati Bell Cellular Sys. Co.*, 708 A.2d 989, 992 (Del. 1998)).

As explained above, all of Chex's actions in accelerating the Note on March 12, 2004, in demanding repayment under the "Repayment: Lender's Option" in January of 2005, and in pursuing adjudication of its claim under the Note separately from the claims under the SPA are consistent with the express terms of the Note. However, iGames, in an attempt to cloud the issues once again, tries to rewrite the express provisions of the Note in an effort to steal more than $2 million from Chex. The implied covenant of good faith does not allow iGames to alter the express terms of the Note as it seeks to do, and therefore, summary judgment is appropriate at this time.

Further, the facts suggest that if any party was dealing in bad faith, it was iGames. For example, it is undisputed that Chex's loss of the NACSF contract regarding the Seminole casinos on January 2 to January 5, 2004, made available the $2 million which iGames then borrowed to make an initial payment for iGames' acquisition of Available Money. (*See* Robben Aff. Ex. 5 (Sept. 22 Wolfington Dep. at 264-265).) Apparently, in an effort to convince Chex to loan the $2 million to iGames, iGames publicly reaffirmed the parties' relationship in respect to the SPA on January 5, 2004. (*See* Robben Aff. Ex. 18.) iGames' ploy worked when Chex loaned the $2 million to the iGames on January 6, 2004. On January 7, 2004, immediately after accepting this $2

_____

[10] A copy of the decision *Erickson v. Horing*, No. 00364, 2002 WL 31163611 (Minn. Ct. App. Oct. 1, 2002) is attached to the Drnec Aff. as Exhibit 2.

million from Chex, which was available merely because of the loss of the Seminole casino contract, iGames then turned around in a vindictive manner and made accusations that the loss of the Seminole casino contract gave iGames the right to terminate the SPA. (*See* C.A. No. 04-180 D.I. 114 at Exhibit K (iGames' Appendix regarding its opposition to Chex and Equitex's companion motion for summary judgment).)    Indeed, iGames' claims in its letter purporting to terminate the SPA, and its claims in this litigation, focus on Chex's loss of the Seminole casino contract.

In light of the facts above, and given Mr. Wolfington's testimony that prior to the termination of the SPA, iGames would *not* have closed on the SPA, (*see* Robben Aff. Ex. 5 (Sept. 22 Wolfington Dep. p. 213, lns. 22-24; p. 214, lns. 1-15)), iGames' actions in refusing to make any payments under the Note and refusing to deliver the Stock Pledge Agreement and Corporate Guaranties suggests that iGames had secretly planned and implemented a strategy to refuse Chex the benefit of its bargain.

Also, Mr. Wolfington's testimony reveals that he believed he could *unreasonably* withhold consent in regard to Chex's efforts to obtaining financing for the second advance of an additional $2 million. (*See* Robben Aff. Ex. 5 (Dec. 3 Wolfington Dep. at 386).)  Thus, Mr. Wolfington obviously thought that he could unjustifiably hinder Chex's performance under the Note, and then claim that Chex had not complied with the Note. This is simply a blatant attempt to steal more than $2 million from Chex and is illustrative of iGames' bad faith.  *See Sterling Capital Advisors, Inc. v. Herzog*, 575 N.W.2d 121, 125 (Minn. Ct. App. 1998) ("'Bad faith' is defined as a party's refusal to fulfill some duty or contractual obligation based on an ulterior motive, not an honest mistake regarding one's rights or duties.").

15

iGames' bad faith precludes its resort to equitable defenses and relief.  *See Cooley v. Major Media Mgt. Corp.*, 402 N.W.2d 815, 817 (Minn. Ct. App. 1987) (indicating bad faith precludes equity).  The implied covenant of good faith is an equitable theory.  *See General Mills, Inc. v. Hunt-Wesson, Inc.*, 889 F.Supp. 1119, 1124 (D. Minn. 1995). Likewise "setoff is an equitable remedy."  *Firstar Eagan Bank, N.A. v. Marquette Bank Minneapolis, N.A.*, 466 N.W.2d 8, 12 (Minn. Ct. App. 1991). Thus, iGames' bad faith precludes it from relying on those theories and iGames cannot withstand judgment against it.

## CONCLUSION

For the foregoing reasons, Chex respectfully requests that Judgment be entered in its favor. There is no issue that requires submission to a jury regarding the parties' claims related to Term Loan Note. Chex is entitled to Summary Judgment on its claim.

MORRIS, JAMES, HITCHENS & WILLIAMS LLP

James W. Semple (#396)
James E. Drnec (#3789)
222 Delaware Avenue
P.O. Box 2306
Wilmington, DE 19899
(302) 888-6800
Email: *jdrnec@morrisjames.com*

Attorneys for Chex Services, Inc.
and Equitex, Inc.

OF COUNSEL:

RIDER BENNETT, LLP

Daniel Q. Poretti
Patrick D. Robben
Douglas J. Frederick
33 South Sixth Street, Suite 4900
Minneapolis, MN 55402
(612) 340-8900
Email: *dqporetti@rider.com*

Dated: April 5, 2005

JED/107955-0001/1131786/1

17

## CERTIFICATE OF SERVICE

I, JAMES E. DRNEC, hereby certify that on April 5, 2005 I electronically filed: REPLY BRIEF IN SUPPORT OF CHEX SERVICES, INC.'S MOTION FOR SUMMARY JUDGMENT, with the Clerk using CM/ECF which will send notification of such filing(s) to the following:

    Thomas P. McGonigle, Esquire
    Matt Neiderman, Esquire
    Duane Morris, LLP
    1100 North Market Street
    12th Floor
    Wilmington, Delaware 19801

    James E. Drnec (#3789)
    Morris, James, Hitchens & Williams LLP
    222 Delaware Avenue
    P.O. Box 2306
    Wilmington, DE  19899
    (302) 888-6950
    Email:  *jdrnec@morrisjames.com*