**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| iGames Entertainment, Inc., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| Chex Services, Inc. and Equitex, Inc., | ) |
| | ) |
| Defendants. | ) |
| | ) |

C.A. No. 04-180-KAJ

**EXHIBIT 1 OF**
**AFFIDAVIT OF JAMES E. DRNEC, ESQUIRE**
**IN SUPPORT OF CHEX SERVICES, INC.'S**
**MOTION FOR SUMMARY JUDGMENT**

FROM KLEHR HARRISON                                    (FRI) 3.12'04 17:42/ST. 17:38/NO. 4862034105 P  2

# KLEHR, HARRISON, HARVEY, BRANZBURG & ELLERS LLP
### ATTORNEYS AT LAW

| | | |
|---|---|---|
| LAWRENCE D. ROVIN | 260 S. BROAD STREET | New Jersey Office |
| | PHILADELPHIA, PA 19102 | 457 Haddonfield Road |
| Direct Dial: (215) 569-2856 | | Suite 510 |
| LROVIN@klehr.com | (215) 568-6060 | Cherry Hill, New Jersey 08002-2220 |
| | FAX: (215) 568-6603 | (856) 486-7900 |
| | | |
| | www.klehr.com | Delaware Office |
| | | 919 Market Street |
| | | Suite 1000 |
| | March 12, 2004 | Wilmington, Delaware 19801-3062 |
| | | (302) 426-1189 |

Henry Fong, President
Equitex, Inc.
2401 PGA Boulevard, Suite 190
Palm Beach Gardens, FL 33410

James P. Welbourn, President and CEO
Chex Services, Inc.
11100 Wayzata Boulevard, Suite 111
Minnetonka, MN 55305

RE:  **Stock Purchase Agreement dated November 3, 2003**

Dear Messrs. Fong and Welbourn:

Chris Wolfington has asked that I contact you with respect to the events of this last week and his phone call with Ijaz Anwar today. First and foremost Chris is prepared to work diligently to execute the agreement he and Henry agreed to in our office here in Philadelphia and he still believes in the value proposition of the combined companies.

In the last conversations between Henry and Chris, Henry communicated to Chris that the lawyers could clean up the remaining issues of the definitive agreement. Henry also spoke directly to the President of Mercantile Capital who confirmed Mercantile's ability and willingness to close on the financing being pursued by Equitex. Unfortunately there has been no communication since and no progress on the documents we prepared for the transaction.

As you are well aware, there have been several events and disclosures since the execution of the November 3, 2003 Stock Purchase Agreement (the "Agreement") among Equitex, Inc. ("Equitex"), Chex Services, Inc. ("Chex") and iGames Entertainment, Inc. ("iGames") which have threatened the consummation of the transactions contemplated thereby and which would entitle iGames to terminate the Agreement and collect the Termination Amount and expense reimbursement described therein, including without limitation those matters described in my letters to you dated January 7, 2004 and January 27, 2004 and your conclusion that tax issues at the Equitex level prevented Equitex from consummating the transaction as structured in the Agreement. Further, the adverse publicity received by Chex related to the cancellation of the Seminole contracts has resulted in erosion of iGames' stock price due to the perceived reduction

PHIL1 562513-2

CX/EX02017

CX/EX02016

FROM KLEHR HARRISON                                    (FRI) 3.12'04 17:42/ST. 17:38/NO. 4862034105 P  3

KLEHR, HARRISON, HARVEY, BRANZBURG & ELLERS LLP

Henry Fong, President
James P. Welbourn, President and CEO
March 12, 2004
Page 2

in the value of the announced Chex acquisition.  Notwithstanding these developments, iGames has remained willing to explore terms and conditions upon which a combination of iGames and Chex could be achieved, while reserving its rights under the Agreement.

Accordingly, iGames has in good faith continued negotiations, resulting in a letter of intent dated January 28, 2004 (which Henry Fong confirmed was approved by the Equitex board of directors) and, following a meeting between Henry and Chris on February 24, 2004, a memorandum summarizing the proposed terms (which was more favorable to Equitex than the approved letter of intent).  Unfortunately, iGames has begun to question whether Equitex and Chex are making the same good faith effort, due to a consistent pattern of delay and attempted renegotiation of settled points.

By way of illustration, the January 28, 2004 letter of intent clearly states that all substantive provisions of the Agreement would be retained unless specifically modified in the letter of intent.  The Equitex board approved the letter of intent.  Notwithstanding this and the fact that Henry negotiated the letter of intent, Henry continues to insist that he cannot agree to provisions such as the Termination Fee, which remains unchanged from the Agreement, without new board approval.

Further, under the terms of the January 6, 2004 $4 million promissory note from iGames to Chex (the "Note"), Chex was required to advance $2 million to iGames on March 6, 2004 (60 days following the date of the note) so that iGames could make the second payment required under the terms of the Available Money acquisition.  Chex was also required to provide proof of adequate financing within 21 days of the note's execution.  Chex has failed to provide proof of financing and has failed to make this advance.  On March 8, 2004, Chris, Henry and Jay Starr from Mercantile discussed a proposed $5 million financing for this and other purposes related to the overall transaction.  Jay indicated that he was prepared to close within days and Henry stated that he would have his lawyers review the proposed documents.  However, there is no indication that Equitex's lawyers were told of this proposal.  Under the terms of the Note, any lender other than Mercantile is subject to iGames approval.  Further, the Agreement clearly provides that any financing not in the ordinary course of business is subject to iGames' approval.  You and your counsel were reminded of this requirement by e-mail on March 8, 2004.  iGames has been informed of a potential "Whitebox" financing, but has received no information concerning the identity of the lender or the terms of the financing.

As a result of Chex's failure to meet its obligations, iGames has been forced to make alternative financing arrangements.  These arrangements are likely to require not only guarantees from iGames, Available Money, Inc. and Chris, but a pledge of the stock of Available Money held by iGames.  Accordingly, as a result of Chex's failure to perform, iGames is likely to not be in a position to pledge those shares to Chex.

PHIL1 562513-2

CX/EX02018

FROM KLEHR HARRISON                          (FRI) 3. 12' 04 17:42/ST. 17:38/NO. 4862034105 P  4

KLEHR, HARRISON, HARVEY, BRANZBURG & ELLERS LLP

Henry Fong, President
James P. Welbourn, President and CEO
March 12, 2004
Page 3

   The purpose of this letter is to inform you that iGames and Chris have reluctantly concluded that your silence and failure to perform on numerous issues is an indication that you no longer desire to pursue a transaction. We are confident that the path of least resistance and the greatest opportunity for success is as a combined entity. However, unless Equitex and Chex exhibit the willingness and desire to quickly resolve the few outstanding issues related to the proposed Agreement and Plan of Merger, iGames will have no choice but to terminate the Agreement and exercise our rights therein. Attached is the text of the termination letter that will be delivered in that event.

   iGames sincerely hopes that it will not be necessary to deliver the attached termination notice.

                                   Very truly yours,

                                   Lawrence D. Rovin

cc:    Christopher M. Wolfington

PHIL1 562513-2

CX/EX02019

FROM KLEHR HARRISON                                                    (FRI) 3. 12' 04 17:42/ST. 17:38/NO. 4862034105 P  5

# KLEHR, HARRISON, HARVEY, BRANZBURG & ELLERS LLP
## ATTORNEYS AT LAW

**LAWRENCE D. ROVIN**
Direct Dial: (215) 569-2898
l.ROVIN@klehr.com

260 S. BROAD STREET
PHILADELPHIA, PA 19102

(215) 568-6060
FAX: (215) 568-6603

www.klehr.com

New Jersey Office
457 Haddonfield Road
Suite 510
Cherry Hill, New Jersey  08002-2220
(856) 486-7900

Delaware Office
919 Market Street
Suite 1000
Wilmington, Delaware  19801-3062
(302) 426-1189

March __, 2004

Henry Fong, President
Equitex, Inc.
2401 PGA Boulevard, Suite 190
Palm Beach Gardens, FL 33410

James P. Welbourn, President and CEO
Chex Services, Inc.
11100 Wayzata Boulevard, Suite 111
Minnetonka, MN 55305

RE:    **Termination of Stock Purchase Agreement dated November 3, 2003**

Dear Messrs. Fong and Welbourn:

By my letter to you dated January 7, 2004 (the "January 7 Letter"), iGames Entertainment, Inc. ("iGames") notified you of its concerns related to the termination by NCASF, Inc. of its contracts with Chex Services, Inc. ("Chex"), including the impact of such termination on the relative rights of the parties under the November 3, 2003 Stock Purchase Agreement (the "Agreement") among Equitex, Inc. ("Equitex"), Chex and iGames.  In particular, the January 7 Letter indicated that the termination of the NCASF, Inc. contracts, and related adverse publicity, would have a Material Adverse Effect on Chex, represented a breach by Equitex and Chex of representations and warranties in the Agreement and a failure to satisfy conditions precedent to iGames' obligations under the Agreement.  As a result, iGames is entitled to terminate the Agreement and receive the Termination Amount called for therein.

