THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| iGames Entertainment, Inc., )<br>)<br>           Plaintiff, )<br>)<br>vs. )<br>)<br>)  C.A. No. 04-180-KAJ<br>Chex Services, Inc. and Equitex, Inc. )<br>)<br>           Defendants. ) | |

**REPLY BRIEF OF CHEX SERVICES, INC. AND EQUITEX, INC.
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

                                                  MORRIS, JAMES, HITCHENS & WILLIAMS LLP

                                                  James W. Semple (#396)
                                                  James E. Drnec (#3789)
                                                  222 Delaware Avenue
                                                  P.O. Box 2306
                                                  Wilmington, DE 19899
                                                  (302) 888-6800
                                                  Email: *jdrnec@morrisjames.com*

OF COUNSEL:                            Attorneys for Chex Services, Inc.
                                                  and Equitex, Inc.
RIDER BENNETT, LLP

Daniel Q. Poretti
Patrick D. Robben
Douglas J. Frederick
33 South Sixth Street, Suite 4900
Minneapolis, MN 55402
(612) 340-8900
Email: *dqporetti@rider.com*

Dated: April 5, 2005

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................................. ii

SUMMARY OF REPLY ARGUMENT ...............................................................................1

REPLY ARGUMENT .............................................................................................................2

    I.    NEITHER EQUITEX NOR CHEX CAN BE LIABLE, AS MATTER OF LAW, FOR THE TERMINATION AMOUNT. .................................................................................................2

        A.    The SPA Clearly Sets Forth Precursors For Equitex To Be Liable For The Termination Amount. ................................................................................2

        B.    Chex Cannot Be Liable For The Termination Amount. ................................................................................2

    II.    IGAMES HAS NO VALID CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING WITH RESPECT TO THE SPA ..........................................................................................6

    III.    CHEX IS NOT LIABLE ON THE TERM LOAN NOTE ..............................................................................8

    IV.    IGAMES' CLAIM THAT EQUITEX AND CHEX BREACHED IMPLIED DUTIES WITH RESPECT TO THE NOTE FAILS AS A MATTER OF LAW .........................................9

    V.    THE UNDISPUTED FACTS DOOM IGAMES' TORTIOUS INTERFERENCE CLAIM .................................................................10

CONCLUSION.......................................................................................................................13

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Aspen Advisors LLC v. United Artists Theatre Co.*,
    843 A.2d 697 (Del Ch. 2004) .................................................................................... 6, 7

*Carlock v. Pillsbury Co.*, 719 F. Supp. 791, 812 (D. Minn. 1989) .................................... 10

*Dave Greytak Enters., Inc. v. Mazda Motors of Am., Inc.*,
    622 A.2d 14 (Del. Ch. 1992), aff'd 609 A.2d 668 (Del. 1992) .............................. 7

*In re Hennepin County 1986 Recycling Bond Litig.*,
    517 N.W.2d 63 (Minn. Ct. App. 1994) ................................................................. 10

*Ind. Consol. Sch. Distr. No. 24 v. Carlstrom*,
    151 N.W.2d 784 (Minn. 1967) ................................................................................ 8

*Kelly v. McKesson HBOC, Inc.*,
    C.A. No. 99C-09-265 WCC, 2002 Del. Super. LEXIS 39 (Jan. 17, 2002) ............. 7

*Midwest Sports Marketing v. Hillerich & Bradsby of Canada*,
    552 N.W.2d. 254 (Minn. Ct. App. 1996) ................................................................ 9

*PAMI-LEMB I INC. v. EMB-NHC, L.L.C.*,
    857 A.2d 998 (Del. Ch. 2004) ............................................................................. 6, 7

*Star Cellular Tel. Co. v. Baton Rouge CGSA, Inc.*,
    90C-JL-219, 1993 Del. Ch. LEXIS 158 (Del. Ch. July 30, 1999), *aff'd* No.
    315, 1993, 1994 Del. LEXIS 190 (Del. June 9, 1994) ............................................ 4

## **SUMMARY OF REPLY ARGUMENT**

iGames' opposition to Defendants' motion for summary judgment can be summed up in one word: "ignore". In order to concur with iGames' arguments as to the scope of the Stock Purchase Agreement ("SPA") and Term Loan Note ("Note"), the Court would have to read only selective sections of the documents and ignore other portions directly controlling the issues in dispute. The Court would have to read only the self-serving, unspecific testimony from Mr. Wolfington alleging various damages without providing any support for the claims, while again ignoring other portions of the testimony of Mr. Wolfington (and others) showing that the unspecified claims are indisputably false. The Court would have to ignore the undisputed evidence about iGames' multiple immediate breaches of the SPA. The Court would have to ignore Mr. Wolfington's unmistakable testimony that iGames had no intent of closing on the SPA in March 2004. The Court would also have to ignore clear judicial statements regarding the scope of the implied covenant of good faith and fair dealing in both Delaware and Minnesota.

