IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

_____

**iGAMES ENTERTAINMENT, INC.**,

    Plaintiff,

v.      C.A. No. 04-180-KAJ

**CHEX SERVICES, INC.** and      JURY TRIAL DEMANDED
**EQUITEX, INC.**,

    Defendants.
_____


**iGAMES ENTERTAINMENT, INC.'S REPLY BRIEF IN FURTHER SUPPORT
OF ITS MOTION FOR SUMMARY JUDGMENT**


DATED:     April 5, 2005

**OF COUNSEL:**
**DUANE MORRIS LLP**
James L. Beausoleil, Jr., Esquire
Matthew A. Taylor, Esquire
One Liberty Place
Philadelphia, Pennsylvania 19103-7396
215.979.1000

**DUANE MORRIS LLP**
Thomas P. McGonigle (Del. I.D. No. 3162)
Matt Neiderman (Del. I.D. No. 4018)
1100 North Market Street, 12th Floor
Wilmington, Delaware 19801
302.657.4900

Attorneys for Plaintiff
iGames Entertainment, Inc.

## TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION AND SUMMARY OF ARGUMENT ......................................................1

ARGUMENT .........................................................................................................................2

I.  iGAMES PROPERLY DISCLOSED ITS POTENTIAL OBLIGATIONS TO LAKE STREET GAMING ASSUMPTION ...............................................2

II. EQUITEX AND CHEX HAD KNOWLEDGE OF iGAMES' AGREEMENT WITH THE TUNICA-BILOXI TRIBE AT THE TIME IT WAS ENTERED INTO AND RECEIVED PROPER DISCLOSURE UNDER THE SPA ......................................................................................................5

III. iGAMES DID NOT WAIVE ITS RIGHT TO ASSERT THAT CHEX'S LOSS OF 25% OF ITS INCOME WAS A MATERIAL ADVERSE EVENT .................................................................................................................7

CONCLUSION ................................................................................................................... 10

## TABLE OF AUTHORITIES

**FEDERAL CASES**                                                                                                    **PAGE**

*ESPN, Inc. v. Office of Comm'r of Baseball*,
76 F. Supp. 2d 383 (S.D.N.Y. 1999).................................................................................................8

**STATE CASES**

*Honeywell International Inc. v. Air Products & Chemicals, Inc.*,
858 A.2d 392 (Del. Ch. 2004)....................................................................................................8,9

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Answering Brief submitted by Defendants Equitex and Chex[1] represents an attempt to manufacture disputed issues of material fact where none exist. Defendants attempt to do so by injecting largely irrelevant testimony of their principals and an expert, consisting of little more than half-truths and excuses for their own conduct in secretly entering into contractual arrangements that directly contradicted their express obligations under the November 3, 2003 Stock Purchase Agreement. Upon closer scrutiny, however, it is apparent there is a fundamental disconnect between the artful testimony Defendants point to and the issues presented by iGames' Motion for Summary Judgment. Cutting through the clutter, Defendants do not, because they cannot, rebut the only material facts set forth in iGames' Motion for Summary Judgment -- facts which are based on the admissions of Defendants' principals, their own written correspondence, executed documents and Defendants' own SEC filings -- all of which demonstrate that Defendants alone were in breach of the SPA at the time they purported to terminate it. As such, judgment should be granted in favor of iGames and against Chex and Equitex.

---

[1] The defined terms used herein shall have the same meaning given them in iGames' Opening Brief in Support of its Motion for Summary Judgment.

**ARGUMENT**

In their Opposition to iGames' Motion for Summary Judgment, Chex and Equitex rehash and spin the facts that have already been the subject of extensive briefing in this matter. To avoid needless repetition, iGames respectfully relies on and incorporates (except as set forth below) the facts and arguments set forth in its Opening Brief in Support of its Motion for Summary Judgment.[2] Despite the significant prior briefing, two factual issues and one legal issue raised by Defendants warrant further discussion: (1) the unsupported factual assertion that iGames' potential liability to Lake Street Gaming was not properly disclosed; (2) the baseless factual allegations concerning the existence of, and significance of an iGames' settlement agreement with the Tunica-Biloxi Tribe; and (3) the legal argument that iGames somehow waived its right to claim that the loss of 25% of Chex's income was a material adverse event. Each is addressed in turn below.