In addition, by my letter to you dated January 27, 2004 (the "January 27 Letter"), iGames further notified you that the failure to disclose to iGames the existence of a $606,316 note receivable, the circumstances surrounding its execution and the current status of the note receivable constituted multiple breaches by Equitex and Chex of their representations and warranties in the Agreement, breaches of Equitex's and Chex's pre-Closing covenants and failure to satisfy conditions precedent to iGames' obligations under the Agreement.  As a result, iGames is entitled to terminate the Agreement and receive the Termination Amount called for therein.

PHIL1 562784-1

CX/EX02020

FROM KLEHR HARRISON                                    (FRI) 3. 12' 04 17:43/ST. 17:38/NO. 4862034105 P 6

KLEHR, HARRISON, HARVEY, BRANZBURG & ELLERS LLP

Henry Fong, President
James P. Welbourn, President and CEO
March ___, 2004
Page 2

Finally, in January 2004 you informed iGames that Equitex could not consummate the transaction as contemplated under the Agreement due to federal income tax consequences to Equitex associated with the structure of the transaction.

Notwithstanding these developments, iGames remained willing to explore terms and conditions upon which a combination of iGames and Chex could be achieved, while reserving its right to exercise its termination rights under the Agreement.

Unfortunately, iGames has concluded that these efforts have been fruitless. Accordingly, this letter shall serve as notice under Section 11(b) of the Agreement that iGames hereby terminates the Agreement pursuant to Sections 11(b)(ii), (iv) and (viii) as a result of the facts and occurrences described in the January 7 Letter and the January 27 Letter. Under Section 11(e) of the Agreement, Equitex and Chex are required to pay to iGames the Termination Amount of $1,000,000 immediately upon receipt of this notice of termination. iGames shall in a timely manner prepare documentation regarding its costs and expenses incurred in connection with the transactions contemplated by the Agreement, which amount shall be due and payable no later than five business days following your receipt of such documentation.

The Termination Amount and cost reimbursement shall be paid by wire transfer to the following account:

| Bank: | PNC Bank # 002998 |
|---|---|
| Account: | Money Centers of America |
| Account No.: | 8612826694 |

Very truly yours,

Lawrence D. Rovin

cc:    Christopher M. Wolfington

PHIL1 562784-1

CX/EX02021

**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| iGames Entertainment, Inc., | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 04-180-KAJ |
| | ) | |
| vs. | ) | |
| | ) | |
| Chex Services, Inc. and Equitex, Inc., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**EXHIBIT 2 OF**
**AFFIDAVIT OF JAMES E. DRNEC, ESQUIRE**
**IN SUPPORT OF CHEX SERVICES, INC.'S**
**MOTION FOR SUMMARY JUDGMENT**



Not Reported in N.W.2d
2002 WL 31163611 (Minn.App.)
(Cite as: 2002 WL 31163611 (Minn.App.))

Page 1

**H**
Only the Westlaw citation is currently available.

NOTICE: THIS OPINION IS DESIGNATED AS UNPUBLISHED AND MAY NOT BE CITED EXCEPT AS PROVIDED BY MINN. ST. SEC. 480A.08(3).

Court of Appeals of Minnesota.
David ERICKSON, et al., individually and on behalf of themselves and as shareholders on behalf of nominal defendant Eliance Corporation, Appellants,
v.
Jeffrey HORING, et al., Respondents,
Kerry ADLER, et al., Respondents,
Jeffrey FARSTAD, Respondent,
WI SOFTWARE INVESTORS LLC, et al., Respondents,
INSIGHT CAPITAL PARTNERS II L.P., et al., Respondents,
and
John Doe and XYZ Corporations, persons and corporations whose identities are not yet known, Defendants,
and
Eliance Corporation, a Delaware Corporation, Nominal Defendant, Respondent.
No. C4-02-138.

Oct. 1, 2002.

Hennepin County District Court, File No. 00364.

Michael C. Mahoney, Havilah L. Solarz, Mahoney & Hagberg, A Professional Association, Wayzata, MN, for appellants.

J. David Jackson, Jonathan Strauss, Kevin C. Braley, Dorsey & Whitney LLP, Minneapolis, MN, for respondents Horing, et al.

Thomas F. Nelson, Jerry S. Podkopacz, David R. Crosby, Leonard, Street and Deinard, P.A., Minneapolis, MN, for respondents Adler, et al.

Robert D. Maher, Best & Flanagan LLP, Minneapolis, MN, for respondent Farstad.

Wendy J. Wildung, Lianne Knych, Faegre & Benson LLP, Minneapolis, MN, for respondents WI Software Investors, et al.

Sean R. O'Brien, Arkin Kaplan & Cohen LLP, New York, NY; William J. Otteson, Greene Espel, P.L.L.P., Minneapolis, MN, for respondents Insight Capital Partners, et al.

Considered and decided by ANDERSON, Presiding Judge, STONEBURNER, Judge, and KLAPHAKE, Judge. [FN*]

> FN* The Honorable Daniel F. Foley, one of the founding members of this court, who continued to serve by appointment order from the supreme court after his retirement, fully participated in the consideration of this appeal. Due to Judge Foley's untimely death before the filing of the opinion, Judge Klaphake has been assigned as a substitute, and now joins the panel in issuing this decision.

**UNPUBLISHED OPINION**

STONEBURNER, Judge.

*1 Appellants sued respondent officers, directors, and shareholders of Eliance Corporation on a variety of claims and the district court granted summary judgment to respondents. Appellants contend the court erred in (a) converting motions to dismiss into summary judgment motions because appellants had no chance to present facts in opposition to the motions; (b) ruling that certain counts were derivative claims; and (c) dismissing derivative claims on the ground that appellants were inadequate representatives. Appellants also challenge dismissal of their (a) fraud claims; (b) breach of contract claims; (c) claims of fraudulent conveyance; (d) claims against individuals who asserted they were not directors; and (e) claims that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d
2002 WL 31163611 (Minn.App.)
(Cite as: 2002 WL 31163611 (Minn.App.))

Page 2

directors breached their duties of loyalty and candor. Because the district court did not err in dismissing appellants' claims or in granting summary judgment on behalf of respondents, we affirm.

## FACTS

Appellants David Erickson, Robert Griggs, and Dianhai Du were founders, officers, and employees of a North Dakota limited liability corporation called Dakotah Marketing & Research (DMR). DMR processed internet credit card transactions, 90% of which were generated through web sites providing adult content. In January 1999, respondents Insight [FN1] and Wexford [FN2] made a $2 million bridge loan to DMR in anticipation of an additional investment. On March 10, 1999, DMR merged into a newly formed Delaware corporation, Eliance. The founders of DMR exchanged their membership interests in DMR for shares of common stock of Eliance. Simultaneously, Insight and Wexford paid approximately $18 million for the purchase of preferred stock in Eliance. Shortly thereafter, the founders redeemed approximately $5 million of their shares.