The purpose of a summary judgment motion is not for the parties to offer disputed spin on the facts. Defendants respectfully submit that they have not indulged in this approach unfortunately favored by iGames, and instead have demonstrated that the clear language of the parties' agreements, iGames' pleadings, and Mr. Wolfington's own testimony, conclusively shows Defendants are entitled to summary judgment.

The time has come for the Court to "untie the knot."

## REPLY ARGUMENT

I. **NEITHER EQUITEX NOR CHEX CAN BE LIABLE, AS MATTER OF LAW, FOR THE TERMINATION AMOUNT.**

   A. **The SPA Clearly Sets Forth Precursors For Equitex To Be Liable For The Termination Amount.**

The SPA expressly acknowledged that Equitex's obligations under the SPA were contingent on approval of the agreement by Equitex's shareholders. (*See* Robben Aff. Ex. 1 at 41 (SPA § 7(g)(ii) ("Buyer further acknowledges that all of Parent's obligations hereunder are subject to and conditioned upon the approval of Parent's shareholders.").) Equitex's shareholders did not approve the agreement. In response, iGames pleads that this clause should be ignored and that Equitex is somehow liable for the Termination Amount nonetheless because the SPA stated that "[t]his Agreement constitutes the valid and legally binding obligation of Parent, enforceable *in accordance with its terms and conditions . . .* " (C.A. No. 04-180 D.I. 113 at 25 (hereinafter "iGames' Br.") (citing SPA § 4(b)).) (Emphasis added.) There is nothing in this clause that disproves Equitex's argument. The "terms and conditions" of the SPA provided that "Parent's obligations hereunder are subject to and conditioned upon the approval of Parent's shareholders." (*See* Robben Aff. Ex. 1 at 41 (SPA § 7(g)(ii)).) Without shareholder approval, Equitex cannot be held liable for the Termination Amount.

   B. **Chex Cannot Be Liable For The Termination Amount**

       1. **The SPA says Chex cannot liable for the Termination Amount**

The SPA expressly provides that any obligation to pay the "Termination Amount" to iGames would *solely* be an obligation of "Parent," i.e., Equitex. (*See* Robben Aff. Ex. 1 at 56 (SPA § 11(e)(ii) (stating *"then Parent shall pay to Buyer a termination fee in an amount equal to $1,000,000 (the 'Termination Amount')"*).) iGames claims

2

Chex is fully liable under the SPA for the Termination Amount, but fails to cite any provision to that effect. Rather, it only points to clauses stating Chex could be liable for iGames' costs and expenses. (iGames' Br. at 31 (citing SPA § 11(e)(ii), (iv), (v), § 12(q).) Nothing in the SPA says Chex could ever be held liable for the $1,000,000 Termination Amount. In fact, the other portions of the SPA providing for payment of costs by "Parent or Chex" or "Parent and/or Chex" demonstrate the parties clearly understood how to differentiate between obligations potentially the responsibility of both Defendants versus those that the parties intended to be solely those of Equitex (upon shareholder approval). Accordingly, Chex cannot be held liable for the Termination Amount without completely ignoring the SPA's plain language.[1]

> 2. **iGames' decision not to close on the SPA, and its prior breaches of the SPA, preclude it from any right to terminate the agreement and seek the Termination Amount**

iGames cannot plausibly sue to claim damages for breach of a contract it would not have closed on. iGames tries to explain away Mr. Wolfington's testimony by claiming it is taken out of context. There is nothing unambiguous about his testimony:

> **Q:** *So, you would have closed the deal, no problem?*
>
> **A:** With the exception of the adjustments that we were discussing. *Let me reflect [on] that question.* As of March 11, I had discussions with Henry about changing terms of the agreement per some issues that they had with their business. Seminole contracts, the non-disclosed bad debt of $600,000. The Whitebox assumed financing, but I didn't even know that the Whitebox closing had closed on the 11[th], but I was not going to close if they were going to do that financing. So *as written, no.*

---

[1] The SPA provided that Equitex could be liable for the Termination Amount if, within 12 months after the shareholders voted to reject the iGames deal, Defendants entered into a transaction with another entity for Chex. (*See* Robben Aff. Ex. 1 at 55-56 (SPA § 11(b)(vi), (e)(ii)).) However, because no such vote occurred, this provision does not apply.