**I.  iGAMES PROPERLY DISCLOSED ITS POTENTIAL OBLIGATIONS TO LAKE STREET GAMING**

Defendants attempt for the first time in their Answering Brief to argue that iGames breached the SPA by failing to make certain disclosures in connection with the SPA. The first such claimed breach is iGames' alleged failure to disclose that an entity known as Lake Street Gaming may be "entitled to sell back to iGames 150,000 shares of iGames' stock that Lake Street Gaming received in consideration for selling certain rights

---

[2] Defendants raise certain factual issues with respect to a Term Loan Note entered into between the parties. To avoid belaboring an issue already exhaustively addressed, iGames respectfully refers to and incorporates the facts concerning the Term Loan Note set forth in its Answering Brief in Opposition to Chex's Motions for Summary Judgment on the Term Loan Note filed by iGames on March 29, 2005.

in a casino game called "table slots" to iGames . . . ." (Defendants' Answering Brief, p. 8). To the contrary, iGames publicly and privately disclosed its potential liability to Lake Street Gaming, which, in any case, could not possibly rise to the level of being material.

On February 14, 2003, long before iGames acquired MCA in preparation for closing on the SPA,[3] iGames purchased the rights to gaming-related intellectual property known as "Table Slots" from Lake Street Gaming in exchange for an up-front payment and additional payment secured by warrants for 150,000 shares of iGames' stock. iGames' ownership of the "Table Slots" intellectual property was publicly disclosed in its SEC filings.[4] (*See, e.g.*, iGames' April 7, 2003 SEC Form SB-2/A, at p. 23 (Exhibit "A")); (Second Affidavit of Patrick D. Robben, Ex. 12, Notes to Financial Statements, Note 1 – Basis of Presentation). Importantly, iGames also disclosed in its SEC filings its only potential remaining obligation to Lake Street Gaming -- the outstanding warrants held by Lake Street Gaming. (April 7, 2003 SEC Form SB-2/A, p. 35). Despite the fact that the warrants were a matter of public record and were well known to Defendants, Defendants never before raised concern about the warrants, nor have Defendants ever previously claimed that the warrants were in any way material.

---

[3] Although the SPA was between iGames, Equitex and Chex, it specifically required that iGames acquire MCA prior to closing on the acquisition of Chex. At the time the parties agreed on this arrangement, iGames was a publicly traded company, with little or no income, in the business of licensing casino games and a slot machine anti-cheating device to casinos. (*See* April 7, 2003 Form SB-2/A, Amendment No. 1). The licensing agreements were its only source of income and the intellectual property it owned were its only assets.

[4] iGames again disclosed its ownership of the "Table Slots" intellectual property on Schedule 5.1(m)(iii) of the SPA, which was titled "Intellectual Property of Parent." (*See* Sealed Appendix of Exhibits to iGames' Answering Brief in Opposition to the Motion of Chex and Equitex for Summary Judgment, Exhibit BB, at IGAMES 00869).

3

Even assuming Defendants could validly claim to have been unaware of the existence of the warrants, the potentially liability associated with those warrants is in no sense material. Equitex's primary interest in the SPA was MCA, the company controlled by Christopher Wolfington. Although privately held, MCA had significant experience in the ATM and cash management industry and had a strong portfolio of casino ATM contracts. The requirement that iGames acquire MCA was a prerequisite to closing on the SPA largely because Equitex wanted Chex's acquirer to be a publicly traded company. The real value in the transaction would result from merging MCA and Chex, two companies with significant income and experience in the casino ATM industry. (*See* December 15, 2004 Deposition of Ijaz Anwar ("Anwar Tr."), at 45:23 - 47:14).[5] Accordingly, a warrant for a relatively nominal number of iGames' shares was of no concern to Defendants in terms of the greater transaction, and Defendants cannot credibly argue that any liability associated with those warrants could rise to the level of material.

The fact that both the iGames' purchase of "Table Slots" and the existence of the warrants were publicly disclosed prior to the SPA, and specifically disclosed in connection with the SPA, flatly contradicts the assertions by Defendants that they learned of iGames' potential liability to Lake Street Gaming during discovery, and that the potential liability (insignificant as it may be) somehow constituted a material breach of the SPA. In short, iGames fully and fairly disclosed this matter, and Defendants are simply trying to point to events which they have long had complete knowledge of in an attempt to manufacture a dispute to avoid summary judgment.

---

[5] Excerpted portions of the transcript of Mr. Anwar's deposition are attached hereto as Exhibit "B."