> FN1. Insight refers to respondents Insight Capital Partners II, L.P.; Insight Capital Partners (Cayman) II, L.P.; Insight Capital Partners III, L.P.; Insight Capital Partners (Cayman) III, L.P.; and Insight Capital Partners (Co Invest) III, L.P.

> FN2. Wexford refers to respondents WI Software Investors, LLC; Imprimis SB, L.P.; and W-E Investors, LLC.

The original board of directors of Eliance consisted of seven members: four from the DMR founders (Deborah Farstad, appellants Erickson and Griggs, and respondent Jeffrey Farstad); two from Insight (respondents Horing and Raghavendran); and one member elected jointly by the DMR founders and Insight (respondent Osaka). Erickson was named CEO of Eliance.

Appellants allege that Insight made numerous promises during the negotiations that led to the formation of Eliance that the DMR founders would remain permanently in control of Eliance.

Appellants assert that they were guaranteed the perpetual right to elect four of seven members of the Eliance board of directors.

In April 1999, Eliance required additional capital due to chargebacks [FN3] and fines from VISA. Respondents allege that appellants had not previously disclosed the chargeback problems prior to their investment in DMR/Eliance; appellants dispute this allegation. Insight made a $2 million loan to Eliance, conditioned upon a smaller board of directors and a personal guaranty by Erickson, Jeffrey Farstad, and Deborah Farstad. Appellants signed the loan documents consenting to the conditions and also signed a Written Action in Lieu of a Special Meeting that changed the board size. Directors Deborah Forstad and Griggs resigned their board positions, although the exact date their resignations became effective is in dispute. As a result of the reduction in board size, the five-member board consisted of two members from the DMR founders, two from Insight, and one independent member elected jointly by Insight and the DMR founders. The certificate of incorporation was subsequently amended to reflect the reduction in board size.

> FN3. Chargebacks occur when a credit card holder disputes the charges on his/her bill and the card originator declines payment to the vendor. Here, VISA "charged back" to Eliance amounts in dispute on a recurring basis, amounting to millions of dollars.

*2 Appellants allege that it was their understanding that the board reduction was temporary and assert that any agreement to the contrary was induced by false representations and omissions of respondents Raghavendran and Horing. But the loan documents that were signed do not state that the reduction is temporary. Appellants also allege that the note was approved in violation of the terms of the purchase agreement because it was not approved by a majority of disinterested directors.

By the end of May 1999, Eliance again required operating capital and Insight provided an additional $1 million loan. The May note provided that this loan would be in default if Deborah Farstad and appellant Griggs failed to deliver their written

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d
2002 WL 31163611 (Minn.App.)
(Cite as: 2002 WL 31163611 (Minn.App.))

Page 3

resignations within 21 days. As with the former note, this note did not state that the board reduction was temporary. Appellants acknowledge that they received the signatory page of this note from Hale & Dorr, LLP, [FN4] but claim that they signed it believing that it was a standard promissory note signature page such as they had signed on prior occasions. Appellants claim that they were unaware of conditions contained in the note. Appellants allege that providing them with only the signatory page of the note was part of a fraudulent scheme by Insight to gain control of Eliance. [FN5]

> FN4. Appellants allege that they did not know that Hale & Dorr was representing Insight, but believed the firm was Eliance's legal counsel. However, the May 10, 1999 Preferred Stock Agreement that appellants signed made clear that Hale & Dorr was "special counsel to the purchasers," and the record indicates that Eliance had in-house counsel.

> FN5. The record contains a May 27, 1999 fax from Eliance in-house counsel, Paul Eidsness, confirming that appellant Erickson possessed the entire note at the time of its execution.

In June, additional loans were made to Eliance by Insight. Appellants again signed signature pages of notes without reviewing the entire document. The record reveals that Eidsness, Eliance in-house counsel, received complete copies of all documents [FN6] executed in May and June 1999.

> FN6. The documents included loan notes and amendments to the Stockholders' Voting Agreement and Articles of Incorporation.

In July 1999, Insight introduced Erickson to respondents Kerry Adler and Laura Hantho who had previously formed a company called BlueSky Ventures (now Webhelp, Inc.) to pursue Internet opportunities. [FN7] Webhelp, Insight, and Eliance entered into a letter of intent contemplating that Adler and Hantho would become board members of Eliance after a merger between Webhelp and Eliance. The merger never occurred, but Adler and Hantho were made officers of Eliance--Adler

replacing Erickson as Eliance's president and CEO, and Hantho as COO.

> FN7. BlueSky Ventures changed its name to Webhelp, Inc. and refers to respondents BlueSky Ventures and Webhelp, Inc.

In late September 1999, appellants and Deborah Farstad attempted to increase the Eliance board to seven directors, as provided under the original certificate of incorporation. Respondents viewed appellants' actions as a coup because they took over Eliance's offices, denied access to respondents Raghavendran and Hantho, and wired over $400,000 to appellants' attorney. Appellants also commenced a federal court action claiming that they agreed only to a temporary reduction in the board size but were tricked into signing documents making the change permanent. *Erickson v. Horing*, No. 99-1468, 2001 WL 1640142 (D.Minn. Sept. 21, 2001). Respondents counterclaimed and moved for a preliminary injunction to declare the five-person board to be duly authorized. [FN8]

> FN8. As part of the proceedings, Jeffrey Farstad (a founder and Eliance's largest common stockholder and chairman of its board) submitted a declaration stating he fully understood the board reduction would be permanent and that Adler and Hantho were never members of the Eliance board.

In October 1999, the federal court granted respondents' motion for a preliminary injunction and ordered appellants' purported election of board members suspended. The court found that appellants failed to overcome the presumption of validity of the certified copy of the amended Certificate of Incorporation establishing the board at five members. *See* Del.Code Ann. tit. 8, § 105 (2000) (stating filed certificate of incorporation is prima facie evidence of validity). The federal court noted that while the parties' signatures on the June 25 documents [FN9] appear on pages separate from the remainder of the text, other documents signed in May indicate that the plaintiffs were aware of and consented to the changes in the makeup of the board. The court found that "it strains credulity to believe that plaintiffs did not understand that the number of directors was to be permanently reduced in exchange for additional

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d
2002 WL 31163611 (Minn.App.)
(Cite as: 2002 WL 31163611 (Minn.App.))

Page 4

financing." *Eliance v. Horing,* No. 99-1468 (Minn.Dist.Ct. Oct. 15, 1999) (order, p.10). [FN10] The action was not tried on the merits, however. *See Dataphase Sys., Inc. v. CL Sys., Inc.,* 640 F.2d 109, 113 (8th Cir.1981) (setting forth factors courts must consider in determining whether to grant a motion for a preliminary injunction).

> FN9. The documents include a Joint Written Action of Directors and Stockholders in Lieu of a Meeting and attached exhibits. The documents established, inter alia, a five-member board of directors.

> FN10. As part of the federal district court order granting defendants' motion for a preliminary injunction, the court ordered Erickson, et al. substituted as plaintiffs in place of Eliance.

**\*3** In November 1999, Eliance entered into an asset purchase agreement with Webhelp which appellants allege was not fair to Eliance and which forms the basis for appellants' fraudulent conveyance claim against respondents.

In January 2000, appellants filed a 12-count complaint, and amended it in May 2000. Appellants' amended complaint is 78 pages in length. Counts one through four are fraud claims brought under Minnesota and North Dakota securities fraud statutes. Appellants allege that all of the respondents (excluding Adler and Hantho) fraudulently induced appellants to agree to the DMR/Eliance merger, wherein they suffered loss of control of the company they founded and a reduction in the value of their interests in that company. Count five alleges that Eliance and respondents Insight and Wexford breached provisions of four separate contracts and breached the implied covenant of good faith embedded within each contract. (Appellants seek review of only three breach of contract claims.) Count six is a derivative claim for breach of fiduciary duties. Count seven alleges breach of duties of controlling stockholders. Count eight is a claim for fraudulent conveyance of Eliance's assets to Webhelp. Count nine is a claim for equitable imposition of a constructive trust against the assets transferred to Webhelp. Count ten alleges breach of fiduciary duties of directors and controlling stockholders to minority stockholders. Count eleven asserts claims for aiding and abetting breach of fiduciary duties, and count twelve alleges common law fraud.