3

(*See* Robben Aff. Ex. 5 (Wolfington Dep. Tran. at 214:1-15) (emphasis added).) This testimony cannot be ignored or now swept under the rug by iGames.

Further, iGames' prior breaches precluded it from any right to sue under the SPA. First, iGames made unauthorized assignments of its rights under the SPA to Mr. Wolfington, and then to Mercantile Capital, within days of the SPA's execution. iGames does not deny that the plain language of Section 12(d) of the SPA prohibited this assignment, but instead claims that the assignment is not prohibited nonetheless. The authority for this proposition cited by iGames does not support iGames' attempt to read-out of the SPA the clear mandate of Section 12(d). "Antiassignment clauses are normally included in contracts to prevent the introduction of a stranger in to the contracting parties' relationship and to assure performance by the original contracting parties." *Star Cellular Tel. Co. v. Baton Rouge CGSA, Inc.*, 90C-JL-219, 1993 Del. Ch. LEXIS 158, at *24 (Del. Ch. July 30, 1999), *aff'd* No. 315, 1993, 1994 Del. LEXIS 190 (Del. June 9, 1994). Here, in the case of a contract creating a business merger, the parties obviously had the intent to prevent assignment of parties' rights so that all parties would remain committed to the transaction. Moreover, the issue of whether a third-party such as Mercantile could be assigned a right to pursue a claim against Defendants is not the same as the issue here, which is whether the parties to a business merger could flagrantly violate plain language governing what they could or could not do during the closing period. iGames cannot point to any facts showing it obtained Defendants' consent to the assignment or the related Loan and Security Agreement.[2] Instead, iGames claims it is entitled to enforce

---

[2] Jeremy Stein, former CEO of iGames, testified, contrary to iGames' suggestion, that he was not aware of Defendants ever giving written permission for this transaction. (iGames' Appendix Ex. CC at 66:22-24; 67:1-2.) Additionally, iGames' argument that it

4

the SPA strictly as written, but only those clauses of the agreement it chooses not to ignore.

In addition, iGames was not allowed to enter into transactions outside the Ordinary Course of Business. (*See* Robben Aff. Ex. 1 at 39 (SPA § 7(b)).) iGames' default on a $2 million loan obligation would, under any stretch of the imagination, be an event outside the ordinary course. iGames' inexcusable shirking of its obligations under the Note, which have been amply discussed elsewhere, constituted an event depriving iGames of any right to terminate the SPA and claim damages.

Finally, as discussed in Defendants' brief in opposition to iGames' motion for summary judgment, iGames also failed to disclosed a February 2003 Asset Purchase Agreement with Lake Street Gaming. (*See* Robben Aff. Ex. 40 (Stein Dep. Tran. at 61:1-24, 62:1-24).) Under this agreement, Lake Street Gaming is entitled to sell back to iGames 150,000 shares of iGames stock that Lake Street Gaming received in consideration for selling certain rights in a casino game called "table slots" to iGames if the fair market value of iGames' stock fell below a certain level. (*See* Second Robben Aff.[3] Ex. 7 (Lake Street Gaming Compl.).) Mr. Wolfington does not deny that iGames never disclosed this agreement to Defendants. (*See* Second Robben Aff. Ex. 9 (Wolfington Dep. Tran. at 121:7-14).) iGames' failure to disclose its agreement with Lake Street Gaming violated sections 5(c) and 5(o) of the SPA and made iGames'

---

disclosed the *Loan and Security Agreement* on Schedule 5.1(g) is false. A review of Schedule 5.1(g) shows that it states that in November 2003, Money Centers of America, Inc. expanded its credit facility with Mercantile. (*See* iGames' Appendix Ex. BB at Schedule 5.1(g).) Nowhere does it disclose that iGames executed the *Loan and Security Agreement* and encumbered its assets in violation of the SPA.

[3] References to the "Second Robben Aff." refer to the Second Affidavit of Patrick D. Robben previously submitted in this matter. (C.A. No. 04-CV-180 D.I. 110.)

5

representations in respect to those provisions materially false as of the date iGames executed the SPA. iGames has no credibility in its attempt to ignore reality and pretend it is wearing the "white hat" and entitled to the Termination Amount.