4

II. **EQUITEX AND CHEX HAD KNOWLEDGE OF iGAMES' AGREEMENT WITH THE TUNICA-BILOXI TRIBE AT THE TIME IT WAS ENTERED INTO AND RECEIVED PROPER DISCLOSURE UNDER THE SPA**

In an apparent attempt to draw attention from their own false reporting and mistreatment of the Howard debt, Defendants have hired an expert to testify that an agreement by iGames to pay the Tunica-Biloxi Tribe commissions on future contracts (the "Tunica-Biloxi Agreement") should have been treated as a current debt obligation, rather than a contingent obligation, and was thus not "properly" identified on iGames' balance sheet. (Defendants' Answering Brief, p. 11). Notwithstanding Defendants' newly-minted theory as to <u>how</u> the transaction should have been accounted for, Defendants had intimate knowledge of all material facts, which were fully and timely disclosed by iGames. In fact, Chex was involved in the discussions that resulted in the Tunica-Biloxi Agreement, iGames disclosed the Tunica-Biloxi Agreement in public filings, and iGames disclosed the Tunica-Biloxi Agreement in the SPA.

First, Chex had extensive knowledge of the Tunica-Biloxi Agreement because it was directly involved in the litigation and ensuing settlement negotiations that gave rise to the agreement. By way of background, MCA and the Tunica-Biloxi Tribe were involved in a joint venture until early 2003, when the Tribe filed for an injunction against MCA <u>and against Chex</u>, allegedly to protect certain vault cash that was loaned by the Tribe to MCA <u>and then loaned by MCA to Chex</u>[6]. Although iGames was ultimately successful in getting Chex dismissed from that suit, Chex's CFO, Ijaz Anwar, was

---

[6] The Tunica-Biloxi relationship is yet another example of the joint ventures that Equitex, Chex and iGames were involved in prior to signing the November 3, 2003 SPA.

5

involved in the very settlement discussions that ultimately resulted in the creation of the Tunica-Biloxi Agreement. (*See* Anwar Tr. at 49:13 - 52:4).

Second, the Tunica-Biloxi Agreement itself was disclosed by iGames in its SEC filings. (*See* iGames' January 2, 2004 SEC Form 8-K/A (Exhibit "C")). Finally, the Tunica-Biloxi Agreement was also specifically disclosed in connection with the SPA, as it was specifically listed on iGames' Schedules pursuant to the disclosure requirements of the SPA. (SPA, Schedule 5.1(o)).[7] The Tunica-Biloxi Agreement was therefore properly disclosed both prior to and in connection with the SPA.

Although Equitex and Chex were fully aware of the existence and terms of the Tunica-Biloxi Agreement and iGames before they signed the SPA, Equitex and Chex now complain about the manner in which it was disclosed and/or accounted for. However, Equitex and Chex fail to explain why they never questioned iGames about the agreement or why they never claimed it was a breach of the SPA until long after they attempted to terminate the SPA. In short, Defendants' eleventh-hour assertions of their belief that information previously disclosed but never before challenged should have been disclosed in a different manner, do not constitute a breach nor do they detract from Defendants' own conduct taken in direct violation of the terms of the SPA.

---

[7] Schedule 5.1(o) is found at page "IGAMES 00871" of Exhibit BB to the Sealed Appendix of Exhibits to iGames' Answering Brief in Opposition to the Motion of Chex and Equitex for Summary Judgment.

### III. IGAMES DID NOT WAIVE ITS RIGHT TO ASSERT THAT CHEX'S LOSS OF 25% OF ITS INCOME WAS A MATERIAL ADVERSE EVENT

Defendants now claim that because iGames issued a press release (at Defendants' urging) to soften the blow of Chex's embarrassing loss of the Seminole Tribe Casino contracts at a time when iGames believed the parties were negotiating in good faith, iGames somehow waived its right to claim breach of the SPA.[8]  Here again, the complete factual context belies Defendants' arguments.

In an attempt to limit the harm to both Equitex and iGames, Christopher Wolfington, CEO of iGames, agreed to issue a joint press release, at the urging of Henry Fong, in which Mr. Wolfington is quoted as follows:

> The synergies and merits of the Chex Services transaction were never dependent on any one contract for its success.  We remain committed to the transaction and look forward to closing as soon as possible.  <u>We are confident that Chex Services has more than sufficient remedies to vindicate the wrongful action taken against them</u>.  From a business perspective, the recent events have allowed Chex Services to accelerate cost cutting measures we otherwise had to postpone until our transaction closed.