On November 20, 2000, the district court converted respondents' motions to dismiss into summary judgment motions and granted summary judgment with respect to all but count ten of the amended complaint. The court found that four of appellants' claims were derivative claims and dismissed them because it concluded that appellants are not adequate representatives of similarly situated shareholders to sue on behalf of Eliance. The court dismissed appellants' fraud-based claims for lack of particularity and failure to state a claim. The court dismissed appellants' breach of contract and fraudulent conveyance claims for failure to state a claim upon which relief could be granted. The court initially denied respondents' motions to dismiss and respondents Webhelp Inc., Kerry Adler, and Laura Hantho's summary judgment motion regarding count ten. But following discovery, the district court granted respondents' summary judgment motion and count ten was dismissed as well. This appeal followed.

## DECISION

Because Eliance is a Delaware corporation and Minnesota is the forum state, this court will apply Minnesota rules and law to procedural matters and Delaware laws to substantive issues. *See Davis v. Furlong,* 328 N.W.2d 150, 153 (Minn.1983) (stating that the law of the forum governs matters of procedure). In determining whether an issue is substantive or procedural, the Minnesota Supreme Court recognizes substantive law as that which creates, defines, and regulates rights, whereas "adjective or remedial" (procedural) law prescribes methods of enforcing the rights or obtaining redress for their invasion. *Meagher v. Kavli,* 251 Minn. 477, 488, 88 N.W.2d 871, 879-80 (1958).

**\*4** Appellants first argue that the district court erred when it treated respondents' motions to dismiss as motions for summary judgment without providing notice and opportunity for appellants to respond.

If, on a motion asserting the defense that the pleading fails to state a claim upon which relief can be granted, matters outside the pleading are

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                                                    Page 5
2002 WL 31163611 (Minn.App.)
(Cite as: 2002 WL 31163611 (Minn.App.))

presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.
Minn. R. Civ. P. 12.02.

Respondents (except for Adler, Hantho, Blue Sky Ventures, Inc., [FN11] and Webhelp, Inc. (hereinafter Webhelp respondents) do not dispute that appellants were not given notice that the claims in respondents' motions to dismiss would be treated as if respondents had moved for summary judgment. [FN12] Respondents argue that despite the court's stating that it was treating their motions to dismiss as motions for summary judgment without notice, the court nonetheless applied a rule 12 analysis in dismissing appellants' claims so that appellants were not prejudiced by the nominal conversion. Appellants concede that the district court applied a rule 12 standard when it dismissed their fraud claims.

> FN11. Webhelp, Inc. was previously known as BlueSky Ventures, Inc. and is the same company.

> FN12. Respondents Adler, Hantho, Webhelp/BlueSky (Webhelp respondents), in addition to joining in the remaining respondents' motions to dismiss, filed a motion seeking partial summary judgment on the claims asserted against them. Therefore, appellants had ample and sufficient notice required by the rules of procedure for those claims asserted against the Webhelp respondents and subject to respondents' motion for summary judgment.

The district court stated that it converted respondents' motions to dismiss to summary judgment motions because it considered documents in addition to the complaint. *Johnson v. State,* 536 N .W .2d 328, 332 (Minn.App.1995), *rev'd on other grounds,* 533 N.W.2d 40 (Minn.1996). But "[c]onversion is not necessary where the court only considers an authenticated copy of a key document upon which * * * the complaint is premised." 1 David F. Herr & Roger S. Haydock, *Minnesota*

*Practice,* § 12.9 at 284 (1998). *See Johnson,* 536 N.W.2d at 332 (quoting Herr and Haydock, *Minnesota Practice,* with approval).

> If the document is referred to in the complaint and its authenticity is not disputed, the court may consider it without treating the motion as a summary judgment motion. If this were not the law, a plaintiff with a legally deficient claim could survive a motion to dismiss simply by failing to attach a dispositive document on which it relied. * * * Minnesota courts have embraced this common-sense principle.
> 1 David F. Herr & Roger S. Haydock, *Minnesota Practice,* § 12.9 at 312 (citations omitted). *See In re Hennepin County 1986 Recycling Bond Litig.,* 540 N.W.2d 494, 497 (Minn.1995) (stating district court may consider entire written contract where complaint refers to contract and contract is central to plaintiff's claims). It is undisputed that the district court considered submissions of both parties that included "contracts and documents that are at the heart of Plaintiffs' case." But there is no evidence that the district court considered any documents other than those specifically referred to in appellants' complaint, at least with respect to appellants' fraud claims. Further, none of the parties dispute the authenticity of any of the documents that the district court reviewed.

**\*5** While Webhelp respondents submitted additional materials in support of their summary judgment motion, the district court's decision reflects that it did not consider such material in dismissing those claims that were not part of respondents' summary judgment motion, so the motion to dismiss the fraud claims did not need to be treated as a motion for summary judgment. *In re Hennepin County,* 540 N.W.2d at 497. Accordingly, we review the dismissal of appellants' fraud claims under a rule 12 standard of review.

As to appellants' other claims, unless appellants can "show prejudice from lack of notice or other procedural irregularities, or [were] not afforded a meaningful opportunity to oppose summary judgment," failure to give notice is not reversible error. *Fed. Land Bank of St. Paul v. Obermoller,* 429 N.W.2d 251, 255 (Minn.App .1988), *review denied* (Minn. Oct. 26, 1988). *See* Minn. R. Civ. P. 61 ("The court at every stage of the proceeding must disregard any error or defect in the proceeding

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d
2002 WL 31163611 (Minn.App.)
(Cite as: 2002 WL 31163611 (Minn.App.))

which does not affect the substantial rights of the parties."). Appellants do not identify how they were prejudiced by the court's conversion of motions to dismiss to summary judgment motions except to state that they "would have produced countervailing and opposing affidavits and documents." But appellants fail to identify any such documents. Appellants' argument is too speculative to demonstrate prejudice. Moreover, given the overlapping nature of the claims [FN13] and the fact that appellants were heard on Webhelp respondents' summary judgment motion, all the documents relied on by the court were known to the parties. Thus, the lack of notice that the motions would be considered as rule 56 motions did not affect appellant's substantial rights. Any error, therefore, is harmless. Accordingly, because appellants failed to demonstrate prejudice, we proceed under a summary judgment standard of review for the remainder of appellants' claims.

> FN13. Most of appellants' claims are related to the reduction in the size of Eliance's board of directors. This was also the subject of the summary judgment motion hearing wherein appellants were heard on this issue and had the opportunity to submit additional documents.

The standard of review applicable to a dismissal for failure to state a claim upon which relief may be granted is whether the complaint sets forth a legally sufficient claim for relief. *Geldert v. Am. Nat'l Bank*, 506 N.W.2d 22, 25 (Minn.App.1993), *review denied* (Minn. Nov. 16, 1993).

On appeal from summary judgment, appellate courts ask two questions, whether (1) there are any genuine issues of material fact; and (2) the district court erred in its application of the law. *State by Cooper v. French*, 460 N.W.2d 2, 4 (Minn.1990) (citation omitted).
 A motion for summary judgment shall be granted when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that either party is entitled to a judgment as a matter of law. On appeal, the reviewing court must view the evidence in the light most favorable to the party against whom judgment was granted.

*Fabio v. Bellomo*, 504 N.W.2d 758, 761 (Minn.1993) (citation omitted).

*6 No genuine issue of material fact exists "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *DLH, Inc. v. Russ*, 566 N.W.2d 60, 69 (Minn.1997) (alteration in original) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356 (1986)). "[T]he party resisting summary judgment must do more than rest on mere averments." *DLH*, 566 N.W.2d at 71. A genuine issue for trial must be established by substantial evidence. *Id.* at 69-70 (quoting *Murphy v. Country House, Inc.*, 307 Minn. 344, 351, 240 N.W.2d 507, 512 (1976)).