## II.  IGAMES HAS NO VALID CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING WITH RESPECT TO THE SPA

The implied duty of good faith and fair dealing fills in contractual terms that are implied, but not stated in the parties' contract. *See, e.g., PAMI-LEMB I INC. v. EMB-NHC, L.L.C.*, 857 A.2d 998, 1016 (Del. Ch. 2004). "The court cannot read the contracts as also including the implied covenant to grant the plaintiff additional unspecified rights in the event that other transactions are undertaken." *Aspen Advisors LLC v. United Artists Theatre Co.*, 843 A.2d 697, 707 (Del Ch. 2004). The SPA is over 60 pages long, single-spaced. (*See* Robben Aff. Ex. 1) (SPA).) iGames fails to explain what additional terms need to be "implied" into the agreement beyond the exhaustively thorough language of the agreement itself.

iGames misapprehends Defendants' argument when it claims that Defendants are arguing "contradictorily, both that the covenant cannot be used to expand the scope of the express agreement and that iGames' allegations of a breach of implied covenant cover the same acts alleged to constitute a violation of the SPA." (iGames' Br. at 32.) There is nothing contradictory about Defendants' position. First, iGames' claimed breaches of the implied duty with respect to the SPA all reiterate allegations that iGames has stated constitute a breach of contract. Therefore, if the contract covers these allegations and renders them actionable as iGames asserts, then there is no need to read-in an implied duty. Second, because the SPA very specifically and exhaustively addresses the parties'

6

rights and obligations, iGames cannot assert a right to additional damages beyond the exclusive contractual remedy-the Termination Amount—provided for in the SPA.

iGames argues without success that the clear authority cited by Defendants is somehow "inapplicable"—i.e., should be ignored. There is nothing equivocal about the Court's holding in *Aspen Advisors* that parties cannot use the doctrine of implied duty in order to obtain "by judicial fiat, contractual protections that they failed to secure for themselves at the bargaining table." *Aspen Advisors LLC.*, 843 A.2d at 707. There is also nothing ambiguous or "inapplicable" about the Delaware court's instructions that "where the subject at issue is expressly covered by the contract, or where the contract is intentionally silent as to that subject, the implied duty does not come into play." *Dave Greytak Enters., Inc. v. Mazda Motors of Am., Inc.*, 622 A.2d 14, 23 (Del. Ch. 1992), *aff'd* 609 A.2d 668 (Del. 1992).[4] The SPA comprehensively addressed the parties' duties and obligations, and set forth the specific and exclusive remedy available to iGames—the Termination Amount—as well as the criteria that had to be met before iGames was entitled to the Termination Amount. The implied duty of good faith has no application to a dispute that, even according to iGames' own count for breach of contract, specifically addresses this dispute.[5]

---

[4] iGames' claim that the Delaware courts have rejected the argument—that claims for breach of the implied duty mirroring breach of contract claims are not permitted—is not supported by the authority it cites. *Kelly v. McKesson HBOC, Inc.*, C.A. No. 99C-09-265 WCC, 2002 Del. Super. LEXIS 39, at *31-34 (Jan. 17, 2002), actually held that it would permit the pleading of claims regarding implied obligations that were not specifically spelled-out in the contract. Similarly, the court in *PAMI-LEMB I INC. v. EMB-NHC, L.L.C.*, 857 A.2d 998, 1016 (Del. Ch. 2004) held that it would permit a claim for breach of implied covenant to go forward if the defendant's conduct "were not found to be in breach of a specific provision of the partnership agreement."

[5] iGames' claim that Defendants breached an implied duty in the SPA by "pursuing a claim in Minnesota state court related to the SPA" (iGames' Br. at 33) is

7

### III. CHEX IS NOT LIABLE ON THE TERM LOAN NOTE

Chex's contemporaneous memoranda submitted in support of its motion for summary judgment on the Term Loan Note ("Note") fully set forth the background on the Note, the express terms of the Note, and iGames' prompt material breaches of the Note. In the interests of judicial economy, Defendants will not repeat all of those facts here. Simply put, even if iGames were right that Defendants failed to provide proof of financing within the required time period, the Note prescribed the appropriate remedy:

> *. . . . In the event that the Lender fails to comply with the foregoing within such 21 day period, then the Borrower shall have the right at any time thereafter to prepay the principal balance of this Note in full, in which case all further payment obligations of the Borrower, other than with respect to amounts accrued through the date of repayment, shall terminate.*