(*See* Second Robben Aff., Ex. 18) (emphasis added).  Despite Equitex's and Chex's representations about the merits of their defenses and their aggressive actions in seeking an injunction, Chex ultimately did not prevail and lost this very significant business.  Although iGames thereafter moved towards closing on the SPA, <u>it specifically reserved</u>

---

[8]  Ironically, Defendants' waiver argument, if taken to its logical conclusion, would undermine their own position in this litigation.  Chex has claimed in this lawsuit that iGames breached the Term Loan Note as early as November 3, 2003.  Yet, Chex "continued to perform" under the Term Loan Note until March 12, 2004, when Defendants finally purported to declare iGames in default.  If post-breach performance automatically gives rise to a waiver as Defendants now suggest, they certainly would have waived any claimed breach.

<u>its rights under the SPA in writing</u>, on January 7, 2004, because of this Material Adverse Effect on Chex's business.  iGames' act of putting Defendants on notice of the potential breach, specifically reserving its rights, and then attempting to negotiate and acceptable agreement that would cure the breach cannot amount to a waiver.   Importantly,  the  SPA itself specifically speaks to the issue of waiver, and provides at § 12(l):

> The rights and remedies of the Parties to this Agreement are cumulative and not alternative.  Neither any failure nor any delay by any Party in exercising any right, power or privilege under this Agreement or any of the documents referred to in this Agreement will operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power or privilege will preclude any other or further exercise of such right, power or privilege or the exercise of any other right, power or privilege. . . .

Thus, the plain language of the SPA defies Defendants' waiver argument.

Apparently unable to advance a compelling argument under the SPA or applicable Delaware law, Defendants next turn to an election of remedies theory under New York law.  Specifically, Defendants raise an election of remedies principal under New York law that a party with actual knowledge of a material breach "cannot elect to continue with the contract, continue to receive benefits from it, and thereafter bring an action for rescission or total breach."  *Honeywell International Inc. v. Air Products & Chemicals, Inc.*, 858 A.2d 392, 420 (Del. Ch. 2004) (quoting *ESPN, Inc. v. Office of Comm'r of Baseball*, 76 F. Supp. 2d 383, 392 (S.D.N.Y. 1999)).  In *Honeywell*, the court found that because the defendant "elected" to continue to perform under the contract "rather than provide timely notice of its objection to the alleged breaches" it could not claim breach based on the same conduct it failed to timely protest.  *Id.* at 419.

In this case, the facts are quite different. iGames gave notice of its objection to the breach (*i.e.*, to the permanent loss of a significant portion of Chex's income) and preserved its rights in writing. Unlike the defendant in *Honeywell*, iGames did not ignore a known and ongoing breach while continuing to benefit from the contract. iGames not only gave timely notice, it terminated the SPA a short time later when it became apparent that Equitex and Chex would not remedy <u>any</u> of their known breaches. Moreover, Equitex and Chex denied iGames of any potential benefits from the SPA by secretly negotiating other deals and then wrongfully terminating the SPA. In the end, the facts of this case render the election of remedies doctrine inapplicable in this case, even if it applied under Delaware law.

## CONCLUSION

WHEREFORE, for the foregoing reasons, iGames respectfully requests that the Court enter judgment in its favor finding Chex and Equitex jointly and severally liable for the Termination Amount, including all associated costs and fees, or, in the alternative, finding that Chex and Equitex were not entitled to terminate the November 3, 2003 Stock Purchase Agreement or to claim any damages at trial resulting from the termination of the Stock Purchase Agreement.

DATED:   April 5, 2005                              **DUANE MORRIS LLP**

                                                    /s/ Thomas P. McGonigle
                                                    Thomas P. McGonigle (Del. I.D. No. 3162)
                                                    Matt Neiderman (Del. I.D. No. 4018)
                                                    1100 North Market Street, 12th Floor
**OF COUNSEL:**                                     Wilmington, Delaware  19801
**DUANE MORRIS LLP**                                302.657.4900
James L. Beausoleil, Jr., Esquire
Matthew A. Taylor, Esquire                          Attorneys for Plaintiff
One Liberty Place                                   iGames Entertainment, Inc.
Philadelphia, Pennsylvania 19103-7396
215.979.1000