*A. Derivative Claims*

Appellants first argue the district court erred in finding that counts seven, nine, and eleven in their complaint are derivative claims. Appellants designated only count six as a derivative claim.

Derivative claims are those brought by shareholders to enforce the right of a corporation when the corporate entity has failed to enforce a right that may properly be asserted against it. Minn. R. Civ. P. 23.06; Del. Ch. R. 23.1. In a derivative claim, the injury is direct to the corporation but indirect to the stockholders bringing the suit. By contrast, "individual" or "direct" claims are those premised upon (1) an injury that a plaintiff suffers that is separate and distinct from that suffered by other shareholders; or (2) a "wrong involving a contractual right of a shareholder * * * which exists independently from any right of the corporation." *Kramer v. W. Pac. Indus., Inc.*, 546 A.2d 348, 351 (Del.1988) (quotation omitted). "For a plaintiff to have standing to bring an individual action, he must be injured *directly* or *independently* of the corporation." *Id.* (citation omitted) (emphasis in original). The line of distinction between derivative and direct/individual claims is often a narrow one. *Id.*

The determination of whether a claim is direct or derivative is a substantive issue. *See Kamen v. Kemper Financial Servs., Inc.*, 500 U.S. 90, 96-97, 111 S.Ct. 1711, 1716 (1991) (holding that demand requirement in a rule of procedure governing

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d
2002 WL 31163611 (Minn.App.)
(Cite as: 2002 WL 31163611 (Minn.App.))

derivative suits is a matter of substance, not procedure. The district court correctly applied Delaware law in its determination of the character of appellants' claims.

Whether a cause of action is individual or derivative must be determined from the "nature of the wrong alleged and the relief, if any, which could result if plaintiff were to prevail." *Kramer,* 546 A.2d at 352. In determining the nature of the wrong alleged, a court must look to the body of the complaint, not to the designation assigned to a claim by the plaintiff. *Id.* at 352.

Taking each count in turn, the district court found that counts seven, nine, and eleven were more properly designated derivative claims because each alleged direct injury to Eliance and only indirect injury to appellants.

Count seven alleges that the Insight and Wexford respondents violated their fiduciary duties as controlling shareholders to the minority shareholders in the following ways: (1) making loans to Eliance while "insisting" on collateral in the form of a pledge of appellant Erickson's common stock "for the purpose of asserting control over him and securing his interest in Eliance"; (2) directing the reduction in board size of Eliance; (3) voting their shares to ratify such actions; (4) financing Webhelp, which directly harmed Eliance by creating a well-financed competing company; (5) permitting respondents Raghavendran and Horing to assist Webhelp and become directors of Webhelp; (6) permitting the merger between Webhelp and Eliance to be abandoned; and (7) permitting the board of Eliance to sell and/or lease substantially all of Eliance assets to Webhelp at under-market values. Appellants allege that as a result of such acts, they have been unfairly deprived of virtually all economic interests in Eliance.

*7 It is clear from the face of the complaint alone that these actions should be considered derivative because any loss of value of Eliance would be felt equally by other shareholders.

Count nine relates to the transfer of Eliance's assets to Webhelp and asks the court to exercise its equitable powers to impose a constructive trust on behalf of appellants and Eliance. Appellants allege

that as a result of the transfer of assets, they ended up with nothing and it would be unjust for respondents to keep their financial rewards. As the district court correctly determined, the actual loss accrued directly to Eliance and only indirectly to appellants and, therefore, count nine is properly treated as a claim for derivative relief.

Count eleven alleges that respondents Insight and Wexford aided and abetted the breach of fiduciary duties of Horing, Raghavendran, Osaka, Hantho, and Adler. A review of the complaint reveals that the only injury pled in connection with this claim is loss in value of common stock owned by appellants. Because the loss in value of appellants' stock is the indirect result of direct losses to the company, this claim is also properly deemed derivative.

Appellants' argument that the district court erred in designating the claims as derivative relies primarily on *Odyssey Partner v. Fleming Co.,* No. C.A. 14770, 1998 WL 155543 (Del. Ch., Mar. 27, 1998), for certain assertions of law pertaining to derivative versus direct claims. But appellants fail to apply that law to the facts at hand except to state that *Odyssey* makes "it clear that the trial court simply misunderstood the nature of the claims and the wrong appellants suffered." In *Odyssey,* the court of chancery denied the defendants' motion for summary judgment because of an incomplete factual record on which to decide the issues. *Id.,* 1998 WL 155543 at *1. In its order denying summary judgment, the Delaware court found that the minority-shareholder plaintiffs had standing to sue individually, having established a "special injury" distinct from that suffered by the shareholders as a whole. *Id.,* 1998 155543 at *3. From the limited facts available in the *Odyssey* opinion, it appears that plaintiffs alleged that defendants engaged in unfair dealing culminating in the foreclosure sale for inadequate consideration of all the assets of a company (ABCO Holding, Inc.) in which plaintiffs were shareholders. *Id.* Defendants' purchase price was equal to the amount of debt ABCO owed defendants, leaving ABCO as a shell corporation with no substantial assets and no equity value. *Id.* Due to the incomplete record and in light of its decision to deny summary judgment, the court declined to write about the legal issues raised by the summary judgment motion. *Id.,* 1998 WL 155543 at * 1. Therefore, application of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d
2002 WL 31163611 (Minn.App.)
(Cite as: 2002 WL 31163611 (Minn.App.))

*Odyssey* to the facts at issue here is tenuous at best.

The district court dismissed the derivative claims on the basis that appellants failed to qualify as fair and adequate representatives of Eliance and their similarly situated shareholders. But all parties concede that Eliance is presently a party in a bankruptcy proceeding pending in federal court in North Dakota. Rights of action accruing to a bankrupt debtor, including shareholder derivative actions, are property interests that become part of the debtor's estate in bankruptcy. *Delgado Oil Co. v. Torres*, 785 F.2d 857, 861 n.11 (10th Cir.1986); *Leffler v. Leffler*, 602 N.W.2d 420, 422 (Minn.App.1999). Therefore, even if appellants could be fair and adequate representatives of the Eliance shareholders, any derivative claims are now the property of the Eliance bankruptcy estate and cannot be prosecuted by appellants.

*8 Furthermore, our extensive review of the record leads us to conclude that the evidence supports the district court's findings, and the district court's findings support its conclusion that appellants cannot fairly and adequately represent Eliance shareholders, especially in light of appellants' interests that are antagonistic to the interests they purport to represent. *See In re Fuqua Indus. Inc. S'holder Litig.*, 752 A.2d 126, 130-134 (Del. Ch.1999) (discussing importance that representative plaintiff not hold interests antagonistic to the class). We therefore affirm the district court's dismissal of appellants' derivative claims.

*B. Fraud Claims*

Appellants next argue that the district court erroneously dismissed their fraud claims for failure to state a claim. In reviewing cases that are dismissed for failure to state a claim on which relief can be granted, the only question before the reviewing court is whether the complaint sets forth a legally sufficient claim for relief. *Barton v. Moore*, 558 N.W.2d 746, 749 (Minn.1997).

Minn. R. Civ. P. 9.02 requires that fraud claims be pleaded with particularity. That is to say, "all of the elements of a fraud cause of action must be pleaded." *Stubblefield v. Gruenberg*, 426 N.W.2d 912, 914 (Minn.App.1988) (citations omitted). A fraudulent misrepresentation claim requires a plaintiff to demonstrate that a defendant:

   (1) made a representation [FN14] (2) that was false (3) having to do with a past or present fact (4) that is material (5) and susceptible of knowledge (6) that the representor knows to be false or is asserted without knowing whether the fact is true or false (7) with the intent to induce the other person to act (8) and the person in fact is induced to act (9) in reliance on the representation (10) that the plaintiff suffered damages (11) attributable to the misrepresentation.

> FN14. A person can make a misrepresentation either (1) by an affirmative statement that is itself false; or (2) by concealing or not disclosing certain facts that render the facts that are disclosed misleading. *M.H. v. Caritas Family Servs.*, 488 N.W.2d 282, 289 (Minn.1992). Statements or opinions that are general and indefinite are not representations of fact. *Martens v. Minn. Mining & Mfg. Co.*, 616 N.W.2d 732, 747 (Minn.2000).