(*See* Robben Aff. Ex. 7 at 1.)

iGames' only plea to avoid this clear contractual language is to allege the Note does not provide that it is an exclusive remedy. The question of whether a remedy is exclusive turns on the intention of the parties as revealed by the language of the contract as a whole, the specific provisions relating to the remedy, and the facts of the case. *Ind. Consol. Sch. Distr. No. 24 v. Carlstrom*, 151 N.W.2d 784, 787 (Minn. 1967). In this case, the Note clearly contemplated that the prepayment remedy be exclusive. It could not have been much clearer. The Note states that if Lender fails to provide proof of financing within 21 days, the right of iGames is to prepay—a right that was not otherwise impeded by the Note's terms. iGames does not explain why the prepayment language

---

laughable. Chex commenced a lawsuit in Minnesota to enforce the Term Loan Note, which had a forum selection clause designating Minnesota state court as the appropriate forum.

would need to be included in the Note if it was simply the statement of *one* of the remedies available.

The parties' intent can also be seen from the "Remedies" paragraph of the Note, which provides that, in contrast to iGames' remedies, Chex's remedies upon iGames' breach "shall be cumulative and concurrent, and may be pursued singularly, successively or together, in the sole discretion of the Lender . . . ." (*See* Robben Aff. Ex. 7 at 3.) The parties plainly evidenced in the Note an ability to distinguish between remedies that were exclusive and those that were not.

### IV.   IGAMES' CLAIM THAT EQUITEX AND CHEX BREACHED IMPLIED DUTIES WITH RESPECT TO THE NOTE FAILS AS A MATTER OF LAW

iGames is trying to have it both ways with its claim for breach of the implied duty of good faith and fair dealing. It does not deny the fact that its allegations for breach of implied duty with respect to the Note all reiterate allegations it has alleged are breaches of the Note or SPA. If these claimed occurrences constitute a violation of the written contracts, then they are governed by the parties' agreement and there is no need for an implied duty claim.

In response, iGames simply reiterates its allegations and claims it is entitled to bring a separate cause of action to allege these purported breaches were done "in bad faith". Contrary to iGames' argument, *Midwest Sports Marketing v. Hillerich & Bradsby of Canada,* 552 N.W.2d. 254, 268 (Minn. Ct. App. 1996), did hold that a claim for breach of implied duty would not stand when it was based on the same facts alleged to demonstrate a breach of contract. Instead, a party must point to separate facts demonstrating the defendant acted in bad faith or hindered appellants' performance. *Id.* iGames' claim for breach of implied duty simply reiterates its claim for breach of

contract, rather than attempting to place additional unspoken covenants into the Note that must be litigated through a separate cause of action.

Further, an implied covenant does not create independent, substantive contractual rights. Nor can it create rights inconsistent with those explicitly set out in the contract. *Carlock v. Pillsbury Co.*, 719 F. Supp. 791, 812 (D. Minn. 1989) (cited with approval in *In re Hennepin County 1986 Recycling Bond Litig.*, 517 N.W.2d 63, 68 (Minn. Ct. App. 1994)). An implied covenant merely fills in terms that the Court deems were implied, but not expressly written, in the agreement. As discussed *supra*, the Note provides a specific remedy for iGames if Chex failed to provide proof of financing within 21 days—iGames would have the right to prepay the loan and thus walk away from its obligations under the Note. iGames is not legally entitled to try to create an extra-contractual remedy beyond that expressly governing the alleged breach.

Finally, iGames offers no explanation as to how Equitex can, as it claims, be liable for an implied duty of good faith related to the Note. If the purpose of the implied duty doctrine is to fill in terms to complete the parties' understanding, it is nonsensical to claim Equitex violated an implied duty under a contract to which it is not even a party.

V.  **THE UNDISPUTED FACTS DOOM IGAMES' TORTIOUS INTERFERENCE CLAIM**

iGames offers no evidence to demonstrate a genuine material fact dispute exists on its claim for tortious interference. Instead, it simply parrots its same allegations without elaboration, and claims that Mr. Wolfington's testimony has been taken out of context. The simple truth is that iGames' claim that its ability to obtain alternate financing was damaged by Defendants' conduct after the parties' relationship terminated is refuted by the undisputed testimony. Mr. Wolfington has testified that "*iGames*