*M.H. v. Caritas Family Servs.*, 488 N.W.2d 282, 289 (Minn.1992) (citation omitted). [FN15] These pleading requirements apply not only to common law fraud, but also to securities fraud and consumer fraud claims alleged by appellants. *See Specialized Tours, Inc. v. Hagen*, 392 N.W.2d 520, 536 (Minn.1986) (Minnesota Securities Fraud); *LeSage v. Norwest Bank Calhoun-Isles, N.A.*, 409 N.W.2d 536, 539 (Minn.App.1987) (applying common law fraud pleading elements to Minnesota Consumer Fraud Act); *Barnes v. Sunderman*, 453 N.W.2d 793, 795 (N.D.1990) (North Dakota Securities Fraud).

> FN15. Because appellants' claims were dismissed for failure to comply with Minnesota's heightened pleading requirements for fraud, Minnesota law, rather than Delaware law, is applied.

The district court found that appellants did not clearly and explicitly allege each of the elements as required by the rules and dismissed all of appellants' fraud claims. A review of appellants' complaint supports the court's decision.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                                                    Page 9
2002 WL 31163611 (Minn.App.)
(Cite as: 2002 WL 31163611 (Minn.App.))

Appellants' complaint makes general, conclusory statements in the various fraud counts rather than stating precisely *what* misrepresentations and omissions by *which* of the respondents was relied upon by *which* of the appellants. For example, appellants state in their complaint that

*9 [d]efendants made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, which operated as a fraud and deceit upon the plaintiffs * * *.

Appellants' second, third, and fourth claims are even less specific. Moreover, the alleged misrepresentations by respondents all involve statements of future acts. For example, the statements made by Raghavendran and Horing prior to the merger of DMR and Eliance regarding control of the company concerned the future relationship between the parties and took place in the context of business negotiations. A representation or expectation as to future acts is not a sufficient basis to support an action for fraud merely because the represented act or event did not take place. *Martens v. Minn. Mining & Mfg. Co.,* 616 N.W.2d 732, 747 (Minn.2000). *See Dollar Travel Agency, Inc. v. Northwest Airlines, Inc.,* 354 N.W.2d 880, 883 (Minn.App.1984) (stating that fraud claims cannot be based on statements of intentions or opinions), *review denied* (Minn. Dec. 21, 1984). A representation as to future acts will only support an action for fraud if the promissor did not intend to perform at the time the promise was made. *Martens,* 616 N.W.2d at 747.

Here, the reduction in board size was requested as a result of Eliance requiring additional funding, not an unlikely consequence of acquiring additional capital. Further, although Insight lost no members in the reduction, it did not gain control of the board--both the founders and Insight had an equal number of representatives on the board. Moreover, even if certain representations were made to appellants that they would perpetually have control of Eliance, the fact remains that the merger documents which appellants read and freely signed, did not contain such representations. Indeed, section 8.9 of the March Stock Purchase Agreement contemplated a change in board control by providing that Insight and Wexford "shall have the right and power immediately to elect a majority of

the board" if Eliance did not diversify from the adult internet business by the second anniversary of the closing.

Appellants also allege fraudulent omissions by respondents Insight, Wexford, Raghavendran, and Horing. Appellants allege that Raghavendran and Horing failed to state that Insight and Wexford were a "far more demanding venture capital group," that

would take advantage of any opportunity to take over DMR and dilute its interest holders, that they had no intention of having an Independent Board member, and that they would engage in financial transactions at exorbitant terms detrimental to the founders and Eliance even though they were in control and otherwise act unreasonably to gain whatever advantage they could. They also failed to tell them that Hale & Dorr, LLP had been Insight's general counsel and would always be acting for the benefit of Insight regardless of who paid them or directed them.

*10 The district court found that respondents owed no duty to disclose the information allegedly omitted, that the corporate documents and agreements superseded and cancelled all prior omissions, and that the omitted information could have been learned from other sources. Further, the court noted that there was nothing in the original merger document between Eliance and DMR that prohibited the documents from being amended in the future. We agree.

Generally, one party to a transaction does not have a duty to disclose material facts known only to that party. *Klein v. First Edina Nat'l Bank,* 293 Minn. 418, 421, 196 N.W.2d 619, 622 (1972). Only where "special circumstances" exist, does a party have a duty to speak out. *Id.* at 422, 196 N.W.2d at 623. Those circumstances include (1) when speaking, a party must say enough to prevent his or her words from misleading the other party; (2) where one party has special knowledge of material facts to which the other party does not have access, he may have a duty to disclose such facts; and (3) where a fiduciary relationship exists, material facts must be divulged. *Id.* at 421, 196 N.W.2d at 622.

As the district court found, there is no indication that these special circumstances exist, and knowledge of Insight's and Wexford's other investments was available to appellants through

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d
2002 WL 31163611 (Minn.App.)
(Cite as: 2002 WL 31163611 (Minn.App.))

Page 10

other sources. When a concealed fact is readily ascertainable, the failure to disclose that fact does not amount to fraud. *Egan v. Thorpe Bros.,* 195 Minn. 370, 371, 263 N.W. 109, 110 (1935). Moreover, where

> both parties are intelligent and fully capable of taking care of themselves and dealing at arms' length, with no confidential relations, no duty to disclose exists when information is not requested, and mere silence is then not a fraud. There must be active concealment or misrepresentation.

*Boubelik v. Liberty State Bank,* 553 N.W.2d 393, 399 (Minn.1996) (citation omitted). Information such as whom Hale & Dorr represented, and the alleged affiliate relationships between Insight, the Chavoya Group, and board member Osaka, was not information uniquely known to respondents.

Appellants argue that the complaint "as a whole" pleads fraud with sufficient particularity. However, rule 9.02 requires that each element be pleaded with specificity. Because appellants failed to explicitly plead each element of each claim against identified respondents, we conclude that the district court did not err in dismissing appellants' fraud claims.

### C. Fraudulent Conveyance Claim

In count eight, appellants claim that respondents fraudulently conveyed Eliance's assets to Webhelp in violation of Minn.Stat. §§ 513.41-.51 (2000), the Uniform Fraudulent Transfer Act (UFTA). The UFTA prohibits debtors from transferring property with intent to hinder, delay, or defraud creditors, or "without receiving a reasonably equivalent value in exchange for the transfer or obligation." Minn.Stat. § 513.44(a)(1), (2); *In re Minn. Breast Implant Litig.,* 36 F.Supp.2d 863, 880 (D.Minn.1998).

*11 Appellants allege that they are creditors [FN16] of Eliance by virtue of their possession of direct claims against Eliance for violations of Minnesota securities laws and their breach of contract claims. Because the district court dismissed those claims that purported to give appellants creditor status, it subsequently dismissed appellants' fraudulent conveyance claims as well.

> FN16. The statute defines "creditor" as "a person who has a claim," and defines a "claim" as "a right to payment, whether or

not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." Minn.Stat. § 513.41, subds. (3),(4) (2000).

As with derivative claims, fraudulent transfer claims are subject to an automatic stay in bankruptcy proceedings. *See In re Keene Corp.,* 164 B.R. 844, 850 (Bankr.S.D.N.Y.1994) (barring prosecution of a fraudulent transfer action). Therefore, appellants are barred from proceeding with their fraudulent conveyance claim by the bankruptcy proceeding. Furthermore, we agree with the district court that appellants are not creditors of Eliance. Appellants claim to be creditors based on their claims against Eliance in this action and other actions. But all claims in the action have been dismissed and appellants failed to raise the issue of other claims in the district court. Because we affirm the district court's dismissal of appellants' claims purporting to give them creditor status, appellants lack creditor standing, effectively barring them from bringing a fraudulent conveyance claim under the UFTA.

### D. Breach of Contract Claims

The district court dismissed appellants' breach of contract claims after finding that the agreements and other submissions of the parties revealed no disputed issues of material fact.