10

*immediately secured a replacement $2,000,000 loan* for the $2,000,000 second installment" for the acquisition of Available Money, Inc. (*See* Robben Aff. Ex. 31 ¶ 10 (Wolfington Aff. ¶ 10 (emphasis added)).) Jay Starr, CEO of Mercantile, confirmed that the March 17, 2004, letter it received from Chex's counsel had no effect on its relationship or business dealings with iGames. (*See* Robben Aff. Ex. 32 (Starr Dep. Tran. at p. 171, lns. 20-24; p. 172, lns. 1-2; p. 179, lns. 23-24; p. 180, lns. 1-4).) (*See also* Robben Aff. Ex. 33 (Breen Dep. Tran. at p. 17, lns. 3-18); Robben Aff. Ex. 34 (Meise Dep. at p. 21, lns. 11-18).) Again, iGames asks that this testimony be swept under the rug and ignored.

iGames' complaint that it has been sued as a result of Defendants' actions by Available Money's shareholders for breach of its sale agreement with them is quite curious, given that it has vigorously contested before this very Court the shareholders' claims. (*See* C.A No. 04-869 (KAJ) (D.I. 11-12).) As the Court is well aware from iGames' appearances before the Court in other litigation related to Available Money, iGames appears to have even obtained a preliminary injunction enforcing the noncompete terms of the sale agreement against the husband of one of the Available Money shareholders. (*See* C.A No. 04-1516 (KAJ) (D.I. 16, 42).)[6]

iGames' other claims, that it has lost goodwill and business reputation, remain vague and ephemeral. Indeed, iGames cannot point to a specific page of deposition transcript providing substance on these claims—it instead cites a 22 page spread of Mr.

---

[6] Is the Court supposed to ignore iGames' position taken in its Available Money litigation? Although Defendants are not privy to all the details of that litigation, they assume based on the docket reflecting iGames' aggressive litigating of both claims that iGames has not simply conceded liability in that matter for failure to pay the Available Money shareholders.

11

Wolfington's deposition transcript as if to say, "it must be in there *somewhere*." That does not create a material fact dispute. iGames also ignores the fact that no-one besides Mercantile saw the March 17, 2004, letter from Defendants' counsel asserting an interest in the Available Money stock that Mr. Wolfington claimed damages his business reputation, and representatives of Mercantile testified that the letter had no impact on its relationship with iGames.

Finally, iGames does not address the fact that Mr. Wolfington has claimed that iGames' loss in business reputation was caused by this litigation. (*See* Robben Aff. Ex. E (Wolfington Dep. Tran. at 462:5-15).) He provides no authority demonstrating that iGames initiating this action against Chex and Equitex (or being sued by Chex and/or Equitex) gives rise to a cause of action for loss of reputation. Summary judgment is proper.

## CONCLUSION

iGames' attempt to preclude summary judgment by selectively putting forth spin on the evidence and the law, while ignoring the facts and law that doom its claims, demonstrates that no genuine issue of material fact exists. The time has come to untie the knot between the parties. Defendants respectfully submit that they are entitled to summary judgment.

                                            MORRIS, JAMES, HITCHENS & WILLIAMS LLP

                                            _____
                                            James W. Semple (#396)
                                            James E. Drnec (#3789)
                                            222 Delaware Avenue
                                            P.O. Box 2306
                                            Wilmington, DE 19899
                                            (302) 888-6800
                                            Email: *jdrnec@morrisjames.com*

OF COUNSEL:                               Attorneys for Chex Services, Inc.
                                              and Equitex, Inc.

RIDER BENNETT, LLP

Daniel Q. Poretti
Patrick D. Robben
Douglas J. Frederick
33 South Sixth Street, Suite 4900
Minneapolis, MN 55402
(612) 340-8900
Email: *dqporetti@rider.com*

Dated: April 5, 2005

## CERTIFICATE OF SERVICE

I, JAMES E. DRNEC, hereby certify that on April 5, 2005 I electronically filed: REPLY BRIEF OF CHEX SERVICES, INC. AND EQUITEX, INC. IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT, with the Clerk using CM/ECF which will send notification of such filing(s) to the following:

>Thomas P. McGonigle, Esquire
>Matt Neiderman, Esquire
>Duane Morris, LLP
>1100 North Market Street
>12th Floor
>Wilmington, Delaware 19801

>James E. Drnec (#3789)
>Morris, James, Hitchens & Williams LLP
>222 Delaware Avenue
>P.O. Box 2306
>Wilmington, DE 19899
>(302) 888-6950
>Email: *jdrnec@morrisjames.com*