On appeal, appellants allege that three separate contracts were breached in addition to the breach of implied covenants of good faith and fair dealing inherent in each contract: the January 15, 1999 Purchase Agreement, the March 10, 1999 Preferred Stock Purchase Agreement, and the March 10, 1999 Stockholders Voting Agreement.

### 1. *January 1999 Purchase Agreement*

The parties to this agreement are the Insight and Wexford Groups and DMR ("together with any successor entity"). Appellants are not parties to this agreement. Because they are not parties to the contract, they cannot claim to have been directly injured by its breach and their claim with respect to this agreement must be dismissed. Appellants argue that they are the "successors to membership

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                                    Page 11
2002 WL 31163611 (Minn.App.)
(Cite as: 2002 WL 31163611 (Minn.App.))

interests in DMR," but offer no explanation of this statement, or how such an interest might be considered a "successor entity" to DMR. Individual members of a limited liability corporation are not parties to company contracts. *See Arent v. Dist. Sciences, Inc.,* 975 F.2d 1370, 1374- 75 (8th Cir.1992) (stating that because company's shareholders were not parties to company contracts, they could not bring a claim).

Moreover, the January agreement was superseded by the March Stock Purchase Agreement, which contained a merger clause expressing the parties' intent to replace prior agreements and understandings with a new, integrated document. Appellants argue that the parties to the two agreements are not the same and therefore the merger language in the March agreement does not apply. Appellants offer no authority for their argument. A review of the two documents reveals that the March agreement encompasses more subjects than the January agreement, but as a whole, it is clear that the intent of the parties was for the March agreement to supercede the January agreement and any other prior understanding of the parties. Also, the March agreement has more parties, but because it includes every party of the January agreement, and because there is no authority to the contrary, we conclude that the merger clause applies to bar appellants' claim.

2. *March 1999 Preferred Stock Purchase Agreement*

**\*12** A review of the March agreement establishes that the provisions appellants allege were breached (1) contained no promises made to or for the benefit of appellants; or (2) contained promises made by Eliance, not the Insight or Wexford respondents. Appellants therefore have no standing to sue for breach of this agreement.

Specifically, appellants allege breach of paragraph 5.1 of the March agreement wherein the Insight and Wexford respondents warrant that they are purchasing the Eliance preferred shares with no present intention of selling or distributing their interests except as provided. But the amended complaint nowhere alleges whether or how this provision was breached, and in fact, several paragraphs of the complaint allege the opposite:

that the Insight and Wexford respondents are, and have been holders of Eliance preferred stock. Further, this contractual obligation represents a present intention at the time the contract was executed and before respondents advanced loans above the $18 million contemplated in this agreement. Respondents were not warranting as to their future intentions, which are subject to change based on new circumstances and events.

Appellants also allege breach of paragraph 5.3 of the agreement wherein the Insight and Wexford respondents warrant that they made sufficient due diligence investigations of DMR such that they were capable of evaluating the risks of an investment. But the amended complaint simultaneously admits that respondents complied with this paragraph.

Appellants' claim breach of paragraph 8.8 requiring that Eliance's by-laws prohibit financial transactions with any stockholder, officer, or director without the approval of a majority of disinterested directors. A review of Eliance's by-laws reveals that this provision was implemented in Article 5.7. Therefore, there was no breach of this provision. Further, paragraph 8.8 was clearly a covenant made by Eliance, not respondents Insight and Wexford.

3. *March 1999 Stockholders Voting Agreement*

Appellants allege that respondents Insight and Wexford violated the paragraph of this agreement that establishes how the board of directors would be elected. Essentially, the parties agreed to support each other's designated candidates. Appellants allege that this clause was breached when respondents attached a provision to the subsequent loan documents that reduced the size of the board as a condition of the loans. The district court found that this clause was effectively amended by the May Written Action in Lieu of a Special Meeting document signed by each of the appellants as common shareholders that authorized the reduction in board size. We agree.

Appellants argue that Delaware law voids the written action because any action to alter or amend a company's certificate of incorporation must first be approved by the board of directors and then recommended to and approved by the stockholders.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                                    Page 12
2002 WL 31163611 (Minn.App.)
**(Cite as: 2002 WL 31163611 (Minn.App.))**

Appellants cite Del.Code Ann. tit. 8, § 141(f) (2000) for this proposition, but this section of the Delaware code does not support appellants' proposition. This section of the code permits directors to take action by unanimous written consent in lieu of a meeting in the absence of limiting language in the certificate of incorporation and the bylaws. *Id.* Because appellants' argument is without adequate legal authority, we decline to address the allegation. *See State, Dep't of Labor and Industry v. Wintz Parcel Drivers, Inc.,* 558 N.W .2d 480, 480 (Minn.1997) (stating court declines to reach issues in absence of adequate briefing); *Ganguli v. Univ. of Minn.,* 512 N.W.2d 918, 919 n.1 (Minn.App.1994) (stating court declines to address allegations unsupported by legal analysis or citation).

### 4. *Breach of Implied Covenants of Good Faith and Fair Dealing*

*13 The district court found that appellants' claims for breach of the implied covenant of good faith were merely attempts to add substantive terms to the primary contracts.

> The covenant of good faith and fair dealing requires a party in a contractual relationship to refrain from arbitrary and unreasonable conduct that has the effect of preventing the other party to the contract from receiving the fruits of the contract.

*Wilmington & N. R.R. Co. v. Del. Valley R.R. Co., Inc.,* No. 97C-09-297- WTQ, 1999 WL 463705, *6 (Del.Super.Ct.1999). The covenant cannot be used to rewrite the express terms of a contract or impose duties inconsistent with those terms. *Cincinnati SMSA, Ltd. P'ship v. Cincinnati Bell Cellular Sys. Co.,* 708 A.2d 989, 992 (Del.1998).

On appeal, appellants argue that respondents' actions violated the spirit of the agreements

> in causing the various agreements to be submitted only as signature pages, in negotiating for a change of control that was prohibited under the spirit (at least) of the various contracts and corporate documents, [by] the filing of a secret and unapproved amendment to the certificate of incorporation, [by] taking advantage of their economic position to extract terms for a change of control without any recognition of a conflict of interest.

Appellants do not elaborate on their argument, but merely state that these actions should be considered as part of the analysis of their breach of contract claims. Issues not briefed on appeal are waived, *Melina v. Chaplin,* 327 N.W.2d 19, 20 (Minn.1982) , and appellate courts may decline to reach an issue in absence of adequate briefing. *Wintz,* 558 N.W.2d at 480. In any event, the district court's basis for dismissing the claim is sound: appellants' arguments are an attempt to add additional terms to the agreement and the record does not reflect any conscious concealment of the relationships complained of.

### D. *Breach of Duty of Candor & Loyalty in Changing Controlling Documents*

The district court did not initially dismiss count ten in its November 2000 order. Subsequently, respondents moved for summary judgment on count ten. The district court granted summary judgment to respondents by order dated October 25, 2001.

Appellants allege in count ten that respondents Insight, Wexford, Raghavendran, Horing, and Osaka [FN17] breached their fiduciary duties of candor and loyalty as directors and controlling shareholders of Eliance. Specifically, appellants allege that respondents engaged in fraud to induce appellants to consent to fundamental changes in corporate documents that divested them of their rights as founders to control Eliance.

> FN17. In their amended complaint, appellants also included respondents Adler and Hantho in their breach of duty of loyalty and candor claim. The district court dismissed this claim against Adler and Hantho because they were never directors of Eliance. On appeal, appellants apparently concede this argument as to Adler and Hantho.

On the merger of DMR into Eliance in March 1999, appellants, as founders, had a right to four out of seven seats on the board of directors as memorialized in the by-laws, articles of incorporation, and other agreements between the parties. From May to September 1999, appellants allege that they were fraudulently induced to consent to the reduction in board size when only

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                          Page 13
2002 WL 31163611 (Minn.App.)
(Cite as: 2002 WL 31163611 (Minn.App.))

signature pages of documents changing the board size were forwarded to appellants for their signatures.

**\*14** Under Delaware law, a director owes a fiduciary duty to "disclose fully and fairly all material information within the board's control when it seeks shareholder action." *Arnold v. Soc. For Sav. Bancorp, Inc.,* 650 A.2d 1270, 1277 (Del.1994). A minority shareholder who exercises actual control of corporate conduct will be attributed fiduciary duties. *O'Reilly v. Transworld Healthcare, Inc.,* 745 A.2d 902, 912 (Del. Ch.1999) . Because none of the respondents owned a majority of shares in Eliance, appellants must show that each of the respondents "held a dominant position and *actually controlled* the corporation's conduct" in order for a fiduciary relationship to exist. *In re Western Nat'l Corp. S'holders Litig.,* No. 15927, 2000 WL 710192 at \*6 (Del. Ch. May 22, 2000) (emphasis added).

To establish a breach of fiduciary duty, a plaintiff must present evidence that a defendant made materially false statements, omitted material facts, or made partial or misleading facts. *O'Reilly,* 745 A.2d at 916. A fact is material "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *Rosenblatt v. Getty Oil Co.,* 493 A.2d 929, 944 (Del.1985). But there is no duty to disclose facts that are reasonably available to the stockholders. *Meyer v. Alco Health Servs. Corp.,* No. Civ. A. 11213, 1991 WL 5000, \*4 (Del Ch. Jan. 17, 1991).

The district court dismissed appellants' claim on the basis that while respondents may have been in positions to control Eliance, appellants failed to present evidence that would lead a reasonable person to conclude that respondents exercised actual control of Eliance. *See In re Sea-Land Corp. S'holders Litig.,* No. Civ. A. 8453, 1987 WL 11283, at \*5 (Del. Ch. May 22, 1987) (stating that "[t]he *potential* ability to exercise control is not equivalent to the actual *exercise* of that control"). The court concluded that no genuine issue of material fact exists showing respondents owed a fiduciary duty to appellants.

The record supports the district court's conclusion.

Appellants' mere assertion that Insight was in a position to control Eliance because of its affiliations with Wexford and Osaka is refuted by documents that demonstrate (1) Insight and Wexford are separate entities that make independent decisions; (2) Osaka's role as an advisory board member of the Insight I group of funds was disclosed to appellants (and Insight I had no relationship with Eliance); (3) Insight was at all relevant times a minority shareholder and a minority presence on the board; and (4) Insight was not involved with the daily operations of Eliance. Because the record supports a determination as a matter of law that respondents had no actual control of the corporate conduct of Eliance, accordingly, they had no fiduciary duty to appellants.

Appellants argue that a duty of candor exists where actual control may be inferred, but cite to no authority for the proposition. Assignment of error in a brief based on "mere assertion" and not supported by argument or authority is waived unless prejudicial error is obvious on mere inspection. *State v. Modern Recycling, Inc.,* 558 N.W.2d 770, 772 (Minn.App.1997) (citation omitted).

**\*15** The undisputed testimony and evidence developed through discovery indicates that Hale & Dorr sent all of the corporate documents reflecting the change in the board size to Paul Eidsness, general counsel for Eliance. Appellants argue that because respondents faxed the documents, they had a duty to check and see if the documents were received because the minimum accepted method of communicating with stockholders is U.S. mail. However, the exhibits submitted with respondents' summary judgment motion clearly indicate that (1) Eidsness received all the documents; (2) respondents did not interfere in any way with appellants' ability to review the documents; and (3) appellant Erickson, as CEO of Eliance, signed several documents evidencing the reduction in board size, including loan notes, [FN18] a Written Action in Lieu of a Special Meeting, Amendment to the Stockholders' Voting Agreement, and an Amendment to the Certificate of Incorporation. Therefore, even if respondents owed a fiduciary duty to appellants, it is undisputed that respondents disclosed material information relevant to the reduction in board size.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d
2002 WL 31163611 (Minn.App.)
(Cite as: 2002 WL 31163611 (Minn.App.))

FN18. The May 12, 1999 loan note for $2 million contains Erickson's signature and a personal edit providing that the board size would be reduced to five members.

### E. Claims Against Respondents Adler and Hantho

Appellants argue that the district court erred in dismissing the claims against respondents Adler and Hantho because it "applied the wrong standard and ignored the material disputed facts." Appellants do not expand on their argument except to argue that while Adler and Hantho may have never been *actual* members of the board of directors, they were *acting* as directors. Appellants also argue that a letter of intent between Eliance, Insight, and Webhelp, Inc. that anticipated a merger of Eliance and Webhelp, established a genuine issue of material fact that Adler and Hantho were "acting" directors of Eliance. But the letter of intent provided for Adler and Hantho to *become* directors only if the proposed merger was completed, which it never was.

As to whether a genuine issue of material fact exists, appellants do not elaborate, and do not assert any legal analysis or legal authority. Generally, appellate courts decline to address allegations unsupported by legal analysis or citation. *Ganguli,* 512 N.W.2d at 919, n.1. In any event, the only counts that could conceivably be directed at Adler and Hantho are the derivative claims, the claim of fraudulent conveyance of Eliance's assets to Webhelp (Adler and Hantho are founders of Webhelp), and the claim of breach of the duty of candor and loyalty in changing controlling documents (count ten).

We conclude that appellants cannot pursue derivative claims. In addressing the duty of candor and breach of loyalty claims, we conclude that because Adler and Hantho were not involved in any way with the documents that resulted in the change of control at Eliance, they had no power to control and influence the actions complained of. Appellants' complaint states that they first met Adler and Hantho on July 1, 1999--long after the execution of the documents that reduced the number of board members. There is no genuine issue of material dispute because the documents that form the basis of count ten were executed long before Adler and Hantho had met appellants, negating any possibility

of wrongdoing by Adler and Hantho.

**\*16** As to appellants' claim against Adler and Hantho concerning the fraudulent conveyence of Eliance's assets to Webhelp, Inc., to prevail, appellants must be "creditors" with direct claims against Eliance under the Uniform Fraudulent Transfer Act (UFTA). *See* Minn.Stat. §§ 513.44(a); 513.41(4) (providing for avoidance of fraudulent transfers by creditors under certain conditions). As discussed above, we affirm the district court's conclusion that appellants are not "creditors" within the meaning of the statute and therefore do not have standing to bring a fraudulent conveyance claim even if the claim was not subject to stay because of the bankruptcy action.

### F. Motion to Strike Unsupported Portions of Appellants' Brief

Respondents [FN19] moved to strike portions of appellants' brief that fail to comply with the requirement that each statement of a material fact be accompanied by a specific page reference to the record. Respondents urge this court to adopt a redacted version of appellants' brief, which respondents submitted with their motion.

FN19. All respondents joined in this motion except Jeffrey Farstad.

Failure to cite to the record is a violation of Minn. R. Civ.App. P. 128.03. *Brett v. Watts,* 601 N.W.2d 199, 202 (Minn.App.1999), *review denied* (Minn. Nov. 17, 1999). Flagrant violation of appellate rules requiring citations to the record may lead to non-consideration of an issue or dismissal of the appeal. *Id.* at 202. Citations to the record are particularly important where the record is extensive or complicated, as is the case here. *Cole v. Star Tribune,* 581 N.W.2d 364, 371 (Minn.App.1998).

Respondents are correct in stating that appellants do not cite to the record in every instance as required by the rules. But some statements that respondents request be stricken are nonetheless part of the record because they appear in appellants' complaint.

The papers filed in the trial court, the exhibits, and the transcript of the proceedings, if any, shall constitute the record on appeal in all cases.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d
2002 WL 31163611 (Minn.App.)
**(Cite as: 2002 WL 31163611 (Minn.App.))**

Minn. R. Civ.App. P. 110.01. Nonetheless, due to the flagrant violation of the appellate rule requiring appellants to cite to the record, we grant respondents' motion and strike those portions of appellant's brief which are not properly referenced and do not appear in appellants' complaint or supporting documents.

**Affirmed; motion granted.**

2002 WL 31163611 (Minn.App.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.